# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 07-739

DAVID F. EVANS; COLLIN FINNERTY; and
READE SELIGMANN,

       Plaintiffs,

          v.

THE CITY OF DURHAM, NORTH CAROLINA;
MICHAEL B. NIFONG; MARK GOTTLIEB;
BENJAMIN HIMAN; DAVID ADDISON;
LINWOOD WILSON; STEVEN CHALMERS;
BEVERLY COUNCIL; RONALD HODGE;
JEFF LAMB; STEPHEN MIHAICH;
MICHAEL RIPBERGER; LEE RUSS;
DNA SECURITY, INC.; RICHARD CLARK; and
BRIAN MEEHAN,

       Defendants.

**CIVIL COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

NATURE OF ACTION ..................................................................................... 1

PARTIES ..................................................................................................... 3

    A.    The Plaintiffs ................................................................................. 3

    B.    The Defendants .............................................................................. 4

        1.    The District Attorney Defendants ....................................... 4

        2.    The City of Durham Defendants ......................................... 5

            a.    The Supervisory Defendants ................................... 5

            b.    The Investigator/Spokesperson Defendants ........... 7

        3.    The DNA Security Defendants ........................................... 8

JURISDICTION AND VENUE ......................................................................... 9

FACTUAL ALLEGATIONS ............................................................................ 10

    A.    Durham Police Officers Initially Conclude that Crystal
        Mangum's Rape Allegations Are False .................................... 10

        1.    Crystal Mangum's Bizarre Behavior ................................ 10

        2.    Mangum Recants Her Rape Allegations ........................... 13

        3.    Mangum Gives Contradictory Statements to Medical
            Personnel and the Durham Police ..................................... 14

        4.    The Medical Examinations of Mangum Further Contradict
            Her Claims ....................................................................... 18

    B.    The Initial Durham Police Investigation .................................. 21

        1.    Gottlieb Takes Over the Investigation .............................. 21

        2.    Kim Pittman Tells Police that Mangum's Claims Are a
            "Crock" ............................................................................ 22

        3.    Mangum Fails To Describe or Identify the Plaintiffs ....... 24

        4.    Mangum Continues To Contradict Herself ....................... 26

        5.    Mangum's Prior History of False Rape Allegations ......... 28

        6.    Evans and Other Lacrosse Captains Cooperate Fully with
            Police ............................................................................... 28

        7.    The Lacrosse Team Cooperates with the Non-Testimonial
            Order ................................................................................ 30

C.  Nifong Takes Over the Durham Police Investigation ................................... 32

    1.  Nifong's Broken Promise Not To Run for Election ........................ 32

    2.  Durham Police Officials Put Nifong in Charge ............................... 32

    3.  Nifong's Awareness of the Absence of Evidence To
        Charge the Three Innocent Duke Lacrosse Players ........................ 34

D.  Defendants' Refusals to Consider Exculpatory Evidence ......................... 35

E.  Defendants' Extrajudicial Efforts To Manufacture Indictments of
    the Three Innocent Duke Lacrosse Players ............................................... 36

    1.  The False and Inflammatory Public Statements by Nifong
        and the Durham Police ..................................................................... 36

        a.  The Nifong Statements ........................................................... 36

        b.  The Durham Police Statements .............................................. 44

    2.  The Initial DNA Testing Further Confirms Mangum Is
        Lying ................................................................................................ 47

    3.  The Conspiracy to Manufacture False Identifications .................... 50

        a.  The April Photo Array ............................................................ 50

        b.  Defendants Replace a Written Lineup Policy
            Intended To Protect the Innocent with a New
            Lineup Crafted to Ensure False Identifications .................... 52

        c.  Mangum Continues To Contradict Herself
            Notwithstanding the Rigged Photo Array ............................. 56

    4.  The DNA Conspiracy ...................................................................... 59

        a.  Nifong and the Durham Police Shop for a New
            DNA Expert and Retain DSI ................................................. 59

        b.  DSI's Testing Excludes All of the Duke Lacrosse
            Players from the Rape Kit Items with 100%
            Certainty ................................................................................ 60

        c.  The April 10 Meeting ............................................................. 62

        d.  The April 17 Indictments of Collin Finnerty and
            Reade Seligmann .................................................................... 64

        e.  The April 21 Meeting ............................................................. 67

        f.  The May 12 Meeting and the May 12 Report ....................... 70

        g.  The May 15 Indictment of David Evans ............................... 72

Case 1:07-cv-00739    Document 1    Filed 10/05/2007    Page 3 of 155

F. Post-Indictment Efforts To Conceal Defendants' Misconduct and Obstruct Justice ........................................................................ 73

  1. The Arrest and Intimidation of Alibi Witnesses .............................. 74

  2. Gottlieb's Phony "Supplemental Case Notes" ................................. 79

  3. Additional False Public Statements .................................................. 81

  4. Defendants' Misrepresentations About the DNA Evidence ............ 82

   a. The September 22 Hearing ..................................................... 87

   b. The December 15 Hearing ..................................................... 90

  5. Further Efforts To Reshape the Factual Record After the December 15 Hearing, Including Additional Witness Tampering ......................................................................................... 92

G. The North Carolina Attorney General and State Bar Conclude that the Plaintiffs Are Innocent ................................................... 94

FIRST CAUSE OF ACTION: MALICIOUS PROSECUTION AND SEIZURE IN VIOLATION OF 42 U.S.C. § 1983 ......................................................................................... 97

SECOND CAUSE OF ACTION: CONCEALMENT OF EVIDENCE IN VIOLATION OF 42 U.S.C. § 1983 ......................................................................................... 98

THIRD CAUSE OF ACTION: FABRICATION OF FALSE EVIDENCE IN VIOLATION OF 42 U.S.C. § 1983 ..................................................................................... 100

FOURTH CAUSE OF ACTION: MAKING FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. § 1983 ..................................................................................... 102

FIFTH CAUSE OF ACTION:  VIOLATIONS OF 42 U.S.C. § 1983 (*MONELL V. DEP'T OF SOCIAL SERVS.*, 436 U.S. 658 (1977)) ...................... 104

A. Officials with Final Policymaking Authority for Durham Police Approved the Unconstitutional Conduct of Their Subordinates. .............. 105

B. Durham Police Had an Established Policy or Custom Permitting Officers to Publish Premature Conclusions of Criminality and Guilt. ...................................................................................................... 106

C. Durham Police Had an Established Policy or Custom Targeting Duke University Students for Harassment Through Selective and Improper Enforcement of the Criminal Laws. .......................................... 107

- iii -

    D.    Officials with Final Policymaking Authority Failed to Exercise
          Adequate Supervisory Responsibility over Nifong.................................. 108

    E.    Officials with Final Policymaking Authority Failed to Exercise
          Adequate Supervisory Responsibility over Gottlieb................................ 110

    F.    After Being Given Final Policymaking Authority over the
          Durham Police Investigation, Nifong Directed Officers to
          Engage in Constitutional Violations. ....................................................... 111

SIXTH CAUSE OF ACTION:
    SUPERVISORY VIOLATIONS OF 42 U.S.C. § 1983 ..................................... 113

    A.    The Supervisory Defendants' Failure to Supervise the
          Investigation Resulted in Violations of Plaintiffs' Constitutional
          Rights..................................................................................................... 113

    B.    The Supervisory Defendants' Failure to Control and Supervise
          Gottlieb Led to Violations of Plaintiffs' Constitutional Rights. .............. 115

    C.    The Supervisory Defendants' Failures to Train, Control, and
          Supervise Addison Led to Violations of Plaintiffs' Constitutional
          Rights..................................................................................................... 116

SEVENTH CAUSE OF ACTION:
    CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983 ................................... 118

EIGHTH CAUSE OF ACTION:
    CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(2)
    (OBSTRUCTION OF JUSTICE)........................................................................ 120

NINTH CAUSE OF ACTION:
    CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(2)
    (WITNESS TAMPERING)................................................................................. 122

TENTH CAUSE OF ACTION:
    CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(3)................................. 123

ELEVENTH CAUSE OF ACTION:
    CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1986 (DURHAM
    POLICE)........................................................................................................... 124

TWELFTH CAUSE OF ACTION:
    CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1986 (DNA
    SECURITY) ...................................................................................................... 126

THIRTEENTH CAUSE OF ACTION:
    MALICIOUS PROSECUTION AND CONSPIRACY ....................................... 127

Case 1:07-cv-00739    Document 1    Filed 10/05/2007    Page 5 of 155

FOURTEENTH CAUSE OF ACTION:
    OBSTRUCTION OF JUSTICE AND CONSPIRACY ...................................... 130

FIFTEENTH CAUSE OF ACTION:
    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND
    CONSPIRACY .................................................................................................. 132

SIXTEENTH CAUSE OF ACTION: NEGLIGENCE BY DURHAM POLICE ........... 133

SEVENTEENTH CAUSE OF ACTION: NEGLIGENT SUPERVISION,
    HIRING, TRAINING, DISCIPLINE, AND
    RETENTION BY DURHAM POLICE .............................................................. 134

EIGHTEENTH CAUSE OF ACTION:
    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY
    DURHAM POLICE ........................................................................................... 137

NINTEENTH CAUSE OF ACTION:
    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY
    DURHAM POLICE (DURHAM POLICE STATEMENTS).............................. 138

TWENTIETH CAUSE OF ACTION:
    NEGLIGENCE BY THE DNA SECURITY DEFENDANTS............................ 139

TWENTY-FIRST CAUSE OF ACTION: NEGLIGENT SUPERVISION,
    HIRING, TRAINING, DISCIPLINE, AND
    RETENTION BY THE DNA SECURITY DEFENDANTS............................... 141

TWENTY-SECOND CAUSE OF ACTION:
    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
    BY THE DNA SECURITY DEFENDANTS ...................................................... 142

PRAYER FOR RELIEF .............................................................................................. 143

JURY DEMAND .......................................................................................................... 148

Case 1:07-cv-00739    Document 1    Filed 10/05/2007    Page 6 of 155

## NATURE OF ACTION

1.     This is a civil action for damages and injunctive relief under 42 U.S.C. § 1983,

42 U.S.C. § 1985, 42 U.S.C. § 1986, 42 U.S.C. § 1988(b), and the common law of

the State of North Carolina arising from one of the most chilling episodes of

premeditated police, prosecutorial, and scientific misconduct in modern American

history, which resulted in charges brought and maintained against three innocent

Duke University students and lacrosse players over a period of more than one

year.

2.     From March 15, 2006 to April 11, 2007, Defendants, individually and in concert,

maliciously conspired to bring charges of rape, sexual assault, and kidnapping

against these three innocent students.  Defendants knew that these charges were

completely and utterly unsupported by probable cause, and a total fabrication by a

mentally troubled, drug prone exotic dancer whose claims, time and again, were

contradicted by physical evidence, documentary evidence, other witnesses, and

even the accuser herself.  In their rush to accuse, Defendants willfully ignored and

were deliberately indifferent to overwhelming evidence of Plaintiffs' actual

innocence.

3.     Instead, Defendants used the accuser's inconsistent and demonstrably false

allegations as the fuel for a media campaign to obtain indictments and win a hotly-

contested election at the expense of the three innocent Duke lacrosse players.

With a community and a nation thus inflamed and clamoring for indictments of

Duke lacrosse players, but with no evidence that any players had actually committed a crime, Defendants set about to fabricate such evidence. And, when scientific testing threatened to expose the truth by reaffirming that the accuser was lying and that no crime had occurred, Defendants conspired to conceal this exculpatory evidence in order to charge and convict the Plaintiffs on "facts" they knew to be untrue. Defendants' actions evidenced a reckless and callous disregard for and deliberate indifference to Plaintiffs' constitutional rights and Defendants' responsibilities to the criminal justice system.

4.    As a result of Defendants' actions, Plaintiffs have suffered deprivations of the rights guaranteed to them under the Fourth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 19 of the North Carolina Constitution; they have suffered economic, emotional, and physical harm; they have suffered irreparable harm to their reputations; and they have incurred millions of dollars in legal fees defending themselves against criminal prosecutions that the Defendants knew were baseless.

5.    Moreover, because the Defendants' policies, customs, practices, and supervisory misconduct raises a substantial risk of irreparable injury to other persons in the City of Durham, Plaintiffs seek the entry of an Order and Permanent Injunction, as set forth in further detail below, to protect all persons and to prevent such misconduct from ever happening again.

## PARTIES

### A.     The Plaintiffs

6.     Plaintiff David F. Evans is a citizen and resident of New York.

7.     Plaintiff Collin Finnerty is a citizen and resident of New York.

8.     Plaintiff Reade Seligmann is a citizen and resident of New Jersey.

9.     As of March 13, 2006, each of the Plaintiffs was an undergraduate student
enrolled at Duke University, one of the leading academic universities in the world.

10.     As of March 13, 2006, each of the Plaintiffs was in good academic standing at
Duke.

11.     As of March 13, 2006, each of the Plaintiffs was a member of Duke's nationally-
ranked men's lacrosse team, which one year earlier had competed in the national
championship game of the NCAA Division I Men's Lacrosse Tournament.

12.     As of March 13, 2006, Evans was a senior at Duke and was on track to graduate
on May 14, 2006.  Evans was also a co-captain of the Duke lacrosse team.  Evans
had accepted an offer to work for a leading Wall Street investment bank after his
graduation from Duke.

13.     As of March 13, 2006, Finnerty was a sophomore at Duke and was on track to
graduate in May 2008.  Finnerty was also a member of the Duke lacrosse team.

14.     As of March 13, 2006, Seligmann was a sophomore at Duke and was on track to
graduate in May 2008.  Seligmann was also a member of the Duke lacrosse team.

- 3 -

**B.** **The Defendants**

**1.** **The District Attorney Defendants**

15. Defendant Michael Nifong was, at all times relevant to this action, the District Attorney for the Fourteenth Prosecutorial District in North Carolina (encompassing the City of Durham and Durham County). Between March 24, 2006 and January 12, 2007, Nifong also directed the Durham Police Department's factual investigation of the allegations regarding the Duke lacrosse team, and in that capacity served in a supervisory and/or policymaking role for the Durham Police Department with respect to this investigation. On June 16, 2007, Nifong was disbarred by the North Carolina bar for his actions relating to the investigation and prosecution of Plaintiffs. On June 18, 2007, Nifong was suspended from his position as District Attorney, and on July 2, 2007, Nifong tendered his resignation as District Attorney. On August 31, 2007, Nifong was found guilty of criminal contempt by the Superior Court for Durham County for Nifong's actions relating to the investigation and prosecution of Plaintiffs. Upon information and belief, Nifong is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

16. Defendant Linwood Wilson was, at all times relevant to this action, an investigator employed by the District Attorney for the Fourteenth Prosecutorial District in North Carolina. Wilson was fired from the District Attorney's Office on or about

- 4 -

June 25, 2007.  Upon information and belief, Wilson is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

### 2. The City of Durham Defendants

17. Defendant City of Durham is a municipal corporation formed under the laws of North Carolina.  Upon information and belief, the City of Durham has purchased liability insurance and/or participates in a municipal risk-pooling scheme sufficient under N.C. Gen. Stat. § 160A-485 to waive its immunity against civil liability.

18. The City of Durham operates the Durham Police Department ("Durham Police"), which is the city department having law enforcement authority in the City of Durham.

### a. The Supervisory Defendants

19. Defendant Steven Chalmers was, at all times relevant to this action. the Chief of Police for the Durham Police Department.  In that capacity, Chalmers served in a supervisory and/or policymaking role for the Durham Police Department.  Upon information and belief, Chalmers is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

20. Defendant Ronald Hodge is and was, at all times relevant to this action. the Deputy Chief of Police for the Durham Police Department.  In that capacity, Hodge served in a supervisory and/or policymaking role for the Durham Police

- 5 -

Department.  Upon information and belief, Hodge is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

21. Defendant Lee Russ is and was, at all times relevant to this action. Executive Officer to the Chief of Police in the Durham Police Department.  In that capacity, Russ served in a supervisory and/or policymaking role for the Durham Police Department.  Upon information and belief, Russ is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

22. Defendant Stephen Mihaich is and was, at all times relevant to this action. the Commander of Investigative Services for the Durham Police Department.  In that capacity, Mihaich served in a supervisory and/or policymaking role for the Durham Police Department.  Upon information and belief, Mihaich is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

23. Defendant Beverly Council is and was, at all times relevant to this action. the Commander of the Uniform Patrol Bureau for the Durham Police Department.  In that capacity, Council served in a supervisory and/or policymaking role for the Durham Police Department.  Upon information and belief, Council is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

24. Defendant Jeff Lamb is and was, at all times relevant to this action. the Commander of the District Two Uniform Patrol of the Durham Police Department. In that capacity, Lamb served in a supervisory and/or policymaking role for the

Durham Police Department.  Upon information and belief, Lamb is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

25. Defendant Michael Ripberger is and was, at all times relevant to this action. a Lieutenant in the Durham Police Department.  Upon information and belief, Ripberger served in a supervisory and/or policymaking role for the Durham Police Department.  Upon information and belief, Ripberger is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

26. Defendants Chalmers, Hodge, Russ, Mihaich, Council, Lamb, and Ripberger are referred to collectively herein as the "Supervisory Defendants."

**b.     The Investigator/Spokesperson Defendants**

27. Defendant David Addison is and was, at all times relevant to this action. a Corporal employed by the Durham Police Department.  Upon information and belief, Addison's duties include serving as an official spokesperson for the Durham Police Department.  Upon information and belief, Addison is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

28. Defendant Mark Gottlieb is and was, at all times relevant to this action. a detective employed by the Durham Police Department.  Upon information and belief, Gottlieb is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

29. Defendant Benjamin Himan is and was, at all times relevant to this action. an investigator employed by the Durham Police Department.  Upon information and

belief, Himan is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

### 3. The DNA Security Defendants

30. Defendant DNA Security, Inc. ("DSI") is a corporation formed under the laws of North Carolina with its primary place of business in Burlington, North Carolina. During times relevant to this action, DSI was retained by the State of North Carolina, the City of Durham, or the Durham Police Department, to provide forensic analysis services relating to the investigation of Plaintiffs and the Duke lacrosse team, and in this capacity acted under color of state law at all times relevant herein.

31. Defendant Richard Clark is the President of DSI. Clark participated in DSI's engagement by the State of North Carolina, the City of Durham, or the Durham Police Department, to provide forensic analysis services relating to the investigation of Plaintiffs and the Duke lacrosse team, and in this capacity acted under color of state law at all times relevant to this action. Upon information and belief, Clark is also the controlling shareholder of DSI, and serves in a supervisory capacity with respect to DSI personnel. Upon information and belief, Clark is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

32. Defendant Brian Meehan is the Laboratory Director of DSI and, upon information and belief, serves in a supervisory capacity with respect to DSI personnel.

- 8 -

Meehan was retained by the State of North Carolina, the City of Durham, or the Durham Police Department, to provide forensic analysis services relating to the investigation of Plaintiffs and the Duke lacrosse team, and in this capacity acted under color of state law at all times relevant to this action. Upon information and belief, Meehan is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

## JURISDICTION AND VENUE

33. This action arises under the Fourth and Fourteenth Amendments to the Constitution of the United States; Article I, Section 19, of the North Carolina State Constitution; 42 U.S.C. § 1983; 42 U.S.C. § 1985; 42 U.S.C. § 1986; 42 U.S.C. § 1988(b); and North Carolina law.

34. This Court has original jurisdiction over Plaintiffs' constitutional and federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

35. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiffs' federal claims, and independent original jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

36. Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. §§ 1391(b)(1), (2), and (3), because most or all of the Defendants reside and may

Case 1:07-cv-00739   Document 1   Filed 10/05/2007   Page 15 of 155

be found in the Middle District of North Carolina and a substantial part of the events giving rise to these claims occurred in the Middle District of North Carolina.

## FACTUAL ALLEGATIONS

**A.     Durham Police Officers Initially Conclude that Crystal Mangum's Rape Allegations Are False**

### 1.     Crystal Mangum's Bizarre Behavior

37.     In the early morning of March 14, 2006, two exotic dancers, Crystal Mangum and Kim Pittman, arrived at the Kroger grocery store on Hillsborough Road in Durham.  Mangum and Pittman were occasionally employed by Angels Escort Service.

38.     From approximately 12:00 midnight to 12:04 a.m., Mangum and Pittman had attempted a brief dance performance for a group of Duke students at an off-campus home located at 610 North Buchanan Boulevard in Durham ("610 N. Buchanan"), which was the home of plaintiff David Evans and fellow co-captains Daniel Flannery and Matthew Zash.  The attendees included some, but not all, members of the lacrosse team, and some students who were not lacrosse players also attended the party.

39.     Upon information and belief, Mangum was under the influence of alcohol and/or drugs before, during, and after the performance at 610 N. Buchanan.

40.     Mangum and Pittman left 610 N. Buchanan in Pittman's car.  While in Pittman's car, Mangum became belligerent and accused Pittman of stealing her purse and money, and refused to leave Pittman's car.  When Pittman tried to remove Mangum from her car in the Kroger parking lot, Mangum told Pittman to "go ahead . . . put marks on me . . . that's what I want . . . put marks on me."

41.     Pittman asked a Kroger security guard to intervene.  The security guard made the immediate assessment that Mangum was intoxicated and made a 911 call to Durham Police.

42.     Sergeant John Shelton of the Durham Police was the first to respond to the 911 call.  He met Pittman in the Kroger parking lot.  Pittman said that Mangum was so severely intoxicated that she could not care for herself.  Pittman told Sergeant Shelton that she had given Mangum a ride, but that Mangum now refused to leave her car.

43.     Sergeant Shelton observed Mangum in the front passenger seat and attempted to rouse her.  When she did not respond, Sergeant Shelton broke an ammonia capsule under Mangum's nose, at which point Mangum immediately began to breathe through her mouth.

44.     Based on his training and experience, Sergeant Shelton immediately recognized from Mangum's response that Mangum was only pretending to be unconscious.  Mangum admitted as much months later during an interview conducted by special prosecutors in the North Carolina Attorney General's Office.

- 11 -

45. With assistance from another officer, Sergeant Shelton removed Mangum from Pittman's car and placed her in a marked patrol car.

46. Because Mangum was pretending to be unconscious, Sergeant Shelton could not take her home or put her in jail. Accordingly, Sergeant Shelton directed uniformed Durham Police officers to transport Mangum to Durham ACCESS, a local outpatient mental health clinic for a twenty-four hour observation.

47. If Mangum had allowed herself to be admitted to Durham ACCESS, she would have been involuntarily held at the facility for at least twenty-four hours.

48. During her intake interview at Durham ACCESS, Mangum alleged that she had been raped at 610 N. Buchanan, at which point she was transported by Durham Police officers to Duke Medical Center for a rape exam.

49. Upon information and belief, Defendants Nifong, Addison, Gottlieb, Himan, and Wilson were aware of these facts, including Mangum's bizarre behavior and Sergeant Shelton's conclusion that she was feigning unconsciousness, yet willfully ignored and/or were deliberately indifferent to this evidence demonstrating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

50. Upon information and belief, the Supervisory Defendants also were aware of these facts, including Mangum's bizarre behavior and Sergeant Shelton's conclusion that she was feigning unconsciousness, yet willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence

demonstrating Plaintiffs' innocence in their rush to charge the three innocent Duke

lacrosse players

### 2. Mangum Recants Her Rape Allegations

51. At or around the time that Mangum was being transported to Duke Medical

Center, Sergeant Shelton was informed of Mangum's rape allegation and drove to

Duke Medical Center to conduct an interview of Mangum. During the interview,

Mangum stated to Shelton that she was a professional stripper; that she had been

hired by Angels Escort Service to perform with another woman named "Nikki"

(Pittman's stage name) at 610 N. Buchanan; that an altercation broke out between

Nikki and some of their audience; and that the two then left the party.

52. During the interview, Mangum specifically denied to Shelton that she had been

forced to engage in sexual activity. Instead, she claimed only that someone had

taken her money.

53. Sergeant Shelton reported Mangum's recantation of her earlier rape allegation to

the Durham Police Watch Commander.

54. Upon information and belief, Defendants Nifong, Addison, Gottlieb, Himan, and

Wilson were aware of Mangum's recantation, yet willfully ignored and/or were

deliberately indifferent to this evidence demonstrating Plaintiffs' innocence in

their rush to charge the three innocent Duke lacrosse players.

55. Upon information and belief, the Supervisory Defendants also were aware of

Mangum's recantation, yet willfully ignored and/or were deliberately indifferent

or grossly negligent with respect to this evidence demonstrating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

56. To the contrary, upon information and belief, in or around May 2006, Defendants Nifong, Wilson, Lamb, Gottlieb, and Himan, acting at the direction of the Supervisory Defendants and other senior officials in the City of Durham, attempted to intimidate and discredit Sergeant Shelton by subjecting him to an internal investigation, accusations of unprofessional conduct, and threats of disciplinary action for reporting Mangum's recantation of her rape claim while at Duke Medical Center on March 13.

### 3. Mangum Gives Contradictory Statements to Medical Personnel and the Durham Police

57. Over the next two days, Mangum would reverse herself again, claiming that she was raped in a series of wildly conflicting and patently implausible statements to medical personnel and police officers.

58. While at Duke Medical Center, Mangum separately and alternatively claimed that she had been raped by three, four, five, and twenty different men.

59. Mangum also told Duke medical personnel that she had not engaged in sexual intercourse at any point before the alleged rape. This statement was utterly disproved by subsequent DNA testing, which established, among other things, that the various rape kit items collected from Mangum contained DNA from at least four unidentified males—none of whom was a Duke lacrosse player—and that

- 14 -

corroborated the witness statement provided by Mangum's driver, Jarriel Johnson. Johnson had told Durham Police that he had driven Mangum to various locations in the Durham area so that Mangum could have sexual intercourse with other men in the hours and days before the party, and that Johnson himself had had sexual intercourse with Mangum in the days before the party.

60.    Mangum at one point told medical personnel at Duke Medical Center that she had been performing at a bachelor's party, and that one of the alleged rapists was the groom. She claimed that the groom did not want to have intercourse with her because he was getting married the next day. Of course, there was no bachelor party at 610 N. Buchanan, and there was no groom there either.

61.    While at Duke Medical Center, Mangum also claimed that her (now three) assailants were named Adam, Brett, and Matt; that none of the men used a condom; that they ejaculated in her vagina or anus; that one of them ejaculated in her mouth; and that before releasing her from the bathroom they "wiped [her] vagina with [a] rag" and put her clothes back on. These claims were utterly disproved by subsequent DNA testing, which revealed that the various rape kit items collected from Mangum contained DNA from at least four unidentified males—none of whom was a Duke lacrosse player—and that corroborated Jarriel Johnson's statement that Mangum was having intercourse with multiple different partners in the hours and days before she arrived at 610 N. Buchanan.

Case 1:07-cv-00739    Document 1    Filed 10/05/2007    Page 21 of 155

62.    While at Duke Medical Center, Mangum also claimed that Pittman had initially
       attempted to convince Mangum to engage in a "threesome" with one of the men at
       the party, and that Pittman had then assisted the alleged rapists in carrying
       Mangum back into the house to be raped. Mangum further claimed at Duke
       Medical Center that Pittman had threatened to leave Mangum on the street if she
       did not engage in sexual activity with the men at the party. Pittman denied these
       allegations. Mangum also alleged that Pittman had driven her to an unfamiliar
       location in Raleigh or Durham, berated her, pushed her out of her car, called the
       police, and stolen her money and possessions. Mangum reported rolling over
       glass when Pittman pushed her out of the car. Of course, the medical reports
       identified no evidence of injury from allegedly rolling on glass. Moreover, these
       allegations were known to be false, given that Sergeant Shelton, not Pittman, had
       removed Mangum from Pittman's car himself.

63.    While at Duke Medical Center, Mangum claimed that the alleged sexual assault
       occurred at "about 1:00 a.m." Mangum had left 610 N. Buchanan prior to 1:00
       a.m.

64.    On March 15, 2006, Mangum went to UNC Hospital to seek painkillers. When
       asked why she needed the drugs, Mangum told UNC medical personnel that she
       had been the victim of a violent assault in which she had allegedly been hit in the
       head and pushed backwards into the sink, hitting her head, but that she was
       "drunk" and "felt no pain" on the night of the attack. One day earlier, Mangum

had indicated precisely the opposite to Duke medical personnel, alleging that she was supposedly in excruciating pain from the alleged rape, but that she had not otherwise been physically assaulted by her purported assailants. While at Duke Medical Center, Mangum never once alleged that she had been hit in the face or pushed into the sink.

65. While at Duke Medical Center, Mangum claimed that she had been taking the muscle relaxant Flexeril and had had one drink earlier in the evening. At UNC Medical Center, however, Mangum stated that she was taking other prescription drugs in addition to Flexeril and was very drunk at the party.

66. Mangum made other conflicting statements to Durham Police on the morning of March 14. As noted above, within hours of the purported sexual assault, Mangum told Sergeant Shelton that she had not been raped at all. During the same visit to Duke Medical Center, Mangum told Durham Police Officer G.D. Sutton that she had been raped by five men, each of whom penetrated her with his penis at some point during the attack. Both of these accounts contradicted her claims to Duke medical personnel. Indeed, Durham Police officers at Duke Medical Center were so convinced that Mangum's rape claim was a hoax that they were overheard stating that if any charges were brought relating to the party, they would not exceed misdemeanor assault.

67. Upon information and belief, Defendants Nifong, Addison, Gottlieb, Himan, and Wilson were aware of these facts, including the various inconsistencies and

contradictions in Mangum's accounts and the conclusions of Durham Police officers present at Duke Medical Center, yet willfully ignored and/or were deliberately indifferent to this evidence demonstrating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

68. Upon information and belief, the Supervisory Defendants also were aware of these facts, including the various inconsistencies and contradictions in Mangum's accounts and the conclusions of Durham Police officers present at Duke Medical Center, yet willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence demonstrating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

### 4. The Medical Examinations of Mangum Further Contradict Her Claims

69. The rape examination that Duke medical personnel performed on Mangum on the morning of March 14, 2006 was intended to document all physical evidence that might constitute proof of a sexual assault and to gather all forensic evidence of potentially sexual or violent contact. Among other things, Duke medical personnel collected Mangum's clothes, took oral, vaginal, and rectal swabs, and collected samples of Mangum's hair, blood, and skin cells for later forensic analysis.

- 18 -

70.     As confirmed in a report issued by the North Carolina Attorney General, this
        examination produced no physical or medical evidence consistent with either rape
        or the traumatic assault Mangum had claimed.

71.     Though Mangum reported being upset and in excruciating pain, her heart rate,
        respiratory rate, and blood pressure were all normal.

72.     Notwithstanding her claims of a brutal sexual assault, the medical examination
        identified no vaginal or anal bruising, tears, or bleeding.  Instead, medical
        personnel noted only "diffuse edema of the vaginal walls," an observation that is
        entirely consistent with Mangum having engaged in intercourse with multiple
        different partners prior to the party—none of whom was a Duke lacrosse player—
        as established by Jarriel Johnson's witness statement and DNA testing conducted
        by DSI and Meehan.

73.     The observation of "diffuse edema of the vaginal walls" is also consistent with
        Mangum's admission to Durham Police that she had performed, using a vibrator,
        for a couple in a hotel room shortly before the lacrosse party.

74.     Upon information and belief, the observation of "diffuse edema of the vaginal
        walls" is also consistent with a yeast infection.

75.     At the end of Mangum's Duke Medical Center examination, officers from the
        Durham Police Department took custody of the rape kit items collected by Duke
        medical personnel.  On March 27, 2006, the rape kit evidence was placed in the
        custody of the crime lab of the State Bureau of Investigation ("SBI").

76. Subsequent forensic analysis by the SBI crime lab found no evidence that Mangum was assaulted or any evidence that would otherwise corroborate her claims. In particular, the SBI crime lab found no evidence of semen or sperm on any of the samples, including those taken from Mangum's mouth, vagina, and anus. Defendant Nifong, disturbed by the SBI lab report, began to shop for another opinion.

77. Subsequent forensic analysis by Defendants DSI and Meehan also revealed that the various rape kit items collected from Mangum contained DNA from at least four unidentified males—none of whom was a Duke lacrosse player. These results corroborated witness statements that Mangum was having intercourse with multiple different partners in the hours and days before she arrived at 610 N. Buchanan.

78. Upon information and belief, Defendants Nifong, Addison, Gottlieb, Himan, and Wilson were aware of these facts, including the medical and scientific evidence that further refuted Mangum's claims, yet they willfully ignored and/or were deliberately indifferent to this evidence demonstrating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

79. Upon information and belief, the Supervisory Defendants and Defendants Clark, Meehan, and DSI also were aware of these facts, including the medical and scientific evidence that further refuted Mangum's claims, yet they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to

this evidence demonstrating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

**B.     The Initial Durham Police Investigation**

      **1.     Gottlieb Takes Over the Investigation**

80.     On March 14, 2006, responsibility for investigating Mangum's rape claim was assigned to Investigator B. Jones.  On or about March 15, 2006, Jones concluded that there was no evidence to proceed with a criminal investigation and that the file would be closed.

81.     At that point, however, Durham Police did not close the investigation, but instead reassigned the investigation to Defendant Mark Gottlieb.

82.     Upon information and belief, Gottlieb was known to supervisory officials in the City of Durham and the Durham Police Department as having a history of selective and malicious prosecution, false arrest, excessive use of force, manufacturing of evidence, and filing of false police reports against students at Duke University.  Upon information and belief, Gottlieb was so notorious in his dislike of Duke students that he had even been reassigned from covering the Trinity Park neighborhood around Duke University because of his prior misconduct and abhorrent record with respect to Duke students.  The house where the party occurred, 610 N. Buchanan, is located in Trinity Park.

- 21 -

83. Nevertheless, on March 15, 2006, Gottlieb was put in charge of the investigation, which Durham Police officials knew related to a party attended by Duke students in Trinity Park.

84. On or about March 16, 2006, Gottlieb assigned Defendant Benjamin Himan to assist him on the investigation. Himan was a rookie investigator who had started in the Investigations Department of the Durham Police only two months earlier, in January 2006. Upon information and belief, supervisory officials in the Durham Police Department were aware of Himan's inexperience, but allowed him to work on the investigation, supervised by the known "Duke hater," Gottlieb.

### 2. Kim Pittman Tells Police that Mangum's Claims Are a "Crock"

85. Even after Gottlieb took over the investigation, Durham Police found nothing to corroborate any rape claim, and abundant evidence to further confirm the initial conclusions of Durham Police officers that Mangum was lying.

86. On March 20, 2006, Defendant Himan spoke with Tammy Rose of Angels Escort Service. Rose identified Pittman as the second dancer who performed with Mangum at 610 N. Buchanan. Rose added that she had already spoken to Pittman about Mangum's rape claim, and that Pittman had told her that there had been no such assault.

87. On March 20, 2006, Himan called Pittman, who confirmed that she had heard about Mangum's allegations of sexual assault, that they were a "crock," and that there was no opportunity for the alleged assault to have occurred. Upon

- 22 -

information and belief, notwithstanding all of the evidence that already showed Mangum was lying, Gottlieb instructed Himan to summon Pittman to their Durham Police station and to arrest her on an outstanding warrant if she did not recant her prior statement that Mangum was lying.

88. Upon information and belief, Gottlieb took these actions with the intent to obstruct justice and to tamper with a witness who had provided evidence that the three Duke lacrosse players were innocent and that Mangum had made false claims.

89. Upon information and belief, Defendants Nifong, Addison, Gottlieb, Himan, and Wilson were aware of Pittman's confirmation that Mangum was lying and the resulting attempts to intimidate her into recanting that position, yet they willfully ignored and/or were deliberately indifferent to this evidence demonstrating Plaintiffs' innocence and the misconduct underlying the investigation in their rush to charge the three innocent Duke lacrosse players.

90. Upon information and belief, the Supervisory Defendants also were aware of Pittman's confirmation that Mangum was lying and the resulting attempts to intimidate her into recanting that position, yet they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence demonstrating Plaintiffs' innocence and the misconduct underlying the investigation in their rush to charge the three innocent Duke lacrosse players.

### 3. Mangum Fails To Describe or Identify the Plaintiffs

91. On or about March 16, 2006, Gottlieb and Himan interviewed Mangum. During this interview, they learned that Mangum was an exotic dancer who performed at a club called "Platinum" in Hillsborough, North Carolina, and also an "independent contractor" who worked on occasion through Angels Escort Service.

92. Mangum also provided Gottlieb and Himan with what she claimed were the physical descriptions of the (now) three men who purportedly had raped her. According to Himan's contemporaneous notes, Mangum's descriptions did not match the three Plaintiffs. For example, Mangum described "Matt" as "heavy set," with a "short hair cut," weighing 260-270 lbs; she described "Adam" as a "short," "white male," with "red cheeks," "fluffy" brown hair, and "a chubby face"; and she described "Brett" as "chubby."

93. On March 16 and 21, 2006, Durham Police Investigator R.D. Clayton showed Mangum a series of photographic arrays, each containing six pictures of Duke lacrosse players (the "March Photo Arrays"). In all, Mangum was shown a total of 36 pictures of Duke lacrosse players, including Evans and Seligmann, and Mangum said that she could not identify any of those players as her alleged assailants.

94. On March 16, Clayton showed Mangum the array containing Seligmann's photograph. Mangum said she was 70% sure she recognized Seligmann from his photograph, but stated that she could not remember exactly where she saw him at

- 24 -

the party.  Notably, Mangum did <u>not</u> claim that Seligmann was one of the men who purportedly assaulted her.

95.     Clayton did not show Mangum any pictures of Evans or Finnerty on March 16.

96.     On March 21, Clayton twice showed Mangum the array containing Evans's photograph.  Each time, Mangum failed to identify anyone in the array.  Notably, Mangum did <u>not</u> identify Evans at all, and she certainly did not claim that Evans was one of the men who purportedly assaulted her.

97.     Clayton never showed Mangum a picture of Finnerty during any of the March Photo Arrays.  This was because Finnerty did not match <u>any</u> of the descriptions that Mangum had provided of her purported assailants.

98.     During the March Photo Arrays, Clayton showed Mangum a picture of another Duke lacrosse player, Brad Ross.  When shown Ross's picture, Mangum told Clayton that she was 100% confident that she had seen Ross at the party at 610 N. Buchanan.  As Durham Police would later confirm, however, Ross was nowhere near 610 N. Buchanan during the party, but instead was in Raleigh, North Carolina, on the campus of North Carolina State University.

99.     Upon information and belief, Defendants Nifong, Addison, Gottlieb, Himan, and Wilson were aware of these facts, yet willfully ignored and/or were deliberately indifferent to this evidence demonstrating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

100. Upon information and belief, the Supervisory Defendants also were aware of these facts, yet willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence demonstrating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

### 4. Mangum Continues To Contradict Herself

101. Mangum continued to contradict her various, already-inconsistent accounts of the alleged rape in subsequent statements that she provided to Durham Police, including in an interview with Gottlieb and Himan on March 16, 2006, and a written statement she provided to Gottlieb and Himan on April 6, 2006.

102. As the following chart illustrates, Mangum could not keep her story straight even after she had settled on a "final" version of the alleged events of the morning of March 14. Instead, Mangum continued to change critical details about the alleged attack, including, for example: (a) the purported sexual acts that each of her alleged assailants performed during the claimed rape; (b) the identity of the purported "bachelor" who was supposedly getting married the next day; (c) the identity of the assailant who supposedly told her, "Sweetheart, you can't leave [the bathroom]"; (d) whether the names "Adam," "Brett," and "Matt" were actual names or aliases used by the purported assailants; and (e) whether Kim Pittman was an aider and abetter, a passive witness, or herself a victim of the purported rape:

- 26 -

**Examples of Contradictions in Mangum's Subsequent Accounts**

| | March 14 Examination (Final Version) | March 16 Interview (Gottlieb/Himan) | April 6 Written Statement |
|---|---|---|---|
| Adam's Role | Rape: anal | Rape: oral | Rape: oral |
| Brett's Role | No rape | Rape: anal/vaginal | Rape: anal/vaginal |
| Matt's Role | Rape: oral/vaginal | Rape: anal/vaginal; choked Mangum | Rape: anal/vaginal; hit Mangum in face |
| "Bachelor" | Matt | -- | Adam |
| "Sweetheart, you can't leave." | Adam | Adam | Matt |
| Names or Aliases? | Actual names ("Dan" was an alias, used by Matt) | Actual names | Aliases ("Adam" was an alias, used by Dan) |
| Pittman's Role | Assisted in rape; robbed Mangum | Passive bystander | Victim |

103.    Upon information and belief, Defendants Nifong, Addison, Gottlieb, Himan, and

Wilson were aware of these facts, including these additional contradictions in

Mangum's various accounts, yet willfully ignored and/or were deliberately

indifferent to this evidence demonstrating Plaintiffs' innocence in their rush to

charge the three innocent Duke lacrosse players.

104.    Upon information and belief, the Supervisory Defendants also were aware of these

facts, including these additional contradictions in Mangum's various accounts, yet

willfully ignored and/or were deliberately indifferent or grossly negligent with

respect to this evidence demonstrating Plaintiffs' innocence in their rush to charge

the three innocent Duke lacrosse players.

### 5. Mangum's Prior History of False Rape Allegations

105. On or about April 28, 2006, Defendants Nifong, Gottlieb, and Himan learned that Mangum had several years earlier made a remarkably similar allegation—that she had been the victim of a purported gang rape by three men—while she lived in Creedmoor, N.C., and that Mangum had ultimately declined to pursue her allegations with the Creedmoor Police Department.

106. Upon information and belief, Defendants Nifong, Gottlieb, Himan, and Wilson were aware of these facts, yet willfully ignored and/or were deliberately indifferent to this evidence demonstrating Plaintiffs' innocence in their rush to charge Evans and to sustain their prosecutions of Finnerty and Seligmann.

107. Upon information and belief, the Supervisory Defendants also were aware of these facts, yet willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence demonstrating Plaintiffs' innocence in their rush to charge Evans and to sustain their prosecutions of Finnerty and Seligmann.

### 6. Evans and Other Lacrosse Captains Cooperate Fully with Police

108. Mangum's rape claims were further belied by the immediate, complete, and total cooperation of Plaintiff Evans and the other two lacrosse players who lived at 610 N. Buchanan in response to a March 16, 2006 search warrant executed by Defendants Gottlieb and Himan and other members of the Durham Police.

109. After Durham Police served the warrant, Evans and Zash denied that any attack had occurred, and offered whatever assistance they could provide to clear things

- 28 -

up.  Daniel Flannery, the third resident of 610 N. Buchanan, arrived approximately 30 minutes after the search began, and also offered his full cooperation.

110.    Evans, Zash, and Flannery did not contest the warrant, offered to help the officers find items identified in the warrant, and when asked, readily agreed to accompany Himan and Gottlieb to the station for interviews.

111.    Evans, Zash, and Flannery voluntarily did everything that Himan and Gottlieb asked of them.  Moreover, none of them asked to speak with an attorney or otherwise demonstrated any reluctance to cooperate.

112.    Evans, Zash, and Flannery accompanied the officers to the station house, where they submitted to hours of isolated interviews during which they were cooperative, truthful, and declined counsel in an effort to assist in what the officers represented was an honest pursuit of the truth.

113.    Evans, Zash, and Flannery provided separate, detailed, and mutually consistent accounts of the events on March 13 and 14.  Each denied that Mangum had been assaulted at any time while she was at 610 N. Buchanan.

114.    Himan and Gottlieb kept Evans, Zash, and Flannery in the station house until approximately 2:00 a.m. on March 17, 2006, at which point the officers asked them to submit to a "Sexual Assault Suspect Kit" to rule them out as suspects. Each agreed.  Evans, Flannery, and Zash also offered to take a lie detector test, but Himan and Gottlieb refused their offers.

115. Himan transported Evans, Zash, and Flannery to Duke Medical Center, where they were examined for evidence of scratches or other injuries consistent with an attack, and provided DNA and hair samples.

116. The Duke medical investigators who examined Evans, Zash, and Flannery found no evidence to support Mangum's allegations.

117. Himan finally released Evans, Zash, and Flannery at about 4:05 a.m. on March 17, 2006, roughly eleven hours after the search warrant was executed.

118. Upon information and belief, Defendants Nifong, Addison, Gottlieb, Himan, and Wilson were aware of these facts, including the three co-captains' immediate, complete and voluntary cooperation with Himan and Gottlieb, yet willfully ignored and/or were deliberately indifferent to this evidence indicating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

119. Upon information and belief, the Supervisory Defendants also were aware of these facts, including the three co-captains' immediate, complete and voluntary cooperation with Himan and Gottlieb, yet willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence indicating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

### 7.    The Lacrosse Team Cooperates with the Non-Testimonial Order

120. On March 22 and 23, 2006, Gottlieb and Himan, in conjunction with the District Attorney's Office and Durham Police attorney Toni Smith, filed for and received a

Non-Testimonial Order ("NTO") directing that all white members of the Duke lacrosse team provide DNA samples, submit to physical examinations, and allow themselves to be photographed.

121. In support of that application, the District Attorney's Office represented that "the DNA evidence requested will immediately rule out any innocent persons, and show conclusive evidence as to who the suspects are in the alleged violent attack upon this victim."

122. Each member of the Duke lacrosse team cooperated fully with the NTO, without objection, providing DNA samples, submitting to examinations for injuries, and allowing himself to be photographed.

123. Upon information and belief, Defendants Nifong, Addison, Gottlieb, Himan, and Wilson were aware of these facts, including the lacrosse team's complete and total cooperation with the NTO procedure, yet willfully ignored and/or were deliberately indifferent to this evidence indicating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

124. Upon information and belief, the Supervisory Defendants also were aware of these facts, including the lacrosse team's complete and total cooperation with the NTO procedure, yet willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence indicating Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

### C. Nifong Takes Over the Durham Police Investigation

#### 1. Nifong's Broken Promise Not To Run for Election

125. In April 2005, Defendant Michael Nifong was appointed to the post of Interim District Attorney for the Fourteenth Prosecutorial District of North Carolina by Governor Michael Easley.

126. In accepting the appointment to Interim District Attorney, Nifong promised Governor Easley that he would not run for election.

127. By March 2006, Nifong had already broken his promise and decided to run for election. Upon information and belief, Nifong would not have obtained full vesting of his pension if he had lost the 2006 election and had to leave the District Attorney's Office.

128. In March 2006, Nifong was engaged in a hotly-contested political campaign in his first effort to be elected to the position of District Attorney. He was facing formidable competition in his own party's primary election from two other candidates, including a highly-regarded former assistant district attorney named Freda Black, whom Nifong had fired upon being appointed District Attorney.

#### 2. Durham Police Officials Put Nifong in Charge

129. On or about March 24, 2006, Nifong learned of the investigation into Mangum's allegations.

130. Nifong immediately recognized that the investigation, and any subsequent prosecution, would garner significant media attention, and that he was in a

position to exploit Mangum's high-profile, racially-charged rape allegation for his personal political gain.  As Nifong would later tell his campaign manager, the Duke lacrosse case provided him with "millions" of dollars in free advertising.

131.   On or about March 24, 2006, Nifong contacted Durham Police officials, who upon information and belief included the Supervisory Defendants, and they agreed that Nifong would direct the police investigation.

132.   Upon information and belief, in March 2006, Durham Police officials—including the Supervisory Defendants—knew that it was unprecedented for a district attorney to direct a police investigation, that Nifong at the time was engaged in a hotly-contested election campaign, and that by assuming primary responsibility for the police investigation Nifong would be in a position to exploit Mangum's high-profile, racially-charged rape allegation for his personal political gain. Nevertheless, these Defendants ignored these extraordinary circumstances and the inherent conflict of interest by agreeing that Nifong would direct the police investigation into Mangum's allegations.

133.   On or about March 24, 2006, Defendant Lamb instructed Gottlieb and Himan that they should take their direction from Nifong regarding the investigation, rather than the usual Durham Police chain of command, and that they should also report to senior command staff in Durham Police on the investigation's progress.

134.   Upon information and belief, Nifong continued to direct the Durham Police investigation of Mangum's allegations until January 12, 2007, when Nifong

recused himself for conflict of interest after the North Carolina bar had charged him with ethics violations relating to the investigation and prosecution of the Plaintiffs.

135. Nifong assigned Defendant Linwood Wilson, an investigator with the District Attorney's Office, to coordinate with Gottlieb and Himan with respect to the police investigation. Upon information and belief, this was an unprecedented assignment for Wilson, who like other investigators in the District Attorney's Office, had served only limited roles, such as scheduling witnesses and serving subpoenas. Moreover, upon information and belief, Wilson had a record of misconduct while working as a private investigator.

### 3. Nifong's Awareness of the Absence of Evidence To Charge the Three Innocent Duke Lacrosse Players

136. On or about the morning of March 27, 2006, Nifong met with Gottlieb and Himan to receive a briefing on what they had learned in their investigation (the "March 27 Briefing").

137. Upon information and belief, during the March 27 Briefing, Gottlieb and Himan proceeded to detail the extraordinary evidence of innocence and the fatal defects in Mangum's claims, including, for example, the numerous contradictions and inconsistencies in Mangum's accounts of events, the fact that Pittman had called Mangum's rape claim a "crock," that Mangum had already viewed several photo arrays and failed to identify any of her purported attackers, and that the three

lacrosse team captains had voluntarily cooperated with police and denied that the alleged attack occurred. Upon information and belief, Himan conveyed to Nifong that Mangum was not credible.

138. During or immediately after the March 27 Briefing, Nifong responded to Gottlieb and Himan, "<u>You know, we're f*cked</u>." Nifong's vulgar, but candid, admission revealed that even Nifong recognized at an early stage that there was no basis to charge the three innocent Duke lacrosse players.

**D.      Defendants' Refusals to Consider Exculpatory Evidence**

139. Notwithstanding their knowledge of actual innocence and the numerous inconsistencies and contradictions in Mangum's versions of events, Defendants repeatedly refused to meet with defense attorneys who offered to provide evidence of Plaintiffs' innocence on repeated occasions prior to the April 17 and May 15 Indictments.

140. On or about April 6, 2006, for example, Evans's attorney, Joseph Blount Cheshire V, sent a letter to Nifong offering to produce Evans for a meeting to continue Evans's full cooperation with the investigation. Nifong refused to meet with either Cheshire or Evans.

141. Prior to the return of the April 17 Indictments, Seligmann's attorney, Kirk Osborn, also contacted Nifong to inform him that he had critical alibi evidence, including telephone records, an eyewitness, and photographs from an ATM machine, to establish that Seligmann was not at 610 N. Buchanan during the time Mangum

claimed to have been attacked. Nifong similarly refused to meet with Osborn or Seligmann and rebuffed their statements regarding Seligmann's innocence.

142. Nifong also refused to meet with other attorneys representing the innocent Duke lacrosse players, notwithstanding repeated requests for such meetings, prior to the return of the April 17 Indictments.

143. It is virtually unheard of that a responsible, ethical district attorney would refuse to receive evidence of innocence tendered by counsel for a putative defendant prior to seeking an indictment.

## E. Defendants' Extrajudicial Efforts To Manufacture Indictments of the Three Innocent Duke Lacrosse Players

### 1. The False and Inflammatory Public Statements by Nifong and the Durham Police

#### a. The Nifong Statements

144. At the time of the March 27 Briefing, the investigation had already started to attract media attention, and Nifong was scheduled to commence a series of televised and print interviews within hours of the March 27 Briefing with members of the local and national news media regarding the investigation.

145. At the time of the March 27 Briefing, Nifong was less than six weeks away from his contested primary election, and he was trailing in the polls.

146. Notwithstanding the substance of the March 27 Briefing, or his immediate conclusion that "we're f*cked," Nifong proceeded in the following hours and days to provide nearly 100 interviews to the news media in which he variously stated,

- 36 -

among other things, that he had "no doubt" that three members of the Duke lacrosse team had engaged in a vicious and racially-motivated gang rape, and that the Duke lacrosse team was a gang of "hooligans" who had not cooperated with authorities, but instead, had engaged in a "stone wall of silence" (the "Nifong Statements").

147. Examples of Nifong's false and malicious public statements include the following:

a. On or around March 24, 2006, Nifong accused the Duke lacrosse team of obstructing justice and erecting a "wall of silence."

b. On or around March 27, 2006, Nifong told ABC News that in "this case, where you have the act of rape—essentially a gang rape—is bad enough in and of itself, but when it's made with racial epithets against the victim, I mean, it's just absolutely unconscionable . . . . The contempt that was shown to the victim, based on her race, was totally abhorrent . . . . My guess is that some of this stonewall of silence that we have seen may crumble once charges start to come out."

c. On or around March 27, 2006, Nifong told NBC News that: "The information that I have does lead me to conclude that a rape did occur . . . . I'm making a statement to the Durham community and, as a citizen of Durham, I am making a statement for the Durham community. This is not the kind of activity we condone, and it must be dealt with quickly and harshly."

- 37 -

d.  On or around March 28, 2006, Nifong asserted that all members of the lacrosse team who declined to implicate other members in the assault were "covering up for a bunch of hooligans."

e.  On or around March 28, 2006, in an interview with the *New York Times*, Nifong declared that: "The thing that most of us found so abhorrent, and the reason I decided to take it over myself, was the combination of gang-like rape activity accompanied by the racial slurs and general racial hostility.  There are three people who went into the bathroom with the young lady, and whether the other people there knew what was going on at the time, they do now and have not come forward.  I'm disappointed that no one has been enough of a man to come forward. And if they would have spoken up at the time, this may never have happened."

f.  On a similar theme, on or around March 28, 2006, Nifong told the Associated Press: "We're talking about a situation where, had somebody spoken up and said 'Wait a minute, we can't do this,' this incident might not have taken place."

g.  On or around March 29, 2006, Nifong continued his string of racially inflammatory and conclusory statements of guilt, telling the press: "The circumstances of the rape indicated a deep racial motivation for some of

- 38 -

the things that were done . . . It makes a crime that is, by nature, one of the most offensive and invasive even more so."

h.　　In an interview with Fox News on or around March 29, 2006, Nifong declared: "There's no doubt in my mind that she was raped and assaulted in this location."

i.　　On or around March 29, 2006, Nifong reiterated this view on MSNBC's Abrams Report, telling his interviewer: "I am convinced that there was a rape, yes sir . . . The circumstances of the case are not suggestive of the alternative explanation that has been suggested by some of the members of the situation. There is evidence of trauma in the victim's vaginal area that was noted when she was examined by a nurse at the hospital. And her general demeanor was suggestive of the fact that she had been through a traumatic situation."

j.　　On or around March 29, 2006, Nifong told CNN: "It just seems like a shame that they are not willing to violate this seeming sacred sense of loyalty to team for loyalty to community."

k.　　On or around March 30, 2006, Nifong was quoted in *USA Today* promising to pursue the case regardless of "the feeling that Duke students' daddies could buy them expensive lawyers and that they knew the right people."

- 39 -

l.      Nifong even had the audacity to attack the lacrosse team members'
        decisions to consult counsel, telling CBS's *Early Show*: "The lacrosse
        team, clearly, has not been fully cooperative . . .  I think that their
        silence is a result of advice with counsel."

m.      On or around March 29, 2006, the Duke lacrosse captains, including
        Evans, issued a statement in which they stated, among other things:
        "The DNA results will demonstrate that these allegations are absolutely
        false."  On March 30, 2006, Nifong responded to this statement by
        telling the media, including Plaintiffs' own university newspaper, the
        Duke *Chronicle*: "The statements that [the team] makes are inconsistent
        with the physical evidence in this case. . . .  They don't want to admit to
        the enormity of what they've done."

n.      On or around March 31, 2006, Nifong asked ESPN why lacrosse team
        members were so "unwilling to tell us what, in their words, did take
        place that night? . . .  And one would wonder why one needs an attorney
        if one was not charged and had not done anything wrong."

o.      On or around April 12, 2006, Nifong stated at a public forum for
        Democratic Party candidates for District Attorney: "The reason that I
        took this case is because this case says something about Durham that
        I'm not going to let be said. . . .  I'm not going to allow Durham's view

- 40 -

in the minds of the world to be a bunch of lacrosse players at Duke

raping a black girl in Durham."

148.   On March 30, 2006, Evans's defense attorney, Joe Cheshire, sent a letter to Nifong

expressing his concern that Nifong's public statements prejudged the guilt of

lacrosse team members and objecting to Nifong's false claims that Plaintiffs and

other lacrosse team members had refused to cooperate with the investigation.

Cheshire expressed his further concern that Nifong's conduct had already

adversely affected Evans's constitutional rights, and urged Nifong to refrain from

further public statement.

149.   Rather than adjust his conduct, Nifong expanded the scope of his public attack.

On or about March 30, 2006, the North Carolina State Bureau of Investigation's

crime lab finished its analysis of evidence gathered as part of the rape kit.  That

analysis revealed no fibers, foreign hairs, blood, semen, sperm, or other forensic

evidence supporting Mangum's allegations.  Since Mangum had stated that her

attackers had not used condoms and had ejaculated inside her, this was a complete

repudiation of her rape claim.

150.   Even though Nifong knew that this evidence further established that Mangum's

rape charges were a lie, he did not drop the case.  Instead, he actually commenced

a new series of public statements intended to convince the public, which was not

yet aware that Mangum had claimed that no condoms were used, that the DNA

results would probably come back negative. Examples of these additional Nifong Statements include the following:

a. On or about April 11, 2006, Nifong told the *Charlotte Observer* that "I would not be surprised if condoms were used . . . Probably an exotic dancer would not be your first choice for unprotected sex."

b. During an appearance on MSNBC's *Abrams Report* on or around March 31, 2006, Nifong again suggested that "If a condom were used, then we might expect that there would not be any DNA evidence recovered from, say, a vaginal swab."

c. In a public forum hosted by North Carolina Central University—the school that Mangum claims to have attended—on April 11, 2006, Nifong summarized his intention to prosecute regardless of what the evidence proved. He promised that "My presence here means this case is not going away," dismissed the absence of forensic evidence, and endorsed the view that absence of such evidence "doesn't mean nothing happened—it just means nothing was left behind."

151. During this period, Nifong told his then-campaign manager that the media coverage of the investigation and the Nifong Statements had provided his campaign with millions of dollars of free advertising.

152. The Nifong Statements were made in violation of the North Carolina Revised Rules of Professional Conduct, and had direct and foreseeable consequences for the criminal process instituted against the Plaintiffs.

153. The Nifong Statements foreclosed any objective search for truth, and committed Durham Police, acting under Nifong's direct supervision, to arrest three Duke lacrosse players.  Moreover, the Nifong Statements, made in the context of Nifong's ongoing political campaign, also compromised his office, making him a partisan advocate of legal conclusions that, while unsupported by the facts, he could not abandon for fear of losing face and the upcoming primary election.

154. The Nifong Statements also inflamed the public, including those who would eventually serve on the grand juries that indicted Plaintiffs, by marking the Plaintiffs as violent sex offenders whose guilt was already established beyond doubt.

155. Upon information and belief, the Supervisory Defendants were aware of the substance of the March 27 Briefing, of Nifong's conclusion to Gottlieb and Himan that "we're f*cked," and of the Nifong Statements that immediately followed the March 27 Briefing.  Nevertheless, the Supervisory Defendants, who already were aware of Nifong's hotly-contested election campaign, continued to allow Nifong to have primary responsibility for the police investigation and to have Durham Police look to Nifong for direction as to the conduct of that investigation.

## b.    The Durham Police Statements

156.    The Nifong Statements were entirely consistent with similarly false and inflammatory statements made by other members of the Durham Police.

157.    Upon information and belief, at all times relevant to this complaint, Defendant Ronald Hodge was the Deputy Chief of Police and the second-highest-ranking official in the Durham Police Department.

158.    Upon information and belief, at all times relevant to this complaint, Defendant David Addison was assigned by the Supervisory Defendants to serve as an official Durham Police spokesperson.

159.    Beginning on March 24, 2006, Addison and Hodge made a series of public statements in which they, like Nifong, stated falsely that Mangum had been brutally assaulted by members of the Duke lacrosse team and that the members of the lacrosse team were obstructing justice (the "Durham Police Statements").  At the times they made these statements, Addison and Hodge knew or should have known that they were false.

160.    Examples of Addison's and Hodge's false and malicious statements include the following

    a.    On or about March 24, 2006, Addison told a reporter for WRAL TV: "You are looking at one victim brutally raped.  If that was someone else's daughter, child, I don't think 46 would be a large enough number to figure out exactly who did it."

- 44 -

b. On or about March 25, 2006, Addison told reporters from CBS and ABC News that a "brutal rape" occurred at 610 N. Buchanan.

c. On or about March 25, 2006, Addison told the Durham *Herald-Sun* that when Durham Police served the search warrant at 610 N. Buchanan on March 16, 2006, the Duke lacrosse players who lived there had refused to cooperate.

d. On or about March 25, 2006, Addison told the Durham *Herald-Sun* that there was "really, really strong physical evidence" of a crime.

e. On or about March 25, 2006, Addison told the Raleigh *News & Observer* that an attack had occurred, that some or all of the Duke lacrosse players knew about it, and that the players should stop obstructing the investigation and come forward to provide evidence. Addison repeated these statements to the Durham *Herald-Sun*, ABC News, and WRAL TV on or about March 25, 26, and 28, 2006.

f. On or about March 28, 2006, Addison colluded with Himan and Durham Crimestoppers to produce a "Wanted" poster, which he caused to be disseminated in and around the campus of Duke University. The flier stated that:

On Monday, March 13, 2006 about 11:00pm, the Duke University Lacrosse Team solicited a local escort service for entertainment. The victim was paid to dance at the residence located at 610 Buchanan.

The Duke Lacrosse Team was hosting a party at the residence. The victim was sodomized, raped, assaulted and robbed. This horrific crime sent shock waves throughout our community. Durham Police needs your assistance in solving this case. We are asking anyone who has any information related to this case, please contact Inv. Himan at 560-4582 x229.

Information can also be provided anonymously through Durham Crimestoppers at 683-1200 or by email to david.addison@durhamnc.gov (Please use an anonymous email account). Durham Crimestoppers will pay cash for any information which leads to an arrest in this case.

g.     In subsequent days, Addison, acting with the approval of senior command officers in the Durham Police Department, and pursuant to existing Department policy and custom, colluded with Himan and Durham Crimestoppers to produce different versions of this same "Wanted" poster.

h.     On or about April 11, 2006, Hodge was interviewed by MSNBC while attending the public forum at North Carolina Central University with Nifong.  When asked if Durham Police had a strong case against Duke lacrosse players, Hodge told MSNBC, "I don't think we would be here if it wasn't."

161.    The Durham Police Statements also had direct and foreseeable consequences for the criminal process instituted against David Evans, Collin Finnerty, and Reade Seligmann.

162.   The Durham Police Statements foreclosed any objective search for truth and committed Durham Police to arrest three Duke lacrosse players. The Durham Police Statements also inflamed the public, including those who would eventually serve on the grand juries that indicted Plaintiffs, by marking the Plaintiffs as violent sex offenders whose guilt was already established beyond doubt.

163.   Upon information and belief, Addison made each of these statements while under the supervision and with the approval of the Supervisory Defendants, and he was acting pursuant to existing Department policy and custom. Upon information and belief, the Supervisory Defendants were aware of Addison's statements and did not retract them, remove Addison from his position, or reprimand him.

## 2.   The Initial DNA Testing Further Confirms Mangum Is Lying

164.   Because Mangum had alleged that none of her attackers used condoms, and that all three had ejaculated inside of her, Defendants knew that DNA testing would be critically important to confirming or disproving Mangum's already inconsistent claims. Defendants also knew that, based on Mangum's allegations, they would have to exclude as suspects any Duke lacrosse players whose DNA was not found on the rape kit items collected on March 14, 2006.

165.   Indeed, in the application for the NTO, dated on or about March 22, 2006, the District Attorney's Office represented that "the DNA evidence requested will immediately rule out any innocent persons, and show conclusive evidence as to who the suspects are in the alleged violent attack upon this victim."

166. On or about April 7, 2006, Nifong appeared on MSNBC's *Abrams Report* and stated: "Under any circumstances, the first step is to determine whether or not there is DNA that can be identified, foreign to the victim, and then once we get past that stage, we could then compare any DNA that was found."

167. On or about December 15, 2006, Defendant Meehan of DSI testified that he knew that the process of excluding potential DNA donors is "the best way to approach this work." This, of course, makes perfect sense where, as here, Mangum had alleged that each of her purported attackers engaged in acts that should have left behind DNA, had they actually occurred.

168. On or about March 27, 2006, Durham Police delivered the rape kit items and DNA samples collected from the white lacrosse players to Agent Rachel Winn in the Serology Section of the State Bureau of Investigation ("SBI") crime lab in Raleigh.

169. On or about March 28, 2006, Agent Winn examined the vaginal smears, oral smears, rectal smears, and panties from the rape kit. Agent Winn determined that none of these items showed the presence of semen, blood, or saliva, as one would have expected if Mangum's account of the purported rape had been truthful.

170. Roughly 24 hours later, on or about March 29, 2006, SBI crime lab personnel notified Nifong that they had examined the items from the rape kit and were unable to find any semen, blood, or saliva on any of the rape kit items.

171.  On or about March 30, 2006, Mr. Nifong spoke with Agent Jennifer Leyn in the DNA section of the SBI crime lab about the status of the SBI lab's testing of evidentiary items in the case.

172.  Ultimately, the SBI lab concluded that no DNA from any of the players was found on the accuser's rape kit items or clothing; that DNA from one of the residents of 610 N. Buchanan was found on a towel in the house; and that DNA from another resident of 610 N. Buchanan was found on the floor in one of the bathrooms in the house.  Nifong provided Plaintiffs with the SBI lab's final report containing these findings on April 10, 2006.

173.  The news of the SBI's exculpatory findings did not deter Nifong from making additional public statements accusing white Duke lacrosse players of rape. Instead, Nifong immediately began to tailor his comments to imply that condoms had been used, even though Mangum had always alleged that her accusers had not used condoms and that they had ejaculated inside of her.

    a.  For example, on March 31, 2006, after his conversation with Agent Leyn of the SBI lab, Nifong stated to a reporter for MSNBC, "[I]f a condom were used, then we might expect that there would not be any DNA evidence recovered from, say, a vaginal swab."

    b.  On or about April 11, 2006, Nifong told the *Charlotte Observer*: "I would not be surprised if condoms were used. . . .  Probably an exotic dancer would not be your first choice for unprotected sex."

- 49 -

c.    On or about April 11, 2006, Nifong stated at the North Carolina Central University public forum that the absence of DNA evidence "doesn't mean nothing happened—it just means nothing was left behind."

174.    Upon information and belief, the Supervisory Defendants were aware of the results of the SBI's testing and Nifong's subsequent comments regarding purported condom use, which were flatly at odds with Mangum's own accounts of the alleged rape.  Nevertheless, the Supervisory Defendants continued to allow Nifong to have primary responsibility for the police investigation and to have Durham Police look to Nifong for direction as to the conduct of that investigation.

### 3.    The Conspiracy to Manufacture False Identifications

### a.    The April Photo Array

175.    With the news of the SBI's DNA test results, Nifong and the Durham Police, including Gottlieb, Himan, and the Supervisory Defendants, knew that they had no evidence to corroborate Mangum's various inconsistent and contradictory accounts of the alleged rape and that DNA testing actually disproved her claims.

176.    Undeterred, however, these Defendants conspired to manufacture evidence of an "identification" of three Duke lacrosse players in order to charge them with rape.

177.    These Defendants knew that Mangum had already failed to identify any of her alleged assailants in the March Photo Arrays, which included 36 photographs of Duke lacrosse players, including Evans and Seligmann.  Moreover, Durham Police had not even included Finnerty's photograph in the March Photo Arrays because

he did not match any of the descriptions that Mangum had provided of her purported assailants.

178. Moreover, at the time of the March Photo Arrays, Durham Police considered Evans to be a suspect because he lived at 610 N. Buchanan, yet Mangum had twice failed to recognize Evans at all in the March Photo Arrays, let alone claim that he was one of her purported assailants.

179. On or about March 31, 2006, one day after Nifong had spoken with SBI personnel about the negative DNA results, Nifong met with Gottlieb and Himan to plan a new identification procedure. Nifong, Gottlieb, and Himan agreed that instead of a standard photo array, Gottlieb would show Mangum an array consisting solely of photographs of all white Duke lacrosse players, without any non-suspects ("fillers"), and they agreed that the procedure would be videotaped for use in future criminal proceedings.

180. Nifong, Gottlieb, and Himan designed and conducted this suggestive procedure with the intention that the identifications it produced would be used to obtain indictments and convictions of three Duke lacrosse players. Nifong, Gottlieb, and Himan intended that Mangum would select three Duke lacrosse players who attended the party, and that those players would subsequently be indicted on rape charges.

181. Later on or about the afternoon of March 31, Gottlieb briefed Defendants Lamb and Ripberger about the proposed identification procedure (the "April Photo

Array").  Upon information and belief, Lamb, Ripberger, and the other Supervisory Defendants approved the proposed April Photo Array, and Gottlieb and Himan set about to prepare the new photo array for Mangum.

        **b.**        **Defendants Replace a Written Lineup Policy Intended To Protect the Innocent with a New Lineup Crafted to Ensure False Identifications**

182.    On or about February 1, 2006, Durham Police implemented a written policy governing witness identification procedures, General Order No. 4077.  General Order No. 4077 was implemented in order to conform to the recommendations of the North Carolina Actual Innocence Commission, which were endorsed by the Education and Training Committee of the North Carolina Criminal Justice Education and Training Standards Commission, after several high-profile instances where suggestive and otherwise improper identification procedures resulted in deprivations of constitutional rights.

183.    General Order No. 4077 requires, among other things, that

      a.    Photo arrays must be conducted by an independent administrator, rather than the Durham Police personnel involved in the investigation.

      b.    There should not be anyone present for the array procedure who knows the identity of any suspects in the array.

      c.    At least five fillers must be included for each suspect in the array, and each array should begin with a filler.

- 52 -

d.  Each filler must resemble the witness's description of the alleged perpetrator in significant features such as "face, profile, height, weight, build, posture, gait, specific articles of clothing, etc."

e.  Where there is an inadequate description of the perpetrator, or a suspect whose appearance differs from the description of the perpetrator, each filler must resemble the suspect in significant features such as "face, profile, height, weight, build, posture, gait, specific articles of clothing, etc."

f.  Durham Police should avoid reusing the same fillers in multiple arrays shown to the same witness.

184.  The April Photo Array developed by Nifong, Gottlieb, and Himan, and approved and ratified by the Supervisory Defendants and other City of Durham officials, constituted a violation and/or a change in Durham Police policy from numerous requirements of General Order No. 4077 that had been implemented to prevent deprivations of constitutional rights.  For example:

a.  The April Photo Array was conducted by Gottlieb, who was directly involved in the investigation, rather than an independent administrator.

b.  Gottlieb knew the identity of Evans and other suspects in the array.

c.  Gottlieb and Himan included no fillers in the array, and the array did not begin with a filler.

- 53 -

d. The array thus did not include fillers who resembled Mangum's description of the alleged perpetrators in significant features such as "face, profile, height, weight, build, posture, gait, specific articles of clothing, etc."

e. The array thus did not include fillers who resembled the suspects in significant features such as "face, profile, height, weight, build, posture, gait, specific articles of clothing, etc."

f. The array included many of the same Duke lacrosse players who had already been included in the March Photo Arrays, including Evans and Seligmann.

g. Moreover, Gottlieb signaled to Mangum that there were no fillers in the array, instructing her that the array consisted entirely of individuals who were believed to have attended the party at 610 N. Buchanan.

185. Notwithstanding that the April Photo Array violated various requirements of General Order No. 4077, the Supervisory Defendants and other City of Durham officials approved and ratified the April Photo Array.

186. On April 4, 2006, Gottlieb conducted the April Photo Array with Mangum. Gottlieb began by telling Mangum that every photograph she would be shown was of an individual who attended the party at 610 N. Buchanan.

187. By being told that there were no fillers in the array, Mangum was thus informed that she could not "fail" the identification procedure by identifying an individual who was not at the party. All she had to do was pick three people—any three people—from the array.

188. The April Photo Array was, in the words of defense attorneys, "a multiple choice test with no wrong answers." As Durham City Council member Eugene Brown would later describe it, "this was like shooting fish in a barrel."

189. Mangum identified Reade Seligmann during the April Photo Array, claiming she was "100%" certain that Seligmann was the one who "made me perform oral sex."

190. Mangum identified Collin Finnerty during the April Photo Array, claiming she was "100%" certain that Finnerty was the "second one" to "put his penis in my anus and my vagina."

191. Mangum again failed to provide a positive identification of David Evans during the April Photo Array. When shown Evans's picture, Mangum was expressionless for roughly 45 seconds, then stated that Evans "looks like one of the guys who assaulted me sort [of]," except that her assailant had a mustache, and ultimately stated that she was only "90%" certain that Evans was one of the men who purportedly assaulted her.

- 55 -

### c. Mangum Continues To Contradict Herself Notwithstanding the Rigged Photo Array

192.  Mangum's performance during the April Photo Array cast further doubt on her credibility because, for example:

a.  During the April Photo Array, Mangum claimed that she was 100% certain that Reade Seligmann was one of her purported assailants, and that she was 90% certain that David Evans was one of the other two purported assailants, except that her purported assailant had a mustache. Yet, during the March Photo Arrays, Mangum said she was only 70% sure she recognized Seligmann and could not remember exactly where she saw him at the party, and she was unable to identify Evans's photograph either of the two times she looked at it.

b.  During the April Photo Array, Mangum claimed that Reade Seligmann was the purported assailant who "made me perform oral sex." But in her March 16 interview with Gottlieb and Himan, Mangum had claimed that this assailant was named "Adam," whom Mangum described as "short" with "red cheeks," "fluffy hair" that is "brown," and a "chubby face." By contrast, Reade Seligmann is a tall, white male with dark hair who was 6' 1" and weighed 215 pounds.

c.  During the April Photo Array, Mangum claimed that Collin Finnerty was the purported assailant who was the "second one" to "put his penis

in my anus and my vagina."  But in her March 16 interview, Mangum had claimed that this assailant was named "Matt," whom Mangum described as "heavy set" with a "short hair cut" and weighing 260 to 270 pounds.  By contrast, Collin Finnerty is tall and skinny (6'5", 230 pounds) with reddish hair.

d.      During the April Photo Array, Mangum claimed that a <u>fourth</u> lacrosse player resembled the purported third attacker ("Brett").  She did not claim that any of the Plaintiffs resembled Brett during the April Photo Array.

e.      Evans did not have a mustache in March 2006.  He never had one.

f.      During the April Photo Array, Mangum again identified lacrosse players whom Durham Police knew were not at the party at 610 N. Buchanan. Mangum claimed she saw Brad Ross standing outside the house talking to the other dancer, but Durham Police knew that Ross was at North Carolina State University in Raleigh during the party.  Mangum also claimed she saw Chris Loftus sitting in the living room or master bedroom, but Durham Police knew that Loftus was instead in his dorm room with his girlfriend at the time of the party, having entered the dorm using his card reader at 10:59 p.m.

g. During the April Photo Array, Mangum failed to identify three lacrosse players whom she had purported to identify during the March Photo Arrays, including Fred Krom, Nick O'Hara, and Kevin Mayer.

h. During the April Photo Array, Mangum purported to identify numerous lacrosse players whom she had failed to identify during the March Photo Arrays, including William Woolcott, Matt Wilson, Adam Langley, Glen Nick, Eric Henkelmen, Dan Flannery, Peter Lamade, John Walsh, Ben Koesterer, Josh Covelski, and Kyle Dowd.

193. Upon information and belief, Defendants Nifong, Gottlieb, Himan, and Wilson were aware of these facts, including the contradictions and inconsistencies raised by Mangum's supposed identifications during the April Photo Array, yet willfully ignored and/or were deliberately indifferent to this evidence of Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

194. Upon information and belief, the Supervisory Defendants also were aware of these facts, including the contradictions and inconsistencies raised by Mangum's supposed identifications during the April Photo Array, yet willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence of Plaintiffs' innocence in their rush to charge the three innocent Duke lacrosse players.

195. As a direct and foreseeable consequence of these Defendants' conduct, Plaintiffs were indicted and arrested pursuant to legal process.

### 4.    The DNA Conspiracy

#### a.    Nifong and the Durham Police Shop for a New DNA Expert and Retain DSI

196.   On or about April 4, 2006, Nifong met with Durham Police Investigator Michelle Soucie and instructed her to locate a private laboratory to conduct additional DNA testing.

197.   At Nifong's direction, Soucie contacted Defendant Meehan of Defendant DSI, a private laboratory in Burlington, North Carolina.  Meehan said that his lab could perform Y-chromosome, or Y-STR DNA testing, which is more sensitive than the autosomal DNA testing performed by the SBI crime lab.

198.   Meehan also told Soucie that DSI was so interested in becoming involved in the investigation that DSI would be willing to cut its standard prices for this testing.

199.   Later that day, Soucie told Nifong about the substance of her conversations with Meehan.

200.   The next day, April 5, 2006, the District Attorney's Office sought and obtained an order from Judge Ronald Stephens to allow for the transfer of the rape kit items to DSI for Y-chromosome DNA testing.  In doing so, the District Attorney's Office told the Court:

> Tests conducted by the S.B.I. laboratory failed to reveal the presence of semen on swabs from the rape kit or the victim's underwear.  In cases without semen present, it is sometimes possible to extract useful DNA

- 59 -

samples for comparison purposes using a technique known as Y STR. This technique isolates cells containing a Y chromosome from the entire sample, which must have been contributed by a male person. The S.B.I. laboratory is not equipped to conduct Y STR DNA analysis. DNA Security is a private laboratory in Burlington, North Carolina that can conduct Y STR DNA analysis and has agreed to undertake this analysis in an expedited manner.

201. On April 6, 2006, the rape kit items and reference DNA samples for Crystal Mangum and the lacrosse players were all transferred from Agent Leyn back to Durham Police CSI Angela Ashby, who transferred them to DSI.

### b. DSI's Testing Excludes All of the Duke Lacrosse Players from the Rape Kit Items with 100% Certainty

202. On April 7, 2006, DSI produced sperm-fraction and non-sperm (epithelial) fraction DNA extractions from the panties, cheek scrapings, oral swabs, vaginal swabs, and rectal swabs contained in the rape kit, assigning them item numbers specific to that lab.

203. On April 7, 2006, DSI also performed seratic PSA presumptive tests for the presence of semen on the rape kit items, all of which were negative.

204. On April 8, 9, and 10, 2006, DSI performed analyses of the rape kit items that resulted in the exclusion with 100% certainty of all members of the lacrosse team, including the three innocent Plaintiffs, as possible donors of DNA found on the

rape kit items. Specifically, DSI reached the following conclusions with respect to

the rape kit items:

a.    On Item 15780, the epithelial fraction of Stain D from the rape kit

panties, DSI identified DNA characteristics from at least two males.

With 100% scientific certainty, the three innocent Plaintiffs, their

teammates on the Duke lacrosse team, and all others from whom

reference DNA samples had been obtained during the investigation were

excluded as sources of that DNA material.

b.    On Item 15767, the sperm fraction of Stain A from the rape kit panties,

DSI identified DNA characteristics from at least two males. With 100%

scientific certainty, the three innocent Plaintiffs, their teammates on the

Duke lacrosse team, and all others from whom reference DNA samples

had been obtained during the investigation were excluded as sources of

that DNA material.

c.    On Item 15776, the sperm fraction from the rectal swab, DSI identified

DNA characteristics from at least one male. With 100% scientific

certainty, the three innocent Plaintiffs, their teammates on the Duke

lacrosse team, and all others from whom reference DNA samples had

been obtained during the investigation were excluded as the source of

that DNA material.

d.    On Item 15777, the epithelial fraction of Stain A from the rape kit panties, DSI identified DNA characteristics from at least four males. With 100% scientific certainty, the three innocent Plaintiffs, their teammates on the Duke lacrosse team, and all others from whom reference DNA samples had been obtained during the investigation were excluded as sources of that DNA material.

e.    On Item 15778, the epithelial fraction of Stain B from the rape kit panties, DSI identified DNA characteristics from at least two males. With 100% scientific certainty, the three innocent Plaintiffs, their teammates on the Duke lacrosse team, and all others from whom reference DNA samples had been obtained during the investigation were excluded as sources of that DNA material.

### c.    The April 10 Meeting

205.    On or about April 10, 2006, Nifong, Himan, and Gottlieb met with Meehan and Defendant Clark, who upon information and belief is the president and controlling shareholder of DSI, at DSI's offices in Burlington (the "April 10 Meeting"). During the April 10 Meeting, Meehan orally reported the results of all analyses conducted by DSI to date, including the results summarized above, which demonstrated that several men contributed DNA to the various items in Mangum's rape kit, but excluded with 100% certainty any of the Duke lacrosse players as contributors of DNA on the rape kit items. These Defendants were thus on notice

- 62 -

of these DNA results demonstrating Plaintiffs' actual innocence at the time they sought the indictments of Seligmann and Finnerty on April 17, 2006, and Evans on May 15, 2006.

206. Indeed, rather than concluding the investigation of the Duke lacrosse players after the April 10 Meeting, Nifong, Himan, Gottlieb, Clark, and Meehan began to consider ways in which these exculpatory results could be concealed and obfuscated in a subsequent prosecution of three Duke lacrosse players on rape charges.

207. Ultimately, Nifong, Himan, Gottlieb, Clark, and Meehan conspired to conceal and obfuscate these exculpatory results. Among other things, these Defendants agreed not to take any notes memorializing the substance of their discussions, so as to hide exculpatory evidence from the three innocent Duke lacrosse players to be charged.

208. Nifong, Meehan, Clark, DSI, Himan, and Gottlieb conspired and acted to conceal and obfuscate the exculpatory DNA results, knowing that if those results came to light, they would prevent an indictment or conviction of any Duke lacrosse player they falsely charged. Indeed, the intended and actual effect of this conspiracy was to facilitate an indictment and prosecution of the three innocent Duke lacrosse players, while concealing by omission the true results of DNA testing, which established Plaintiffs' actual innocence.

209.   Upon information and belief, the Supervisory Defendants were aware of the substance of the April 10 Meeting, including the results of DSI's testing and the illicit agreement to conceal the exculpatory results of DSI's testing, yet in their rush to charge and convict the three innocent Duke lacrosse players, they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence demonstrating Plaintiffs' innocence and the misconduct underlying the investigation.  Moreover, the Supervisory Defendants continued to allow Nifong to have primary responsibility for the police investigation, to have Durham Police look to Nifong for direction as to the conduct of that investigation, and to have Gottlieb and Himan continue to participate in that investigation.

### d.   The April 17 Indictments of Collin Finnerty and Reade Seligmann

210.   On April 17, 2006, Nifong successfully obtained a grand jury indictment against Collin Finnerty for first-degree rape, first-degree sex offense, and kidnapping.

211.   On April 17, 2006, Nifong successfully obtained a grand jury indictment against Reade Seligmann for first-degree rape, first-degree sex offense, and kidnapping.

212.   Nifong sought and obtained the April 17, 2006 indictments of Finnerty and Seligmann (the "April 17 Indictments") in order to deprive the two innocent Duke lacrosse players of their civil rights and to assure his own election to the position of District Attorney.

- 64 -

213. Upon information and belief, Gottlieb and Himan each provided inculpatory testimony before the grand jury that returned the April 17 Indictments, despite actual knowledge of Finnerty's and Seligmann's innocence, in order to deprive the two innocent Duke lacrosse players of their civil rights and to facilitate Nifong's election to the office of District Attorney for the City of Durham.

214. Two weeks after the April 17 Indictments, on May 2, 2006, Nifong won the Democratic primary, beating Freda Black by three percentage points.

215. In February 2007, two individuals, identifying themselves as two of the grand jurors who voted to return the April 17 Indictments, spoke to ABC News. Each of the grand jurors stated that they only learned of Mangum's multiple inconsistent accounts of the alleged rape, including her recantation of the rape allegation, from the media long after they were asked to return the April 17 Indictments. According to ABC News, one of the grand jurors said:

> "I don't know for sure whether she was raped, you know, because of everything that came out. I'm not sure, to tell you the truth. . . . What do you mean you're not sure whether you got raped or not? That didn't add up."

According to ABC News, the other grand juror said:

> "Knowing what I know now and all that's been broadcast on the news and in media, I think I would have definitely made a different decision. . . . It [Mangum's recantation] raised a lot of doubt."

- 65 -

216. Of course, Nifong, Gottlieb, Himan, and the Supervisory Defendants knew long before the April 17 Indictments were returned that Mangum had recanted her rape allegation to Officer Shelton at Duke Medical Center on March 14, 2006, and that she had provided multiple inconsistent, contradictory, and demonstrably false accounts of the alleged attack. Nevertheless, upon information and belief, Nifong, Gottlieb, Himan, and the Supervisory Defendants agreed not to provide this information to the grand jury that returned the April 17 Indictments.

217. Moreover, upon information and belief, Gottlieb, Himan, and Nifong agreed in advance of the April 17 Indictments that they would mislead the grand jury as to the nature of the evidence concerning Finnerty and Seligmann and not reveal to the grand jury the evidence of Finnerty's and Seligmann's actual innocence.

218. Indeed, when Himan was first told of the decision to seek indictments of Finnerty and Seligmann, his initial response was, "With what?" Moreover, upon information and belief, Nifong, Gottlieb, and Himan knew that they lacked any proof that Seligmann had even attended the party at 610 N. Buchanan.

219. Upon information and belief, Defendants Lamb, Ripberger, and the other Supervisory Defendants were informed of the lack of evidence against Finnerty and Seligmann, and the overwhelming evidence of their actual innocence, yet in their rush to charge these innocent Duke lacrosse players, they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to the evidence of Finnerty's and Seligmann's innocence and the misconduct underlying

- 66 -

the investigation. Moreover, the Supervisory Defendants continued to allow Nifong to have primary responsibility for the police investigation, to have Durham Police look to Nifong for direction as to the conduct of that investigation, and to have Gottlieb and Himan continue to participate in that investigation.

220. As a direct and foreseeable consequence of Defendants' conduct, Finnerty and Seligmann suffered deprivations of their rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 19 of the North Carolina Constitution.

### e. The April 21 Meeting

221. On April 21, 2006, four days after the April 17 Indictments were returned against the two innocent Duke lacrosse players, Nifong, Gottlieb, and Himan met again with Meehan and Clark at DSI's offices in Burlington (the "April 21 Meeting").

222. During the April 21 Meeting, Meehan reported that:

a. DNA from at least four different men was found on the items in the rape kit. Every single one of the Duke lacrosse players, including Finnerty, Seligmann, and Evans, was excluded as a possible contributor of this DNA because none of their DNA profiles matched or were consistent with any of the DNA found on the rape kit items.

b. DNA found on Mangum's vaginal swab was consistent with the DNA profile of Mangum's boyfriend, Matthew Murchison.

- 67 -

c. DNA on a composite swab taken from several fingernail specimens found in David Evans's garbage can was "consistent" with the DNA of David Evans and at least 14 other men whose DNA information was contained in a DSI database.

d. DNA on a swab taken from a fingernail found on a computer at 610 N. Buchanan was consistent with the DNA profile of lacrosse player Kevin Coleman.

223. Rather than moving to dismiss the charges against Finnerty and Seligmann and concluding the investigation of the remaining Duke lacrosse players, these Defendants again continued to obstruct justice and agreed to conceal and obfuscate this exculpatory evidence. Specifically, these Defendants agreed that DSI would produce a written report that would purport to be a final report of the results of all DNA testing conducted by DSI, but that this report would omit the exculpatory results of DSI's testing, including the fact that none of the players' DNA profiles matched or were consistent with any of the DNA found on the rape kit items. Moreover, as part of the conspiracy, these Defendants agreed that there would be no report or notes memorializing the substance of their discussions regarding the exculpatory DNA testing during the April 21 Meeting.

224. Nifong, Meehan, Clark, DSI, Himan, and Gottlieb conspired and acted to fabricate this false and misleading report, and to conceal and obfuscate the exculpatory DNA evidence, knowing that the false and misleading report would become part

- 68 -

of the criminal process. Indeed, the intended and actual effect of this illicit agreement was to fabricate a false and misleading "final" report of DNA testing that would sustain the prosecutions of Finnerty and Seligmann, and support and sustain the indictment and prosecution of Evans, while concealing by omission the true results of DNA testing, which further established Plaintiffs' actual innocence.

225. The conduct of DSI, Clark, and Meehan violated numerous internal and professional standards of conduct relating to scientific testing, yet they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to these violations in their rush to assist Nifong and the Durham Police with securing charges against Evans and sustaining the prosecutions of Finnerty and Seligmann.

226. Upon information and belief, the Supervisory Defendants were aware of the substance of the April 21 Meeting, including the results of DSI's testing and the illicit agreement to conceal the exculpatory results of DSI's testing, yet in their rush to charge Evans and to sustain the prosecutions of Finnerty and Seligmann, they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence of actual innocence and the misconduct underlying the investigation. Moreover, the Supervisory Defendants continued to allow Nifong to have primary responsibility for the police investigation, to have Durham Police look to Nifong for direction as to the conduct of that investigation, and to have Gottlieb and Himan continue to participate in that investigation.

- 69 -

### f. The May 12 Meeting and the May 12 Report

227. On May 12, 2006, Nifong returned to DSI with Himan for another meeting with Dr. Meehan and Defendant Clark to discuss the results of all of the lab's testing (the "May 12 Meeting").

228. During the May 12 Meeting, Meehan provided Nifong with a ten-page report that he and DSI had prepared regarding DNA testing (the "May 12 Report").

229. Defendants understood and agreed that the May 12 Report would be provided to the Plaintiffs and the court under the knowingly false pretense that it represented the final report of DSI's work and contained all of DSI's findings with respect to DNA testing.

230. In keeping with the conspiracy, the May 12 Report used a limited reporting formula that Nifong, Meehan, Clark, Gottlieb, and Himan had agreed upon to conceal the entirety of DSI's findings. Specifically, the May 12 Report only reported on a DNA result if it matched or was consistent with one of the individuals who had provided a reference sample for testing purposes—e.g., Mangum's boyfriend and the Duke lacrosse players. The May 12 Report intentionally omitted the DNA results that matched or were consistent with the multiple unidentified men who had not provided any reference specimens for comparison (the "multiple unidentified males").

231. Meehan would later admit, under oath and during cross-examination, that the use of this reporting formula and language was "inappropriate," that it violated DSI

and industry custom and practice, and that it did not clearly convey the entirety of DSI's findings.

232. DSI, Meehan, and Clark's use of this limited reporting formula—which was the product of an intentional agreement with Nifong, Himan, Gottlieb, and the Durham Police—concealed the complete results of "any examinations or tests conducted by" DSI, and it specifically concealed the existence of the exculpatory evidence as underscoring the Duke lacrosse players' actual innocence.

233. The limited reporting formula also violated the standard protocols of DSI itself, which—like North Carolina's open-file discovery laws, the FBI's DNA Quality Assurance Audit Standard 11.1.2, and the accreditation standards of the American Society of Crime Laboratory Directors/Laboratory Accreditation Board—require the disclosure of the results of all DNA tests in any report produced by the lab. Nevertheless, DSI, Clark, and Meehan willfully ignored and/or were deliberately indifferent or grossly negligent with respect to these violations in their rush to assist Nifong and the Durham Police with securing charges against Evans and sustaining the prosecutions of Finnerty and Seligmann.

234. On May 12, 2006, Nifong provided the misleading May 12 Report to Plaintiffs. Applying the intentionally limited reporting formula, DSI's May 12 Report stated the results of only three of DSI's comparison analyses, and intentionally and deceptively concluded that Evans might have been one of the three otherwise unidentified males whose DNA characteristics were found on fingernails taken out

of his bathroom trash can on March 16, 2006. The May 12 Report did not report at all and intentionally excluded the conclusions that neither Evans nor Finnerty nor Seligmann was one of the multiple unidentified males whose DNA was found on the various rape kit items.

235. Upon information and belief, the Supervisory Defendants knew or should have known about the substance of the May 12 Meeting and the May 12 Report, including the fact that the May 12 Report intentionally concealed and obfuscated the exculpatory results of DSI's testing, yet they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence demonstrating Plaintiffs' innocence and the misconduct underlying the investigation in their rush to support an indictment of Evans and to sustain the prosecutions of Finnerty and Seligmann. Moreover, the Supervisory Defendants continued to allow Nifong to have primary responsibility for the police investigation, to have Durham Police look to Nifong for direction as to the conduct of that investigation, and to have Gottlieb and Himan continue to participate in that investigation.

### g. The May 15 Indictment of David Evans

236. On May 15, 2006, three days after receiving the intentionally fraudulent May 12 Report, which Nifong knew to be misleading, Nifong used it to cause a grand jury indictment to be returned against David Evans for first-degree rape, first-degree sexual offense, and kidnapping (the "May 15 Indictment").

- 72 -

237. Nifong sought and obtained the May 15 Indictment, despite knowledge of Evans's actual innocence, in order to make good on his pre-election public statements and deprive an innocent Duke lacrosse player of his civil rights.

238. Upon information and belief, Himan testified before the grand jury that issued the May 15 Indictment, despite knowledge of Evans's actual innocence, in order to deprive an innocent Duke lacrosse player of his civil rights.

239. As in the case of the April 17 Indictments, upon information and belief, Gottlieb, Himan, and Nifong agreed in advance of the May 15 Indictment that they would mislead the grand jury as to the evidence concerning Evans and not reveal to the grand jury the evidence of Evans's actual innocence.

240. As a direct and foreseeable consequence of Defendants' conduct, Evans suffered deprivations of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 19 of the North Carolina Constitution.

**F.     Post-Indictment Efforts To Conceal Defendants' Misconduct and Obstruct Justice**

241. After the April 17 and May 15 Indictments, several of the Defendants engaged in further misconduct intended to conceal their earlier illicit actions, and to attempt to further deprive the Plaintiffs of their constitutional rights by continuing to retrain Plaintiffs' liberty, deprive them of due process and a fair trial, and ultimately convict the three innocent Duke lacrosse players on charges that these Defendants knew to be false.

242. These Defendants' goal was to sustain the prosecutions and ultimately to convict the three innocent Duke lacrosse players by, among other things, concealing the DNA conspiracy that had resulted from the April 10, April 21, and May 12 Meetings, and the conspiracy to manufacture false identifications in the April Photo Array; to intimidate potential defense witnesses into providing false testimony, recanting exculpatory testimony, or remaining silent; and to fabricate new evidence to conceal the inconsistencies and contradictions by Mangum.

### 1. The Arrest and Intimidation of Alibi Witnesses

243. Defendants' initial efforts to fabricate evidence occurred within days of the April 17 Indictments. On or about April 19, 2006, the media began to publish conclusive alibi evidence collected by Reade Seligmann that demonstrated that he was nowhere near 610 N. Buchanan during the time that Mangum alleged she had been raped. This evidence included time-stamped photographs, cell phone records, his Duke entry card records, and an affidavit from a taxicab driver named Moezeldin Ahmad Elmostafa stating that he picked up Seligmann from the Trinity Park neighborhood just after midnight on March 14, 2006, and that he drove Seligmann to an ATM machine, a fast-food restaurant, and Seligmann's dormitory during the time that Mangum claimed she was being raped at 610 N. Buchanan.

244. At Nifong's direction, Himan interviewed Elmostafa on April 24, 2006. Elmostafa provided Himan with a written statement in which he again confirmed Seligmann's alibi.

- 74 -

245. Himan reported the substance of the April 24 interview to Nifong, who immediately directed his investigator, Defendant Linwood Wilson, to investigate Elmostafa in an attempt to find information that would either discredit Elmostafa or force him to recant Seligmann's alibi.

246. When Wilson discovered an uncleared 2003 arrest warrant relating to a shoplifting prosecution of one of Elmostafa's taxicab passengers, Nifong ordered Wilson, Gottlieb, and Himan to arrest Elmostafa on the warrant if he did not recant Seligmann's alibi.

247. On May 9, 2006, Wilson contacted Himan to state that Nifong wanted to know when Elmostafa would be arrested. Himan assured Wilson that Elmostafa would be arrested the next day.

248. On May 10, 2006, Himan and Clayton went to Elmostafa's home and asked if he wanted to change his story about Seligmann's alibi. When Elmostafa said that he would not recant Seligmann's alibi, Himan and Clayton proceeded to inform Elmostafa that they had an outstanding warrant for his arrest, placed Elmostafa in handcuffs, and took him into custody.

249. After Elmostafa was arrested, the officers again asked him whether he wanted to change his previous statement exonerating Seligmann. Elmostafa refused.

250. As punishment for Elmostafa's refusal to recant his truthful statement, Nifong directed that Elmostafa be prosecuted on larceny charges relating to the 2003 warrant.

251. On or about May 11, 2006, despite his direct involvement in this witness tampering, Nifong provided an interview to the News & Observer in which he flatly lied about the circumstances of Elmostafa's arrest. Notwithstanding his own directive that Elmostafa be asked again about Seligmann's alibi, Nifong stated, "I would be very surprised if the officers even thought about using that as an opportunity to ask him something." Nifong also claimed that the 2003 warrant for Elmostafa's arrest was discovered during a routine rundown of information about witnesses in the case, when Nifong knew that it had resulted from his specific instructions that Wilson target Elmostafa specifically.

252. Upon information and belief, the Supervisory Defendants were aware of these facts—including Elmostafa's unequivocal support of Seligmann's alibi, Nifong's directive to get Elmostafa to change his story using the 2003 warrant, and Nifong's misrepresentations to the public about the circumstances of Elmostafa's arrest—yet in their rush to charge Evans and sustain the indictments of Finnerty and Seligmann, they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this evidence demonstrating the misconduct underlying the investigation. Moreover, the Supervisory Defendants continued to allow Nifong to have primary responsibility for the police investigation, and to have Durham Police look to Nifong for direction as to the conduct of that investigation.

253. This was not the first instance in which Defendants attempted to obstruct justice and to deprive Plaintiffs' of their constitutional rights by tampering with alibi witnesses who contradicted Mangum's allegations.

254. As noted above, in her initial call with Himan on March 20, 2006, Pittman unequivocally stated that Mangum's rape allegations were a "crock" and that Pittman had been with Mangum for virtually the entire night.

255. Thereafter, Himan—using a similar technique to the one applied against Elmostafa—located an outstanding warrant against Pittman for an alleged parole violation, and provided it to Gottlieb and Clayton, who took Pittman into custody. Upon information and belief, these actions were taken at the direction or with the knowledge or approval of the Supervisory Defendants, or the Supervisory Defendants were willfully ignorant, deliberately indifferent, or grossly negligent with respect to these actions.

256. Upon information and belief, Nifong, Gottlieb, and Himan, acting individually and in concert, engaged in obstruction of justice and witness tampering by telling Pittman that if she changed her categorical denial and timeline of events, she would be given a deal on her parole violation.

257. On or about March 22, 2006, Pittman provided a formal written statement in which she recanted her initial statement that no assault occurred and her unequivocal conclusion that Mangum's allegations were a "crock."

- 77 -

258. Thereafter, Pittman was released on very favorable bail terms recommended by the District Attorney's Office.

259. Nifong also attempted to intimidate Duke lacrosse players who denied that a crime had occurred by publicly threatening to bring aiding and abetting charges against any lacrosse players who attended the party at 610 N. Buchanan.

260. The intended effect of Nifong's comments was to chill any Duke lacrosse player from denying the charges that Nifong intended to bring against three of that player's teammates, by threatening him with criminal prosecution.

261. On or about April 13, 2006, Gottlieb and Himan also attempted to intimidate other Duke lacrosse players by traveling to Duke University, entering student dormitories without a warrant, and attempting to conduct "ambush" interviews of players known to be represented by counsel.

262. Upon information and belief, in or around May 2006, Defendants Nifong, Wilson, Lamb, Gottlieb, and Himan, acting at the direction of the Supervisory Defendants and other senior officials in the City of Durham, attempted to intimidate and discredit Sergeant Shelton by subjecting him to an internal investigation, accusations of unprofessional conduct, and threats of disciplinary action for reporting Mangum's recantation of her rape claim while at Duke Medical Center on March 13.

263. Upon information and belief, the Supervisory Defendants were aware of these facts—including the attempts to intimidate Pittman and the other Duke lacrosse

players—yet in their rush to charge and sustain the indictments of the three innocent Duke lacrosse players, they willfully ignored and/or were deliberately indifferent or grossly negligent with respect to this additional evidence demonstrating the misconduct underlying the investigation. Moreover, the Supervisory Defendants continued to allow Nifong to have primary responsibility for the police investigation, to have Durham Police look to Nifong for direction as to the conduct of that investigation, and to have Gottlieb and Himan continue to participate in the investigation.

### 2. Gottlieb's Phony "Supplemental Case Notes"

264. Gottlieb took no contemporaneous notes of the interview of Mangum on March 16, 2006. In July 2006, however—after defense filings revealed numerous inconsistencies and contradictions in Mangum's accounts and the documents included in the State's discovery production—Gottlieb created an after-the-fact "report" of all of his purported activities in the investigation, including the March 16 interview with Mangum, which he titled his "Supplemental Case Notes." The Supplemental Case Notes were provided to the Defendants on July 17, 2006.

265. Gottlieb's Supplemental Case Notes were an intentional fabrication in an attempt to cover up inconsistencies and contradictions in Mangum's actual statements regarding the incident.

266. For example, in order to explain Mangum's bizarre behavior and inconsistent accounts, Gottlieb concocted a phony story and put words into Mangum's mouth

to support it.  Gottlieb wrote that Mangum purportedly had told him that she began to feel funny after consuming a drink provided to her at the party—falsely suggesting she had been given a "mickey."

267.    In addition, in order to conceal the disparities between Mangum's actual description of her alleged attackers during the March 16 interview and the Plaintiffs, Gottlieb simply invented a new account that Mangum had purportedly given during the March 16 interview.  Unlike the descriptions memorialized in Himan's contemporaneous notes, however, Gottlieb's descriptions were manufactured to fit Evans, Finnerty, and Seligmann:

     a.     "W/M, young, blonde hair, baby faced, tall and lean";

     b.     "W/M, medium height (5'8"+ with Himan's build), dark hair medium build, and had red (rose colored) cheeks";

     c.     (c) "W/M, 6+ feet, large build, with dark hair."

268.    A comparison of Himan's contemporaneous notes with Gottlieb's post-Indictment version demonstrates the disparities in the two accounts:

| **Himan's Notes** | **Gottlieb's "Supplemental Case Notes"** |
| --- | --- |
| "Adam":  white male, short, red cheeks, fluffy hair, brown, chubby face. | W/M, medium height (5'8"+) medium build, dark hair, red (rose colored) cheeks. |
| "Matt" :  heavy set, short hair cut, 260lbs to 270lbs. | W/M, 6+ feet, large build, with dark hair. |
| "Brett":  Chubby | W/M, young, blonde hair, baby faced, tall and lean. |

- 80 -

269. Upon information and belief, as part of their ongoing obstruction of justice and deprivation of Plaintiffs' constitutional rights, certain of the Defendants provided Gottlieb's Supplemental Case Notes to the media in an attempt to maintain public support for the prosecution.

### 3. Additional False Public Statements

270. Defendants continued to make false public statements in an attempt to continue their conspiracy, to cover up their own wrongdoing, and to maintain the inflammatory atmosphere that their prior false public statements had created against the three innocent Duke lacrosse players.

271. On May 3, 2006, for example, Nifong publicly insinuated that Plaintiffs' attorneys were strategically disclosing DNA test results. Nifong did not reveal that he himself had already entered into an illicit agreement to conceal the exculpatory results of DSI's testing. Nifong stated:

> "My guess is that there are many questions that many people are asking that they would not be asking if they saw the results. . . . They're not things that the defense releases unless they unquestionably support their positions. . . .. So the fact that they're making statements about what the reports are saying, and not actually showing the reports, should in and of itself raise some red flags."

272. In addition, in a June 13, 2006, email to a Newsweek reporter that was subsequently published, Nifong stated that "None of the 'facts' I know at this

- 81 -

time, indeed, none of the evidence I have seen from any source, has changed the opinion that I expressed initially." Nifong did not mention any of the exculpatory DNA evidence that he and other Defendants had conspired to conceal and successfully omitted from the May 12 Report, or the conspiracy to manufacture false identifications of the Plaintiffs in the April Photo Array.

### 4. Defendants' Misrepresentations About the DNA Evidence

273. No later than April 10, 2006, Defendants had in their possession an oral report from Meehan that DSI's testing had revealed the existence of DNA from multiple unidentified males on Mangum's rape kit items, and excluded with 100% certainty all of the Duke lacrosse players, including the Plaintiffs, as contributors of the DNA found on those items.

274. Defendants not only concealed this evidence in order to obtain the April 17 and May 15 Indictments of the three innocent Duke lacrosse players, but succeeded in concealing it for nearly seven months, affirmatively representing to defense counsel and the Superior Court of Durham County that Nifong was aware of no other exculpatory evidence or DNA testing in the case. Even when Defendants finally disclosed the exculpatory facts, they did not do so in a recognizable form, but rather, attempted to bury the exculpatory results as unsummarized raw data scattered across nearly 2,000 pages of documents in a willful attempt to obfuscate the results from Plaintiffs and the court, to obstruct justice, and to cover up their own wrongdoing.

275. On May 18, 2006, Nifong served various discovery materials on defense counsel for the Plaintiffs, in connection with a hearing in the case on that same day. These materials included another copy of the May 12 Report. None of the discovery materials that Nifong produced on May 18 included any of the underlying data or information concerning DSI's testing and analysis, and certainly did not include any documentation or information indicating the presence of DNA from multiple unidentified males on the rape kit items. Moreover, Nifong did not provide in the discovery materials any written or recorded memorializations of the substance of Dr. Meehan's oral statements made during the April 10, April 21, and May 12 Meetings concerning the results of all of DSI's tests and examinations, including the existence of DNA from multiple unidentified males on the rape kit items ("memorializations of Dr. Meehan's oral statements").

276. At the same time he served the discovery materials, Nifong also served and filed with the Court written responses to the Plaintiffs' initial discovery requests, in which he falsely stated that "The State is not aware of any additional material or information which may be exculpatory in nature with respect to the Defendant." In his written discovery responses, Nifong falsely stated that the Plaintiffs had received all of the reports of the experts whom the State intended to call in the case, Meehan and another employee of DSI.

277. Yet, at the time he made these representations to the Superior Court and to the Plaintiffs in his written discovery responses, Nifong was aware of the existence of

Case 1:07-cv-00739    Document 1    Filed 10/05/2007    Page 89 of 155

DNA from multiple unidentified males on the rape kit items. He was aware that DSI's written report did not reveal the existence of this evidence. And he was aware that he had not provided the Plaintiffs with memorializations of Dr. Meehan's oral statements regarding the existence of this evidence.

278. In an opinion dated July 11, 2007, the Disciplinary Hearing Commission of the North Carolina State Bar found that the representations contained in Nifong's May 18 written discovery responses were intentional misrepresentations and intentional false statements of material fact to opposing counsel and to the Superior Court.

279. At the May 18, 2006 hearing, the Honorable Ronald Stephens, Superior Court Judge presiding, asked Nifong if he had provided the Plaintiffs with all discovery materials.

280. In response to Judge Stephens' inquiry, Nifong falsely stated: "I've turned over everything I have."

281. In an opinion dated July 11, 2007, the Disciplinary Hearing Commission of the North Carolina State Bar found that Nifong's response to Judge Stephens's question was a misrepresentation and a false statement of material fact.

282. On June 19, 2006, Nifong issued a press release to representatives of *Newsweek* in which he stated, "None of the 'facts' I know at this time, indeed, none of the evidence I have seen from any source, has changed the opinion that I expressed initially."

283. Nifong's statement to *Newsweek* was a misrepresentation and a false statement of material fact intended to harm Plaintiffs in the court of public opinion and with the prospective jury pool.

284. On June 19, 2006, counsel for the Plaintiffs requested various materials from Nifong, including a report or written statement of the meetings between Nifong and Meehan to discuss the DNA test results. This request was addressed at a hearing before Judge Stephens on June 22, 2006.

285. During the June 22, 2006 hearing, Nifong stated in open court that, other than what was contained in the May 12 Report, all of his communications with Meehan were privileged "work product." Nifong falsely stated to Judge Stephens that the sum total of his meeting with Meehan was, "We received the reports, which [defense counsel] has received, and we talked about how we would likely use that, and that's what we did."

286. At the time Nifong made these representations to Judge Stephens on June 22, Nifong knew that he had discussed with Meehan on three occasions the existence of DNA from multiple unidentified males on the rape kits items, which evidence was not disclosed in DSI's written report, and that Dr. Meehan's statements to him revealing the existence of DNA from multiple unidentified males on the rape kits items were not privileged work product but, rather, were evidence of actual innocence that should have been provided to the three innocent Duke lacrosse players then under indictment and awaiting trial.

287. In an opinion dated July 11, 2007, the Disciplinary Hearing Commission of the North Carolina State Bar found that Nifong's representations to Judge Stephens at the June 22, 2006 hearing were intentional misrepresentations and intentional false statements of material fact to the Court and to opposing counsel.

288. During the June 22 hearing, Judge Stephens entered an Order directing Nifong to provide Collin Finnerty and later all the Plaintiffs with among other things, all "results of tests and examinations, or any other matter or evidence obtained during the investigation of the offenses alleged to have been committed by the defendant" and statements of any witnesses taken during the investigation, with oral statements to be reduced to written or recorded form.

289. To cover up his misconduct and that of the other Defendants, Nifong did not provide the Plaintiffs with all "results of tests and examinations, or any other matter or evidence obtained during the investigation of the offenses alleged to have been committed by the defendant" and did not provide the three innocent Duke lacrosse players with statements of any witnesses taken during the investigation, with oral statements reduced to written or recorded form.

290. In an opinion dated July 11, 2007, the Disciplinary Hearing Commission of the North Carolina State Bar found that Nifong did not comply with Judge Stephens' June 22 Order.

291. On August 31, 2006, the Plaintiffs collectively filed a Joint Omnibus Motion to Compel Discovery seeking, among other things, the complete file and all

underlying data regarding DSI's work and the substance of any discoverable comments made by Meehan during the April 10, April 21, and May 12 Meetings with Nifong, Himan, and Gottlieb. The Joint Omnibus Motion was addressed by the Honorable Osmond W. Smith III, Superior Court Judge presiding, at a hearing on September 22, 2006.

### a. The September 22 Hearing

292. At the September 22 hearing, counsel for the Plaintiffs specifically stated in open court that they were seeking the results of any tests finding any additional DNA on Mangum, even if that DNA did not match any of the Plaintiffs or other individuals who provided known reference specimens.

293. In response to a direct question from Judge Smith, Nifong falsely stated that the May 12 Report not only encompassed all tests performed by DSI, but everything discussed at the April 10, April 21, and May 12 meetings. The following exchange occurred immediately thereafter on the Plaintiffs' request for memorializations of Meehan's oral statements:

> Judge Smith: "So you represent there are no other statements from Dr. Meehan?"
> Mr. Nifong: "No other statements. No other statements made to me."

294. At the time Nifong made these false representations to Judge Smith, he was aware that Meehan had told him in their meetings about the existence of overwhelming exculpatory evidence, namely the DNA from multiple unidentified males on the

rape kit items, he was aware that he had not provided the Plaintiffs with a written or recorded memorialization of Meehan's statements, and he was aware that the existence of that DNA was not revealed in DSI's written report.

295. In an opinion dated July 11, 2007, the Disciplinary Hearing Commission of the North Carolina State Bar found that Nifong's statements and response to Judge Smith at the September 22 hearing were intentional misrepresentations and intentional false statements of material fact to the Court and to opposing counsel.

296. On September 22, 2006, Judge Smith ordered Nifong to provide the Plaintiffs with the complete files and underlying data from both the SBI and DSI by October 20, 2006.

297. On October 19, 2006, counsel for Evans faxed Nifong a proposed order reflecting Judge Smith's September 22 ruling. The proposed order stated, in paragraph 4, "Mr. Nifong indicated that he did not discuss the facts of the case with Dr. Meehan and that Dr. Meehan said nothing during [the April 10, April 21, and May 12 Meetings] beyond what was encompassed in the final report of DSI, dated May 12, 2006. The Court accepted Mr. Nifong's representation about those meetings and held that there were no additional discoverable statements by Dr. Meehan for the State to produce."

298. On October 24, 2006, Nifong responded by letter to defense counsel's October 19, 2006 letter and proposed order. In his response, Nifong identified two changes he believed were appropriate to two portions of the proposed order, made no mention

- 88 -

of any changes to paragraph 4, and wrote that "the proposed order seems satisfactory" and "seems to reflect with acceptable accuracy the rulings of Judge Smith on September 22."

299. Nifong's October 24 letter was an intentional misrepresentation and an intentional omission of material fact to opposing counsel.

300. On October 27, 2006, Nifong provided 1,844 pages of underlying documents and materials from DSI to the Plaintiffs pursuant to the September 22, 2006 Order, but he did not provide them with a complete written report from DSI setting forth the results of all of its tests and examinations, including the existence of DNA from the multiple unidentified males, or any written or recorded memorializtions of Dr. Meehan's oral statements.

301. After approximately 100 hours of review and complex analysis of the underlying data provided to them on October 27, defense counsel for the Plaintiffs determined that DSI's written report did not include the results of DNA tests performed by DSI and that DSI had found DNA from multiple unidentified males on the rape kit items and that such results were not included in DSI's written report.

302. On December 13, 2006, the Plaintiffs filed a Motion to Compel Discovery: Expert DNA Analysis, detailing their discovery of the existence of DNA from multiple unidentified males on the rape kit items and explaining that this evidence had not been included DSI's written report. The motion did not allege any attempt or agreement to conceal the potentially exculpatory DNA evidence or test results.

The Motion to Compel Discovery: Expert DNA Analysis was addressed by the Honorable Osmond W. Smith III, Superior Court Judge presiding, at a hearing on December 15, 2006.

### b. The December 15 Hearing

303. At the December 15 hearing, both in chambers and again in open court, Nifong falsely stated or implied to Judge Smith that he was unaware of the existence of DNA from multiple unidentified males on the rape kit items until he received the December 13 motion and that he was unaware that the results of any DNA testing performed by DSI had been excluded from DSI's written report. Nifong falsely stated to Judge Smith in open court: "The first I heard of this particular situation was when I was served with these reports—this motion on Wednesday of this week."

304. In an opinion dated July 11, 2007, the Disciplinary Hearing Commission of the North Carolina State Bar found that Nifong's representations that he was unaware of the existence of DNA from multiple unidentified males on the rape kit items and/or that he was unaware of the exclusion of such evidence from DSI's written report, were intentional misrepresentations and intentional false statements of material fact to the Superior Court and to opposing counsel.

305. During the December 15 hearing, Dr. Meehan testified under oath to the following statements:

a.  Meehan discussed with Nifong at the April 10, April 21, and May 12 meetings the results of all tests conducted by DSI to date, including the overwhelming exculpatory finding of at least four unidentified males' DNA on the rape kit items;

b.  Meehan and Nifong discussed and agreed that "we would only disclose or show on our report those reference specimens that matched evidence items";

c.  DSI's report did not set forth the results of all tests and examinations DSI conducted in the case, but was instead limited to only some results;

d.  The limited report was the result of "an intentional limitation" arrived at between Meehan and Nifong "not to report on the results of all examinations and tests" that DSI performed;

e.  The failure to provide all test and examination results purportedly was based on privacy concerns; and

f.  Meehan would have prepared a report setting forth the results of all of DSI's tests and examinations if he had been asked to do so by Nifong or other representatives of the State of North Carolina at any time after May 12, 2006.

306.  Even after Meehan confessed to the DNA conspiracy in open court at the December 15 hearing, Nifong continued to attempt to misrepresent his

involvement in the months-long concealment and obfuscation of the exculpatory results, stating to a representative of the news media:  "[W]e were trying to, just as Dr. Meehan said, trying to avoid dragging any names through the mud but at the same time his report made it clear that all the information was available if they wanted it and they have every word of it."

### 5.    Further Efforts To Reshape the Factual Record After the December 15 Hearing, Including Additional Witness Tampering

307.    Even after Meehan confessed to the conspiracy to conceal the exculpatory forensic evidence and to manufacture a deliberately incomplete DNA report, certain Defendants continued to attempt to reshape the factual record in order to maintain the prosecution of the three innocent Duke lacrosse players.

308.    On December 21, 2006, days after Meehan's testimony, Wilson conducted an unwitnessed, unsupervised interview of Mangum the sole purpose of which was to revive the prosecution by persuading Mangum to alter her statements to conform to the revelations regarding the lack of Plaintiffs' DNA on the rape kit items. Upon information and belief, Wilson did so at Nifong's direction and with Nifong's approval.

309.    By conducting this interview without a witness, Wilson violated standing Durham Police polices that required at least two officers at every witness interview.

310.    During this interview, Wilson claimed that Mangum contradicted critical elements of her earlier statements.  In particular, Wilson claimed, Mangum recanted her

allegations that she had been raped and that one or more of her alleged assailants had ejaculated in her vagina or anus during the course of the alleged assault. According to Wilson, however, Mangum still maintained she was assaulted, and for the first time alleged that she may have been penetrated with a foreign object.

311. Wilson also claimed that Mangum provided new eyewitness identifications of the Plaintiffs during this interview, based on the same photographs that were used in the tainted April Photo Array. Wilson deliberately brought these photographs with him for the purpose of manufacturing new "identifications" of the three innocent Duke lacrosse players, after the players' attorneys had made known that they would be moving to suppress the identifications made during the April Photo Array. Wilson would later falsely claim that he inadvertently brought the photographs with him to the interview, and that Mangum "happened" to see them and identify the Plaintiffs.

312. Even with Wilson's obvious and repugnant coaching, Mangum provided yet another account of the evening of March 13-14. This, too, was contradicted by the other evidence.

313. Despite Mangum's cajoled "recantation," her implausible new accusations, and the overwhelming evidence of innocence, Nifong did not dismiss the prosecution. Instead, he dismissed only the charge of first degree rape, and continued to prosecute Plaintiffs on the remaining sexual assault and kidnapping charges in a

desperate attempt to continue the prosecution of the three innocent Duke lacrosse players.

### G.    The North Carolina Attorney General and State Bar Conclude that the Plaintiffs Are Innocent

314.   In December 2006, Nifong received notice that an ethics complaint had been filed against him with the North Carolina State Bar for violations of the North Carolina Revised Rules of Professional Conduct based on his conduct during the investigation and prosecution of Plaintiffs.

315.   On January 12, 2007, Nifong had no choice but to recuse himself from the prosecution of the Plaintiffs and referred their cases to the North Carolina Attorney General.  At that point, Nifong was no longer in a position to control the conspiracy, to obstruct justice, and to maintain the baseless prosecution of the three innocent Duke lacrosse players.

316.   The Attorney General conducted an intensive, independent investigation of the three cases, which included pursuing the documented inconsistencies in Mangum's accounts, examining all of the DNA evidence, and inviting and reviewing exculpatory evidence from the Plaintiffs.

317.   On April 11, 2007, the Attorney General dismissed all of the remaining charges against the three innocent Duke lacrosse players.

318.   In his public statement announcing the decision to dismiss, the Attorney General described the investigation conducted by State officials and declared that "these

cases were the result of a tragic rush to accuse and a failure to verify serious allegations."

319. Specifically, the Attorney General concluded that Nifong, Durham Police, and other Defendants conspicuously failed to confront Mangum with both the contradictions among her initial inconsistent accounts of events on March 14, 2006, and the contradictions raised by the physical and documentary evidence.

320. The Attorney General also concluded that Nifong, Durham Police, and other Defendants failed to make a serious assessment of Mangum's credibility in light of these contradictions, Mangum's admitted use of alcohol and prescription drugs, and Mangum's psychiatric history.

321. The Attorney General concluded that Ms. Mangum's credibility was suspect, her various inconsistent allegations were incredible and were contradicted by other evidence in the case, and that credible and verifiable evidence demonstrated that the three innocent Duke lacrosse players could not have participated in an attack during the time it was alleged to have occurred.

322. Based on its findings that no credible evidence supported the allegation that the crimes occurred, the Attorney General declared that Reade Seligman, Collin Finnerty, and David Evans were innocent of all charges in the Duke Lacrosse case. The cases against the three innocent Duke lacrosse players were dismissed on April 11, 2007.

323. The Attorney General noted that "a lot of people need to apologize" for what happened to the Plaintiffs.

324. On June 16, 2007, Nifong was disbarred by the North Carolina bar for his actions relating to the investigation and prosecution of Plaintiffs. In announcing the hearing committee's decision, committee chair F. Lane Williamson stated, "This matter has been a fiasco. There's no doubt about it." Williamson added, "We acknowledge the actual innocence of the defendants, and there's nothing here that has done anything but support that assertion."

325. On July 11, 2007, the North Carolina bar issued the committee's written opinion announcing Nifong's disbarment. Among other things, the committee found that "[Nifong's] conduct was, at least, a major contributing factor in the exceptionally intense national and local media coverage the Duke Lacrosse case received and in the public condemnation heaped upon the Duke Defendants," who "experienced heightened public scorn and loss of privacy while facing very serious criminal charges of which the Attorney General of North Carolina ultimately concluded they were innocent."

326. On August 31, 2007, Nifong was found guilty of criminal contempt by the Superior Court for Durham County (Honorable Osmond W. Smith III, Superior Court Judge presiding) for his false and misleading statements at the September 22 hearing. Judge Smith sentenced Nifong to a symbolic one day in jail, explaining that "If what I impose, with regard to Mr. Nifong, would make things better or

different for what's already happened, I don't know what it would be or how I could do it."

## FIRST CAUSE OF ACTION:
## MALICIOUS PROSECUTION AND SEIZURE IN VIOLATION OF
## 42 U.S.C. § 1983

(Against Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI
in their individual capacities)

327. Plaintiffs incorporate paragraphs 1-326 above.

328. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI are "persons," as that term is used in the text of 42 U.S.C. § 1983.

329. Under color of state law, Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI, acting individually and in concert, initiated and continued criminal prosecutions against each of the Plaintiffs on charges of first-degree rape, first-degree sexual assault, and kidnapping.

330. There was no probable cause for any of the criminal prosecutions of the Plaintiffs.

331. Each of the criminal prosecutions terminated in favor of the Plaintiffs.

332. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI's actions were malicious and evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

333. As result of these wrongful prosecutions, Plaintiffs were seized and deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

Case 1:07-cv-00739    Document 1    Filed 10/05/2007    Page 103 of 155

334. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

335. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

## SECOND CAUSE OF ACTION:
## CONCEALMENT OF EVIDENCE IN VIOLATION OF 42 U.S.C. § 1983

(Against Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI
in their individual capacities)

336. Plaintiffs incorporate paragraphs 1-335 above.

337. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI are "persons," as that term is used in the text of 42 U.S.C. § 1983.

338. Under color of law, Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI, acting individually and in concert, concealed evidence of Plaintiffs' actual innocence.

339. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI conspired to develop a "limited reporting protocol" that was, in reality, intended to conceal and obfuscate evidence of Plaintiffs' innocence from the Plaintiffs, their attorneys, and the courts.

- 98 -

340. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI knowingly and intentionally concealed critical exculpatory DNA evidence and expert reports to which Plaintiffs were entitled under standing court orders, the Fourteenth Amendment to the United States Constitution, and North Carolina law.

341. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI continued to conceal the exculpatory DNA evidence until October 2006, when these Defendants then attempted to cloak it by producing it in snippets scattered across nearly 2,000 pages of raw scientific data.

342. These Defendants' decision to bury this evidence under the piles of unfiltered data was calculated to perpetuate their concealment of that evidence.

343. In addition, Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI intentionally withheld notes and memorializations of Meehan's oral reports of the results of DSI's testing, to which Plaintiffs were entitled under standing court orders, North Carolina law, and the Fourteenth Amendment.

344. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

345. As a result of these Defendants' conduct, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

346. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

347. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in criminal proceedings pursued against them, and incurred expenses associated with defending against the criminal proceedings initiated and sustained by Defendants.

**THIRD CAUSE OF ACTION:**
**FABRICATION OF FALSE EVIDENCE IN VIOLATION OF 42 U.S.C. § 1983**

(Against Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI
in their individual capacities)

348. Plaintiffs incorporate paragraphs 1-347 above.

349. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI are "persons," as that term is used in the text of 42 U.S.C. § 1983.

350. Acting under color of law, Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI, individually and in concert, conspired to produce a false and misleading DNA report that they understood and agreed would be falsely misrepresented as the "final" results of all DNA testing by DSI, and that would be used in the criminal proceeding instituted against Plaintiffs.

351. Under color of law, Nifong, Gottlieb, Himan, and Wilson, acting individually and in concert, abused their authority and positions as law enforcement officers to intimidate defense witnesses in an effort to force them to alter their accounts of

- 100 -

events on March 13 and 14, 2006, in order to obtain false statements that they could use in the criminal proceedings against Plaintiffs and/or to prevent those witnesses from testifying in defense of the Plaintiffs.

352. Under color of law, Nifong, Gottlieb, and Himan, acting individually and in concert, manipulated photographic arrays and identification procedures in direct violation of written Durham Police procedures in order to secure false witness identifications, knowing that those identifications would be used in the criminal proceedings instituted against Plaintiffs.

353. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights

354. As a result of Defendants' conduct, each of the Plaintiffs was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

355. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

356. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

## FOURTH CAUSE OF ACTION:
## MAKING FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. § 1983

(Against Nifong, Hodge, and Addison in their individual capacities)

357.  Plaintiffs incorporate paragraphs 1-356 above.

358.  Nifong, Hodge, and Addison are "persons," as that term is used in the text of 42 U.S.C. § 1983.

359.  Beginning in March 2006 and December 2007, Nifong, Hodge, and Addison made various public statements, including the Nifong and Durham Police Statements, that were of and concerning the Plaintiffs and the investigation and prosecution of Mangum's allegations.

360.  Nifong, Hodge, and Addison made their respective public statements, including the Nifong and Durham Police Statements, under color of law.

361.  In his public statements, including the Nifong Statements, Nifong falsely stated, among other things, that:

a.  Three members of the Duke lacrosse team had committed a vicious, racially-motivated gang rape;

b.  Mangum had identified Plaintiffs as her assailants;

c.  There was "no doubt" a rape occurred;

d.  Other members of the Duke lacrosse team aided and abetted the alleged gang rape;

- 102 -

e. Plaintiffs and other members of the Duke lacrosse team were "a bunch of hooligans" engaged in a "stonewall of silence";

f. None of the members of the lacrosse team "has been enough of a man to come forward."

g. The absence of DNA results could be explained by condom use during the alleged assault;

h. None of the facts that Nifong knew as of June 19, 2006 raised any doubt that a rape might not have occurred; and

i. Based on the results of the DNA testing, there was no question that a rape occurred.

362. In their public statements, including the Durham Police Statements, Hodge and Addison falsely stated, among other things, that members of the Duke lacrosse team had committed a brutal gang rape and robbery at 610 N. Buchanan, that Plaintiffs and other members of the Duke lacrosse team were obstructing the investigation by failing to come forward and provide evidence, and that Durham Police had developed a strong case against Plaintiffs.

363. Nifong, Hodge, and Addison's false statements, including the Nifong and Durham Police Statements, were published through the local, national, and international media, conveying these false statements to an audience of hundreds of millions of people.

364.    Nifong, Hodge, and Addison's false statements, including the Nifong and Durham Police Statements, were intended to inflame the Durham community and grand jury pool against the Plaintiffs and other Duke lacrosse players, and to compromise the fairness of subsequent judicial proceedings.

365.    Nifong's, Hodge's, and Addison's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

366.    As a result of Nifong's, Hodge's, and Addison's false public statements, Plaintiffs were seized and deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

367.    As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

368.    As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

### FIFTH CAUSE OF ACTION:  VIOLATIONS OF 42 U.S.C. § 1983 (*MONELL V. DEP'T OF SOCIAL SERVS.*, 436 U.S. 658 (1977))

(Against the Supervisory Defendants in their official capacities, Nifong in his official capacity with respect to Durham Police, and the City of Durham)

369.    Plaintiffs incorporate the allegations made in paragraphs 1-368 above.

- 104 -

370. Nifong, the Supervisory Defendants, the City of Durham are "persons," as that term is used in the text of 42 U.S.C. § 1983.

### A. Officials with Final Policymaking Authority for Durham Police Approved the Unconstitutional Conduct of Their Subordinates.

371. Upon information and belief, the Supervisory Defendants and other officials in the City of Durham having final policymaking authority for Durham Police had contemporaneous knowledge through the chain of command that Nifong and Durham Police officers were conducting manipulative identification procedures that violated constitutional standards, intimidating witnesses who had information about Plaintiffs' innocence, concealing evidence of Plaintiffs' innocence, fabricating false evidence, and making false public statements regarding Plaintiffs and the Duke lacrosse team.

372. It would have been plainly obvious to a reasonable policymaker that such conduct would lead to deprivations of Plaintiffs' constitutional rights.

373. Upon information and belief, the Supervisory Defendants and other officials in the City of Durham and the Durham Police nevertheless agreed to, approved, and ratified this unconstitutional conduct by Nifong and their subordinates in Durham Police.

374. As a direct and foreseeable consequence of these policy decisions, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**B. Durham Police Had an Established Policy or Custom Permitting Officers to Publish Premature Conclusions of Criminality and Guilt**.

375. Addison, acting in his official capacity as spokesman of the Durham Police Department, pursuant to established custom or policy, and with the acquiescence or approval of the Supervisory Defendants, made a series of public statements expressing the Department's official conclusion that Mangum had been raped, sexually assaulted, and kidnapped by members of the Duke lacrosse team.

376. In addition, Addison repeatedly expressed the Department's official view that Plaintiffs and other members of the Duke lacrosse team were obstructing justice by failing to confess their knowledge of, or involvement in, the alleged assault.

377. Addison, acting pursuant to established customs or policies of the City of Durham and the Durham Police Department, with the acquiescence or approval of Chalmers, Hodge, Lee and other policymaking officials in the Durham Police Department, and in his official capacity as coordinator of Durham Crimestoppers, caused the publication of a series of "Wanted" posters that contained inflammatory and conclusory allegations of rape, sexual assault, and kidnapping against members of the Duke lacrosse team.

378. Hodge himself, in his capacity as Deputy Chief of Police and the second-highest-ranking official in the Durham Police Department, stated publicly that the Durham Police had a strong case against members of the Duke lacrosse team.

379. As a direct and foreseeable consequence of the custom or policy allowing Durham Police officials to publish premature official conclusions of criminality and guilt, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**C.  Durham Police Had an Established Policy or Custom Targeting Duke University Students for Harassment Through Selective and Improper Enforcement of the Criminal Laws.**

380. Upon information and belief, the Supervisory Defendants and other officials in the City of Durham and the Durham Police established a policy or custom encouraging Durham Police officers to target Duke University students for selective enforcement of the criminal laws.

381. It would have been plainly obvious to a reasonable policymaker that such conduct would lead to deprivations of Plaintiffs' constitutional rights. Indeed, upon information and belief, the Supervisory Defendants were aware that Gottlieb had attempted to effectuate this policy by engaging in selective and malicious prosecution, excessive use of force, manufacturing of false evidence, and filing of false police reports against Duke University students, yet they consistently failed to take adequate or meaningful steps to discipline Gottlieb, correct his behavior, or terminate his employment.

382. As a direct and foreseeable consequence of this policy decision, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**D.** **Officials with Final Policymaking Authority Failed to Exercise Adequate Supervisory Responsibility over Nifong.**

383.    On or about March 24, 2006, the Supervisory Defendants and, upon information and belief, other officials with final policymaking authority in the City of Durham and the Durham Police agreed that Nifong would direct the Durham Police investigation into the allegations of rape, sexual assault, and kidnapping made by Crystal Mangum.

384.    Before and after Nifong was given authority to direct the Durham Police investigation, the Supervisory Defendants and other officials with final policymaking authority in the City of Durham and the Durham Police had actual or constructive knowledge that Nifong did not have the experience or training to direct a complex criminal investigation; that he was in the midst of a hotly-disputed election campaign; that he had a history of explosive, irrational, and unstable behavior; that his political ambition was driving his personal engagement with the investigation; and that he had made statements committing the investigation to a determinate outcome.

385.    In these circumstances, adequate scrutiny of Nifong's character, conduct, and background would have made it plainly obvious to a reasonable policymaker that the decision to permit him to direct this investigation would lead to deprivations of Plaintiffs' constitutional rights.

386. Nevertheless, the Supervisory Defendants and other officials in the City of Durham and the Durham Police Department allowed Nifong to direct the investigation knowing, or with deliberate indifference to the likelihood, that their decision would result in violations of Plaintiffs' constitutional rights.

387. After Nifong was allowed to direct the investigation, the Supervisory Defendants and other officials with final policymaking authority in the City of Durham and the Durham Police had actual or constructive knowledge that Nifong had authorized and/or personally engaged in decisions from which it would have been plainly obvious to a reasonable supervisory official that violations of Plaintiffs' constitutional rights inevitably would occur, including the deviation from the procedures otherwise required under General Order No. 4077, the conspiracy to fabricate and conceal DNA evidence during the April 10, April 21, and May 12 Meetings, the intimidation of defense witnesses, and the Nifong Statements. Nevertheless, the Supervisory Defendants and other officials in the City of Durham and the Durham Police Department took no corrective action and instead continued to permit Nifong to direct the Durham Police investigation and continued to direct Durham Police to report to Nifong, knowing or with reckless disregard or deliberate indifference to the likelihood that their decision would result in further violations of Plaintiffs' constitutional rights.

388.    As a direct and foreseeable consequence of these policy decisions, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### E.    Officials with Final Policymaking Authority Failed to Exercise Adequate Supervisory Responsibility over Gottlieb.

389.    Upon information and belief, as of March 13, 2006, Gottlieb had a documented history of selective and malicious prosecution, excessive use of force, manufacturing of false evidence, and filing of false police reports in his dealings with Duke University students.

390.    The Supervisory Defendants and other officials in the City of Durham and the Durham Police Department consistently failed to take adequate or meaningful steps to discipline Gottlieb, correct his behavior, or terminate his employment.

391.    By these omissions, these officials endorsed and ratified Gottlieb's unconstitutional conduct, established a custom or practice of targeting Duke University students for harsh or disproportionate treatment, or established a custom and practice of failing to correct the unconstitutional conduct of Durham Police officers.

392.    In these circumstances, it would have been plainly obvious to a reasonable policymaker that the decision to place Gottlieb in a lead position on this investigation would lead to deprivations of Plaintiffs' constitutional rights.

393. Despite this evidence, the Supervisory Defendants and other officials in the City of Durham and the Durham Police Department, assigned Gottlieb to lead the investigation knowing, or with deliberate indifference to the likelihood, that their decision would result in violations of Plaintiffs' constitutional rights.

394. As a direct and foreseeable consequence of this official action, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**F.     After Being Given Final Policymaking Authority over the Durham Police Investigation, Nifong Directed Officers to Engage in Constitutional Violations.**

395. On or about March 24, 2006, the Supervisory Defendants and other officials with final policymaking authority in the City of Durham and the Durham Police Department agreed that Nifong would direct the Durham Police investigation into the allegations of rape, sexual assault, and kidnapping made by Mangum.

396. On or about March 24, 2006, Defendant Lamb instructed Gottlieb and Himan that they should take their direction from Nifong regarding their investigation, rather than the usual Durham Police chain of command, and that they should also report to senior command staff on the investigation's progress.

397. By agreeing that Nifong would direct the investigation, and by instructing Durham Police personnel to take direction from Nifong instead of the usual chain of command, the Supervisory Defendants, the City of Durham, and the Durham Police Department delegated to Nifong final policymaking authority over the

- 111 -

investigative procedures implemented by the Durham Police Department and the Durham Police personnel involved in the investigation.

398. Acting in this capacity, Nifong used his delegated authority to implement a series of investigative policies and actions that included, among other things, the manufacturing of a false and misleading DNA report, the suppression of exculpatory DNA evidence, the intimidation of witnesses, and the manipulation of witness identification procedures.

399. Nifong implemented these policies and actions with knowledge or deliberate indifference to the likelihood that they would result in violations of Plaintiffs' constitutional rights.

400. Upon information and belief, the Supervisory Defendants and other officials in the City of Durham and the Durham Police nevertheless ratified these investigative policies and actions implemented by Nifong.

401. As a direct and foreseeable consequence of these investigative policies and actions, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

\* \* \*

402. As a direct and foreseeable consequence of each of the foregoing constitutional deprivations caused by policymaking officials, customs and practices, and policies in the City of Durham and the Durham Police Department, Plaintiffs have suffered

economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

403. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

## SIXTH CAUSE OF ACTION: SUPERVISORY VIOLATIONS OF 42 U.S.C. § 1983

(Against the Supervisory Defendants in their individual capacities)

404. Plaintiffs incorporate the allegations made in paragraphs 1-403 above.

405. The Supervisory Defendants are "persons," as that term is used in the text of 42 U.S.C. § 1983.

### A. The Supervisory Defendants' Failure to Supervise the Investigation Resulted in Violations of Plaintiffs' Constitutional Rights.

406. On or about March 24, 2006, Nifong, with the acquiescence or approval of the Supervisory Defendants assumed direct responsibility for the police investigation into allegations of rape, sexual assault, and kidnapping made by Crystal Mangum.

407. On or about March 24, 2006, the Supervisory Defendants ordered Addison, Gottlieb, Himan and officers involved in the investigation to report directly to Nifong, but required that they continue to provide information about the investigation to their chain of command.

- 113 -

408. During the course of the subsequent investigation, Nifong, Gottlieb, Wilson, and Himan, individually and in concert, engaged in a number of investigative abuses, including intimidation of witnesses, manufacturing of false evidence, suppression of exculpatory evidence, and manipulation of witness identification procedures.

409. The Supervisory Defendants knew, or should have known, about these abuses and failed to take meaningful preventative or remedial action.

410. The Supervisory Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

411. As a direct and foreseeable consequence of these acts and omissions, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

412. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

413. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

### B. The Supervisory Defendants' Failure to Control and Supervise Gottlieb Led to Violations of Plaintiffs' Constitutional Rights.

414. Upon information and belief, by March 2006, Gottlieb had a demonstrated history of antagonism against students at Duke University, marked by numerous incidents of excessive use of force, malicious prosecution, and manufacturing of evidence.

415. The Supervisory Defendants knew or should have known about Gottlieb's history, but failed to take meaningful remedial action.

416. In light of Gottlieb's history, the Supervisory Defendants acted recklessly or with deliberate indifference when they put him in a position to lead the investigation into Mangum's allegations.

417. The Supervisory Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

418. As a direct and foreseeable consequence of these acts and omissions, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

419. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

420. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and

Case 1:07-cv-00739    Document 1    Filed 10/05/2007    Page 121 of 155

incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

**C. The Supervisory Defendants' Failures to Train, Control, and Supervise Addison Led to Violations of Plaintiffs' Constitutional Rights.**

421. In March 2006, Addison was the official spokesperson of the Durham Police Department and the coordinator of the Durham Crimestoppers program.

422. Prior to placing him in this role, and during the pendency of his tenure in that role, the Supervisory Defendants demonstrated reckless or callous indifference to the rights of potential criminal suspects by failing to provide Addison with adequate training regarding the legal and constitutional dimensions of his position.

423. During his tenure as spokesperson and Crimestoppers' coordinator, Addison demonstrated a consistent pattern of publishing statements expressing premature conclusions of guilt and illegality.

424. The Supervisory Defendants demonstrated reckless or callous indifference to the rights of potential criminal suspects by failing to take meaningful action to correct this conduct.

425. In March and April 2006, Addison, acting in his role as spokesman for the Durham Police Department and as coordinator of Durham Crimestoppers, published a series of inflammatory statements expressing the Department's official conclusion that Crystal Mangum had been raped, sodomized, sexually assaulted, and kidnapped by members of the Duke lacrosse team. In addition, Addison

repeatedly expressed the Department's official view that Plaintiffs and other members of the Duke lacrosse team were obstructing justice by failing to confess their knowledge of or involvement in the alleged assault on Crystal Mangum.

426.    The Supervisory Defendants knew or should have known about these statements, but demonstrated reckless disregard or deliberate indifference by failing to take prompt and meaningful preventative or remedial action.

427.    To the contrary, Hodge himself publicly stated that Durham Police had a strong case against members of the Duke lacrosse team at a time when he knew or should have known that such a statement was false.

428.    The Supervisory Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

429.    As a direct and foreseeable consequence of the Supervisory Defendants' failures to train and supervise Addison, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

430.    As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

431.    As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and

- 117 -

incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

## SEVENTH CAUSE OF ACTION:
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

(Against Nifong in his individual capacity; Addison, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI in their individual and official capacities; Nifong in his official capacity with respect to Durham Police; and the Supervisory Defendants, in their individual and official capacities)

432. Plaintiffs incorporate the allegations made in paragraphs 1-431 above.

433. Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DSI, and the Supervisory Defendants are "persons," as that term is used in the text of 42 U.S.C. § 1983.

434. Under color of state law, Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DSI, and the Supervisory Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves to deprive Plaintiffs of their constitutional rights by charging and prosecuting the three innocent Duke lacrosse players on charges of rape, sexual assault, and kidnapping, which these Defendants knew were not supported by probable cause.

435. Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DSI, and the Supervisory Defendants willfully participated in this illegal objective by various means, with the intent to further some purpose of the conspiracy, including, for example:

- 118 -

a.    publishing false and inflammatory public statements regarding Plaintiffs;

b.    manufacturing and approving the phony "identification" of Plaintiffs during the April Photo Array;

c.    entering into the aforementioned DNA conspiracy to fabricate and conceal the results of DSI's findings;

d.    intimidating alibi and other defense witnesses, including Moezeldin Elmostafa, Kim Pittman, Sergeant John Shelton, and the other innocent Duke lacrosse players;

e.    agreeing to make false and materially incomplete statements to the grand juries that returned the April 17 and May 15 Indictments;

f.    fabricating additional false evidence after the April 17 and May 15 Indictments, such as Gottlieb's "Supplemental Case Notes" and Wilson's December 2006 "interview" of Mangum; and

g.    making false statements to the Superior Court of Durham County and the Plaintiffs' defense counsel in an effort to conceal the unlawful conspiracy.

436.    Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DSI, and the Supervisory Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

437.    As a direct and foreseeable consequence of this conspiracy, Plaintiffs were

deprived of their rights under the Fourth and Fourteenth Amendments to the

United States Constitution.

438.    As a direct and foreseeable consequence of these deprivations, Plaintiffs have

suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of

privacy, loss of education, and irreparable harm to their reputations.

439.    As a further consequence of these deprivations, Plaintiffs were required to retain

counsel to represent them in the criminal proceedings pursued against them, and

incurred expenses associated with defending against the unlawful criminal

proceedings initiated and sustained by Defendants.

### EIGHTH CAUSE OF ACTION:
### CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(2)
### (OBSTRUCTION OF JUSTICE)

(Against Nifong in his individual capacity and in his official capacity with respect to
Durham Police; Addison, Clark, Gottlieb, Himan, Meehan, Wilson, the Supervisory
Defendants, and DSI in their individual and official capacities; and the City of Durham)

440.    Plaintiffs incorporate the allegations made in paragraphs 1-439 above.

441.    Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, the Supervisory

Defendants, DSI, and the City of Durham are "persons," as that term is used in 42

U.S.C. § 1985.

442.    Under color of state law, Nifong, Addison, Clark, Gottlieb, Himan, Meehan,

Wilson, the Supervisory Defendants, DSI, and the City of Durham conspired and

entered into express and/or implied agreements, understandings, or meetings of the

- 120 -

minds among themselves for the purpose of impeding, hindering, obstructing and defeating the due course of justice in the State of North Carolina, with the intent to deny Plaintiffs the equal protection of the laws.

443. Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, the Supervisory Defendants, DSI, and the City of Durham's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

444. As a direct and foreseeable consequence of this conspiracy, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

445. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

446. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

## NINTH CAUSE OF ACTION:
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(2)
## (WITNESS TAMPERING)

(Against Nifong in his individual capacity and in his official capacity with respect to Durham Police; Gottlieb, Himan, Wilson, and the Supervisory Defendants in their individual and official capacities; and the City of Durham)

447.  Plaintiffs incorporate the allegations made in paragraphs 1-446 above.

448.  Nifong, Gottlieb, Himan, Wilson, the Supervisory Defendants, and the City of Durham are "persons," as that term is used in 42 U.S.C. § 1985.

449.  Under color of state law, Nifong, Gottlieb, Himan, Wilson, the Supervisory Defendants, and the City of Durham conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of deterring alibi and other defense witnesses—including Moezeldin Elmostafa, Kim Pittman, Sergeant John Shelton, and members of the Duke lacrosse team—by force, intimidation, and threat from attending the Superior Court of Durham County and testifying freely, fully, and truthfully to matters that these Defendants knew were, or would be, pending therein.

450.  Nifong, Gottlieb, Himan, Wilson, the Supervisory Defendants, and the City of Durham's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

451.  As a direct and foreseeable consequence of this conspiracy, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

452.	As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

453.	As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

## TENTH CAUSE OF ACTION:
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(3)

(Against Nifong in his individual capacity and in his official capacity with respect to Durham Police; Addison, Clark, Gottlieb, Himan, Meehan, Wilson, the Supervisory Defendants, and DSI in their individual and official capacities; and the City of Durham)

454.	Plaintiffs incorporate the allegations made in paragraphs 1-453 above.

455.	Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DSI, the Supervisory Defendants, and the City of Durham are "persons," as that term is used in 42 U.S.C. § 1985.

456.	Under color of state law, Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DSI, the Supervisory Defendants, and the City of Durham conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of depriving, either directly or indirectly, Plaintiffs of the equal protection of the laws and of their equal privileges and immunities under the laws.

- 123 -

457. Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, DSI, the Supervisory Defendants, and the City of Durham's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

458. As a direct and foreseeable consequence of this conspiracy, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

459. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

460. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

### ELEVENTH CAUSE OF ACTION:
### CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1986 (DURHAM POLICE)

(Against the Supervisory Defendants in their individual and official capacities and the City of Durham)

461. Plaintiffs incorporate the allegations made in paragraphs 1-460 above.

462. The Supervisory Defendants and the City of Durham are "persons," as that term is used in 42 U.S.C. § 1986.

- 124 -

463. The Supervisory Defendants, Durham Police Department, and the City of Durham had prior knowledge of the wrongs conspired to be committed by Defendants Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI.

464. The Supervisory Defendants, Durham Police Department, and the City of Durham had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed by Defendants Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI, and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power.

465. As a direct and proximate result of the neglect and/or refusal of the Supervisory Defendants, Durham Police Department, and the City of Durham to prevent or to aid in preventing the commission of the wrongs conspired to be committed by Defendants Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI, the Plaintiffs suffered injuries and damages as alleged herein.

466. The Supervisory Defendants, Durham Police Department, and the City of Durham's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

467. As a direct and foreseeable consequence of this conspiracy, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

468. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

469. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

### TWELFTH CAUSE OF ACTION:
### CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1986 (DNA SECURITY)

(Against Clark, Meehan, and DSI in their individual and official capacities)

470. Plaintiffs incorporate the allegations made in paragraphs 1-469 above.

471. Clark, Meehan, and DSI are "persons," as that term is used in 42 U.S.C. § 1986.

472. Clark, Meehan, and DSI had prior knowledge of the wrongs conspired to be committed by Defendants Nifong, Clark, Gottlieb, Himan, Meehan, and DSI.

473. Clark, Meehan, and DSI had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed by Defendants Nifong, Clark, Gottlieb, Himan, Meehan, and DSI, and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power.

474. As a direct and proximate result of the neglect and/or refusal of Clark, Meehan, and DSI to prevent or to aid in preventing the commission of the wrongs conspired

to be committed by Defendants Nifong, Clark, Gottlieb, Himan, Meehan, and DSI, the Plaintiffs suffered injuries and damages as alleged herein.

475. Clark, Meehan, and DSI's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

476. As a direct and foreseeable consequence of this conspiracy, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

477. As a direct and foreseeable consequence of these deprivations, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

478. As a further consequence of these deprivations, Plaintiffs were required to retain counsel to represent them in the criminal proceedings pursued against them, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

## THIRTEENTH CAUSE OF ACTION:
## MALICIOUS PROSECUTION AND CONSPIRACY

(Against Nifong in his individual capacity; Addison, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI in their individual and official capacities; and Nifong in his official capacity with respect to Durham Police)

479. Plaintiffs incorporate the allegations made in paragraphs 1-478 above.

480. Beginning on March 14, 2006, Nifong, Addison, Clark, Gottlieb, Himan, Hodge, Meehan, Wilson, and DSI, acting individually and in concert, instituted or participated in the institution of criminal proceedings against Plaintiffs.

481. These proceedings were not supported by probable cause and were terminated in Plaintiffs' favor on April 11, 2007.

482. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by conspiring to manufacture and by manufacturing false and misleading expert reports with the knowledge that these reports would be used to advance and perpetuate the criminal process against Defendants.

483. Nifong, Gottlieb, Himan, and Wilson demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by conspiring to manufacture and by manufacturing false and misleading investigative reports with the knowledge that these reports would be used to advance and perpetuate the criminal process against Defendants.

484. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI further demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by attempting to hide exculpatory DNA evidence in hundreds of pages of raw data rather than disclosing Meehan and DSI's distilled findings and conclusions.

485. Nifong, Gottlieb, Himan, and Wilson demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by intimidating Kimberly Pittman and

attempting to intimidate Moezeldin Elmostafa and Sergeant John Shelton with the purpose of altering their statements exonerating Plaintiffs.

486. Nifong, Gottlieb, and Himan demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by manipulating witness identification procedures in order to perpetuate the criminal proceedings against Plaintiffs.

487. Nifong, Hodge, and Addison demonstrated malice, spite, ill-will, and wanton disregard for Plaintiffs' rights by making repeated false, inflammatory, and misleading statements regarding the Duke lacrosse team and the Plaintiffs.

488. As a direct and foreseeable consequence of Defendants' conduct, Plaintiffs were unreasonably and unlawfully subjected to indictment and criminal prosecution.

489. As a direct and foreseeable consequence of being subjected to prosecution, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

490. As a further consequence of being subjected to prosecution, Plaintiffs were required to retain counsel to represent them in protracted criminal proceedings, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

# FOURTEENTH CAUSE OF ACTION:
## OBSTRUCTION OF JUSTICE AND CONSPIRACY

(Against Nifong in his individual capacity; Clark, Gottlieb, Himan, Meehan, Wilson, and DSI in their individual and official capacities; and Nifong in his official capacity with respect to Durham Police)

491. Plaintiffs incorporate the allegations made in paragraphs 1-490 above.

492. Between March 14, 2006 and April 11, 2007, Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI, acting individually and in concert, engaged in acts that attempted to and did prevent, obstruct, impede, and hinder public and legal justice in the State of North Carolina.

493. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI engaged in this obstruction of justice by conspiring to manufacture and by manufacturing false and misleading expert reports with the knowledge that these reports would be used to advance and perpetuate the criminal process against Defendants.

494. Nifong, Gottlieb, Himan, and Wilson engaged in this obstruction of justice by conspiring to manufacture and by manufacturing false and misleading investigative reports with the knowledge that these reports would be used to advance and perpetuate the criminal process against Defendants.

495. Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI engaged in this obstruction of justice by attempting to hide exculpatory DNA evidence in hundreds of pages of raw data rather than disclosing Meehan and DSI's distilled findings and conclusions.

- 130 -

496. Nifong, Gottlieb, Himan, and Wilson engaged in this obstruction of justice by intimidating Kimberly Pittman and attempting to intimidate Moezeldin Elmostafa and Sergeant John Shelton with the purpose of altering their statements exonerating Plaintiffs.

497. Nifong, Gottlieb, and Himan engaged in this obstruction of justice by manipulating witness identification procedures in order to perpetuate the criminal proceedings against Plaintiffs.

498. As a direct and foreseeable consequence of Defendants' conduct, Plaintiffs were unreasonably and unlawfully subjected to an indictment and criminal prosecution that were sustained by Defendants' continuing unlawful actions.

499. As a direct and foreseeable consequence of being subjected to this obstruction of justice, Plaintiffs have suffered economic loss, physical harm, emotional trauma, loss of liberty, loss of privacy, loss of education, and irreparable harm to their reputations.

500. As a further consequence of being subjected to prosecution, Plaintiffs were required to retain counsel to represent them in protracted criminal proceedings, and incurred expenses associated with defending against the unlawful criminal proceedings initiated and sustained by Defendants.

## FIFTEENTH CAUSE OF ACTION:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND
## CONSPIRACY

(Against Nifong in his individual capacity; Addison, Clark, Gottlieb, Himan, Hodge, Meehan, Wilson, and DSI in their individual and official capacities; and Nifong in his official capacity with respect to Durham Police)

501.   Plaintiffs incorporate the allegations made in paragraphs 1-500 above.

502.   Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI acted individually and in concert to manufacture inculpatory evidence and to conceal exculpatory evidence for the purpose of perpetuating a criminal action against Plaintiffs falsely charging them with rape, sexual assault, and kidnapping—charges that were calculated to shame, to humiliate, and to produce public condemnation of the Plaintiffs.

503.   Nifong, Hodge, and Addison repeatedly made false, insulting, offensive, and inflammatory statements about Plaintiffs and other members of the Duke lacrosse team calculated to shame, to humiliate, and to produce public condemnation of the Plaintiffs.

504.   Nifong, Gottlieb, Himan, and Wilson, acting individually and in concert, intimidated witnesses and manipulated witness identification procedures with the intention of perpetuating criminal proceedings against Plaintiffs.

505.   In combination with conduct described above, these actions evidenced a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiffs to suffer severe emotional distress.

- 132 -

506. Defendants' conduct had the direct and foreseeable consequence of marking Plaintiffs as violent criminals and racists in the minds of hundreds of millions of people.

507. Defendants' conduct had the further consequence of making Plaintiffs and other members of the Duke lacrosse team into public pariahs, subjecting them to extreme and sustained public obloquy, causing them to endure death threats, taunts, and insults, and subjecting them to assaults by the local, national, and international media.

508. Despite Plaintiffs' exoneration, Defendants' conduct will continue to have deleterious effects on Plaintiffs, who will forever be associated with the false allegations advanced by Defendants and repeatedly publicized by Nifong, Hodge, and Addison.

509. As a result of Defendants' intentional and outrageous conduct, Plaintiffs have suffered and continue to suffer from emotional and mental conditions generally recognized and diagnosed by trained professionals.

510. As a direct and foreseeable consequence of those conditions, Plaintiffs have suffered, and continue to suffer, disabling emotional, mental, and physical harm.

### SIXTEENTH CAUSE OF ACTION: NEGLIGENCE BY DURHAM POLICE

(Against Addison, Gottlieb, Himan, and Hodge in their individual and official capacities, and the City of Durham)

511. Plaintiffs incorporate the allegations made in paragraphs 1-510 above.

- 133 -

512. At the time of the Durham Police Statements described above, Addison and Hodge each owed Plaintiffs a duty to use due care with respect to his public statements concerning the investigation of Mangum's claims.

513. At the time of the events alleged above, Gottlieb and Himan owed Plaintiffs a duty to use due care with respect to the investigation of Mangum's allegations.

514. At the time they made their respective Durham Police Statements, Addison and Hodge each knew or should have known that such statements were false and inflammatory and likely to cause Plaintiffs harm.

515. At the time Gottlieb and Himan committed the acts and omissions alleged above, they knew or should have known that they violated or departed from Durham Police policies and procedures, violated or departed from professional standards of conduct, violated constitutional rights, and were likely to cause Plaintiffs harm.

516. In committing the aforementioned acts and/or omissions, Addison, Gottlieb, Himan, and Hodge negligently breached said duties to use due care, which directly and proximately resulted in the injuries and damages to the Plaintiffs as alleged herein.

**SEVENTEENTH CAUSE OF ACTION: NEGLIGENT SUPERVISION, HIRING, TRAINING, DISCIPLINE, AND RETENTION BY DURHAM POLICE**

(Against the Supervisory Defendants in their individual and official capacities, and the City of Durham)

517. Plaintiffs incorporate the allegations made in paragraphs 1-516 above.

- 134 -

518. At the time of the events alleged above, each of the Supervisory Defendants, and the City of Durham owed Plaintiffs a duty to use due care in the hiring, training, supervision, discipline, and retention of Durham Police personnel, including the personnel involved in the investigation of Mangum's claims.

519. The Supervisory Defendants negligently supervised Defendant Gottlieb by failing to discipline him and instead assigning him to the police investigation into Mangum's allegations notwithstanding prior allegations of Gottlieb's misconduct with respect to students attending Duke University.

520. The Supervisory Defendants negligently supervised Defendant Himan by assigning him to the police investigation into Mangum's allegations, notwithstanding Himan's lack of prior experience in major felony investigations.

521. The Supervisory Defendants negligently supervised Defendants Addison, Gottlieb, and Himan, failed to provide them with proper training, and failed to outline proper procedure to them in various respects relating to the appropriate conduct of criminal investigations, including by way of example:

   a.    the appropriate chain of command in criminal investigations;

   b.    the issuance of public statements relating to an open investigation;

   c.    the conduct of eyewitness identification procedures;

   d.    the service of outstanding warrants on witnesses in a criminal investigation or proceeding;

e.     prohibiting threats, inducements, or intimidation of witnesses;

f.     the standards for police reports, investigator's notes, and other reports of investigations, including the timely and truthful preparation of such documents;

g.     the supervision of private companies engaged to provide scientific testing or other services in connection with a police investigation; and

h.     the standards for probable cause.

522.   The Supervisory Defendants further negligently supervised Gottlieb and Himan by ignoring evidence demonstrating the misconduct underlying the investigation, and instead continuing to allow Nifong to have primary responsibility for the police investigation, ordering Gottlieb and Himan to look to Nifong for direction as to the conduct of that investigation, and having Gottlieb and Himan continue to serve on that investigation.

523.   The Supervisory Defendants further negligently supervised Addison by ignoring the false and inflammatory Addison Statements, failing to retract such statements, failing to reprimand Addison for such statements, and failing to remove Addison from his role as a spokesperson for the Durham Police Department.  To the contrary, Hodge joined Addison by publicly stating that Durham Police had a strong case.

524. In committing the aforementioned acts or omissions, each Supervisory Defendant negligently breached said duty to use due care, which directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

## EIGHTEENTH CAUSE OF ACTION:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY DURHAM POLICE

(Against Gottlieb, Himan, and the Supervisory Defendants in their individual and official capacities, and the City of Durham)

525. Plaintiffs incorporate the allegations made in paragraphs 1-524 above.

526. Gottlieb, Himan, and the Supervisory Defendants acted individually and in concert to manufacture false evidence and to conceal the evidence of Plaintiffs' innocence for the purpose of charging and prosecuting the three innocent Duke lacrosse players on charges of rape, sexual assault, and kidnapping, which charges they knew or reasonably believed were false and unsupported by probable cause.

527. Gottlieb, Himan, and the Supervisory Defendants' conduct subjected Plaintiffs to public obloquy, made them pariahs in their communities, and forced them to endure harsh media scrutiny.

528. Gottlieb, Himan, and the Supervisory Defendants' conduct violated or departed from Durham Police policies and procedures, including General Order No. 4077.

529. Gottlieb, Himan, and the Supervisory Defendants were negligent in engaging in this conduct, from which it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm.

530.   As a direct and foreseeable consequence of Gottlieb, Himan, and the Supervisory Defendants' conduct, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.

## NINTEENTH CAUSE OF ACTION:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY DURHAM POLICE (DURHAM POLICE STATEMENTS)

(Against Addison and the Supervisory Defendants in their individual and official capacities, and the City of Durham)

531.   Plaintiffs incorporate the allegations made in paragraphs 1-530 above.

532.   Addison and the Supervisory Defendants acted individually and in concert to publish false and inflammatory statements accusing Plaintiffs of criminal conduct, including rape, sexual assault, kidnapping, aiding and abetting, and obstruction of justice, ignoring the evidence of Plaintiffs' innocence and that no crime had been charged, let alone occurred.

533.   Addison and the Supervisory Defendants acted individually and in concert to publish false and inflammatory statements accusing Plaintiffs of refusing to cooperate with the police investigation into Mangum's claims, ignoring the evidence of Evans's and the other captains' complete and total cooperation with the search warrant at 610 N. Buchanan and subsequent interviews and medical testing, and the entire Duke lacrosse team's total cooperation with the NTO procedure.

- 138 -

534. Addison and the Supervisory Defendants' conduct subjected Plaintiffs to public obloquy, made them pariahs in their communities, and forced them to endure harsh media scrutiny.

535. Addison and the Supervisory Defendants were negligent in engaging in this conduct, from which it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm.

536. As a direct and foreseeable consequence of Addison and the Supervisory Defendants' conduct, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.

## TWENTIETH CAUSE OF ACTION:
## NEGLIGENCE BY THE DNA SECURITY DEFENDANTS

(Against Clark and Meehan in their individual and official capacities, and DSI)

537. Plaintiffs incorporate the allegations made in paragraphs 1-536 above.

538. At the time of the events alleged above, Clark, Meehan, and DSI owed Plaintiffs a duty of due care with respect to their involvement in the police investigation of Mangum's claims.

539. In April 2006, Clark, Meehan, and DSI agreed to omit exculpatory findings that resulted from their scientific testing of Mangum's rape kit items from DSI's report of the results of its scientific testing relating to the investigation.

- 139 -

540.  In April and May 2006, Clark, Meehan, and DSI acted individually and in concert to produce the May 12 Report that misstated the purported results of DSI's scientific testing relating to the investigation of Mangum's claims and omitted exculpatory findings that resulted from their scientific testing of Mangum's rape kit items.

541.  DSI's acts and omissions failed to comply with DSI's internal protocols, Federal Bureau of Investigation standards, and regulations governing accredited DNA testing facilities.

542.  At the time the May 12 Report was produced, Clark, Meehan, and DSI knew, or should have known, that these acts and omissions would result in the filing and prosecution of serious criminal charges against the Plaintiffs.

543.  In September 2006, Clark, Meehan, and DSI were ordered by the Superior Court of Durham County to disclose all evidence relating to the testing of samples gathered from Mangum and the rape kit items.

544.  In response to that order, Clark, Meehan, and DSI released roughly 2,000 pages of raw data, but failed to signal the presence of DNA from four unidentified males in samples taken from the rape kit items, a conclusion that required hundreds of hours of study to determine from the raw data they produced.

545.  At the time they produced this raw data, Clark, Meehan, and DSI knew, or should have known, that the concealment of their exculpatory findings would prolong the prosecution of the Plaintiffs.

546. In committing the aforementioned acts and omissions, Clark, Meehan, and DSI negligently breached their aforementioned duties to use due care, which directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

**TWENTY-FIRST CAUSE OF ACTION: NEGLIGENT SUPERVISION, HIRING, TRAINING, DISCIPLINE, AND RETENTION BY THE DNA SECURITY DEFENDANTS**

(Against Clark and Meehan in their individual and official capacities, and DSI)

547. Plaintiffs incorporate the allegations made in paragraphs 1-546 above.

548. At the time of the events alleged above, Clark and Meehan held supervisory positions at DSI.

549. At the time of the events alleged above, Clark, Meehan, and DSI owed Plaintiffs a duty to use due care with respect to the scientific testing described above.

550. Clark and DSI negligently hired, supervised, and retained Meehan, failed to provide Meehan with proper training and discipline, and failed to outline proper procedure to Meehan with respect to the preparation and issuance of reports of scientific testing conducted by DSI in a criminal investigation.

551. Clark, Meehan, and DSI negligently hired, supervised, and retained the DSI personnel assisting Meehan in the scientific testing and preparation of the May 12 Report described above, failed to provide them with proper training, and failed to outline proper procedure to them with respect to the preparation and issuance of reports of scientific testing conducted by DSI in a criminal investigation.

- 141 -

552. In committing the aforementioned acts or omissions, each of Clark, Meehan, and DSI negligently breached said duty to use due care, which directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

### TWENTY-SECOND CAUSE OF ACTION:
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### BY THE DNA SECURITY DEFENDANTS

(Against Clark and Meehan in their individual and official capacities, and DSI)

553. Plaintiffs incorporate the allegations made in paragraphs 1-552 above.

554. Clark, Meehan, and DSI acted individually and in concert to manufacture false evidence and to conceal the evidence of Plaintiffs' innocence for the purpose of charging and prosecuting the three innocent Duke lacrosse players on charges of rape, sexual assault, and kidnapping, which charges they knew or reasonably believed were false and unsupported by their own scientific testing.

555. Clark, Meehan, and DSI's conduct subjected Plaintiffs to public obloquy, made them pariahs in their communities, and forced them to endure harsh media scrutiny.

556. Clark, Meehan, and DSI's conduct violated DSI's internal protocols, Federal Bureau of Investigation standards, and accreditation rules governing DNA testing facilities.

557. Clark, Meehan, and DSI were negligent in engaging in this conduct, from which it was reasonably foreseeable that Plaintiffs would suffer emotional and psychological harm.

558. As a direct and foreseeable consequence of Clark, Meehan, and DSI's conduct, Plaintiffs have suffered and continue to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental, and physical harm.

## PRAYER FOR RELIEF

559. WHEREFORE, to redress the injuries proximately and directly caused by Defendants' conduct as stated in Paragraphs 1-558 above, and to prevent the substantial risk of irreparable injury to other persons in the City of Durham as a result of the policies, customs, practices, and supervisory misconduct alleged herein, Plaintiffs hereby request the following relief:

    a. the issuance of an Order and Permanent Injunction ("Permanent Injunction") that:

        i. appoints an independent monitor (the "Monitor"), to be determined by the Court, who shall oversee certain activities of the Durham Police Department for a period of ten (10) years, and who shall report to the Court on an annual basis regarding Defendants' compliance or non-compliance with the terms of the Permanent Injunction;

        ii. authorizes the Monitor to establish, review, and enforce all policies applicable to the management of the Durham Police Department;

        iii. provides the Monitor with the authority to hire, fire, and promote all Durham Police officials, including the Chief of Police;

- 143 -

iv. establishes an independent citizen Police Review Committee, composed of three members selected by the Court, which shall review and hear publicly complaints of misconduct by Durham residents against Durham Police personnel and make recommendations to the Monitor as to discipline or innocence;

v. orders that all eyewitness identification arrays, lineups, and similar procedures conducted by the Durham Police Department, whether formal or informal, and/or of suspects or "witnesses," conform to the provisions of General Order No. 4077 and be recorded by videotape;

vi. orders that any reports of DNA or other scientific testing requested by the Durham Police Department or District Attorney's Office include the results of all testing, and all notes, charts, or raw data generated during such testing, and that a copy of each such report be provided to the Monitor to ensure compliance;

vii. orders that the Durham Police Department provide proper training, based on materials and plans approved by the Monitor, to all current and new personnel (the "Remedial Training") on the following matters:

1. the appropriate chain of command in criminal investigations;

2. the issuance of public statements relating to an open investigation;

3. the conduct of eyewitness identification procedures;

4. the service of outstanding warrants on witnesses in a criminal investigation or proceeding;

5. prohibiting threats, inducements, or intimidation of witnesses;

6. the standards for police reports, investigator's notes, and other reports of investigations, including the timely and truthful preparation of such documents;

7. the supervision of private companies engaged to provide scientific testing or other services in connection with a police investigation; and

8. the standards for probable cause;

viii. enjoins the Durham Police Department from issuing any press releases, written statements, posters, flyers, or other materials intended for publication relating to a Durham Police investigation, whether directly or indirectly through an entity in which Durham Police personnel participate (such as Crimestoppers), without first obtaining the approval of the Monitor;

ix. enjoins the Durham Police Department from making any oral public statements relating to a Durham Police investigation, whether directly or indirectly through an entity in which Durham Police

- 145 -

personnel participate (such as Crimestoppers), without first obtaining the approval of the Monitor as to the substance of the statement;

x.  enjoins the Durham Police Department from serving any arrest warrants on a person known to be a witness in a criminal investigation or criminal proceeding without first obtaining the approval of the Monitor;

xi.  enjoins the Durham Police Department from delegating any supervision over a Durham Police investigation to the District Attorney's Office;

xii.  orders the Durham Police Department to implement a policy requiring Durham Police personnel to present exculpatory evidence when testifying before a grand jury.

xiii.  enjoins the Durham Police Department from targeting students of Duke University for selective enforcement of the criminal laws, and from refusing to protect the legal and constitutional rights of students of Duke University;

xiv.  requires the City of Durham to pay all costs relating to the Monitor, Police Review Committee, and Remedial Training for the duration of the Permanent Injunction; and

xv.  enjoins DSI and Meehan from providing any reports of DNA or other scientific testing, or providing any expert testimony, in any court proceeding, whether civil or criminal, for a period of ten (10) years;

b.  damages in an amount to be established at trial as compensation for constitutional deprivations; past and future economic loss, physical harm, emotional trauma, loss of privacy, and loss of reputation; loss of education; and expenses associated with defending against the criminal proceedings initiated and sustained by Defendants' unlawful conduct;

c.  damages in an amount to be established at trial to punish Defendants for outrageous conduct pursued out of actual malice that recklessly and callously disregarded and was deliberately indifferent to Plaintiffs' constitutional rights, to discourage them from engaging in similar conduct in the future, and to deter others similarly situated from engaging in similar misconduct;

d.  an award of attorneys' fees, including attorneys' fees pursuant to 42 U.S.C. § 1988(b);

e.  an award for reasonable and customary costs, expenses, and interest incurred in pursuit of this action; and

f.  whatever additional relief the Court may deem proper.

## JURY DEMAND

Plaintiffs hereby request a trial by jury on all claims so triable.

Dated:  October 5, 2007                    Respectfully submitted,

### WILLIAMS & CONNOLLY LLP


By: _____/s/ Charles Davant IV_____
        Brendan V. Sullivan, Jr.*
        Robert M. Cary*
        Christopher N. Manning*
        Charles Davant IV (N.C. Bar #28489)
        725 Twelfth Street, N.W.
        Washington, D.C.  20005
        Tel.    (202) 434-5000
        Email  cmanning@wc.com
        Email  cdavant@wc.com

*Attorneys for Plaintiffs*
  *David F. Evans and Collin Finnerty*

      (* motion for special appearance
       to be filed forthwith)


           -and-


### RUDOLF WIDENHOUSE & FIALKO


By: _____/s/ David S. Rudolf_____
        David S. Rudolf (N.C. Bar #8587)
        312 West Franklin Street
        Chapel Hill, NC  27516
        Tel.    (919) 967-4900
        Email  dsrudolf@rwf-law.com


- 148 -

**BARRY C. SCHECK, ESQ.**

Barry C. Scheck*
Attn: Elizabeth Vaca
100 Fifth Avenue
New York, NY  10011
Tel.    (212) 364-5390
Email  bcsinnocence@aol.com

(* motion for special appearance
   to be filed forthwith)


**EMERY CELLI BRINCKERHOFF &
  ABADY LLP**

Richard D. Emery*
75 Rockefeller Plaza, 20th Floor
New York, NY  10019
Tel.    (212) 763-5000
Fax.    (212) 763-5001
Email  remery@ecbalaw.com

(* motion for special appearance
   to be filed forthwith)

*Attorneys for Plaintiff Reade Seligmann*