# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID F. EVANS; COLLIN FINNERTY;
and READE SELIGMANN,

     Plaintiffs,

          v.                        Case No. 1:07-CV739

THE CITY OF DURHAM, NORTH
CAROLINA; MICHAEL B. NIFONG;
MARK GOTTLIEB; BENJAMIN HIMAN;
DAVID ADDISON; LINWOOD WILSON;
PATRICK BAKER; STEVEN CHALMERS;
BEVERLY COUNCIL; RONALD HODGE;
JEFF LAMB; MICHAEL RIPBERGER;
LEE RUSS; DNA SECURITY, INC.;
RICHARD CLARK; and BRIAN MEEHAN,

     Defendants.

---

## BRIEF IN SUPPORT OF MOTION TO DISMISS
## OF DEFEDANTS DNA SECURITY, INC. AND RICHARD CLARK

     Defendants DNA Security, Inc., and Richard Clark, through counsel and pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) and Local Rule 7.2, respectfully submit this Brief in support of their Motion to Dismiss.

### NATURE OF THE MATTER BEFORE THE COURT

     This action arises out of the case styled *State vs. Finnerty, Evans, & Seligmann* ("the Criminal Action"), in which each of the current Plaintiffs was named as a criminal

defendant relating to an alleged sexual assault. The Criminal Action was eventually dismissed, and the lead prosecutor, Defendant Michael Nifong ("Nifong"), was disbarred.

Plaintiffs contend that the governmental Defendants -- members of the Durham County District Attorney's office, members of the Durham County Police Department, the Durham City Manager, and the City of Durham ("the Non-DSI Defendants") -- engaged in various acts of misconduct in bringing and maintaining the Criminal Action, including witness intimidation, fabrication of evidence, withholding of evidence, and misrepresentations to opposing counsel and the court. Assuming -- as the Court must at this stage -- that Plaintiffs' allegations have some merit, it is perhaps not surprising that Plaintiffs have brought suit against some or all of the Non-DSI Defendants.

What is surprising, and highly unusual, is that Plaintiffs also have brought suit against an expert witness for the State (Brian Meehan or "Meehan")[1], the DNA laboratory that performed work for the State (DNA Security, Inc. or "DSI"), and the President of the DNA laboratory (Richard Clark or "Clark") (collectively, "the DSI Defendants"). Such a step is extraordinary for several reasons, including (as discussed below) the fact that expert witnesses are *absolutely immune* from suit and that none of the DSI Defendants owed a duty to Plaintiffs.

What is even more startling about Plaintiffs' claims is that Plaintiffs do *not* allege that any of the DSI Defendants: (1) fabricated evidence; (2) destroyed evidence;

---

[1] During the relevant events, Meehan was the Laboratory Director of DNA Security, Inc. (Am. Compl. ¶ 32.)

(3) made any false statements to the criminal defendants[2]; or (4) made any false statements to any court. To the contrary, Plaintiffs **admit** that:

1. DSI accurately conducted testing that established that no DNA evidence existed to support the claims of the alleged rape victim (Crystal Mangum or "Mangum") against Plaintiffs (Am. Comp. ¶¶ 61, 206).

2. DSI accurately conducted testing that contradicted Mangum's claim that she had not had sexual intercourse with anyone other than the Plaintiffs in the days leading up to the alleged rape (*id.* ¶¶ 59, 77).

3. **DSI and Meehan reported all of the results of the DNA testing to Nifong and the police** (*id.* ¶¶ 207, 224).

4. Meehan prepared a written report, as directed by Nifong, regarding any matches between the rape kit samples and the DNA samples provided by the lacrosse players (*id.* ¶¶ 230, 232).

5. DSI produced to Nifong, who then produced to the criminal defendants, **all** of the underlying, raw data from the DNA sampling (*id.* ¶ 302).

6. Meehan truthfully testified in court about how the DNA testing and reporting occurred (*id.* ¶ 307).

---

[2]     At some points in the Amended Complaint, Plaintiffs loosely refer to the May 12 Report as "false and misleading." (*Id.* ¶ 226.) However, Plaintiffs never point to any statements in the report that they contend were not true. Instead, Plaintiffs apparently contend that the report was "false" because it did not contain every opinion formed by DSI. (*See, e.g., id.* ¶ 232 (report "intentionally omitted the DNA results that matched or were consistent with . . . multiple unidentified men").)

Ultimately, Plaintiffs' allegations as to the DSI Defendants come down to this: Even though the criminal defendants were given both a report and all of the raw data generated by DSI, and even though the DNA testing performed by DSI was accurate and exonerated Plaintiffs, Plaintiffs do not like the way that the report was written (because it did not include information about DNA from males other than the lacrosse players), and Plaintiffs object to the fact that the DNA raw data was voluminous and difficult for the criminal defense attorneys to understand (although the defense attorneys did understand the data after some effort (*id*. ¶ 303)). Contorting those facts -- taken at face value at this stage of the proceedings -- into a lawsuit against the DSI Defendants is inappropriate. For the multiple reasons discussed below, the claims against DSI and Clark should be dismissed.

## **FACTS**[3]

The Amended Complaint in this action contains 567 paragraphs, the great majority of which do not relate to the DSI Defendants. Other parties will undoubtedly review those facts in their respective briefs. Therefore, DSI and Clark will limit their discussion to those facts that relate to the claims against the DSI Defendants.[4]

---

[3]     DSI and Clark sharply disagree with many of the allegations in the Amended Complaint. For the purposes of the present Motion, however, Plaintiffs' allegations are taken at face value.

[4]     Meehan is represented by separate counsel. Because the DSI Defendants are frequently lumped together in the Amended Complaint, however, much of the discussion in this Memorandum necessarily relates to, and applies to, Meehan as well as DSI and Clark.

**A. Retention of DSI.** Early in the criminal investigation involving Plaintiffs, initial DNA testing requested by Nifong and performed by the State Bureau of Investigation "found no evidence that Mangum was assaulted or any evidence that would otherwise corroborate her claims." (Am. Comp. ¶ 76.) Nifong directed that another lab be located to perform additional, more sensitive testing (*id.* ¶ 199), and his office ultimately located and retained DSI. (*Id.* ¶ 203.) Meehan was the Laboratory Director for DSI, and Clark was DSI's President. (*Id.* ¶¶ 31, 32.)

**B. Work performed by DSI.** The rape kit evidence as well as DNA samples obtained from the lacrosse players were transferred to DSI on April 6, 2006. (*Id.* ¶ 203.) Plaintiffs allege that the work subsequently performed by DSI: (1) found no DNA from Plaintiffs in any of the rape kit samples, thereby directly contradicting Mangum's allegations (*id.* ¶¶ 61, 206[5]); and (2) found DNA from other males in the rape kit samples, thereby contradicting Mangum's claim that she had not had sex with anyone other than Plaintiffs in the days leading up to the alleged rape (*id.* ¶¶ 59, 77).

Plaintiffs further allege that, as DSI performed the analysis, a total of three meetings occurred between Nifong, police officers, Meehan, and Clark to discuss the status and results of DSI's work and that *in those meetings, Meehan provided complete and correct information to Nifong and the police as to DSI's findings.* (*Id.* ¶¶ 207, 224,

---

[5] The header on page 61 of the Amended Complaint reads: "DSI's Testing Excludes All of the Duke Lacrosse Players from the Rape Kit Items with 100% Certainty."

230.) Those findings included the fact that there were no matches to any of the lacrosse players, but that DNA had been found from other males.[6] (*Id.*)

On May 12, 2006, as directed by Nifong, Meehan provided Nifong with a written report ("the May 12 Report") of DSI's findings on the issue of whether any matches were found between the rape kit samples (*i.e.*, the samples from Mangum) and the "reference" samples (the 46 lacrosse players and Mangum's boyfriend). Per Nifong's directions, the report did not discuss the DNA from any "non-reference" samples (*i.e.*, persons other than the lacrosse players and Mangum's boyfriend). (*Id.* ¶¶ 230-32.)

The fact that the May 12 Report did not refer to any non-reference sample matches is one of Plaintiffs' two complaints against the DSI Defendants in this matter:

> The May 12 Report only reported on a DNA result if it matched or was consistent with one of the individuals who had provided a reference sample for testing purposes -- e.g., Mangum's boyfriend and the Duke lacrosse players. The May 12 Report intentionally omitted the DNA results that matched or were consistent with the multiple unidentified men who had not provided any reference specimens for comparison.

(*Id.* ¶ 232.) Thus, Plaintiffs complain that, while the DSI Defendants provided Nifong and the police with a complete *verbal* report, the *written* report did not contain all of DSI's conclusions. Plaintiffs allege that *Nifong* later misrepresented to defense counsel and the court that the written report contained all of DSI's conclusions. (*Id.* ¶¶ 277, 278.)

---

[6] "No later than April 10, 2006, Defendants had in their possession an oral report from Meehan that DSI's testing had revealed the existence of DNA from multiple unidentified males on Mangum's rape kit items, and excluded with 100% certainty all of the Duke lacrosse players, including the Plaintiffs, as contributors of the DNA found on those items." (*Id.* ¶ 275; *see also id.* ¶¶ 207, 224, 296.)

There is no allegation that the DSI Defendants had any involvement with these misrepresentations.

Plaintiffs Finnerty and Seligmann were indicted by a Durham grand jury on April 17, 2006 -- after Meehan accurately reported to Nifong the results of tests completed to that date (*id*. ¶¶ 206-07) and several weeks before DSI issued its May 12 Report summarizing the results of its DNA analysis (*id*. ¶¶ 212-13). Plaintiffs do not allege that DSI, Clark, or Meehan testified or otherwise presented evidence that was considered by the grand jury in its decision to indict Finnerty and Seligmann.[7] Plaintiff Evans was indicted on May 15, 2006, three days after the release of the May 12 Report, but again, Plaintiffs make no claim that the DSI Defendants presented evidence to the grand jury. (*Id*. ¶¶ 238-41.)

Subsequent to the indictments, criminal defense counsel requested, and received, the underlying raw data from DSI's work. (*Id*. ¶ 302.) Plaintiffs make no allegation that the DSI Defendants altered, withheld, or fabricated any of that data. The raw data consisted of 1,844 pages of material that, as the name indicates, was raw, basic documentation generated as part of DSI's work. The fact that the underlying data was not presented in a form that was simple to understand is Plaintiffs' second complaint against the DSI Defendants:

> Even when Defendants finally disclosed the exculpatory facts [i.e., the presence of DNA from unidentified males], they did not do so in a recognizable form, but rather, attempted to bury the exculpatory results as

---

[7] In contrast, Plaintiffs do allege that other Defendants testified before the grand jury. (*See, e.g.*, Am. Compl. ¶ 215.)

> unsummarized raw data scattered across nearly 2000 pages of documents in a willful attempt to obfuscate the results from Plaintiffs and the court, to obstruct justice, and to cover up their own wrongdoing.

(*Id*. ¶ 276.)  Plaintiffs concede that they received exactly what they asked for -- the complete files of DSI.  (*Id*. ¶ 298.)  Plaintiffs concede, moreover, that their non-scientist, criminal defense attorneys *were* able to understand the raw data and thereby determine that Nifong had made misrepresentations concerning the May 12 Report.  (*Id*. ¶ 303.)

**C. Collapse of State's case.**  After criminal defense counsel determined that Nifong had made misrepresentations concerning DSI's report, a hearing was conducted on December 15, 2006.  At that hearing, Meehan testified truthfully in all respects and explained exactly what the May 12 Report did, and did not, include.  (*Id*. ¶ 307.)  Meehan further testified that he

> would have prepared a report setting forth the results of all of DSI's tests and examinations if he had been asked to do so by Nifong or other representatives of the State of North Carolina at any time after May 12, 2006.

(*Id*. ¶ 307(f).)  The revelation that Nifong had made misrepresentations to the court and opposing counsel about the May 12 Report set in motion the ethics charges that led to Nifong's recusal, the transfer of the case to the Attorney General's office, and the eventual declaration of Plaintiffs' innocence.  (*Id*. ¶¶ 297, 316-19.)

**D.  Summary.**  Thus, according to the Amended Complaint:

1.  DSI was hired to test the rape kit and compare it to the lacrosse players' samples (*id*. ¶¶ 202, 204);

2. DSI performed this work accurately and confirmed that no matches existed (*id.* ¶¶ 61, 206);

3. DSI determined that other DNA was present (*id.* ¶¶ 77, 207);

4. DSI informed Nifong about all of its conclusions (*id.* ¶¶ 207, 224);

5. At Nifong's request, Meehan prepared a written report that set forth the data showing no matches between the rape kit samples and any lacrosse players (*id.* ¶ 232);

6. Nifong misrepresented that May 12 Report reflected all of DSI's conclusions and data (*id.* ¶¶ 277, 278);

7. When asked, DSI turned over all of the raw data to Plaintiffs (*id.* ¶ 302);

8. Plaintiffs used the raw data to determine that Nifong had made misrepresentations (*id.* ¶ 303);

9. This conclusion was confirmed by Meehan's testimony (*id.* ¶ 307); and

10. The discovery of Nifong's misrepresentations led to the collapse of the criminal prosecution (*id.* ¶¶ 316-19).

These are the facts upon which Plaintiffs have sued the DSI Defendants for violations of Plaintiffs' civil rights, as well as malicious prosecution, obstruction of justice, intentional infliction of emotional distress, and negligence.

Finally, it must be noted that Plaintiffs have sued Clark, and grouped him generically together with various parties, yet there is no allegation that Clark himself did anything wrong. Plaintiffs allege that Clark was the President of DSI (*id.* ¶ 31), and that Clark attended the three meetings with Nifong at which the results of the testing were

discussed (*id.* ¶¶ 207, 223, 229). Plaintiffs do not allege that Clark performed any of the DNA testing, that he prepared the May 12 Report, or that he played any role in preparing, compiling, or producing any of the raw data. So, while DSI and Meehan have been sued for accurately performing DNA testing, accurately reporting their conclusions to Nifong and the police, preparing a report as requested by Nifong, and giving Nifong the raw data, Plaintiffs allege that Clark simply attended meetings with Nifong and the police.

## QUESTIONS PRESENTED

1. Should Plaintiffs' claims be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6)?

2. Should Plaintiffs' claim for injunctive relief be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)?

## ARGUMENT

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is intended to test the legal sufficiency of the complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). Such a motion should be granted when the complaint fails to allege all of the elements of a cause of action or facts sufficient to support such elements. *Bass v. E.I Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir.). Dismissal also is "appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996).

To survive a motion to dismiss, the complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). A plaintiff opposing a motion to dismiss bears the burden of alleging "enough facts to state a claim to relief that is plausible on its face." *Id*. at 1974. The Court should construe the factual allegations in the complaint in favor of the plaintiff, but *need not accept as true "unwarranted inferences, unreasonable conclusions, or arguments*." *Eastern Shore Mkt., Inc. v. J.D. Assoc. L.P.*, 213 F.3d 175, 180 (4th Cir. 2000) (emphasis added); *see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

## I.   ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE MEEHAN WAS AN EXPERT WITNESS WITH ABSOLUTE IMMUNITY

### A.   The DSI Defendants Enjoy Absolute Immunity from All of Plaintiffs' Claims Arising from Their Role in the Criminal Proceeding

Under long-established precedent, the DSI Defendants are entitled to absolute immunity from all of Plaintiffs' claims, which arise from Meehan's conduct (as the laboratory director for DSI) as an expert witness for the State in the Criminal Action. A witness in a criminal proceeding -- whether a private citizen or a public official -- has absolute immunity from subsequent damages claims based on the witness's testimony. *Briscoe v. LaHue*, 460 U.S. 325, 335 (1983); *Lyles v. Sparks*, 79 F.3d 372, 378 (4th Cir. 1996); *Burke v. Miller*, 580 F.2d 108, 109 (4th Cir. 1978) (followed in *Briscoe*). Absolute witness immunity has a lengthy history in the English and American courts,

going back to the sixteenth century. *See Briscoe*, 460 U.S. at 330-31; *Burke*, 580 F.2d at 109 ("That . . . inviolable immunity is accorded witnesses is attested by a plethora of precedent."). Because the cases recognizing witness immunity from federal claims are descended from centuries-old common law cases, it is not surprising that the same immunity principle bars North Carolina state law claims against witnesses. *See Fowle v. Fowle*, 255 N.C. 720, 721, 122 S.E.2d 722, 723 (1961) (per curiam); *Odinkemelu v. Williams*, No. 1:00CV750, 2001 WL 34013620, at *5 (M.D.N.C. Apr. 3, 2001), *aff'd*, 20 Fed. Appx. 136 (4th Cir. 2001) (applying North Carolina law).

Plaintiffs' claims do not arise from Meehan's testimony at trial (because the charges against Plaintiffs were dismissed before a trial occurred). Instead, their claims relate to the only role that Meehan played in the Criminal Action: preparing and reporting on the expert conclusions formed in performing the DNA analysis.

Absolute witness immunity encompasses not just activity at trial but also actions preliminary to trial and, indeed, prior to the initiation of a prosecution. A witness has broad immunity for actions taken "in preparation for providing expert witness testimony in the 'due course of a judicial proceeding.'" *Sharp v. Miller*, 121 N.C. App. 616, 617, 468 S.E.2d 799, 801 (1996) (quoting *Williams v. Congdon*, 43 N.C. App. 53, 55, 257 S.E.2d 677, 678 (1979)); *see also Woodward v. Weiss*, 932 F. Supp. 723, 727 (D.S.C. 1996) (absolute witness privilege applied to any "preliminary step to a judicial proceeding which bore a reasonable relation to litigation"). The justice system's interest in ascertaining the complete truth of matters in dispute necessitates such a broad grant of

immunity to potential witnesses not only for their trial testimony, but also for their participation in pretrial analysis:

> The truth-seeking function of the court demands evidence. Yet evidence does not present itself to the court. It must be located, organized, and understood by the attorneys before it can be presented to the court. This process of discovering, organizing, and understanding evidence is a vital part of the judicial process. It is perhaps more essential to the court's truth-seeking function than the actual trial for without it there would be no grist for the mill.

*Collins v. Walden*, 613 F. Supp. 1306, 1315 (N.D. Ga. 1985), *aff'd*, 784 F.2d 402 (11th Cir. 1986) (unpublished table decision).

Consequently, expert witnesses are absolutely immune from claims based on "their actions in preparing the report to guide expert testimony" as well as their analysis performed prior to drafting the expert report. *Sharp*, 121 N.C. App. at 618, 468 S.E.2d at 801; *see Harden v. Green*, 27 Fed. Appx. 173, 177 (4th Cir. 2001) (per curiam) (expert entitled to "absolute . . . witness immunity for their conduct in completing competency exams and furnishing written reports"); *Woodward*, 932 F. Supp. at 727-28 (expert witness absolutely immune from claims related to pre-litigation report provided to insurer); *Williams*, 43 N.C. App. at 55, 257 S.E.2d at 678 ("Plaintiff has alleged, and proof submitted by defendant supports, that defendant conducted his interviews and made his report as a witness in the due course of a judicial proceeding. Accordingly, defendant's report is absolutely privileged and cannot be made the basis of a cause of action for either medical malpractice or libel."); *see also Kutilek v. Gannon*, 766 F. Supp. 967, 973 (D. Kan. 1991) (granting absolute immunity for retained experts' role in

reviewing evidence, interviewing parties and preparing expert reports before administrative hearing; "Absolute immunity extends to an expert witness's pretrial activities taken in preparation for testimony."); *Kahn v. Burman*, 673 F. Supp. 210, 212 (E.D. Mich. 1987) ("[W]itness immunity encompasses experts' reports prepared either before or during litigation."), *aff'd*, 878 F.2d 1436 (6th Cir. 1989). Indeed, immunity applies if the expert never testifies, his report is never provided to the court, and he is never identified as an expert at all. *Jarman v. Offutt*, 239 N.C. 468, 472, 80 S.E.2d 248, 251 (1954) (recognizing witness immunity for expert witness statement provided to party but never subsequently submitted by party when litigation abandoned).

In *Sharp v. Miller*, the Superior Court not only dismissed the claims but imposed Rule 11 sanctions, and the Court of Appeals affirmed both rulings. *Id.* at 618, 468 S.E.2d at 801-82. Relying on *Williams v. Congdon* and *Briscoe v. LaHue*, among other cases, the Court of Appeals held that the application of absolute immunity to claims about irregularities in expert witness reports was so well-established as to justify Rule 11 sanctions. *Id.*

Under this settled authority, the DSI Defendants are absolutely immune from Plaintiffs' claims in this case -- both federal and state. Even if Plaintiffs had valid constitutional and tort claims (which they do not, as discussed below), the DSI Defendants nevertheless have absolute immunity from each of Plaintiffs' claims.

## B.  Plaintiffs Cannot Avoid Absolute Witness Immunity Through Conspiracy Claims

Plaintiffs' conspiracy allegations cannot alter the absolute immunity that the DSI

Defendants otherwise enjoy:

> [A]llowing a plaintiff to circumvent the *Briscoe* rule by alleging a conspiracy to present false testimony would undermine the purposes served by granting witnesses absolute immunity from damages liability under § 1983.  Absolute witness immunity is based on the policy of protecting the judicial process and is "necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation."  . . .  "*[A]ny other holding would eviscerate absolute immunity since a witness rarely prepares her testimony on her own.*"

*Franklin v. Terr*, 201 F.3d 1098, 1101-02 (9th Cir. 2000) (emphasis added; quoting

*Briscoe*, 460 U.S. at 333, and district court decision in *Franklin*); *Collins*, 613 F. Supp. at

1315 ("The witness's immunity, which applies even if the testimony is false, would be

meaningless if the witness could be held liable under a conspiracy theory based on the

collaboration with counsel").[8]  Therefore, a plaintiff cannot evade a witness's absolute

immunity by arguing that his claims do not concern the witness's testimony but instead

---

[8]     *See also, e.g.*, *Safouane v. Fleck*, 226 Fed. Appx. 753, 762 (9th Cir. 2007) ("allegation of a conspiracy to affect the outcome [of a proceeding] is insufficient to defeat immunity"); *Reasonover v. St. Louis County*, 447 F.3d 569, 580 (8th Cir. 2006) ("a prosecutor is absolutely immune from a civil conspiracy charge when his alleged participation in the conspiracy consists of otherwise immune acts"); *Snelling v. Westhoff*, 972 F.2d 199, 200 (8th Cir. 1992); *House v. Belford*, 956 F.2d 711, 720-21 (7th Cir. 1992); *Crawford v. Abrams*, No. 0:06-1990-TLW-BM, 2007 WL 2934904, at *3 (D.S.C. Oct. 4, 2007) (noting that "most circuits have rejected § 1983 claims alleging that defendants who were testifying witnesses were not entitled to absolute immunity because they were engaged in a conspiracy with each other or with the prosecutor to offer perjurious testimony in a criminal case against the plaintiff") (citing cases).

concern an alleged conspiracy (with the prosecutor or another state actor) to testify falsely or to withhold evidence.

In keeping with *Briscoe*, and because the courts recognize that "a witness rarely prepares her testimony on her own," *Mowbray v. Cameron County*, 274 F.3d 269, 277-78 (5th Cir. 2001), expert witnesses are immune from Section 1983 claims -- for conspiracy as well as for underlying constitutional violations -- based on their conversations with government investigators or prosecutors. *Mowbray*, 274 F.3d at 277-78 (laboratory expert had absolute immunity under Section 1983 when, after discussions with prosecutors and officers, he failed to disclose that two tests for victim's blood on defendant's clothing were negative and instead testified that tests were positive); *Lyles*, 79 F.3d at 378; *see Holmes v. Eddy*, 341 F.2d 477, 480-81 (4th Cir. 1965) (per curiam) (witness was immune from state law tort and conspiracy claims based on allegations made to S.E.C. investigators and affidavit executed before case was instituted); *Griffin v. Walker*, No. 1:04CV918, 2006 WL 2023148, at *3 (M.D.N.C. July 18, 2006) (dismissing claims against individual who identified defendant during police investigation as barred by absolute witness immunity; claims were "legally frivolous").

Indeed, because claims arising from the witness's anticipated testimony are foreclosed by *Briscoe*, an alleged discussion or "conspiracy" about that presentation between the witness and the prosecutor cannot open the witness to liability. *See Lyles*, 79 F.3d at 375, 378 (finding that witness had absolute immunity from claims, including that he "conspired to make, and made, false representations about [plaintiffs] in . . . judicial

proceedings"); *Burke*, 580 F.2d at 108 (finding that witness had absolute immunity from claims, including allegations of "conspiracy by [witness] with the prosecuting attorney to deprive [criminal defendant] of a fair trial"); *Hawkins v. Webster*, 78 N.C. App. 589, 591-92, 337 S.E.2d 682, 684 (1985) (absolute immunity applied to claims that witness conspired to give false information to investigators and to make false statements both on the stand and in other documents submitted in litigation). Plaintiffs' suggestion that the meetings between the DSI Defendants and Nifong reflected the DSI Defendants' participation in a conspiracy is precisely the sort of interaction between witness and prosecutor that is fully protected by absolute witness immunity.[9]

*     *     *

---

[9] Plaintiffs' "conspiracy" claims against the DSI Defendants are insufficient in any event. As a rule, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic*, 127 S. Ct. at 1965. In particular, mere conclusory allegations of conspiracy are insufficient to state a claim for violation of Section 1983. *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1007 (4th Cir. 1987). An allegation of lawful conduct coupled with "a bare assertion of conspiracy will not suffice." *Bell Atlantic*, 127 S. Ct. at 1966.

Plaintiffs offer only conclusory allegations that the DSI Defendants "conspired" with Nifong, based on three meetings between Nifong and the DSI Defendants and DSI's generation of the May 12 Report at Nifong's direction. (Am. Compl. ¶¶ 207-11, 223-27, 229-35.) The fact that the prosecutor *met* with his retained expert on more than one occasion does not dictate the conclusion that the DSI Defendants "conspired" against Plaintiffs. To the contrary, Plaintiffs' conspiracy claims describe precisely the sort of ordinary and expected interaction between witness and prosecutor that is protected by absolute witness immunity. Indeed, if every interaction between a lawyer and his retained expert invited a Section 1983 conspiracy claim, it would be difficult to imagine any case in which prosecutors and witnesses alike would not operate under the specter of civil liability for their actions -- precisely the result witness (and prosecutorial) immunity is intended to avoid.

In sum, as an expert witness retained by the State, Meehan, and therefore DSI and Clark, are entitled to absolute immunity from all of Plaintiffs' claims, including their conspiracy claims. At all times, DSI's scientific analysis, preparation of reports, and communication with Nifong and other State officials were undertaken pursuant to Meehan's role as an expert witness. The DSI Defendants should be dismissed from this case.

## II. PLAINTIFFS' SECTION 1983 CLAIMS FAIL BECAUSE THEY ARE NOT PREMISED ON ANY DUTY OWED BY THE DSI DEFENDANTS

Plaintiffs' Section 1983 claims suffer from a second—and equally fatal—flaw: Plaintiffs' claims stem from the allegation that DSI effectively deprived them of allegedly exculpatory evidence by failing to include all of its expert opinions in the May 12 Report. Even if one assumes that failing to discuss evidence in an expert report is tantamount to withholding that evidence (even if that evidence is later produced prior to trial), neither the Constitution nor state law imposes any duty on the DSI Defendants to disclose potentially exculpatory information directly to Plaintiffs. Under settled law, that duty belongs to the prosecutor alone.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court declared that prosecutors are constitutionally obligated to produce exculpatory evidence to criminal defendants before trial: "[S]uppression *by the prosecution* of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87 (emphasis added). In *Giglio v. United States*, the Supreme Court stated unequivocally

that the decision whether evidence must be disclosed "is the responsibility of the prosecutor." 405 U.S. 150, 154 (1972). The *Brady* doctrine reflects "the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). In light of that "special role," the imposition of a duty of disclosure on the prosecutor alone makes perfect sense: "The *Brady* duty is framed by the dictates of the adversary system and the prosecution's legal role therein. . . . The prosecutor must ask such lawyer's questions as whether an item of evidence has 'exculpatory' or 'impeachment' value and whether such evidence is 'material.'" *Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) (en banc) (Wilkinson, J.); *accord, id.* at 664, 669 (Murnaghan, J.); *see also Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense.").

Thus, in this case as in every other, the prosecutor alone was constitutionally charged with disclosing any exculpatory evidence. The Constitution imposes no duty on non-prosecutorial parties, especially expert witnesses, to disclose potentially exculpatory evidence to a criminal defendant. Instead, at most, those witnesses should disclose potentially exculpatory information to the prosecutor, whose duty it becomes to determine, in the exercise of legal judgment, whether disclosure is warranted.

In *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (en banc)[10], every judge on the Fourth Circuit agreed that a witness (such as a police officer) owes no duty of disclosure to a criminal defendant. Instead, at most, "the police officer's duty is to disclose to the prosecution rather than to the defendant directly." *Id.* at 668 (Murnaghan, J.); *see also id.* at 660 (Wilkinson, J.) ("to speak of the duty binding police officers as a *Brady* duty is simply incorrect. The Supreme Court has always defined the *Brady* duty as one that rests with the prosecution"); *id.* at 678-79 (Luttig, J.). In *Jean*, half of the en banc Fourth Circuit joined Judge Murnaghan's opinion, declaring that a witness would "comply with *Brady*" and therefore would not be subject to Section 1983 liability if he delivered information to the prosecutor, who would then "make a discretionary legal judgment about whether the evidence is material and exculpatory, such that *Brady* compels its disclosure to the defendant." *Id.* at 664; *see also id.* at 669 ("The police officer's duty is not to determine whether the evidence is material and exculpatory. His duty is simply to collect the evidence and to disclose all of it to the prosecutor, who then makes the discretionary legal judgment about its material, exculpatory attributes."). The other half of the court joined Judge Wilkinson's opinion, ruling that the witness generally would not face liability under Section 1983 *even for withholding evidence from the prosecutor.* *Id.* at 660-62. *See also Washington v. Buraker*, 322 F. Supp. 2d 692, 701 (W.D. Va. 2004)

---

[10]    *Jean* was an equally divided decision of the en banc court. The opinion for affirmance, joined by half of the members of the court, was authored by Judge Wilkinson. Judge Murnaghan wrote a separate opinion (denominated a dissent) for the remaining members of the court. Judge Luttig dissented separately.

("the Fourth Circuit does not currently recognize a cause of action under *Brady* against police officers" for withholding evidence).

Numerous other federal courts also have concluded that a witness's duty is, at most, to disclose evidence to the prosecutor, who then is charged with determining whether the evidence is material, potentially exculpatory, and should be produced.[11] A witness is not liable under Section 1983 if he discloses evidence to the prosecutor but the prosecutor determines that the evidence is not subject to production. Even police officers are not charged with Section 1983 liability for breach of the broad disclosure obligations that Plaintiffs would impose on purely private parties like the DSI Defendants.[12]

Plaintiffs' claims against the DSI Defendants stem from the allegation that the May 12 Report purportedly failed to detail the presence of DNA from unidentified males in the rape kit evidence. Even if one were to assume that this evidence was somehow

---

[11] *See, e.g., McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996) ("Investigators satisfy their obligations under *Brady* when they turn exculpatory and impeachment evidence over to the prosecutor."). *See also Harrison v. Abraham*, No. 96-4262, 1997 WL 256970, at *18 (E.D. Pa. May 16, 1997) ("[T]he only courts found by this Court to have addressed this issue have held that police officers do not have a duty to disclose exculpatory evidence to a defendant but, rather, have a duty only to disclose such evidence to the prosecuting attorney.") (citing cases), *aff'd*, 151 F.3d 1025 (3d Cir. 1998) (unpublished table decision).

[12] *See, e.g., Walker v. City of New York*, 974 F.2d 293, 298-99 (2d Cir. 1992) (witnesses have no "obligation with respect to exculpatory evidence beyond disclosing that evidence to the prosecutor;" dismissing Section 1983 claims against police department); *Mowbray*, 274 F.3d at 278 (although "*Brady* imposes a duty on prosecutors to share exculpatory evidence with the defense," court was unaware of any "case extending *Brady* to police officers or lab technicians"; affirming 12(b)(6) dismissal of Section 1983 *Brady* claim against laboratory technician and police officer).

withheld from Plaintiffs (notwithstanding the fact that Plaintiffs admit that the evidence was given to them before any scheduled trial), the DSI Defendants simply cannot be held liable for that nondisclosure. As a private testing laboratory, DSI had no duty to make disclosure to Plaintiffs directly. At most, DSI was required to make full disclosure of the DNA testing results to the prosecutor -- which it did. Plaintiffs affirmatively and repeatedly allege as much. (*See, e.g.,* Am. Compl. ¶¶ 207, 224, 275, 296.) Indeed, the gravamen of Plaintiffs' complaint is that Nifong persisted with the prosecution notwithstanding his full knowledge of the DNA testing results (as well as additional evidence that called into doubt the criminal charges against Plaintiffs).

In short, DSI fully satisfied any possible obligation it might have had when it informed Nifong of the results of its DNA testing. The law is clear that the decision about what evidence to provide to Plaintiffs and when to provide it was Nifong's alone to make. In the absence of any duty to provide evidence directly to Plaintiffs, and having satisfied any arguable duty to provide evidence to Nifong, Plaintiffs cannot state a claim for any breach of duty by the DSI Defendants. Plaintiffs' Section 1983 claims against the DSI Defendants must be dismissed.

## III. PLAINTIFFS' SECTION 1983 CLAIMS WOULD FAIL EVEN IF THE DSI DEFENDANTS HAD A DUTY TO PRODUCE EVIDENCE TO PLAINTIFFS

### A. Plaintiffs Cannot State a Claim for Concealment of Evidence Because the Charges Against Them Were Dismissed

Plaintiffs cannot state a claim under Section 1983 for another, and independently determinative, reason: Even if DSI had an independent duty under *Brady* to disclose

potentially exculpatory evidence directly to Plaintiffs, no *Brady* violation arose here because the evidence was provided and the charges against Plaintiffs were dismissed before trial.

*Brady* is violated only if "the suppressed evidence might have affected the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 674-75 (1985); *United States v. Agurs*, 427 U.S. 97, 104 (1976). "[U]nless the omission deprived the defendant of a fair trial, there was no constitutional violation . . . and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose." *Bagley*, 473 U.S. at 675; *Agurs*, 427 U.S. at 108; *see Strickler*, 527 U.S. at 289 (no *Brady* violation unless criminal defendant shows "result of the trial would have been different" if evidence disclosed). Because no constitutional violation occurs unless the criminal defendant is convicted in an unfair trial, no Section 1983 claim lies where either the evidence is provided before trial, or the charges are dismissed and no trial occurs, or both.

The Fourth Circuit has made that rule crystal clear. In *Jean*, the en banc court agreed that there is no *Brady* violation -- and so no Section 1983 claim -- unless the "failure to disclose the exculpatory information deprived the § 1983 plaintiffs of their right to a fair trial." 221 F.3d at 659 (Wilkinson, J.); *accord, id.* at 674 (Murnaghan, J.) ("no court has ever recognized [a] freestanding liberty interest in exculpatory evidence"; instead, defendant has only liberty interest in "avoiding incarceration" based on withheld material evidence). *Jean* followed the Fourth Circuit's prior decision in *Taylor v. Waters*, 81 F.3d 429 (4th Cir. 1996), in which the Court rejected claims based on an investigator's

failure "to disclose exculpatory evidence to the prosecutor in a more timely manner" where the charges were dismissed before trial. *Id.* at 432, 435-37. *Taylor* found no *Brady* violation when it was "undisputed that [the criminal defendant] was not subjected to trial." *Id.* at 436 n.5; *see Friedland v. City of Charlotte*, No. 3:98 CV 122, 2001 WL 1360436, at *5 (W.D.N.C. Oct. 26, 2001) (*Brady* does "not provide a criminal defendant an absolute right to all potentially exculpatory evidence [but] [i]nstead, it provides a remedy where a criminal defendant can show that there is a reasonable probability that he would not have been convicted if the state had disclosed the exculpatory evidence.").

Here, there was no *Brady* violation giving rise to a Section 1983 claim. Plaintiffs acknowledge that they were provided with all of the alleged DNA *Brady* material well before trial was scheduled (Am. Compl. ¶¶ 267, 302-03, 319), which is all that *Brady* requires. *United States v. Neely*, 76 F.3d 376, 1996 WL 60329, at *5-6 (4th Cir. Feb. 13, 1996) (unpublished table decision) (no *Brady* claim stated absent claim that government failed to provide evidence "in sufficient time for it to be used at trial"; indeed, "Brady does not necessarily require that exculpatory information be produced prior to trial" so long as defendant has it in time to use it during trial); *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985) ("[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial;" finding no constitutional violation where exculpatory information was disclosed through

testimony of first trial witness).[13] Moreover, all criminal charges against Plaintiffs were dismissed before trial (and after the testing data was produced), so Plaintiffs suffered no deprivation of the constitutional "fair trial" rights that *Brady* protects. *Taylor*, 81 F.3d at 436 n.5.[14]

### B. Plaintiffs Cannot State a Section 1983 Claim for Malicious Prosecution Against the DSI Defendants

Because Plaintiffs' claims based on the alleged *Brady* violation are foreclosed by settled precedent, Plaintiffs attempt to recast their claims related to the DNA evidence as constitutional claims for "malicious prosecution" in violation of the Fourth and Fourteenth Amendments (First Cause of Action; Am. Compl. ¶ 335). But the Fourth Circuit has held that "there is no such thing as a '§ 1983 malicious prosecution' claim." *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000). Plaintiffs have no Fourteenth Amendment claim for any injury styled "malicious prosecution." *Taylor*, 81 F.3d at 436 (allegation that police investigator failed to disclose exculpatory evidence to prosecutor

---

[13]     *See also United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996) ("Where the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, *Brady* is not violated."); *United States v. Banda-Gutierrez*, 28 F.3d 109, 1994 WL 274055, at *5 (9th Cir. June 20, 1994) (unpublished table decision) (exculpatory information "need not be disclosed prior to trial . . . so long as the defense receives the information at a time when the disclosure would be of value to the accused").

[14]     *See also, e.g., Becker v. Kroll*, 494 F.3d 904, 924 (10th Cir. 2007) (criminal defendant "never proceeded to trial, and she cannot therefore rest her § 1983 claims on a *Brady* violation") (applying both *Jean* and *Taylor*); *Nygren v. Predovich*, 637 F. Supp. 1083, 1087 (D. Colo. 1986) (dismissing Section 1983 claims where charges were dismissed before trial; "the *Brady* rule only implicates a criminal defendant's due process right *to a fair trial* . . . There simply is no constitutional violation unless suppression of the evidence deprived the defendant of a fair trial.") (emphasis in original).

"does not allege a deprivation of any right guaranteed under the Due Process Clause of the Fourteenth Amendment"). Instead, "[w]hat is conventionally referred to as a '§ 1983 malicious prosecution' action is nothing more than a § 1983 claim arising from a Fourth Amendment violation." *Lambert*, 223 F.3d at 260. (following *Albright v. Oliver*, 510 U.S. 266 (1994)); *see Taylor*, 81 F.3d at 436. Plaintiffs can state no Fourth Amendment claim against the DSI Defendants under settled law.

Once a criminal defendant has been indicted, no Fourth Amendment claim arises from arresting him or continuing the ongoing criminal prosecution. *Taylor*, 81 F.3d at 436 & n.5; *Brooks v. City of Winston-Salem*, 85 F.3d 179, 184 (4th Cir. 1995); *see Jean*, 221 F.3d at 660 (applying *Taylor*). Thus, Plaintiffs cannot state a claim against the DSI Defendants for any supposed constitutional harm arising after their indictments, as it is well-settled that a defendant has no Fourth Amendment right to "avoid[] prosecution upon less than probable cause." *Brooks*, 85 F.3d at 184 (dismissing Section 1983 claims challenging defendant's "fail[ure] to attempt to terminate the criminal proceedings after it became clear that [criminal defendant] was innocent"); *Taylor*, 81 F.3d at 436-37 (dismissing Section 1983 claims alleging that defendant "fail[ed] to disclose exculpatory evidence after a determination of probable cause ha[d] been made by a neutral detached magistrate").

Nor can Plaintiffs state any Fourth Amendment claim against the DSI Defendants arising prior to their indictments. Any such claim necessarily would be premised on the argument that the DSI Defendants provided allegedly exculpatory information to Nifong

that ***Nifong*** chose not to have provided to the grand jury. Such an argument is unavailing, for several reasons. ***First***, DSI made full and accurate disclosure of the results of the DNA testing to the prosecutor. ***Second***, as discussed above, the DSI Defendants had *no duty* to make disclosure to or otherwise ensure the presentation of evidence before the grand jury.[15] And ***third,*** there is no requirement that the prosecutor or grand jury witnesses themselves provide *any* exculpatory evidence to the grand jury in the first instance. *United States v. Williams*, 504 U.S. 36, 52 (1992) ("Imposing on the prosecutor a legal obligation to present exculpatory evidence in his possession would be incompatible with [the "accusatory" grand jury] system."). If Nifong had no obligation to have the grand jury witnesses disclose known exculpatory evidence to the grand jury, Plaintiffs have no Fourth Amendment claim against the DSI Defendants for somehow failing to ensure that such a disclosure was made.

In short, Plaintiffs cannot state a Fourteenth Amendment due process claim against the DSI Defendants because Plaintiffs were never subjected to a criminal trial, and they cannot state a Fourth Amendment claim for unconstitutional seizure under any conceivable interpretation of their claims. Their Section 1983 claims should be dismissed.

---

[15]     Nor did the DSI Defendants have an *opportunity* to do so:  According to the Amended Complaint, the DSI Defendants played no role in the grand jury process, and Plaintiffs make no claim that the DSI Defendants testified before the grand jury or otherwise presented evidence for consideration in the probable cause determination. Indeed, DSI had not even completed its analysis or prepared the May 12 Report when the indictments of Finnerty and Seligmann were handed down (on April 17, 2006).

## IV. PLAINTIFFS CANNOT STATE CLAIMS BASED UPON RESPONDEAT SUPERIOR OR SUPERVISOR LIABILITY

### A. DSI Cannot Be Held Liable Under Section 1983 on a Theory of *Respondeat Superior*

It is settled law that a municipality cannot be held liable under Section 1983 on a theory of *respondeat superior*. *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Collins v. City of Harker Heights*, 503 U.S. 115, 121 (1992); *Gantt v. Whitaker*, 203 F. Supp. 2d 503, 509 (M.D.N.C. 2002), *aff'd*, 57 Fed. Appx. 141 (4th Cir. 2003). That rule applies equally to private corporations:  "[A] private corporation is not liable under § 1983 for torts committed by [employees] when such liability is predicated solely upon a theory of *respondeat superior*."  *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999); *see Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982) (rule that "a municipal corporation cannot be saddled with section 1983 liability via *respondeat superior* alone" is "equally applicable to the liability of private corporations").  Therefore, DSI cannot be held liable under Section 1983 based on a theory of *respondeat superior* for any constitutional tort allegedly committed by Meehan or Clark.

The Fourth Circuit has held emphatically that "a private corporation is liable under § 1983 *only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights."  *Austin*, 195 F.3d at 728 (emphasis in original).  Plaintiffs do not claim, however, that the injuries they allege resulted from any "official policy or custom" of DSI.  *See Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355-56

(4th Cir. 2003) (reversing denial of motion for judgment as a matter of law where plaintiff offered no evidence that "an official policy or custom of the corporation caused the alleged deprivation of federal rights").[16]  Nor do Plaintiffs claim that either Clark or Meehan exercised "final policymaking authority" on behalf of DSI.  *Austin*, 195 F.3d at 728-29 (principles governing whether municipality can be liable for single decision of policymaking official "are equally applicable to a private corporation" "when an employee exercises final policymaking authority concerning an action that allegedly causes a deprivation of federal rights"; question is whether employee, "as a matter of state and local positive law, or custom or usage having the force of law . . . exercised final policymaking authority concerning" the alleged wrongdoing).  Absent such allegations, Plaintiffs' Section 1983 claims against DSI must be dismissed.

### B.  Clark Cannot Face Supervisory Liability

Plaintiffs' Section 1983 claims against Clark are also flawed, because they do not plead the necessary elements of supervisory liability:

> [T]hree elements [are] necessary to establish supervisory liability under § 1983:  (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to

---

[16]     *See also, e.g.*, *Breen v. Pendergraph*, No. 3:0CV148, 2007 WL 4591868, at *7-8 (W.D.N.C. Dec. 28, 2007) (granting summary judgment in favor of private corporation on Section 1983 claims where corporation's "policy" was not constitutionally infirm); *El Bay v. Celebration Station*, No. 3:02CV461, 2006 WL 2811497, at *3 (W.D.N.C. Sept. 28, 2006), *aff'd*, 242 Fed. Appx. 917 (4th Cir. 2007) (granting summary judgment in favor of private corporation on Section 1983 claims where "plaintiff does not allege, nor does the record reflect, a policy or custom by the corporation . . . to effectuate any of the alleged constitutional violations the plaintiff asserts").

show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).[17]  Even assuming for the sake of argument that Plaintiffs' bare-bones allegations as to Clark (which describe nothing more than Clark's physical presence at three meetings with Nifong) suffice to plead the first two elements required to impose supervisory liability on Clark, Plaintiffs' claims fail at the third prong.  There can be no "affirmative causal link" -- and thus no supervisory liability -- where the plaintiff has not suffered a constitutional injury.  *See e.g., Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 630-31 (4th Cir. 2002) ("Because the Appellants have failed to demonstrate a constitutional injury . . . their supervisory liability claim fails on the third prong of the *Shaw* test, i.e., there is no affirmative causal link between the supervisor's inaction and any constitutional injury suffered by the Appellants."); *Phillips v. Bailey*, 337 F. Supp. 2d 804, 807 (W.D.Va. 2004).  Because Plaintiffs have failed to state a claim under Section 1983 for a violation of their rights under either the Fourth or Fourteenth Amendments, Plaintiffs' supervisory liability

_____

[17]    Moreover, "[u]nder the first prong of *Shaw*, the conduct engaged in by the supervisor's subordinates must be 'pervasive,' meaning that the 'conduct is widespread or at least has been used on several different occasions.'"  *Randall v. Prince George's County, Md.*, 302 F.3d 188, 206 (4th Cir. 2002).  In addition, a plaintiff ordinarily cannot satisfy the "deliberate indifference" prong of the *Shaw* test "by. . . pointing to a single incident or isolated incidents" "for a supervisor cannot be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct."  *Id.* (quotation omitted) ("deliberate indifference" may be established by showing "supervisor's continued inaction in the face of documented widespread abuses").  The Amended Complaint simply fails to plead "widespread" or "pervasive" conduct by any DSI employee under Clark's supervision.

claims against Defendant Clark should be dismissed. *Tigrett*, 290 F.3d at 630-31;

*Phillips*, 337 F. Supp. 2d at 807.[18]

## V.  PLAINTIFFS CANNOT ESTABLISH CAUSATION FOR ANY OF THEIR CLAIMS

Plaintiffs' claims require them to establish proximate causation between the DSI

Defendants' acts and their alleged injuries. "Proximate cause is a cause which in natural

and continuous sequence, unbroken by any new and independent cause, produced the

plaintiff's injuries, and without which the injuries would not have occurred." *Weaver v.

Sheppa*, 651 S.E.2d 395, 398 (N.C. Ct. App. 2007) (quotation omitted); *Nelson v.

Hartford Underwriters Ins. Co.*, 177 N.C. App. 595, 613, 630 S.E.2d 221, 233 (2006)

(proximate cause is one that "directly produces an event and without which the event

would not have occurred") (quotation omitted).

Proximate causation is a requirement for liability for Plaintiffs' state tort claims.

*See, e.g., Weaver*, 651 S.E.2d at 398; *Carver v. Lykes*, 262 N.C. 345, 352-53, 137 S.E.2d

139, 145 (1964). Similarly, traditional notions of proximate cause apply in Section 1983

actions. *See, e.g., Carter v. Barker*, 225 F.3d 653, 2000 WL 1008794, at *7 (4th Cir. July

21, 2000) (unpublished table decision); *Blue v. Bigos*, 89 F.3d 827, 1996 WL 325316, at

*1 (4th Cir. June 7, 1996) (unpublished table decision); *Scott v. Hern*, 216 F.3d 897, 911

(10th Cir. 2000) ("plaintiff must allege factual causation -- *i.e.*, 'but for' causation -- in

order to state a claim under § 1983"); *Russo v. United States*, 37 F. Supp. 2d 450, 4554

---

[18]    In addition, as discussed elsewhere in this Brief, Plaintiffs have failed to plead a
causal link between any conduct by the DSI Defendants and any damages suffered by
Plaintiffs.

n.3 (E.D. Va. 1999). Thus, a plaintiff states a claim for relief under Section 1983 only when he alleges the necessary causal nexus between the defendant's actions and the constitutional harm the plaintiff claims to have suffered.

An unadorned allegation of proximate causation will not suffice, however, where the facts alleged make clear that the defendant's wrongdoing was not the cause of the plaintiff's harm. Where it is plain on the face of the complaint that such a causal nexus is lacking, dismissal is appropriate. *See Scott*, 216 F.3d at 911; *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156, 349 S.E.2d 82, 83 (1986).

In the American criminal justice system, the grand jury serves an "accusatory" rather than an "adjudicative" function. *Williams*, 504 U.S. at 51. Accordingly, the grand jury hears only the witnesses whom the prosecutor decides to present -- and the prosecutor is not constitutionally constrained to present any witnesses or any particularly type of evidence. *Id.* at 51-52; *Respublica v. Shaffer*, 1 U.S. (1 Dall.) 236 (1788) (it is grand jury's function not "to enquire . . . upon what foundation [the charge may be] denied" or otherwise to examine suspect's defenses, but only to examine "upon what foundation [the charge] is made" by the prosecutor) (quoted in *Williams*, 504 U.S. at 51-52); *Bernard v. County of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004) (decision about presenting evidence to grand jury lies "at the very core of a prosecutor's role as an advocate"). A witness -- indeed, even a suspect -- has no right to present any evidence to the grand jury or to cause its presentation. *Williams*, 504 U.S. at 51-52; *see State v. Morgan*, 9 N.C. App. 624, 627, 177 S.E.2d 457, 459 (1970); *State v. Jones*, 85 N.C. App.

56, 69, 354 S.E.2d 257, 258 (1987) (defendant cannot challenge evidence presented to grand jury; his rights are protected by "his right to object to improper evidence and cross-examine witnesses at trial") (quotation omitted).

In this system, the prosecutor's decision to seek an indictment and his decision about what witnesses to present to the grand jury intervene between a witness who does not testify before the grand jury and the indictment. In particular, no tort claim predicated on a non-prosecutorial party's alleged withholding of evidence can lie against that party when he has disclosed all evidence to the prosecutor:

> [C]ourts . . . hold that police officers may be liable under section 1983 for prosecution without probable cause if they fail to disclose exculpatory evidence to prosecutors, make false or misleading reports to the prosecutor, omit material information from the reports, or otherwise interfere with the prosecutor's ability to exercise independent judgment. . . .

> Although the converse principle is variously stated, it is equally well established that *where an officer* [or other non-prosecutorial party] *presents all relevant probable cause evidence to an intermediary, such as a prosecutor*, a grand jury, or a magistrate, *the intermediary's independent decision to seek a warrant, issue a warrant, or return an indictment breaks the causal chain and insulates the officer from a section 1983 claim* based on lack of probable cause for an arrest or prosecution.

*Rhodes v. Smithers*, 939 F. Supp. 1256, 1274 (S.D.W.Va. 1995) (emphasis added; citing numerous cases). The prosecutor has the sole responsibility to present witnesses to the grand jury; others have no right to intervene in the grand jury proceedings. Therefore, the most that the witness can do is to provide accurate information to the prosecutor who then has the sole power to decide what to do with it.

Plaintiffs concede that DSI made full disclosure to the prosecutor, so it is plain that the prosecutor's role in the grand jury process broke the causal chain. In particular, no act by the DSI Defendants could have caused or contributed to the indictment of Plaintiffs Finnerty and Seligmann, who were indicted on April 15, 2006, just ten days after DSI was retained to analyze the rape kit evidence, before DSI had even analyzed all of the evidence, and nearly a month before the May 12 Report issued. (*See* Am. Compl. ¶¶ 198-203, 212, 213, 230.) Plaintiffs affirmatively allege that DSI accurately provided the prosecutor all of the results of the tests that had been completed at the time of the indictments, and the prosecutor and his grand jury witnesses decided not to present that information to the grand jury. (*Id*. ¶¶ 207-08, 210, 212-14.) By the plain allegations of the Amended Complaint, the prosecutor's discretionary decision not to provide that information to the grand jury breaks any causal link between the DSI Defendants' actions and the alleged injuries to Plaintiffs.

Plaintiff Evans' claim should not be treated differently. Evans was not indicted until May 15, 2006, three days after DSI presented the May 12 Report to the prosecutor (Am. Compl. ¶¶ 230, 238). The Amended Complaint acknowledges that -- in addition to the information in the May 12 Report -- the prosecutor knew all of the results of the tests that DSI performed at that time, but he and the grand jury witnesses independently determined not to present that information to the grand jury. (*See id*. ¶ 241 (alleging that "Gottlieb, Himan, and Nifong agreed in advance of the May 15 Indictment that they

would mislead the grand jury as to the evidence concerning Evans and not reveal to the grand jury the evidence of Evans' actual innocence").)

Because the Complaint makes clear that Plaintiffs' alleged injuries were not proximately caused by any action of the DSI Defendants, their claims must be dismissed.

## VI. PLAINTIFFS' SECTION 1985 AND 1986 CLAIMS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO SATISFY SEVERAL ELEMENTS OF THOSE CLAIMS

Plaintiffs allege that the DSI Defendants should be held liable for violations of 42 U.S.C. § 1985(2) (eighth cause of action), 42 U.S.C. § 1985(3) (tenth cause of action), and 42 U.S.C. § 1986 (twelfth cause of action) for conspiring to deny Plaintiffs equal protection of the laws (and for failing to prevent such a conspiracy).  None of those claims can withstand the DSI Defendants' motion to dismiss, for a number of reasons.

### A. Plaintiffs Fail to Satisfy Section 1985's Requirement of Alleging That the DSI Defendants Were Motivated by a Discriminatory Animus Based on Plaintiffs' Membership in a Qualifying Class

Plaintiffs attempt to state claims under both the second clause of Section 1985(2) (which prohibits participating in a conspiracy to obstruct justice "with the intent to deny any citizen the equal protection of the laws") and Section 1985(3) (which prohibits participating in a conspiracy to deprive any person "of the equal protection of the laws, or of equal privileges and immunities under the laws").  Congress did not intend Section 1985 to "apply to all tortious, conspiratorial interferences with the rights of others." *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971).  Section 1985(3), the "Klu Klux Klan Act," was enacted for the specific purpose of quelling post-Civil War violence against

African-Americans: "Congress enacted § 1985(3)" "[a]gainst [a] backdrop of political terrorism" in order to "afford[] a remedy for the vindication of the civil rights of those being threatened and injured, notably blacks and advocates for their cause." *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 156-57 (4th Cir. 1985). In *Griffin v. Breckenridge*, the Supreme Court thus held that in order to state a claim under the statute, the plaintiff must allege that the defendant was motivated by a "racial, or perhaps otherwise class-based, indiviously discriminatory animus." 403 U.S. at 102; *see Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995).[19]

In *Griffin*, the Supreme Court refused to find that there might be "class-based" groups deserving of protection other than African-Americans. 403 U.S. at 102 & n.9. The Court left open the possibility that it "perhaps" might do so in the future, *id.*, but in the years since, it has never extended the protection of the second clause of Section 1985(2) or Section 1985(3) beyond animus directed toward African-Americans. *See Bray v. Alexandria Clinic*, 506 U.S. 263, 269-70 (1993) ("We have not yet had occasion to resolve the 'perhaps' [of the existence of other protected classes left open in *Griffin*].");  *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 836 (1983) ("it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause"; rejecting economically or politically motivated animus as grounds for claim).

---

[19]     As the second clause of Section 1985(2) is similarly geared toward the "equal protection of the laws," the prohibition of 1985(2) is limited to the same invidious discriminatory animus required by 1985(3). *See King v. Jeffries*, 402 F. Supp. 2d 624, 634 (M.D.N.C. 2005).

The Fourth Circuit has extended the scope of protection of the Klu Klux Klan Act only to religious minorities, *Ward v. Connor*, 657 F.2d 45 (4th Cir. 1981) (member of Unification Church), and that decision came *before* the Supreme Court twice refused to extend the Act's scope beyond animus directed toward African-Americans in *Scott* and *Bray*. *See Bloch v. Mtn. Mission Sch.*, 846 F.2d 69, 1988 WL 45433, at *1-2 (4th Cir. May 2, 1988) (unpublished table decision) (orphans not protected class); *Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir. 1985) (whistleblowers not protected class); *Harrison*, 766 F.2d at 161 ("[s]ince the Court in *Griffin* provided blacks a remedy under § 1985(3), . . . no other group or class has achieved similar status"); *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985) (military prisoners not protected class).[20] While some courts in other jurisdictions have extended the scope of protected classes, it is "obvious that . . . the class protected can extend no further than to those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence,'" and that the class must be "discrete" and "insular." *Buschi*, 775 F.2d at 1258 (quoting *Scott*, 463 U.S. at 851).

Plaintiffs simply cannot claim the protection of Section 1985, because they do not allege that they are members of a protected class. Plaintiffs do not and could not allege that they are part of a discrete and insular class. They do not and could not allege that they -- "undergraduate student[s] enrolled at Duke University, one of the leading

---

[20]    The Fourth Circuit did extend Section 1985(3) to women, *NOW v. Operation Rescue*, 914 F.2d 582 (4th Cir. 1990), but it was reversed by the Supreme Court. *Bray*, 506 U.S. 263.

academic universities in the world" (Am. Compl. ¶ 9) who spent "millions of dollars in legal fees defending themselves against legal prosecutions" (*id.* ¶ 4) -- are members of a class "in unprotected circumstances similar to those of the victims of Klan violence."

The Amended Complaint does not allege (even in conclusory fashion) Plaintiffs' membership in any particular class entitled to protection under Section 1985 (Am. Compl. ¶¶ 445-52, 460-67), an omission that warrants dismissal of those claims. *C&H Co. v. Richardson*, 78 Fed. Appx. 894, 902 (4th Cir. 2003) (affirming summary judgment in favor of defendant with respect to claim under Section 1985(3) because plaintiff failed to "allege that the complained-of discrimination resulted from its membership in any qualifying class"). Moreover, regardless of the motives of any other Defendant, Plaintiffs do not allege a discriminatory animus on the DSI Defendants' part, much less that the DSI Defendants shared the same motivation as the other Defendants. *See Martin v. Boyce*, No. 1:99 CV 1072, 2000 WL 1264148, at *7 (M.D.N.C. July 20, 2000) ("all of the conspirators must share the same forbidden animus"). Having failed to satisfy these fundamental requirements, Plaintiffs' Section 1985 claims fail.

### B.     The DSI Defendants' Actions Did Not Deprive Plaintiffs of Any Rights

Plaintiffs' Section 1985 claims must be dismissed for an additional reason: Section 1985 does not create any substantive rights but instead only provides remedies based on violations of other rights. *Scott*, 463 U.S. at 833; *Great Am. Fed. S&L Ass'n v. Novotny*, 442 U.S. 366, 372 (1979); *see, e.g., Federer v. Gephardt*, 363 F.3d 754, 758 (8th Cir. 2004); *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001). Here,

the predicate violations underlying Plaintiffs' Section 1985 claims are the same as those underlying their Section 1983 claims -- and they fail for the same reasons. Because their underlying claims fail, Plaintiffs' 1985 conspiracy claims fail as well.[21]

## C.    Plaintiffs' Section 1986 Claim Must Be Dismissed As Well

Section 1986 provides, in relevant part, that "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured."  42 U.S.C. § 1986.  That section thus "provides a cause of action against any party with knowledge of a § 1985 conspiracy who fails to attempt to prevent the conspiracy."  *Brissett*, 1998 WL 195945, at *3.

---

[21]    Plaintiffs' Section 1985 claims also fail for yet another reason:  The Fourth Circuit has applied a "relatively stringent standard for establishing Section 1985 conspiracies," requiring that a plaintiff prove "an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights."  *Simmons*, 47 F.3d at 1377; *see id.* at 1378 (plaintiffs must allege that defendants "share[d] the general conspiratorial objective") (citing cases).  Applying this "very high" pleading standard, *Brissett v. Paul*, 141 F.3d 1157, 1998 WL 195945, at *2 (4th  Cir. 1998) (unpublished table decision), the Fourth Circuit "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a § 1985 conspiracy."  *Simmons*, 47 F.3d at 1377.

Under this "stringent" standard, Plaintiffs' Section 1985 claims are deficient for the same reason that their Section 1983 conspiracy claims are flawed:  Plaintiffs' allegations of conspiracy rely on nothing more than the supposition that the DSI Defendants conspired with the prosecutor because they conferred during the course of the criminal proceeding.  Plaintiffs' conclusions that these meetings constituted a "conspiracy" are precisely the sort of allegations that the Fourth Circuit has rejected repeatedly.  *See, e.g.*, *Simmons*, 47 F.3d at 1377-78 (fact that defendants met and talked with one another several times while playing their respective roles in the process does not state a claim for conspiracy).

Plaintiffs' Section 1986 claims must be dismissed because their Section 1985 claims fail for the reasons set forth above. "A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." *Trerice*, 755 F.2d at 1085. Where, as here, a plaintiff fails to state a claim for violation of Section 1985, his or her claim under Section 1986 fails as well. *Id.*; *Brissett*, 1998 WL 195945, at *3.

Moreover, to state a valid Section 1986 claim, the DSI Defendants must have had the "power to prevent or aid in preventing the commission" of the alleged harms under Section 1985. 42 U.S.C. § 1986. Here, DSI satisfied any possible duty by providing information to the prosecutor. As set forth above, the prosecutor had an independent constitutional duty to determine what information was provided to the criminal defendants, and the DSI Defendants lacked the power to control the exercise of his prosecutorial discretion. *See, e.g., Lohr v. Association of Catholic Teachers*, 416 F. Supp. 619, 623 (E.D. Pa. 1976) (no Section 1986 claim when defendant lacked authority to control behavior).

## VII.  PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED

Plaintiffs assert state law claims against the DSI Defendants under theories of negligence (negligence, negligent infliction of emotional distress, and negligent supervision), intentional infliction of emotional distress, obstruction of justice, and malicious prosecution. Each of these claims fails for the reasons set forth below.

**A.** **Plaintiffs Cannot State Any Negligence Claims Against the DSI Defendants Because the DSI Defendants Owed No Duty to Plaintiffs**

Plaintiffs cannot state claims against the DSI Defendants based in negligence because the DSI Defendants owed no duty to Plaintiffs. It is black-letter law that unless the defendant owes a legal duty of care to the plaintiff, the plaintiff cannot state a negligence claim: "Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law." *Huntley v. Howard Lisk Co.*, 154 N.C. App. 698, 703, 573 S.E.2d 233, 236 (2002) (quotation omitted).[22] Whether a duty of care exists is a question of law for the Court. *See id.* The answer to that question depends upon the relationship between the parties. *Eisenberg v. Wachovia Bank. N.A.*, 301 F.3d 220, 224-26 (4th Cir. 2002) (refusing to recognize duty owed by bank to noncustomer under North Carolina law); *Vickery v. Olin Hill Constr. Co.*, 47 N.C. App. 98, 103, 266 S.E.2d 711, 715 (1980) (refusing to recognize duty owed by seller and real estate agent to buyer).

North Carolina has never recognized a duty owed by expert witnesses to parties against whom they are retained to testify, nor has it recognized a duty flowing from a DNA testing laboratory (let alone its President) to a criminal defendant. Indeed, to the DSI Defendants' knowledge, every court to consider the issues has concluded that expert witnesses and DNA laboratories have no duty to adverse parties and thus cannot be liable

---

[22] The same is true for any claim of negligent infliction of emotional distress, *Sheaffer v. County of Chatham*, 337 F. Supp. 2d 709, 733-34 (M.D.N.C. 2004), and for any claim of negligent hiring and supervision, *Little v. Omega Meats I, Inc.*, 171 N.C. App. 583, 586-87, 615 S.E.2d 45, 48, *aff'd*, 360 N.C. 164 (2005).

to them for negligence: "[T]he duty imposed on a witness is generally owed to the court, not the adverse party. Accordingly, a breach of the duty owed to the court does not give rise to a cause of action in tort by the adverse party." *Maiden v. Rozwood*, 597 N.W.2d 817, 829-30 (Mich. 1999) (concluding that medical examiner who prepared autopsy report that implicated defendant owed duty of care to prosecution on whose behalf she testified and to the court, but not to criminal defendant). *Accord*, *e.g.*, *Field v. Graffagnino*, 514 F. Supp. 2d 1036, 1046 (W.D. Tenn. 2007) ("Expert witnesses do not owe any duty to an adverse party; instead they owe a duty to the Court to testify truthfully and honestly."); *Williams v. Nat'l Med. Servs., Inc.*, 400 F.3d 1102, 1104 (8th Cir. 2005); *Kahn v. Burman*, 673 F. Supp. 210 (E.D. Mich. 1987), *aff'd*, 878 F.2d 1436 (6th Cir. 1989); *McNall v. Frus*, 784 N.E.2d 238, 239 (Ill. Ct. App. 2002); *Lewis v. Swenson*, 617 P.2d 69, 74 (Ariz. Ct. App. 1980) (O'Connor, J.).

Because the DSI Defendants owed no duty to Plaintiffs, their negligence claims must be dismissed.

### B.    Plaintiffs Fail to State a Claim for Malicious Prosecution

The *sine qua non* of a malicious prosecution claim under North Carolina law is that the defendant must have initiated the underlying criminal action. Specifically, to survive a Rule 12(b)(6) motion on a malicious prosecution claim, a plaintiff must plead facts sufficient to establish: (1) that the defendant initiated the earlier proceeding; (2) malice on the part of the defendant in doing so; (3) lack of probable cause for the defendant's initiation of the earlier proceeding; and (4) termination of the earlier

proceeding in favor of the plaintiff. *Best v. Duke Univ.*, 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994); *North Carolina ex rel. Hailey v. Westmoreland*, 267 F. Supp. 2d 497, 503 (M.D.N.C. 2003).

In North Carolina, criminal proceedings are initiated either by a prosecutor who presents a bill of indictment to a grand jury, by an arresting officer, or by a complaining witness who swears out a warrant before a magistrate. *See, e.g., Best*, 337 N.C. at 749, 448 S.E.2d at 510 (campus police department whose officer swore out arrest warrant initiated criminal proceeding); *Alt v. Parker*, 112 N.C. App. 307, 313, 435 S.E.2d 773, 776 (1993) (complaining witness who swore out arrest warrant initiated criminal proceeding). Witnesses who provide information to investigators or prosecutors do not "initiate" proceedings. *See Charles Stores Co. v. O'Quinn*, 178 F.2d 372, 374 (4th Cir. 1949) (dismissing malicious prosecution claim against witness who reported plaintiffs' alleged crime to police officers, applying North Carolina law); *Showell v. U.S. Airways, Inc.*, No. 3:06 CV 384, 2007 WL 3275131, at *7 (W.D.N.C. Nov. 2, 2007) (same); *Shillington v. K-Mart Corp.*, 102 N.C. App. 187, 196, 402 S.E.2d 155, 160 (1991) (same).[23]

In some circumstances, the Court of Appeals has allowed malicious prosecution claims to proceed against complaining witnesses who provide false information to law

---

[23]     *See also, e.g., Harris v. Barham*, 35 N.C. App. 13, 16, 239 S.E.2d 717, 719 (1978); *Hawkins v. Webster*, 78 N.C. App. 589, 593, 337 S.E.2d 682, 685 (1985) (plaintiff does not state claim for malicious prosecution by alleging that defendants "procured or caused to be instituted against him" a civil action for indemnity, when defendants did not themselves initiate the indemnity claims).

enforcement that causes police or prosecutors to initiate prosecution. *See, e.g., Scarborough v. Dillard's, Inc.*, 162 N.C. App. 360, 590 S.E.2d 477 (2004) (unpublished table decision). Those cases are contrary to the Supreme Court's requirement that the defendant have actually *initiated* the proceeding. *Best*, 337 N.C. at 749, 448 S.E.2d at 510. Even if those cases are followed, however, malicious prosecution claims against even complaining witnesses fail when the witness provides honest information to prosecutors who then decide to prosecute. *See, e.g., Allen v. Montgomery Ward & Co.*, No. 1:98 CV 7, 1999 WL 33117435, at *5-6 (W.D.N.C. Mar. 3, 1999), *aff'd*, 198 F.3d 236 (4th Cir. 1999). To the DSI Defendants' knowledge, North Carolina has never recognized malicious prosecution claims against any retained expert, or against any witness of any sort who provides accurate and complete information to the prosecutor who initiated the prosecution.

The DSI Defendants did not initiate the prosecution of Plaintiffs. None of the DSI Defendants acted as a complaining witness. Instead, Meehan and DSI were retained experts hired to analyze evidence gathered by law enforcement and to provide a report. Plaintiffs concede that DSI provided complete and accurate information to the prosecuting attorney. In addition, the May 12 Report was not generated until *after* two of the Plaintiffs had been indicted. (Am. Compl. ¶¶ 489, 491.) These allegations make clear that Plaintiffs cannot state a claim against the DSI Defendants for malicious prosecution under state law, because their own Complaint demonstrates that no action by

the DSI Defendants "initiated" any criminal proceeding against Plaintiffs and because DSI provided Nifong with complete and accurate information.

### C. Plaintiffs Fail to State a Claim for Obstruction of Justice

Plaintiffs' obstruction of justice claim is based on the allegation that the May 12 Report did not contain all of DSI's opinions, and that the DSI Defendants should have made the raw data easier for Plaintiffs to understand. Such allegations do not support a claim for obstruction of justice in North Carolina.

Where documentary evidence is at issue, North Carolina courts recognize a tort claim only where there has been ***alteration*** or ***destruction*** of evidence. *Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326 (1984) (destruction and alteration of medical records); *Grant v. High Point Reg'l Health Sys.*, 645 S.E.2d 851, 853-56 (N.C. Ct. App. 2007) (destruction of medical records); *Jones v. City of Durham*, 643 S.E.2d 631 (N.C. Ct. App. 2007) (destruction of videotape of accident); *see also* N.C. Gen. Stat. § 14-221.1. The tort has not been expanded beyond instances of alteration or destruction to claims about the manner or format in which evidence is produced. Accordingly, Plaintiffs' obstruction of justice claim necessarily fails.

### D. Plaintiffs Fail to State a Claim for Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress claim, Plaintiffs must allege "(1) extreme and outrageous conduct, (2) intending to cause and causing (3) severe emotional distress." *Jolly v. Acad. Collection Serv., Inc.*, 400 F. Supp. 2d 851, 866 (M.D.N.C. 2005); *see Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981).

Plaintiffs' claim fails at the first prong, because Plaintiffs do not allege any conduct by the DSI Defendants that can be considered "extreme and outrageous," which is an issue for the court. *See Jolly*, 400 F. Supp. 2d at 866 ("Whether the conduct is extreme and outrageous is a question of law for the Court."); *Shillington*, 102 N.C. App. at 198, 402 S.E.2d at 161 (same).

Conduct is extreme and outrageous when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 373, 618 S.E.2d 867, 873 (2005) (internal quotations omitted). This is a "stringent" standard. *Jolly*, 400 F. Supp. 2d at 866. Because Plaintiffs have pled *no* conduct by the DSI Defendants that violated any duty owed to them under federal or state law, none of Plaintiffs' allegations describe conduct "beyond all possible bounds of decency" or "utterly intolerable in a civilized community." *Johnson*, 173 N.C. App. at 373, 618 S.E.2d at 873.

Even if it were assumed that the failure of an expert to include all opinions in a report, and the failure to summarize raw data for a third party, constituted a violation of some legal right of Plaintiffs, such conduct does not meet the high standard of "extreme and outrageous" conduct necessary to state a claim for intentional infliction of emotional distress. *See, e.g.*, *Ausley v. Bishop*, 133 N.C. App. 210, 221, 515 S.E.2d 72, 80 (1999) (affirming summary judgment in favor of defendant on claim of intentional infliction of emotional distress where, among other things, plaintiff alleged that defendant "contacted

the police and caused embezzlement charges to be filed against defendant"); *Lay v. Mangum*, 87 N.C. App. 251, 255-56, 360 S.E.2d 481, 484 (1987) (affirming directed verdict in favor of defendant on claim of intentional infliction of emotional distress premised on plaintiff's swearing out warrant charging defendant with nonsupport of illegitimate child; concluding as a matter of law that, although criminal charges were terminated in plaintiff's favor, plaintiff failed to show outrageous conduct).

## VIII.   PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF

Plaintiffs seek sweeping injunctive relief against the DSI Defendants.  (*See* Am. Compl. ¶ 567.xv (requesting that the Court "enjoin[] DSI and Meehan from providing any reports of DNA or other scientific testing, or providing expert testimony, in any court proceeding, whether civil or criminal, for a period of ten (10) years").)   Whether measured by settled principles of standing or the pleading requirements for injunctive relief, Plaintiffs have not pled a real and immediate threat of future irreparable injury. Speculative claims of future injury are not enough, and alleged past harms do not demonstrate a real and immediate threat of future irreparable injury.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983) (civil rights plaintiff not entitled to injunction preventing police from using choke hold during traffic stops, when plaintiff made no allegation of real and immediate threat of future traffic stop by an officer who would employ a choke hold); *N.A.A.C.P. v. Brackett*, 130 Fed. Appx. 648, 652 (4th Cir. 2005) (plaintiffs must show "(1) that it is likely that they again will find themselves in the same or similar circumstances giving rise to the allegedly unconstitutional conduct; *and*

(2) that it is likely that they again will be subjected to the allegedly unconstitutional conduct") (per curiam; emphasis in original; quotation omitted).

Plaintiffs do not allege that they are or will become parties to any court proceeding (other than this lawsuit), that scientific evidence would be relevant to any such court proceeding, that the DSI Defendants would provide any such scientific testimony, or that the DSI Defendants would do so in a way calling that testimony into question.[24] Plaintiffs simply make no allegations whatsoever that support any claim for injunctive relief against the DSI Defendants.

## CONCLUSION

For the reasons stated above, DNA Security, Inc. and Richard Clark respectfully request that the claims against them be dismissed.

Respectfully submitted,

/s/ Robert J. King III
Robert J. King III
N.C. State Bar No. 15946
Kearns Davis
N.C. State Bar No. 22014
Brooks, Pierce, McLendon, Humphrey, &
   Leonard, L.L.P.
Post Office Box 26000
Greensboro, North Carolina  27420
Telephone:  336-373-8850
Facsimile:  336-378-1001

*Counsel for Defendants DNA Security, Inc. and Richard Clark*

---

[24]     Indeed, Plaintiffs do not allege that anyone has called into question the propriety of the DSI Defendants' actions in any other case.

Robert A. Sar
N.C. State Bar No. 22306
Nicholas J. Sanservino, Jr.
N.C. State Bar No. 36557
2301 Sugar Bush Road, Suite 600
Raleigh, North Carolina 27612
Telephone: (919) 787-9700
Facsimile: (919) 783-9412

*Counsel for Defendant DNA Security, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 15, 2008, I electronically filed the foregoing **BRIEF IN SUPPORT OF MOTION TO DISMISS OF DEFEDANTS DNA SECURITY, INC. AND RICHARD CLARK** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Charles Davant IV
Brendan V. Sullivan, Jr.
Robert M. Cary
Christopher N. Manning
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
*Counsel for Plaintiffs David F. Evans*
*and Collin Finnerty*

David S. Rudolf
RUDOLF WIDENHOUSE & FIALKO
312 West Franklin Street
Chapel Hill, NC 27516

*Counsel for Plaintiff Reade Seligmann*

James B. Craven III
340 West Main Street
PO Box 1366
Durham, NC 27702

*Counsel for Michael B. Nifong*

Reginald B. Gillespie, Jr.
FAISON & GILLESPIE
5517 Durham-Chapel Hill Blvd., Ste. 2000
PO Box 51729
Durham, NC 27717-1729

*Counsel for Defendant City of Durham, NC*

Edwin M. Speas
POYNER & SPRUILL, LLP
3600 Glenwood Avenue
Raleigh, NC 27612

*Counsel for Defendant Mark Gottlieb*

James B. Maxwell
MAXWELL FREEMAN & BOWMAN, PA
PO Box 52396
Durham, NC 27717-2396

*Counsel for Defendant David Addison*

Patricia P. Kerner
TROUTMAN SANDERS, LLP
434 Fayetteville Street, Suite 1900
Raleigh, NC 27601

*Counsel for Defendants Steven*
*Chalmers, Beverly Council, Ronald*
*Hodge, Jeff Lamb, Patrick Baker,*
*Michael Ripberger, and Lee Russ*

Robert A. Sar
Nicholas J. Sanservino, Jr.
OGLETREE DEAKINS NASH
SMOAK & STEWART, PC
2301 Sugar Bush Road, Suite 600
Raleigh, NC 27612

Joel M. Craig
KENNON CRAVER BELO CRAIG
& McKEE, PLLC
4011 University Drive, Suite 300
PO Box 51579
Durham, NC  27717-1579

*Counsel for Defendant Benjamin Himan*

I further certify that I caused the foregoing document to be served by first-class mail,

postage-prepaid, to the following non CM/ECF participants:

Barry C. Scheck
100 Fifth Avenue
New York, NY  10011

Richard D. Emery
EMERY CELLI BRINCKERHOFF
& ABADY LLP
75 Rockefeller Plaza, 20th Floor
New York, NY  10019

*Counsel for Plaintiff Reade Seligmann*

Paul R. Dickinson, Jr.
LEWIS & ROBERTS PLLC
5960 Fairview Road, Ste. 102
Charlotte, NC  28210-3103

James A. Roberts, III
LEWIS & ROBERTS PLLC
1305 Navaho Drive, Suite 400
Raleigh, NC  27609-7482

*Counsel for Defendant Brian Meehan*

Linwood Wilson
6910 Innesbrook Way
Bahama, NC  27503-9700

*Pro se*

Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, DC  20036

*Counsel for Defendant City of Durham, NC*

Respectfully Submitted,


/s/ Robert J. King III