IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:07-CV-00739

| | | |
|---|---|---|
| **DAVID F. EVANS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **BRIEF IN SUPPORT** |
| | ) | **OF DEFENDANT** |
| **v.** | ) | **CITY OF DURHAM,** |
| | ) | **NORTH CAROLINA'S** |
| **THE CITY OF DURHAM, NORTH CAROLINA,** | ) | **MOTION TO DISMISS** |
| ***et al.*,** | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT** |
| **Defendants.** | ) | |

## I.      STATEMENT OF THE CASE

On the night of March 13, 2006, a group of Duke lacrosse players hired two Durham women to perform an exotic dance for a lacrosse team party.  Early the next morning, and for months afterward, one of the women claimed to have been raped. Following a criminal investigation into the allegations, District Attorney Michael Nifong presented the evidence to a grand jury, which returned indictments against the Plaintiffs. Soon after, Mr. Nifong's conduct came under sharp scrutiny.  The Attorney General of North Carolina took control of the investigation and later dismissed the charges against the three Plaintiffs.  Mr. Nifong was disbarred by the North Carolina State Bar, found in criminal contempt of court, and jailed.

The central fact of this case is that the Plaintiffs *cannot* recover against Mr. Nifong's employer—the State of North Carolina—because it has absolute immunity.  As a result, Plaintiffs have resorted to overreaching conspiracy claims and other novel legal

theories that attempt to impose legal liability on the City of Durham, Durham police officers, and City administrators for the actions of an overzealous prosecutor.  All this creativity is in aid of an effort to impose on Durham taxpayers untold millions of dollars in damages for Plaintiffs who were publicly exonerated and never spent a moment in jail.

Plaintiffs' legal overreaching and creativity are contrary to settled law.  The United States Supreme Court has squarely held that an accused is *not* "entitled to judicial oversight or review of the decision to prosecute."  *Albright v. Oliver*, 510 U.S. 266, 274 (1994).  Some of the wrongs that Plaintiffs decry might, if true, have been actionable if they had gone to trial, but of course they never did—thankfully there is no flawed trial, no imprisonment of which Plaintiffs can complain.  The balance of Plaintiffs' claims largely sound in defamation.  But the United States Supreme Court has also held squarely that "[d]efamation [is] not a constitutional violation," *Siegert v. Gilley*, 500 U.S. 226, 233 (1991), and thus is not a proper basis for a federal civil rights suit.  Plaintiffs' claims against the City, as set forth below, should be dismissed.

## II.    STATEMENT OF FACTS[1]

### A.    A Woman Claims She Was Brutally Raped and Durham Police Investigate.

Early in the morning of March 14, 2006, Crystal Mangum told workers at Durham ACCESS, a local outpatient mental health clinic, that she had been raped several hours before.   Am. Compl. ¶ 48.   According to Mangum, the rape occurred at 610 North Buchanan Boulevard, the residence of three Duke lacrosse players.   *Id*.   The players had hosted a lacrosse party that night and had hired Mangum and another exotic dancer to perform.   Am Compl. ¶ 38.   Over the next several days, Mangum continued to claim that she was raped.   Am. Compl. ¶¶ 57-58.   On March 15, 2006, Mangum, complaining of pain, told medical personnel at UNC Hospital that she had been attacked the prior day. Am. Compl. ¶ 64.

Mangum's claims about what happened to her were not always consistent.   Am. Compl. ¶¶ 92, 102.   When first questioned by police, she denied that she had been raped; but later, when interviewed by medical personnel, she repeated her earlier allegation that she had, indeed, been raped.   Am. Compl. ¶¶ 52, 58.   Evidence suggested that Mangum had been under the influence of alcohol or drugs the night of the alleged rape and during her initial interviews.   Am. Compl. ¶¶ 39, 64, 65.

---

[1] Solely for the purpose of this Motion, the City of Durham assumes the veracity of the allegations in the Amended Complaint. But should a trial become necessary on any claim, the City will demonstrate that its officials' and police officers' conduct was consistent with federal and state law and was motivated by the belief that any serious crime reported by a resident of the City should be thoroughly investigated without bias in favor of or against any person on the basis of race, gender, or socioeconomic status.

Duke medical personnel performed a rape examination on Mangum on the morning of March 14, 2006. Am. Compl. ¶ 69. Medical personnel noted "diffuse edema of the vaginal walls," consistent with Mangum's having engaged in intercourse with multiple people. Am. Compl. ¶ 72. Mangum remained upset and complained of excruciating pain and restated her claim that she had been raped by multiple people. Am. Compl. ¶¶ 70-72.

On March 15, 2006, Sergeant Mark Gottlieb was assigned to investigate. Am. Compl. ¶ 83. The following day, Sergeant Gottlieb assigned Investigator Benjamin Himan to assist him, and the two officers interviewed Mangum. Am. Compl. ¶¶ 83, 84, 91. Repeating her earlier allegations, Mangum told the officers that three men had raped her, and provided physical descriptions. Am. Compl. ¶ 92.

Later that day, Magistrate Tammy Drew issued a search warrant for 610 North Buchanan Blvd.; upon arriving at the house, Sergeant Gottlieb and Investigator Himan spoke to the players who lived there. Am. Compl. ¶ 108. The players confirmed that Mangum had been at the house the prior evening but denied that any assault occurred. Am. Compl. ¶¶ 113, 114, 118.

On March 16 and 21, Durham Police showed Mangum a series of photographic arrays, each containing pictures of Duke lacrosse players, including Plaintiffs Seligmann and Evans, but she was not able to identify any of the players as her attackers. Am. Compl. ¶¶ 93, 94, 96. On March 23, 2006, Judge Ronald Stephens signed a Non-Testimonial Order ("NTO") directing that members of the Duke lacrosse team provide

DNA samples, submit to physical exams, and allow themselves to be photographed. Am. Compl. ¶ 120.

**B.  The State Prosecutor Gets Involved in the Case.**

At the time of the incident, Defendant Michael Nifong was serving as Interim District Attorney for the Fourteenth Prosecutorial District, and was running for election to that office.  Am. Compl. ¶¶ 125, 128.  On March 24, 2006, Nifong contacted Durham police officials about the case.  Am. Compl. ¶ 131.  Three days later, Nifong met with Sergeant Gottlieb and Investigator Himan and was briefed on the investigation.  Am. Compl. ¶ 136.  Gottlieb and Himan told Nifong the details of the case, including the allegations by Mangum, the contradictions in her accounts, Pittman's lack of support of Mangum's account, Mangum's inability to identify the men who she said raped her, and the cooperation of the players who had been interviewed.  Am. Compl. ¶ 137.

The Amended Complaint alleges that Defendant Lamb instructed Sergeant Gottlieb and Investigator Himan that "they should take direction from Nifong" regarding the investigation, "rather than or in addition to the usual Durham Police chain of command."  Am. Compl. ¶ 133.  This approach, in which a prosecutor would "direct" the investigation, was "unprecedented."  Am. Compl. ¶ 132.  Meanwhile, Nifong assigned Linwood Wilson, an investigator with the District Attorney's office, to coordinate with Sergeant Gottlieb and Investigator Himan.  Am. Compl. ¶ 135.  This again, according to the Amended Complaint, was "unprecedented."  Am. Compl. ¶ 135.  Once he became

involved, Nifong decided to exploit the high visibility of the case for advantage in his campaign for office.  Am. Compl. ¶ 130.

### C.  Events Prior to the April Indictments.

1.  *April Photo Arrays.*

On April 4, 2006, Sergeant Gottlieb showed Crystal Mangum additional photograph arrays ("April Photo Arrays") of Duke lacrosse players.  Am. Compl. ¶ 188. Mangum identified Plaintiff Seligmann as having forced her to perform oral sex.  Am. Compl. ¶ 191.  She identified Plaintiff Finnerty as having penetrated her anally and vaginally.  Am. Compl. ¶ 192.  She identified Plaintiff Evans as looking similar to one of those who assaulted her, except that the assailant had a mustache.  Am. Compl. ¶¶ 193, 194e.  She was 90% sure of her identification of Evans and 100% sure of Finnerty and Seligmann.  Am. Compl. ¶¶ 191-93.

2.  *Public Statements.*

District Attorney Nifong made numerous public statements regarding the case, including interviews in which he stated that he had "no doubt" that three members of the Duke lacrosse team had committed a rape.  Am. Compl. ¶ 147.  Defendant Hodge (Deputy Chief of Police) and Defendant Addison (identified as a police spokesperson) also allegedly made public statements about the investigation.  Am. Compl. ¶ 159-60. The Complaint alleges that the Supervisory Defendants approved of Addison's statements.  Am. Compl. ¶  163.

3.    *DNA Testing and Results.*

Mangum underwent a medical examination on the morning of March 14, 2006, using standard "rape kit" procedure. Am. Compl. ¶¶ 69-75. On March 30, 2006, the State Bureau of Investigation's crime lab finished its analysis of evidence gathered as part of the rape kit, revealing no evidence supporting Mangum's claim that she had been raped. Am. Compl. ¶ 149. On April 4, 2006, Nifong instructed that Defendant DSI, a private laboratory in Burlington, North Carolina be contacted to conduct additional DNA testing. Am. Compl. ¶ 199. The District Attorney's Office obtained a court order from Judge Ronald Stephens allowing for the transfer of the rape kit items to DSI for Y-chromosome testing. Am. Compl. ¶ 202. Although the results "identified DNA characteristics from at least two males," the three Plaintiffs were excluded as potential sources of that DNA "[w]ith 100% scientific certainty." Am. Compl. ¶ 206. The Complaint alleges that Sergeant Gottlieb, Investigator Himan, Nifong, and the DSI Defendants "conspired to conceal and obfuscate these exculpatory DNA results." Am. Compl. ¶ 209.

**D.    The April Indictments and Subsequent Events.**

Nifong decided to present the evidence concerning Plaintiffs Finnerty and Seligmann to a grand jury. Am. Compl. ¶ 214. At the grand jury proceeding, Sergeant Gottlieb and Investigator Himan "each provided inculpatory testimony" despite, according to the Complaint, their "actual knowledge of Finnerty's and Seligmann's innocence." Am. Compl. ¶ 215. On April 17, 2006, the grand jury returned indictments

against Finnerty and Seligmann for first-degree rape, first-degree sexual offense, and kidnapping. Am. Compl. ¶ 212. Finnerty and Seligmann were subsequently arrested (and immediately released). Am. Compl. ¶ 197.

On April 21, 2006, Nifong, Sergeant Gottlieb, and Investigator Himan met with the DSI Defendants. Am. Compl. ¶ 223. Defendant Meehan reported that DNA from four different men was found on the items in the rape kit, but none of it was consistent with DNA from any Duke lacrosse players. Am. Compl. ¶ 224. DSI found that a composite swab taken from several fingernail specimens was consistent with the DNA of David Evans and fourteen other men whose DNA information was contained in the DSI database. Am. Compl. ¶ 224c. The Complaint alleges that the Defendants conspired to fabricate a report that would "omit the exculpatory results of DSI's testing." Am. Compl. ¶ 225. On May 12, Meehan presented Nifong with a ten-page report that he and DSI had prepared. Am. Compl. ¶ 230. The report allegedly excluded results that matched or were consistent with unidentified men. Am. Compl. ¶¶ 231-33.

### E.    The May Indictment.

On May 15, 2006, a grand jury indicted David Evans for first-degree rape, first-degree sexual offense, and kidnapping. Am. Compl. ¶ 238. Investigator Himan testified allegedly "to comply with orders and pressure he had received from the Supervisory Defendants." Am. Compl. ¶ 240. The Complaint alleges that Sergeant Gottlieb, Investigator Himan, and Nifong "agreed in advance of the May 15 Indictment that they

would mislead the grand jury as to the evidence concerning Evans and not reveal to the grand jury the evidence of Evans's actual innocence." Am. Compl. ¶ 241.

### F.     **Post-indictments Conduct.**

Plaintiffs allege that after the indictments, Nifong and other Defendants engaged in acts designed to facilitate criminal convictions, including witness tampering, Am. Compl. ¶¶ 248-53, 261, witness intimidation, Am. Compl. ¶¶ 263-64, and covering up inconsistencies in the available evidence, Am. Compl. ¶¶ 267, 310-15.  In discovery and in pre-trial proceedings, Nifong provided incomplete and misleading items to defense counsel and gave false statements to defense counsel and the court that he had provided all exculpatory evidence.  Am. Compl. ¶¶ 277-78, 282, 290-91, 295-96, 300-05.

On January 12, 2007 Nifong recused himself from the prosecution of the Plaintiffs.  Am. Compl. ¶ 317.  On April 11, 2007, the Attorney General of North Carolina dismissed all of the remaining charges against Plaintiffs before any trial was held.  Am. Compl. ¶¶ 319, 324.

On June 16, 2007, Nifong was disbarred for his conduct in this case.  Am. Compl. ¶ 326-27.  On August 31, 2007, Nifong was found to be in criminal contempt by the Superior Court of Durham County for false and misleading statements to that court and was jailed.  Am. Compl. ¶ 328.

## III.    QUESTIONS PRESENTED

The questions before the Court are:

- Whether the City of Durham may be held liable for acts of a State Prosecutor and a private DNA testing lab, over whom the City never exercised actual control and for whom it was never legally responsible;

- Whether the City may be held liable for Plaintiffs' arrests, even though the arrests occurred only after independent decisions by the State Prosecutor to seek, and a State grand jury to issue, criminal indictments;

- Whether Plaintiffs have stated cognizable claims for conspiracy to deprive them of equal protection of the law even though they have not alleged that they are members of a "protected class";

- Whether Plaintiffs have sufficiently alleged a risk of future harm sufficient to warrant injunctive relief even though they live outside the State, have no specific plans to return to the State, and have not alleged any intent to put themselves in a position that would make recurrence of the "unprecedented" events in this case likely; and

- Whether Plaintiffs' allegations otherwise fail to state a claim upon which relief can be granted.

## IV.  ARGUMENT

### A.  <u>Standard of Review.</u>

In considering a motion to dismiss a complaint for its failure to state a claim upon which relief can be granted, a court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, however, a complaint must "in light of the nature of the action . . . sufficiently allege[] each element of the cause of action so as to inform the opposing party of the claim and its general basis."  *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 348 (4th Cir. 2005).  Moreover, the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Lanier v. Norfolk Southern Corp.*, No. 06-1986, 2007 WL 4270847, at *3 (4th

Cir. Dec. 5, 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).

Any claim that is not "plausible on its face" must be dismissed. *Lanier*, 2007 WL

4270847, at *3 (quoting *Twombly*, 127 S. Ct. at 1974). Finally, a court is not bound by a

plaintiff's legal conclusions. *See, e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577

(4th Cir. 2001) (noting that the "presence . . . of a few conclusory legal terms does not

insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not

support the legal conclusions).

### B.  Claims Against the City of Durham Fail Because They Rely on Conduct of Independent, Non-City Actors.

Plaintiffs attempt to hold the City liable for the conduct of persons and entities

over whom it had no control and no legal responsibility by suing those persons and

entities in their "official capacity."[2]  In particular, Plaintiffs purport to sue the City

through a claim against State prosecutor Nifong "in his official capacity with respect to

Durham Police," even though Nifong never had any official capacity with the Durham

---

[2] *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (government entity is "the real party in interest" in an official capacity suit); *Nivens v. Gilchrist*, 444 F.3d 237, 249 (4th Cir. 2006) (same); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").  "Official capacity" suits operate in the same manner under North Carolina law. *See Moore v. City of Creedmoor*, 481 S.E.2d 14, 21-22 (N.C. 1997) (noting that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent" (quotations and citations omitted)).

Police.  *See* Cause of Action Nos. 5, 7-10, 13-15.[3]  Plaintiffs also appear to assert claims

against the City through claims against DSI, a private DNA-testing laboratory, and DSI

employees in their purported "official capacity."  *See* Cause of Action Nos. 7-8, 10, 12-

15, 20-22.  Because Nifong and the DSI defendants had no "official capacity"—or other

relevant connection—with *the City of Durham*, these claims are utterly without legal

basis.  To the extent any Cause of Action (specifically, Causes of Action No. 5, 7-10, 12-

15, 20-22) relies on this theory of liability against the City, it must be dismissed.[4]

---

[3] Plaintiffs also purport to sue Defendant Linwood Wilson, Nifong's investigator,
in his "official capacity."  *See* Causes of Action No. 13-15.  Unlike with Nifong,
however, the Complaint does not even suggest that Wilson served any role with respect
to the City.  *See* Am. Compl. ¶ 16.  Presumably, then, Plaintiffs' "official capacity"
claims against Wilson are claims against the State of North Carolina.  To the extent the
Plaintiffs actually are seeking to hold the City liable for any actions by Wilson, those
claims fail for the same reason as the claims against Nifong in his "official capacity," as
well as for the additional reason that Plaintiffs never allege that Wilson performed any act
on behalf of the City.

[4] Plaintiffs' liberal use of the "official capacity" device also results in a number of
duplicative claims that warrant dismissal for that reason alone.  For example, on at least
eight occasions, the City of Durham is a named defendant along with a number of City
officials sued in their official capacities.  *See* Causes of Action 5, 8-11, 17-19.  On other
occasions, multiple City officials are sued in their official capacities, but the City is not a
named defendant.  *See* Causes of Action 7, 13-16.  Each of these official-capacity claims
within a single Cause of Action represents one claim against the City.  The duplicative
claims (within Causes of Action 5, 7, 8-11, 13-19) should be dismissed.  *Kentucky v.
Graham*, 473 U.S. at 165-66; *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004);
*Hicks v. Halifax County Bd. of Educ.*, 93 F. Supp. 2d 649, 667 (E.D.N.C. 1999); *see also
Moore v. City of Creedmoor*, 481 S.E.2d at 21 (under North Carolina law, "where the
governmental entity may be held liable for damages resulting from its official policy, a
suit naming public officers in their official capacity is redundant" (citation omitted)).

1.     *Michael Nifong Was a State Actor at All Relevant Times.*

The Amended Complaint baldly claims that State Prosecutor Michael Nifong "served in a supervisory and/or policymaking role for the Durham Police Department." Am. Compl. ¶ 15.  The Complaint posits that this role was "delegated" to him by various Supervisory Defendants employed by the City of Durham.  Am. Compl. ¶ 401.  In addition to being nonsensical, this claim fails as a matter of law.

Whether a government entity may be held liable for the acts of a particular official depends on "the definition of the official's functions under relevant state law." *McMillian v. Monroe Co., Ala.*, 520 U.S. 781, 786 (1997); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988).  The relevant state law for such analyses includes the state constitution, statutory provisions, and case law.  *McMillian*, 520 U.S. at 787-93.

There may be times—particularly where different aspects of an officer's job are subject to supervision by different governmental entities—when state law does not "speak with perfect clarity" as to which entity is responsible for an officer's conduct.  *Id.* at 793 (quoting *Praprotnik*, 485 U.S. at 125).  Here, however, North Carolina law speaks with absolute clarity.  Under North Carolina law, the District Attorney is not imbued with authority to act on behalf of municipalities, nor are municipalities empowered to control or delegate power to District Attorneys.  At all times, a District Attorney operates solely on behalf of the State of North Carolina and answers to the Attorney General.  *See* N.C. Const. art. IV, § 18(1) (District Attorney shall "be responsible for the prosecution *on behalf of the State* of all criminal actions in the Superior Courts of his district" (emphasis

added)); N.C.G.S. § 7A-61 (same). Acting District Attorneys are no different. *See* N.C.G.S. § 7A-63 ("An acting district attorney has all the power, authority, and duties as the regular district attorney…."). State law fully defines the scope, and limits, of a District Attorney's authority.[5] Cities in North Carolina simply have no role in any aspect of supervision or control of District Attorneys.

Other aspects of North Carolina law confirm Nifong's status as a State—not a municipal—actor. The state pays the salaries of District Attorneys. *See* N.C.G.S. § 7A-65. Any vacancy occurring in the office of district attorney is filled by the governor. *See* N.C. Const. art IV, § 19; G.S. § 163-10. And the jurisdiction of the District Attorney is defined by references to counties, not individual cities. *See* N.C.G.S. § 7A-60. Under *McMillian*, these factors all establish that the State of North Carolina, not the City of Durham, is responsible for Nifong's conduct. *See* 520 U.S. at 791-92 & n.7.

Without any legal support, Plaintiffs attempt to circumvent the clear provisions of North Carolina law by suggesting that Nifong's role in the investigation, in concert with investigators from the Durham Police Department, somehow transformed him into a City

---

[5] N.C. Const. art. IV, § 18(1) (giving only the General Assembly of the State authority to prescribe additional duties for the District Attorneys); *see also* N.C.G.S. § 7A-61 (District Attorney "shall . . . prosecute in a timely manner in the name of the State all criminal actions and infractions requiring prosecution in the superior and district courts of his prosecutorial district"); *State v. Smith*, 607 S.E.2d 607, 625 (N.C. 2005) (a District Attorney is "entrusted by the State with unique authority" in his prosecutorial role to, among other things, "decide[] who shall be initially charged, draft[] criminal indictments for submission to the grand jury, prepare[] information, decide[] which cases are ripe for dismissal [and] negotiate[] pleas" and noting that the State Legislature supervises the District Attorney's exercise of this authority).

official.  *See, e.g.*, Am. Compl. ¶¶ 132-33.  But a District Attorney's job naturally includes some measure of investigation; indeed, he is entitled by state law to an investigatory assistant whose sole duty is to "investigate cases preparatory to trial and to perform such other Duties as may be assigned by the district attorney."  N.C.G.S. § 7A-69.  The fact that a particular act by a District Attorney may be labeled "investigative" rather than "prosecutorial" does not alter the fact that the District Attorney acts solely on behalf of the state of North Carolina, and not on behalf of any municipality.[6]

Moreover, coordination of a criminal investigation with local officials does not transform a State official into a local one.  A State prosecutor naturally must work with city officials.  But that clearly does not render him a City official himself.  Whatever role a District Attorney plays, it is pursuant to the North Carolina Constitution and statutes.  *See* N.C. Const. art. IV, § 18(1) (noting that the office of the District Attorney may "perform such other duties *as the General Assembly may prescribe*" (emphasis added)); *Simeon v. Hardin*, 451 S.E.2d 858, 868 (N.C. 1994) ("The remainder of the district attorney's duties [outside of duties imposed by the state constitution] . . . are derived from

---

[6] While the line between investigation and prosecution may have a bearing on Nifong's absolute immunity as a prosecutor, *see Buckley v. Fitzsimmons*, 509 U.S. 259, 269-278 (1993), that is a different question from whether Nifong acted as a city official when performing investigative activities.  Where, as here, every aspect of a District Attorney's job is subject to the exclusive control of the State, the distinction between "investigation" and "prosecution" is irrelevant.  The City cannot be liable for a District Attorney's actions, whether viewed as prosecution or investigation.

statutes promulgated by the General Assembly pursuant to authority granted in Article IV, Section 18 of the North Carolina Constitution." (citation omitted)).[7]

The strict line between a State prosecutor and municipal authorities in North Carolina is reflected throughout the case law. *See, e.g.*, *Nivens v. Gilchrist*, 444 F.3d 237, 249 (4th Cir. 2006) (dismissing § 1983 claim against prosecutor in official capacity because District Attorney was clearly State actor); *State v. Summers*, 528 S.E.2d 17, 21 (N.C. 2000) ("[T]here can be no question that the district attorney and the Attorney General both represent the interests of the people of North Carolina."); *State v. Camacho*, 406 S.E.2d 868, 870 (N.C. 1991) ("The several District Attorneys of the State are independent constitutional officers, elected in their districts by the qualified voters thereof, and their special duties are prescribed by the Constitution of North Carolina and by statutes." (citations omitted)).  Indeed, no court has found that a District Attorney in North Carolina may act as a municipal actor in any context.

---

[7] It is true that, under the laws of some other states, a prosecutor may take on a municipal role.  *See, e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 (1986) (finding that county could be liable for prosecutor's conduct because, under Ohio law, a county prosecutor could "establish county policy under appropriate circumstances").  But, as the Supreme Court noted in *Pembaur* and reaffirmed in *McMillian*, whether a state prosecutor may take on a municipal role is entirely a function of state law and how it allocates powers and authorities.  *Compare Carter v. Philadelphia*, 181 F.3d 339, 349 (3d Cir. 1999) (finding prosecutor may create policy on behalf of a municipality in part because under Pennsylvania law, district attorneys are "chief law enforcement officers for the county in which [they were] elected") *with Jones v. Ziegler*, 894 F. Supp. 880, 893 & n.12 (D. Md. 1995) (county could not be held liable for alleged acts of state prosecutor because state prosecutor is a state official who acts only pursuant to state mandates), *aff'd*, *Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997).   There is no doubt that *in North Carolina*, a District Attorney is subject to the exclusive control of the State and may not act in a municipal capacity.

Not only is it impossible for a North Carolina District Attorney to exercise municipal authority under State law, it is equally impossible for City officials to "delegate" such authority to an official acting on behalf of the State. The very act of delegation requires control by the delegator over the delegatee—and this control is the very reason why an entity would be liable for constitutional harm caused by that actor. *See Praprotnik*, 485 U.S. at 127 ("[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies."). Here, of course, there was no supervisor/subordinate relationship between the City of Durham and Nifong at all; the City of Durham was never in a position to demand "conformance with their policies" from Nifong or any other officer acting under State authority. Nifong did not report to, or take orders from, any City official.

In short, Plaintiffs' apparent "delegation" theory has no support in North Carolina law. Because Nifong was a State actor for all purposes and at all times relevant to this lawsuit, as a matter of law, the City cannot be held liable for his actions.[8] To the extent that Causes of Action No. 5, 7-10, 14-15 seek to hold the City liable via "official capacity" claims against Nifong, they must be dismissed.

---

[8] Indeed, allowing the normal coordination between municipal police officers and State prosecutors to trigger municipal liability for the acts of the State prosecutor would create perverse incentives for local officials to *avoid* coordinating with prosecutors. That would obviously disserve the interests of justice and effective law enforcement. *See Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996) (noting that "open communication between investigators and prosecutors should be encouraged").

## 2. The City Is Not Responsible for the Conduct of the Private Laboratory, DSI.

Plaintiffs also apparently seek to hold the City responsible for the acts of DSI and its employees, Clark and Meehan, by suing them in their "official capacit[ies]." *See* Causes of Action No. 7-8, 10, 12-15, and 20-22. This attempt also fails as a matter of law. Even assuming that the DSI Defendants acted under color of state law, their conduct is the responsibility of the State of North Carolina, not the City of Durham.

Plaintiffs explicitly acknowledge that it was State prosecutor Nifong who was responsible for involving the DSI Defendants in this case. Am. Compl. ¶ 198. It was Nifong's office that then sought a court order to allow transfer of the rape kit items to DSI. Am. Compl. ¶ 202. And it was the State that paid for DSI's services.[9] The City never exercised any control or supervision over DSI, regardless of whether City officials allegedly conspired with the DSI Defendants. As a matter of law, then, the DSI Defendants simply had no "official capacity" with the City.

---

[9] *See* Exhibit 1 to the City of Durham's Motion to Dismiss (Letters from Nifong to Judge Ralph Walker and Orders Granting District Attorney's Request for Payment of DSI's Expenses). "[A] court may take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a motion for summary judgment." *Clark v. USDA-RHS*, No. 3:06cv457, 2007 U.S. Dist. LEXIS 80845, at *4-5 (W.D.N.C. Oct. 22, 2007). Publicly-recorded papers from prior court proceedings meet the public records exception and the court may consider them in deciding a motion to dismiss. *Id.*; *see Norfolk Fed'n of Bus. Dists. v. Dep't of Housing & Urban Dev.*, 932 F. Supp. 730, 736 (E.D. Va. 1996), *aff'd*, 1996 U.S. App. LEXIS 30037 (4th Cir. Nov. 20, 1996) ("In short, a court may consider matters of public record, items appearing in the record of the case, as well as exhibits attached to the complaint.").

Moreover, the decision whether to use the DSI report to seek an indictment or to present it as evidence in any trial was entirely up to the State prosecutor.  *State v. Sturgill*, 469 S.E.2d 557, 562 (N.C. Ct. App. 1996) ("In North Carolina, law enforcement officers have no independent authority to make prosecutorial decisions.").  Indeed, Plaintiffs allege that the very object of the alleged conspiracy was to indict and prosecute Plaintiffs, *e.g.*, Am. Compl. ¶¶ 208-10, **an exclusive function of the State, not the City**.  *Sturgill*, 469 S.E.2d at 562.[10]  Therefore, to the extent that Causes of Action No. 7-8, 10, 12-15, and 20-22 seek to hold the City liable by virtue of "official capacity" claims against the DSI Defendants, those Causes of Action must be dismissed.

### C. Plaintiffs' Federal Claims Resting on Theory of "Malicious Prosecution" or Unreasonable Seizure (Causes of Action 5 and 7) Fail To State a Claim and Must Be Dismissed.

Causes of Action No. 5 and 7 allege that the City is responsible for violation of the Plaintiffs' federal constitutional rights.[11]  These claims should be dismissed because

---

[10] Notably, Plaintiffs do not complain about the testing of DNA, but only the reporting of the results for the benefit of  prosecution.  Am. Compl. ¶¶ 204-09, 224-25.

[11] Plaintiffs allege violations of the Fourth and Fourteenth Amendments.  They never say, however, whether they are claiming independent violations of the Fourteenth Amendment, or whether they cite that Amendment merely because it is the Fourteenth Amendment that makes the Fourth Amendment applicable to state and local entities. *Cf. Slade v. Hampton Rds. Reg'l Jail*, 407 F.3d 243, 252 (4th Cir. 2005) (complaint's citation of Fourteenth Amendment, combined with allegations of equal protection violations, failed to put defendant on notice that plaintiff also intended to pursue claims under Due Process Clause of that Amendment and under Takings Clause of Fifth Amendment (as incorporated by the Fourteenth)).  Either way, as discussed in text, Plaintiffs cannot state a Due Process claim under the Fourteenth Amendment because they were never tried, and case law makes clear that their "malicious prosecution" and "unreasonable seizure" claims must be viewed solely through the lens of the Fourth Amendment.  To the extent

Plaintiffs have failed to allege any underlying constitutional violation by City officials, and further, because Plaintiffs have failed to allege a policy or custom of the City that caused their injuries.

When a Section 1983 plaintiff attempts to sue a city, a court must address, at the outset, "whether plaintiff's harm was caused by a constitutional violation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992); *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 274 (4th Cir. 1998). Here, Plaintiffs have failed to allege a cognizable constitutional violation—though not for lack of creativity. Plaintiffs' myriad claims are liberally peppered with catchphrases designed to evoke a variety of violations and harms, such as allegations about failure to turn over exculpatory evidence and misleading photo arrays. Some of these *might* state constitutional claims *if* Plaintiffs had actually been tried and convicted. But they have no application here, since Plaintiffs were never tried. Other claims, such as those alleging harm to Plaintiffs' reputations, have no constitutional import whatsoever. *See Siegert v. Gilley*, 500 U.S. 226, 233 (1991).

In short, all of Plaintiffs' Section 1983 claims must be viewed as allegations of an "unreasonable seizure" under the Fourth Amendment. Viewed through that lens, it becomes clear that the allegations are fatally defective, for two independent reasons. First, Plaintiffs were "seized," for Fourth Amendment purposes, only when they were

_____

Plaintiffs might rely on an "equal protection" theory of harm (which, again, is pure speculation, since they do not say), their claims fail for the reasons explained in Section IV.C, *infra*.

arrested *after* indictment by a grand jury. As a matter of law, a grand jury indictment breaks the causative chain between prior conduct by investigators and subsequent harm to Plaintiffs. Second, Plaintiffs acknowledge that Durham police disclosed the evidence in their possession to the State prosecutor. Having done so, they—and the City—are, as a matter of law, not responsible for any subsequent harm caused by the prosecutor or grand jury. For these reasons, Plaintiffs' allegations do not state a Fourth Amendment claim, and Cause of Action Nos. 5 and 7, which are based on that underlying claim, must be dismissed.

1.     *Plaintiffs' Redundant Claims Can Be Reduced to the Question of Whether Plaintiffs Were Unreasonably Seized in Violation of the Fourth Amendment.*

The alleged constitutional violations underlying Causes of Action No. 5 and 7 against the City are sprinkled throughout Causes of Action No. 1 through 4. Those claims variously allege "malicious prosecution/seizure," "concealment of evidence," "fabrication of evidence," and "making false public statements" by City officials.[12] While these claims are styled as separate constitutional harms, each must be viewed solely as an allegation that Plaintiffs were "unreasonably seized" in violation of the Fourth Amendment. The U.S. Supreme Court has made clear that—in a factual scenario such as this one, where the accused was arrested but never tried—the correct inquiry is whether the arrest constituted an unreasonable seizure under the Fourth Amendment, and

---

[12] As noted in Section IV.A, to the extent that Causes of Action No. 5 and 7 purport to attach liability to the City for actions of Nifong or the DSI Defendants, they fail to state a claim.

squarely rejected the suggestion that an accused is "'entitled to judicial oversight or review of the decision to prosecute.'" *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (citation omitted); *see also id.* at 273 n.6 (rejecting theory that Fifth Amendment applies when no trial occurs). In short, "[t]he Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." *Id.* at 274. Thus, as the Fourth Circuit has held, the appropriate inquiry centers on the seizure and its reasonableness:

> [Our precedent] makes clear that *there is no such thing as a "§ 1983 malicious prosecution"* claim. What we termed a "malicious prosecution" claim . . . is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution—specifically, the requirement that the prior proceeding terminate favorably to the plaintiff. . . . It is not an independent cause of action.

*Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000) (citation and footnote omitted) (emphasis added).

Many of Plaintiffs' allegations have aspects of harms that, in other contexts, might give rise to liability. For example, allegations of suggestive lineups or a failure to provide exculpatory evidence to the defense may trigger constitutional violations when a criminal defendant is actually tried and convicted. *See, e.g.*, *Stovall v. Denno*, 388 U.S. 293 (1967) (introduction of suggestive lineup at trial violates Due Process rights of defendant). But without a trial, there can be no constitutional violation. *See, e.g., Antonio v. Moore*, 174 Fed. Appx. 131, 135 (4th Cir. 2006) (suggestive lineup claims actionable under § 1983 only when conduct "impair[s] . . . defendant's core right—i.e.,

the right to a fair trial"); *Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir. 2000) (because plaintiff "does not allege that his trial was unfair," his claims regarding unduly suggestive lineups fail; there is no "constitutional right to be free of suggestive lineups"); *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006) ("The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality."); *Burrell v. Virginia*, 395 F.3d 508, 513 (4th Cir. 2005) (even if officer's questioning would have violated Fifth Amendment standards, no constitutional violation occurred unless incriminating statements used at trial).

Plaintiffs' other allegations do not implicate constitutional interests at all. For example, Plaintiffs claim that public statements by Nifong and the police were part and parcel of the violations of Plaintiffs' constitutional rights. *See* Cause of Action No. 4. Yet, the Supreme Court has made it clear that an interest in one's reputation is *not* protected by the Constitution. *See Siegert v. Gilley*, 500 U.S. 226, 233 (1991) ("Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation."). Nor are the consequences that flow from harm to one's reputation of constitutional import. *See, e.g.*, *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994); *Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1078 (3d Cir. 1997) ("Indeed, even financial injury due solely to government defamation does not constitute a claim for deprivation of a constitutional liberty interest."). To the extent that Plaintiffs suggest that such public statements somehow voided the grand jury's indictment, such claims still fail. *See United States v. Waldon*, 363 F.3d 1103, 1109 (11th Cir. 2004) (rejecting attack on

grand jury indictment in light of publicity, since such an argument "misconstrues the role of the grand jury"). Plaintiffs' claims thus depend solely on whether they can establish that each was unreasonably seized in violation of the Fourth Amendment. Because they cannot do so as a matter of law, as discussed below, these claims fail.

> ## 2. *Because Plaintiffs Were Arrested After a Grand Jury Indictment, Plaintiffs Cannot Establish Causation.*

Plaintiffs do not allege, or even suggest, that they were "seized" prior to indictment by a grand jury, nor could they. A Fourth Amendment seizure occurs as a result of traditional physical limitations placed on one's liberty. *See, e.g.*, *Riley v. Dorton*, 115 F.3d 1159, 1164 (4th Cir. 1997) (rejecting concept of seizure occurring during pretrial release); *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003) (pretrial conditions in which defendant was required to obtain court permission prior to leaving state insufficient to constitute Fourth Amendment seizure). The only "seizure" of Plaintiffs, for Fourth Amendment purposes, occurred immediately *following* indictment, when they were arrested and, after posting bond, released. A decision by the grand jury to indict is an independent and intervening action that breaks the causal chain between alleged malfeasance by investigators and harm suffered by Plaintiffs as a result of the seizure. *See Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) ("the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor" (citation omitted)); *Kompare v. Stein*, 801 F.2d 883, 892 (7th Cir. 1986) ("The indictment establishes that there was probable cause . . . and we are bound by this

determination . . . .") (citing *Gerstein v. Pugh*, 420 U.S. 103, 117 n. 19 (1975)); *see also*

*Crudup v. Schulte*, 12 Fed. Appx. 682, 685-86 (10th Cir. 2001) ("[E]ven accepting that

[defendant's] actions gave rise to a cognizable § 1983 claim for malicious prosecution, in

this case Judge Smith's finding of probable cause to bind Crudup over for trial is fatal to

the claim."); *Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir. 1996) (even if defendant

officer had "set in motion a malicious prosecution . . . , the preliminary hearing broke the

'chain of causation'"); *Whiting v. Traylor*, 85 F.3d 581, 586 n.10 (11th Cir. 1996)

("[A]rresting officers will not be responsible for the continuation of the prosecution

because the prosecutor (or some other factor) will break the causal link between

defendants' conduct and plaintiff's injury.").

Plaintiffs' insinuations that the grand jury proceedings were somehow tainted by

defendants' failure to present the grand jury with exculpatory evidence or by their public

statements, *see* Am. Compl. ¶¶ 154, 162, 218, 219, 241, are legally irrelevant. "[A]n

indictment valid on its face is not subject to challenge on the ground that the grand jury

acted on the basis of inadequate or incompetent evidence . . . or even on the basis of

information obtained in violation of a defendant's Fifth Amendment privilege against

self-incrimination." *United States v. Calandra*, 414 U.S. 338, 345 (1974). *See also*

*United States v. Williams*, 504 U.S. 36, 51-55 (1992) ("Imposing upon the prosecutor a

legal obligation to present exculpatory evidence in his possession would be incompatible

with [the grand jury] system."); *United States v. Waldon*, 363 F.3d 1103, 1109 (11th Cir.

2004) ("The government is under no duty to bring exculpatory evidence to the grand jury's attention.").[13]

Similarly, courts have repeatedly rejected the notion that a grand jury indictment may be invalidated on the ground of prejudicial publicity. *See, e.g., id.* at 1109 (rejecting attack on grand jury indictment, since "the concern over adverse publicity" for constitutional purposes is "its effect on the fairness of the ensuing trial . . . not its effect on the grand jury"); *United States v. Washington*, 705 F.2d 489, 499 (D.C. Cir. 1983) (affirming district court's refusal to hold evidentiary hearing regarding effect of pre-indictment publicity); *In re United States*, 441 F.3d 44, 64 (1st Cir. 2006) ("It is doubtful that adverse publicity claimed to affect a grand jury states a basis for dismissal [of an indictment]."); *In re Grand Jury*, 508 F. Supp. 1210, 1213 (S.D. Ala. 1980) ("'[I]t does not appear that any indictment has thus far been dismissed on th(e) ground' that it was 'induced by prejudicial publicity.'") (quoting 8 Moore's Federal Practice § 6.03(4), at 6-

---

[13] Some courts have suggested that an indictment might not break the causal chain in a particular case if a defendant committed perjury before the grand jury, *see, e.g., Wilkins v. Clary*, No. 3:01CV795, 2005 WL 1705211, at *26 (E.D. Va. July 5, 2005), while others disagree, *see Jones v. Cannon*, 174 F.3d 1271, 1287 (11th Cir. 1999) (finding that plaintiff's allegations of perjury before a grand jury do not "prevent[] the grand jury indictment from breaking the chain of causation"). Plaintiffs, in any event, make no such allegation here; they merely allege that investigators presented inculpatory evidence at the grand jury proceeding and did not present exculpatory evidence. But, as noted above, there is no legal obligation to present exculpatory evidence to a grand jury. Of course, the testifying officers are absolutely immune from liability arising from their testimony. *See Lyles v. Sparks*, 79 F.3d 372, 378 (4th Cir. 1996).

61 (2d ed. 1979)).[14]   In circumstances like those alleged in the Complaint, a reviewing

court is bound by the probable cause determination of the grand jury "because the

indictment was fair upon its face and returned by a properly constituted grand jury."

*Kompare*, 801 F.2d at 892 (citation omitted).  Because the seizure of Plaintiffs occurred

only after their indictments, then, City officials—and the City itself—cannot be held

liable as a matter of law.

   3.   *Plaintiffs Cannot Establish Causation Because City Investigators
        Fully Disclosed All Evidence to the State Prosecutor.*

   Even if the grand jury indictments themselves did not break the chain of causation

between the conduct of any City official and Plaintiffs' arrests, the chain had already

been broken when, as Plaintiffs acknowledge, the police provided the exculpatory

---

[14] Even if prejudicial publicity could invalidate a grand jury indictment, Plaintiffs do not actually allege such prejudice.  To do so, they would have to allege—at least—that grand jury members heard a particular statement regarding the case; that the jurors were influenced by the statement; and that the influence was so strong that it caused the jurors to vote to indict when they otherwise would not have, contrary to the court's instructions to disregard any out-of-court statements they might have heard.  Moreover, even if Plaintiffs had made such allegations, proving them would raise serious jurisprudential and federalism concerns given the importance of maintaining the secrecy of grand jury proceedings.  *Shell v. Wall*, 760 F. Supp. 545, 548 n.3 (W.D.N.C. 1991); *see also* N.C.G.S. § 15A-623(e) (1997) ("all persons present [at grand jury proceedings] shall keep its secrets and refrain from disclosing anything which transpires" during sessions thereof); *State v. Griffin*, 525 S.E.2d 793 (N.C. Ct. App. 2000) (upholding trial court's order refusing to conduct *in camera* review of grand jury members and witnesses to determine validity of indictments returned against defendant); *Houpe v. City of Statesville*, 497 S.E.2d 82, 90 (N.C. Ct. App. 1998) (finding that slander claims arising from grand jury testimony would present obstacles in light of secrecy of grand jury proceedings).

evidence in their possession to the State prosecutor, Nifong. Plaintiffs therefore fail to state a viable claim that City officials caused a Fourth Amendment violation.

The Amended Complaint leaves no doubt that investigators fully disclosed to the State prosecutor, in scrupulous detail, the exculpatory evidence within their knowledge. *See, e.g.*, Am. Compl. ¶ 137 (investigators "proceeded to detail the extraordinary evidence of innocence and the fatal defects" in the rape allegations). Having done so, the investigators cannot, as a matter of law, have caused the prosecutor's decision to seek an indictment, the grand jury's decision to indict, or the Plaintiffs' resulting seizure.[15]

> [I]t is . . . well established that where an officer presents all relevant probable cause evidence to an intermediary, such as a prosecutor, a grand jury, or a magistrate, the intermediary's independent decision to seek a warrant, issue a warrant, or return an indictment breaks the causal chain and insulates the officer from a section 1983 claim based on lack of probable cause for an arrest or prosecution.

*Rhodes v. Smithers*, 939 F. Supp. 1256, 1274 (S.D. W.Va. 1995), *aff'd mem.*, 91 F.3d 132 (4th Cir. 1996); *see also Walker v. Scott*, No. 7:05-CV-00010, 2006 WL 1288315, at *6 (W.D. Va. May 4, 2006) ("The prosecutor's decision to take the case to the grand jury broke the causal chain, relieving [investigators] from liability for any Fourth Amendment claim…arising from the investigation of the case. Thus, [plaintiff's allegations] fail to state any Fourth Amendment claim whatsoever . . . regarding [the] pre-indictment investigation . . . ."); *Eubanks v. Gerwen*, 40 F.3d 1157, 1160-61 (11th Cir.1994)

---

[15] *Cf. State v. Sturgill*, 469 S.E.2d 557, 562 (N.C. App. 1996) ("In North Carolina, law enforcement officers have no independent authority to make prosecutorial decisions.").

(officers not liable for alleged Fourth Amendment violations when they act on seemingly reliable tip, conduct an investigation, and turn over all relevant information to prosecutor, who then decides whether to prosecute).[16]

### D. Plaintiffs Fail To Allege any Relevant City Policy or Custom that Caused any Constitutional Injury.

Even if Plaintiffs had alleged an underlying constitutional violation by Durham police officers—which they have not—they have not adequately alleged a *policy or custom* of the City that caused the violation. The bulk of Plaintiffs' *Monell* claims (specifically, Cause of Action Nos. 5C-5F) therefore fail to state a claim on which relief may be granted.

It is well established that municipalities may be liable only for their own wrongdoing in the form of an unlawful "policy" or "custom"—and not simply for the wrongdoing of their employees.

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A policy or custom may be established by showing: (1) an express municipal policy, such as a written ordinance or regulation; (2) affirmative decisions by persons with final policymaking

---

[16] For even more obvious reasons, the conduct that allegedly occurred after Plaintiffs' seizure, *see, e.g.*, Am. Compl. ¶¶ 248, 264, 266-67, cannot have caused the seizure. Such allegations are thus irrelevant to the constitutional inquiry.

authority for the city; (3) an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) a practice that is so "'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)). Plaintiffs do not allege an express City policy here. Rather, they appear to allege in general fashion various affirmative decisions by City "policymakers" in this case, omissions, and practices that gave rise to City "policy." But the bulk of Plaintiffs' *Monell* claims fail to state a claim as a matter of law even accepting the truth of their allegations.

      1.    *Plaintiffs' Allegations Regarding an Alleged Policy To Target Students (Causes of Action 5C and 5E) Lack Sufficient Specificity and Do Not Allege that Such a Policy Caused the Alleged Constitutional Violation.*

In Cause of Action No. 5C, Plaintiffs allege that City policymakers established a "policy or custom encouraging Durham police officers to target Duke University students for selective enforcement of the criminal laws" and "consistently failed to take adequate or meaningful steps to discipline Gottlieb, correct his behavior, or terminate his employment" when he "had attempted to effectuate this policy" by targeting Duke students. Am. Compl. ¶¶ 384-85. Similarly, in Cause of Action 5E, Plaintiffs allege that "Gottlieb had a documented history" of targeting Duke students, and that the City's failure to take adequate steps to stop this conduct "established a custom or practice of targeting Duke University Students for harsh or disproportionate treatment." Am. Compl. ¶¶ 393, 395. But in order adequately to allege a City policy or custom, Plaintiffs

would need to allege "numerous *particular* instances" of the same unconstitutional conduct. *See, e.g.*, *Jones v. Wellham*, 104 F.3d 620, 624 (4th Cir. 1997) (emphasis added) (affirming district court's rejection of "custom or usage" theory of liability on basis that "undisputed facts of record failed, as a matter of law, to show the 'persistent and widespread' practice required to invoke that theory"); *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (two prior similar acts did not create a widespread and permanent practice necessary to impose liability under § 1983). Yet, Plaintiffs allege *no* particular instances of similar prior conduct. They allege only in a general fashion that Sergeant Gottlieb had "a history" of similar conduct against Duke students. Moreover, Plaintiffs own allegations directly undermine the notion of such a policy or custom, since they claim that the Durham Police Department "reassigned [Gottlieb] from covering the Trinity Park neighborhood around Duke University because of his prior misconduct and abhorrent record with respect to Duke students." Am. Compl. ¶ 82.

Moreover, even if Plaintiffs had adequately alleged a City policy to target Duke students, that hardly amounts to a City policy to *seize people without probable cause*.[17] Plaintiffs thus have failed to allege sufficient facts to establish a causal link between the alleged policy and the alleged constitutional violation. Causes of Action No. 5C and 5E should therefore be dismissed.

---

[17] To the extent these allegations purport to raise an equal protection claim, they fail for the reasons explained in Section IV.C, *supra*.

2.    *Allegations Related to Nifong Do Not State a City Policy or Custom.*

In Cause of Action No. 5D, Plaintiffs allege that City policymakers failed to supervise Nifong adequately.  In Cause of Action No. 5F, they allege that Nifong himself was a City policymaker, and that his "directions" to Durham police officers established City policy.  As discussed above, however, Nifong was at all times a State prosecutor, acting solely for the State of North Carolina and subject to exclusive State supervision and control; he was neither a City employee nor a City policymaker (let alone a "final" City policymaker, as required by *Monell*).[18]  *See* Part IV.A.1, *supra*.  As a matter of law, then, the Supervisory Defendants' alleged failure to supervise Nifong, and Nifong's own actions, could not establish city policy or custom.  Causes of Action Nos. 5D and 5F should therefore be dismissed.

E.    **Plaintiffs' Claim of "Witness Tampering" (Cause of Action 9) Is Legally Deficient for Numerous Reasons.**

Cause of Action 9, regarding an alleged conspiracy to intimidate "alibi and other defense witnesses" from testifying in "the Superior Court of Durham County" (Am. Comp. ¶ 455), fails to state a claim for many independent reasons.  First, the federal statute at issue—42 U.S.C. § 1985(2)—has multiple subparts, but the only one related to witness intimidation (a "part one" claim) applies only to witnesses in *federal* court.  *See id.* (prohibiting conspiracy to "deter, by force, intimidation, or threat, any party or witness

---

[18] *See Riddick v. School Bd. of the City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000) (no municipal liability for decisions of superintendent and principal where school board retained exclusive final review authority over employee disciplinary matters).

*in any court of the United States* from attending such court, or from testifying to any matter pending therein") (emphasis added); *Kush v. Rutledge*, 460 U.S. 719, 725-26 (1983). Plaintiffs' allegations, however, are related exclusively to proceedings in "the Superior Court of Durham County." Am. Compl. ¶ 455. Any allegation of witness tampering in connection with state court proceedings, however, fails to state a claim under part one of Section 1985(2). *See, e.g.*, *Rutledge v. Arizona Bd. of Regents*, 859 F.2d 732, 736 (9th Cir. 1988) ("That the conspiracy may have affected presentation of the case in state court is immaterial . . . ."); *Lee v. Ventura County Sheriff's Dept.*, No. 90-56368, 1992 U.S. App. LEXIS 7361, at *4 (9th Cir. Apr. 14, 1992) (dismissing plaintiff's claim for witness intimidation because "Section 1985(2) applies to a deprivation of civil rights in *federal, not state* court, proceedings") (emphasis added).

Even if Section 1985(2) applied to the intimidation of witnesses in state court proceedings, Plaintiffs' allegations still fail to state a claim. If, by referring to "the Superior Court of Durham County," Plaintiffs mean the grand jury proceedings, the plaintiffs have no cognizable claim because a defendant has no right to present witnesses to a grand jury, and a prosecutor has no duty to provide the grand jury with exculpatory evidence. *See Williams*, 504 U.S. at 51-55. If Plaintiffs are referring to a criminal trial, no trial ever occurred. Plaintiffs thus could not have suffered any constitutional injury from the alleged conspiracy to deter witnesses from testifying. *See Rhodes*, 939 F. Supp. at 1270 (unless and until a statement is used against the criminal defendant, "it is the witness, not the criminal defendant, who suffers the constitutional injury when the

witness is coerced into making a statement") (citing *Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994)).[19]

F.      **Plaintiffs' Federal Conspiracy Claims Relating to Alleged Deprivation of Equal Protection Must Be Dismissed Because Plaintiffs Fail to Allege Discrimination Against a Protected Class.**

Plaintiffs allege that Defendants engaged in a plethora of conspiracies under Sections 1985 and 1986 to deprive them of equal protection of the law. *See* Causes of Action No. 8 & 10-12.[20] But those statutes grant relief only to plaintiffs who are members of a "protected class," and only where the defendants were motivated by a class-based animus against the plaintiffs. To the extent the Amended Complaint categorizes Plaintiffs as part of a class at all, it is only as Duke students or Duke lacrosse players.[21] Neither of these groups is a protected class. Moreover, even read in the light most favorable to the Plaintiffs, the Complaint fails to allege that the Defendants acted

[19] To the extent that this claim rests on purported intimidation of Moezeldin Ahmad Elmostafa and Kim Pittman, the claims fail for the additional reason that the allegations of intimidation relate solely to the execution of valid arrest warrants. *See* Am Compl. ¶¶ 248, 257. Taking action on "legal claims possessing a reasonable basis in law and fact simply do[es] not constitute the 'force or intimidation' necessary to satisfy § 1985(2)." *Raiser v. Kono*, No. 06-4243, 2007 U.S. App. LEXIS 16120, at *11 (10th Cir. July 5, 2007) (citing *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1124 (10th Cir. 2007)). Thus, confronting Elmostafa and Pittman with pre-existing citations cannot serve as the basis for intimidation under Section 1985(2).

[20] If Plaintiffs were to assert that the alleged witness intimidation described in Cause of Action No. 9 constitutes "obstructing…justice" in state court within the meaning of part two of Section 1985(2), then that claim is entirely redundant of Cause of Action No. 8 (alleging obstruction of justice) and should be dismissed for that reason, as well as for the reasons described in the text of this section.

[21] *See* Cause of Action 5E (alleging an unconstitutional policy of "targeting Duke University students for harsh or disproportionate treatment").

out of a racial or other class-based animus against the Plaintiffs.  For those reasons, these Causes of Action must be dismissed.

There is no question that the relevant parts of Section 1985 require that plaintiffs be members of a protected class and that the defendants have been motivated by a class-based animus against the plaintiffs.  *See Bey v. Celebration Station*, No. 3:02CV461, 2006 U.S. Dist. LEXIS 72479, at *9-10 (W.D.N.C. Sept. 28, 2006) (§ 1985(2) and § 1985(3) "both . . . require proof of a racial or otherwise class-based discriminatory animus behind the defendant's actions" (citing *Griffin v. Breckenridge*, 403 U.S. 88, 91 (1971)).  The list of potential "classes" is neither large nor expanding.  Indeed, "[i]n construing this requirement neither the Supreme Court nor the Fourth Circuit has identified any classes other than racial or religious classes."  *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985) (military prisoners not "protected class"); *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985) ("the class protected can extend no further than to those classes of persons who are . . . in unprotected circumstances similar to those of the victims of Klan violence."); *Cloaninger v. McDevitt*, No. 1:06CV135, 2006 U.S. Dist. LEXIS 65913, at *18 (W.D.N.C. Sept. 3, 2006) ("As recognized by the controlling law in the Fourth Circuit, . . . the only class of persons protected by Section 1985(3) are African-Americans.") (citing *Harrison v. KVAT Food Mgmt.*, 766 F.2d 155, 161-62 (4th Cir. 1985)).

Because a claim under section 1986 is dependent upon the existence of a claim under section 1985, section 1986 also requires that plaintiffs be members of a protected

class.  *See Brissett v. Paul*, No. 97-6898, 1998 U.S. App. LEXIS 6824, at *4 (4th Cir. April 6, 1998); *Trerice*, 755 F.2d at 1085; *Estate of Hezekiah Harvey v. Roanoke City Sheriff's Office*, No. 7:06CV00603, 2007 U.S. Dist. LEXIS 12614, at *11-12 (W.D. Va. Feb. 23, 2007) ("Because the plaintiff has failed to allege facts supporting the existence of such animus on the part of the defendants, the plaintiff's conspiracy claim under § 1985 is subject to dismissal.  Moreover, because the plaintiff has failed to state a claim under § 1985, her claim under § 1986 must also be dismissed."); *Jenkins v. Trs. of Sandhills Cmty. College*, 259 F. Supp. 2d 432, 445 (M.D.N.C.) (same), *aff'd*, 80 Fed. Appx. 819 (4th Cir. 2003); *Ollo v. Mills*, No. 4:96CV1009, 1998 U.S. Dist. LEXIS 14024, at *20 (M.D.N.C. May 22, 1998) (same).

Plaintiffs' original Complaint made clear that their equal protection arguments were based on allegations that they were unfairly targeted because of their status as Duke students, and the bulk of their Amended Complaint is no different.  *See, e.g.*, Am. Compl. ¶ 82 (alleging Sergeant Gottlieb's unfair treatment of Duke students); *id*. ¶ 384 (alleging that Duke students are unfairly targeted); *id*. ¶ 395 (same); *id*. ¶ 419 (alleging that failure to supervise Sergeant Gottlieb led to unfair treatment of Duke students).

Apparently recognizing that Duke students are not a protected class, Plaintiffs have belatedly asserted that "one or more" of the Defendants were motivated by "racial animus" in this case.  *See* Am. Compl. ¶¶ 448, 463.  But this bare, conclusory allegation stands in sharp contrast to the remainder of the Amended Complaint.  Indeed, charges of racial animus, or facts from which any racial animus on the part of any Defendants

against Plaintiffs might be inferred, appear *nowhere* in the two hundred and ninety-one

paragraphs outlining the "Factual Allegations" of the case. *See* Am. Compl. ¶¶ 37-328.[22]

Plaintiffs' conclusory allegation of racial animus on the part of City officials is so

disconnected from the factual allegations in the Amended Complaint that the conspiracy

claims that depend on racial animus must be dismissed. As the Fourth Circuit has made

clear, "[e]ven with notice pleading, a complaint purporting to describe the events

justifying relief must nonetheless demonstrate that relief can be granted in those

circumstances." *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 346 (4th Cir.

2006). Merely asserting "racial animus" without alleging any facts to support that

assertion amounts to a "legal conclusion," which is insufficient to state a claim "because

'it is the alleged facts supporting those words, construed liberally, which are the proper

focus at the motion to dismiss stage.'" *Id.* at 346 (quoting *Bass v. E.I. Dupont de

Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)). In *Jordan*, plaintiff alleged that he

complained about a racial remark by a co-worker and was fired in retaliation for

complaining. *Id.* He also alleged that "his race was a motivating factor" in his firing. *Id.*

at 344. Nevertheless, the Fourth Circuit found that even reading the complaint's

allegations liberally, there were simply no factual allegations from which to infer that

racial animus motivated his employers. *Id.* at 346-47. While the complaint fairly alleged

---

[22] Tellingly, Plaintiffs' extensive and detailed request for specific injunctive relief touches every aspect of law enforcement in Durham that Plaintiffs find wanting—including the alleged unfair targeting of Duke students—yet expresses no concern regarding invidious racial animus by City officials. *See* Am. Compl. ¶¶ 567(a)(i) – 567(a)(xv).

retaliation, it did not fairly allege racial animus on the part of his employers. *Id.* The Fourth Circuit accordingly affirmed the district court's dismissal of that claim. *Id.* at 347; *see also Bass*, 324 F.3d at 765 (conclusory allegations that the employer discriminated against the plaintiff "because of her race and sex" were not sufficient to allege a claim when facts of complaint did not support the charge).

Here, as in *Jordan*, Plaintiffs repeatedly beat the drum of a *different* type of discrimination—against *Duke students*—but offer not a single factual allegation to justify leveling a *racial* discrimination charge. Indeed, the racial animus allegation is even more conclusory and unsupported here than in *Jordan*. Here, Plaintiffs do not specify any particular Defendant that supposedly acted with racial animus. Nor do Plaintiffs actually even allege that Defendants necessarily targeted them *because of* their race. Indeed, Plaintiffs' "racial animus" broadside is posed in the alternative—Plaintiffs allege that Defendants were "motivated by invidious racial animus, intended to foment invidious racial animus in the Durham community, and/*or* intended to take advantage of the invidious racial animus that they had fomented in the Durham community against Plaintiffs." Am. Compl. ¶¶ 448, 463 (emphasis added). But the case law makes clear that a plaintiff must allege that the defendant himself was motivated by racial animus against the plaintiff in order to state a claim under Section 1985, not simply that he sought to create racial tensions or take advantage of racial animus on the part of others in order to achieve some other objective. *See, e.g.*, *Griffin*, 403 U.S. at 102 ("The language requiring intent to deprive of equal protection, or equal privileges and immunities, means

that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993) (requiring that "the defendant have taken his action at least in part because of, not merely in spite of its adverse effects upon an identifiable group") (internal quotations omitted); *Bey*, 2006 U.S. Dist. LEXIS 72479, at *9-10; *Estate of Torres v. Terhune*, No. Civ. S-98-2211 WBS/GGH, 2002 U.S. Dist. LEXIS 1130, *41 (E.D. Cal. Jan. 9, 2002) (plaintiffs failed to show "the existence of racial or class-based animus on the part of the defendants" even though they had alleged that defendants had taken advantage of racial tensions between rival gangs). Plaintiffs have manifestly failed to do that.

Even if Plaintiffs' conclusory allegation were enough to satisfy the notice pleading standard—despite the Fourth Circuit's direct holding to the contrary in *Jordan* and *Bass*—it clearly fails to satisfy the *heightened* pleading standard applicable to conspiracy claims under § 1985 (and § 1986). *Mbadiwe v. Union Mem'l Reg'l Med. Ctr., Inc*., No. 3:05CV49-MU, 2005 U.S. Dist. LEXIS 31674, at *7 (W.D.N.C. Nov. 28, 2005); *Brissett v. Paul*, No. 97-6898, 1998 U.S. App. LEXIS 6824, at *10 (4th Cir. April 6, 1998) ("The threshold requirement is very high . . . ."). "'Because of the high threshold that a plaintiff must meet to establish a prima facie case under section 1985, courts often grant motions of dismissal.'" *Ollo v. Mills*, 1998 U.S. Dist. LEXIS 14024, at *45 (quoting *Davis v. Hudgins*, 896 F. Supp. 561, 571 (E.D. Va. 1995)). The Fourth Circuit has emphasized that this standard is difficult to meet: "This Court, under that standard, has rarely, if ever,

found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy . . . . Indeed, we have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995); *see also Jenkins*, 259 F. Supp. 2d at 445. "Concrete facts" means facts showing some act of involvement, not mere acquiescence. *See Simmons*, 47 F.3d at 1378 (rejecting as "wholly unsupported by the law" argument that defendant was participant in § 1985(3) conspiracy because of "wilful [sic] blindness"). "Indeed, the law is clear that although an express agreement is not necessary, the participants in the conspiracy must share the general conspiratorial objective. . . ." *Id.* (quotation and citation omitted).

Plaintiffs here fall far short of this stringent standard. They do not allege that they are members of a protected class, they do not allege which particular Defendants were motivated by racial animus toward the Plaintiffs, and they do not even clearly allege that *any* Defendants actually acted out of racial animus against them.[23] Causes of Action Nos. 8 & 10-12 should therefore be dismissed.

---

[23] Even if they had adequately pleaded racial animus, Plaintiffs themselves point to a more obvious motivation than race—ambition. They repeatedly allege that Nifong was motivated by his desire to seek publicity, no matter what vehicle was available to him to do so. *See* Am. Compl. ¶¶ 3, 130, 132, 151, 153, 388. Since Plaintiffs themselves propound this motivation by Nifong, their bare suggestion of racial animus on the part of all the defendants clearly fails to state a claim. *See Wilkerson v. Thrift*, 124 F. Supp. 2d 322, 329 (W.D.N.C. 2000) (rejecting racial animus theory because, among other things, non-racial motivations were "just as likely").

### G.    Plaintiffs Fail to State a Claim Under the North Carolina Constitution.

Plaintiffs in several places allege a violation of the North Carolina Constitution Article I, Section 19, without actually making this the basis for any specific cause of action.  *See* Am. Compl.  ¶¶ 4, 33, 222, 242.  Once again, they leave Defendants to guess whether they are actually asserting a claim with these allegations—as well as which Defendants are alleged to have violated the State Constitution and in what manner.  This does not meet even the most liberal pleading standard, and for that reason alone the Court should dismiss any State constitutional claims.  *See, e.g.*, *McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39, 42 (6th Cir. 1988).

In any event, to the extent Plaintiffs are alleging a violation of the State Constitution, they fail to state a claim upon which relief can be granted.  Under North Carolina law, a plaintiff may bring a State constitutional claim only "'in the absence of an adequate state remedy' for the same violation."  *Kling v. Harris Teeter Inc.*, 338 F. Supp. 2d 667, 678 (W.D.N.C. 2002) (quoting *Hughes v. Bedsole*, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995)), *aff'd*, 86 Fed. Appx. 662 (4th Cir. 2004).  An adequate state remedy exists when there is an alternative state law cause of action which "if successful, would have compensated [the plaintiff] for the same injury he claims in the direct constitutional claim."  *Id.* (quoting *Alt v. Parker*, 112 N.C. App. 307, 435 S.E.2d 773, 779 (1993)).  "This is so *even if a plaintiff cannot prevail on the alternative state law cause of action*."  *Id.*  (citing *Alt*, 435 S.E.2d at 779) (emphasis added); *Kling*, 338 F. Supp. 2d at 678 (dismissing Article I, Section 19 claim because "Plaintiffs have asserted a myriad of state

law causes of action . . . which, if successful, would compensate them for their alleged injuries"); *Simmons v. Justice*, 87 F. Supp. 2d 524, 533-34 (W.D.N.C. 2000) (dismissing Article I, Section 19 claim because plaintiff had asserted state malicious prosecution claim). Here, Plaintiffs have alleged a myriad of state law claims based on the conduct that, presumably, also underlies any State constitutional claims. Accordingly, the State constitutional claims must be dismissed.

### H. Plaintiffs' Claims for Injunctive Relief Must Be Dismissed.

In addition to damages, Plaintiffs seek unprecedented sweeping, and intrusive injunctive relief from this Court. Am. Compl. ¶¶ 5, 567. In order to have standing to seek injunctive relief, Plaintiffs must allege a "real and immediate threat" that they would again be victimized by the conduct of which they complain. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1981). Plaintiffs' allegations fall woefully short of this standard. The personal risk to Plaintiffs of any interaction with, let alone harm from, the Durham Police Department are so remote as to be completely hypothetical. Indeed, Plaintiffs are no longer students at Duke University, and do not even reside within North Carolina, let alone within the jurisdiction of the Durham Police Department. Moreover, the Amended Complaint goes to great lengths to highlight the singular and "unprecedented" nature of this case, much of which resulted from the overzealousness of a State prosecutor who is no longer employed by the State. Under these circumstances, the risk of any particular person—let alone Plaintiffs—suffering additional damage from the sort of conduct

alleged here is, at best, remote.  Accordingly, Plaintiffs have no standing to sue for injunctive relief.

The Supreme Court has applied strict rules for a plaintiff's standing to sue for injunctive relief on a number of occasions, most notably in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1981).  In *Lyons*, the plaintiff was stopped by police for a minor traffic violation.  *Id.* at 97.  Without provocation, he was put in a chokehold, rendering him unconscious and causing damage to his larynx.  *Id.* at 98.  He sued for injunctive relief, arguing that he was in danger of being attacked again by police, who frequently used such tactics during stops.  *Id.*

The Court held that the Plaintiff did not have standing to sue for injunctive relief because there was no realistic danger that he personally would be harmed again:

> [I]t is no more than conjecture to suggest that in every instance of a traffic stop, arrest, or other encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse.  And it is surely no more than speculation to assert . . . that Lyons himself will again be involved in one of those unfortunate instances. . . .

*Id.* at 108.  Even if the Los Angeles police department had a *policy* for its officers to engage in the unconstitutional conduct, the plaintiff still needed to articulate a realistic risk that he personally would be harmed again.  *Id*. at 109.  Finding that the plaintiff had failed to do so, the Court ruled that the claim for injunctive relief must be dismissed.  *Id*. at 110.

Here, Plaintiffs' risk of future injury is even more remote and speculative than in *Lyons*.  In *Lyons*, the plaintiff remained a resident of Los Angeles.  *Id.* at 114 (Marshall,

J., dissenting). Not so here, where the Plaintiffs are citizens and residents of New York or New Jersey. Am. Compl. ¶ 6-8. Plaintiffs have belatedly sought to fill this obvious void by adding to their Amended Complaint an allegation that they intend to visit Durham on "future occasions." Am. Compl. ¶ 5. But the mere suggestion that they intend to return to Durham at some time in the future is insufficient to give Plaintiffs standing. *See Wood v. Sink*, No. 6:95CV00362, 1996 U.S. Dist. LEXIS 21928 (D.N.C. July 30, 1996) ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."); *see also Dobrich v. Walls*, 380 F. Supp. 2d 366, 373 (D. Del. 2005) (finding that, since student's family moved out of the jurisdiction of defendant school district, student has no standing for injunctive relief against that district).

Plaintiffs' argument is even weaker than the losing argument of the plaintiff in *Lyons* for another reason. In *Lyons,* the police conduct complained of could be triggered during routine traffic stops. Here, in contrast, the conduct complained of arose from a very specific combination of alleged circumstances, including: a "mentally troubled, drug prone exotic dancer" claiming to have been raped by a number of Duke students for whom she had performed, Am. Compl. ¶ 2; a lead investigator who allegedly targeted Duke students for selective and unfair application of the law, Am. Compl. ¶ 82; a state prosecutor allegedly motivated solely by time-sensitive political aspirations, Am. Compl. ¶ 128; and the unusually volatile nature of the rape allegations. Indeed, the Amended

Complaint takes pains to describe Defendants' actions in this case as "unprecedented" and repeatedly highlights the singularity of the events. *See, e.g.*, Am. Compl. ¶ 132 (role played by district attorney "unprecedented"), *id*. ¶ 135 (role played by state investigator "unprecedented"); *id*. ¶ 1 (describing ways in which case stands out in "modern American history"). Given the highly unusual combination of events described in the Amended Complaint, and Plaintiffs' lack of ties with the City of Durham, the "risk" that Plaintiffs will be again victimized by these Defendants in a manner similar to the conduct alleged in the Amended Complaint is much more remote than the risk that the Supreme Court analyzed—*and found insufficient as a matter of law*—in *Lyons*.[24]

Courts in the Fourth Circuit have applied the *Lyons* standard numerous times in rejecting claims for injunctive relief  In *Simmons v. Poe*, 47 F.3d 1370, for example, the plaintiff alleged that police engaged in discriminatory behavior—racial profiling—in investigating a rape allegation, and sought an injunction. The Fourth Circuit soundly rejected the plaintiff's claim:

---

[24] Plaintiffs' subjective apprehensions of future unlawful conduct are irrelevant to the standing inquiry. As the *Lyons* Court made clear:

> The reasonableness of [the plaintiff's] fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct. It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.

*Lyons*, 461 U.S. at 107, n.8.

> [I]t is clear that [the plaintiff] does not meet the standard articulated in
> *Lyons* for the granting of injunctive or declaratory relief. Because [the
> plaintiff] was released from police custody and eventually eliminated from
> the list of suspects in the case, he cannot show either a continuing wrong or
> a real or immediate threat that he would likely be irreparably injured by the
> use of the race profile in the instant case.

*Id.* at 1382. Similarly, in *Caviness v. Durham Public Schools Bd. of Educ.*, No.

1:95CV00878, 1996 WL 33657236 (M.D.N.C. Dec. 16, 1996), this Court stated in

another law enforcement setting:

> Plaintiffs may have been illegally deprived of their constitutional rights
> under the Fourth and Fourteenth Amendments for the activities which took
> place . . . . If so, Plaintiffs presumably have standing under Article III to
> sue for damages against Defendants. This isolated occurrence, however,
> does not establish a real and immediate threat that Plaintiffs would again be
> detained, arrested, imprisoned, or searched. The speculative nature of
> Plaintiffs' claim of future harm is not real or immediate.

*Id.* at *9. *See also Howard v. Food Lion, Inc.*, 232 F. Supp. 2d 585, 599 (M.D.N.C.

2002) (dismissing claim for injunctive relief in absence of facts demonstrating "real and

immediate danger of injury"); *Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d

636, 641 (D. Md. 2005) (dismissing claim for injunctive relief against medical center

because "even if Plaintiff correctly alleges that he was the victim of discrimination, the

present record does not reflect any on-going discrimination against him or that he is

likely to return . . . in the near future."); *Waller v. Butkovich*, 584 F. Supp. 909, 925

(D.N.C. 1984 (dismissing claim for injunctive relief because plaintiffs "have failed to

allege facts suggesting that they are presently sustaining some direct injury or that there is

a real and immediate threat of such injury in the future"); *cf. Golden v. Zwickler*, 394

U.S. 103 (1969) (rejecting former Congressman's request for injunctive relief against

unconstitutional limitations on leaflet distribution because his assertion that he could "be a candidate for Congress again" was "hardly a substitute for evidence that this is a prospect of 'immediacy and reality'"), *discussed in Lyons*, 461 U.S. at 104.

In short, Plaintiffs have demonstrated neither that "it is likely that they again will find themselves in the same or similar circumstances giving rise to the allegedly unconstitutional conduct" nor that, if they did, "that it is likely that they again will be subjected to the allegedly unconstitutional conduct." *NAACP v. Brackett*, 130 Fed. Appx. 648, 652 (4th Cir. 2005). Accordingly, injunctive relief is not available to them.

Moreover, injunctive relief is particularly inappropriate here, where Plaintiffs' sweeping requests for a wholesale restructuring of Durham's local law enforcement system and intrusive and protracted oversight raise serious federalism concerns. *See, e.g.*, Am. Compl. ¶ 567(a)(ii) (seeking to give "monitor" power to "establish, review, and enforce all policies applicable to the management of the Durham Police Department"); *id.* ¶ 567(a)(iii) (providing monitor with power to "hire, fire, and promote all Durham Police officials, including the Chief of Police"). The Supreme Court has directed that federal courts should exercise special restraint when considering such intrusion into a state or local entity's administration of its own law:

> [R]ecognition of the need for a proper balance between the state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury which is both great and immediate. . . . [T]he normal principles of equity, comity, and federalism . . . should inform the judgment of federal courts when asked to oversee state law enforcement authorities. In exercising their equitable powers federal courts must

recognize "[t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."

*Lyons*, 461 U.S. at 112 (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)) (other citations omitted); *accord NAACP v. Brackett*, 130 Fed. Appx. 648, 652 (4th Cir. 2005).

Because Plaintiffs have failed to allege any real and immediate danger of future harm, and particularly in light of the federalism concerns articulated in *Lyons*, Plaintiffs' claims for injunctive relief should be dismissed.[25]

## I.     Plaintiffs' Claims for Punitive Damages Against the City Must Be Dismissed.

Plaintiffs seek punitive damages against all Defendants.  *See* Am. Compl. ¶ 567c. The City of Durham, however, is immune from punitive damages in both federal civil rights claims and under North Carolina law.  For federal civil rights claims, see *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (immunity from punitive

---

[25] Plaintiffs also lack standing with respect to part of their requested relief for the additional reason that it is not redressable by this Court.  Plaintiffs ask the Court to order that "any reports of DNA or other scientific testing requested by the . . . District Attorney's Office include [all] results . . . ."  Am. Compl. ¶ 567(a)(vi).  The Court cannot order, and the City cannot implement, this relief because it relates to the District Attorney's Office—a state entity.  Thus, Plaintiffs lack standing to seek such relief.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 126 (1998) (Stevens, J., concurring) ("The 'case or controversy' limitation of Art. III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court" (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40-46 (1976)); *see also Jackson v. Leake*, No. 1:05CV00691, 2006 U.S. Dist. LEXIS 55017, at *20-22 (M.D.N.C. Aug. 7, 2006) (entry of injunction against the District Attorney would not redress alleged injuries because District Attorney could not prevent North Carolina State Board of Elections from imposing challenged provisions).

damages for § 1983 claims); *Johnson v. New York*, No. 90 Civ. 7125, 1991 U.S. Dist.

LEXIS 3401, at *17 (S.D.N.Y. Mar. 22, 1991) (*City of Newport*'s reasoning "applies with

equal force in the context of a § 1985 action"); *Mitros v. Borough of Glenolden*, 170 F.

Supp. 2d 504, 507-508 (E.D. Pa. 2001) (§ 1985 claim).  For claims under North Carolina

law*, see Efird v. Riley*, 342 F. Supp. 2d 413, 430 (M.D.N.C. 2004) ("It is well settled that

under North Carolina public policy, in the absence of a statute indicating otherwise, a

plaintiff may not recover punitive damages against government entities."); *N.C.

Motorcoach Ass'n v. Guilford County Bd. of Educ.*, 315 F. Supp. 2d 784, 810 (M.D.N.C.

2004) (dismissing plaintiff's request for punitive damages because defendant was a

governmental entity); *Ripellino v. N.C. Sch. Bds. Ass'n*, 158 N.C. App. 423, 427 (2003)

(holding that as a governmental entity, school board was immune from punitive

damages); *Long v. City of Charlotte*, 293 S.E.2d 101, 115 (N.C. 1982) (following

reasoning of *City of Newport*).  Therefore, Plaintiffs' claims for punitive damages against

the City (including any "official capacity" claims against other Defendants[26]) should be

dismissed.

---

[26] *See Crain v. Butler*, 419 F. Supp. 2d 785, 793 (E.D.N.C. 2005) (prohibiting claims for punitive damages against officers of local governments in their official capacities); *Houpe v. City of Statesville*, 497 S.E.2d 82, 93 (N.C. 1998) (same).

## V.    CONCLUSION

For the foregoing reasons, to the extent Causes of Action 5, 7-12, and 20-22 are alleged against the City, they should be dismissed; and Plaintiffs' requests for relief under the North Carolina Constitution, for injunctive relief, and for punitive damages against the City should also be dismissed.

This the 15th day of January, 2008.

FAISON & GILLESPIE

By: /s/ Reginald B. Gillespie, Jr.
     Reginald B. Gillespie, Jr.
     North Carolina State Bar No. 10895
     5517 Chapel Hill Boulevard, Suite 2000
     Post Office Box 51729
     Durham, North Carolina  27717-1729
     Telephone:  (919) 489-9001
     Fax: (919) 489-5774
     E-Mail: rgillespie@faison-gillespie.com

STEPTOE & JOHNSON LLP

By: /s/ Roger E. Warin
     Roger E. Warin*
     Michael A. Vatis*
     Matthew J. Herrington*
     John P. Nolan*
     Ana H. Voss*
     Steptoe & Johnson LLP
     1330 Connecticut Avenue, NW
     Washington, DC  20036
     Telephone: (202) 429-3000
     Fax: (202) 429-3902
     E-Mail: rwarin@steptoe.com
     *(Motion for Special Appearance to be filed)

Attorneys for Defendant, City of Durham, North Carolina

<u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>

The undersigned hereby certifies that, pursuant to Rule 5 of the Federal Rules of Civil Procedure and LR5.3 and LR5.4, MDNC, the foregoing pleading, motion, affidavit, notice, or other document/paper has been electronically filed with the Clerk of Court using the CM/ECF system, which system will automatically generate and send a Notice of Electronic Filing (NEF) to the undersigned filing user and registered users of record, and that the Court's electronic records show that each party to this action is represented by at least one registered user of record, to each of whom the NEF will be transmitted, except that, with respect to the following party, a copy is being transmitted via first class mail to the address listed below:

Mr. Linwood Wilson
6910 Innesbrook Way
Bahama, North Carolina 27503-9700

This the 15th day of January, 2008.

FAISON & GILLESPIE

By: /s/ Reginald B. Gillespie, Jr.
        Reginald B. Gillespie, Jr.
        North Carolina State Bar No. 10895

        Attorneys for Defendant the City of
            Durham, North Carolina

        5517 Chapel Hill Boulevard, Suite 2000
        Post Office Box 51729
        Durham, North Carolina 27717-1729
        Telephone: (919) 489-9001
        Fax: (919) 489-5774
        E-Mail: rgillespie@faison-gillespie.com