# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DAVID F. EVANS, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:07CV739 |
| CITY OF DURHAM, N.C., et al., | |
| Defendants. | |

## CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

**RUDOLF WIDENHOUSE & FIALKO**
David S. Rudolf (N.C. Bar #8587)
312 West Franklin Street
Chapel Hill, NC  27516

**BARRY C. SCHECK, ESQ.**
Barry C. Scheck*
Attn: Elizabeth Vaca
100 Fifth Avenue
New York, NY  10011

**EMERY CELLI BRINCKERHOFF & ABADY LLP**
Richard D. Emery**
Ilann M. Maazel**
75 Rockefeller Plaza, 20th Floor
New York, NY  10019
(* motion for special appearance forthcoming)
(** motion for special appearance pending)

*Attorneys for Plaintiff Reade Seligmann*

April 2, 2008

**WILLIAMS & CONNOLLY LLP**
Brendan V. Sullivan, Jr. (*pro hac vice*)
Robert M. Cary (*pro hac vice*)
Christopher N. Manning (*pro hac vice*)
Charles Davant IV (N.C. Bar #28489)
725 Twelfth Street, N.W.
Washington, D.C.  20005

*Attorneys for Plaintiffs David F. Evans and Collin Finnerty*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... v

STATEMENT OF THE CASE ........................................................................ 2

    A.    Overview of the Amended Complaint ........................................... 2

    B.    The Defendants ............................................................................ 3

    C.    Summary of Relevant Allegations ............................................... 4

        1.    The Fatal Contradictions in the Accuser's Claims ........... 4

        2.    The Supervisory Defendants' Delegation of Authority to Nifong ............................................................................. 7

        3.    The April Photo Array ...................................................... 9

        4.    The DNA Conspiracy ..................................................... 13

        5.    Defendants' Post-Indictment Efforts To Conceal Misconduct and Obstruct Justice ................................... 16

QUESTIONS PRESENTED ........................................................................ 17

ARGUMENT .............................................................................................. 20

I.      STANDARD OF REVIEW ................................................................. 20

II.     NEITHER GOTTLIEB, WILSON, NOR THE DSI DEFENDANTS ARE ENTITLED TO ABSOLUTE IMMUNITY. ............................... 22

    A.    Gottlieb Is Not Entitled to Witness Immunity. ......................... 22

    B.    Wilson Is Not Entitled to Prosecutorial Immunity .................... 23

    C.    The DSI Defendants Are Not Entitled to Expert Witness Immunity. .................................................................................. 27

III.    THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS UNDER  42 U.S.C. § 1983. ................................................................ 30

    A.    Summary of § 1983 Claims ........................................................ 30

    B.    The Amended Complaint Alleges a Violation of Plaintiffs' Fourth and Fourteenth Amendment Rights ................................ 31

        1.    Defendants Caused Plaintiffs To Be Unlawfully Seized Without Probable Cause .................................................. 31

        2.    The Duration of Plaintiffs' Seizures Is Irrelevant. ........... 35

        3.      Plaintiffs Are Entitled To Recover for Injury to Their Reputations. ........................................................................ 36

        4.      Defendants' Post-Indictment Misconduct Is Relevant to the § 1983 Claims. ............................................................ 37

   C.     The § 1983 Claims Do Not Require a Conviction. .................... 39

   D.     Defendants Caused the Deprivation of Plaintiffs' Constitutional Rights. ............................................................................................ 40

        1.      The Return of an Indictment Does Not Preclude § 1983 Liability Against a Defendant Who Deceives the Grand Jury. ................................................................................... 41

        2.      Nifong's Participation Does Not Preclude Defendants' Liability. ............................................................................. 43

IV.    THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS AGAINST THE CITY OF DURHAM. .................................................. 46

   A.     Summary of Claims Against the City of Durham ...................... 46

   B.     The Fifth Cause of Action Properly Alleges the Elements of a § 1983 Claim Against the City of Durham. ................................. 48

        1.      The City Is Liable for Constitutional Violations that Were Caused and Ratified by Its Policymaking Officials. ....................... 49

        2.      The City Is Liable for Civil Rights Violations Caused by Nifong Pursuant to Delegated Authority over the Police Investigation. .................................................................... 50

        3.      The City of Durham Is Liable Under § 1983 for Civil Rights Violations Caused by Official Custom and Policy. .............. 55

        4.      The City of Durham Is Liable Under § 1983 for the Supervisory Defendants' Failure To Supervise Nifong and Gottlieb. ............................................................................ 58

   C.     The City Is Properly a Defendant in Plaintiffs' Remaining Claims. ............................................................................................ 60

V.     THE AMENDED COMPLAINT STATES A § 1983 CLAIM AGAINST THE SUPERVISORY DEFENDANTS. ............................. 64

VI.   THE AMENDED COMPLAINT STATES A § 1983 CLAIM AGAINST DSI AND CLARK. ................................................................ 69

VII.   GOTTLIEB, HIMAN, ADDISON, AND THE SUPERVISORY
       DEFENDANTS ARE NOT ENTITLED TO QUALIFIED
       IMMUNITY. .............................................................................................71

       A.   The Supreme Court and Fourth Circuit Have Identified the
            Standards Governing Claims of Qualified Immunity. ...............................72

       B.   Gottlieb, Himan, Addison, and the Supervisory Defendants Do
            Not Have Qualified Immunity for Causing Plaintiffs' Seizures
            Without Probable Cause. ...............................................................74

       C.   Gottlieb, Himan, Addison, and the Supervisory Defendants Do
            Not Have Qualified Immunity for Fabricating Evidence in Order
            To Cause Plaintiffs' Seizures. .......................................................75

       D.   Gottlieb, Himan, and the Supervisory Defendants Do Not Have
            Qualified Immunity for Concealing Evidence of Plaintiffs'
            Innocence and the Lack of Probable Cause in Bad Faith in Order
            To Cause Plaintiffs' Seizures. .......................................................79

       E.   Addison and Hodge Do Not Have Qualified Immunity for the
            False and Inflammatory Statements Alleged To Have Caused
            Plaintiffs' Seizures. .....................................................................80

VIII.  THE AMENDED COMPLAINT STATES ACTIONABLE CIVIL
       RIGHTS CONSPIRACY CLAIMS. .......................................................82

       A.   Summary of the Civil Rights Conspiracy Claims. .....................................82

       B.   The Amended Complaint Alleges Sufficient Direct and
            Circumstantial Evidence To Establish an Unlawful Conspiracy. ...............84

       C.   The Second Clause of § 1985(2) Prohibits Witness Tampering
            Related to State Proceedings. ........................................................89

       D.   The § 1985 Claims Sufficiently Allege Invidious Racial Animus.............92

            1.   Defendants Were Motivated by, Fomented, and Took
                 Advantage of Racial Animus Against Plaintiffs. .............................92

            2.   Section 1985 Prohibits Invidious Animus Against Any
                 Race. .............................................................................94

       E.   Plaintiffs Have Stated Actionable Claims Under § 1986............................96

IX.    THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS
       UNDER NORTH CAROLINA LAW....................................................98

       A.   The Amended Complaint States a Malicious Prosecution Claim. ..............99

       B.   The Amended Complaint States an Obstruction of Justice Claim............103

C.      The Amended Complaint States an Intentional Infliction of Emotional Distress Claim........................................................................ 106

D.      The Amended Complaint States a Negligence Claim............................ 110

E.      The Amended Complaint States a Claim for Negligent Hiring, Training, Discipline, and Retention. ....................................................... 112

F.      Public Official Immunity Does Not Extend to Intentional Misconduct Committed by Gottlieb, Addison, and Himan....................... 113

X.      THE COURT MAY DISMISS OFFICIAL CAPACITY CLAIMS WHERE THE CITY IS ALSO NAMED AS A DEFENDANT AND IS THE REAL PARTY IN INTEREST................................................................... 114

XI.      DEFENDANTS MAKE NO OTHER ARGUMENTS SUPPORTING DISMISSAL. ........................................................................................... 116

A.      It Is Premature To Dismiss the Prayer for an Injunction. .......................... 116

B.      There Are No "State Constitution" or "Punitive Damages" Causes of Action Against the City of Durham for the Court To Dismiss. ................................................................................................... 119

CONCLUSION ............................................................................................................ 120

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Action v. Gannon,*
450 F.2d 1227 (8th Cir. 1971) (en banc) ............................................................... 95

*Albright v. Oliver,*
510 U.S. 266 (1994) (plurality op.) ....................................................... 36

*Alford v. Cumberland County,*
No. 06-1569, 2007 WL 2985297 (4th Cir. Oct. 15, 2007) ..................................... 74

*Amaechi v. West,*
237 F.3d 356 (4th Cir. 2001) ............................................................. 73, 74

*Antonio v. Moore,*
174 F. App'x 131 (4th Cir. 2006) (per curiam) ...................................... 40

*Archbold v. Nw. Cmty. Hosp.,*
191 F.3d 455 (7th Cir. 1999) (table), *available at* 1999 WL 518933 ................... 89

*Auriemma v. Montgomery,*
860 F.2d 273 (7th Cir. 1988) ................................................................. 26

*Austin v. Paramount Parks, Inc.,*
195 F.3d 715 (4th Cir. 1999) .................................................................. 70

*Avery v. County of Burke,*
660 F.2d 111 (4th Cir. 1981) ................................................................. 65

*Bailey v. Kennedy,*
349 F.3d 731 (4th Cir. 2003) ....................................................... 40, 113

*Barreto-Rivera v. Medina-Vargas,*
168 F.3d 42 (1st Cir. 1999) .................................................................. 59

*Barrett v. Harrington,*
130 F.3d 246 (6th Cir. 1997) ................................................................. 35

*Bell Atlantic Corp. v. Twombly,*
127 S. Ct. 1955 (2007) ................................................... 20-21, 84-85, 87

*Bennett v. N.C. Department of Transportation*,
No. 1:05CV764 (JAB), 2007 WL 4208390 (M.D.N.C. Nov. 26, 2007).. 48, 51, 120

*Biby v. Bd. of Regents of the Univ. of Neb. at Lincoln*,
338 F. Supp. 2d 1063 (D. Neb. 2004), *aff'd*, 419 F.3d 845 (8th Cir. 2005) .......... 89

*Blair v. County of Davidson*,
No. 1:05CV11, 2006 WL 1367420 (M.D.N.C. May 10, 2006) ......... 66, 69, 71, 120

*Bd. of County Comm'rs  v. Brown*,
520 U.S. 397 (1997) ............................................................................. 55, 58, 60

*Borneman v. United States*,
213 F.3d 819 (4th Cir. 2000) ............................................................................ 61

*Brady v. Maryland*,
373 U.S. 83 (1963) ..................................................................................... 33, 78

*Brandon v. Holt*,
469 U.S. 464 (1985) ........................................................................................ 46

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) ........................................................................................ 92

*Brever v. Rockwell Int'l Corp.*,
40 F.3d 1119 (10th Cir. 1994) ......................................................................... 90

*Brooks v. City of Winston-Salem*,
85 F.3d 178 (4th Cir. 1996) ............................................................... 31-32, 39, 75

*Brown v. Gilmore*,
278 F.3d 362 (4th Cir. 2002) ........................................................................... 73

*Brown v. Daniel*,
Nos. 99-1678, 99-1679, 2000 WL 1455443 (4th Cir. Sept. 29, 2000)............. 23, 27

*Brown v. Miller*,
No. 06-30887, 2008 WL 509078 (5th Cir. Feb. 27, 2008).................................. 32

*Brown & Williamson Tobacco Corp. v. CSX Transp., Inc.*,
882 F. Supp. 511 (E.D.N.C. 1995) ................................................................. 111

*Buckley v. Fitzsimmons*,
509 U.S. 259 (1993) ...............................................22, 23-24, 25, 35, 81

*Burke v. Ocean County Prosecutor's Office*,
No. 07-3623, 2008 WL 346142 (D.N.J. Feb. 6, 2008) ........................................ 35

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961) ........................................................................................... 62

*Burns v. Reed*,
500 U.S. 478 (1991) ........................................................................... 22, 23, 25

*Carter v. Burch*,
34 F.3d 257 (4th Cir. 1994)............................................................................... 25

*Carter v. Morris*,
164 F.3d 215 (4th Cir. 1999)............................................................................. 56

*Chavis v. Clayton County Sch. Dist.*,
300 F.3d 1288 (11th Cir. 2002) ........................................................................ 89

*City of Canton v. Harris*,
489 U.S. 378 (1989) .......................................................................................... 57

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .......................................................................................... 118

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ........................................................................... 50, 51, 54

*Clanton v. Cooper*,
129 F.3d 1147 (10th Cir. 1997)......................................................................... 40

*Clark v. Clabaugh*,
20 F.3d 1290 (3d Cir. 1994) ............................................................................. 97

*Clark v. Universal Builders, Inc.*,
501 F.2d 324 (7th Cir. 1974)............................................................................. 94

*Cleary v. County of Macomb*,
No. 06-15505, 2007 WL 2669102 (E.D. Mich. Sept. 6, 2007)............................. 29

*Cook County v. United States ex rel. Chandler*,
538 U.S. 119 (2003) ...................................................................................119-20

*Cooper v. Dupnik*,
924 F.2d 1520 (9th Cir. 1991) ..................................................................... 35

*Crabtree ex rel. Crabtree v. Muchmore*,
904 F.2d 1475 (10th Cir. 1990) .................................................................... 86

*Cranford v. Frick*,
No. 1:05CV62, 2007 WL 676687 (M.D.N.C. Feb. 28, 2007) .................. 51, 66, 71

*Crudup v. Schulte*,
12 F. App'x 682 (10th Cir. 2001) ................................................................. 43

*Daskalea v. District of Columbia*,
227 F.3d 433 (D.C. Cir. 2000) ..................................................................... 57

*Davis v. Grusemeyer*,
996 F.2d 617 (3d Cir. 1993) ........................................................................ 25

*Dowe v. Total Action Against Poverty*,
145 F.3d 653 (4th Cir. 1998) ...................................................................... 30

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) ...................................................................... 56

*Erickson v. Pardus*,
127 S. Ct. 2197 (2007) ........................................................................... 20, 21

*Estate of Torres v. Terhune*,
No. S982211WBSGGH, 2002 WL 32107950 (E.D. Cal. Jan. 9, 2002) ............... 93

*Eubanks v. Gerwen*,
40 F.3d 1157 (11th Cir. 1994) .................................................................... 46

*Evans v. Chichester Sch. Dist.*,
533 F. Supp. 2d 523 (E.D. Pa. 2008).............................................................. 85

*Fiacco v. Rensselaer*,
783 F.2d 319 (2d Cir. 1986) ........................................................................ 57

*Franks v. Delaware*,
    438 U.S. 154 (1978) ............................................................... 32, 78, 80

*Gallo v. City of Philadelphia*,
    161 F.3d 217 (3d Cir. 1998) .......................................................... 36, 78

*Gay v. Wall*,
    761 F.2d 175 (4th Cir. 1985) ............................................................. 38

*Gillespie v. Dimensions Health Corp.*,
    369 F. Supp. 2d 636 (D. Md. 2005) ................................................... 118

*Gobel v. Maricopa County*,
    867 F.2d 1201 (9th Cir. 1989) ....................................................... 26, 35

*Goncalves v. Reynolds*,
    198 F. Supp. 2d 278 (W.D.N.Y. 2001) ................................................. 26

*Green v. City of New York*,
    465 F.3d 65 (2d Cir. 2006) ............................................................... 57

*Green v. Maroules*,
    211 F. App'x 159 (4th Cir. 2006) .................................................... 30, 93

*Gregory v. City of Louisville*,
    444 F.3d 725 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 962 (2007) ...... 22, 27, 28, 32

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971) ..................................................................... 83, 93

*Griffin v. City of Opa-Locka*,
    261 F.3d 1295 (11th Cir. 2001) ..................................................... 59, 60

*Hafner v. Brown*,
    983 F.2d 570 (4th Cir. 1992) ............................................................. 44

*Harrison v. KVAT Food Management*,
    766 F.2d 155 (4th Cir. 1985) ............................................................. 95

*Hall v. Marion Sch. Dist. No. 2*,
    31 F.3d 183 (4th Cir. 1994) ........................................................... 50, 51

*Hand v. Gary*,
838 F.2d 1420 (5th Cir. 1988) .......................................................... 43

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ......................................................................... 72

*Harris v. Bornhurst*,
513 F.3d 503 (6th Cir. 2008) ..................................................... 33, 80

*Harris v. City of Va. Beach*,
11 F. App'x 212 (4th Cir. 2001) ...................................................... 68

*Heffernan v. Hunter*,
189 F.3d 405 (3d Cir. 1999) ........................................................... 90

*Higgins v. Spence & Spence*,
No: 5:07-CV-33-D, 2008 WL 506187 (E.D.N.C. Feb. 21, 2008) .......... 85

*Hinkle v. City of Clarksburg*,
81 F.3d 416 (4th Cir. 1996) ...................................................... 82, 86

*Hope v. Pelzer*,
536 U.S. 730 (2002) .................................................................. 73, 75

*Hoover v. Keith*,
No. 1:04CV1047, 2005 WL 3164107 (M.D.N.C. Jan. 5, 2005) ........... 26

*Imbler v. Pachtman*,
424 U.S. 409 (1976) .................................................................. 24, 25

*Jackson v. Blue Dolphin Commc'ns of N.C., LLC*,
226 F. Supp. 2d 785 (W.D.N.C. 2002) ........................................... 104

*Jasinski v. Adams*,
781 F.2d 843 (11th Cir. 1986) ........................................................ 66

*Jean v. Collins*,
221 F.3d 656 (4th Cir. 2000) (en banc) ...................................... 33, 80

*Jolly v. Acad. Collection Serv., Inc.*,
400 F. Supp. 2d 851 (M.D.N.C. 2005) ........................................... 108

*Jones v. City of Chicago*,
856 F.2d 985 (7th Cir. 1988) ...................................................... 39, 42, 66

*Jones v. Wellham*,
104 F.3d 620 (4th Cir. 1997) ........................................................... 56

*Jordan by Jordan v. Jackson*,
15 F.3d 333 (4th Cir. 1994) ..................................................... 50, 51, 56

*Joseph v. Patterson*,
795 F.2d 549 (6th Cir. 1986) ........................................................... 26

*Kalina v. Fletcher*,
522 U.S. 118 (1997) ................................................................... 78, 80

*Karadi v. Dillards, Inc.*,
No. 5:98-CV-709-BR(2), 1999 WL 1939997 (E.D.N.C. Feb. 19, 1999),
*vacated on other grounds sub nom.*
*Karadi v. Jenkins*, 7 F. App'x 185 (4th Cir. 2001) (per curiam) ................ 100, 103

*Keko v. Hingle*,
318 F.3d 639 (5th Cir. 2003) ........................................................... 29

*Kentucky v. Graham*,
473 U.S. 159 (1985) ................................................................. 114, 115

*Kinzer v. Jackson*,
316 F.3d 139 (2d Cir. 2003) ........................................................... 38

*Kjellson v. Mills*,
No. 07-11918, 2008 WL 451882 (11th Cir. Feb. 21, 2008) .......................... 32, 38

*Kompare v. Stein*,
801 F.2d 883 (7th Cir. 1986) ........................................................... 43

*Kush v. Rutledge*,
460 U.S. 719 (1983) ..................................................................... 89

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v.*
*Stop Treaty Abuse-Wisconsin, Inc.*,
41 F.3d 1190 (7th Cir. 1994) ......................................................... 93-94

*Lambert v. Williams*,
223 F.3d 257 (4th Cir. 2000) .......................................................... 31, 75

*Lavender v. W. Va. Reg'l Jail & Corr. Facility Auth.*,
No. 3:06-1032, 2008 WL 313957 (S.D.W. Va. Feb. 4, 2008) ............................. 66

*Lewellen v. Raff*,
843 F.2d 1103 (8th Cir. 1988) ........................................................... 89

*Lohr v. Ass'n of Catholic Teachers, Local 1776*,
416 F. Supp. 619 (E.D. Pa. 1976) ........................................................ 98

*Love-Lane v. Martin*,
355 F.3d 766 (4th Cir. 2004) .......................................................... 50, 51

*Lyles v. Sparks*,
79 F.3d 372 (4th Cir. 1996) .............................................................. 25

*Malley v. Briggs*,
475 U.S. 335 (1986) .................................................................... 42

*Mapp v. Ohio*,
367 U.S. 643 (1961) .................................................................... 31

*Marrero v. City of Hialeah*,
625 F.2d 499 (5th Cir. 1980) ............................................................ 35

*Maryland v. Wilson*,
519 U.S. 408 (1997) .................................................................... 36

*Mazloum v. District of Columbia*,
442 F. Supp. 2d 1 (D.D.C. 2006) ..................................................... 88-89

*McAndrew v. Lockheed Martin Corp.*,
206 F.3d 1031 (11th Cir. 2000) .......................................................... 90

*McCord v. Bailey*,
636 F.2d 606 (D.C. Cir. 1980) ........................................................... 90

*McDonald v. Santa Fe Trail Transp. Co.*,
427 U.S. 273 (1976) .................................................................... 96

**Page**

*McGhee v. Pottawattamie County,*
    514 F.3d 739 (8th Cir. 2008) ................................................................ 34, 78, 80

*McMillian v. Monroe County,*
    520 U.S. 781 (1997) ................................................................................... 53, 54

*Memphis Cmty. Sch. Dist. v. Stachura,*
    477 U.S. 299 (1986) .......................................................................................... 37

*Miller v. Prince George's County,*
    475 F.3d 621 (4th Cir.), *cert. denied*, 128 S. Ct. 109 (2007) .......................... 32, 39

*Monell v. Department of Social Services of City of New York,*
    436 U.S. 658 (1978) ................................ 46, 47, 48, 49, 50, 54, 55, 57, 61, 69, 114

*Mylan Labs., Inc. v. Matkari,*
    7 F.3d 1130 (4th Cir. 1993) ............................................................................... 20

*Neil v. Biggers,*
    409 U.S. 188 (1972) .......................................................................................... 77

*Neitzke v. Williams,*
    490 U.S. 319 (1989) .......................................................................................... 22

*Newport v. Fact Concerts, Inc.,*
    453 U.S. 247 (1981) ........................................................................................ 120

*Oklahoma City v. Tuttle,*
    471 U.S. 808 (1985) .......................................................................................... 55

*Ortega v. Merit Ins. Co.,*
    433 F. Supp. 135 (N.D. Ill. 1977) ...................................................................... 94

*Owens ex rel. Owens v. Lott,*
    372 F.3d 267 (4th Cir. 2004) .................................................................. 73, 74, 81

*Park v. City of Atlanta,*
    120 F.3d 1157 (11th Cir. 1997) .............................................................. 95, 96, 97

*Paul v. Davis,*
    424 U.S. 693 (1976) .................................................................................... 34, 35

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986) .......................................................48, 49-50, 51, 52, 53, 54, 70

*Phillips v. County of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) .................................................................. 21

*Phillips v. Mabe*,
    367 F. Supp. 2d 861 (M.D.N.C. 2005).......................................... 20, 22, 52, 83, 94

*Pierce v. Gilchrist*,
    359 F.3d 1279 (10th Cir. 2004) ............................................................. 29, 73, 79

*Price v. City of Charlotte*,
    93 F.3d 1241 (4th Cir. 1996) ................................................................. 37

*Pruitt v. Pernell*,
    360 F. Supp. 2d 738 (E.D.N.C. 2005),
    *aff'd*, 173 F. App'x 298 (4th Cir. 2006) ............................................................. 66

*Pryor v. Debnam*,
    No. 5:98CV613, 1999 WL 1939989 (E.D.N.C. Mar. 22, 1999)........................... 69

*Randall v. Prince George's County*,
    302 F.3d 188 (4th Cir. 2002)........................................................... 37, 69

*Randall v. United States*,
    30 F.3d 518 (4th Cir. 1994) ............................................................. 20

*Reaves v. Town of Fair Bluff*,
    No. 7:03-CV-103, 2005 U.S. Dist. LEXIS 43084 (E.D.N.C. May 12, 2005)........ 68

*Reed v. Buckeye Fire Equip.*,
    241 F. App'x 917 (4th Cir. 2007) (per curiam).......................................... 104, 105

*Reed v. City of Chicago*,
    77 F.3d 1049 (7th Cir. 1996) ............................................................. 43

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) ......................................................................... 95

*Revene v. Charles County Comm'rs*,
    882 F.2d 870 (4th Cir. 1989)............................................................. 22

*Rhodes v. Smithers*,
939 F. Supp. 1256 (S.D.W. Va. 1995),
*aff'd per curiam*, 91 F.3d 132 (4th Cir. 1996) ............................................. 46, 89, 92

*Ridpath v. Bd. of Governors Marshall Univ.*,
447 F.3d 292 (4th Cir. 2006) ................................................................. 99

*Rodriguez v. Smithfield Packing Co.*,
338 F.3d 348 (4th Cir. 2003) ................................................................. 70

*Rogers v. Jefferson-Pilot Life Ins. Co.*,
883 F.2d 324 (4th Cir. 1989) ................................................................. 20

*Rogers v. Pendleton*,
249 F.3d 279 (4th Cir. 2001) ....................................................... 32, 36, 40

*Sanders v. English*,
950 F.2d 1152 (5th Cir. 1992) ............................................................... 38

*Sara Lee Corp. v. Kayser-Roth Corp.*,
No. 92-460, 1995 U.S. Dist. LEXIS 6554 (M.D.N.C. Apr. 10, 1995) ................. 85

*Saucier v. Katz*,
533 U.S. 194 (2001) ............................................................................ 72

*Shaw v. Stroud*,
13 F.3d 791 (4th Cir. 1994) ............................................. 60, 65, 66-67, 69

*Silkwood v. Kerr-McGee Corp.*,
460 F. Supp. 399 (W.D. Okla. 1978), *aff'd*, 637 F.2d 743 (10th Cir. 1980) ......... 88

*Simmons v. Poe*,
47 F.3d 1370 (4th Cir. 1995) ..................................................... 84, 85, 88

*Simpson v. Life Investors Ins. Co. of Am.*,
367 F. Supp. 2d 875 (M.D.N.C. 2005) ............................................... 61, 63

*Slakan v. Porter*,
737 F.2d 368 (4th Cir. 1984) ......................................... 65, 66-67, 68, 69

*Smith v. Wade*,
461 U.S. 30 (1983) ........................................................................... 120

*Sorlucco v. NYPD*,
971 F.2d 864 (2d Cir. 1992) .................................................................. 55

*Spell v. McDaniel*,
824 F.2d 1380 (4th Cir. 1987) ............................................................... 57

*Spurlock v. Satterfield*,
167 F.3d 995 (6th Cir. 1999) ........................................................... 22, 27

*Stevens v. Rifkin*,
608 F. Supp. 710 (N.D. Cal. 1984) ........................................................ 35

*Stevens v. Tillman*,
568 F. Supp. 289 (N.D. Ill. 1983) .......................................................... 95

*Suarez Corp. Indus. v. McGraw*,
125 F.3d 222 (4th Cir. 1997) ................................................................. 23

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002) .............................................................................. 20

*Trerice v. Summons*,
755 F.2d 1081 (4th Cir. 1985) ............................................................... 96

*United States v. McCoy*,
513 F.3d 405 (4th Cir. 2008) ................................................................. 36

*United States v. Price*,
383 U.S. 787 (1966) .............................................................................. 62

*United States v. Waldon*,
363 F.3d 1103 (11th Cir. 2004) ............................................................. 43

*United States v. Williams*,
504 U.S. 36 (1992) .......................................................................... 43, 90

*Univ. Gardens Apartments Joint Venture v. Johnson*,
419 F. Supp. 2d 733 (D. Md. 2006) ....................................................... 35

*Velez v. Levy*,
401 F.3d 75 (2d Cir. 2005) .................................................................... 35

**Page**

*Veney v. Wyche,*
293 F.3d 726 (4th Cir. 2002) ........................................................ 20, 43, 46, 86, 119

*Vill. of Riverdale v. 138th St. Joint Venture,*
527 F. Supp. 2d 760 (N.D. Ill. 2007) .................................................................. 21

*Wagenmann v. Adams,*
829 F.2d 196 (1st Cir. 1987) ............................................................................. 42

*Walker v. Thompson,*
288 F.3d 1005 (7th Cir. 2002) ........................................................................... 85

*Waller v. Butkovich,*
584 F. Supp. 909 (M.D.N.C. 1984) ............................................................... 86, 97

*Waller v. Butkovich,*
605 F. Supp. 1137 (M.D.N.C. 1985) ............................................................. 94-95

*Warner v. Greenbaum, Doll & McDonald,*
104 F. App'x 493 (6th Cir. 2004) ....................................................................... 89

*Washington v. Wilmore,*
407 F.3d 274 (4th Cir. 2005) ....................................................... 34, 42, 44, 76, 78

*West v. Atkins,*
487 U.S. 42 (1988) ............................................................................................ 62

*W.E.T. v. Mitchell,*
No. 1:06CV487, 2007 WL 2712924 (M.D.N.C. Sept. 14, 2007) ...................... 114

*White v. Frank,*
855 F.2d 956 (2d Cir. 1988) ............................................................................. 42

*Whiting v. Traylor,*
85 F.3d 581 (11th Cir. 1996) ............................................................................ 41

*Williams v. Rappeport,*
699 F. Supp. 501 (D. Md. 1988),
*aff'd sub nom. Williams v. Dvoskin,* 879 F.2d 863 (4th Cir. 1989) ...................... 27

*Wilson v. Kittoe,*
337 F.3d 392 (4th Cir. 2003) ................................................................... 72, 73, 74

*Wilson v. Layne*,
    526 U.S. 603 (1999) ....................................................................... 74

*Wilson-Cook Med., Inc. v. Wilson*,
    942 F.2d 247 (4th Cir. 1991) ......................................................... 63

*Wood v. Kesler*,
    323 F.3d 872 (11th Cir. 2003) ....................................................... 38

*Yarris v. County of Delaware*,
    465 F.3d 129 (3d Cir. 2006) .......................................................... 29

*Zahrey v. Coffey*,
    221 F.3d 342 (2d Cir. 2000) ..................................................... 34, 45

## STATE CASES

*Becker v. Pierce*,
    608 S.E.2d 825 (N.C. Ct. App. 2005) ..................................... 101, 102

*Best v. Duke Univ.*,
    448 S.E.2d 506 (N.C. 1994) .................................................. 102, 103

*Block v. County of Person*,
    540 S.E.2d 415 (N.C. Ct. App. 2000) ........................................... 112

*Briggs v. Rosenthal*,
    327 S.E.2d 308 (N.C. Ct. App. 1985) ........................................... 108

*Broughton v. McClatchy Newspapers, Inc.*,
    588 S.E.2d 20 (N.C. Ct. App. 2003) ............................................ 104

*Burgess v. Busby*,
    544 S.E.2d 4 (N.C. Ct. App. 2001) ........................................ 104, 105

*Colvard v. Francis*,
    416 S.E.2d 579 (N.C. Ct. App. 1992) ........................................... 101

*Cook v. Lanier*,
    147 S.E.2d 910 (N.C. 1966) ............................................ 100, 102, 103

**Page**

*Corum v. Univ. of N.C.*,
413 S.E.2d 276 (N.C. 1992) ............................................................. 119

*Dickens v. Puryear*,
276 S.E.2d 325 (N.C. 1981) ............................................................. 108

*Grant v. High Point Reg'l Health Sys.*,
645 S.E.2d 851 (N.C. Ct. App. 2007) ............................................... 104

*Harris v. Barham*,
239 S.E.2d 717 (N.C. Ct. App. 1978) ............................................... 100

*Hart v. Ivey*,
420 S.E.2d 174 (N.C. 1992) ........................................................110-11

*Henry v. Deen*,
310 S.E.2d 326 (N.C. 1984) ............................................................. 104

*Herndon v. Barrett*,
400 S.E.2d 767 (N.C. Ct. App. 1991) ............................................... 112

*Hill v. Hill*,
553 S.E.2d 679 (N.C. 2001) (per curiam),
*rev'g* 545 S.E.2d 442 (N.C. Ct. App. 2001) ................................... 103

*Hogan v. Forsyth Country Club Co.*,
340 S.E.2d 116 (N.C. Ct. App. 1986) .........................................61, 108

*Hung Nguyen v. Burgerbusters, Inc.*,
642 S.E.2d 502 (N.C. Ct. App. 2007) .......................................101, 102

*In re Kivett*,
309 S.E.2d 442 (N.C. 1983) ..............................................103-04, 105, 106

*James River Equip., Inc. v. Mecklenburg Utils., Inc.*,
634 S.E.2d 557 (N.C. Ct. App. 2006) ............................................... 109

*Johnson v. Colonial Life & Accident Ins. Co.*,
618 S.E.2d 867 (N.C. Ct. App. 2005) ............................................... 108

*Jones v. City of Durham*,
643 S.E.2d 631 (N.C. Ct. App. 2007) .........................103, 104, 105, 110

*Jones v. Gwynne*,
    323 S.E.2d 9 (N.C. 1984) ...................................................................101-02, 103

*Medlin v. Bass*,
    398 S.E.2d 460 (N.C. 1990) ............................................................................. 112

*Moore v. City of Creedmoor*,
    460 S.E.2d 899 (N.C. Ct. App. 1995),
    *aff'd in part and rev'd in part*, 481 S.E.2d 14 (N.C. 1997) ......................... 100, 115

*Moore v. Evans*,
    476 S.E.2d 415 (N.C. Ct. App. 1996) ............................................. 39, 99, 103, 114

*Mozingo v. Pitt County Mem'l Hosp., Inc.*,
    415 S.E.2d 341 (N.C. 1992) ............................................................................ 112

*Munick v. City of Durham*,
    106 S.E. 665 (N.C. 1921) ................................................................................. 61

*Norman v. Nash Johnson & Sons' Farms, Inc.*,
    537 S.E.2d 248 (N.C. Ct. App. 2000) .............................................................. 109

*Palsgraf v. Long Island R.R. Co.*,
    162 N.E. 99 (N.Y. 1928) ................................................................................. 111

*Peal ex rel. Peal v. Smith*,
    444 S.E.2d 673 (N.C. Ct. App. 1994), *aff'd*, 457 S.E.2d 599 (N.C. 1995) .......... 112

*Saxon v. Smith*,
    479 S.E.2d 788 (N.C. Ct. App. 1997) .......................................... 100, 101, 102, 103

*Scarborough v. Dillard's, Inc.*,
    590 S.E.2d 477 (N.C. Ct. App. Jan. 20, 2004) (table),
    *available at* 2004 WL 77764 ..................................................................... 101, 102

*Sharp v. Miller*,
    468 S.E.2d 799 (N.C. 1996) .............................................................................. 27

*Shillington v. K-Mart Corp.*,
    402 S.E.2d 155 (N.C. Ct. App. 1991) ............................................................... 108

*Smith v. Jackson County Bd. of Educ.*,
608 S.E.2d 399 (N.C. Ct. App. 2005) .............................................. 112

*Stanley v. Moore*,
454 S.E.2d 225 (N.C. 1995) ............................................................ 109

*State v. Oliver*,
274 S.E.2d 183 (N.C. 1981) ..............................................................77

*State v. Richardson*,
402 S.E.2d 401 (N.C. 1991) ..............................................................77

*State v. Rogers*,
315 S.E.2d 492 (N.C. Ct. App. 1984) .............................................. 105

*Stein v. Asheville City Bd. of Educ.*,
626 S.E.2d 263 (N.C. 2006) ..................................................... 110, 111

*Thomas v. Sellers*,
542 S.E.2d 283 (N.C. Ct. App. 2001) ....................................... 100, 103

*West v. King's Department Store, Inc.*,
365 S.E.2d 621 (N.C. 1988) ..................................................... 107, 109

*Williams v. Kuppenheimer Mfg. Co.*,
412 S.E.2d 897 (N.C. Ct. App. 1992) .......................................... 99, 102

*Winters v. Lee*,
446 S.E.2d 123 (N.C. Ct. App. 1994) .............................................. 111

*Woodson v. Rowland*,
407 S.E.2d 222 (N.C. 1991) ............................................................. 62

# STATUTES

**Page**

U.S. Const. amend. IV ............30, 31, 32, 33, 34, 35-36, 37, 38, 39, 46, 58, 78, 80, 82, 119

U.S. Const. amend. XIV ....................................................30, 31, 34, 36-37, 46, 119

42 U.S.C. § 1981 (2000)................................................................................. 95

42 U.S.C. § 1982 (2000)............................................................................. 93, 94

42 U.S.C. § 1983 (2000)............................................................................ *passim*

42 U.S.C. § 1985 (2000)....18, 19, 46, 60, 84, 85, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98

    42 U.S.C. § 1985(2).........................................18, 19, 82, 83, 84, 89, 90, 91, 92, 93

    42 U.S.C. § 1985(3).............................................19, 82, 83, 85, 88, 92, 93, 94, 95

42 U.S.C. § 1986 (2000)......................................... 19, 46, 60, 82, 84, 96, 97, 119

Fed. R. Civ. P. 8(a)(2) ............................................................................ 21, 85

Fed. R. Civ. P. 12(b)(6) ........................................................................... 20, 22

Fed. R. Civ. P. 26(a)(2) ................................................................................ 29

Fed. R. Evid. 201 ........................................................................................ 63

    Fed. R. Evid. 201(b)(1)........................................................................... 63

    Fed. R. Evid. 201(b)(2)........................................................................... 63

Fed. R. Evid. 404(b) .................................................................................... 37

N.C. Const., art. I, § 19............................................................................... 119

N.C. Gen. Stat. Ann. § 7A-61 ........................................................................ 52

Ohio Rev. Code Ann. § 309.08(A)................................................................... 52

Ohio Rev. Code Ann. § 309.09(A)................................................................... 52

## FEDERAL COURT DOCUMENTS

Page

Complaint, *Antonio v. Moore*, No. 03-1560-AM (E.D. Va. filed Dec. 17, 2003)
(attached as Exhibit 2) ............................................................................ 40

Complaint, *Hoover v. Keith*, No. 1:04CV1047
(M.D.N.C. filed Nov. 9, 2004) (attached as Exhibit 1) ........................................ 26

## MISCELLANEOUS

Charles Nagy, 67 C.J.S. *Obstructing Justice* §§ 1, 2 (1978) ............................................ 104

*DNA Lab Chief Who Worked on Duke Lacrosse Case Leaves Job,*
*A.P. State & Local Wire*, Nov. 13, 2007 .............................................................. 117

Mary G. Leary, *Obstructing Justice,*
*in Strong's North Carolina Index 4th* § 15 (Feb. 2008) ........................................ 104

Matt Dees, *Baker To Depart as City Manager,*
*News & Observer*, Dec. 12, 2007, at A1 .............................................................. 117

Matt Dees & Joseph Neff, *Review of Lacrosse Case Halted,*
*News & Observer*, Aug, 28, 2007, at A1 .............................................................. 117

Michael Avery et al., Police Misconduct §§ 13:9-13:10 (3d ed. 2006) ........................... 37

Stanley B. Chambers, Jr., *26 Officers Gain Promotions in Durham Police Department,*
*News & Observer*, Nov. 24, 2007, at B3 .............................................................. 117

The Amended Complaint describes the intentional misconduct during the investigation of the "Duke lacrosse case" that caused Plaintiffs David F. Evans, Collin Finnerty, and Reade Seligmann, to be indicted and arrested on false charges of rape, sexual assault, and kidnapping, and to be prosecuted for over a year. The alleged misconduct was brazen and far-reaching: police officers, investigators, forensic scientists, and public officials are alleged to have conspired to charge and arrest three innocent men and, in furtherance of this scheme, to have fabricated false evidence, concealed evidence of Plaintiffs' actual innocence and the lack of probable cause to indict them, intimidated witnesses, and issued public statements falsely proclaiming, among other things, that there was "no doubt" the charges were true.

In response to Plaintiffs' allegations, Defendants have filed a series of motions to dismiss the Amended Complaint (the "Motions"), each making the remarkable assertion that Defendants cannot be held accountable for such misconduct *as a matter of law*. These arguments are fundamentally flawed, however, either because they rely on a mischaracterization of Plaintiffs' allegations, or because they depend on propositions of law that do not exist or are inapplicable on the facts alleged. On the principal question presented by each of the Motions—do the allegations of the Amended Complaint, taken as true, state claims upon which relief can be granted against each of the Defendants under the federal civil rights laws and North Carolina law—the answer is plainly yes.[1]

---

[1] This Consolidated Opposition brief is filed pursuant to the Court's Order of November 29, 2007, which authorizes Plaintiffs to file a single consolidated brief that exceeds the page limits in Local Rule 7.3(d), "so long as no more than 50 pages of briefing are devoted to arguments exclusively raised by a single Defendant's or group of Defendants' motion." Order of Nov. 29, 2007 (Doc. No. 25). The individual Defendants' briefs are cited herein as "Addison Br.," "Gottlieb Br.," "Himan Br.," and "Wilson Br." The City of Durham's brief is cited as "City Br."; the DSI Defendants' brief is cited as "DSI Br."; and the Supervisory Defendants' brief is cited as "SD Br."

## STATEMENT OF THE CASE

### A.     Overview of the Amended Complaint

The Amended Complaint alleges that between March 15, 2006, and April 11, 2007, Defendants "maliciously conspired to bring charges of rape, sexual assault, and kidnapping" against Plaintiffs David Evans, Collin Finnerty, and Reade Seligmann, all the while knowing that "these charges were completely and utterly unsupported by probable cause, and instead rested on the claims of a mentally troubled, drug prone exotic dancer that were contradicted time and again by physical evidence, documentary evidence, other witnesses, and even the accuser herself." Am. Compl. ("AC") ¶ 2. The Duke lacrosse case was "one of the most chilling episodes of premeditated police, prosecutorial, and scientific misconduct in modern American history," *id*. ¶ 1, and with good reason, because the misconduct alleged in the Amended Complaint required the coordinated misconduct of a prosecutor, police investigators, forensic scientists, and supervisory officials at the highest levels of the City of Durham.

The Amended Complaint alleges that Defendants were so determined to charge and arrest three Duke lacrosse players that they willfully ignored, or were deliberately indifferent to, the overwhelming evidence of Plaintiffs' actual innocence and the lack of probable cause against them. *Id*. ¶ 2. Instead, Defendants exploited the accuser's inconsistent and demonstrably false allegations, first, as part of a media campaign by Nifong and Durham Police that was intended to inflame racial tensions in the Durham community. *Id*. ¶ 3. Then, with an outraged Durham citizenry, and a nation, demanding arrests, "but with no evidence that any players had actually committed a crime, Defendants set about to fabricate such evidence. And, when scientific testing threatened to expose the truth by reaffirming that the accuser was lying and that no crime

had occurred, Defendants conspired to conceal this exculpatory evidence in order to charge and convict the Plaintiffs on 'facts' they knew to be untrue." *Id*.

As a result of Defendants' misconduct, Plaintiffs were unlawfully seized without probable cause pursuant to indictments obtained against Seligmann and Finnerty on April 17, 2006 (the "April 17 Indictments") and against Evans on May 15, 2006 (the "May 15 Indictment"); they suffered substantial economic, emotional, and physical harm; they suffered irreparable harm to their reputations; and they incurred "millions of dollars in legal fees defending themselves against criminal prosecutions that the Defendants knew were baseless." *Id*. ¶¶ 4, 212-222, 238-242.

## B. The Defendants

The Amended Complaint alleges misconduct by three groups of Defendants:

1. <u>The City of Durham Defendants</u>:  (a) the two Durham Police investigators (Mark Gottlieb and Benjamin Himan) and the Durham Police spokesperson (David Addison) who are alleged to have engaged in the misconduct at issue; (b) the "Supervisory Defendants," which include the Durham City Manager (Patrick Baker), the Chief of Police (Steven Chalmers), three members of the Durham Police command staff (Ronald Hodge, Lee Russ, and Beverly Council), and Gottlieb's and Himan's immediate supervisors (Jeff Lamb and Michael Ripberger), each of whom is alleged to have approved, ratified, or directly engaged in the misconduct at issue despite knowledge of the lack of probable cause against Plaintiffs; and (c) the City of Durham (the "City").

2. <u>The District Attorney Defendants</u>:  (a) the former District Attorney Michael Nifong, who is alleged to have engaged in the misconduct at issue while directing the Durham Police investigation pursuant to a delegation of authority by the

Supervisory Defendants; and (b) Linwood Wilson, Nifong's investigator, who is alleged to have engaged in certain misconduct while acting in an investigatory capacity. (Nifong has been dismissed from the case pending the disposition of his bankruptcy petition.)

3.    The DSI Defendants:  (a) DNA Security, Inc. ("DSI"), the private DNA laboratory that was retained to provide forensic analysis for the police investigation; (b) Richard Clark, DSI's President and controlling shareholder; and (c) Brian Meehan, DSI's former Laboratory Director.  Clark and Meehan are each alleged to have engaged in the DNA-related misconduct at issue.

## C.    Summary of Relevant Allegations

The allegations regarding Defendants' misconduct take up roughly 100 pages of the Amended Complaint, and it would be neither efficient nor appropriate to restate them all here.  For purposes of the instant Motions, Plaintiffs summarize some of the allegations that are relevant to Defendants' arguments:

### 1.    The Fatal Contradictions in the Accuser's Claims

The Amended Complaint alleges that the claims of the accuser, Crystal Mangum, were so patently incredible and demonstrably false that they were contradicted time and again "by physical evidence, documentary evidence, other witnesses, and even the accuser herself."  AC ¶ 2.  The facts known to Defendants established that there was absolutely no basis to support Mangum's claims, let alone probable cause to support indictments or seizures of Plaintiffs.

Even in the first hours and days, it was obvious to Durham Police that Mangum was making a false rape claim to avoid being involuntarily held for her bizarre behavior after leaving a party at 610 North Buchanan Street in Durham ("610 N. Buchanan").  Id. ¶ 46-50.  Within minutes of her initial rape claim, Mangum immediately

recanted to the first Durham Police officer who interviewed her. *Id.* ¶ 52. Within the first 48 hours, Mangum provided several "wildly conflicting and patently implausible statements" regarding the circumstances of the alleged rape, *id.* ¶ 57, inventing key details that were "precisely the opposite" of what she had said just a day before, *id.* ¶ 64. At different times, she claimed that she had been raped by anywhere from three to twenty different men. *Id.* ¶ 58. Indeed, the first Durham Police officers who responded "were so convinced that Mangum's rape claim was a hoax that they were overheard stating that if any charges were brought relating to the party, they would not exceed misdemeanor assault," *id.* ¶ 66, and the first Durham Police investigator assigned to Mangum's claim had concluded "that there was no evidence to proceed with a criminal investigation and that the file would be closed," *id.* ¶ 80. But rather than close the file, Durham Police reassigned the case to Gottlieb, an investigator with a known history of misconduct towards students at Duke University, and Himan, a rookie investigator. *Id.* ¶¶ 81-84.

Even after Mangum had settled on a "final" version of events—that she was purportedly raped at a bachelor party by three men named "Adam," "Brett," and "Matt," none of whom wore condoms and each of whom ejaculated inside her—Mangum's account continued to be entirely contradicted by medical examinations, forensic analysis, other witnesses, and even Mangum herself. For example:

- Mangum *continued* to change critical details in subsequent interviews and statements, including, among other things, (a) the purported sexual acts performed by each of her alleged assailants; (b) the identity of the purported "bachelor"; (c) the identity of the assailant who supposedly told her, "Sweetheart, you can't leave [the bathroom]"; (d) whether the names "Adam," "Brett," and "Matt" were actual names or aliases used by the purported assailants; and (e) whether the second dancer at the party, Kim Pittman, was an

aider and abettor, a passive witness, or herself a victim of the purported rape, *id*. ¶¶ 101-102;[2]

- Mangum provided descriptions of the purported rapists that did not match Plaintiffs, *id*. ¶ 92;

- The medical examinations of Mangum "produced no physical or medical evidence consistent with either rape or the traumatic assault Mangum had claimed." These examinations were instead consistent with Mangum's consensual sexual activity with her driver, Jarriel Johnson, and with other men whom Johnson had described to Durham Police, *id*. ¶¶ 70, 72-73;

- Pittman, the other dancer, told Durham Police and others that Mangum's allegations were a "crock" and that there was no opportunity for an assault to have occurred, *id*. ¶¶ 86-87, 259;

- During photo arrays on March 16 and 21, 2006 (the "March Photo Arrays"), in which Mangum was shown pictures of 36 Duke lacrosse players, including Evans and Seligmann, Mangum not only failed to identify any player as one of her purported attackers, but she even purported to "recognize" a player from the party whom Durham Police knew was never there, *id*. ¶¶ 93-94, 96, 98;

- Forensic analysis of Mangum's rape kit by the State Bureau of Investigation ("SBI") crime lab found no evidence of "semen, blood, or saliva on any of the rape kit items," or anything else to corroborate her claims, *id*. ¶ 76;

- Subsequent forensic analysis of Mangum's rape kit by the DSI Defendants identified DNA from at least four different men who were not members of the Duke lacrosse team, and excluded Plaintiffs and every member of the team from the rape kit items with 100% certainty, *id*. ¶¶ 77, 206; and

- Durham Police learned that Mangum had a few years earlier "made a remarkably similar allegation—that she had been the victim of a purported gang rape by three men," *id*. ¶ 105.

---

[2] A chart summarizing some of these obvious contradictions appears at Paragraph 102 of the Amended Complaint.

The Amended Complaint alleges not only that Defendants were aware of these fatal flaws in Mangum's claims and the lack of probable cause against Plaintiffs, *see, e.g.*, *id.* ¶¶ 78-79, 89-90, 99-100, 103-104, 106-107, 210-211, but also that some of them candidly admitted it. For example, when Nifong was briefed on the overwhelming evidence showing Mangum's claims were false, he crudely told Gottlieb and Himan, "You know, we're f*cked." *Id.* ¶ 138. And when Himan was approached about seeking indictments of Seligmann and Finnerty, he asked, bluntly, "With what?" *Id.* ¶ 220.

### 2. The Supervisory Defendants' Delegation of Authority to Nifong

The Amended Complaint also alleges that the wrongdoing resulted in large part from the Supervisory Defendants' decision to delegate authority to Nifong to direct the Durham Police investigation and their instructions to Gottlieb and Himan to take direction from Nifong instead of, or in addition to, the usual Durham Police chain of command. *Id.* ¶¶ 131-133, 401-405. The Supervisory Defendants' delegation of this investigative authority to Nifong, a prosecutor, was all the more remarkable because Nifong at the time was engaged in a hotly-contested campaign for District Attorney and thus was in a position to exploit Mangum's high-profile, racially-charged rape allegations for his personal political gain. *Id.* ¶ 132.

Nifong wasted no time in doing exactly that. Immediately after his first meeting with the Durham Police investigators, Nifong commenced a series of nearly 100 media interviews in which he variously stated, among other things, that he had "no doubt" that three members of the Duke lacrosse team had engaged in a vicious and racially-motivated gang rape and that the Duke lacrosse team was a gang of "hooligans" who had not cooperated with authorities but, instead, had engaged in a "stone wall of silence" (the "Nifong Statements"). *Id.* ¶ 146. These statements were complemented by

similarly false and inflammatory statements by Durham Police, including Hodge, the Deputy Chief of Police, and Addison, the official Durham Police spokesperson. Beginning on March 24, 2006, Addison and Hodge made a series of public statements in which they, like Nifong, stated falsely that Mangum had been brutally assaulted by members of the Duke lacrosse team and that the members of the lacrosse team were refusing to cooperate with the investigation (the "Durham Police Statements"). *Id*. ¶ 159.[3] These statements not only foreclosed any objective search for truth; they were intended to inflame the public, and specifically the grand jury pool, by branding any three Duke lacrosse players they wanted to arrest as violent sex offenders whose guilt was already established beyond doubt. *Id*. ¶ 162.

The Amended Complaint alleges that Nifong also exploited his authority over the Durham Police investigation to direct Gottlieb, Himan, and others to fabricate false evidence, conceal evidence of Plaintiffs' innocence, and intimidate witnesses into providing false testimony to make good on his public statements and cause the arrests and prosecutions of three Duke lacrosse players. *Id*. ¶¶ 176, 210, 215, 226, 248, 258, 264. Yet, notwithstanding the Supervisory Defendants' knowledge both of Nifong's false public statements and these acts of misconduct, they did nothing to revoke Nifong's authority over the Durham Police investigation. *Id*. ¶¶ 155, 183, 211, 228, 254, 257, 264.

---

[3] Evans and the two other lacrosse players residing at 610 N. Buchanan had fully cooperated with the police search of 610 N. Buchanan, submitted to hours of voluntary interviews, provided detailed written statements, and consented to medical examinations that found no evidence to support Mangum's allegations. AC ¶¶ 108-119.

### 3.     The April Photo Array

The false, inflammatory, and racially-charged Nifong and Durham Police Statements caused many in the Durham community and the nation to believe that three white Duke lacrosse players had committed a violent and racially-motivated gang rape. The resulting public outcry and demands for arrests were so immediate and forceful that, by March 29, 2006, the Supervisory Defendants and other senior City officials had summoned Himan and Gottlieb to a series of meetings (the "March 29 Meetings") in which they ordered or otherwise pressured the investigators to obtain identifications and arrests of three white Duke lacrosse players, notwithstanding their knowledge of the fatal contradictions in Mangum's claims and the lack of probable cause that a crime had actually occurred. *Id.* ¶ 179.

This was an impossible and unreasonable demand, and not simply because Mangum's claims were false. At the time, Mangum had already been shown six different arrays of Duke lacrosse players (the "March Photo Arrays")—a total of 36 players in all, including Evans (twice) and Seligmann—and she had not identified any of them as her alleged assailants. *Id.* ¶ 93. Moreover, in addition to the contradictions detailed above, Mangum had further demonstrated her unreliability during the March Photo Arrays by claiming to recognize a player from the party whom Durham Police knew had been in Raleigh at the time. *Id.* ¶ 98.

In addition, two months earlier the Durham Police Department had implemented a written policy governing witness identification procedures, General Order No. 4077 (the "General Order"), which set forth a number of stringent requirements for photo arrays that were intended to protect constitutional rights, including the following:

- Photo array procedures must be conducted by an independent administrator, rather than the Durham Police personnel involved in the investigation;

- Persons knowing the identity of any suspects in the array should be excluded from the procedure;

- There must be at least five fillers included for each suspect in the array, and each array should begin with a filler;

- Each filler must resemble the witness's description of the alleged perpetrator in significant features such as "face, profile, height, weight, build, posture, gait, specific articles of clothing, etc.";

- Where there is an inadequate description of the perpetrator, or a suspect whose appearance differs from the description of the perpetrator, each filler must resemble the suspect in significant features such as "face, profile, height, weight, build, posture, gait, specific articles of clothing, etc.";

- Durham Police should avoid reusing the same fillers in multiple arrays shown to the same witness.

*Id.* ¶ 185. The very purpose of the General Order was to conform to recommendations issued by the North Carolina Actual Innocence Commission and endorsed by the Education and Training Committee of the North Carolina Criminal Justice Education and Training Standards Commission after several high-profile instances in which suggestive and otherwise improper identification procedures resulted in deprivations of constitutional rights. *Id.* ¶ 184.

As a result of Mangum's inherent unreliability and her performance in the March Photo Arrays, Nifong, Gottlieb, and Himan knew that they could not comply with the General Order but, instead, had to design an identification procedure that Mangum could not "fail." *Id.* ¶ 177. During a meeting on or about March 31, 2006, they agreed that, instead of a standard photo array, Gottlieb would show Mangum photographs only

of white Duke lacrosse players, without any fillers, so that Mangum could not fail to identify three players whom they could indict and arrest on rape charges. *Id.* ¶¶ 180-181.

This procedure intentionally violated several critical requirements of the General Order:

- Gottlieb conducted the April Photo Array, rather than an independent administrator;

- Gottlieb knew the identities of the suspects in the array;

- There were no fillers in the array, and the array did not begin with a filler;

- The array thus did not include fillers who resembled Mangum's description of the alleged perpetrators in significant features such as "face, profile, height, weight, build, posture, gait, specific articles of clothing, etc.";

- The array thus did not include fillers who resembled the suspects in significant features such as "face, profile, height, weight, build, posture, gait, specific articles of clothing, etc.";

- The array included the same 36 Duke lacrosse players whom Mangum had already failed to identify in the March Photo Arrays, including Evans, whose picture Durham Police had already shown to Mangum twice, and Seligmann; and

- Gottlieb signaled to Mangum at the outset that there were no fillers in the array, thus effectively informing Mangum that she could not "fail" to identify someone who was not at the party and that all she had to do was pick any three people from the array.

*Id.* ¶ 186. The Supervisory Defendants were briefed regarding the April Photo Array procedure, but notwithstanding these violations of the General Order, they approved and ratified the April Photo Array. *Id.* ¶¶ 186-187. Moreover, the Supervisory Defendants took no steps after learning of these deliberate violations of the General Order to revoke

Nifong's authority over the Durham Police investigation or to remove Gottlieb and Himan from that investigation. *Id*. ¶ 196.

The resulting procedure, in the words of Durham City Council member Eugene Brown, "was like shooting fish in a barrel." *Id*. ¶ 190. Mangum purported to identify Seligmann and Finnerty as "100%," and said that she would be "90%" certain that Evans was "one of the guys who assaulted me sort [of]," if Evans had a mustache. *Id*. ¶¶ 191-193. But notwithstanding Defendants' efforts to manufacture three foolproof "identifications," Mangum still managed to make critical errors that completely undermined the reliability of her purported identifications of Plaintiffs:

- Mangum claimed to identify Seligmann, even though she had seen his picture in March and had said only that she was 70% sure she had seen him and could not remember where—<u>not</u> that he was one of the men who raped her, *id*. ¶ 194(a);

- Mangum claimed that Seligmann was the purported assailant who "made me perform oral sex," but her prior description of that assailant ("Adam") on March 16 did not match Seligmann, *id*. ¶ 194(b);

- Mangum claimed that Finnerty was the "second one" to "put his penis in my anus and my vagina," but her March 16 description of that assailant ("Matt") also did not match Finnerty, *id*. ¶ 194(c);

- Mangum never claimed that any of the Plaintiffs resembled her purported third attacker ("Brett"), and instead claimed that a <u>fourth</u> lacrosse player looked like "Brett," *id*. ¶ 194(d);

- Mangum claimed to be "90%" certain about Evans, even though she had been shown his picture twice in the March Photo Arrays and had not identified him either time, *id*. ¶ 194(a);

- Evans did not have a mustache, *id*. ¶ 194(e);

- Mangum again identified lacrosse players whom Durham Police knew were not at the party at 610 N. Buchanan, *id.* ¶ 194(f); and

- In at least fourteen different cases, Mangum failed to recognize a lacrosse player in the April Photo Array whom she had purported to recognize in March, and vice versa, *id.* ¶ 194(g)-(h).

The Amended Complaint alleges that Nifong, Gottlieb, Himan, and the Supervisory Defendants each were aware of these critical errors, but that they willfully ignored, or were deliberately indifferent to, this evidence of Plaintiffs' innocence in their rush to arrest and charge three innocent Duke lacrosse players. *Id.* ¶¶ 195-196.

### 4. The DNA Conspiracy

The Amended Complaint also alleges that, because Mangum had alleged that none of her attackers had used condoms and that all three had ejaculated inside of her, Defendants knew that DNA testing would be critically important to confirming or disproving her already inconsistent claims and that they would have to exclude any Duke lacrosse players whose DNA was not found on Mangum's rape kit items. *Id.* ¶ 164.

Defendants soon learned, however, that finding a DNA match to any Duke lacrosse player would be impossible. By March 29, 2006, the SBI crime lab had reported that it had found no semen, blood, or saliva on any of the rape kit items, as one would have expected if Mangum's account of the purported rape had been truthful, and the SBI crime lab ultimately concluded that there was no DNA whatsoever from any player on Mangum's rape kit items or her clothing. *Id.* ¶ 76.

Undeterred, in April 2006 Durham Police personnel retained DSI, a private laboratory in Burlington, North Carolina, to conduct Y-chromosome, or Y-STR DNA testing, which is more sensitive than the autosomal DNA testing performed by the SBI crime lab. *Id.* ¶ 199. At the time, Meehan told Durham Police that DSI was so eager to

be involved in the high-profile investigation of the Duke lacrosse team that DSI was willing to cut its standard prices for the testing. *Id.* ¶ 200.

Between April 8 and 10, 2006, DSI conducted testing of Mangum's rape kit items. But instead of identifying DNA from Plaintiffs or any other member of the Duke lacrosse team on Mangum's rape kit items, DSI instead identified DNA from several *other* men, none of whom was a lacrosse player. *Id.* ¶ 206. DSI excluded with 100% certainty every member of the lacrosse team, including Plaintiffs, as being the donors of this DNA. *Id.* Even if Mangum had been telling the truth when she claimed to be the victim of a rape committed by men who were not wearing condoms and had ejaculated inside her (she was not), these DNA findings conclusively established Plaintiffs' actual innocence—and that other men would have been responsible. *Id.*

The Amended Complaint alleges that Meehan and Clark informed Nifong, Gottlieb, and Himan of these exculpatory findings during a meeting on April 10, 2006 (the "April 10 Meeting"), but instead of concluding the investigation, these Defendants agreed that they would conceal these exculpatory findings so that they could claim to have probable cause to support arrests, indictments, and prosecutions of three Duke lacrosse players on rape charges. *Id.* ¶¶ 207-208. One week later, Seligmann and Finnerty were indicted. *Id.* ¶¶ 212-213.

During subsequent meetings on April 21, 2006 (the "April 21 Meeting") and May 12, 2006 (the "May 12 Meeting"), Nifong, Gottlieb, Himan, and the DSI Defendants agreed to fabricate a false "final report of the results of all DNA testing" that would omit the exculpatory findings regarding the rape kit items, in violation of DSI's internal protocols, FBI standards, and the regulations of DSI's accrediting organizations. *Id.* ¶¶ 225, 231. The resulting report (the "May 12 Report") intentionally omitted the fact

that DNA from at least four other men was found on the rape kit items and, instead, deceptively reported that DNA consistent with Evans was found on one of Mangum's false fingernails. *Id*. ¶¶ 232-233, 236. As the Amended Complaint alleges, "the intended and actual effect of this illicit agreement was to fabricate a false and misleading 'final' report of DNA testing that would sustain the prosecutions of Finnerty and Seligmann, and support and sustain the indictment and prosecution of Evans, while concealing by omission the true results of DNA testing, which further established Plaintiffs' actual innocence." *Id*. ¶ 226. Three days after the May 12 Meeting and Report, Evans was indicted. *Id*. ¶ 238.

The Amended Complaint alleges that the Supervisory Defendants were aware of the substance of the April 10, April 21, and May 12 Meetings, including the results of DSI's testing and the illicit agreement to conceal the exculpatory results of DSI's testing, yet in their rush to charge and convict the three innocent Duke lacrosse players, they intentionally disregarded this misconduct, continued to allow Nifong to have responsibility for the police investigation, continued to have Durham Police take direction from Nifong, and continued to allow Gottlieb and Himan to participate in the investigation. *Id*. ¶¶ 211, 228, 237.

During a court hearing on December 15, 2006 (the "December 15 Hearing"), Meehan admitted under oath to the underlying facts of the DNA conspiracy, including DSI's initial discovery of the DNA from at least four other men, none of whom was a lacrosse player, on Mangum's rape kit items; the concealment of this evidence as a result of "an intentional limitation" agreed upon during the earlier meetings with Nifong; and DSI's creation of an "inappropriate" report that did not convey all of DSI's findings, in violation of FBI standards, DSI protocols, and industry custom and practice. *Id*. ¶ 307.

### 5. Defendants' Post-Indictment Efforts To Conceal Misconduct and Obstruct Justice

The Amended Complaint also alleges that after the April 17 and May 15 Indictments, Defendants engaged in further misconduct intended to conceal their earlier illicit actions and continue to deprive Plaintiffs of their constitutional rights by sustaining the prosecutions and impositions on Plaintiffs' liberty, notwithstanding the absence of probable cause. This post-indictment misconduct included the following:

- Gottlieb's fabrication of phony "Supplemental Case Notes" in July 2006 to cover up inconsistencies and contradictions in Mangum's actual statements regarding the incident and provide a malicious explanation for Mangum's bizarre behavior, *id*. ¶¶ 266-267;

- Efforts by Nifong, Himan, Gottlieb, and Wilson, with the knowledge and tacit approval of the Supervisory Defendants, to intimidate Seligmann's alibi witness, Moezeldin Elmostafa, by threatening to enforce a three-year old arrest warrant against him unless he provided a false statement recanting his earlier statements corroborating Seligmann's alibi, *id*. ¶¶ 248-252, 254;

- Efforts by Nifong, Wilson, Lamb, Gottlieb, and Himan, at the direction of the Supervisory Defendants, to intimidate and discredit the Durham Police officer who had reported Mangum's recantation of her rape claim and her lack of credibility, by subjecting him to an internal investigation and threats of disciplinary action, *id*. ¶¶ 56, 218, 264-265;

- Misrepresentations by Nifong and the DSI Defendants to conceal the existence of the exculpatory DNA evidence, *e.g., id*. ¶¶ 276-278;

- Wilson's surreptitious, unsupervised "re-interview" of Mangum on December 21, 2006, which was intended "to revive the prosecution" after Meehan's admission to the DNA conspiracy "by persuading Mangum to alter her statements to conform to the revelations regarding the lack of Plaintiffs' DNA on the rape kit items" and to "manufactur[e] new 'identifications'" of Plaintiffs after learning that Plaintiffs were moving to suppress the April Photo Array, *id*. ¶¶ 310, 313; and

- Additional false public statements by Nifong intended to conceal Defendants' wrongdoing and maintain the inflammatory animus against Plaintiffs, *id.* ¶¶ 273-274, 276, 308.

## QUESTIONS PRESENTED

The questions raised by Defendants' Motions, and the sections of this Brief that respond to them, are as follows:

1.  Are Gottlieb, Wilson, and the DSI Defendants entitled to absolute immunity from claims arising out of their misconduct during the investigation of Mangum's allegations?  (Section II)

    a.  Is Gottlieb entitled to absolute immunity because, in addition to his alleged investigatory misconduct, he also testified before a grand jury?  (Section II.A)

    b.  Is Wilson entitled to absolute immunity for investigatory misconduct because he was employed by a prosecutor?  (Section II.B)

    c.  Are the DSI Defendants entitled to absolute "expert witness" immunity from claims arising out of their non-testimonial forensic work in support of the investigation?  (Section II.C)

2.  Have Plaintiffs stated an actionable constitutional deprivation under 42 U.S.C. § 1983?  (Section III.B)

3.  Does the absence of a conviction bar a § 1983 claim arising from an unconstitutional seizure?  (Section III.C)

4.  Do Plaintiffs' indictments break the "causal chain" or constitute an "absolute defense" to the § 1983 claims against Defendants as a matter of law, where Plaintiffs allege that the indictments were caused by Defendants' misconduct?  (Section III.D)

5.  Have Plaintiffs stated a § 1983 claim against the City, where Plaintiffs allege that their unlawful seizures were caused by

    a.  misconduct that was authorized or ratified by the City's final policymaking officials?  (Section IV.B.1)

b. misconduct that Nifong caused or directed while acting pursuant to authority delegated to him by the City's policymaking officials over the Durham Police investigation? (Section IV.B.2)

c. the foreseeable application of official policies, customs, and practices of the City that had already resulted in violations of constitutional rights? (Section IV.B.3)

d. the Supervisory Defendants' failures to remove Nifong and Gottlieb from the Durham Police investigation, despite knowledge of their misconduct? (Section IV.B.4)

6. Is the City liable under North Carolina law for misconduct committed by the DSI Defendants during the period in which they were alleged to have been retained by the City and Durham Police to provide forensic analysis for the police investigation? (Section IV.C)

7. Have Plaintiffs stated a § 1983 claim against the Supervisory Defendants, where Plaintiffs allege that the Supervisory Defendants knew of their subordinates' wrongdoing and participated in, authorized, or ratified that wrongdoing? (Section V)

8. Have Plaintiffs stated a § 1983 claim against DSI and Clark based on the allegations that DSI's President and controlling shareholder and its Laboratory Director directly participated in the violations of Plaintiffs' rights? (Section VI)

9. Would a reasonable official have understood at the time of the alleged wrongdoing that conspiring to charge innocent persons of rape in the absence of probable cause was unconstitutional? (Section VII)

10. Have Plaintiffs stated conspiracy claims under 42 U.S.C. § 1983 and § 1985, where Plaintiffs allege that each Defendant agreed to the overall objective of framing innocent persons and performed acts in furtherance of that objective? (Section VIII.B)

11. Must each act in furtherance of a conspiracy be successful in order to sustain a conspiracy claim under § 1983 or § 1985? (Section VIII.B)

12. Is witness tampering in state-court proceedings actionable under the second clause of § 1985(2)? (Section VIII.C)

13.   Is a conspiracy to foment and exploit racial animus to procure unconstitutional seizures actionable under § 1985(2) and § 1985(3)? (Section VIII.D)

14.   Have Plaintiffs stated claims under 42 U.S.C. § 1986 against the City, the Supervisory Defendants, and the DSI Defendants, where Plaintiffs allege that those Defendants had the power to prevent the alleged § 1985 conspiracies?  (Section VIII.E)

15.   Have Plaintiffs stated a malicious prosecution claim against certain Defendants under North Carolina law, where Plaintiffs allege that those Defendants both participated in and conspired to cause prosecutions that were unsupported by probable cause?  (Section IX.A)

16.   Have Plaintiffs stated an obstruction of justice claim against certain Defendants under North Carolina law, where Plaintiffs allege that those Defendants performed acts that prevented, obstructed, impeded, or hindered legal justice?  (Section IX.B)

17.   Is a conspiracy to accuse and arrest innocent persons on false charges of a racially-motivated gang rape sufficiently "extreme and outrageous" to support an intentional infliction of emotional distress ("IIED") claim under North Carolina law?  (Section IX.C)

18.   May a plaintiff bring an IIED claim based on false and inflammatory statements that would also support a defamation claim under North Carolina law?  (Section IX.C)

19.   Are the DSI Defendants exempt from the duty of ordinary care that every person owes to the foreseeable victims of their negligence?  (Section IX.D)

20.   Does North Carolina public official immunity extend to the alleged intentional misconduct committed by Gottlieb, Addison, and Himan? (Section IX.F)

21.   Should the Court dismiss Plaintiffs' prayer for injunctive relief at this stage?  (Section XI.A)

22.   Should the Court dismiss Plaintiffs' prayer for punitive damages or strike references to the North Carolina Constitution from the Amended Complaint?  (Section XI.B)

# ARGUMENT

## I.    STANDARD OF REVIEW

The standard of review for Defendants' Rule 12(b)(6) Motions is well-settled:  the Motions must be denied unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the [well-pleaded] allegations" in the Amended Complaint.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) (quotation marks omitted); *accord Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  "In making this determination, a court must view the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations." *Phillips v. Mabe*, 367 F. Supp. 2d 861, 867 (M.D.N.C. 2005) (citing *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994)); *accord Erickson v. Pardus*, 127 S. Ct. 2197 (2007).  Consequently, motions to dismiss are granted "only in very limited circumstances."  *Mabe*, 367 F. Supp. 2d at 867 (quoting *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir. 1989)).  Moreover, in the context of a civil rights complaint, the Court "must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged."  *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted).

Some Defendants suggest that the Court should conduct a more stringent review based on the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), which, Defendants assert, imposes a "duty" on courts to "weed out" claims deemed to be not "plausible."  Gottlieb Br. at 4; SD Br. at 5.  *Twombly* turned on a complaint's "formulaic recitation of the elements of a cause of action," with no

supporting factual allegations whatsoever, 127 S. Ct. at 1964-65, 1968-69, quite the opposite of the Amended Complaint here, which consists of over 150 pages and 560 paragraphs and describes Defendants' meetings, agreements, and coordinated misconduct in painstaking detail. Moreover, in holding that the *Twombly* plaintiff had failed to state a "plausible" claim, the Supreme Court expressly cautioned that:

- it was not altering the traditional "notice pleading" standards of Rule 8(a)(2) of the Federal Rules of Civil Procedure;

- "once a claim has been stated adequately [under Rule 8(a)(2)], it may be supported by showing any set of facts consistent with the allegations in the complaint";

- "[a]sking for plausible grounds does not impose a probability requirement at the pleading stage"; and

- a motion to dismiss may not be granted "based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."

*Twombly*, 127 S. Ct. at 1959, 1964-65, 1969 & n.8, 1974. Ultimately, *Twombly* stands for the proposition that "Rule 8(a)(2) has it right." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (citation omitted); *see also Erickson*, 127 S. Ct. at 2200 ("Specific facts are not necessary [under Rule 8(a)(2)]; the [complaint] need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (ellipsis in original; internal quotation marks omitted)); *Vill. of Riverdale v. 138th St. Joint Venture*, 527 F. Supp. 2d 760, 766 (N.D. Ill. 2007) ("*Twombly* . . . merely instruct[s] that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide [Rule 8 notice]." (internal quotation marks omitted)).

In addition, most of the Defendants disregard the fact that Plaintiffs' allegations must be accepted as true at this stage by raising arguments that either challenge or mischaracterize the facts alleged in the Amended Complaint. (Examples are identified throughout this Opposition.) Each of these arguments must be rejected at this stage because "the purpose of a motion to dismiss is to test the legal sufficiency of the complaint and not the facts that support it." *Mabe*, 367 F. Supp. 2d at 867 (citing *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989)). The issue presented on a Rule 12(b)(6) motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quoting *Revene v. Charles County Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989) (internal quotation marks omitted)).

## II. NEITHER GOTTLIEB, WILSON, NOR THE DSI DEFENDANTS ARE ENTITLED TO ABSOLUTE IMMUNITY.

Because "absolute immunity" presents a threshold issue for the Court's determination, we first address the contentions by Gottlieb, Wilson, and the DSI Defendants that they are entitled to this complete protection. The courts have been "quite sparing" in recognizing absolute immunity. *See Spurlock v. Satterfield*, 167 F.3d 995, 1003 (6th Cir. 1999) ("[A]bsolute immunity is the exception rather than the rule."). Each of these Defendants "'bears the burden of showing that such immunity is justified for the function in question.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)); *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 962 (2007). None of them can do so.

### A. Gottlieb Is Not Entitled to Witness Immunity.

Gottlieb seeks absolute immunity based on his contention that the only allegations against him arise from grand jury testimony. Gottlieb Br. at 20-23. Not so.

The Amended Complaint alleges that Gottlieb conspired with the other Defendants to charge the three innocent Plaintiffs and that, in furtherance of this conspiracy, Gottlieb fabricated false inculpatory evidence before and after the indictments, agreed to conceal evidence of innocence, and participated in witness intimidation. AC ¶¶ 87-88, 175-176, 179-182, 186, 188, 207-210, 218-219, 225-226, 232, 258-260, 263-264, 266-271. Moreover, the allegations regarding Gottlieb's grand jury appearance are directed, not at Gottlieb's actual testimony, but rather, at the agreement in advance of his testimony to mislead the grand jury based on fabricated evidence and the concealment of the evidence of Plaintiffs' actual innocence and the lack of probable cause to indict them. Such non-testimonial conduct is not subject to absolute immunity. *See, e.g.*, *Brown v. Daniel*, Nos. 99-1678, 99-1679, 2000 WL 1455443, at *4 (4th Cir. Sept. 29, 2000).

### B. Wilson Is Not Entitled to Prosecutorial Immunity.

Wilson seeks absolute immunity based on his contention that he was at all times "an investigator acting at the direction of a judicial officer performing prosecutorial functions." Wilson Br. at 6. "[T]he scope of absolute prosecutorial immunity has been narrowly drawn." *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 230 (4th Cir. 1997). The Supreme Court has held that courts must employ a "functional approach" to absolute prosecutorial immunity, *Burns*, 500 U.S. at 486, and that even prosecutors are not entitled to such immunity where they are performing investigatory functions similar to those of police officers, *see Buckley*, 509 U.S. at 273-76. In *Buckley*, the Court refused to extend absolute immunity to prosecutors who were alleged to have fabricated evidence and concocted false witness statements, even if the evidence was intended for a future trial. *Id.* Moreover, the *Buckley* Court held that this "functional approach" to prosecutorial immunity did not stop after an indictment or probable cause determination: although "[a]

prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested," *id.* at 274, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity," *id.* at 274 n.5.

Here, neither Nifong nor Wilson was performing "prosecutorial functions" when they committed the illegal acts complained of in the Amended Complaint. Indeed, the allegations concerning Wilson arise from the same types of functions that were being performed by Durham Police during this investigation and that, under *Buckley*, are considered to be "investigatory functions" not entitled to absolute immunity. Plaintiffs allege, for example, that Wilson participated with Durham Police in the efforts to intimidate Elmostafa into falsely recanting his corroboration of Seligmann's alibi, AC ¶¶ 246-253; that Wilson participated in the efforts to intimidate and discredit Sergeant Shelton, who had stated that Mangum was not credible and had recanted her initial rape allegation, *id.* ¶ 264; and that Wilson conducted a surreptitious solo "interview" of Mangum, during which he coached Mangum into providing a new "identification" of Plaintiffs and changing her prior accounts in a transparent effort to conform her story to the evidence of Plaintiffs' innocence, *id.* ¶¶ 309-314.

None of Wilson's actions relate to matters that have been held to be "'intimately associated with the judicial phase of the criminal process.'" *Buckley*, 509 U.S. at 270 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). Wilson is not alleged to have engaged in "professional evaluation of the evidence assembled by the police" or to have prepared such evidence "for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley*, 509 U.S. at 273. He

did not make decisions about "whether and when to prosecute." *Imbler*, 424 U.S. at 431 n.33. He is not alleged to have appeared before a judge and presented evidence, *Burns*, 500 U.S. at 491, to have elicited in-court testimony from witnesses or made statements during judicial proceedings, *id.* at 489-90; or to have attempted "to control the presentation of [a] witness' testimony" during or in preparation for trial (none was scheduled), *Imbler*, 424 U.S. at 430 n.32. Rather, Wilson's actions were intended to fabricate false and inculpatory "clues and corroboration" in order to maintain the charade of "probable cause" and sustain the prosecutions—the very kinds of actions that *Buckley* holds are not entitled to absolute immunity. *See Buckley*, 509 U.S. at 273.

Wilson offers no reasoning or caselaw to alter this conclusion. The fact that some of Wilson's challenged conduct (his participation in witness intimidation and re-interview of Mangum) occurred after Plaintiffs' indictments, *see* Wilson Br. at 14, does not support his position because *Buckley* expressly rejects absolute immunity for a prosecutor's post-indictment "police investigative work." 509 U.S. at 274 n.5 (quotation marks omitted).[4] Wilson discusses Fourth Circuit decisions immunizing prosecutors for withholding exculpatory evidence during a pending criminal proceeding or for making decisions about whether to prosecute, *see* Wilson Br. at 10, but unlike *Carter v. Burch*, 34 F.3d 257 (4th Cir. 1994), here the concealment of evidence is alleged to have begun "before the initiation of the judicial process," *id.* at 263; and unlike *Lyles v. Sparks*, 79 F.3d 372 (4th Cir. 1996), here Wilson is not alleged to have made any decisions about "'whether and when to prosecute,'" *id.* at 377 (quoting *Imbler*, 424 U.S. at 431 n.33).

---

[4] Wilson argues that *Davis v. Grusemeyer*, 996 F.2d 617, 632 (3d Cir. 1993), recognized a broader immunity for all "ongoing investigation" after indictment. Wilson Br. at 7. However, *Davis* was decided before the Supreme Court's decision in *Buckley*.

Wilson mentions cases involving a prosecutor's "assistant" or "investigator," but immunity is determined by function, not title, and unlike Wilson, the individuals in those cases performed no investigative work. *See Hoover v. Keith*, No. 1:04CV1047, 2005 WL 3164107, at *2 (M.D.N.C. Jan. 5, 2005) (holding that "assistant" district attorney was immune for involvement in prosecution);[5] *Goncalves v. Reynolds*, 198 F. Supp. 2d 278, 279-80, 282 (W.D.N.Y. 2001) (investigator "did not actually investigate the underlying events" and merely prepared "felony complaint" and "arrest warrant" at direction of district attorney's office).  Many of Wilson's other cases actually reject his argument. *See Gobel v. Maricopa County*, 867 F.2d 1201, 1204-05 (9th Cir. 1989) (*denying* absolute immunity for role in false arrest, false statements to media, and illegal detention); *Auriemma v. Montgomery*, 860 F.2d 273, 279 (7th Cir. 1988) (*denying* absolute immunity for "unlawful investigative activities"); *Joseph v. Patterson*, 795 F.2d 549, 556-57 (6th Cir. 1986) (*denying* absolute immunity for participation in unlawful search and investigation of obstruction allegation).  As the Sixth Circuit explained in *Joseph*: "when the nonjudicial official undertakes action on his own initiative or when he carries out administrative or investigatory functions of the prosecutor, he can only claim the affirmative defense of qualified immunity."  795 F.2d at 560.  Wilson thus cannot demonstrate that he is entitled to absolute immunity with respect to his alleged conduct.

---

[5] As the complaint in *Hoover* makes clear, the claims were against an "Assistant District Attorney" and related to the performance of prosecutorial functions.  *See* Compl. at 2-3, *Hoover v. Keith*, No. 1:04CV1047 (M.D.N.C. filed Nov. 9, 2004) (attached as Exh. 1).

**C.      The DSI Defendants Are Not Entitled to Expert Witness Immunity.**

The DSI Defendants claim that they are "expert witnesses" entitled to "absolute witness immunity." DSI Br. at 11. Courts have construed witness immunity even more narrowly than prosecutorial immunity. *See Gregory*, 444 F.3d at 741. Whether an expert is entitled to absolute immunity is determined by a functional approach: experts are entitled to absolute immunity only for acts taken "in preparation for providing expert witness testimony in the due course of a judicial proceeding." *Sharp v. Miller*, 468 S.E.2d 799, 801 (N.C. 1996) (internal quotation marks omitted). An expert is *not* entitled to immunity for "non-testimonial acts," *Daniel*, 2000 WL 1455443, at *4, nor can an expert immunize unlawful, non-testimonial conduct by later providing testimony, *see Spurlock*, 167 F.3d at 1003-04. *See also Williams v. Rappeport*, 699 F. Supp. 501, 507 (D. Md. 1988) (applying functional analysis to retained expert's immunity claim), *aff'd sub nom. Williams v. Dvoskin*, 879 F.2d 863 (4th Cir. 1989).

Here, the DSI Defendants' absolute immunity claim rests on two faulty premises: that because Meehan ultimately testified at the December 15 Hearing, he was merely an "expert witness"; and that because DSI's May 12 Report was produced to Plaintiffs along with police and SBI crime lab reports, it was an "expert report" prepared for litigation. DSI Br. at 11-14. As the Amended Complaint makes clear, however, the DSI Defendants are not being sued for Meehan's in-court testimony, or for an "expert report" created for discovery purposes but, rather, for forensic analysis and reporting in support of a police investigation—the same kind of non-testimonial investigative work performed by any police crime lab. *See* AC ¶¶ 30, 202 (DSI Defendants "provide[d] forensic analysis services relating to the investigation of Plaintiffs" because "[t]he S.B.I. laboratory [was] not equipped to conduct Y STR DNA analysis."); *id.* ¶ 546 (DSI

Defendants "owed Plaintiffs a duty of due care with respect to their involvement in the police investigation."). Moreover, the Amended Complaint alleges that the DSI Defendants' forensic analysis was intended to help Nifong and Durham Police obtain probable cause and that their DNA-related misconduct began before Plaintiffs were indicted. *See id.* ¶¶ 208-210 (DSI Defendants agreed at the April 10 Meeting to "conceal[] and obfuscate[]" exculpatory DNA results "in order to manufacture probable cause, obtain indictments, and subsequently prosecute three Duke lacrosse players on rape charges."); *id.* ¶ 226-228 (May 12 Report fabricated to "secur[e] charges against Evans" and "sustain the prosecutions of Finnerty and Seligmann.").

The fact that crime lab scientists and other forensic examiners have specialized training and expertise, prepare reports of their findings, and often testify in court does not transform their forensic investigation into "preparation for providing expert witness testimony." DSI Br. at 12. To the contrary, courts have routinely rejected absolute immunity claims by forensic experts. As the Sixth Circuit has explained:

> "Expert" forensic examiners act in an investigatory fashion when they interpret and document physical evidence. . . . [T]he pre-trial investigatory acts by forensic examiners merit no more protection under absolute immunity than do other persons performing investigatory actions.

*Gregory*, 444 F.3d at 740.[6] Similarly, the Fifth Circuit denied absolute immunity to a private physician who, like the DSI Defendants, had been retained to provide

---

[6] In *Gregory*, the defendant was retained to "interpret and document physical evidence," hairs taken from the victim's clothing, and compare them to the suspect. *See* 444 F.3d at 740. There, as here, the examiner's report did not disclose all of her conclusions (including her identification of several hairs that did not match the suspect). *See id.* The Sixth Circuit rejected the forensic examiner's absolute immunity defense. *See id.* at 732.

"investigative," "pre-testimonial activities," including forensic analysis and "writing a report": "[I]f, as alleged, Dr. West used shoddy and unscientific research techniques that resulted in a report critical to a baseless murder prosecution . . . there is no obvious reason why Dr. West should enjoy immunity greater than that of other investigators." *Keko v. Hingle*, 318 F.3d 639, 644 (5th Cir. 2003); *see also Cleary v. County of Macomb*, No. 06-15505, 2007 WL 2669102, at *9 (E.D. Mich. Sept. 6, 2007) (rejecting absolute immunity claim by medical examiner who "was functioning as an investigator when he examined [victim] and reported on this examination"); *cf. Yarris v. County of Delaware*, 465 F.3d 129, 138 (3d Cir. 2006) (rejecting absolute immunity claim, equating post-conviction "handling of DNA evidence" by prosecutor to work performed by "police officers, medical examiners, and other clerical state employees"). Indeed, allegations that a defendant falsified the results of his or her forensic analysis are not even entitled to *qualified* immunity, let alone absolute immunity. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1300 (10th Cir. 2004) (affirming denial of qualified immunity to forensic examiner accused of falsifying investigative report and recording a "match" when one did not exist).[7] The DSI Defendants do not mention this line of cases and, instead, rely on cases involving a Rule 26(a)(2) expert witness retained for civil litigation, an expert alleged to have testified falsely, or a lay witness alleged to have testified falsely. None of these cases is applicable to the conduct of the DSI Defendants.

---

[7] The defendant in *Pierce* did not assert absolute immunity.

## III.  THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS UNDER 42 U.S.C. § 1983.

### A.  Summary of § 1983 Claims.

The First through Seventh Causes of Action of the Amended Complaint allege violations of 42 U.S.C. § 1983 (the "§ 1983 Claims").  At this preliminary stage, the Court must determine whether each of these Causes of Action alleges facts sufficient to satisfy the elements of § 1983.[8]  *See Green v. Maroules*, 211 F. App'x 159, 161 (4th Cir. 2006) (citing *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 658 (4th Cir. 1998)).  In this regard, each of the § 1983 Claims alleges that (1) the respective Defendants are "persons" for purposes of § 1983, AC ¶¶ 330, 339, 351, 360, 372, 409, 438; (2) Defendants acted at all relevant times under color of state law, *id.* ¶¶ 331, 340, 352-354, 362, 371, 408, 439; and (3) Defendants caused Plaintiffs to be subjected to a deprivation of their rights under the Fourth and Fourteenth Amendments, *id.* ¶¶ 335, 347, 356, 368, 378, 383, 386, 392, 398, 405, 416, 423, 434, 442.  These allegations and the supporting background facts detailed in the Amended Complaint are more than sufficient to state claims under § 1983.  *See, e.g.*, *Green*, 211 F. App'x at 161.

Defendants' common arguments against the § 1983 Claims fall into three general categories:  (1) that the § 1983 Claims do not allege a deprivation of an actionable constitutional right; (2) that Defendants cannot be liable under § 1983 because Plaintiffs were never convicted of a crime; and (3) that even if Plaintiffs did suffer an

---

[8] Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"  42 U.S.C. § 1983 (2000).

actionable deprivation, Defendants cannot be liable because Nifong or the grand jury was an "intervening cause." Each of these arguments is fundamentally flawed because it relies on either a mischaracterization of the allegations of the Amended Complaint, a misreading of the law, or both. Plaintiffs address each argument in turn.

**B.** **The Amended Complaint Alleges a Violation of Plaintiffs' Fourth and Fourteenth Amendment Rights.**

**1.** **Defendants Caused Plaintiffs To Be Unlawfully Seized Without Probable Cause.**

Defendants' contention that the § 1983 Claims do not identify a violation of any recognized constitutional right rings hollow against the allegations of the Amended Complaint:

- The First Cause of Action alleges that the actions of Nifong, Gottlieb, Himan, Wilson, and the DSI Defendants willfully and maliciously caused the seizures of Plaintiffs pursuant to legal process that was not supported by probable cause, in violation of Plaintiffs' rights under the Fourth Amendment as applied to the States through the Fourteenth Amendment, *see Mapp v. Ohio*, 367 U.S. 643, 654-55 (1961). Such claims are commonly styled as "§ 1983 malicious prosecution claims," as the First Cause of Action is here, or, alternatively, as claims for unlawful seizure pursuant to legal process not supported by probable cause. *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183-84 (4th Cir. 1996). Regardless of the title, these claims allege the same thing: "a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort" of malicious prosecution. *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000). The elements of these claims are straightforward: Plaintiffs must allege that these Defendants, acting under color of law, caused a seizure "pursuant to

legal process that was not supported by probable cause and that the criminal proceedings [have] terminated in [Plaintiffs'] favor." *Brooks*, 85 F.3d at 183-84. Like the common law tort of malicious prosecution, these § 1983 claims are not limited only to prosecutors, and can be brought against police officers, crime labs, and other investigatory personnel whose misconduct causes an unlawful seizure. *See Brown v. Miller*, No. 06-30887, 2008 WL 509078, at *3 (5th Cir. Feb. 27, 2008) (crime lab); *Kjellson v. Mills*, No. 07-11918, 2008 WL 451882, at *3-4 (11th Cir. Feb. 21, 2008) (same); *Miller v. Prince George's County,* 475 F.3d 621, 631 & n.5 (4th Cir. 2007) (county and police officer), *cert. denied*, 128 S. Ct. 109 (2007); *Gregory*, 444 F.3d at 740 (forensic examiner); *Rogers v. Pendleton*, 249 F.3d 279, 284 (4th Cir. 2001) (police officers); *Brooks*, 85 F.3d at 183 (police officer).[9]

• The Second Cause of Action alleges that Nifong, Gottlieb, Himan, Wilson, and the DSI Defendants willfully and maliciously acted in bad faith to conceal evidence of Plaintiffs' actual innocence and the lack of probable cause—principally DSI's finding, reported at the April 10 Meeting, that Mangum's rape kit items contained DNA from four unidentified men, but none from Plaintiffs or any other Duke lacrosse player, and the circumstances of the April Photo Array—in order to mislead the grand juries and cause Plaintiffs to be indicted and seized in the absence of probable cause. Like the First Cause of Action, such allegations state a violation of Plaintiffs' Fourth Amendment rights to be free from seizure pursuant to legal process that these Defendants knew was unsupported by probable cause. *See also Franks v. Delaware*, 438 U.S. 154,

---

[9] Contrary to Defendants' assertions, the § 1983 Claims do not allege violations of a "right to be free of criminal investigation," SD Br. at 12, but, rather, the right to be free from seizures caused by misconduct during a criminal investigation.

156 (1978) (§ 1983 defendants violate clearly established Fourth Amendment rights when they make knowing or reckless false statements to obtain legal process to effect a seizure). In addition, these allegations state a violation of the right, recognized by every judge on an otherwise divided *en banc* Fourth Circuit, to be free from "bad faith" concealment of evidence that results in a "constitutional deprivation." *Jean v. Collins*, 221 F.3d 656, 662-63 (4th Cir. 2000) (Wilkinson, J., concurring, joined by Widener, Wilkins, Niemeyer, Williams, and Traxler, JJ.) (bad faith concealment by officers that results in constitutional deprivation is actionable under § 1983); *see also id.* at 677 (Murnaghan, J., dissenting, joined by Michael, Motz, King, and Hamilton, JJ.) (concealment is actionable even absent bad faith); *id.* at 679 (Luttig, J., dissenting) (same).[10] Defendants' argument that, under *Jean*, their only disclosure obligation was to their co-conspirator, Nifong, *see, e.g.*, DSI Br. at 20, is addressed in Section III.D, *infra*.

- The Third Cause of Action alleges that Nifong, Gottlieb, Himan, Wilson, and the DSI Defendants affirmatively fabricated inculpatory evidence against Plaintiffs—including, for example, the April Photo Array, the May 12 DNA Report, and coerced witness statements—also in order to mislead the grand juries about probable cause and thus effect the unlawful seizures. *See, e.g.*, AC ¶¶ 175-190, 195-197, 207-211,

---

[10] Contrary to Defendants' assertions, this claim does not depend on whether the Defendants owed a duty to disclose under *Brady v. Maryland*, 373 U.S. 83 (1963), *see* DSI Br. at 23-24; Gottlieb Br. at 19-20, or whether there is a constitutional requirement to disclose exculpatory evidence that does not rise to the level of establishing actual innocence or a lack of probable cause, *see* City Br. at 26 n.13; Gottlieb Br. at 20, but, rather, whether Defendants violated Plaintiffs' rights when they knowingly or recklessly sought to seize them pursuant to indictments that they knew, based on the concealed evidence, were unsupported by probable cause. *See also Harris v. Bornhorst*, 513 F.3d 503, 511-12, 514-16 (6th Cir. 2008) (defendants violated clearly established rights by concealing parts of confession that were at odds with known facts of crime).

224-237, 244-271, 309-315, 350-358. Like the First and Second Causes of Action, such allegations state a § 1983 malicious prosecution claim. In addition, they state a violation of Plaintiffs' "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Washington v. Wilmore*, 407 F.3d 274, 282-83 (4th Cir. 2005) (internal quotation marks omitted); *see also McGhee v. Pottawattamie County*, 514 F.3d 739, 747-48 (8th Cir. 2008) (defendants violate clearly established rights by fabricating evidence before filing formal charges); *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (same).[11]

- The Fourth Cause of Action alleges that Nifong, Hodge, and Addison engaged in an unprecedented campaign of over 100 false and inflammatory public statements and interviews that were intended to inflame the grand jury pool by branding Plaintiffs as white racists who had engaged in a violent and racially-motivated gang rape, and thus to cause the indictments and seizures of Plaintiffs in violation of the Fourth and Fourteenth Amendment right to be free from seizure pursuant to legal process not supported by probable cause. AC ¶¶ 359-370. Ordinarily, the reputational stigma that results from a false public statement is not independently sufficient to support a § 1983 claim, *see Paul v. Davis*, 424 U.S. 693, 710 (1976), but here, the alleged misconduct supports a § 1983 claim under what some courts have called the

---

[11] Himan argues that the § 1983 Claims against him should be dismissed because he did not "play[] a role in the presentation of the DNA report to the grand jury for Evans' indictment." Himan Br. at 18. This argument fails on several grounds, not the least of which is that the Amended Complaint expressly alleges that Himan conspired and participated with other Defendants to fabricate the May 12 Report for the purpose of obtaining a seizure of Evans, AC ¶¶ 207-210, 229-236, and that Himan fabricated other evidence, including the April Photo Array and coerced Pittman statement, *id.* ¶¶ 179-181, 186, 256-260.

"stigma-plus" test because the false statements caused both reputational stigma plus a deprivation of Plaintiffs' rights.[12]

- The Fifth, Sixth, and Seventh Causes of Action allege a § 1983 municipal liability claim against the City of Durham, a § 1983 supervisory liability claim against the Supervisory Defendants, and a § 1983 conspiracy claim against all Defendants. Each of these claims results from the violations of the rights at issue in the First through Fourth Causes of Action, and is discussed in further detail in Sections IV, V, VI, and VIII, *infra*, respectively.

### 2. The Duration of Plaintiffs' Seizures Is Irrelevant.

Some Defendants appear to concede the well-settled proposition that an arrest in connection with an indictment constitutes a seizure for purposes of the Fourth

---

[12] *Paul*, 424 U.S. at 710; *see Buckley*, 509 U.S. at 262 (prosecutors lacked absolute immunity for § 1983 claim based on false public statements). Indeed, courts have held that false statements need not even *cause* the constitutional deprivation, so long as the false statements and deprivation were "connected." *See Velez v. Levy*, 401 F.3d 75, 88-89 (2d Cir. 2005) (holding that the same person need not cause the reputational stigma and the constitutional deprivation, so long as both are "connected"); *Barrett v. Harrington*, 130 F.3d 246, 261 (6th Cir. 1997) (no judicial immunity from § 1983 claim based on false public statements); *Cooper v. Dupnik*, 924 F.2d 1520, 1534-35 (9th Cir. 1991) (recognizing § 1983 claim under Fourteenth Amendment based on public statements that falsely implied that evidence supported plaintiff's arrest); *Gobel v. Maricopa County*, 867 F.2d 1201, 1205 (9th Cir. 1989) (recognizing § 1983 due process claim where "false statements were made in connection with [plaintiffs'] illegal arrest"); *Marrero v. City of Hialeah*, 625 F.2d 499, 519 (5th Cir. 1980) (recognizing § 1983 claim based on false public statements relating to illegal seizure); *Burke v. Ocean County Prosecutor's Office*, No. 07-3623, 2008 WL 346142, at *3 (D.N.J. Feb. 6, 2008) (recognizing § 1983 claim based on false statements to press that "jeopardized [the plaintiff's] life"); *Univ. Gardens Apartments Joint Venture v. Johnson*, 419 F. Supp. 2d 733, 740 n.4 (D. Md. 2006) (recognizing § 1983 claim where a malicious false statement is "coupled with an illegal . . . seizure"); *Stevens v. Rifkin*, 608 F. Supp. 710, 727 (N.D. Cal. 1984) (recognizing due process claim "where the injury to reputation is inflicted in connection with the denial of a right specifically secured by the Bill of Rights").

Amendment, as applied to the States through the Fourteenth Amendment, and challenge only whether they can be found to have "caused" such a seizure as a matter of law. *See, e.g.*, City Br. at 20 ("Plaintiffs, were 'seized,' for Fourth Amendment purposes, . . . when they were arrested after indictment by a grand jury." (emphasis omitted)); *see also Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality op.) (petitioner's voluntary "surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment"); *Pendleton*, 249 F.3d at 290 ("An arrest is a seizure of the person . . . ."). Other Defendants, however, attempt to downplay Plaintiffs' seizures as "temporary" to suggest that they are not actionable. *See* Addison Br. at 13. But the duration of custody is irrelevant to the fact that a constitutional harm occurs when one is arrested without probable cause. *See United States v. McCoy*, 513 F.3d 405, 412 (4th Cir. 2008) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." (quoting *Maryland v. Wilson*, 519 U.S. 408, 420 n.8 (1997))); *cf. Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (holding that imposition of pretrial restrictions, including financial loss associated with bail, constitutes seizure).

### 3. Plaintiffs Are Entitled To Recover for Injury to Their Reputations.

Several Defendants also argue that Plaintiffs are alleging a constitutional "interest in one's reputation," either (1) by bringing a § 1983 claim based on false statements in the Fourth Cause of Action, or (2) by seeking damages in each of the § 1983 Claims for the reputational harms that were caused by the unlawful seizures. Addison Br. at 13; City Br. at 23; Himan Br. at 20-21. Plaintiffs are not alleging that their interest in their reputations is a liberty or property interest under the Fourteenth

Amendment.  As noted above, the Fourth Cause of Action states a § 1983 claim, not because the false statements caused reputational harm, but because they caused Plaintiffs to be indicted and seized without probable cause in violation of Plaintiffs' Fourth and Fourteenth Amendment rights.  As to Plaintiffs' claims for reputational damages, it is well settled that because § 1983 incorporates "the common law of torts," it permits a plaintiff to recover all damages that flow from a constitutional deprivation, including any damages for "impairment of reputation . . . , personal humiliation, and mental anguish and suffering."  *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (alteration in original) (quotation marks omitted); *see also Randall v. Prince George's County*, 302 F.3d 188, 208 (4th Cir. 2002) (quoting *Stachura*); *Price v. City of Charlotte*, 93 F.3d 1241, 1245 (4th Cir. 1996) (same); Avery, Rudovsky & Blum, Police Misconduct §§ 13:9-13:10, at 686-90 (3d ed. 2006).

### 4.   Defendants' Post-Indictment Misconduct Is Relevant to the § 1983 Claims.

Several Defendants attempt to carve out the allegations of post-indictment misconduct from the Court's consideration of the § 1983 Claims on the ground that such misconduct is somehow not relevant to whether Defendants caused unlawful seizures in violation of § 1983.  *See* City Br. at 29 n.16; DSI Br. at 26; Gottlieb Br. at 23; Himan Br. at 18.  This effort is misdirected for two reasons:

First, plaintiffs and prosecutors may introduce evidence of a defendant's subsequent bad acts to demonstrate, among other things, that earlier misconduct was not the product of mistake, accident, or good faith.  *See* Fed. R. Evid. 404(b).  A reasonable juror would be free to reject any such assertions of mistake, accident, and good faith here, in light of the evidence of Gottlieb's fabricated "supplemental case notes," the May 12

Report (fabricated after Seligmann and Finnerty's indictments), the efforts by several Defendants to intimidate defense and alibi witnesses, the efforts by other Defendants to continue to conceal the exculpatory DNA evidence, and Wilson's intentional coaching of Mangum into providing further false statements. *See* AC ¶¶ 231-237, 243-304, 309-315. That evidence, coupled with the evidence of Defendants' pre-indictment misconduct, is sufficient to establish Defendants' liability under § 1983 for causing the unlawful seizures of Plaintiffs.

Second, several courts, including the Fourth Circuit, have recognized that a separate Fourth Amendment harm can occur, in violation of § 1983, where a defendant fabricates evidence in order to *continue* a seizure or prosecution that otherwise lacks probable cause.[13] Because the Amended Complaint already identifies Fourth Amendment violations caused by Defendants' pre-indictment misconduct, however, there is no reason at this stage for the Court to determine whether there are additional Fourth Amendment violations caused by post-indictment misconduct.

---

[13] *E.g.*, *Gay v. Wall*, 761 F.2d 175, 179 (4th Cir. 1985) ("If . . . the defendants deprived [the plaintiff] of his liberty beyond a time when they knew him to be innocent, the defendants' conduct may well be actionable under § 1983."); *accord Kjellson*, 2008 WL 451882, at *4 ("Probable cause is required to *continue* a prosecution, not just to arrest a defendant or to institute a prosecution."); *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003) ("[A] criminal prosecution . . . continued . . . without any probable cause" can be a malicious prosecution.); *Kinzer v. Jackson*, 316 F.3d 139, 143-44 (2d Cir. 2003) ("A malicious prosecution claim can rest on a prosecution that is continued notwithstanding the discovery of information that exculpates the defendant."); *Sanders v. English*, 950 F.2d 1152, 1163 (5th Cir. 1992) ("Deliberately concealing or deliberately failing to disclose exculpatory evidence . . . can . . . form the basis for an inference that a defendant police officer acted with malice in . . . maintaining a prosecution.").

**C.** **The § 1983 Claims Do Not Require a Conviction.**

Defendants next argue that their § 1983 liability is precluded as a matter of law because, they contend, the *only* actionable constitutional harm that could possibly result from manufactured evidence is the deprivation of the right to a fair trial. *See* Addison Br. at 14; City Br. at 20; DSI Br. at 23; Gottlieb Br. at 14; Himan Br. at 12; SD Br. at 21. This argument misstates the law. The fact that a § 1983 defendant's fabrication of evidence may be challenged under the due process clause after a conviction does not mean that it cannot violate the Fourth Amendment where it causes only a seizure; it just means that, after a conviction, the plaintiff's continued confinement "passes over from the Fourth Amendment to the due process clause." *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988).

The case law establishes that a plaintiff need not have been convicted in order to bring a § 1983 claim under the Fourth Amendment for unlawful seizure without probable cause. *See, e.g., Miller v. Prince George's County,* 475 F.3d at 630 (charges dismissed before trial); *Brooks*, 85 F.3d at 183 (same); *Jones v. City of Chicago*, 856 F.2d at 991 (mistrial and dismissal of charges); *Moore v. Evans*, 476 S.E.2d 415, 426 (N.C. Ct. App. 1996) (charges dismissed before trial). The only prerequisite for such a claim is that the criminal proceedings have been terminated in the plaintiff's favor. *See Brooks*, 85 F.3d at 183-84. A "conviction" requirement would make no sense in the context of a malicious prosecution/unlawful seizure claim under § 1983: where, as here, defendants inflict constitutional harm by fabricating probable cause to cause a seizure, it would be folly to preclude liability simply because the charges were ultimately dismissed prior to conviction. *See Jones v. City of Chicago*, 856 F.2d at 993-94 ("The jury was entitled to find that had it not been for the misconduct of the defendants, Jones would neither have

been arrested nor charged."); *see also Bailey v. Kennedy*, 349 F.3d 731, 736, 741 (4th Cir. 2003) (plaintiff arrested but never formally charged); *Pendleton*, 249 F.3d at 295 (charges dismissed before trial); *Clanton v. Cooper*, 129 F.3d 1147, 1152, 1155 (10th Cir. 1997) (plaintiff arrested but never formally charged).

Nor do Defendants cite any case that would support such a remarkable proposition. For example, Defendants rely on *Antonio v. Moore*, 174 F. App'x 131 (4th Cir. 2006) (per curiam), but there, the plaintiff never claimed that the suggestive identification was the cause of his unlawful seizure. Nor could he, because, as his complaint reveals, the identification did not occur until *after* his arrest.[14] Instead, Antonio's unlawful seizure claim was based on purported defects in the arrest warrant, not the identification. *See id.* at 136-37. Here, by contrast, Plaintiffs expressly allege that the rigged April Photo Array was a cause of their unlawful seizures. AC ¶¶ 354, 356. Therefore, *Antonio* does not apply.

> **D.   Defendants Caused the Deprivation of Plaintiffs' Constitutional Rights.**

Defendants' fall-back position is that the grand jury or Nifong was an "intervening cause" of the seizures or an "absolute defense" insulating their pre-indictment conduct from § 1983 liability. Defendants advance two arguments: first, Defendants argue that, as a matter of law, a prosecutor's decision to proceed or a grand jury's decision to indict insulates all pre-indictment misconduct by others; second, Defendants argue that, because Nifong had all of the relevant information relating to Defendants' misconduct and decided to seek indictment anyway, Nifong's decision was an independent and intervening cause of the constitutional deprivation. The first

---

[14] *See* Compl. at 5, *Antonio v. Moore*, No. 03-1560-AM (E.D. Va. filed Dec. 17, 2003) (attached as Exh. 2).

argument is wrong on the law. The second would turn the law on its head. And both arguments ignore the fact that (as Defendants' own cases show), causation arguments are fact-intensive and rarely appropriate for resolution on a motion to dismiss. *See Whiting v. Traylor*, 85 F.3d 581, 586 n.10 (11th Cir. 1996) ("For now, we are deciding a case about pleadings and not one about proof of causation.").

1.  **The Return of an Indictment Does Not Preclude § 1983 Liability Against a Defendant Who Deceives the Grand Jury.**

Contrary to Defendants' first argument, *see* Addison Br. at 10; City Br. at 24; Gottlieb Br. at 21; Himan Br. at 15-16; SD Br. at 15, neither a grand jury indictment nor a prosecutor's decision to seek indictment—nor, for that matter, a judge's decision to issue an arrest warrant or a trial jury's vote to convict—breaks the "causal chain" or constitutes an "absolute defense" for § 1983 purposes where, as here, a police officer or other defendant is alleged to have "misrepresented, withheld, or falsified evidence" that influenced that decision:

> The intervening acts of a grand jury have never been enough to defeat an otherwise viable [§ 1983] malicious prosecution claim. . . . And though an indictment by a grand jury is generally considered prima facie evidence of probable cause in a subsequent civil action for malicious prosecution, this presumption may be rebutted by proof that the defendant misrepresented, withheld, or falsified evidence.
>
> * * *
>
> As with the grand jury, . . . the public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false.

*White v. Frank*, 855 F.2d 956, 961-62 (2d Cir. 1988); *see also Malley v. Briggs*, 475 U.S. 335 (1986) (judicial officer's decision to issue arrest warrant did not break causal chain where police officer who wrote affidavit knew he lacked probable cause to arrest); *Wilmore*, 407 F.3d at 283 (indictment and conviction did not shield officer from liability for pre-indictment false report); *Jones v. City of Chicago*, 856 F.2d at 994 ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."); *Wagenmann v. Adams*, 829 F.2d 196, 212-13 (1st Cir. 1987) (court clerk's decision to set bail did not insulate police officer from liability for violating plaintiff's right to be free from excessive bail).[15]

This sort of misconduct, of course, is precisely what the Amended Complaint alleges. Defendants, knowing there was no probable cause to indict Plaintiffs, decided to fabricate inculpatory evidence, conceal evidence of actual innocence, and make false statements in bad faith in order to mislead the grand juries and effect seizures of Plaintiffs. Since the indictments and seizures were not only reasonably foreseeable, but the intended result of this misconduct, Defendants cannot now point to the indictments as "intervening causes" of Plaintiffs' seizures. *See Wilmore*, 407 F.3d at 283 (causation inquiry includes whether the fabricated evidence "influenced the decision to bring charges"); *Jones v. City of Chicago*, 856 F.2d at 993-94 ("The jury was entitled to

---

[15] As the Seventh Circuit has observed, there is no difference in the causation analysis between malicious prosecution/unlawful seizure cases and due process cases under § 1983. *See Jones v. City of Chicago*, 856 F.2d at 994 ("[T]he causal inquiry is unchanged.").

find that had it not been for the misconduct of the defendants, Jones would neither have been arrested nor charged."); *Hand v. Gary*, 838 F.2d 1420, 1427-28 (5th Cir. 1988) ("[T]he chain of causation is broken only where all the facts are presented to the grand jury, . . . where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information . . . . Any misdirection . . . by omission or commission perpetuates the taint of the original official behavior."); *Veney*, 293 F.3d at 730.

      None of Defendants' cases supports a contrary result. Indeed, Defendants cite only one case in which a plaintiff alleged a deliberate attempt to mislead the grand jury or hearing judge, but that case was decided on a motion for summary judgment, not a motion to dismiss because of a point of law. *See Crudup v. Schulte*, 12 F. App'x 682, 686 (10th Cir. 2001). Defendants' remaining citations largely stand for the unremarkable propositions that (1) mistakes do not lead to § 1983 liability;[16] and (2) a prosecutor generally owes no duty to disclose exculpatory evidence to the grand jury.[17] Sustaining Plaintiffs' claims does not require contradiction of either of those propositions.

### 2. Nifong's Participation Does Not Preclude Defendants' Liability.

      Finally, Defendants argue that they cannot be found to have caused the unlawful seizures because they "fully disclosed" all relevant evidence to Nifong, and

---

[16] *See, e.g., Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996) ("[T]he chain of causation is broken by an indictment, *absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers* . . . ." (emphasis added)); *Kompare v. Stein*, 801 F.2d 883, 892 (7th Cir. 1986) (defendants insulated from liability where initial autopsy established probable cause for manslaughter, even though subsequent autopsy proved innocence).

[17] *See, e.g., United States v. Williams*, 504 U.S. 36, 51-55 (1992); *United States v. Waldon*, 363 F.3d 1103, 1109 (11th Cir. 2004).

Nifong made the decision to seek indictments anyway. City Br. at 27-29; DSI Br. at 27; Gottlieb Br. at 17; Himan Br. at 17. Because the allegations of the Amended Complaint must be accepted as true, Defendants are essentially arguing that even though Nifong joined with them in the unlawful scheme to indict Plaintiffs in the absence of probable cause, they cannot be liable because Nifong, as their co-conspirator, knew that they had also fabricated inculpatory evidence, concealed evidence of actual innocence, and made false and inflammatory statements in furtherance of the scheme.

This argument does not suffer for lack of creativity or nerve. In essence, Defendants take the settled law described in the previous Section—that a deceived prosecutor cannot shield a wrongdoer from liability—and flip it on its head, arguing that since Nifong was *not* deceived, his actions must have been independent. Such an argument again ignores the settled proposition that § 1983 incorporates the common law of torts, holding defendants liable for "the natural consequences of [their] actions." *Wilmore*, 407 F.3d at 283 (internal quotation marks omitted). It also ignores the doctrine of conspiracy, alleged in the Seventh Cause of Action (and several of the state-law causes of action), which makes one co-conspirator liable for the acts of the others. *See Hafner v. Brown*, 983 F.2d 570, 577 & n.6 (4th Cir. 1992). Moreover, it ignores the allegations of the Amended Complaint, which make clear that Gottlieb and Himan agreed to mislead the grand jury regarding the lack of probable cause, *see* AC ¶¶ 181, 195-196, 210, 215, 219-220, the Supervisory Defendants knew this and still approved their conduct, *see id.* ¶¶ 182-183, 196, 211, 221, 237, and the DSI Defendants engaged in their DNA-related misconduct to ensure that Nifong and the Durham Police would be able to obtain the indictments and seizures of Plaintiffs, *see id.* ¶¶ 208-210, 225-227, 229-235.

Nor does the case law support the leap of logic suggested by Defendants. In *Zahrey*, for example, the Second Circuit rejected an identical "causation" defense by a prosecutor who, as here, was alleged to have conspired with police officers to cause an arrest without probable cause. 221 F.3d at 353. The prosecutor argued that, because he was part of the conspiracy, he could not have been deceived, and thus, his decision to seek the indictment was an independent, intervening act that broke the causal chain for any pre-indictment conduct. *Id.* The Second Circuit flatly rejected this argument because it ignored the "reasonable foreseeability" principle of causation: "If, as alleged, [the prosecutor] fabricated evidence in his investigative role, it was at least reasonably foreseeable that in his advocacy role he would later use that evidence before the grand jury, with the likely result that Zahrey would be indicted and arrested." *Id.* at 353-54.

The same logic applies here. The Amended Complaint alleges that Defendants worked together with Nifong in an investigative role; that they conspired and acted together to fabricate evidence, conceal the evidence demonstrating the lack of probable cause, make false and inflammatory statements, and mislead the grand juries; and that they did so precisely in order to help Nifong obtain the indictments and arrests of Plaintiffs in his traditional advocacy role. *Compare* AC ¶¶ 181-183, 195-196, 208-211, 215, 219-221, 225-227, 229-235, *with Zahrey*, 221 F.3d at 353. It defies logic to conclude that it was not "reasonably foreseeable" that such actions would achieve the intended results or that there was an "intervening cause." *See Zahrey*, 221 F.3d at 352-53 ("Even if the intervening decision-maker . . . is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty.").

Defendants' cases are inapposite.  The City and Gottlieb rely on *Rhodes v. Smithers*, but as that case makes clear, the actions of a prosecutor serve as an intervening cause only where he or she acts in good faith.  *See* 939 F. Supp. 1256, 1274 (S.D.W. Va. 1995), *aff'd per curiam*, 91 F.3d 132 (4th Cir. 1996).  The City also cites *Eubanks v. Gerwen*, but there, it was undisputed that the defendant police officers had acted in good faith.  *See* 40 F.3d 1157, 1160-61 (11th Cir. 1994).  Here, it is alleged that Defendants acted in bad faith.  At bottom, Defendants cannot meet their heavy burden to defeat Plaintiffs' § 1983 claims at the pleading stage.  *See Veney*, 293 F.3d at 730.

## IV.  THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS AGAINST THE CITY OF DURHAM.

### A.  Summary of Claims Against the City of Durham

The Amended Complaint alleges several causes of action against the City of Durham.  The Fifth Cause of Action states a § 1983 claim directly against the City for violations of Plaintiffs' Fourth and Fourteenth Amendment rights resulting from official actions, policies, and customs attributable to the City or its policymaking officials.  This is commonly referred to as a "*Monell* claim," after the Supreme Court's decision in *Monell v. Department of Social Services of City of New York*, which holds that municipalities can be held liable under § 1983.  *See* 436 U.S. 658 (1978).  The Seventh through Eleventh Causes of Action allege civil rights conspiracy claims under 42 U.S.C. §§ 1983, 1985, and 1986 against the City, either by directly naming the City and/or by naming City employees and agents in their official capacities, which makes the City the real party in interest on those claims ("official capacity claims").[18]  The Thirteenth

---

[18] The individual Defendants are not personally liable on official capacity claims, only the City.  *See Brandon v. Holt*, 469 U.S. 464, 472 (1985).

through Twenty-Second Causes of Action state direct and/or official capacity claims against the City under North Carolina law.

In this Section, we respond to the City's arguments for the dismissal of these municipal liability claims. These arguments fall into three general categories, each of which is defeated by the allegations of the Amended Complaint and applicable law:

• First, the City argues that it cannot be held liable for any claims relating to Nifong's misconduct during the investigation because, the City contends, Nifong was not an employee, official, or policymaker of the City. City Br. at 13-17.[19] As explained in Section IV.B.2, *infra*, however, this argument is defeated by allegations that the City's policymaking officials delegated authority to Nifong to direct the Durham Police investigation, later ratified the misconduct committed by Nifong and the Durham Police personnel acting at Nifong's direction, and in certain cases directly approved or participated in the misconduct. *See* AC ¶¶ 15, 56, 129-135, 155, 178-187, 207-211, 215, 218, 221, 226, 245-265, 373, 391, 399-405, 408, 412-416, 440, 455, 530, 534.

• Second, the City argues that it cannot be held liable under the Fifth Cause of Action because Plaintiffs have failed to allege a City policy or custom that caused Plaintiffs to suffer a constitutional injury. City Br. at 29-32. As explained in Section IV.B, *infra*, however, Plaintiffs identify multiple grounds for § 1983 liability in the Fifth Cause of Action, including City policymakers' misconduct, misconduct committed by Nifong pursuant to delegated authority, and supervisory failures, in addition to the City policies, customs, and practices that resulted in violations of Plaintiffs' rights; each of these grounds is independently sufficient to support *Monell*

---

[19] The City directs this argument at the Fifth, Seventh, Eighth, Ninth, Tenth, Thirteenth, Fourteenth, and Fifteenth Causes of Action. City Br. at 13-17.

liability.  Moreover, as explained in Section IV.B.3, *infra*, the allegations relating to City policies, customs, and practices are legally sufficient to state a claim for municipal liability under § 1983.

•	Third, the City contends that any official capacity claims relating to the DSI Defendants should be dismissed because, the City alleges, the DSI Defendants were private parties engaged by Nifong on behalf of the State.  City Br. at 18-19.[20]  As explained in Section IV.B.4, *infra*, however, these assertions depend on documents outside the Amended Complaint that are not appropriate for conclusive judicial notice and that impermissibly contradict Plaintiffs' allegations that the DSI Defendants' misconduct occurred while they were retained on behalf of the City and the Durham Police to provide forensic analysis for the police investigation.  *See* AC ¶¶ 198-203.

**B.	The Fifth Cause of Action Properly Alleges the Elements of a § 1983 Claim Against the City of Durham.**

In *Monell*, the Supreme Court held that a municipality may be held directly liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts . . . may fairly be said to represent official policy, inflicts [constitutional] injury."  *Monell*, 436 U.S. at 694.  The courts have applied *Monell* to a variety of circumstances, distinguishing between discretionary acts and "action for which the municipality is actually responsible."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986); *see also Bennett v. N.C. DOT*, No. 1:05CV764 (JAB), 2007 WL 4208390, at *5 (M.D.N.C. Nov. 26, 2007).  All of these cases can be

---

[20] The City directs this argument against the Seventh, Eighth, Tenth, Twelfth, Thirteenth, Fourteenth, Fifteenth, Twentieth, Twenty-First, and Twenty-Second Causes of Action. City Mot. at 2 ¶ 2.

distilled to a single guiding principle: "*Monell* is a case about responsibility." *Pembaur*, 475 U.S. at 478. On the facts alleged in the Amended Complaint, there is no doubt that the City and its Police Department, through official policies, customs, and the direct actions of policymakers, were intimately engaged in the efforts to violate Plaintiffs' constitutional rights. The City is therefore responsible for the damages that were inflicted on Plaintiffs as a result of those violations.

The misconduct alleged in the Amended Complaint satisfies several independent grounds for municipal liability under § 1983. We discuss each in turn.

> **1.      The City Is Liable for Constitutional Violations that Were Caused and Ratified by Its Policymaking Officials.**

In Part A of the Fifth Cause of Action, Plaintiffs allege that officials with final policymaking authority for the City—the City Manager, the Chief of Police, and senior command officers in the Durham Police Department (collectively, the "Supervisory Defendants")—directly caused the violations of Plaintiffs' civil rights by ordering or ratifying the illegal conduct of their subordinates. AC ¶¶ 175-179, 182-187, 215, 218, 408, 412-416, 373-378. These allegations alone are sufficient to state a § 1983 claim against the City under *Monell*.

The City does not raise any arguments directly against this part of the Fifth Cause of Action and, indeed, concedes the point. *See* City Br. at 29-30 (noting that "affirmative decisions by persons with final policymaking authority for the city" are sufficient to establish municipal liability under § 1983).[21] Rightly so. "If the decision to adopt [a] particular course of action is properly made by that government's authorized

---

[21] The City's arguments relating to whether there was an underlying constitutional violation are addressed in Section III, *supra*.

decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur*, 475 U.S. at 481. Even a single action "directed by those who establish governmental policy" is sufficient to subject the City to liability. *Id.* Similarly, if such officials ratify the unconstitutional conduct already caused by their subordinates, the City is liable under § 1983. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification [is] chargeable to the municipality because their decision is final."); *Love-Lane v. Martin*, 355 F.3d 766, 782-83 (4th Cir. 2004) (To establish *Monell* liability, a plaintiff "must demonstrate that the [policymaker] was aware of the constitutional violation and either participated in, or otherwise condoned, it."); *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994) (decision affirming unconstitutional actions of subordinate sufficient to establish municipal liability); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 340 (4th Cir. 1994) (allegation that policymakers "condoned and ratified the improper and overreaching conduct of" their subordinates sufficient to establish municipal liability under § 1983).

> **2.** **The City Is Liable for Civil Rights Violations Caused by Nifong Pursuant to Delegated Authority over the Police Investigation.**

In addition to policymaker misconduct, the Supreme Court has recognized a related "delegation" principle of municipal liability under § 1983: a municipality can be held liable under § 1983 for civil rights violations caused by persons acting pursuant to delegated authority. This § 1983 delegation liability takes two forms. First, where a municipality's policymaking officials delegate final authority over a particular decision or area to another person, and that person commits a civil rights violation while acting within the scope of the delegated authority, the municipality is liable under § 1983 as if

its final policymaking officials had committed the violation. *See Praprotnik*, 485 U.S. at 126-27; *Pembaur*, 475 U.S. at 481-85. Second, a municipality is liable under § 1983 where its policymaking officials delegate discretionary authority to another person and subsequently ratify that person's misconduct. *See Praprotnik*, 485 U.S. at 127.

Plaintiffs allege both types of § 1983 delegation liability here. In this case, the City's policymaking officials delegated to Nifong the authority to direct the Durham Police investigation and told Durham Police investigators to take direction from Nifong rather than the usual chain of command. AC ¶¶ 15, 129-135, 174, 180-181, 198, 207-211, 226, 245-265, 399-405. Nifong later caused and directed others to cause the violations of Plaintiffs' constitutional rights while acting in this delegated investigatory capacity. *Id.* ¶¶ 129-135, 175-193, 207-242, 399-405. The Amended Complaint separately alleges that the City's policymaking officials ratified the misconduct caused by Nifong and by its officers working at Nifong's direction, "knowing, or with deliberate indifference to the likelihood, that [those actions] would result in violations of Plaintiffs' constitutional rights." *Id.* ¶ 404. These allegations are sufficient to state a § 1983 delegation claim against the City, regardless of whether Nifong had final or discretionary authority over the police investigation. *See Praprotnik*, 485 U.S. at 126-27 (policymaker's ratification of acts pursuant to delegated authority sufficient for § 1983 liability); *Pembaur*, 475 U.S. at 481-85 (municipality liable where sheriff instructed officers to take direction from county prosecutor); *Love-Lane*, 355 F.3d at 782-83; *Hall*, 31 F.3d at 196; *Jordan*, 15 F.3d at 340; *Bennett*, 2007 WL 4208390, at *6 n.3 ("recogniz[ing] that an official 'policy or custom' can, in some limited circumstances, be inferred from an official's ratification of a constitutional violation"); *Cranford v. Frick*, No. 1:05CV62, 2007 WL 676687, at *4 (M.D.N.C. Feb. 28, 2007) (allegations that law

enforcement officers sought and received approval and direction from supervisor sufficient to state official capacity claim).

None of the City's arguments defeats this § 1983 delegation claim. First, the City simply rejects Plaintiffs' factual allegations as "nonsensical." But that is a jury argument. Because Plaintiffs' allegations are accepted as true at this stage, this argument must fail. *See Phillips v. Mabe*, 367 F. Supp. 2d 861, 867 (M.D.N.C. 2005).

Second, the City attempts to recast the allegations that City policymakers delegated authority to Nifong as simply "the normal coordination between municipal police officers and State prosecutors" that could not have "transformed him into a City official." City Br. at 14-15 & 17 n.8. To be clear, Plaintiffs are <u>not</u> asserting that a municipality in North Carolina can ordinarily be held liable under § 1983 for the actions of a District Attorney in his or her traditional advocacy role. Rather, Plaintiffs assert that the City is liable for Nifong's actions *because its policymakers delegated authority over the Durham Police investigation to Nifong* and because the civil rights violations arose from Nifong's misconduct *in that investigative role*. AC ¶¶ 405-407.

In *Pembaur*, the Supreme Court considered a virtually identical instance of delegation and held that it was sufficient to trigger municipal liability under § 1983. There, county law enforcement officers were instructed by their superior to take direction from the county prosecutor regarding how to handle a stand-off situation. *See Pembaur*, 475 U.S. at 472-73. There, as here, state law authorized the prosecutor to prosecute crimes "on behalf of the state," Ohio Rev. Code Ann. § 309.08(A); *compare* N.C. Gen. Stat. Ann. § 7A-61 ("in the name of the State"), and to advise local law enforcement as requested, *see* Ohio Rev. Code Ann. § 309.09(A) ("The prosecuting attorney shall be the legal adviser" to local agencies.); N.C. Gen. Stat. Ann. § 7A-61 ("The district attorney

shall . . . advise the officers of justice in his district[.]").  The officers followed the

prosecutor's instructions, which "directly caused the violation of petitioner's Fourth

Amendment rights."  *Pembaur*, 475 U.S. at 484.  The Court in *Pembaur* rejected the

same sort of recasting of the prosecutor's role that the City offers here:  "We decline to

accept respondent's invitation to overlook this delegation of authority by disingenuously

labeling the Prosecutor's clear command mere 'legal advice.'"  *Id*. at 485.  Instead, the

Court held that the delegation made the prosecutor the "final decisionmaker" for the

municipality in that situation, thus rendering the county liable under § 1983.  *Id*.

The City's final argument is that delegation is "impossible" because North

Carolina law defines District Attorneys as State officials.  City Br. at 13-17.  This

argument misconceives the purpose of state law in the analysis of § 1983 claims.  Courts

look to state law to determine whether a particular official, *in the normal course of

business*, has sufficient authority to render a municipality liable for his or her misconduct.

*See, e.g.*, *McMillian v. Monroe County*, 520 U.S. 781, 785-86 (1997) (examining state

law to determine if sheriff had final policymaking authority for municipality in traditional

"law enforcement" capacity).  But that is a separate question from whether a municipality

is liable because of the actual delegation of authority to another person.  No court has

ever precluded a § 1983 delegation claim simply because municipal policymakers

delegated authority to a State official, nor would such a rule make any sense.  Where

municipal officials like the Supervisory Defendants already have final policymaking

authority and elect to delegate that authority to someone else, it is irrelevant whether the

person to whom such authority is conferred is a municipal official, a State official, or a

private party.  Through the act of delegation, that person has become an agent of the

municipality, and if he or she uses that delegated authority to violate someone's rights, or

if the municipal policymaker ratifies the agent's misconduct, the municipality is liable under § 1983. *See Pembaur*, 475 U.S. at 481 ("If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."). Ultimately, as noted above, "*Monell* is a case about responsibility," and the Supreme Court has cautioned courts to be wary of efforts by municipalities to shield themselves from liability behind proxies and labels. *Pembaur*, 475 U.S. at 478; *see also McMillian*, 520 U.S. at 796; *Praprotnik*, 485 U.S. at 127. "[A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations." *Pembaur*, 475 U.S. at 481. "If . . . a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." *Praprotnik*, 485 U.S. at 126.[22]

---

[22] Nor does the City cite a single case that would preclude delegation to a State official as a basis for municipal liability under § 1983. The City relies on a portion of *Praprotnik* that uses the term "subordinate," but there the Court was not purporting to limit delegation or ratification only to subordinate officials. 485 U.S. at 126 (quoted in City Br. at 17). To the contrary, in *Pembaur*, the Court held that final authority was delegated to a prosecutor who was not a subordinate. 475 U.S. at 485. The City's reliance on *McMillian v. Monroe County* is also misplaced. *McMillian* did not involve delegation at all; rather, the Court was determining whether a sheriff had final authority for the municipality in his normal law enforcement capacity. 520 U.S. at 785-86 (quoted in City Br. at 13). Neither case, nor any others cited by the City, holds that delegation to a State official is "impossible." City Br. at 17.

### 3. The City of Durham Is Liable Under § 1983 for Civil Rights Violations Caused by Official Custom and Policy.

The Supreme Court has also recognized that a municipality is liable under § 1983 when its implementation of a policy, custom, or practice results in a "deprivation of rights protected by the Constitution." *Monell*, 436 U.S. at 690-91. Such liability can result from civil rights violations caused by, among other things, (a) a policy that, if enforced, is likely to result in violations of civil rights, *see id.*; (b) a failure to change an existing policy that has previously caused civil rights violations or provide adequate training to ensure that no further violations occur, *see Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); (c) an institutional custom or practice that is widespread and "so manifest as to imply the constructive acquiescence of senior policy-making officials," *Sorlucco v. NYPD*, 971 F.2d 864, 871 (2d Cir. 1992); or (d) "an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker," *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

Here, Parts B and C of the Fifth Cause of Action allege that the violations of Plaintiffs' civil rights were caused by two separate policies, customs, or practices of the City of Durham: (1) the Durham Police custom and practice of issuing premature public declarations of guilt (addressed in Part B of the Fifth Cause of Action); and (2) the Durham Police policy of targeting Duke University students living in the Trinity Park neighborhood for selective and aggressive enforcement of the law (the "Zero Tolerance Policy"), a policy that, prior to March 13, 2006, had resulted in violations of the constitutional rights of Duke University students without meaningful response by the City or the Durham Police Department (addressed in Part C of the Fifth Cause of Action).

The City does not contend that Part B of the Fifth Cause of Action fails to state a claim for municipal liability.[23] However, the City argues that the Zero Tolerance Policy claim alleged in Part C of the Fifth Cause of Action fails to state a municipal liability claim for two reasons: (1) the Amended Complaint does not "allege numerous *particular* instances of the same unconstitutional conduct," City Br. at 30-31 (citation and internal quotation marks omitted); and (2) the Zero Tolerance Policy does not amount to "a City policy to seize people without probable cause," *id.* at 31 (emphasis omitted). These arguments misstate the law.

First, the Fourth Circuit has expressly rejected the heightened pleading standard that the City seeks to impose. At the pleading stage, "[t]here is *no* requirement that [a § 1983 Plaintiff] . . . plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan*, 15 F.3d at 339 (emphasis added). All that is required is that the Amended Complaint put the City of Durham on notice of the Zero Tolerance Policy and the allegations of prior constitutional violations. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 245 (4th Cir. 1999) (quoting and citing *Jordan*, 15 F.3d at 339). The City's contrary position is based on *summary judgment* cases, *Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997), and *Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999), that were decided on a fully developed record after discovery. Neither of these cases is applicable at the motion to dismiss phase.

Second, an official policy does not need to expressly require officers "to seize people without probable cause," *see* City Br. at 31, or otherwise be facially

_____

[23] Plaintiffs respond to the City's arguments regarding whether the Nifong and Durham Police Statements are actionable under § 1983 in Section III.B.1, *supra*.

unconstitutional in order to trigger municipal liability. *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989) ("[W]e reject petitioner's contention that only unconstitutional policies are actionable under [§ 1983]."). Rather, it is sufficient to show that the municipality was on notice that its policy would cause constitutional violations but failed to take adequate steps to prevent those violations. *See Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (*Monell* liability can be established where "the municipality is aware that its policy for handling a given situation, although not unconstitutional in itself, may be applied unconstitutionally, but nevertheless consciously chooses not to train its employees in proper application of the policy."); *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000) (systematic policy of sexual abuse in the face of written policy prohibiting sexual harassment sufficient to establish § 1983 liability); *Spell v. McDaniel*, 824 F.2d 1380, 1387-88 (4th Cir. 1987) ("[A] policy or custom that is not itself unconstitutional" may still provide ground for municipal liability where it is "independently proven to have caused the violation."); *Fiacco v. Rensselaer*, 783 F.2d 319, 326 (2d Cir. 1986) (rejecting "the City [D]efendants' suggestion that a municipal policy that is not itself unconstitutional but that merely permits or tolerates unconstitutional acts by city employees cannot be the basis for municipal liability under § 1983").

Here, the Amended Complaint alleges not only that the Zero Tolerance Policy was likely to result in constitutional violations against Duke University students, but that City officials were already on notice that it was causing such violations. AC ¶¶ 82, 384-385. When Gottlieb, who had already engaged in misconduct while carrying out the Zero Tolerance Policy, was later assigned to run the investigation into Mangum's allegations involving Duke students and Trinity Park, it was reasonably foreseeable that

more violations would occur.[24]  *See Bd. of County Comm'rs*, 520 U.S. at 411-12 (Municipal liability based on otherwise lawful hiring decision can be established where "adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude . . . that this officer was highly likely to inflict the particular injury suffered by the plaintiff." (emphases omitted)).  By failing to control Gottlieb or otherwise prevent constitutional violations in the enforcement of the Zero Tolerance Policy, City policymakers demonstrated deliberate indifference to Plaintiffs' constitutional rights.  AC ¶ 385.  That indifference caused Plaintiffs to suffer violations of their Fourth Amendment rights.  *See id.* ¶ 386.  On this basis alone, the City is liable under § 1983.

### 4. The City of Durham Is Liable Under § 1983 for the Supervisory Defendants' Failure To Supervise Nifong and Gottlieb.

Finally, in Parts D and E of the Fifth Cause of Action, Plaintiffs allege two other independent grounds for § 1983 liability against the City:  the Supervisory Defendants' deliberate indifference to Plaintiffs' rights (1) by initially assigning Gottlieb to the investigation into Mangum's allegations and later failing to remove him after learning of his misconduct; and (2) by delegating authority to Nifong over the Durham Police investigation and later failing to take corrective action after learning that Nifong had engaged and directed Durham Police officers to engage in misconduct. Municipalities are liable under § 1983 for deliberate indifference evidenced by supervisors and policymakers in the hiring and supervision of municipal employees and agents.  *See Bd. of County Comm'rs*, 520 U.S. at 410-11 (recognizing supervisory

---

[24] The City's assertion that Gottlieb's initial reassignment away from Trinity Park somehow "undermine[s]" Plaintiffs' claim, *see* City Br. at 31, rings hollow, given the fact that Gottlieb was reassigned right back to this high-profile investigation.

liability for hiring decisions evidencing deliberate indifference in light of past conduct that would have been evident by "adequate scrutiny" of officer's background); *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1313-14 (11th Cir. 2001) (municipality liable for constitutional harm resulting from deliberate indifference in single hiring decision); *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 49 (1st Cir. 1999) (municipality can be held liable for deliberate indifference demonstrated by failure to discipline police officer for pattern of abuses). Here, the Amended Complaint alleges two classic examples of such indifference.

The City's only argument with respect to the "failure to supervise Nifong" claim (Part D of the Fifth Cause of Action) is that Nifong was a State official, and therefore as a matter of law the Supervisory Defendants could not "supervise" him. *See* City Br. at 32. This argument ignores the allegations of the Supervisory Defendants' delegation of authority to Nifong over the Durham Police investigation. By delegating such authority to Nifong, the Supervisory Defendants had a duty to supervise his actions relating to the investigation and to revoke his authority when they learned that Nifong, and Durham Police officers acting at his direction, had engaged in misconduct. AC ¶ 132-134, 187, 211, 221, 228, 237, 254, 265. By failing to revoke Nifong's authority, the Supervisory Defendants acted with deliberate indifference to Plaintiffs' rights, thus triggering § 1983 liability.

The City argues against the "failure to supervise Gottlieb" claim (Part E of the Fifth Cause of Action) with a rehash of arguments that it raised against Part C of the Fifth Cause of Action. These arguments can be rejected for the same reasons stated in Section IV.B.3, *supra*. Plaintiffs allege that the Supervisory Defendants were aware of Gottlieb's prior record of misconduct, including some of the same abuses of which

Plaintiffs now complain, and that they disregarded the "known or obvious consequences" of further civil rights violations when they assigned him to the investigation. *Id.* ¶¶ 80-84; *see Bd. of County Comm'rs*, 520 U.S. at 411-12 (municipal liability for hiring decisions is appropriate where the "connection between the background of the particular applicant and the specific constitutional violation alleged [is] strong"); *Griffin*, 261 F.3d at 1314 (municipality liable for sexual harassment perpetrated by employee where policymaker hired employee despite "red flags" of harassment in his history). Similarly, when the Supervisory Defendants learned that Gottlieb was committing multiple acts of misconduct in this investigation, they should have removed him immediately, yet they never did so. *See* AC ¶¶ 132-134, 187, 211, 221, 228, 237, 254, 265; *Shaw v. Stroud*, 13 F.3d 791, 799-801 (4th Cir. 1994) (supervisor liable for "deliberate indifference" because of failure to remove subordinate notwithstanding three prior incidents of abuse). Ultimately, the Supervisory Defendants' deliberate indifference allowed Gottlieb and Nifong to continue unchecked and cause the unlawful seizures of Plaintiffs. This also subjects the City to liability under § 1983.

### C. The City Is Properly a Defendant in Plaintiffs' Remaining Claims.

In addition to the Fifth Cause of Action, Plaintiffs have alleged several other direct and official capacity claims against the City under 42 U.S.C. § 1985, 42 U.S.C. § 1986, and North Carolina law. The City does not dispute that, to the extent Plaintiffs have properly alleged the elements of these additional causes of action, they have stated claims against the City either directly or by naming individual Defendants in their official capacities.[25] The City does argue, however, that it cannot be liable on these

---

[25] Plaintiffs respond to the City's arguments about whether Plaintiffs have alleged the elements of a § 1985 and § 1986 claim in Section VIII, *infra*.

additional claims for acts committed by Nifong or the DSI Defendants because, the City

contends, neither Nifong nor the DSI Defendants acted in an "official capacity" with

respect to the City during the investigation.  City Br. at 13-19.

As it relates to Nifong, the City's argument is the same one that it raises in

opposition to the Fifth Cause of Action—that Nifong was a State official not subject to

supervision by City officials, *id.* at 13-17—and thus, this argument is defeated by the

same allegations of delegation and ratification discussed in Section IV.B.2, *supra*.

Moreover, unlike a § 1983 *Monell* claim, which requires proof of official action,

Plaintiffs' state-law claims against the City can be supported by proof of torts committed

by City employees and agents under the doctrine of *respondeat superior.  See, e.g.,

Munick v. City of Durham*, 106 S.E. 665, 667 (N.C. 1921) (municipalities can be held

liable for actions of their agents acting in their official roles); *Hogan v. Forsyth Country

Club Co.*, 340 S.E.2d 116, 123 (N.C. Ct. App. 1986) ("North Carolina recognizes the

existence of a claim against an employer for negligence in employing or retaining an

employee whose wrongful conduct injures another."); *see also Borneman v. United

States*, 213 F.3d 819, 828 (4th Cir. 2000) (municipality can be held liable for intentional

torts under North Carolina law); *Simpson v. Life Investors Ins. Co. of Am.*, 367 F. Supp.

2d 875, 881 (M.D.N.C. 2005) (discussing factors relevant to determining whether

employer is liable for conduct of employee or agent).

As it relates to the DSI Defendants, the City's argument is that these

defendants never worked for the City, only for Nifong and the State of North Carolina,

and therefore had no "official capacity" with the City that would trigger municipal

liability.  City Br. at 18-19.[26]  This is contrary to what the Amended Complaint alleges, however.  Plaintiffs allege that the DSI Defendants were retained by "the City of Durham, or the Durham Police Department," not simply Nifong, based on the allegations that the DSI Defendants were retained to assist in the Durham Police "investigation of Plaintiffs," that the person who initially located and retained them was a Durham Police investigator, that Durham Police personnel attended meetings with the DSI Defendants to discuss their forensic analysis, and that the Supervisory Defendants requested and received updates on the DSI Defendants' efforts.  AC ¶¶ 30-32, 198-201, 207, 211, 223, 228, 229, 237.  Even if Nifong alone had retained the DSI Defendants to perform forensic analysis for the Durham Police investigation, this retention would have been pursuant to the authority delegated to Nifong by the Supervisory Defendants discussed above in Section IV.B.2.  These allegations of the DSI Defendants' role in the Durham Police investigation, and their recruitment and supervision by City employees and agents, are sufficient to establish an official capacity relationship between the DSI Defendants and the City at the pleading stage.  *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961); *Woodson v. Rowland*, 407 S.E.2d 222, 234 (N.C. 1991).

---

[26] The City does not contest that the DSI Defendants can act under color of law or argue that the City cannot be held liable for the conduct of agents and contractors working at the direction of City officials and officers.  *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 57-58 (1988) (contract physician's conduct attributable to prison); *United States v. Price*, 383 U.S. 787, 794 (1966) ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law[.]"); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961) (government's "position of interdependence" with private contractor rendered government "a joint participant in the challenged activity").

The City asks the Court to disregard these allegations and make a conclusive determination that the DSI Defendants were working exclusively for Nifong in his prosecutorial role, and not at all for the City, the Durham Police Department, or Nifong in his delegated investigatory role, based on two selectively produced documents: two state-court orders that Nifong obtained in the criminal proceedings seeking payment for DSI.  This effort should be rejected for three reasons.  First, the Court ordinarily may not consider facts outside the complaint in deciding a motion to dismiss.  *See Wilson-Cook Med., Inc. v. Wilson*, 942 F.2d 247, 252 (4th Cir. 1991).  Second, contrary to the City's assertions, these court orders are not "public records and prior determinations" of which the Court should take "judicial notice" under Rule 201 of the Federal Rules of Evidence, City Mot. at 4, because neither order satisfies the criteria for judicial notice: (1) the fact that the City is seeking to judicially establish—that DSI was purportedly working only for Nifong in his prosecutorial role, and not at all for the City or Durham Police—was not "generally known within the territorial jurisdiction" of the Court, Fed. R. Evid. 201(b)(1); and (2) given that these orders were issued based on representations by Nifong, who was later convicted and disbarred for making false representations to the same court in the same matter, the orders are hardly a source "whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2).  Third, neither order is entitled to conclusive weight:  the orders did not result from any matter that was actually litigated in the criminal proceedings, and the most that they purport to show is that payment of DSI's bills was requested by the State, which is only one of the factors that relate to whether the DSI Defendants were acting as an agent of the City for purposes of the Durham Police investigation.  *See Simpson*, 367 F. Supp. 2d at 881.

## V. THE AMENDED COMPLAINT STATES A § 1983 CLAIM AGAINST THE SUPERVISORY DEFENDANTS.

The Amended Complaint alleges two § 1983 claims against the Supervisory Defendants in their individual capacities. The Sixth Cause of Action states a § 1983 claim against the Supervisory Defendants for acts and omissions that resulted in the violations of Plaintiffs' rights. The Seventh Cause of Action states a § 1983 claim against the Supervisory Defendants for conspiring to deprive Plaintiffs of their constitutional rights. (Plaintiffs respond to the Supervisory Defendants' arguments relating to the Seventh Cause of Action in Section VIII, *infra*.)

The Sixth Cause of Action addresses two different types of conduct. First, it seeks to hold the Supervisory Defendants liable for their affirmative actions that resulted in the deprivation of Plaintiffs' rights, including (1) ordering identifications and arrests of Duke lacrosse players during and after the March 29 Meetings, AC ¶¶ 175-179, 215, 408, 412, 415-416; (2) approving and later ratifying the tainted April Photo Array that immediately followed the March 29 Meetings, *id.* ¶¶ 182-183, 186-187, 408, 412, 415-416; and (3) agreeing with Nifong, Gottlieb, and Himan to mislead the grand jury as to the evidence of actual innocence and lack of probable cause*, id.* ¶¶ 218, 408, 415-416. The Supervisory Defendants' liability for these affirmative actions is analyzed in the same manner as the liability of any other police officer. *See* Sections III & IV.B.1, *supra* (citing cases).

Second, the Sixth Cause of Action seeks to hold the Supervisory Defendants liable for their subordinates' violations of Plaintiffs' civil rights that foreseeably resulted from (1) the Supervisory Defendants' failure to supervise the investigation generally, including their failure to revoke Nifong's authority over the investigation or otherwise take any meaningful action to prevent or remedy the numerous

abuses that they learned about during the investigation, AC ¶¶ 410-418; (2) the Supervisory Defendants' failure to control and supervise Gottlieb, including their decision to allow him to lead the investigation despite knowledge of his prior history of similar misconduct against Duke students, *id.* ¶¶ 419-425; and (3) the Supervisory Defendants' failure to train, control, and supervise Addison, who had a known record of improper public statements, at any time before or after he began his protracted campaign of false and inflammatory statements proclaiming the guilt of Duke lacrosse players and the supposedly heinous nature of the purported crime, *id.* ¶¶ 426-436.

"The principle is firmly entrenched that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw*, 13 F.3d at 798 (citing cases). Supervisory liability for a subordinate's misconduct "is not premised upon *respondeat superior* but upon 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Id.* at 798 (quoting *Slakan v. Porter*, 737 F.2d 368, 372-73 (4th Cir. 1984)). The Fourth Circuit has expressly noted that "supervisory liability can extend 'to the highest levels of state government,'" and that "liability ultimately is determined 'by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Id.* at 798 (quoting *Slakan*, 737 F.2d at 376). The Fourth Circuit has also noted that this issue "is ordinarily one of fact, not law." *Id.* at 799 (citing *Slakan*, 737 F.2d at 376; *Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir. 1981)).

There are three elements of a supervisory liability claim: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in

conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices[]'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799. The first and second elements are established by either (a) evidence of a supervisor's inaction in the face of conduct that is either "widespread" or that "has been used on several different occasions," *id.* (citing *Slakan*, 737 F.2d at 373-74), or (b) evidence of the supervisor's affirmative approval of or participation in even a single instance of misconduct, *see Cranford v. Frick*, No. 1:05CV62, 2007 WL 676687, at *5-6 (M.D.N.C. Feb. 28, 2007) ("Plaintiff's allegation of the Sheriff's affirmative misconduct relieves her from the burden of showing 'deliberate indifference,' and provides a sufficient basis for an individual liability claim under § 1983."); *Blair v. County of Davidson*, No. 1:05CV11, 2006 WL 1367420, at *10-11 (M.D.N.C. May 10, 2006) (denying motion to dismiss where plaintiff alleged that supervisors "were specifically involved in the deprivation of her constitutional rights, knew of the constitutional violations, had the power to prevent them, and failed to act to prevent the constitutional violations").[27] The third element is established by "direct" proof, such as "'where the

---

[27] *Accord Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) (supervisors "had approved every false step, and had done their part to make the scheme work"); *Jasinski v. Adams*, 781 F.2d 843, 848 (11th Cir. 1986) (supervisor participated in decision); *Lavender v. W. Va. Reg'l Jail & Corr. Facility Auth.*, No. 3:06-1032, 2008 WL 313957, at *4 (S.D.W. Va. Feb. 4, 2008) (supervisor "acquiesced" in subordinates' unlawful use of force) (quotation marks omitted); *Pruitt v. Pernell*, 360 F. Supp. 2d 738, 741 (E.D.N.C. 2005), *aff'd*, 173 F. App'x 298 (4th Cir. 2006) (supervisor instructed subordinates to engage in single incident of unlawful conduct).

policy commands the injury of which the plaintiff complains,'" or "'by [the] tort principle that holds a person liable for the natural consequences of his actions.'" *Shaw*, 13 F.3d at 799 (alteration in original) (quoting *Slakan*, 737 F.2d at 376).

The Amended Complaint satisfies each of these elements. First, it details the Supervisory Defendants' contemporaneous knowledge of the repeated abuses that were being committed by Durham Police and Nifong throughout the investigation,[28] the prior history of misconduct by Gottlieb, AC ¶¶ 82, 393-394, 419-420, and the prior history of improper public statements by Addison, *id.* ¶¶ 426-429. Second, it details not only the Supervisory Defendants' utter inaction in the face of these repeated abuses,[29] but their affirmative participation, authorization, or ratification of the abuses.[30] Finally, the Amended Complaint alleges that these supervisory failures foreseeably led to the constitutional deprivations suffered by Plaintiffs. *Id.* ¶¶ 4, 215, 222, 242, 416, 423, 434, 442, 450, 457, 465, 474.

These allegations defeat the Supervisory Defendants' sweeping claim that the Amended Complaint fails "to allege facts showing personal knowledge" and makes "no allegation as [to] why the City Manager, or any one of these particular members of the Durham Police Department would have been in a position to know of a pervasive risk of constitutional violations." SD Br. at 17, 19. Indeed, the Amended Complaint

---

[28] *See* AC ¶¶ 50, 55-56, 68, 79, 90, 100, 104, 107, 119, 124, 132, 155, 163, 174, 179, 183, 187, 196, 211, 218, 221, 228, 237, 254, 257, 264-265, 373, 379, 385, 388, 391, 404, 414, 420, 428-431, 440, 447, 455, 462, 471, 526-531, 534, 540-544.

[29] *Id.* ¶¶ 50, 55, 68, 79, 90, 100, 104, 107, 119, 124, 163, 257, 385, 394, 414, 420, 526-529, 531, 543.

[30] *Id.* ¶¶ 56, 155, 174, 179, 183, 187, 211, 215, 218, 221, 228, 237, 240, 254, 264-265, 373-377, 391, 395, 404, 440, 455, 530, 534.

identifies numerous instances in which Defendant Baker and the other Supervisory Defendants attended meetings or otherwise learned of the misconduct. *See, e.g.*, AC ¶¶ 174, 179, 182-183, 196, 211, 221, 228, 237, 254, 265, 373, 379, 385, 391, 414, 431.[31]

The Supervisory Defendants' other arguments similarly rely on a mischaracterization of the Amended Complaint. For example, the Supervisory Defendants contend that there are no substantive allegations against Defendants Council and Russ in the Amended Complaint, SD Br. at 10, but this simply ignores the fact that Council and Russ are two of the "Supervisory Defendants" whose knowledge, affirmative actions, and supervisory inaction are detailed throughout the Amended Complaint. *See, e.g.*, AC ¶¶ 22, 23, 26, 183, 187, 373-388, 404. The Supervisory Defendants also contend that the Amended Complaint fails to identify "the supervisor of any particular individual" or somehow "fail[s] at 'pinpointing the persons in the decisionmaking chain,'" SD Br. at 16-17 (quoting *Slakan*, 737 F.2d at 373), but this argument is belied by the allegations that the Supervisory Defendants did supervise Gottlieb, Himan, and Addison, AC ¶¶ 81-82, 131-133, 158, and by the fact that the Supervisory Defendants' counsel has already *confirmed* that these individuals were in the "decisionmaking chain." SD Br. at 17 (internal quotation marks omitted).[32] To the extent the Supervisory

---

[31] The Supervisory Defendants' cases, which turn on the absence of such allegations, are therefore inapposite. *See* SD Br. at 17-18 (citing *Harris v. City of Va. Beach*, 11 F. App'x 212, 214-15 (4th Cir. 2001); *Reaves v. Town of Fair Bluff*, No. 7:03-CV-103, 2005 U.S. Dist. LEXIS 43084, at *12 (E.D.N.C. May 12, 2005)).

[32] After this lawsuit began, the Supervisory Defendants' counsel requested and obtained Plaintiffs' voluntary dismissal of Stephen Mihaich, who had been named as a Supervisory Defendant in the initial complaint, based on the representation that, *unlike the other Supervisory Defendants*, Mihaich was not in the decisionmaking chain above Himan, Gottlieb, or Addison, and did not otherwise formulate or approve the conduct, policies, or practices at issue.

Defendants are attempting to suggest that only some, as opposed to all of them, are responsible, that is a matter for discovery, not a motion to dismiss. *See Shaw*, 13 F.3d at 798-99 ("[T]his issue is ordinarily one of fact, not law."); *Slakan*, 737 F.2d at 373; *Blair*, 2006 WL 1367420, at *10-11 (denying motion to dismiss § 1983 claims against law enforcement supervisors); *Pryor v. Debnam*, No. 5:98CV613, 1999 WL 1939989, at *4-5 (E.D.N.C. Mar. 22, 1999) (same).[33]

At bottom, the Amended Complaint describes an investigation run amok. The Supervisory Defendants allegedly knew of past, present, and intended future conduct by other Durham Police defendants that itself violated civil rights or that created an unacceptably high risk of such violations in this high-profile investigation. Even worse, the Supervisory Defendants not only failed to do anything to stop the misconduct; in some instances, they affirmatively approved or participated in it. *See Randall v. Prince George's Count*y, 302 F.3d 188, 206 (4th Cir. 2002). Such allegations are more than sufficient to state a claim under § 1983.

## VI.     THE AMENDED COMPLAINT STATES A § 1983 CLAIM AGAINST DSI AND CLARK.

DSI argues that Plaintiffs' § 1983 claims against it must be dismissed because a private corporation "cannot be held liable under section 1983 on a theory of *respondeat superior*." DSI Br. at 28.[34] However, the § 1983 claims against DSI are not based on *respondeat superior* but, rather, on the same principles as the *Monell* claim

---

[33] Plaintiffs respond to the Supervisory Defendants' arguments regarding whether there was an underlying constitutional violation in Section III, *supra*.

[34] The First, Second, Third, and Seventh Causes of Action all allege § 1983 claims against DSI.

alleged against the City of Durham in the Fifth Cause of Action. "'The principles of § 1983 municipal liability . . . apply equally to a private corporation[.]'" *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003) (quoting *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999)). One of those principles, expressly recognized by the Fourth Circuit, is that "corporate liability may . . . 'be imposed for a single decision by [corporate] policymakers under appropriate circumstances.'" *Id.* at 355 (alteration in original) (quoting *Pembaur*, 475 U.S. at 480). Here, DSI's liability arises from a series of decisions and actions by Clark, DSI's "President" and "controlling shareholder," and Meehan, DSI's "Laboratory Director," who are named as defendants with DSI in the relevant causes of action. AC ¶¶ 31-32. Together, Clark and Meehan affirmatively participated in the conspiracy to conceal the exculpatory DNA results and to instead fabricate a false report of "all DNA findings" in order to obtain, and later sustain, the indictments of Plaintiffs. *Id.* ¶¶ 199-200, 204-210, 222-237, 242, 340-349. Notably, DSI does not deny that Clark and Meehan were corporate "policymakers," *Rodriguez*, 338 F.3d at 355 (quotation marks omitted), but instead relies on the fact that the Amended Complaint does not specifically invoke the purportedly talismanic words "final policymaking authority," DSI Br. at 29. Given Plaintiffs' allegations regarding Clark's and Meehan's roles with DSI, such a specific allegation would be redundant.[35]

Clark also seeks dismissal of the § 1983 claims against him on the grounds that the Amended Complaint fails to state a § 1983 supervisory liability claim.[36] This

---

[35] To the extent that the words "final policymaking authority" must be used, Plaintiffs request leave to add them to the Amended Complaint.

[36] The First, Second, Third, and Seventh Causes of Action allege § 1983 claims against Clark.

argument is based on the demonstrably false assertion that the allegations against Clark are "bare-bones" and "describe nothing more than Clark's physical presence at three meetings with Nifong." *See* DSI Br. at 30. To the contrary, the Amended Complaint alleges that Clark affirmatively participated in the misconduct:

- "Clark . . . conspired to conceal and obfuscate the[] exculpatory [DNA] results . . . knowing that if those results came to light, they would prevent an indictment or conviction of any Duke lacrosse player," AC ¶¶ 209-10;

- "Clark . . . agreed not to take any notes . . . so as to hide exculpatory evidence," *id.* ¶ 209;

- "Clark . . . conspired and acted to fabricate [the] false and misleading report, and to conceal and obfuscate the exculpatory DNA evidence . . . to sustain the prosecutions of Finnerty and Seligmann, and support and sustain the indictment and prosecution of Evans," *id.* ¶ 226;

- "In keeping with the conspiracy, the May 12 Report used a limited reporting formula that Nifong, Meehan, Clark, Gottlieb, and Himan had agreed upon to conceal the entirety of DSI's findings," *id.* ¶ 232.

As in the case of the Supervisory Defendants, these allegations of Clark's affirmative participation in the underlying misconduct with his Laboratory Director, Meehan, are sufficient to state a claim against Clark for direct and supervisory violations of § 1983. *See Cranford*, 2007 WL 676687, at *5-6; *Blair*, 2006 WL 1367420, at *10-11; *see also* Section V, *supra*.

## VII. GOTTLIEB, HIMAN, ADDISON, AND THE SUPERVISORY DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Several of the individual Defendants assert that they are entitled to qualified immunity because, they contend, they could not have violated Plaintiffs' clearly established rights as a matter of law. *See* Addison Br. at 7-8; Gottlieb Br. at 25-26;

Himan Br. at 12-15; SD Br. at 26-30.  They make this argument notwithstanding

Plaintiffs' allegations that these Defendants

- conspired to cause, and did cause, Plaintiffs' seizures pursuant to indictments that they knew were unsupported by probable cause;

- fabricated inculpatory evidence;

- intimidated alibi and defense witnesses;

- concealed evidence of Plaintiffs' actual innocence and the lack of probable cause against them;

- made false public statements accusing white Duke lacrosse players of a violent and racially-motivated gang rape; and

- agreed to mislead the grand jury regarding the lack of evidence against Plaintiffs.

On the facts alleged, these Defendants cannot meet their burden of establishing their

entitlement to qualified immunity.  *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).

**A.      The Supreme Court and Fourth Circuit Have Identified the Standards Governing Claims of Qualified Immunity.**

Qualified immunity is an affirmative defense that protects government

officials performing discretionary functions, but only to the extent that "their conduct

does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Determining whether a § 1983 defendant is entitled to qualified immunity is a two-step

inquiry.  First, the court must decide "whether a constitutional right would have been

violated on the facts alleged."  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  Second, once a

constitutional violation has been established, the court must determine whether the right

was "clearly established" at the time of the alleged violation. *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002).

The key question, for qualified immunity purposes, is whether a reasonable official would have been on fair notice that the conduct at issue was unconstitutional. The Supreme Court's decision in *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). Thus, a constitutional right is deemed to be "clearly established" when "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739 (internal quotation marks omitted). "This determination 'is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances.'" *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004) (quoting *Kittoe*, 337 F.3d at 402).

Moreover, the Fourth Circuit has repeatedly held that "'the exact conduct at issue need not have been held unlawful for the law governing an officer's actions to be clearly established,'" and that "the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity." *Id.* (quoting *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001); citing *Kittoe*, 337 F.3d at 403). This is because "general statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Hope*, 536 U.S. at 741 (internal quotation marks omitted). Therefore, courts "must consider 'not only already

specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.'" *Owens*, 372 F.3d at 279 (quoting *Amaechi*, 237 F.3d at 362-63). "After all, qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations." *Kittoe*, 337 F.3d at 403 (internal quotation marks omitted).

In considering "[w]hether a right has been specifically adjudicated or is manifestly apparent from broader applications of the constitutional premise in question, [the courts of the Fourth Circuit] look ordinarily to the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Owens*, 372 F.3d at 279 (internal quotation marks omitted). "When there are no such decisions from courts of controlling authority, we may look to 'a consensus of cases of persuasive authority' from other jurisdictions, if such exists." *Id.* at 280 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999); citing *Amaechi*, 237 F.3d at 363).

"Most often . . . qualified immunity is tested at the summary judgment stage after the facts have been developed through discovery." *Alford v. Cumberland County*, No. 06-1569, 2007 WL 2985297, at *3 (4th Cir. Oct. 15, 2007). That is because the allegations of a complaint, which are accepted as true for purposes of a motion to dismiss, often satisfy both elements of qualified immunity. Here, the Amended Complaint does precisely that as to each Defendant seeking qualified immunity.

**B.  Gottlieb, Himan, Addison, and the Supervisory Defendants Do Not Have Qualified Immunity for Causing Plaintiffs' Seizures Without Probable Cause.**

As discussed in Section III, *supra*, the Amended Complaint includes several causes of action alleging that Gottlieb, Himan, Addison, and the Supervisory Defendants caused, and conspired with other Defendants to cause, the unlawful seizures

of Plaintiffs pursuant to legal process that they knew was not supported by probable cause. The cases cited in Section III, *supra*, establish the applicable law for qualified immunity purposes. In particular, the Fourth Circuit recognized the right to be free of such seizures in *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183-84 (4th Cir. 1996), and *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000). Here, the Amended Complaint documents the extensive evidence, known to these Defendants, that Mangum's claims were absolutely and demonstrably false, that Plaintiffs were actually innocent, and that there was no probable cause to support an arrest or indictment of Plaintiffs. This evidence is perhaps best summarized by Himan's candid response, "With what?" when approached about seeking the April 17 Indictments against Seligmann and Finnerty, *see* AC ¶ 220, and Nifong's equally blunt assessment, "We're f*cked," when he was informed of the lack of evidence and fatal contradictions in Mangum's claims, *see id.* ¶ 138. Moreover, the Amended Complaint alleges that although Himan, Gottlieb, and the Supervisory Defendants knew of the lack of probable cause to seize Plaintiffs, they agreed with Nifong to seek indictments anyway, even going so far as to agree in advance that they would mislead the grand juries about the lack of evidence. *See id.* ¶¶ 181, 195-196, 210, 215, 219-220. A "reasonable official" in the same position "would understand that what he is doing violates" Plaintiffs' clearly established rights to be free of seizure without probable cause. *Hope*, 536 U.S. at 739 (quotation marks omitted).

**C.** **Gottlieb, Himan, Addison, and the Supervisory Defendants Do Not Have Qualified Immunity for Fabricating Evidence in Order To Cause Plaintiffs' Seizures.**

The Amended Complaint also alleges that Gottlieb, Himan, Addison, the Supervisory Defendants, and their co-conspirators fabricated false inculpatory evidence—including the April Photo Array, the May 12 DNA Report, and the coerced

statement from Pittman—in order to cause Plaintiffs' seizures without probable cause. The Fourth Circuit has held that such claims are properly characterized, "at the appropriate level of generality, [as implicating] the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity," and that this right was "clearly established in [the year] 1983." *Washington v. Wilmore*, 407 F.3d 274, 282-83 (4th Cir. 2005) (internal quotation marks omitted).

Here, Plaintiffs allege that each of the following evidentiary items was fabricated by these Defendants or their co-conspirators:

• <u>The April Photo Array</u>. Gottlieb, Himan, and the Supervisory Defendants suggest that the April Photo Array should be analyzed as a "suggestive" identification, rather than as fabricated evidence. Gottlieb Br. at 14 & n.3; Himan Br. at 12-15; SD Br. at 14-15. But the April Photo Array, which was designed by Gottlieb, Himan, and Nifong, and approved and ratified by the Supervisory Defendants, was not intended to be merely "suggestive." Rather, it was deliberately fabricated in order to provide Mangum, who had already failed to identify 36 players as her attackers, with an identification procedure that she could not "fail." AC ¶¶ 180-183, 186-190. Gottlieb, Himan, and the Supervisory Defendants knew that the April Photo Array violated numerous requirements of the Durham Police Department's General Order governing witness identification procedures, which had been "implemented in order to conform to the recommendations of the North Carolina Actual Innocence Commission, which were endorsed by the Education and Training Committee of the North Carolina Criminal Justice Education and Training Standards Commission, after several high-profile instances where suggestive and otherwise improper identification procedures resulted in deprivations of constitutional rights." *Id.* ¶ 184. But in order to assure "identifications,"

these Defendants had to discard numerous protections required by the General Order: in particular, they included only suspects, they did not include any "fillers," Gottlieb ran the array instead of an independent administrator, and Gottlieb signaled to Mangum at the outset that there were no fillers in the array. *Id.* ¶ 186. The transparent purpose of this fabricated array, described as "a multiple choice test with no wrong answers" and "shooting fish in a barrel," was to ensure that Mangum would "identify" three white Duke lacrosse players, so that Defendants could obtain the arrests that the Supervisory Defendants had demanded in the March 29 Meetings. *Id.* ¶¶ 189-190. Ultimately, whether analyzed as a "suggestive" array or an effort to fabricate evidence, a reasonable officer would have concluded that the April Photo Array was constitutionally defective.[37]

- The May 12 DNA Report. Similarly, the May 12 DNA Report, which was designed by Gottlieb, Himan, Nifong, and the DSI Defendants, and approved and ratified by the Supervisory Defendants, was a fabricated document that directly violated requirements of the FBI, the American Society of Crime Laboratory Directors/Laboratory Accreditation Board, and even DSI itself. AC ¶ 235. The May 12 Report falsely purported to contain the results of "all DNA testing," yet it deceptively

---

[37] The North Carolina Supreme Court had clearly established at the time of the April Photo Array that, absent evidence of reliability, an identification procedure violates constitutional rights where it includes only suspects or the witness is told it includes a suspect. *See State v. Richardson*, 402 S.E.2d 401, 405 (N.C. 1991); *State v. Oliver*, 274 S.E.2d 183, 194-95 (N.C. 1981). Defendants can hardly contend that a reasonable officer would have been unaware that such prohibitions were "clearly established" when they were codified in the Durham Police General Order that Defendants intentionally circumvented. AC ¶¶ 184-186. Nor did Defendants have any reasonable basis to believe that the April Photo Array would be reliable, given Mangum's performance in the March Photo Arrays, *id.* ¶¶ 91-100, and as confirmed by her further contradictions in the April Photo Array, *id.* ¶ 194. *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). But as noted, the April Photo Array was not intended to be a "reliable" procedure, only one that Mangum could not fail.

implied that one of Mangum's fingernails contained DNA consistent with Evans, and it omitted the finding of DNA from four unidentified men on the rape kit items. *Id.* ¶¶ 225, 231-233, 236-237. Here, as in *Wilmore*, Defendants contend that Plaintiffs' allegations regarding the May 12 Report are "really nothing more than a clever rephrasing of an assertion that [the defendants] violated *Brady v. Maryland* . . . by failing to disclose exculpatory evidence." *Wilmore*, 407 F.3d at 282 (citation omitted). *Compare id. with* Gottlieb Br. at 27; Himan Br. at 18. But, as in *Wilmore*, the purpose of the omissions here was to permit "the creation of false evidence" that could be used to deprive Evans of his liberty. *Wilmore*, 407 F.3d at 282. As noted above, the "right not to be deprived of liberty as a result of the fabrication of evidence" was "clearly established in [the year] 1983, when the events relevant to this litigation took place." *Wilmore*, 407 F.3d at 282-83 (quotation marks omitted); *see also McGhee v. Pottawattamie County*, 514 F.3d 739, 747-48 (8th Cir. 2008) (finding it clearly established in 2002 that law enforcement officials could not fabricate evidence before filing formal charges). Similarly, the Supreme Court had also clearly established that providing false information in an affidavit supporting an arrest warrant, whether knowingly or with reckless disregard for the truth, constitutes a Fourth Amendment violation. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *cf. Kalina v. Fletcher*, 522 U.S. 118 (1997) (prosecutor's false statements in arrest warrant were subject to § 1983 liability). In short, there can be no doubt that a reasonable officer would have known that conspiring to fabricate a false report of "all DNA testing" would violate Plaintiffs' clearly established rights.[38]

---

[38] The May 12 Report was also intended to maintain the prosecutions of Seligmann and Finnerty and sustain the restrictions on their liberty pursuant to bail. AC ¶ 235; *see Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998) (holding that pretrial restrictions, including financial loss associated with bail, constitute seizure). In this

- **Pittman's False Recantation**.  Gottlieb, Himan, and their

co-conspirators also conspired and caused Pittman to recant falsely her initial statements

that Mangum's rape claim was a "crock" and that no rape occurred, and to provide a new

statement falsely suggesting that a rape could have occurred, by threatening Pittman with

arrest if she did not comply.  Contrary to Himan's contention, Plaintiffs are not alleging

coercion based on the fact that Pittman was arrested pursuant to a warrant.  Himan Br. at

25-26.  Rather, it was the forced substitution of Pittman's false statement, accomplished

by Gottlieb and Himan threatening Pittman with arrest unless she recanted her

exculpatory statement, and the Supervisory Defendants' knowledge and tacit approval of

this illegal intimidation, that constituted the unlawful acts.  AC ¶¶ 87-90.  These acts thus

fall into the same category of fabricating evidence and concealing evidence of actual

innocence as the creation of the May 12 DNA Report and the April 12 Array.

### D. Gottlieb, Himan, and the Supervisory Defendants Do Not Have Qualified Immunity for Concealing Evidence of Plaintiffs' Innocence and the Lack of Probable Cause in Bad Faith in Order To Cause Plaintiffs' Seizures.

The Second Cause of Action specifically relates to the Defendants' bad

faith concealment of evidence—principally, the exculpatory DNA findings omitted from

the fabricated May 12 Report as a result of the illegal agreement among Gottlieb, Himan,

Nifong, the DSI Defendants, and the Supervisory Defendants.  *Id.* ¶¶ 338-349.  The

express purpose of Defendants' bad faith concealment was to mislead the April 17 and

---

regard, "[t]here is no moral, constitutional, common law, or common sense difference between providing phony evidence in support of an arrest and providing phony evidence in support of continued confinement and prosecution."  *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004); *see also* note 13, *supra* (citing cases regarding post-indictment fabrication).

May 15 grand juries into believing that there was probable cause to indict Plaintiffs, even though Plaintiffs had been excluded with 100% certainty as any of the four unidentified men whose DNA was identified on Mangum's rape kit items—and, thus, were excluded as suspects given Mangum's claim that her purported assailants did not use condoms and had ejaculated inside her. *Id.* ¶ 206, 232-234, 344.

To call such evidence "exculpatory" is an understatement, and Defendants' bad faith concealment of it violated Plaintiffs' clearly established rights. Indeed, in *Jean v. Collins*, every judge on an otherwise divided *en banc* Fourth Circuit agreed that "bad faith" concealment of evidence would be actionable under § 1983 if it resulted in a constitutional deprivation. *See* 221 F.3d 656, 662-63 (4th Cir. 2000) (Wilkinson, J., concurring, joined by Widener, Wilkins, Niemeyer, Williams, and Traxler, JJ.) (bad faith concealment that results in constitutional deprivation is actionable); *id.* at 677 (Murnaghan, J., dissenting, joined by Michael, Motz, King, and Hamilton, JJ.) (concealment actionable even in the absence of bad faith); *id.* at 679 (Luttig, J., dissenting) (same). Moreover, because Defendants' concealment here was intended to permit them to use information that otherwise would have been rendered demonstrably false so they could obtain indictments and seizures of Plaintiffs, it runs afoul of the same Fourth Amendment principles that the Supreme Court clearly established in *Franks*, 438 U.S. at 155-56, and *Kalina*, 522 U.S. at 118, discussed in the previous Section. *See also McGhee*, 514 F.3d at 747-48; *Harris v. Bornhurst*, 513 F.3d 503, 514-16 (6th Cir. 2008).

### E. Addison and Hodge Do Not Have Qualified Immunity for the False and Inflammatory Statements Alleged To Have Caused Plaintiffs' Seizures.

The Fourth Cause of Action specifically relates to the false public statements made by Nifong, Hodge, and Addison that are alleged to have caused

Plaintiffs' seizures without probable cause. It is virtually impossible to put into words the furor that these statements evoked among people of all races, both in the Durham community and around the world. Over the course of the three weeks leading up to the April 17 Indictments, these Defendants falsely and publicly reported on an almost daily basis that three white members of the Duke lacrosse team had committed a violent and racially-motivated rape of a young black woman, that there was "no doubt" the rape had occurred, that it was a "horrific crime [that] sent shock waves throughout our community," that there was "really, really strong physical evidence," that there was evidence of a "deep racial motivation," and that the lacrosse team was a gang of "hooligans" engaged in a "stone wall of silence." AC ¶¶ 144-163, 359-370. Even after Defendants had learned that every member of the Duke lacrosse team had been excluded with 100% certainty as contributors to the DNA of at least four men found on Mangum's rape kit items, Hodge stood by Nifong at the April 11 NCCU forum and told the media that Durham Police had a strong case against the Duke lacrosse team. *Id.* ¶¶ 150, 160. The Amended Complaint alleges that these false statements caused the indictments and arrests of Plaintiffs. *Id.* ¶¶ 368-370.

In *Buckley v. Fitzsimmons*, the Supreme Court considered a § 1983 claim against prosecutors based on false public statements alleged to have caused a deprivation of the plaintiff's constitutional rights, and held that the prosecutors lacked absolute immunity with respect to the claim. 509 U.S. 259, 262 (1993). Moreover, as noted in Section III.B.1, *supra*, the "consensus of cases of persuasive authority from other jurisdictions," *Owens*, 372 F.3d at 280 (internal quotation marks omitted), demonstrates that the right not to be deprived of one's liberty or property interests as a result of false public statements is clearly established. *See* note 12, *supra* (citing cases).

## VIII. THE AMENDED COMPLAINT STATES ACTIONABLE CIVIL RIGHTS CONSPIRACY CLAIMS.

### A. Summary of the Civil Rights Conspiracy Claims.

The Amended Complaint alleges several causes of action against the Defendants for conspiring to deprive Plaintiffs of their civil rights. The Seventh Cause of Action alleges that Defendants, acting under color of state law, conspired to deprive Plaintiffs of their civil rights based on charges that Defendants knew were not supported by probable cause in violation of 42 U.S.C. § 1983. The Eighth, Ninth, and Tenth Causes of Action allege that Defendants' conduct also violated 42 U.S.C. § 1985(2) and § 1985(3) (collectively, "the § 1985 Claims").[39] The Eleventh and Twelfth Causes of Action allege that certain Defendants refused or neglected to prevent the § 1985 conspiracies in violation of 42 U.S.C. § 1986 (the "§ 1986 Claims"); the § 1986 Claims are not themselves conspiracy claims but, rather, derivative claims based on the existence of a § 1985 conspiracy.

To establish a conspiracy in violation of 42 U.S.C. § 1983, a plaintiff must allege that the defendants "acted jointly and in concert and that some overt act was done in furtherance of the conspiracy" that resulted in the "deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). The Seventh Cause of Action alleges that Defendants violated § 1983 by conspiring to deprive Plaintiffs of their rights under the Fourth and Fourteenth Amendments and by committing overt acts in furtherance of the conspiracy that caused actual violations of Plaintiffs' rights. AC ¶¶ 437-444.

---

[39] The Seventh, Eighth and Tenth Causes of Action are directed against all Defendants. The Ninth Cause of Action, alleging a witness tampering conspiracy, is directed against all Defendants *except* Addison, Clark, Meehan, and DSI.

To establish a violation of the second clause of 42 U.S.C. § 1985(2), a plaintiff must allege that "two or more persons in any State . . . conspire[d] for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws." 42 U.S.C. § 1985(2) (2000). The Eighth and Ninth Causes of Action allege that the relevant Defendants violated the second clause of § 1985(2) in two different ways: (1) by conspiring generally to obstruct justice in an effort to cause Plaintiffs to be seized in the absence of probable cause and ultimately convicted, AC ¶¶ 445-452; and (2) in the case of certain Defendants, by specifically conspiring to tamper with alibi and defense witnesses to ensure the unlawful seizures and convictions of Plaintiffs, *id.* ¶¶ 453-459.[40]

To establish a violation of 42 U.S.C. § 1985(3), a plaintiff must allege that "two or more persons in any State . . . conspire[d] . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). The Tenth Cause of Action alleges that the Defendants, motivated by race-based invidiously discriminatory motives, violated this statute by conspiring to deprive Plaintiffs of their federally secured rights. AC ¶¶ 460-467; *see Phillips v. Mabe*, 367 F. Supp. 2d 861, 873 (M.D.N.C. 2005) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

---

[40] Although the Ninth Cause of Action is styled as "Witness Tampering," it is brought under the second clause of § 1985(2), which prohibits "any manner" of "impeding, hindering, obstructing, or defeating" justice in State proceedings. Defendants' analysis of the Ninth Cause of Action under the *first* clause of § 1985(2), which specifically prohibits witness tampering in *federal* court proceedings, is therefore inapposite. Plaintiffs have alleged the Ninth Cause of Action separately because, unlike the Eighth Cause of Action, not all Defendants are alleged to have been involved in this conspiracy.

Defendants raise several arguments against the civil rights conspiracy claims. First, Defendants argue that the Amended Complaint fails to allege sufficient facts to support a conspiracy claim under either § 1983 or § 1985.[41] Second, Defendants argue that the Ninth Cause of Action should be dismissed because § 1985(2) applies only to witness tampering in federal proceedings. Third, Defendants argue that the § 1985 Claims should be dismissed because Plaintiffs fail to allege invidious animus based on race or protected class, a required element of such claims. Fourth, Defendants argue that if the § 1985 Claims are dismissed, then the Eleventh and Twelfth Causes of Action, alleging violations of 42 U.S.C. § 1986, must be dismissed as well. We respond to each of these arguments in order.

**B. The Amended Complaint Alleges Sufficient Direct and Circumstantial Evidence To Establish an Unlawful Conspiracy.**

The allegations of the Amended Complaint, taken as true, are more than sufficient to state a claim for civil rights conspiracy under § 1983 and § 1985. As an initial matter, Defendants suggest that these allegations must be subjected to a "stringent" or "heightened" "plausibility" analysis, citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), and *Simmons v. Poe*, 47 F.3d 1370 (4th Cir. 1995). *See, e.g.*, Addison Br. at 16; City Br. at 11, 39; DSI Br. at 11, 39 n.21; SD Br. at 11, 31. However, as discussed in Section I, *supra*, the Supreme Court imposed no such requirement in *Twombly*. To the contrary, the Court emphasized that (1) it was dismissing the conspiracy claim because it was a "formulaic recitation of the elements of a cause of action" with no supporting factual allegations, 127 S. Ct. at 1964-65, (2) "we do not require heightened fact pleading

---

[41] Plaintiffs respond to the argument that the § 1985 Claims should be dismissed because there was no underlying constitutional deprivation in Section III, *supra*.

of specifics," *id.* at 1974, and (3) a motion to dismiss may not be granted "based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder," *id.* at 1969 & n.8.[42] Similarly, while *Simmons* refers to a "relatively stringent standard" for § 1985 claims, there the court did not impose a heightened pleading requirement but, rather, as in *Twombly*, it relied upon the traditional meaning of Rule 8(a)(2) in "reject[ing] section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Simmons*, 47 F.3d at 1377. "No Federal Rule or statute provides a heightened pleading standard for § 1985(3) claims," *Evans v. Chichester Sch. Dist.*, 533 F. Supp. 2d 523, 535 (E.D. Pa. 2008), or for conspiracy claims generally.[43]

To the contrary, as the Fourth Circuit recognized in *Simmons*, it is enough for purposes of § 1985 for a plaintiff to allege facts showing that the defendants entered into an "an agreement or a meeting of the minds" and shared "the general conspiratorial objective" to violate their constitutional rights. *Simmons*, 47 F.3d at 1377-78 (internal quotation marks omitted). The Fourth Circuit subsequently held that this agreement need

---

[42] The Supreme Court noted in *Twombly* that "the complaint does not set forth a single fact in a context that suggests an agreement" and "mentioned no specific time, place, or person involved in the alleged conspiracies." 127 S. Ct. at 1968-69, 1970 n.10.

[43] *See, e.g.*, *Twombly*, 127 S. Ct. at 1974 (no heightened fact pleading for Sherman Act conspiracy); *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002) (no heightened pleading standard for § 1983 conspiracy claims); *Higgins v. Spence & Spence*, No: 5:07-CV-33-D, 2008 WL 506187, at *4 (E.D.N.C. Feb. 21, 2008) (no heightened pleading standard for civil conspiracy claims); *Sara Lee Corp. v. Kayser-Roth Corp.*, No. 92-460, 1995 U.S. Dist. LEXIS 6554, at *17 (M.D.N.C. Apr. 10, 1995) ("[C]onsidering the liberal notice-pleading requirements at this stage, the court finds that Kayser-Roth has sufficiently alleged a conspiracy" based on "indirect, circumstantial evidence[.]")

not be established by "direct evidence," but rather, that a plaintiff may instead "come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Hinkle*, 81 F.3d at 421. This is especially important in civil rights cases, where "direct evidence of a conspiracy is rarely available and . . . the existence of a conspiracy must usually be inferred from the circumstances." *Crabtree ex rel. Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)*; see also Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) ("[Courts] must be especially solicitous of the wrongs alleged [in civil rights actions]." (quotation marks omitted)); *Waller v. Butkovich*, 584 F. Supp. 909, 931 (M.D.N.C. 1984) ("All that can be required at the pleading stage is that a defendant be given notice of how he is alleged to have participated in the conspiracy, so that he may intelligently prepare his answer and defense.").

When these well-settled principles are applied to the Seventh, Eighth, Ninth, and Tenth Causes of Action, it is clear that Plaintiffs have alleged sufficient direct and circumstantial evidence to support conspiracy claims that are not only plausible but compelling. The Amended Complaint contains what Gottlieb refers to as the "long laundry list of [the] alleged wrongful acts" perpetrated by Defendants, *see* Gottlieb Br. at 27, in furtherance of the conspiracy to obtain indictments and seizures of Plaintiffs notwithstanding a complete lack of probable cause. This list includes the following acts:

- The coordinated efforts by Nifong, Addison, Himan, and Hodge to make false and inflammatory public statements, AC ¶¶ 144-163, 272-274;

- The March 29 Meetings, during which the Supervisory Defendants ordered Himan and Gottlieb to obtain identifications and arrests of three white Duke lacrosse players, *id.* ¶ 179;

- The efforts by Nifong, Gottlieb, Himan, and the Supervisory Defendants in the days after the March 29 Meetings to design, approve, and show to Mangum the intentionally suggestive April Photo Array in order to fabricate identifications of three white lacrosse players, *id.* ¶¶ 180-190;

- The agreement at the April 10 Meeting among Meehan, Clark, Nifong, Himan, Gottlieb, DSI and, later, the Supervisory Defendants to conceal and obfuscate the DNA testing that not only excluded Plaintiffs as contributors to the rape kit items with 100% certainty, but also identified at least four unknown males, not Duke lacrosse players, as contributors to those items, *id.* ¶¶ 207-211;[44]

- The subsequent agreement among Meehan, Clark, Nifong, Himan, Gottlieb, DSI and, later, the Supervisory Defendants "that DSI would fabricate a misleading written report that would purport to be "a final report of the results of all DNA testing conduct by DSI, but that . . . would omit the exculpatory results of DSI's testing," *id.* ¶¶ 225-226;

- The agreements and coordinated efforts by Nifong, Himan, Gottlieb, Wilson and, later, the Supervisory Defendants to attempt to intimidate alibi and defense witnesses, including Moezeldin Elmostafa, Kim Pittman, Sergeant John Shelton, and the other Duke lacrosse players, into either fabricating false testimony or remaining silent, *id.* ¶¶ 247-265; and

- The agreement and coordinated efforts among Nifong, Gottlieb, Himan, and the Supervisory Defendants to mislead the grand juries as to the evidence of actual innocence and the lack of probable cause, *id.* ¶¶ 218-219, 241.

The Amended Complaint alleges that each of these events occurred at a time when Defendants knew or had reason to know of the lack of probable cause against Plaintiffs. Such allegations are hardly "conclusory," SD Br. at 32; DSI Br. at 17 n.9, or a "formulaic recitation of the elements of a cause of action." *Twombly*, 127 S. Ct. at 1964-65.

---

[44] Meehan expressly admitted to the existence of this agreement in his testimony at the December 15 Hearing. AC ¶ 307.

Several Defendants argue that the § 1985 Claims should be dismissed as to them because they are not alleged to have been involved in every overt act. This argument ignores the basic tenet of conspiracy: every individual who shares the "general conspiratorial objective" becomes liable for the acts of their co-conspirators in furtherance of the conspiracy, even if they did not directly participate in them. *Simmons*, 47 F.3d at 1377-78 (citation omitted). "It simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Simmons*, 47 F.3d at 1378 (alteration and internal quotation marks omitted). This well-settled principle is incorporated into the text of § 1985. *See* 42 U.S.C. § 1985(3). That is why, for example, it is of no import that Gottlieb claims he "only" participated in the fabrication of evidence, concealment of exculpatory DNA findings, and the unlawful agreement to conceal evidence of actual innocence and absence of probable cause from the grand jury, *see* Gottlieb Br. at 27; or that Addison is not alleged to have directly intimidated any witnesses, *see* Addison Br. at 16;[45] or that Wilson did not personally attend the meetings at DSI, *see* Wilson Br. at 19-20. Plaintiffs' detailed allegations of direct and circumstantial evidence establish each Defendant's agreement to achieve the overall unlawful objective and subsequent participation in furtherance thereof, and are therefore sufficient to allege a basis for holding these Defendants liable for their co-conspirators' actions. *See, e.g.*, *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 10 (D.D.C. 2006) ("[A] defendant may be liable under § 1985(3) . . . even though he does not directly commit the underlying violation."); *Silkwood v. Kerr-McGee Corp.*, 460 F. Supp. 399, 412 (W.D. Okla. 1978) ("It is clear that the statute [§ 1985(3)] makes no exceptions for conspirators who did not personally

---

[45] Addison also is not a defendant in the § 1985 witness tampering conspiracy.

commit any overt act or who joined the conspiracy after the occurrence of the overt acts which injured plaintiff."), *aff'd*, 637 F.2d 743 (10th Cir. 1980).

**C. The Second Clause of § 1985(2) Prohibits Witness Tampering Related to State Proceedings.**

As noted above, the Ninth Cause of Action alleges a witness tampering conspiracy in violation of the second clause of § 1985(2), which prohibits conspiracies "impeding, hindering, obstructing, or defeating, *in any manner*, the due course of justice in any State." 42 U.S.C. § 1985(2), cl. 2 (emphasis added). It is well settled that a conspiracy to interfere with the truthful testimony of defense witnesses in state proceedings is covered by this clause. *See Kush v. Rutledge*, 460 U.S. 719, 721 n.1 (1983) ("[T]he second clause of [§1985(2)] . . . applies to witness intimidation in state-court proceedings[.]"); *Chavis v. Clayton County Sch. Dist.*, 300 F.3d 1288, 1293 (11th Cir. 2002); *Lewellen v. Raff*, 843 F.2d 1103, 1116 n.16 (8th Cir. 1988).

For this reason, Defendants' arguments regarding the *first* clause of § 1985(2), which applies to witness tampering in federal court proceedings, are simply not applicable. *See, e.g.*, City Br. at 32-33; SD Br. at 33-35. Defendants cite no cases prohibiting a state-court witness tampering claim from being brought under the second clause of § 1985(2). To the contrary, their cases recognize such causes of action, but dismissed claims that lacked allegations of invidious racial or class-based animus.[46]

---

[46] *See, e.g.*, *Warner v. Greenbaum, Doll & McDonald*, 104 F. App'x 493, 497-99 (6th Cir. 2004) (cited in SD Br. at 33 n.7); *Archbold v. Nw. Cmty. Hosp.*, 191 F.3d 455 (7th Cir. 1999) (table), *available at* 1999 WL 518933, at *2 (cited in SD Br. at 33 n.7); *Biby v. Bd. of Regents of the Univ. of Neb. at Lincoln*, 338 F. Supp. 2d 1063, 1075-76 (D. Neb. 2004), *aff'd*, 419 F.3d 845 (8th Cir. 2005) (cited in SD Br. at 34 n.7); *Rhodes v. Smithers*, 939 F. Supp. 1256, 1271 (S.D.W. Va. 1995), *aff'd per curiam*, 91 F.3d 132 (4th Cir. 1996) (cited in City Br. at 33).

Here, the Amended Complaint alleges such animus, *see* AC ¶¶ 448, 453, as discussed in Section VIII.D, *infra*.

Defendants' other arguments are similarly misplaced:

- The City is incorrect when it contends that the Ninth Cause of Action is "entirely redundant" of the Eighth Cause of Action simply because both claims arise under the second clause of § 1985(2). City Br. at 34 n.20. These claims are directed against different defendants: Addison, Clark, Meehan, and DSI are not alleged to have participated in the racially-motivated witness tampering conspiracy alleged in the Ninth Cause of Action.

- The City's argument that witness tampering claims do not extend to the grand jury phase "because a defendant has no right to present witnesses," City Br. at 33, ignores the plain language of the second clause of § 1985(2), which does not limit itself to "court" proceedings or proceedings where a person may call witnesses but, rather, to "any" efforts to pervert "the due course of justice in any State." 42 U.S.C. § 1985(2), cl. 2. Moreover, courts have routinely applied the first clause of § 1985 to grand jury witness tampering. *See, e.g.*, *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1035 n.2 (11th Cir. 2000) (citing *Heffernan v. Hunter*, 189 F.3d 405, 409 (3d Cir. 1999); *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1125 (10th Cir. 1994); *McCord v. Bailey*, 636 F.2d 606, 618 (D.C. Cir. 1980)). The City ignores these cases, and relies instead upon *United States v. Williams*, 504 U.S. 36 (1992), a case that did not address § 1985 at all, *see id.* at 50-51.

- Himan's argument that the Ninth Cause of Action should be dismissed because not every intimidated witness recanted or provided false testimony, Himan Br. at 22-23, ignores a fundamental premise of conspiracy doctrine: there is no

requirement in § 1985 or elsewhere that every act in furtherance of a conspiracy be successful.  Here, the Amended Complaint alleges that the conspiracy succeeded in causing Pittman to falsely recant her initial statement that no assault occurred and that Mangum's allegations were a "crock," AC ¶¶ 256-259,[47] and in chilling other possible defense and alibi witnesses from speaking out publicly, *id.* ¶¶ 261-264.   Moreover, the Ninth Cause of Action alleges a conspiracy, the ultimate goal of which was to obstruct justice in order to achieve the unlawful seizures and convictions of Plaintiffs.

- Himan and the City also argue that Elmostafa and Pittman were arrested pursuant to "valid" warrants and that Plaintiffs therefore cannot establish "force, intimidation, or threat" under the first clause of § 1985(2).  City Br. at 34 n.19; Himan Br. at 25-26.  Even if such proof were required here, which it is not,[48] the Amended Complaint makes clear that the relevant Defendants intimidated these witnesses, not by executing warrants, but by threatening that the warrants would be executed *unless* the witnesses provided false testimony.  AC ¶¶ 244, 250, 258-259.  Obviously, if these warrants were also stale or otherwise invalid, it would be further proof of the Defendants' corrupt motives, but that is a matter for discovery.

- Finally, Wilson mischaracterizes Plaintiffs' allegations when he contends that his involvement was limited to "interviewing and evaluating the testimony

---

[47] Himan cites no authority for his sweeping claim that Pittman must disavow the *coerced* statement for it to be actionable.  *See* Himan Br. at 22.  It is enough that the Amended Complaint alleges that this was "false testimony" and inconsistent with the overwhelming evidence of actual innocence.  *See* AC ¶¶ 244, 258-259.

[48] As noted above, the Ninth Cause of Action is brought under the general obstruction provisions of the *second* clause of § 1985(2), which applies to state-court proceedings and by its terms does not require proof of obstruction "by force, intimidation, or threat." 42 U.S.C. § 1985(2), cl. 2.

of important potential witnesses." Wilson Br. at 13-14. As the Amended Complaint makes clear, Wilson affirmatively participated in the conspiracies to intimidate Elmostafa and Shelton and the concealment of DNA evidence. AC ¶¶ 247-253, 264, 340-41.

### D. The § 1985 Claims Sufficiently Allege Invidious Racial Animus.

#### 1. Defendants Were Motivated by, Fomented, and Took Advantage of Racial Animus Against Plaintiffs.

Civil rights conspiracies under § 1985(2) and § 1985(3) require proof of invidious animus based on race or other protected status. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 340 (1993); *Rhodes v. Smithers*, 939 F. Supp. 1256, 1271 (S.D.W. Va. 1995). Defendants argue (1) that Plaintiffs have failed to allege membership in any such class, City Br. at 40; DSI Br. at 38; Gottlieb Br. at 29-30; Himan Br. at 25; (2) that Plaintiffs are alleging that "Duke students" or "Duke lacrosse players" are a protected class, Addison Br. at 16; City Br. at 34, 36, 38; Himan Br. at 24; SD Br. at 36; or (3) that Plaintiffs have failed to allege animus at all, City Br. at 34-38; Gottlieb Br. at 29; Wilson Br. at 18-19. Each of these arguments is incorrect.

Plaintiffs allege that Defendants' acts in furtherance of the § 1985 conspiracies were motivated by invidious animus based on race, an unquestionably protected classification, and were intended to foment and take advantage of racial animus against Plaintiffs. AC ¶¶ 448, 453, 463. The Amended Complaint is replete with details from which to infer Defendants' invidious racial motives, including (1) the efforts by Nifong, Addison, and Hodge to foment such animus in the Durham community through false and inflammatory claims of a racially-motivated gang rape that supposedly included racist threats and slurs; (2) the Supervisory Defendants' subsequent demands for arrests of white Duke lacrosse players, notwithstanding the lack of probable cause, in order to

satisfy the Durham community that had been misled by the prior racially-inflammatory statements; and (3) Defendants' efforts to fabricate false inculpatory evidence against white Duke lacrosse players and conceal evidence of their innocence as part of the April Photo Array and the DNA conspiracy. *See, e.g.*, AC ¶¶ 146, 147b, 147e, 147g-h, 147o, 160h, 179-190, 206-211, 412, 448, 463. These allegations are based on fact, not "legal conclusion." City Br. at 37. *See Green v. Maroules*, 211 F. App'x 159, 162-63 (4th Cir. 2006) (holding that plaintiff who alleged she was target of racial profiling and conspiracy to falsely arrest her alleged racial animus and properly stated a claim under § 1985).

The City incorrectly argues that "invidious racial animus" is not satisfied by proof of a defendant's efforts "to create racial tensions or take advantage of racial animus on the part of others in order to achieve some other objective." City Br. at 38. The City's principal authority for this proposition, *Griffin v. Breckenridge*, includes no such holding but, rather, stands for the unremarkable proposition that the "racial animus" requirement means that "[t]he conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." 403 U.S. 88, 102 (1971).[49] Moreover, courts interpreting 42 U.S.C. § 1982, another provision of the Civil Rights Act that, like § 1985(2) and § 1985(3), requires proof of invidious racial or class-based animus, have held that "regardless of defendants' ultimate motivation, the fact that they deliberately stirred up and harnessed the racial animosity of others to serve their own ends is sufficient to find a violation." *Lac Du Flambeau Band of Lake Superior*

---

[49] The City also relies upon *Estate of Torres v. Terhune*, No. S982211WBSGGH, 2002 WL 32107950, at *11 (E.D. Cal. Jan. 9, 2002), a case decided on summary judgment in which the plaintiff had neither alleged nor offered any facts showing that the defendants had fomented racial animus among rival prison gangs, *id.*

*Chippewa Indians v. Stop Treaty Abuse-Wisconsin, Inc.*, 41 F.3d 1190, 1194 (7th Cir. 1994); *see also Clark v. Universal Builders, Inc.*, 501 F.2d 324, 331 (7th Cir. 1974) (defendants cannot escape liability for acting with racial animus in violation of § 1982 by "proclaiming that they merely took advantage of a discriminatory situation created by others"); *Ortega v. Merit Ins. Co.*, 433 F. Supp. 135, 140-41 (N.D. Ill. 1977) (quoting *Clark*, 501 F.3d at 331).

Finally, it is irrelevant that Defendants contend that they personally harbored no invidious racial animus, Addison Br. at 5; DSI Br. at 38; Wilson Br. at 18, or were acting in good faith, City Br. at 3 n.1; Gottlieb Br. at 1; Himan Br. at 23. If racial animus depended on a defendant's admission, it would rarely be established. Typically, "motivation can only be inferred from . . . statements and actions." *Lac Du Flambeau*, 41 F.3d at 1194. At best, Defendants' claims to the contrary create disputes of fact that cannot be resolved on a motion to dismiss.

### 2. Section 1985 Prohibits Invidious Animus Against Any Race.

This Court and other courts have consistently rejected the argument, now advanced by Defendants, *see* Addison Br. at 16-17; DSI Br. at 36-37; SD Br. at 36, that only members of a "minority" or "traditionally disadvantaged" group may seek relief under § 1985. *See Mabe*, 367 F. Supp. 2d at 873-74 ("[T]he Court finds that Defendants' argument that Plaintiff cannot rely on §1985(3) because he is not a minority is without merit."); *Waller v. Butkovich*, 605 F. Supp. 1137, 1144-45 (M.D.N.C. 1985) ("The Court rejects the notion that Section 1985(3) requires that animus be directed against a traditionally disadvantaged group."). In addition, this Court and others have expressly permitted white plaintiffs to bring claims under § 1985 in response to animus against them based on their race or even their perceived racist beliefs. *See Waller*, 605 F. Supp.

at 1144-45 (members of Ku Klux Klan); *Action v. Gannon*, 450 F.2d 1227, 1232 (8th Cir. 1971) (en banc) (worshippers at white parish targeted because of alleged racism).[50]

Defendants contend that their contrary view is supported by the Fourth Circuit's decision in *Harrison v. KVAT Food Management*, *see* Addison Br. at 16-17; DSI Br. at 36, SD Br. at 35-36, but that opinion stands only for the proposition that "victims of purely political conspiracies" cannot bring a § 1985(3) claim. 766 F.2d 155, 161 (4th Cir. 1985). Defendants note that *Harrison* mentioned "blacks," but a careful reading of the opinion reveals that the Fourth Circuit did so only to provide an example of a group that had successfully brought claims under § 1985(3). *See id.* The Fourth Circuit certainly did *not* hold that members of other races are precluded from bringing a § 1985(3) claim, nor would such a limitation make any sense in light of the equal protection principles of the statute itself, which expressly extend to "*any* person or class of persons." 42 U.S.C. § 1985(3) (2000) (emphasis added).[51]

---

[50] *Accord Park v. City of Atlanta*, 120 F.3d 1157, 1161-62 (11th Cir. 1997) ("While African Americans . . . are certainly entitled to § 1985(3) protection, it does not follow that they are the only group entitled to such protection." (citation omitted)); *Stevens v. Tillman*, 568 F. Supp. 289, 293 (N.D. Ill. 1983) ("It would be wholly inconsistent with the spirit of both the United States Constitution and the Civil Rights Act of 1871 to hold that a black plaintiff could bring a claim under § 1985(3) alleging racial discrimination . . . and a white plaintiff could not." (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-90, 291 (1978))).

[51] The Supreme Court has held that similar equal protection language in another provision of the civil rights laws, 42 U.S.C. § 1981, which "explicitly applies to '[a]*ll* persons,'" included members of all races, including "white persons." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-87 (1976).

**E.** **Plaintiffs Have Stated Actionable Claims Under § 1986.**

The Eleventh and Twelfth Causes of Action (the "§ 1986 Claims") allege that the City of Durham, the Supervisory Defendants, and the DSI Defendants violated 42 U.S.C. § 1986 by refusing or neglecting to prevent the § 1985 conspiracies alleged in the Eighth, Ninth, and Tenth Causes of Action. To establish a violation of § 1986, a plaintiff must allege that the defendant (1) had "knowledge that any of the wrongs conspired to be done [in violation of § 1985] [were] about to be committed"; (2) had the "power to prevent or aid in preventing the commission of the same"; and (3) "neglect[ed] or refuse[d] so to do." 42 U.S.C. § 1986 (2000). The statute "does not require that the [§ 1986 Defendants] themselves participated in the [§ 1985] conspiracy or shared in the discriminatory animus with members of the conspiracy." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997) (quotation marks omitted).

Defendants make three arguments for dismissal of the § 1986 Claims. First, all Defendants argue that the § 1986 Claims should be dismissed because no viable claim exists under § 1985. *See* City Br. at 35-36; SD Br. at 37; DSI Br. at 39-40. *See also Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985) ("A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985."). This argument fails because its premise is incorrect. As demonstrated in Sections VIII.B, VIII.C, and VIII.D, *supra*, Plaintiffs have adequately stated claims under § 1985.

Second, the City argues that the § 1986 Claims should be dismissed because Plaintiffs were not "members of a protected class," City Br. at 35-36. This is the same argument that the City advanced against the § 1985 Claims, and it fails for the same reasons stated in Section VIII.D, *supra*. Moreover, as noted above, § 1986 does not require that the § 1986 Defendants "shared in the discriminatory animus with members of

the [§ 1985] conspiracy." *Park*, 120 F.3d at 1160-61; *Clark v. Clabaugh*, 20 F.3d 1290, 1298 (3d Cir. 1994) (§ 1986 defendant need not "personally share the class-based animus" (quotation marks omitted)). For this reason, even if a jury were to determine that certain § 1986 Defendants failed to prevent the § 1985 conspiracies because of political or public safety considerations or some other non-discriminatory motivation, those Defendants would still be liable under § 1986.

Finally, the DSI Defendants argue that they cannot be liable under § 1986 because they "lacked the power to control" Nifong. DSI Br. at 40. But "control" is not the test under § 1986; rather, what matters is whether the DSI Defendants had the "power to *prevent* or *aid in preventing*" a § 1985 conspiracy and refused to do so. 42 U.S.C. § 1986 (emphasis added). Whether the DSI Defendants had such power is "an issue of proof" that cannot be resolved on a motion to dismiss. *Waller v. Butkovich*, 584 F. Supp. 909, 943 (M.D.N.C. 1984) ("If the evidence establishes the existence of the § 1985(3) conspiracy and [the § 1986 defendants'] advance knowledge of it, then whether or not they had the power to prevent its effectuation becomes an issue of proof."). Even so, the Amended Complaint alleges that the DSI Defendants had such power, and refused to use it, in two ways. First, by affirmatively participating in such a conspiracy, *see* AC ¶¶ 208-210, 225-226, 445-452, 460-467, Meehan and Clark refused to prevent DSI's involvement in it, even though as the owner and Laboratory Director of DSI, *see* AC ¶¶ 31-32, they had the power to do so.[52] Second, separate and apart from the issue of

---

[52] *Cf. Butkovich*, 584 F. Supp. at 943 ("The allegation that the defendants had the power to prevent, or to aid in preventing, the effectuation of the conspiracy is somewhat conclusory, but their employment as law enforcement officials obviates the need for much specificity on that score.").

whether Clark and Meehan participated in the § 1985 conspiracies with Nifong and the

Durham Police Defendants, they had the power to "aid in preventing" the effectuation of

those conspiracies by simply releasing the exculpatory DNA results—or, at a minimum,

not agreeing to conceal and fabricate evidence—and yet, they refused to do either.[53]

## IX. THE AMENDED COMPLAINT STATES ACTIONABLE CLAIMS UNDER NORTH CAROLINA LAW.

Plaintiffs have alleged their remaining causes of action against the

Defendants under North Carolina law, including claims for malicious prosecution and

conspiracy (Thirteenth Cause of Action);[54] obstruction of justice and conspiracy

(Fourteenth Cause of Action);[55] intentional infliction of emotional distress and

conspiracy (Fifteenth Cause of Action);[56] negligence (Sixteenth and Twentieth Causes of

Action);[57] negligent infliction of emotional distress (Eighteenth, Nineteenth, and Twenty-

---

[53] By contrast, the holding in the sole case cited by the DSI Defendants turned on the absence of a § 1985 conspiracy and the fact that the defendant employer was not involved in anything more than the lawful collection of union fees pursuant to a "proper and valid" collective bargaining agreement. *Lohr v. Ass'n of Catholic Teachers, Local 1776*, 416 F. Supp. 619, 621-23 (E.D. Pa. 1976) (cited in DSI Br. at 40).

[54] The Thirteenth Cause of Action is directed at Nifong, Addison, Gottlieb, Himan, Wilson, and the DSI Defendants in their individual capacities, and the City based on official capacity.

[55] The Fourteenth Cause of Action is directed at Nifong, Gottlieb, Himan, Wilson, and the DSI Defendants in their individual capacities, and the City based on official capacity.

[56] The Fifteenth Cause of Action is directed at Nifong, Addison, Gottlieb, Himan, Hodge, Wilson, and the DSI Defendants in their individual capacities, and the City based on official capacity.

[57] The Sixteenth Cause of Action is directed at the City based on official capacity claims against Addison, Gottlieb, Himan, and Hodge. The Twentieth Cause of Action is directed at the DSI Defendants in their individual capacities and the City based on DSI's official capacity with respect to the Durham Police investigation.

Second Causes of Action);[58] and negligent supervision, hiring, training, discipline, and retention (Seventeenth and Twenty-First Causes of Action).[59]

### A. The Amended Complaint States a Malicious Prosecution Claim.

Defendants do not dispute that the Thirteenth Cause of Action adequately pleads three of the four elements of a malicious prosecution claim.[60] The only argument, advanced by some Defendants, is that Plaintiffs have not sufficiently alleged the first element of malicious prosecution. *See* Addison Br. at 18; DSI Br. at 42-45; Gottlieb Br. at 37; Himan Br. at 30-31. Their argument misstates the law.

Contrary to Defendants' position, the North Carolina courts have never limited a malicious prosecution claim only to defendants who "initiated the earlier

---

[58] The Eighteenth and Nineteenth Causes of Action are directed at the City based on official capacity claims against Gottlieb, Himan, and the Supervisory Defendants in the Eighteenth Cause of Action and official capacity claims against Addison and the Supervisory Defendants in the Nineteenth Cause of Action. The Twenty-Second Cause of Action is directed at the DSI Defendants in their individual capacities and the City based on DSI's official capacity with respect to the Durham Police investigation.

[59] The Seventeenth Cause of Action is directed at the City based on official capacity claims against the Supervisory Defendants. The Twenty-First Cause of Action is directed at the DSI Defendants in their individual capacities and the City based on DSI's official capacity with respect to the Durham Police investigation. Although Plaintiffs have named the individual Defendants and the City of Durham in the state-law causes of action alleging negligence (the Sixteenth through Nineteenth Causes of Action), the City is the real party in interest on those claims. *See* Sections IX.F & X, *infra*; *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306-07 (4th Cir. 2006).

[60] The elements of a malicious prosecution claim are that a defendant: "'(1) instituted, procured or participated in the criminal proceeding against [the] plaintiff; (2) without probable cause; (3) with malice; and (4) [that] the prior proceeding terminated in favor of plaintiff.'" *Moore v. Evans*, 476 S.E.2d 415, 421 (N.C. Ct. App. 1996) (quoting *Williams v. Kuppenheimer Mfg. Co.*, 412 S.E.2d 897, 899 (N.C. Ct. App. 1992)). Defendants do not dispute that the Amended Complaint adequately pleads the final three elements.

proceeding." DSI Br. at 42. Rather, they have extended the tort to defendants who "initiated," "instituted," or "instituted, or procured, or participated in" the earlier proceeding.[61] "[W]hen discussing the tort of malicious prosecution generally, our cases indicate a liberal reading of the requirement that the defendant have 'initiated' the earlier proceeding." *Moore v. City of Creedmoor*, 460 S.E.2d 899, 906 (N.C. Ct. App. 1995), *aff'd in relevant part*, 481 S.E.2d 14 (N.C. 1997).

In *Moore*, the North Carolina Court of Appeals expressly rejected the argument, presently advanced by some Defendants, that a police officer can never be liable for malicious prosecution, *see* Addison Br. at 18; Gottlieb Br. at 37; Himan Br. at 30-31, holding instead that officers "can be held responsible for having 'initiated'" a malicious proceeding even though "the ultimate decision to file . . . the action was made solely by the District Attorney in the exercise of his discretion." *Moore v. City of Creedmoor*, 460 S.E.2d at 905. Moreover, here the Amended Complaint specifically alleges that Gottlieb, Himan, and Addison conspired with Nifong to initiate the prosecution without probable cause, and that they also affirmatively participated in the efforts to initiate and maintain that prosecution. *See, e.g.*, AC ¶¶ 135, 175-176, 181, 208-210 (allegations of conspiracy with Nifong to initiate and maintain prosecution); *id.*

---

[61] *Cook v. Lanier*, 147 S.E.2d 910, 913 (N.C. 1966) ("instituted, or procured, or participated in"); *Moore v. City of Creedmoor*, 460 S.E.2d 899, 906 (N.C. Ct. App. 1995), *aff'd and rev'd in part on other grounds*, 481 S.E.2d 14, 24 (N.C. 1997) ("initiated," "instituted," or "instituted, or procured, or participated in" (emphasis and quotation marks omitted) (citing cases)); *Thomas v. Sellers*, 542 S.E.2d 283, 287 (N.C. Ct. App. 2001) (same); *Karadi v. Dillards, Inc.*, No. 5:98-CV-709-BR(2), 1999 WL 1939997, at *6-7 (E.D.N.C. Feb. 19, 1999) (same), *vacated on other grounds sub nom. Karadi v. Jenkins*, 7 F. App'x 185 (4th Cir. 2001) (per curiam); *Saxon v. Smith*, 479 S.E.2d 788, 793 (N.C. Ct. App. 1997) (same); *Moore v. Evans*, 476 S.E.2d at 421 (same); *Harris v. Barham*, 239 S.E.2d 717, 719 (N.C. Ct. App. 1978) (same).

¶¶ 158-162 (alleging examples of Addison's numerous false and inflammatory statements in role as official Durham Police spokesperson); *id.* ¶¶ 180, 208, 225, 250, 266-267, 340, 352, 455 (alleging Gottlieb and Himan's roles in the rigged photo array, witness intimidation, and fabrication and concealment of DNA evidence and case notes). These allegations are more than sufficient to establish that these Defendants "initiated" or "instituted, or procured, or participated in" a prosecution under North Carolina law.[62]

Similarly, the DSI Defendants fail to identify a single case that has held that a defendant cannot be liable for malicious prosecution unless he or she is "a prosecutor who presents a bill of indictment to a grand jury, . . . an arresting officer, or . . . a complaining witness who swears out a warrant before a magistrate." DSI Br. at 43. To the contrary, the North Carolina courts have repeatedly permitted malicious prosecution claims against private citizens who did not "swear[] out a warrant before a magistrate,"[63]

---

[62] Himan and Wilson also argue that they cannot be liable for conspiring to commit malicious prosecution, obstruction of justice, and IIED because Himan was "simply fulfilling his duties as a police officer," *see* Himan Br. at 34, and Wilson did not attend the meetings with DSI, *see* Wilson Br. at 19-20. Himan's contention is pure *ipse dixit* and foreclosed by the Amended Complaint, which alleges that Himan engaged in affirmative misconduct with the other Defendants in violation of state law. Wilson's argument ignores the fact that the DSI meetings were only one aspect of a conspiracy in which Wilson was an active participant, and that in North Carolina "[c]onspirators are jointly and severally liable for all the acts of their co-conspirators done in furtherance of the conspiracy." *Colvard v. Francis*, 416 S.E.2d 579, 581 (N.C. Ct. App. 1992).

[63] *See Jones v. Gwynne*, 323 S.E.2d 9, 17-18 (N.C. 1984) (fast food restaurant); *Hung Nguyen v. Burgerbusters, Inc.*, 642 S.E.2d 502, 506 (N.C. Ct. App. 2007) (restaurant chain); *Williams*, 412 S.E.2d at 900 (clothier); *Becker v. Pierce*, 608 S.E.2d 825, 829 (N.C. Ct. App. 2005) (neighbor); *Scarborough v. Dillard's, Inc.*, 590 S.E.2d 477 (N.C. Ct. App. Jan. 20, 2004) (table), *available at* 2004 WL 77764, at *2 (department store); *Saxon*, 479 S.E.2d at 790 (gun buyer).

including persons alleged to have withheld exculpatory evidence,[64] persons whose "actions went further than merely providing assistance and information," *Williams v. Kuppenheimer Mfg. Co.*, 412 S.E.2d 897, 900 (N.C. Ct. App. 1992), and persons without whose efforts "it is unlikely there would have been a criminal prosecution," *Hung Nguyen v. Burgerbusters, Inc.*, 642 S.E.2d 502, 506 (N.C. Ct. App. 2007).[65] The DSI Defendants' alleged participation in the conspiracy to charge Plaintiffs by concealing the exculpatory DNA evidence and fabricating the false report of "all DNA findings"— wrongdoing that made the false charges possible—easily satisfies the first element of a malicious prosecution claim under these decisions. *See, e.g.*, AC ¶¶ 206-210.

   The DSI Defendants attempt to dismiss this voluminous body of precedent as "contrary to the [North Carolina] Supreme Court's requirement that the defendant have actually *initiated* the proceeding," DSI Br. at 44, *citing Best v. Duke Univ.*, 448 S.E.2d 506 (N.C. 1994). But *Best* stands only for the proposition that a person who initiates a malicious prosecution is liable, not that liability is limited only to those who initiate malicious prosecutions. Nowhere does *Best* overrule, or even question, the North Carolina Supreme Court's prior holding in *Cook* that a defendant may be liable if they "instituted, or procured, *or participated in*, a criminal prosecution." *Cook v. Lanier*, 147 S.E.2d 910, 913 (N.C. 1966) (emphasis added). If the North Carolina Supreme Court had intended to overrule *Cook*, presumably it would have said so, and in the absence of such a

---

[64] *See Jones v. Gwynne*, 323 S.E.2d at 17-18 (affirming jury verdict against employee who had alleged plaintiff's embezzlement but had intentionally withheld evidence tending to show plaintiff's innocence); *Saxon*, 479 S.E.2d at 793 (permitting claim against gun buyer who intentionally withheld facts rebutting fraud charges).

[65] *See also Becker*, 608 S.E.2d at 829; *Scarborough*, 2004 WL 77764, at *2.

holding, it must be presumed that *Cook* is still good law.[66]  Indeed, seven years later in

*Hill v. Hill*, 553 S.E.2d 679 (N.C. 2001) (per curiam), the North Carolina Supreme Court

adopted the analysis of "section one of the dissenting opinion by Judge Tyson" in the

Court of Appeals, *id.* at 679, which expressly applied the "instituted, procured or

participated in" standard in concluding that the plaintiff's malicious prosecution should

have been sustained, 545 S.E.2d 442, 451 (N.C. Ct. App. 2001) (Tyson, J., dissenting).  It

is not surprising, therefore, that numerous North Carolina decisions since *Best* have

continued to recognize and apply *Cook*'s "instituted, or procured, or participated in"

standard.[67]  Finally, even if the DSI Defendants' reading of *Best* were controlling, and it

is not, the Thirteenth Cause of Action would still state a claim against the DSI

Defendants based on the allegations of their conspiracy with Nifong and Durham Police

to initiate the malicious prosecutions of Plaintiffs.  *See* AC ¶¶ 206-210.

> **B.**     **The Amended Complaint States an Obstruction of Justice Claim.**

The DSI Defendants, Gottlieb, and Himan each argue that the Fourteenth

Cause of Action fails to state a claim for obstruction of justice.[68]  "'Obstruction of justice

is a common law offense in North Carolina'" and consists of "'any act which prevents,

obstructs, impedes or hinders public or legal justice.'"  *Jones v. City of Durham*, 643

S.E.2d 631, 633 (N.C. Ct. App. 2007) (quoting *In re Kivett*, 309 S.E.2d 442, 462 (N.C.

---

[66] Nor does *Best* question the North Carolina Supreme Court's decision in *Jones v. Gwynne*, 323 S.E.2d 9 (N.C. 1984), to affirm a compensatory damages award against a private corporation and employee found liable for malicious prosecution.

[67] *See, e.g.*, *Thomas*, 542 S.E.2d at 287; *Karadi*, 1999 WL 1939997, at *6-7; *Saxon*, 479 S.E.2d at 793; *Moore v. Evans*, 476 S.E.2d at 421.

[68] The City and Wilson do not dispute that the Fourteenth Cause of Action alleges an obstruction of justice claim against them.

1983); *Broughton v. McClatchy Newspapers, Inc.*, 588 S.E.2d 20, 30 (N.C. Ct. App. 2003)).

        As an initial matter, the DSI Defendants and Gottlieb each misconstrue the scope of the obstruction of justice tort by attempting to limit it only to "alteration or destruction of evidence," DSI Br. at 45 (emphasis omitted), and by attempting to preclude its application to deliberately rigging a photographic lineup or concealing exculpatory evidence, Gottlieb Br. at 38. However, North Carolina law does not exempt *any* particular category of wrongdoing from liability. Rather, as the leading North Carolina Supreme Court decision, not cited by the DSI Defendants or Gottlieb, makes clear, obstruction can be caused by "*any act* which prevents, obstructs, impedes or hinders public or legal justice" and it "may take a variety of forms." *In re Kivett*, 309 S.E.2d at 462 (emphasis added) (quotation marks omitted). Since then, the North Carolina courts have applied the obstruction tort expansively, including to the same kinds of misconduct alleged with respect to Gottlieb and the DSI Defendants. Thus, the tort has been applied to the Durham Police Department's failure to produce evidence, *Jones v. City of Durham*, 643 S.E.2d at 633; the solicitation of a false affidavit, *Jackson v. Blue Dolphin Commc'ns of N.C., LLC*, 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002); a conspiracy to conceal a medical diagnosis, *see Henry v. Deen*, 310 S.E.2d 326, 334 (N.C. 1984); and the failure to preserve evidence relevant to a medical malpractice lawsuit.[69]

_____

[69] *See Grant v. High Point Reg'l Health Sys.*, 645 S.E.2d 851, 853-56 (N.C. Ct. App. 2007); *see also Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 928 (4th Cir. 2007) (per curiam) (holding that threat to reveal embarrassing letter if plaintiff proceeded with a lawsuit was obstruction); *Burgess v. Busby*, 544 S.E.2d 4, 13 (N.C. Ct. App. 2001) (holding that alerting health care providers to jurors' identities after their verdict was obstruction). *See generally* Mary G. Leary, *Obstructing Justice, in Strong's North Carolina Index 4th* § 15 (Feb. 2008), and Charles Nagy, 67 C.J.S. *Obstructing Justice* §§ 1, 2 (1978) (cited with approval by *In re Kivett*, 309 S.E.2d at 462).

The fact that Nifong directed the police investigation and subsequent prosecutions, *see* Himan Br. at 31, or had a duty to disclose exculpatory evidence, *see* Gottlieb Br. at 38, does not preclude Defendants' liability as Nifong's co-conspirators and for their own conduct obstructing justice. *See Jones v. City of Durham*, 643 S.E.2d at 633 (recognizing obstruction claim against Durham Police Department for failure to produce exculpatory evidence). Nor does it matter that the charges against Plaintiffs were ultimately dismissed. *See* Gottlieb Br. at 38-39. As the Fourth Circuit held in rejecting a similar argument, "there are other North Carolina decisions finding a legally sufficient claim where the defendant *attempted* to prevent, obstruct, impede, or hinder justice," but did not succeed in doing so. *Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 928 (4th Cir. 2007) (per curiam) (citing *Burgess v. Busby*, 544 S.E.2d 4, 12-13 (N.C. Ct. App. 2001); *Kivett*, 309 S.E.2d at 462; *Blue Dolphin Commc'ns*, 226 F. Supp. 2d at 794; *State v. Rogers*, 315 S.E.2d 492, 512-13 (N.C. Ct. App. 1984)).

Defendants provide no authority or reasoning to support their narrow view of obstruction. Rather, they engage in cherry-picking and recasting of Plaintiffs' allegations, arguing that the obstruction claim against the DSI Defendants is based simply on an incomplete report and failure to make "the raw data easier for Plaintiffs to understand," *see* DSI Br. at 45, and that the claim against Gottlieb is based only on "[t]he use of allegedly suggestive identification procedure" and a failure to "take notes," *see* Gottlieb Br. at 38. But Plaintiffs' allegations are not so limited. The Amended Complaint alleges that the DSI Defendants (1) conspired to conceal their exculpatory DNA findings and to fabricate a false and incomplete report of "all DNA findings" for the express purpose of causing Plaintiffs to be indicted without probable cause and ultimately convicted; (2) later resisted efforts to obtain the raw data that would reveal the

DSI Defendants' deception; and (3) when compelled to produce such evidence, concealed the exculpatory DNA findings as scattered data points among 2,000 pages of notes, instead of reporting them in accordance with FBI, industry, and internal standards, in the hopes that Plaintiffs' counsel would have insufficient sophistication or resources to uncover the exculpatory findings. AC ¶¶ 206-207, 210, 276, 302-304. Similarly, the Amended Complaint alleges that Gottlieb also fabricated false evidence, including "supplemental case notes," prepared three months after the first indictments, that were a transparent effort to plug glaring contradictions in the prosecution's case; rigged a photographic lineup; conspired to conceal the exculpatory DNA evidence; conspired to mislead the grand jury; and conspired to intimidate witnesses—all in an effort to manufacture indictments and ultimately convictions of Plaintiffs. *See, e.g.*, *id.* ¶¶ 54, 56, 176, 180, 186, 340, 455. Defendants' efforts are alleged not only to have caused the indictments, but also to have extended the prosecutions against Plaintiffs for over a year. By any measure, such conduct "prevents, obstructs, impedes or hinders public or legal justice." *In re Kivett*, 309 S.E.2d at 462 (quotation marks omitted).

**C.** **The Amended Complaint States an Intentional Infliction of Emotional Distress Claim.**

The DSI Defendants, Gottlieb, Addison, Himan, and Hodge argue for the dismissal of the Fifteenth Cause of Action, which alleges intentional infliction of emotional distress ("IIED") and conspiracy, on the ground that a conspiracy to charge and publicly accuse three innocent men of a racially-motivated gang rape, kidnapping, and sexual assault is not "extreme and outrageous" as a matter of law. *See* Addison Br. at 20-21; DSI Br. at 45-57; Gottlieb Br. at 39-40; Himan Br. at 32-33; SD Br. at 44-45.

This argument is contrary not only to common sense, but also to North Carolina Supreme Court precedent that rejected such an argument on far less egregious facts.

In *West v. King's Department Store, Inc.*, 365 S.E.2d 621 (N.C. 1988), a store manager accused the plaintiffs of stealing a hand cart. The plaintiffs, one of whom was a hospital outpatient, attempted to prove their innocence by producing a receipt and summoning a person who had witnessed the sale, but the manager ignored this evidence and repeatedly told the plaintiffs "in the presence of others that they stole the merchandise and would be arrested if they did not return it." *See id*. at 625 (quotation marks omitted). The Supreme Court reversed a directed verdict for the defendant, holding on these facts that the "extreme and outrageous conduct of the store manager [wa]s manifest," *id.*:

> Few things are more outrageous and more calculated to inflict emotional distress on innocent store customers that have paid their good money for merchandise and have in hand a document to prove their purchase than for the seller or his agent, disdaining to even examine their receipt, to repeatedly tell them in a loud voice in the presence of others that they stole the merchandise and would be arrested if they did not return it. . . . [T]he store manager's last remarks to the [plaintiffs] as they left the store, a threat of prosecution in the future, left the [plaintiffs] under a continuing apprehension of prosecution for a year after this incident. . . . [T]hese factors together constitute sufficient evidence upon which a reasonable jury could have returned a verdict in favor of the plaintiffs.

*Id*. at 625-26 (alteration, citations, and quotation marks omitted).

Here, Defendants did not simply accuse Plaintiffs of a minor theft in front of other store customers. Addison, Hodge, and Nifong engaged in a prolonged campaign of false, inflammatory, and racially-charged statements both to the Durham community and the world accusing Plaintiffs of committing a racially-motivated gang rape—

statements that predictably led to death threats and other epithets against Plaintiffs. *See* AC ¶¶ 159-160, 514. And instead of simply subjecting a customer to an "apprehension of prosecution" for over a year while ignoring evidence of innocence, 365 S.E.2d at 625-26, here the DSI Defendants, Gottlieb, Addison, Himan, and Hodge caused Plaintiffs to be arrested, charged, prosecuted, and subjected to an apprehension of *felony convictions* for over a year, and they did so not only by ignoring evidence of innocence, but by affirmatively fabricating and concealing evidence and coercing witness statements. *See, e.g.*, AC ¶¶ 161-162, 207-210. Indeed, when one compares this conduct to actions that Defendants' own cases have found to constitute actionable IIED, it becomes even clearer that such misconduct "may be reasonably regarded as extreme and outrageous, [and] it is for the jury to determine, upon proper instructions, whether the conduct complained of is, in fact, sufficiently extreme and outrageous to result in liability." *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 121 (N.C. Ct. App. 1986) (workplace sexual harassment was "sufficiently outrageous conduct . . . to entitle [plaintiff] to go to the jury") (cited in DSI Br. at 39); *see also Dickens v. Puryear*, 276 S.E.2d 325, 336 (N.C. 1981) (one death threat sufficient to constitute IIED) (cited in Himan Br. at 32).[70]

Hodge and Addison also argue that the IIED claim should be dismissed because it is really a time-barred defamation claim that has been recast as an IIED claim.

---

[70] Defendants cite some cases rejecting IIED claims, but each involved conduct that was far less egregious than alleged here. *See Jolly v. Acad. Collection Serv., Inc.*, 400 F. Supp. 2d 851, 866-67 (M.D.N.C. 2005) (defendant "spoke harshly"); *Johnson v. Colonial Life & Accident Ins. Co.*, 618 S.E.2d 867, 873 (N.C. Ct. App. 2005) (comments about firing plaintiff); *Briggs v. Rosenthal*, 327 S.E.2d 308, 312 (N.C. Ct. App. 1985) (publishing article that was "honest, sincere and sensitive"); *Shillington v. K-Mart Corp.*, 402 S.E.2d 155, 198 (N.C. Ct. App. 1991) ("refusal to listen to plaintiff's explanation").

*See* Addison Br. at 19; SD Br. at 41.[71]  First, Hodge's argument rests on the faulty premise that the sole basis for the IIED claim against him is "Hodge's April 11, 2006, answer to a reporter's question."  *See* SD Br. at 41-42, 44-47.  In fact, the claim against Hodge is based on *all* of his alleged malicious acts that were intended to cause three Duke lacrosse players to be charged and arrested notwithstanding the overwhelming evidence of actual innocence, including, for example, (1) ordering identifications and arrests even after Mangum had failed to identify any of 36 Duke lacrosse players (including Evans and Seligmann) as her attackers; (2) approving and ratifying the rigged April Photo Array; (3) approving the concealment of DNA evidence; and (4) conspiring to mislead the grand jury as to the lack of probable cause.  *See, e.g.*, AC ¶¶ 50, 55, 56, 79, 82, 100, 107, 119, 131-132, 179, 183, 211, 508, 518.  Moreover, Hodge and Addison are wrong on the law:  in *West*, the North Carolina Supreme Court sustained the plaintiffs' IIED claim based on the store manager's false statements, even though the plaintiffs were unable to sustain a defamation claim based on those same statements.  *See* 365 S.E.2d at 624-26.  Moreover, "the general rule [is] that a plaintiff may plead alternative theories of recovery based on the same conduct or transaction."  *Stanley v. Moore*, 454 S.E.2d 225, 228-29 (N.C. 1995); *Norman v. Nash Johnson & Sons' Farms, Inc.*, 537 S.E.2d 248, 265 (N.C. Ct. App. 2000) (same); *see also James River Equip., Inc. v. Mecklenburg Utils., Inc.*, 634 S.E.2d 557, 560 (N.C. Ct. App. 2006) ("It is well-established that liberal pleading rules permit pleading in the alternative, and that theories may be pursued in the complaint." (alterations and internal quotation marks omitted)).

---

[71] Hodge makes the same argument against the negligence claim in the Sixteenth Cause of Action, but Plaintiffs are not pursuing liability against Hodge on that claim, only the City of Durham based on official capacity.

**D.     The Amended Complaint States a Negligence Claim.**

The DSI Defendants argue that the Sixteenth Cause of Action, alleging negligence, should be dismissed as to them because they owed Plaintiffs no legal duty under North Carolina law.[72]  This argument is based on a mischaracterization of the claims against them, and it is refuted by controlling North Carolina precedent.

First, like the DSI Defendants' "absolute immunity" argument (discussed in Section II.C, *supra*), their argument that "expert witnesses" owe no duty to adverse parties in a court proceeding, *see* DSI Br. at 41-42, is directed to a "straw man" claim that Plaintiffs have not asserted.[73]  Plaintiffs' negligence claim is not based on expert testimony in a court case but, rather, the DSI Defendants' forensic analysis in support of a police investigation.  *See* AC ¶ 546 (DSI Defendants "owed Plaintiffs a duty of due care *with respect to their involvement in the police investigation*." (emphasis added)); AC ¶¶ 30, 202 (DSI Defendants "provide[d] forensic analysis services relating to the investigation of Plaintiffs").

Moreover, the DSI Defendants offer no authority that exempts them from the duty of ordinary care that "every person" owes to the foreseeable victims of their negligence.  *See, e.g.*, *Stein v. Asheville City Bd. of Educ.*, 626 S.E.2d 263, 267 (N.C. 2006); *Hart v. Ivey*, 420 S.E.2d 174, 178 (N.C. 1992).  In North Carolina, as elsewhere,

---

[72] The City does not dispute that Plaintiffs have alleged facts sufficient to support a negligence claim against the City based on official capacity.  *See Jones v. City of Durham*, 638 S.E.2d at 203 (permitting negligence claim against City for officer's dangerous driving).  As noted above, Plaintiffs are not seeking to hold Addison, Himan, Gottlieb, or the Supervisory Defendants liable in their individual capacities on this claim.

[73] While the DSI Defendants also argue that a "DNA laboratory" owes no such duty, they cite no cases that involve a DNA laboratory.

"the law imposes upon *every person* who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence." *Hart*, 420 S.E.2d at 178 (emphasis added) (alteration and internal quotation marks omitted). A defendant owes a plaintiff a legal duty whenever "injury to the plaintiff was foreseeable and avoidable through due care." *Stein*, 626 S.E.2d at 267 (citing *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 99-100 (N.Y. 1928)); *see also Winters v. Lee*, 446 S.E.2d 123, 124 (N.C. Ct. App. 1994) (existence of a legal duty turns on whether injury to others was "*reasonably foreseeable*" (quotation marks omitted)); *see also Brown & Williamson Tobacco Corp. v. CSX Transp., Inc.*, 882 F. Supp. 511, 514 (E.D.N.C. 1995) ("An individual has a general duty of care under the law to act in the manner any ordinary, prudent and reasonable person would do under similar circumstances. The duty of care is only owed to foreseeable plaintiffs who the defendant reasonably believed would be harmed by its action." (citations omitted)). For example, the North Carolina Supreme Court held in *Hart* that hosts of a social gathering "were under a duty to the people who travel on the public highways not to serve alcohol to an intoxicated individual who was known to be driving" because drunk drivers foreseeably could harm such travelers. *See Hart*, 420 S.E.2d at 178.

The DSI Defendants do not even attempt to argue that their actions could not foreseeably harm plaintiffs. Nor could they. The DSI Defendants were retained to assist in the Durham Police investigation by analyzing the DNA on the rape kit items and other evidence collected by Durham Police. *See* AC ¶¶ 30, 202. They knew or should have foreseen that their findings would be critical to the determination of whether or not to charge any Duke lacrosse players, including Plaintiffs, with serious felonies. *See id*. ¶¶ 200, 210. Moreover, the DSI Defendants' own internal policies, as well as national

standards set by the Federal Bureau of Investigation and accrediting organizations, *required* the DSI Defendants to report all findings of their tests. *See id*. ¶¶ 522, 536, 564. Yet, the DSI Defendants not only elected not to report all findings, including the fact that DNA from at least four unidentified males, none a Duke lacrosse player, was found on the rape kit items; they agreed in advance that those findings would not be reported, in violation of internal policy and national standards. *See Peal ex rel. Peal v. Smith*, 444 S.E.2d 673, 678-79 (N.C. Ct. App. 1994) ("The conduct by the corporation, in violating its own policy, provided evidence that the corporation failed to exercise ordinary care . . . . *We therefore conclude that there was a duty*." (emphasis added)), *aff'd*, 457 S.E.2d 599 (N.C. 1995). To the extent that the DSI Defendants' misconduct was not intentional, it was undoubtedly reckless or negligent.

> **E.    The Amended Complaint States a Claim for Negligent Hiring, Training, Discipline, and Retention.**

The City of Durham does not dispute that the Amended Complaint pleads facts sufficient to allege claims against the City for negligent hiring, training, discipline, and retention. As noted above, Plaintiffs are not seeking to impose liability on the Supervisory Defendants in their individual capacities on this claim, only to hold the City liable both directly and based on official capacity. Therefore, the Court does not need to reach the Supervisory Defendants' arguments with respect to this cause of action.[74]

---

[74] The North Carolina Supreme Court has held that supervisors may be liable for negligent supervision, *see Mozingo v. Pitt County Mem'l Hosp., Inc.*, 415 S.E.2d 341, 344 (N.C. 1992), and does not mention the word "employer" in the elements of the tort, *see Medlin v. Bass*, 398 S.E.2d 460, 462 (N.C. 1990). *Accord Smith v. Jackson County Bd. of Educ.*, 608 S.E.2d 399, 410 (N.C. Ct. App. 2005); *Block v. County of Person*, 540 S.E.2d 415, 421-22 (N.C. Ct. App. 2000); *Herndon v. Barrett*, 400 S.E.2d 767, 767 (N.C. Ct. App. 1991).

**F.     Public Official Immunity Does Not Extend to Intentional Misconduct Committed by Gottlieb, Addison, and Himan.**

While Plaintiffs agree that Gottlieb, Himan, Addison, and the Supervisory Defendants are entitled to public official immunity for the state-law negligence claims alleged against them in their individual capacities (the Sixteenth, Seventeenth, Eighteenth, and Nineteenth Causes of Action), these Defendants are not entitled to such immunity for the intentional torts alleged against them in the Thirteenth, Fourteenth, and Fifteenth Causes of Action.  Public officials in North Carolina are immune from state-law liability only "so long as they keep within the scope of their official authority and act without malice or corruption."  *Bailey v. Kennedy*, 349 F.3d 736, 742 (4th Cir. 2003).  And while Himan, Gottlieb, and Addison contend that there are no facts to support an inference of their malicious intent, *see* Gottlieb Br. at 32-33; Himan Br. at 27-28; Addison Br. at 17-18, as set forth above, the Amended Complaint alleges such facts numerous times.  *See, e.g.*, AC ¶¶ 3, 49-50, 82, 87-88, 159-163, 176-196, 207-211, 215, 218-221, 225-237, 240-241, 243-271, 309-315; *see also* Sections III.B, IX.A-IX.C, *supra*.  Moreover, like qualified immunity, public official immunity is not available to defendants who violate clearly established rights.  *See Bailey v. Kennedy*, 349 F.3d at 742 ("[Public official immunity] is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." (internal quotation marks omitted)); *Moore v. Evans*, 476 S.E.2d at 421-22 (denying public official immunity where factual dispute existed over whether identification was sufficient to support probable cause).

## X.   THE COURT MAY DISMISS OFFICIAL CAPACITY CLAIMS WHERE THE CITY IS ALSO NAMED AS A DEFENDANT AND IS THE REAL PARTY IN INTEREST.

The City and the Supervisory Defendants ask the Court to dismiss several official capacity claims against City employees and agents in causes of action in which the City is already named directly as a defendant, on the ground that the official capacity claims are thus "redundant" or "duplicative" of the claims against the City.  *See* City Br. at 12 n.4; SD Br. at 8-10 & n.1.[75]

In the context of the federal civil rights statutes, it is well-settled that "[c]laims against the official in his or her official capacity which are duplicative of claims against a government entity" may be dismissed where "the government entity . . . has also been sued" on the same claim.  *W.E.T. v. Mitchell*, No. 1:06CV487, 2007 WL 2712924, at *10 (M.D.N.C. Sept. 14, 2007); *see also Kentucky v. Graham*, 473 U.S. 159, 163-66 (1985).  Therefore, the Court may dismiss the official capacity claims against the City employees and agents named in the Fifth, Eighth, Ninth, Tenth, and Eleventh Causes of Action because the City is already named as a defendant on these causes of action.  The Court may also dismiss the official capacity claims in the Seventh Cause of Action, which alleges conspiracy in violation of § 1983, because they are duplicative of the *Monell* claim alleged against the City in the Fifth Cause of Action.

Plaintiffs have identified no case that applies this principle to the state-law claims alleged in the Sixteenth, Seventeenth, Eighteenth, and Nineteenth Causes of

---

[75] These include the Fifth, Eighth, Ninth, Tenth, Eleventh, Sixteenth, Seventeenth, Eighteenth, and Nineteenth Causes of Action, each of which names the City directly as well as City employees and agents in their official capacities, and the Seventh Cause of Action, which does not name the City directly, but is duplicative of the § 1983 claim alleged against the City in the Fifth Cause of Action.

Action.  Both the City and the Supervisory Defendants suggest that the North Carolina

Supreme Court extended this principle to claims "under North Carolina law" in *Moore v.*

*City of Creedmoor*, 481 S.E.2d 14 (N.C. 1997), City Br. at 12 n.4; *see also* SD Br. at 9,

but *Moore* addressed a § 1983 claim, not an official capacity claim under state law.  *See*

*Moore*, 481 S.E.2d at 21.  And there are important distinctions between municipal

liability under § 1983 and municipal liability under North Carolina law.  *See* Section

IV.C, *supra*.  Nevertheless, given that the City concedes that it is properly named as a

Defendant in these causes of action, and that its liability is "duplicative" of the liability of

the employees and agents named in their official capacities on the same claims, City Br.

at 12 n.4, Plaintiffs do not see any reason why the principles articulated in *Kentucky v.*

*Graham*, 473 U.S. 159, 166 (1985), should not apply with equal force to the official

capacity claims alleged under state law here.  Therefore, so long as the City remains "the

real party in interest" in the Sixteenth, Seventeenth, Eighteenth, and Nineteenth Causes of

Action, the official capacity claims against City employees in those causes of action may

be dismissed.  *Graham*, 473 U.S. at 166.

Finally, the City suggests that the Thirteenth, Fourteenth, and Fifteenth

Causes of Action should be dismissed on the same grounds.  *See* City Br. at 12 n.4.

Unlike the other causes of action discussed above, however, the City concedes that it is

not named as a defendant in these causes of action.  *See id.*  Therefore, the official

capacity claims against City employees and agents are not duplicative of any claim

against the City and may not be dismissed unless the City is substituted as a defendant

directly in these causes of action.

# XI. DEFENDANTS MAKE NO OTHER ARGUMENTS SUPPORTING DISMISSAL.

## A. It Is Premature To Dismiss the Prayer for an Injunction.

At trial, Plaintiffs intend to present facts sufficient to support an Order and Permanent Injunction against the City of Durham, DSI, and Meehan in order to prevent these Defendants from harming Plaintiffs and any other person by continuing to engage in the same kinds of official misconduct alleged in the Amended Complaint. AC ¶ 567a. The events described in the Amended Complaint identify a compelling need for injunctive relief. The "Duke lacrosse case" involved a coordinated campaign of politically- and racially-charged misconduct that was authorized and ratified by officials at the highest levels of the City of Durham; it involved longstanding policies, customs, and practices of the Durham Police Department that have not been changed and will continue to result in further misconduct; and it involved a DNA laboratory whose owner and Laboratory Director participated in a conspiracy to fabricate and conceal evidence.

There would be a significant benefit, both to Plaintiffs and the public, from the requested Injunction. Among other things, it would require the Durham Police Department to actually follow its own stated General Order for eyewitness identifications, rather than approving the *ad hoc*, "suspects-only" array when expedient. *Id.* ¶ 567a.v. It would require Durham Police to provide DNA reports that include the results of all testing and the backup materials relating to that testing. *Id.* ¶ 567a.vi. It would require Durham Police to provide proper training to its personnel on such matters as public statements, eyewitness identification, and probable cause. *Id.* ¶ 567a.vii. It would prevent Durham Police from making premature public statements of guilt and delegating control over a police investigation to a district attorney. *Id.* ¶¶ 567a.viii, 567a.ix, 567a.xi. And it would also prevent Durham Police from systematically targeting

students at Duke University.  *Id.* ¶ 567a.xiii.  Such relief would not only protect

Plaintiffs, but the broader Durham community, including many citizens who lack the

resources to challenge similar misconduct.

The requested Injunction and Court monitoring are necessary because there

is no indication that the City and DSI ever intend to take responsibility for their

misconduct and implement reforms that would protect Plaintiffs and others.  The City

announced, to much fanfare, a blue ribbon commission to investigate the Durham Police

Department's misconduct in this case, and then promptly canceled it before it could hear

a single witness from the City or Durham Police.  *See* Matt Dees & Joseph Neff, *Review

of Lacrosse Case Halted*, *News & Observer*, Aug, 28, 2007, at A1.  The City then

announced that Defendant Patrick Baker would be stepping down as City Manager, but

only so that he would become the City Attorney, notwithstanding his role in ordering

arrests without probable cause and approving the unconstitutional April Photo Array.  *See*

Matt Dees, *Baker To Depart as City Manager*, *News & Observer*, Dec. 12, 2007, at A1.

Addison received a promotion.  *See* Stanley B. Chambers, Jr., *26 Officers Gain

Promotions in Durham Police Department*, *News & Observer*, Nov. 24, 2007, at B3.

And while Meehan is no longer employed by DSI, upon information and belief Clark

continues to run the company.  *See* DSI Br. at 2; *DNA Lab Chief Who Worked on Duke

Lacrosse Case Leaves Job*, *A.P. State & Local Wire*, Nov. 13, 2007.

Not surprisingly, these Defendants oppose the Injunction.  They argue that

because Plaintiffs are not continuously in the City of Durham, there is no actual or

imminent risk of harm.  Ironically, on the day the Defendants made this argument,

Plaintiff David Evans was in the City of Durham as part of a business trip to Duke

University.  Indeed, each of the Plaintiffs expects to travel to the City of Durham during

and after this litigation, *see* AC ¶¶ 567, whether for business, Division I lacrosse contests, potential graduate or professional school, or to visit friends who still attend Duke University.[76]  *See Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d 636, 645 (D. Md. 2005) (sustaining claim for injunctive relief where deaf Plaintiffs alleged intention to return to location that had "policy, pattern, and practice" of violating ADA).

More importantly, however, Plaintiffs' physical location is not relevant to the likelihood that they will be targeted again for the same kinds of misconduct by Durham Police and DSI in the future.  As the Amended Complaint alleges, Seligmann's whereabouts were not a factor in his illegal seizure; rather, Defendants used the rigged identification of Seligmann in the April Photo Array to obtain his indictment even though they had no proof that he had actually attended the party at 610 N. Buchanan.  AC ¶ 220.  Moreover, the DSI Defendants have Plaintiffs' DNA and, thus, the ability to fabricate false reports of forensic analysis regardless of Plaintiffs' current locations.

At bottom, the need for the requested Injunction is based on a risk of "actual or imminent" harm that is not "hypothetical" in light of the allegations of deliberate, high-level misconduct by the top policymaking officials of the City and DSI.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983) (noting that allegations that "the City ordered or authorized police officers to act in such [a] manner" would state a claim for injunctive relief under § 1983).  However, given that the Injunction will not be requested until trial, and that the factual basis for it may change before then, it is premature at this stage for the Court to rule on Defendants' request to dismiss the prayer for the Injunction.  *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

---

[76] Plaintiffs can amend to add these facts if the Court so prefers.

### B. There Are No "State Constitution" or "Punitive Damages" Causes of Action Against the City of Durham for the Court To Dismiss.

Finally, the City requests the "dismissal" of two aspects of the Amended Complaint, neither of which involves a cause of action against the City. First, the City asks the Court to "dismiss" any claims for violation of the North Carolina Constitution. As the City correctly observes, however, Plaintiffs allege no such cause of action. *See* City Br. at 41-42.[77] This is because a direct cause of action under the North Carolina Constitution is permitted only "in the absence of an adequate state remedy." *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 289 (N.C. 1992). Here, North Carolina law provides several causes of action with which to vindicate Plaintiffs' rights under Article I, Section 19 of the North Carolina Constitution, just as federal law provides causes of action under 42 U.S.C. §§ 1983, 1985, and 1986 to vindicate Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs have alleged these causes of action in the Amended Complaint. That is not a basis to strike textual references to Plaintiffs' rights under the North Carolina Constitution, however.

Second, the City seeks "dismissal" of "Plaintiffs' claims for punitive damages against the City." City Br. at 49. Again, however, there is no cause of action for punitive damages in the Amended Complaint, only a subparagraph of the Prayer for Relief stating that Plaintiffs intend to seek punitive damages against appropriate Defendants at trial. AC ¶ 567c. While there is no dispute that the City of Durham would be immune from a punitive damages award, and that Plaintiffs do not intend to request such damages against the City absent a change in existing law, *see Cook County v.*

---

[77] For this reason, the City's request is better characterized as a request to "strike" textual references to the North Carolina Constitution. *See, e.g.*, AC ¶¶ 4, 222, 242.

*United States ex rel. Chandler*, 538 U.S. 119, 129 (2003); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266-71 (1981), the appropriate remedy is not to dismiss or strike this portion of the Prayer for Relief, which indisputably applies to other Defendants,[78] but simply to instruct the jury at trial that it may only assess punitive damages against the other Defendants, and not the City of Durham.

## CONCLUSION

For the aforementioned reasons, the Court should deny Defendants' Motions to Dismiss, except that

1. Because the City is already named as a defendant in the Fifth, Seventh, Eighth, Ninth, Tenth, Eleventh, Sixteenth, Seventeenth, Eighteenth, and Nineteenth Causes of Action, the Court may dismiss the official capacity claims alleged in those causes of action. *See* Section X, *supra*.

2. The Court may dismiss the individual capacity claims alleging negligence by Addison, Gottlieb, Himan, and the Supervisory Defendants in the Sixteenth, Seventeenth, Eighteenth, and Nineteenth Causes of Action based on public official immunity. *See* Section IX.F, *supra*.

---

[78] *See, e.g.*, *Smith v. Wade*, 461 U.S. 30, 35, 56 (1983); *Bennett v. N.C. Dep't of Transp.*, No. 1:05CV764, 2007 WL 4208390, at *8 (M.D.N.C. Nov. 26, 2007); *Blair v. County of Davidson*, No. 1:05CV11, 2006 WL 1367420, at *13 (M.D.N.C. May 10, 2006).

Dated: April 2, 2008          Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**


By: ____/s/ Christopher N. Manning_____
By: ____/s/ Charles Davant IV_____
      Brendan V. Sullivan, Jr. (pro hac vice)
      Robert M. Cary (pro hac vice)
      Christopher N. Manning (pro hac vice)
      Charles Davant IV (N.C. Bar #28489)
      725 Twelfth Street, N.W.
      Washington, D.C.  20005
      Tel.    (202) 434-5000
      Email  cmanning@wc.com
      Email  cdavant@wc.com

*Attorneys for Plaintiffs*
  *David F. Evans and Collin Finnerty*

        -and-


**RUDOLF WIDENHOUSE & FIALKO**


By: ____/s/ David S. Rudolf_____
      David S. Rudolf (N.C. Bar #8587)
      312 West Franklin Street
      Chapel Hill, NC  27516
      Tel.    (919) 967-4900
      Email  dsrudolf@rwf-law.com

**BARRY C. SCHECK, ESQ.**

Barry C. Scheck*
Attn: Elizabeth Vaca
100 Fifth Avenue
New York, NY  10011
Tel.    (212) 364-5390
Email  bcsinnocence@aol.com

(* motion for special appearance
  to be filed forthwith)


**EMERY CELLI BRINCKERHOFF &
  ABADY LLP**

Richard D. Emery**
Ilann M. Maazel**
75 Rockefeller Plaza, 20th Floor
New York, NY  10019
Tel.    (212) 763-5000
Fax.    (212) 763-5001
Email  remery@ecbalaw.com

(** motion for special appearance
  pending)

*Attorneys for Plaintiff Reade Seligmann*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| DAVID F. EVANS, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:07CV739 |
| CITY OF DURHAM, N.C., et al., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2008, I electronically filed the foregoing

**CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

**THE FIRST AMENDED COMPLAINT** with the Clerk of the Court using the

CM/ECF system, which will send notification of such filing to the following:

James B. Craven III
340 West Main Street
P.O. Box 1366
Durham, NC 27702

*Counsel for Michael B. Nifong*
*(terminated administratively pursuant to order of Jan. 28, 2008)*


Reginald B. Gillespie, Jr.
FAISON & GILLESPIE
5517 Durham-Chapel Hill Blvd., Ste. 2000
P.O. Box 51729
Durham, NC 27717-1729

*Counsel for Defendant City of Durham*

Joel M. Craig
KENNON CRAVER BELO CRAIG & MCKEE, PLLC
4011 University Drive, Suite 300
P.O. Box 51579
Durham, NC 27717-1579

*Counsel for Defendant Benjamin Himan*


James B. Maxwell,
MAXWELL, FREEMAN & BOWMAN, P.A.
P.O. Box 52396
Durham, NC 27717-2396

*Counsel for Defendant David Addison*


Edwin M. Speas
Eric P. Stevens
POYNER & SPRUILL, LLP
3600 Glenwood Avenue
Raleigh, NC 27612

*Counsel for Defendant Mark Gottlieb*


Patricia P. Kerner
D. Martin Warf
Hannah G. Styron
TROUTMAN SANDERS LLP
434 Fayetteville Street, Suite 1900
Raleigh, NC 27601

*Counsel for Defendants Steven Chalmers, Beverly Council, Ronald Hodge, Jeff Lamb, Patrick Baker, Michael Ripberger, and Lee Russ*

Robert A. Sar
Nicholas J. Sanservino, Jr.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2301 Sugar Bush Road
Suite 600
Raleigh, NC 27612

*Counsel for Defendant DNA Security*


Robert J. King III
Kearns Davis
BROOKS, PIERCE, McLENDON, HUMPHREY & LEONARD, LLP
2000 Renaissance Plaza
Post Office Box 26000
Greensboro, NC 27420

*Counsel for Defendant DNA Security, Inc. & Richard Clark*


Paul R. Dickinson, Jr.
James A. Roberts, III
LEWIS & ROBERTS PLLC
1305 Navaho Drive, Suite 400
Raleigh, NC  27609-7482

*Counsel for Defendant Brian Meehan*


David S. Rudolf
RUDOLF WIDENHOUSE & FIALKO
312 West Franklin Street
Chapel Hill, NC 27516

*Counsel for Plaintiff Reade Seligmann*


I further certify that I caused the foregoing document to be served by first-class mail,

postage prepaid, to the following non CM/ECF participants:

Roger E. Warin
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. N.W.
Washington, D.C. 20036

*Counsel for Defendant City of Durham*


Linwood Wilson
6910 Innesbrook Way
Bahama, NC 27503-9700

*Pro se*

Barry C. Scheck
100 Fifth Avenue
New York, NY 10011

Richard D. Emery
EMERY CELLI BRINCKERHOFF & ABADY LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019

*Counsel for Plaintiff Reade Seligmann*


Respectfully submitted,


/s/ Charles Davant IV
Charles Davant IV (N.C. Bar No. 28489)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005
Tel.    (202) 434-5000
Email: cdavant@wc.com

*Attorney for Plaintiffs David F. Evans and
   Collin Finnerty*