# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# CIVIL ACTION NO. 1:07-CV-00739

| | |
|---|---|
| **DAVID F. EVANS,** *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | **SUPPLEMENTAL BRIEF** |
| ) | **IN SUPPORT OF MOTIONS** |
| v. ) | **TO DISMISS OF DEFENDANTS** |
| ) | **GOTTLIEB, HIMAN, AND** |
| **THE CITY OF DURHAM,** ) | **THE CITY OF DURHAM,** |
| **NORTH CAROLINA,** ) | **NORTH CAROLINA** |
| *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

Defendants Mark Gottlieb, Benjamin Himan, and the City of Durham, North Carolina ("City") (collectively, "City Defendants"), pursuant to this Court's order (Doc. No. 96), submit this supplemental brief in support of their motions to dismiss. This brief addresses the effect of the Supreme Court's recent decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

*Iqbal* puts into sharp focus the rampant deficiencies in Plaintiffs' First Amended Complaint ("Complaint"). In *Iqbal*, the Supreme Court has made clear that a claim cannot stand on factual allegations that are merely *consistent with*, rather than actually *suggesting*, the required elements of the claim. But Plaintiffs' claims are based on factual allegations that, even if true, are at best only consistent with the required elements of the claims, and do not cross the threshold into suggesting those elements. While Plaintiffs assert the required elements in conclusory fashion, their factual allegations fail to support those assertions.

Plaintiffs' central strategy is to describe in detail the overzealousness of the State Prosecutor in prosecuting Plaintiffs and then to identify any parallel conduct on the part of City Defendants who were assigned to investigate Crystal Mangum's rape claims. Because the City Defendants were working in parallel with the State Prosecutor, goes the theory, they *must have been* acting maliciously; they *must have been* colluding to deprive Plaintiffs of their rights, and they *must have been* conspiring with the State Prosecutor for the purpose of convicting innocent people. But *Iqbal* makes clear that even if the City Defendants' investigative actions were *consistent with* the sweeping, nefarious conspiracy to convict innocent people asserted by Plaintiffs, those actions are also consistent with a far more obvious, mundane, and innocent scenario: police doing the best they could to faithfully execute their investigatory duties under trying circumstances.

With perfect 20/20 hindsight, Plaintiffs take issue with how Defendants collected and weighed the evidence available to them. Investigators were either too aggressive, *see* Am. Compl. ¶ 263 (criticizing investigators for attempting to talk to Duke students on campus); or not aggressive enough, *see id.* ¶ 321 (investigators failed to push Mangum on inconsistencies). Investigators either were too willing to keep complete investigatory records, *see id.* ¶ 180 (criticizing Gottlieb for ensuring that Mangum's photo array process was videotaped), or not willing enough, *see id.* ¶ 225 (complaining that investigators didn't take notes during meetings with Meehan). For each action, Plaintiffs assert an underlying wrongful purpose: multiple independent conspiracies, malicious intent on the part of investigators, and unconstitutional City policies ratifying such conduct. But the Complaint's factual allegations—once divested of Plaintiffs'

conclusory characterizations—suggest nothing of the sort. Accordingly, Plaintiffs' Amended Complaint fails to meet *Iqbal*'s standards.

**I.     *IQBAL* CONFIRMS THE REQUIREMENTS OF FRCP 8 FOR ALL CLAIMS BROUGHT IN FEDERAL COURT**

With respect to the pleading standards inherent in Federal Rule of Civil Procedure 8, the *Iqbal* decision provides clear direction on at least four key points:

- *Pleadings in federal district court must be plausible, no matter what the cause of action.*

*Iqbal* makes clear that the plausibility requirement first articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), was "based on [the Court's] interpretation . . . of Rule 8," and that "[t]hat Rule in turn governs the pleading standard 'in all civil actions and proceedings in the United States district courts.'" *Iqbal*, 129 S. Ct. at 1953 (citation omitted). This means that *Iqbal*'s standards not only apply to all federal claims made in a federal court, but also to state law claims brought pursuant to a federal court's supplemental or diversity jurisdiction. The Court also refused to adopt a "flexible" approach to *Twombly*'s requirements, whereby a pleader must "amplify a claim with some factual allegations" in some contexts but not others. *Iqbal*, 129 S. Ct. at 1944. After *Iqbal*, there is no question that the plausibility inquiry underlying Rule 8 must be applied with equal rigor to every cause of action alleged in federal court.

- *The plausibility requirement cannot be circumvented even if a court intends to limit discovery—particularly in actions challenging Government defendants' official conduct.*

Several courts, including the court below in *Iqbal*, held that a court could defer on the *Twombly* inquiry, while managing the discovery process to avoid prejudice to the

defendants at issue. *See Iqbal*, 129 S. Ct. at 1953. The Court in *Iqbal* squarely rejected this approach, finding that "the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed upon the discovery process." *Id.* (citation omitted). Adherence to the plausibility inquiry is "especially important" in suits against Government official defendants:

> If a Government official is to devote time to his or her duties, and to the formulation of sound and responsible policies, it is counterproductive to require the substantial diversion that is attendant to participating in litigation and making informed decisions as to how it should proceed. Litigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government.

*Id.*[1]

- *A court must aggressively cull out conclusory allegations couched as factual allegations.*

*Iqbal* makes clear that conclusory allegations are not entitled to the assumption that they are true. In *Iqbal*, the Court identified three in particular:

---

[1] As the Tenth Circuit recently noted:

> [C]omplaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants. The *Twombly* standard may have greater bite in such contexts, appropriately reflecting the special interest in resolving the affirmative defense of qualified immunity "at the earliest possible stage of a litigation."

*Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (footnote and citations omitted). Thus, the importance of adherence to the plausibility standards dovetails with proper recognition of the underlying principles of qualified immunity—immunity to which Defendants Gottlieb and Himan are entitled. *See* Memorandum in Support of Defendant Mark Gottlieb's Motion to Dismiss at 25-26 (Doc. No. 39) ("Gottlieb Open. Br."); Defendant Benjamin Himan's Brief in Support of His Motion to Dismiss at 12-14 (Doc. No. 37) ("Himan Open. Br.").

- that Attorney General Ashcroft and FBI Director Mueller "'knew of, condoned, and willfully and maliciously agreed to subject [Iqbal]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest'";
- that Ashcroft was the "'principal architect" of this invidious policy"; and
- that Mueller was "'instrumental' in adopting and executing it."

*Iqbal*, 129 S. Ct. at 1951 (quoting the complaint). Each of these allegations is "factual" in the sense that they allege actions and the state of mind of the defendants. But the Court found that they were "bare assertions" that "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Id.* (citation omitted). But such threadbare allegations, the Court held, carry no weight. Moreover, it did not matter that the plaintiffs alleged "discrete wrongs" rather than, as in *Twombly*, "general wrongdoing that extended over a period of years," *id.* at 1952. Either way, if the allegation is conclusory in nature, it should not be assumed true. *Id.*

- *Behavior that is merely consistent with alleged bad intent—but also consistent with an "'obvious alternative explanation,'"* Iqbal*, 129 S. Ct. at 1951—is not suggestive of such bad intent.*

While granting no weight to the conclusory allegations themselves, the Court closely examined the factual allegations that might be said to support them. In *Iqbal* itself, there were two such allegations: First, that the FBI, under Mueller's direction, "arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11"; and second, that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by

- 5 -

the FBI was approved by" Ashcroft and Mueller "in discussions in the weeks after September 11, 2001." *Iqbal*, 129 S. Ct. at 1951, 1961 (quoting the complaint). The Court noted that these allegations—including allegations of meetings between the two defendants—were *consistent with* the invidious discrimination alleged. "But given more likely explanations, they do not *plausibly* establish this purpose." *Id*. at 1951 (emphasis added). Specifically, the Court assessed the alleged law enforcement actions within the context in which they occurred—namely, the government's response to the September 11, 2001 attacks by Al Qaeda:

> It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. As between that "obvious alternative explanation" for the arrests and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.

*Id.* at 1951-52 (citations omitted).

Each of these points demonstrates fatal defects in Plaintiffs' claims here, as explained below.[2]

---

[2] A fifth point made by *Iqbal* involves the standard for personal liability for supervisors in claims under Section 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). When such suits involve causes of action requiring specific intent (such as intent to discriminate on the basis of race), Plaintiffs must plausibly allege more than simple acquiescence in the discriminatory conduct of subordinates. *See Iqbal*, 129 S. Ct. at 1948-49. Plaintiffs' claims with respect to the Durham Supervisory Defendants utterly fail in this regard. *See* Supplemental Brief of Defendants Baker, Chalmers, Council, Hodge, Lamb, Ripberger, Russ, and Addison, which is hereby incorporated by reference.

## II. PLAINTIFFS' COMPLAINT FAILS TO MEET *IQBAL*'S STANDARDS

Plaintiffs' Complaint proceeds from the same "there-must-have-been-evil-intent" approach underlying the complaint in *Iqbal*. Indeed, every facet of the City's investigation is characterized as initiating, supporting, facilitating, or prolonging an effort led by the State Prosecutor to convict innocent people. But as between the "purposeful, invidious" conspiracy alleged by Plaintiffs, and the "'obvious alternative explanation'" of good-faith efforts to identify perpetrators of a horrific crime, the conspiratorial actions and malicious intent alleged by Plaintiffs are "not a plausible conclusion." *Iqbal*, 129 S. Ct. at 1951-52 (citation omitted).

While Plaintiffs certainly throw out their share of "extravagantly fanciful" notions, *see, e.g.*, Am. Compl. ¶¶ 387-92 (alleging that *City* defendants failed to "supervise" the *State Prosecutor*), the crux of Plaintiffs' problem lies with their reliance on unsupported characterizations of conduct. This deficiency pervades the Complaint, but is most notable in three areas: allegations of conspiracy; allegations of malicious and discriminatory intent; and allegations regarding City "policy" to undertake malicious investigations.

### A. Allegations of Conspiracy

Plaintiffs breathlessly allege that City investigators "maliciously conspired" with all manner of government and private persons to convict three Duke students, all while "knowing" that they were innocent. *See* Am. Compl. ¶ 2. But such conclusory allegations of conspiracy are entitled to no weight. *Iqbal*, 129 S. Ct. at 1949. Moreover,

these conclusory allegations are not supported by any factual allegations suggestive of such a conspiracy.

For example, Plaintiffs allege that City investigators conspired with Meehan and Nifong to hide exculpatory DNA results and fabricate inculpatory DNA reports. *See* Am. Compl. ¶¶ 207-10, 224-27, 229-34. Plaintiffs trumpet that the City investigators sat in meetings with the State Prosecutor and representatives of Defendant DSI. *See id.* But simply alleging that people attended meetings is insufficient to plausibly suggest a meeting of the minds, let alone a conspiracy to convict innocent people. *See Iqbal*, 129 S. Ct. at 1951 (even though the complaint alleged that Mueller and Ashcroft met shortly after 9-11 to discuss the policy at issue, the complaint nevertheless did not support conclusory allegations as to intent).

Moreover, as *Iqbal* demands, the pleadings must be assessed with the underlying context in mind. Here, Plaintiffs do not allege that either of the City investigators knew anything at all about DNA testing, let alone the customs and industry standards regarding the proper reporting format of such results. Indeed, they imply the opposite by blaming the City for failing to train the investigators on such things. *See* Am. Compl. ¶ 528g. Indeed, Plaintiffs' allegations make clear that State Prosecutor Nifong—not the City investigators—decided not only who would test the DNA, but how those results would be explained to the public, shared with the defense, brought before the grand jury, and presented to the Court. *See* Am. Compl. ¶¶ 198-203, 212-42. No factual allegations suggest that Nifong sought or needed City investigators' agreement in making these decisions.

Similarly, while Plaintiffs allege that investigators began conspiring to convict innocent people the day following Mangum's rape claim, Am. Compl. ¶ 2, the factual allegations do not support—and, indeed, belie—this conclusion. For example, investigators were vigilant in collecting DNA samples not only from the team captains (March 16) but from all of their teammates (March 23) during the NTO process. Those results were sent to the state laboratory for testing. No claims of foul play by investigators, the state prosecutor's office in preparing or filing the NTO, or the state laboratory in testing the DNA, are alleged. *See* Am. Compl. ¶¶ 120-21 (noting that a Durham Police attorney and the district attorney's office supported the NTO). Giving the benefit of the doubt to Plaintiffs, it is perhaps possible that investigators believed that collecting DNA and sending it to the state laboratory for testing would advance an underlying conspiracy to convict innocent people. But the factual allegations do not make such a conclusion plausible. The "obvious alternative explanation" is that the City investigators collected that evidence and processed it with the idea that the evidence would help them determine what, if anything, happened to Crystal Mangum. The conclusory allegations of conspiracy simply have not been nudged "'across the line from conceivable to plausible.'" *Iqbal*, 129 S. Ct. at 1952 (citation omitted).

Nor do Plaintiffs' allegations of meetings between Nifong and the City investigators plausibly suggest a conspiracy in light of the "obvious alternative explanation" for such meetings—that police routinely coordinate with prosecutors when conducting a criminal investigation, particularly where the underlying crime is a serious felony. Moreover, to the extent that Nifong was animated by factors having nothing to

do with the evidence, he was committed to that course of conduct before he even spoke to the investigators, *see* Am. Compl. ¶¶ 127-30, 144, and no factual allegation plausibly suggests that the City Defendants were acting to advance Nifong's career. Thus, Plaintiffs' claims against the City Defendants that depend on assertions of a nefarious conspiracy, *see, e.g.*, Causes of Action 5 & 7-15, must be dismissed.

### B. Malicious Intent

Plaintiffs' allegations of malicious and/or discriminatory intent, which pervade the entire Complaint, are also conclusory and devoid of factual allegations that actually suggest malice and discriminatory purpose. For example, Plaintiffs repeatedly allege "on information and belief" that City investigators "willfully ignored" or were "deliberately indifferent to" evidence of Plaintiffs' innocence. *See, e.g.*, Am. Compl. ¶ 78 (alleging that Gottlieb and Himan knew that the medical evidence provided by Duke was not consistent with rape). But these conclusory allegations are not supported by specific factual allegations suggestive of malice or discriminatory intent. Indeed, many of the Complaint's factual allegations belie such conclusions. For example, Plaintiffs allege that City investigators detailed the evidence available to them—warts and all—to Prosecutor Nifong three days after he got involved in the case. Am. Compl. ¶¶ 136-37. Doing so is patently inconsistent with Plaintiffs' conclusion that the investigators "willfully ignored" or were "deliberately indifferent to" evidence of Plaintiffs' innocence or were intentionally attempting to harm innocent people.

Plaintiffs also attempt to hang their hats on allegations of Sergeant Gottlieb's alleged dislike of Duke students generally. *See, e.g.*, Am. Compl. ¶ 82. But this

conclusion stands alone, without factual allegations to support an inference that Gottlieb intended to aid a malicious and unfounded prosecution of Plaintiffs. Gottlieb's investigative actions are much more readily explained by the seriousness of Mangum's claim that she was raped at a party held at a residence inhabited by Duke lacrosse players than by any purported dislike for Duke students generally.

With respect to Investigator Himan, the Complaint is utterly devoid of any factual allegation suggestive of malicious or discriminatory intent. Notably, the only statement attributed to Himan in the entire Complaint is his reaction upon hearing that Nifong intended to indict Plaintiff Seligmann. *See* Am. Compl. ¶ 220. Himan's response ("With what?") suggests not the hatching of a nefarious plot but an investigator voicing his concerns about a prosecutor's stated intentions. Once again, the factual allegation is *at least* as consistent with a good-faith effort to investigate an allegation of a serious crime as with a malicious conspiracy to prosecute innocent people.

Another blatant example of the Complaint's shortcomings under *Iqbal* involves allegations, "on information and belief," that Gottlieb and Himan "provided inculpatory testimony before the grand jury . . . despite actual knowledge of Finnerty's and Seligmann's innocence, to deprive the two innocent Duke lacrosse players of their civil rights, to comply with orders and pressure they had received from the Supervisory Defendants . . . and to facilitate Nifong's election to the office of District Attorney . . . ." Am. Compl. ¶ 215; *see also id.* ¶ 240 (similar allegation with respect to Himan as to the Evans indictment). But these conclusory allegations are not entitled to the presumption of truth under *Iqbal*, and the Complaint offers no factual allegations in support of the

claims about the Defendants' intent. Indeed, given the secret nature of grand jury proceedings, Plaintiffs could not know what was said during those proceedings, so they cannot make specific factual allegations about Gottlieb's and Himan's testimony at all.

Finally, as noted in the City's opening brief, the other underlying intent alleged in the Complaint—*i.e.*, invidious racial discrimination—is completely unsupported by factual allegations. As the City explained in its opening brief, this allegation is "so disconnected from the factual allegations in the Amended Complaint that the conspiracy claims that depend on racial animus must be dismissed." Brief in Support of Defendant City of Durham, North Carolina's Motion to Dismiss First Amended Complaint at 37 (Doc. No. 43) ("City Open. Br."); *see also id*. at 37-39. *Iqbal* forcefully underscores this point. The underlying issue in *Iqbal*, as in this case, was a bare allegation of discriminatory intent. Thus, as in *Iqbal*, the court must determine whether specific factual allegations support the conclusory allegation. But as the City has pointed out, there is not one allegation from which such racial animus can be inferred—in the two hundred and ninety two paragraphs outlining the "Factual Allegations." *See* City Open. Br. at 36-38.[3] Moreover, the allegations of discrimination in *Iqbal* were, at least, levied

---

[3] Plaintiffs' alternative reasoning—that the equal protection claim may stand on a "fomenting of racial animosity" theory in the absence of racial animus, *see* Consolidated Opp. to Defendants' Motion to Dismiss, at 93 (Doc. No. 51) ("Opp. Br.")—clearly fails under *Iqbal*. "[P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences. . . . It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group." *See Iqbal*,129 S. Ct. at 1948 (citation and quotations omitted). Neither "fomenting" racial animosity to accomplish another purpose (such as winning an election), nor acquiescing in the discrimination of others for any other animating reason, *see Iqbal*, 129 S. Ct. at 1948, is a substitute for the specific discriminatory animus required to state a claim.

against two specific individuals. Here, in contrast, the allegations are made against fourteen defendants, yet with nary a hint as to which, if any, of them were actually animated by an intent to discriminate against Plaintiffs on the basis of race. After *Iqbal*, there can be no question that the equal protection claims are fatally deficient and must be dismissed.[4]

In short, under the standards clarified by *Iqbal*, the Complaint utterly fails to properly plead malice and/or discriminatory intent, and those deficiencies doom Plaintiffs' claims against the City Defendants. *See* Causes of Action 1-15. Moreover, in underscoring the deficiencies of Plaintiffs' Complaint in this regard, *Iqbal* confirms Defendants Gottlieb and Himan's right to public officer immunity: Under North Carolina law, public officials acting within the scope of their authority may be liable in tort only if their conduct is intentionally harmful, malicious, or corrupt. *See Moore v. Evans*, 476 S.E.2d 415, 421 (N.C. Ct. App. 1996). In the absence of plausible allegations of such intent under *Iqbal*, Defendants Gottlieb and Himan are immune from all state law claims. *See* Causes of Action 13-16, & 18; *see also* Gottlieb Open. Br. at 30-35; Himan Open. Br. at 26-28.

---

[4] The pleading requirements set forth in *Iqbal* provide additional support for the Fourth Circuit's approach to Section 1985 claims. *See, e.g.*, *Brisset v. Paul*, No. 97-6898, 1998 U.S. App. LEXIS 6824, at *10 (4th Cir. 1998) ("To prove a § 1985 conspiracy . . . [t]he threshold requirement is very high, and this court "has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy") (citation omitted); *see also* City Open. Br. at 37-40.

## C. City Policy

Plaintiffs allege two types of City policy: (1) actual approval and/or ratification of the allegedly nefarious conduct of its investigators and spokespersons; and (2) longstanding customs that made the alleged constitutional violations inevitable under *Monell*. Particularly after *Iqbal*, however, neither theory holds water.

Plaintiffs repeatedly allege that the Supervisory Defendants had knowledge of and acquiesced in the actions by the investigators. *See, e.g.*, Am. Compl. ¶ 211 (alleging that Supervisory Defendants knew of the conspiracy to conceal DNA results). They make such allegations not only to try to hold the Supervisory Defendants individually liable, but also to establish a City policy or custom sufficient for *Monell* liability. But these allegations are the very embodiment of the threadbare recitation of elements which *Iqbal* held is not entitled to the presumption of truth. And there are simply no factual allegations that actually suggest approval of unconstitutional conduct by investigators, or the purposeful establishment of City policy to engage in such conduct. Moreover, Plaintiffs fail even to identify *which* Supervisory Defendant approved or ratified investigators' conduct, thus falling even further short of the *Iqbal* standards than the plaintiff in *Iqbal* itself, who at least specified the two policymakers who allegedly authorized and approved the alleged unconstitutional conduct. In addition, each allegation is "on information and belief," signaling again that Plaintiffs lack any factual basis for their claims. *See Iqbal*, 129 S. Ct. at 1951. Allegations that the undifferentiated Supervisory Defendants collectively knew of and ratified the underlying malicious and

conspiratorial actions of Durham investigators are conclusory at best and cannot support Plaintiffs' *Monell* claims.

As to the second type of policy allegations, Plaintiffs occasionally refer to preexisting "policies and customs" of the City, but they do so in the same conclusory way as the plaintiffs in *Iqbal*, which the Supreme Court found insufficient to state a claim. For example, Plaintiffs allege that the City "established a policy or custom encouraging Durham Police officers to target Duke University students for selective enforcement of the criminal laws." Am. Compl. ¶ 384. But no specific factual allegations support this bare assertion. Plaintiffs do allege that the Supervising Defendants allowed Sergeant Gottlieb to patrol City areas in which Duke students lived, as though this established a policy of selective enforcement of the law. But Plaintiffs' own allegations then undercut the notion of such a policy, since they note that the police department "reassigned [Gottlieb] from covering the Trinity Park neighborhood." Am. Compl. ¶ 82. Plaintiffs also vaguely suggest that the City unfairly targeted Duke students more generally, Am. Compl. ¶ 384-86, but provide no facts whatsoever supporting this conclusion. If what Plaintiffs have in mind is the "targeting" associated with problems arising from college parties, such as underage drinking, DUI, and public urination described in other plaintiffs' complaints before this Court, such efforts hardly establish a policy of maliciously investigating and prosecuting innocent individuals on serious rape charges. *See* Reply Brief in Support of Defendant City of Durham, North Carolina's Motion to Dismiss Second Am. Compl. at 18-19, *McFadyen v. Duke University*, No. 1:07-CV-00953 (M.D.N.C. Nov. 26, 2008) (Doc. No. 107) (outlining fundamental differences

between so-called "Zero Tolerance" enforcement efforts and the investigation of Mangum's rape claims). Moreover, any targeting of Duke students regarding drinking and public disturbance issues hardly suggests a nefarious policy of "selective enforcement." Rather, it is more readily explained as an understandable response to complaints from neighboring residents about the behavior of Duke students living nearby. Just as the disparate impact on Muslims arising from law enforcement efforts following the September 11 attacks was found by the Supreme Court not to be suggestive of discriminatory intent, so any disparate impact on Duke students arising from enforcement efforts to counter underage drinking and noise complaints is hardly suggestive of a City policy to maliciously and selectively enforce the laws against Duke students. Again, while it may be *possible* that such a policy underlies the conduct of police investigators, there are no factual allegations that make the existence of such a policy *plausible* under the analysis required by *Iqbal*.[5]

*Iqbal* makes clear that allegations that simply mimic elements of causes of action, such as those which Plaintiffs employ to recite the required elements of *Monell* claims, are entitled to no weight. And with no underlying well-pleaded factual allegations to support them, the claims against the City must be dismissed.[6]

---

[5] Other alleged "customs," such as "publish[ing] premature official conclusions of criminality and guilt," Am. Compl. ¶ 383, enjoy even less support, since no previous examples of such conduct are even hinted at by Plaintiffs anywhere in their Complaint.

[6] As explained in the City's opening brief, even if such claims passed muster under *Iqbal*, the claims against the City fail both because (1) the Complaint fails to state a constitutional violation at all; and (2) even if it did, the alleged City policies did not make those violations "inevitable." *See* City Open. Br. at 11-42.

### D. Other Deficiencies

In addition to the broad deficiencies described above, several other flaws in Plaintiffs' Complaint are also apparent.

#### 1. Plaintiffs' Request for Injunctive Relief Relies on Conclusory Allegations That Are Ineffectual Under *Iqbal*

Plaintiffs seek the Court's permission to re-design the Durham Police Department according to their conceptions of proper organization and procedures. Am. Compl. ¶¶ 5, 567. But Plaintiffs' underlying claims of "real and immediate threat," are so conclusory that the claim fails to meet Article III standing requirements. Am. Compl. ¶ 5 (alleging that Plaintiffs intend to return to Durham "on future occasions"); *City of Los Angeles v. Lyons*, 461 U.S. 95 (1981); City Open. Br. at 42-44. Even if *Lyons* left Plaintiffs any wiggle room on the standing issue—which it plainly does not—Plaintiffs cannot exploit it in light of *Iqbal*'s standards. Plaintiffs' allegations of "real and immediate threat" to them are precisely the sort of transparent recitation of a required element that *Iqbal* stands against.

#### 2. Plaintiffs' Allegations With Respect to Damages Are Conclusory

Plaintiffs make bare allegations of economic, emotional, and physical harm they have suffered as a result of the alleged conduct of Defendants. Am. Compl. ¶ 4. But, again, *Iqbal* makes clear that unsupported recitation of the required elements of the claims at issue is insufficient to survive a motion to dismiss. Plaintiffs have not provided specific factual allegations to support their conclusory allegations of harm, let alone described the severe emotional distress required for several of their claims. *See* Causes of Action 15, 18-19 (intentional and negligent emotional distress claims); *see also Oshop*

*v. Tenn. Dept. of Children's Servs.*, No. 3:09-CV-0063, 2009 WL 1651479, at *9 (M.D. Tenn. June 10, 2009) (dismissing claim for negligent infliction of emotional distress because allegation of "infliction of severe emotional harm" and similar unspecified harms were simply "[t]hreadbare recitals of the elements of a cause of action" and could not state a claim under *Iqbal* (citations omitted)); *DiPietro v. N.J. Family Support Payment Center*, No. 08-4761, 2009 WL 1635568, at *8 (D.N.J. June 10, 2009) (same). This is particularly true here, where Plaintiffs acknowledge that the Attorney General of North Carolina has publicly cleared Plaintiffs of wrongdoing. Am. Compl. ¶ 324. For this additional reason, Plaintiffs' Complaint is deficient.

## III. CONCLUSION

Plaintiffs' claims must be dismissed.[7]

---

[7] Plaintiffs should not be permitted to amend their Complaint at this stage of the proceedings. First, this matter has already undergone extensive briefing; re-pleading would entail significant additional burden on all parties, including many defendants entitled to qualified immunity; second, Plaintiffs cannot claim unfair surprise, since *Iqbal* merely clarified the pleading standards previously set out in *Twombly*; and third, given the length of Plaintiffs' Complaint, it is unlikely that Plaintiffs can muster more factual material in an attempt to cure their pleading deficiencies.

This the 24th day of June, 2009.

| | |
|---|---|
| FAISON & GILLESPIE | STEPTOE & JOHNSON LLP |
| By: /s/ Reginald B. Gillespie, Jr.<br>Reginald B. Gillespie, Jr.<br>North Carolina State Bar No. 10895<br>5517 Chapel Hill Boulevard, Suite 2000<br>Post Office Box 51729<br>Durham, North Carolina 27717-1729<br>Telephone: (919) 489-9001<br>Fax: (919) 489-5774<br>E-Mail: rgillespie@faison-gillespie.com | By: /s/ Roger E. Warin<br>Roger E. Warin*<br>Michael A. Vatis*<br>Matthew J. Herrington*<br>John P. Nolan*<br>Leah M. Quadrino*<br>Steptoe & Johnson LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC 20036<br>Telephone: (202) 429-3000<br>Fax: (202) 429-3902<br>E-mail: rwarin@steptoe.com<br>*Motion for Special Appearance to be filed |

*Attorneys for Defendant City of Durham*

| | |
|---|---|
| POYNER & SPRUILL LLP | KENNON, CRAVER, BELO, CRAIG & MCKEE, PLLC |
| By: /s/ Eric P. Stevens<br>David W. Long<br>North Carolina State Bar No. 2779<br>Eric P. Stevens<br>North Carolina State Bar No. 17609<br>Post Office Box 1801<br>Raleigh, North Carolina 27602-1801<br>Telephone: (919) 783-6400<br>Fax: (919) 783-1075<br>E-Mail: estevens@poynerspruill.com | By: /s/ Joel M. Craig<br>Joel M. Craig<br>North Carolina State Bar No. 9179<br>Henry W. Sappenfield<br>North Carolina State Bar No. 37419<br>4011 University Drive<br>Post Office Box 51579<br>Durham, North Carolina 27717-1579<br>Telephone: (919) 490-0500<br>Fax: (919) 490-0873<br>E-mail: jcraig@kennoncraver.com |
| *Attorneys for Defendant Mark Gottlieb* | *Attorneys for Defendant Benjamin Himan* |

CERTIFICATE OF ELECTRONIC FILING AND SERVICE

The undersigned hereby certifies that, pursuant to Rule 5 of the Federal Rules of Civil Procedure and LR5.3 and LR5.4, MDNC, the foregoing pleading, motion, affidavit, notice, or other document/paper has been electronically filed with the Clerk of Court using the CM/ECF system, which system will automatically generate and send a Notice of Electronic Filing (NEF) to the undersigned filing user and registered users of record, and that the Court's electronic records show that each party to this action is represented by at least one registered user of record, to each of whom the NEF will be transmitted.

This the 24th day of June, 2009.

FAISON & GILLESPIE

By: /s/ Reginald B. Gillespie, Jr.
Reginald B. Gillespie, Jr.
North Carolina State Bar No. 10895

*Attorneys for Defendant City of Durham,
North Carolina*