## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| DAVID F. EVANS, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:07-CV-739 |
| CITY OF DURHAM, N.C., et al., | |
| Defendants. | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF OPPOSING MOTIONS TO DISMISS

In supplemental briefs, the wrongdoers behind the Duke lacrosse case—one of the best-documented episodes of police and prosecutorial civil rights abuses in modern history—contend that their misconduct can never be the subject of a federal action because the pleading requirements of Rule 8(a) present an insurmountable barrier. They declare that the well-known facts of the Duke lacrosse case are "implausible," and that the Court should simply disbelieve them and dismiss the case before discovery even begins. They further contend that Plaintiffs' 151-page Amended Complaint, which details each wrongdoer's role in the Duke lacrosse case, cannot survive a motion to dismiss because it should have been *even more* detailed.

The Supreme Court's recent decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), does not support Defendants' arguments. In *Iqbal*, a prisoner complaining of conditions in a New York prison named as defendants the Attorney General of the United States and the Director of the FBI based on nothing more than a few conclusory and implausible allegations about the nation's top law enforcement officials. The defective *Iqbal*

allegations bear no resemblance to Plaintiffs' detailed account of each Defendant's direct and well-documented role in procuring and sustaining the indictments of the three innocent Duke lacrosse players, despite knowing of the absence of probable cause. The Amended Complaint recounts numerous facts that are established by police records, court files, videotaped interviews, testimony in a North Carolina State Bar proceeding, testimony in a Durham County Superior Court criminal contempt proceeding, and the findings of the North Carolina Attorney General's investigation—an investigation that prompted the Attorney General to declare that "a lot of people need to apologize" for what they did to Plaintiffs (AC ¶ 325). Indeed, Defendants liken Plaintiffs' claims to the defective *Iqbal* allegations only by ignoring and distorting the allegations of the Amended Complaint, which plainly state claims upon which relief can be granted.

## ARGUMENT

### I. Under *Iqbal*, a Plaintiff's Factual Allegations Need Only Be "Plausible."

*Iqbal* has two principal holdings that are pertinent here. First, a complaint must contain more than "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *See id.* at 1949 (quotation marks omitted). Second, a complaint must have "facial plausibility," meaning that there is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. Importantly, the Court emphasized that "Rule 8 . . . does not require detailed factual allegations," and that the plausibility standard is "not akin to a probability requirement." *Id.* at 1949.

The Court applied these holdings, which it previously had articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007),[1] to a prisoner's complaint about New York prison conditions. The prisoner named as defendants, in addition to prison staff, Attorney General John Ashcroft and FBI Director Robert Mueller. *See Iqbal*, 129 S. Ct. 1937. Other than allegations that were mere "formulaic recitation of the elements," the prisoner-plaintiff made only two factual allegations about Ashcroft and Mueller: (1) that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men"; and (2) "that the policy of holding post-September-11th detainees in highly restrictive conditions . . . was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." *Id.* at 1951-52 (alteration in original) (quotation marks omitted). The Court held that these two allegations did not "contain facts plausibly showing that [Ashcroft and Mueller] purposefully adopted a policy of classifying post-September-11 detainees [for restrictive confinement] *because of their race, religion, or national origin*," a required element of the prisoner's *Bivens* claim. *Id.* at 1952 (emphasis added). The "September 11 attacks were perpetrated by 19 Arab Muslim hijackers," who were part of "an Islamic fundamentalist group . . . headed by another Arab Muslim," the Court wrote, so "[i]t should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a

---

[1] As the City Defendants concede, *Iqbal* in no way heightens the pleading standard articulated in *Twombly*. *See* City Supp. Br. at 18 n.7. Rather, *Iqbal* merely reaffirms the *Twombly* principles and their applicability outside the antitrust context in which they were announced. The parties always have assumed that *Twombly* applies here and have already briefed the Motions To Dismiss under the *Twombly* standard. *See* Pls.' Consol. Opp. at 20-22.

disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id*. at 1951.

Since *Iqbal*, one district court has already recognized that the Fourth Circuit's standard of review for civil rights complaints remains the same: "where . . . the defendant seeks to dismiss the plaintiff's civil rights complaint, this Court must be especially solicitous of the wrongs alleged and must not dismiss the claim unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Swagler v. Harford County*, No. RDB 08-2289, 2009 U.S. Dist. LEXIS 47895, at *9 (D. Md. June 2, 2009) (internal quotation marks omitted) (citing, *e.g.*, *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). *Accord Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). These principles apply with equal force here.

## II.     This Is Not the Complaint in *Iqbal*.

The factual narrative in Plaintiffs' 151-page Amended Complaint, which details each wrongdoer's role in the Duke lacrosse case, stands in stark contrast to the two factual allegations against Ashcroft and Mueller in *Iqbal*. For each Defendant, the Amended Complaint pleads facts showing far "more than a sheer possibility that [the] defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. It pleads that each Defendant knowingly engaged in specific actions to procure arrests and sustain indictments of three innocent Duke lacrosse players knowing of the absence of probable cause against them. Defendants argue otherwise only by ignoring and distorting the allegations of the Amended Complaint. Plaintiffs assume the Court's familiarity with these allegations, but for purposes of the instant briefing, Plaintiffs provide the following examples to demonstrate the differences between the allegations here and in *Iqbal*:

**A.     Plaintiffs Have Stated Claims Against the City Defendants.**

**1.     Plaintiffs Have Stated Claims Against Gottlieb and Himan.**

The Amended Complaint pleads facts showing that Defendants Gottlieb and Himan committed numerous unlawful acts to conceal the evidence that no crime had occurred, and to obtain Plaintiffs' arrests, indictments, and convictions, knowing of Plaintiffs' actual innocence and the absence of probable cause. They were presented with multiple inconsistent versions of the accuser's story. *See* AC ¶¶ 101-03, 105. They admitted at a "March 27[,] [2006] Briefing . . . that Mangum was not credible." *Id*. ¶ 137; *see also id.* ¶ 138 ("Nifong responded . . . 'You know, we're f*cked.'"). They were told by a key witness, Kim Pittman, that "Mangum's rape allegations were a 'crock.'" *Id*. ¶ 256. They were told at an April 10, 2006 meeting that DNA evidence proved that "several men contributed DNA to the various items in Mangum's rape kit, but excluded with 100% certainty any of the Duke lacrosse players as contributors." *Id*. ¶ 207. "Indeed, when Himan was first told of the decision to seek indictments of Finnerty and Seligmann, his initial response was, "'With what?'" *Id*. ¶ 220.

The Amended Complaint also pleads that Gottlieb and Himan, undeterred by the knowledge that no crime had occurred, conducted an improperly suggestive photo array in violation of Durham police policy (and the U.S. Constitution), with the approval of their superiors and with the intent and effect of procuring false "identifications" of three white Duke lacrosse players. *See id.* ¶¶ 180-86. At an April 21, 2006 meeting, Gottlieb and Himan also agreed with Defendants Nifong, Meehan, and Clark that Defendant DNA Security, Inc. ("DSI") would create a false DNA report that would omit the exculpatory evidence that the DNA of four men (none a Duke lacrosse player) was found in the rape kit. *See id.* ¶¶ 207-10; 223-26. Gottlieb and Himan caused Pittman to be arrested for an

alleged parole violation in order to attempt to coerce her into changing her timeline of events, and her categorical denial that any assault took place. *Id.* ¶¶ 87, 256-60. They attempted to intimidate witnesses by entering student dormitories without a warrant in order to attempt "ambush" interviews of witnesses known to be represented by counsel. *Id.* ¶ 263. They attempted to intimidate and discredit another witness, Sergeant Shelton, by subjecting him to an internal investigation, accusations of unprofessional conduct, and threats of disciplinary action for truthfully reporting Mangum's recantation of her rape claim at Duke Medical Center on March 13, 2006. *See id.* ¶ 56. Moreover, Gottlieb intentionally fabricated an after-the-fact "report" of his purported activities in the investigation (*see id.* ¶¶ 266-70), and Himan arrested alibi witness Moezeldin Elmostafa on an outstanding warrant after Elmostafa refused to recant his truthful corroboration of Plaintiff Seligmann's alibi. *See id.* ¶¶ 250-51.

These are just examples of what Gottlieb, in his initial brief, called the "laundry list" of wrongdoing pleaded in the Amended Complaint. *See* Gottlieb Br. at 27. Taking the pleaded facts as true, there is "more than a sheer possibility" that these Defendants acted unlawfully. *Iqbal*, 129 S. Ct. at 1949.

In their supplemental briefing, the City Defendants attempt to sweep away these extensive factual allegations by labeling them all as "conclusory,"[2] or by contending that there are "alternative explanations" for the alleged misconduct, such as "efforts to identify perpetrators of a horrific crime" and to "determine what, if anything, happened to

---

[2] The City Defendants even contend that Plaintiffs' damages allegations are "conclusory." City Supp. Br. at 17. This, of course, ignores the allegations that Plaintiffs were falsely arrested and indicted, suffered reputational harm, suffered "diagnosable emotional . . . harm," incurred "millions of dollars" of expenses defending against criminal proceedings, and had their educations interrupted. *E.g.*, AC ¶¶ 4, 567(b).

Crystal Mangum."  City Supp. Br. at 7, 9, 10.  On the facts alleged, however, it is the City Defendants' "alternative explanations," not Plaintiffs' claims, that are implausible: the Amended Complaint alleges facts that, taken as true, demonstrate that the City Defendants were aware of overwhelming proof that no crime had occurred, and yet still caused Plaintiffs to be arrested, indicted, and publicly vilified in the absence of any probable cause.  *Iqbal* does not permit courts to choose between competing "alternative explanations" for well-pleaded factual allegations, only to determine if there is more than a "sheer possibility" that Defendants acted unlawfully; indeed, the Supreme Court unequivocally rejected the sort of "probability requirement" that the City Defendants would impose.  *Iqbal*, 129 S. Ct. at 1949.  In short, the City Defendants may present their "alternative explanations" to a jury, but this does not entitle them to dismissal under Rule 12(b)(6).  Plaintiffs have stated claims against them.

The City Defendants also contend that the Court should reject allegations made "on information and belief" as conclusory because the phrase supposedly "signal[s] . . . that Plaintiffs lack any factual basis for their claims."  *E.g.*, City Supp. Br. at 14.  This argument confuses the pre-discovery "factual allegations" at issue in *Iqbal* with the evidentiary standards of Rule 56.  *Iqbal* does not stand for the proposition that allegations "on information and belief" are second-class allegations.  Indeed, in a recent post-*Iqbal* case, a federal district court relied on several factual allegations made on "information and belief" to hold that plaintiff (and accused terrorist) Jose Padilla had sufficiently stated claims against former Deputy Attorney General John Yoo.  *See Padilla v. Yoo*, No. C 08-00035, 2009 WL 1651273, at *21-22 (N.D. Cal. June 12, 2009).

The City Defendants also turn the invitation for supplemental briefing into an opportunity to reargue several issues that *Iqbal* never addressed and that have already

been exhaustively briefed by the parties. For example, *Iqbal* never addresses the issue of public officer immunity, and it certainly does not "confirm[] . . . Gottlieb and Himan's right" to such protection. City Supp. Br. at 13. *See* Pls.' Consol. Opp. at 113 (explaining why doctrine does not apply here). The City Defendants also repeat their argument that the Amended Complaint does not sufficiently plead a racially discriminatory motive under § 1985. *See* City Supp. Br. at 12 n.3; SD Supp. Br. at 17. This argument also is unsupported by *Iqbal*, which did not address either § 1985 or the legal doctrine that fomenting and exploiting racial animus to deprive a person's civil rights is actionable. *See* Pls.' Consol. Opp. at 92-94 (discussing cases). It also ignores the allegations of Defendants' actions to foment invidious racial animus against Plaintiffs based on false, racially-charged allegations, and then to take advantage of that animus. *See* AC ¶¶ 147b, 147e, 147g, 147o, 179-180, 448, 463. The City Defendants also repeat their prior argument regarding injunctive relief, *see* City Supp. Br. at 17, which *Iqbal* did not address and which should be denied as premature. *See* Pls.' Consol. Opp. at 116-18.

### 2. Plaintiffs Have Stated Claims Against the Supervisory Defendants and the City.

The Supervisory Defendants (as well as the City and other Defendants) begin with the proposition that *Iqbal* reaffirmed the long-established rule that officials may not be held liable under § 1983 via a theory of vicarious liability or *respondeat superior.* *See* SD Supp. Br. at 2-3; *see also* Nifong Supp. Br. at 1-2; City Supp. Br. at 1-2; DSI Supp. Br. at 11. This point is both uncontested and irrelevant, however. As Plaintiffs have previously stated, their § 1983 claims are not based on such a theory. *See, e.g.*, Pls.' Consol. Opp. at 65 (the Supervisory Defendants' liability for their subordinates' misconduct "is not premised upon *respondeat superior* but upon a recognition that

supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care"); *see also id.* at 69-70 ("[T]he § 1983 claims against DSI are not based on *respondeat superior* . . . .").[3]

Rather, the Amended Complaint is replete with factual allegations that the Supervisory Defendants—Defendants Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger—"themselves" directly engaged in unconstitutional conduct. SD Supp. Br. at 3.[4] The Supervisory Defendants were repeatedly made aware of overwhelming evidence that no assault had occurred, *see id.* ¶¶ 50, 55, 68, 79, 89, 90, 104, 107, 119, 124, 196, 221, yet they affirmatively acted and conspired to ensure that three white Duke lacrosse players would be arrested and charged despite the lack of probable cause.

The Amended Complaint includes an illustrative example of how the Supervisory Defendants' actions directly caused the violations of Plaintiffs' rights. On or about March 29, 2006, Baker, Chalmers, and the other Supervisory Defendants summoned Himan and Gottlieb to meetings where they ordered or otherwise pressured the two investigators to expedite the identifications and arrests of white Duke lacrosse players, notwithstanding their knowledge of the evidence demonstrating Plaintiffs' innocence and that no crime had occurred. *See id.* ¶¶ 179, 376. After the March 29, 2006 meetings, the

---

[3] As explained in Plaintiffs' prior briefing, the City can be held liable on Plaintiffs' state-law claims under the doctrine of *respondeat superior*. *See* Pls. Consol. Opp. at 61.

[4] The Supervisory Defendants and the City suggest that Plaintiffs must refer to each Supervisory Defendant individually, rather than using the term "Supervisory Defendants," in order for paragraphs describing their group meetings and common misconduct to be credited under *Iqbal*. *See* SD Supp. Br. at 7-8. *Iqbal* does not stand for any such proposition—there were no collective factual allegations against Ashcroft or Mueller—nor would such a rule be sensible or efficient here. Even so, the Amended Complaint contains many allegations that name individual Supervisory Defendants.

Supervisory Defendants continued to pressure Himan and Gottlieb to get identifications and arrests, *see id.* ¶ 179, until Gottlieb and Himan worked with Nifong to design a new, suggestive photo array procedure.  On March 31, 2006, two of the Supervisory Defendants, Lamb and Ripberger, approved the proposed procedure, which violated numerous provisions of a Durham Police General Order that, ironically, had been implemented in order to protect constitutional rights.  *See id.* ¶¶ 180-87.  The other Supervisory Defendants also approved the unconstitutional identification procedure before it took place, and ratified it after it was conducted.  *See id.* ¶ 183.

The Supervisory Defendants also learned of numerous improprieties during the investigation, including "that Nifong and Durham Police officers were conducting manipulative identification procedures that violated constitutional standards, intimidating witnesses who had information about Plaintiffs' innocence, concealing evidence of Plaintiffs' innocence, fabricating false evidence, and making false public statements regarding Plaintiffs and the Duke lacrosse team."  *Id*. ¶ 373.  Rather than working to cure and prevent the unconstitutional conduct, however, they abetted and ratified it, in some cases directly.  *See, e.g.*, *id.* ¶ 183 (approving April Photo Array knowing that no crime had occurred); *id.* ¶¶ 56, 264 (directing attempts to intimidate and discredit Sergeant Shelton for truthfully reporting Mangum's recantation of her rape claim);[5] *id.* ¶ 257 (approving attempted coercion of Pittman into providing false statements); *id.* ¶¶ 379,

---

[5]  The Supervisory Defendants attempt to limit this allegation to Defendant Lamb, *see* SD Supp. Br. at 16, but the Amended Complaint alleges that the attempts to intimidate and discredit Shelton were directed by "the Supervisory Defendants," not Lamb alone.  AC ¶ 264.  The Supervisory Defendants also suggest that their actions against Shelton were "motivated by legitimate disciplinary reasons," SD Supp. Br. at 16 (citing AC ¶ 440), but as noted above, *Iqbal* does not authorize the Court to choose between competing inferences from well-pleaded facts.  The Supervisory Defendants' alternative explanations may be presented at trial, if there is evidentiary support for them.

381 (approving false and inflammatory public statements and "Wanted" poster by Addison); *id.* ¶ 382 (false public statement by Hodge that Durham Police had a strong case). They also "willfully ignored and/or were deliberately indifferent or grossly negligent" to the evidence of misconduct by continuing to delegate authority over the police investigation to Nifong and by continuing to direct Himan and Gottlieb to report to Nifong. *E.g.*, *id.* ¶¶ 237, 265, 391, 402, 404, 413-24.

Indeed, the Supervisory Defendants are independently liable for civil rights violations because they "'set[] in motion a series of acts by others which the[y] . . . kn[ew] or reasonably should [have known] would cause others to inflict the constitutional injury.'" *Spell v. McDaniel*, 591 F. Supp. 1090, 1110 (E.D.N.C. 1984) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). This principle was recently reaffirmed in the *Padilla* case, discussed above, which was decided after *Iqbal* and held that accused terrorist Jose Padilla had sufficiently stated claims against former Deputy Attorney General John Yoo. 2009 WL 1651273. Padilla had alleged on information and belief that defendant Yoo "intended or was deliberately indifferent to the fact that Mr. Padilla would be subjected to the illegal policies [Yoo] set in motion and to the substantial risk that Mr. Padilla would suffer harm as a result"; "personally recommended Mr. Padilla's unlawful military detention as a suspected enemy combatant and then wrote [legal] opinions to justify the use of unlawful interrogation methods against persons suspected of being enemy combatants"; and took these actions where "[i]t was foreseeable that the illegal interrogation policies would be applied to Mr. Padilla." *Id.* at *22 (second alteration in original) (quotation marks omitted). The district court held that the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others

which the actor knows or reasonably should know would cause others to inflict the constitutional injury."  2009 WL 1651273, at *21 (quotation marks omitted)).

In this regard, the Amended Complaint pleads far more (and far more detailed) facts concerning the Supervisory Defendants than the facts pleaded in *Padilla*.  *See id*. Here, the Supervisory Defendants are alleged to have delegated authority over the police investigation to Nifong despite being aware of numerous reasons why such delegation was likely to result in serious improprieties, *see* AC ¶¶ 131-33, 387-88, 399, 401, 411. The Supervisory Defendants also permitted Gottlieb to work on the high-profile case, notwithstanding that his long history of selective and malicious prosecution, excessive use of force, manufacturing of false evidence, and filing of false police reports had already caused his reassignment from cases involving Duke students in Trinity Park.  *See id*. ¶¶ 81-83, 393-97.  The Supervisory Defendants also never attempted to stop Addison from continuing to disseminate false and inflammatory public statements that white Duke lacrosse players had engaged in a vicious rape and cover-up.  *See id*. ¶¶ 427-28, 430-31. Finally, as noted above, the Supervisory Defendants were made aware of repeated misconduct and unconstitutional actions by Nifong and Durham Police officers during the investigation, yet they took no steps to correct or discipline their unconstitutional behavior.  *See id*. ¶¶ 237, 265, 384-85, 391, 402, 404, 413-24.  These allegations demonstrate more than "simple acquiescence in the discriminatory conduct of subordinates."  City Supp. Br. at 6 n.2.  Rather, as the Amended Complaint makes clear, each of the Supervisory Defendants engaged in these wrongful acts for unconstitutional purposes.  *See, e.g.*, AC ¶ 412 ("During the March 29 Meetings, upon information and belief, the Supervisory Defendants ordered Himan and Gottlieb to expedite the identifications and arrests of white Duke lacrosse players, notwithstanding the evidence

demonstrating Plaintiffs' innocence, in order to satisfy a Durham community that had been misled by the false and inflammatory Nifong Statements and Durham Police Statements into believing that three white Duke lacrosse players had committed a violent and racially-motivated gang rape.").

Finally, the Amended Complaint independently states claims against the Supervisory Defendants under longstanding conspiracy law, which *Iqbal* did not alter or address. As noted in Plaintiffs' prior Opposition, a Defendant need not participate in every unlawful act to be liable for a § 1983 conspiracy, only at least one overt act in furtherance of a shared illegal objective. *See* Pls.' Consol. Opp. at 82. Moreover, a defendant's liability need not be established by "direct evidence," but rather may be established "with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996); *Al Shimari v. CACI Premier Tech., Inc.*, No. l:08cv827, 2009 U.S. Dist. LEXIS 29995, at *79 (E.D. Va. Mar. 18, 2009) (finding that plaintiffs sufficiently pleaded facts to support a claim of conspiracy under *Twombly* because "Plaintiffs point to at least two suggestive facts that push their claims into the realm of plausibility").[6] Here, the Amended Complaint alleges that each Supervisory Defendant

---

[6] "[D]irect evidence of a conspiracy is rarely available and . . . the existence of a conspiracy must usually be inferred from the circumstances." *Crabtree ex rel. Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990). *Accord Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ("While conclusory allegations of a § 1983 conspiracy are insufficient, we have recognized that such conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." (citation and internal quotation marks omitted); *Waller v. Butkovich*, 584 F. Supp. 909, 931 (M.D.N.C. 1984) ("All that can be required at the pleading stage is that a defendant be given notice of how he is alleged to have participated in the conspiracy, so that he may intelligently prepare his answer and defense.").

was presented with evidence that no crime had occurred (*see, e.g.*, AC ¶¶ 50, 55, 68, 79, 89, 90, 104, 107, 119, 124, 196, 221), yet each of them participated in meetings and agreed to one or more actions intended to secure Plaintiffs' arrests and indictments notwithstanding the absence of probable cause (*see id.* ¶¶ 56, 131-33, 179-87, 237, 257, 264, 265, 373, 376, 379, 381, 382, 384, 385, 387-88, 391, 399, 400-02, 404, 411-24, 427-28, 430-31). These factual allegations constitute, at a minimum, circumstantial evidence that each Supervisory Defendant "shared the same conspiratorial objective" of violating Plaintiffs' rights. *Hinkle*, 81 F.3d at 421.

The City's arguments relating to the "City policy" aspects of the Fifth Cause of Action (City Supp. Br. at 14-16) are largely derivative of the Supervisory Defendants' arguments, and can be dispatched on the same grounds. As an initial matter, the City does not address the other aspects of the Fifth Cause of Action relating to the Supervisory Defendants' delegation of authority to Nifong, *see* Pls.' Consol. Opp. at 50-54, or the Supervisory Defendants' failure to supervise Nifong and Gottlieb, *see id.* at 58-60. Both of these allegations are well-pleaded and sufficient to sustain the Fifth Cause of Action.

Nor are the City's arguments relating to the "City policy" allegations merely "conclusory." City Supp. Br. at 15. The City's first argument, relating to the Supervisory Defendants' approval and ratification of the misconduct, *see id.* at 14, is defeated by the allegations summarized above demonstrating the Supervisory Defendants' direct involvement in the efforts to obtain Plaintiffs' arrests notwithstanding their awareness of the absence of probable cause. The City's second argument, that "no factual allegations" support Plaintiffs' assertion that the City "established a policy or custom encouraging Durham Police officers to target Duke University students for selective enforcement of the criminal laws," *see id.* at 15, is similarly belied by the

Amended Complaint, which alleges not only that the City had imposed a "Zero Tolerance Policy" against Duke students in Trinity Park that was likely to result in constitutional violations, but that City officials were already on notice that this policy was causing such violations, including prior misconduct by Gottlieb. *See* AC ¶¶ 82, 384-85; Pls.' Consol. Opp. at 55-58. The Supervisory Defendants not only "consistently failed to take adequate or meaningful steps to discipline Gottlieb, correct his behavior, or terminate his employment," AC ¶ 385; they put Gottlieb "in charge of the investigation [into Mangum's allegations], which Durham Police officials knew related to a party attended by Duke students in Trinity Park," *id.* ¶ 83. These allegations are more than sufficient to establish the existence of a policy or custom at this stage. *See, e.g.*, *Jackson v. Boyd*, No. 5:96-CV-819-BO(3), 1997 U.S. Dist. LEXIS 7141, at *10-11 (E.D.N.C. Apr. 16, 1997) (holding that allegations that "the City was aware of other incidents of excessive force during arrests; that it failed to take sufficient corrective action to deal with such violations; that it failed to properly train, supervise, and discipline its officers with regard to the proper use of force during arrest; and that the actions of [its officer] were pursuant to a policy or custom attributable to the City" were sufficient to state a claim).[7]

### 3. Plaintiffs Have Stated Claims Against Addison.

The Amended Complaint alleges that Defendant Addison was aware of overwhelming evidence that no crime had occurred, yet he nonetheless made knowingly false public statements (examples of which are quoted in the Amended Complaint) of a

---

[7] The City continues to argue that Plaintiffs must allege previous examples of violations pursuant to its policies in order to state a § 1983 claim against the City. *See* City Supp. Br. at 16 n.5. *Iqbal* contains no such holding, however, and as discussed in prior briefing, the Fourth Circuit has expressly rejected this argument. *See* Pls.' Consol. Opp. at 56 (citing cases).

brutal assault by members of the Duke lacrosse team, and that members of the team were refusing to cooperate with police, in a "rush to charge the three innocent Duke lacrosse players." AC ¶¶ 49, 54, 67, 78, 89, 99, 103, 118, 123, 159 & 160a-160g; *see e.g.*, *id.* ¶ 160a ("Addison told a reporter for WRAL TV: 'You are looking at one victim brutally raped.'"); ¶ 160d ("Addison told the Durham *Herald-Sun* that there was 'really, really strong physical evidence' of a crime."). Again, taking these facts as true, there is "more than a sheer possibility" that Addison acted unlawfully. *Iqbal*, 129 S. Ct. at 1949.

**B.    Plaintiffs Have Stated Claims Against the DSI Defendants.**

**1.    Plaintiffs Have Stated Claims Against Meehan.**

The Amended Complaint pleads facts showing that Defendant Meehan took unlawful actions to help procure Plaintiffs' arrests, indictments, and convictions for a "crime" that Meehan knew never occurred. It was Meehan who reported to Nifong, Gottlieb, and Himan on April 10, 2006 and April 21, 2006 that his laboratory's DNA testing not only proved with 100% certainty that no Duke lacrosse player contributed DNA to the rape kit items, but also that four non-lacrosse players had contributed DNA. *See* AC ¶¶ 79, 207, 224. Yet Meehan agreed "to conceal and obfuscate these exculpatory results." *Id.* ¶ 209. At the April 21, 2006 meeting, Meehan reached an agreement with Nifong, Gottlieb, and Himan "to hide exculpatory evidence from the three innocent Duke lacrosse players to be charged." *Id.* ¶¶ 209, 225. He also agreed at that meeting to produce (and later did produce) a written report purporting (falsely) to be a final report of all DNA testing, but omitting the exculpatory evidence, in violation of his laboratory's own protocols, FBI standards, accreditation regulations, and the U.S. Constitution. *See id.* ¶¶ 225-26, 230-35. "Meehan confessed to th[is] DNA conspiracy in open court at the December 15 hearing." *Id.* ¶ 308; *see also id.* ¶ 309. In sworn testimony, Meehan

confessed that he and Nifong "discussed and agreed that 'we would only disclose or show on our report those reference specimens that matched evidence items,'" and that "DSI's report did not set forth the results of all tests and examinations DSI conducted in the case, but was instead . . . 'an intentional limitation' arrived at between Meehan and Nifong 'not to report on the results of all examinations and tests' that DSI performed." *Id.* ¶ 307. These facts do not, as the DSI Defendants argue, demonstrate "lawful" or "ordinary and expected interaction" between a prosecutor and his retained expert. DSI Supp. Br. at 4-5. Rather, taken as true, they present more than a "sheer possibility" that Meehan acted unlawfully. *Iqbal*, 129 S. Ct. at 1949.

### 2. Plaintiffs Have Stated Claims Against Clark and DSI.

The DSI Defendants assert that Plaintiffs "premise their claims against [Defendant Clark] on his title alone," and "[a]t most . . . allege that Clark was physically present at meetings." DSI Supp. Br. at 11. That is not accurate. The Amended Complaint pleads that Defendant Clark not only participated in the April 10, 2006 meeting described above, but also that he orally agreed with Nifong, Himan, Gottlieb, and Meehan at that meeting to conceal and obfuscate the exculpatory DNA results. *See* AC ¶¶ 79, 207-09, 224. "Clark . . . agreed not to take any notes . . . so as to hide exculpatory evidence." *Id.* ¶ 209. "Clark . . . conspired and acted to conceal and obfuscate the exculpatory DNA results, knowing that if those results came to light, they would prevent an indictment or conviction of any Duke lacrosse player." *Id.* ¶ 210. Clark also participated in the April 21, 2006 meeting where he, along with Defendants Nifong, Himan, Gottlieb and Meehan, again agreed to take no notes memorializing their discussions of the exculpatory evidence, and agreed that DSI "would produce a written report that would purport to be a final report of the results of all DNA testing conducted by DSI, but. . . would omit the

exculpatory results of DSI's testing . . . in violation of DSI's internal protocols, Federal Bureau of Investigation standards, and regulations governing accredited DNA testing facilities." *Id*. ¶ 31, 223-26, 234. "DSI, Meehan, *and Clark's* use of this limited reporting formula—which was the product of an intentional agreement with Nifong, Himan, Gottlieb, and the Durham Police—concealed the complete results of 'any examinations or tests conducted by' DSI, and it specifically concealed the existence of the exculpatory evidence as underscoring the Duke lacrosse players' actual innocence." *Id*. ¶ 234 (emphasis added). Finally, at the May 12, 2006 meeting with Gottlieb, Himan, Nifong, and Meehan, Clark agreed that a report "would be provided to the Plaintiffs and the court under the knowingly false pretense that it represented the final report of DSI's work and contained all of DSI's findings with respect to DNA testing." *Id*. ¶¶ 229-31. The DSI Defendants' remaining arguments are similar to those raised by other Defendants and can be rejected on the same grounds identified above and at pages 69-71 of Plaintiffs' prior Opposition. Pls.' Consol. Opp. at 69-71. Taking all of the facts in the Amended Complaint as true, there is "more than a sheer possibility" that Clark and DSI acted unlawfully. *Iqbal*, 129 S. Ct. at 1949.

**C.    Plaintiffs Have Stated Claims Against Wilson.**

The Amended Complaint alleges that despite Defendant Wilson's knowledge of the evidence of Plaintiffs' innocence and the lack of evidence that any assault occurred, AC ¶¶ 49, 54, 67, 78, 89, 99, 103, 106, 118, 123, 195, Wilson engaged in numerous unlawful acts during the investigation of the Duke lacrosse case. In concert with Defendants Nifong, Lamb, Gottlieb, and Himan, Wilson attempted to intimidate and discredit Sergeant Shelton by subjecting him to an internal investigation, accusations of unprofessional conduct, and threats of disciplinary action for truthfully reporting

Mangum's recantation of her rape claim while at Duke Medical Center on March 13, 2006. *See id*. ¶ 56, 264. Wilson also assisted Himan, Gottlieb, and Nifong in their efforts to intimidate alibi witness Moezeldin Elmostafa and force him to recant Plaintiff Seligmann's alibi; indeed, Wilson specifically directed Himan to arrest Elmostafa on an uncleared arrest warrant. *Id*. ¶¶ 247-49. Wilson also conducted an unwitnessed and unsupervised interview of Mangum on December 21, 2006, in order to persuade her to make false statements to conform to the complete absence of DNA evidence implicating Plaintiffs. *Id*. ¶¶ 310-15. During this improper interview, Wilson also manufactured "new 'identifications' of the three innocent Duke lacrosse players, after the players' attorneys had made known that they would be moving to suppress the identifications made during the April Photo Array." *Id*. ¶ 313. These facts, taken as true, demonstrate "more than a sheer possibility" that Wilson acted unlawfully. *Iqbal*, 129 S. Ct. at 1949.

### D. Plaintiffs Have Stated Claims Against Nifong.

In his supplemental brief, Defendant Nifong makes no serious argument that the Amended Complaint fails to plead facts showing more than a "sheer possibility" he acted unlawfully. Nor could he. The North Carolina State Bar (in disbarring Nifong), the North Carolina Attorney General (in declaring Plaintiffs' actual innocence), and the Superior Court for Durham County (in finding Nifong guilty of criminal contempt) all found more than a "sheer possibility" that Nifong engaged in wrongdoing. *See id*. ¶¶ 15, 277-82, 290-92, 316-28. Perhaps most telling is Nifong's suggestion that the Amended Complaint might be *too* long. *See* Nifong Supp. Br. at 2-3.

The Amended Complaint alleges that Nifong recognized from the outset that there was no basis to charge Plaintiffs, telling Gottlieb and Himan as early as March 27, 2006, "'You know, we're f*cked.'" AC ¶ 138. Nevertheless, to further his own personal and

political agenda, Nifong conspired with the other Defendants and took affirmative actions to manufacture indictments and arrests of Plaintiffs in the absence of probable cause. Nifong was directly involved in the manufacturing of the unconstitutionally suggestive photo array, which he and the City Defendants intended would be uses to obtain indictments and convictions of three innocent Duke lacrosse players in the absence of probable cause. *See id.* ¶¶ 180-81. Nifong also directed DSI to produce a purported final forensic DNA report that would omit the overwhelmingly exculpatory DNA evidence that DNA from at least four different men was found on the items in the rape kit—none of which matched any of the Duke lacrosse players. *See id.* ¶¶ 224-26, 307. Nifong conspired to intimidate and discredit alibi witnesses into manufacturing false statements and recanting truthful statements (AC ¶¶ 56, 246-49, 258, 261). Finally, Nifong gave nearly 100 interviews in which he made numerous false and inflammatory statements regarding Plaintiffs and the rest of the Duke lacrosse team, including his false public claims that there was "no doubt" that three members of the Duke lacrosse team had engaged in a vicious and racially-motivated gang rape while he was expressing privately to Gottlieb and Himan that "we're f*cked." *See id.* ¶¶ 138, 144-55, 273-74. These allegations, taken as true, state more than a sheer possibility that Nifong engaged in wrongdoing. Nifong's motion to dismiss should be denied.

## CONCLUSION

For the aforementioned reasons, *Iqbal* does not alter the Court's analysis of Defendants' Motions To Dismiss. The Court should deny Defendants' Motions except to the extent stated in Plaintiffs' previously filed Consolidated Opposition.

Dated: July 14, 2009                    Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**


By:    ____/s/ Charles Davant IV_____
          Brendan V. Sullivan, Jr. (*pro hac vice*)
          Robert M. Cary (*pro hac vice*)
          Christopher N. Manning (*pro hac vice*)
          Charles Davant IV (N.C. Bar #28489)
          725 Twelfth Street, N.W.
          Washington, DC  20005
          Tel.:          (202) 434-5000
          E-mail:      cdavant@wc.com

*Attorneys for Plaintiffs*
  *David F. Evans and Collin Finnerty*


                      -and-


**RUDOLF WIDENHOUSE & FIALKO**


By:    ____/s/ David S. Rudolf_____
          David S. Rudolf (N.C. Bar #8587)
          312 West Franklin Street
          Chapel Hill, NC  27516
          Tel.:          (919) 967-4900
          E-mail:      dsrudolf@rwf-law.com

**BARRY C. SCHECK, ESQ.**

Barry C. Scheck*
Attn: Elizabeth Vaca
100 Fifth Avenue
New York, NY 10011
Tel.:          (212) 364-5390
E-mail:        bcsinnocence@aol.com

(* motion for special appearance
  to be filed)


**EMERY CELLI BRINCKERHOFF &
  ABADY LLP**

Richard D. Emery (pro hac vice)
Ilann M. Maazel (pro hac vice)
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Tel.:          (212) 763-5000
Fax.:          (212) 763-5001
E-mail:        remery@ecbalaw.com

*Attorneys for Plaintiff Reade Seligmann*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

|  |  |
|---|---|
| DAVID F. EVANS, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:07CV739 |
| CITY OF DURHAM, N.C., et al., | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2009, I electronically filed the foregoing

**PLAINTIFFS' SUPPLEMENTAL BRIEF OPPOSING MOTIONS TO DISMISS**

with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to the following:

Reginald B. Gillespie, Jr.
*Counsel for Defendant City of Durham*

Joel M. Craig
Henry W. Sappenfield
*Counsel for Defendant Benjamin Himan*

James B. Maxwell,
*Counsel for Defendant David Addison*

Edwin M. Speas
Eric P. Stevens
*Counsel for Defendant Mark Gottlieb*

Patricia P. Kerner
D. Martin Warf
Hannah G. Styron
*Counsel for Defendants Steven Chalmers, Beverly Council, Ronald Hodge, Jeff Lamb,*
*Patrick Baker, Michael Ripberger, and Lee Russ*

Robert A. Sar
Nicholas J. Sanservino, Jr.
*Counsel for Defendant DNA Security*

Robert J. King III
Kearns Davis
*Counsel for Defendant DNA Security, Inc. & Richard Clark*

Paul R. Dickinson, Jr.
James A. Roberts, III
*Counsel for Defendant Brian Meehan*

Linwood Wilson
*Pro se*

James B. Craven III
*Counsel for Michael B. Nifong*


Respectfully submitted,

/s/ Charles Davant IV
Charles Davant IV (N.C. Bar No. 28489)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel.:          (202) 434-5000
Email:        cdavant@wc.com

*Attorney for Plaintiffs David F. Evans and*
  *Collin Finnerty*