No. 08-1065

# In the Supreme Court of the United States

POTTAWATTAMIE COUNTY, IOWA,
JOSEPH HRVOL, AND DAVID RICHTER,

*Petitioners,*

v.

CURTIS W. MCGHEE, JR.
AND TERRY J. HARRINGTON,

*Respondents.*

**On Writ of Certiorari to
the United States Court of Appeals
for the Eighth Circuit**

BRIEF FOR THE STATES OF COLORADO, ARKANSAS, DELAWARE, IDAHO, INDIANA, IOWA, KENTUCKY, LOUISIANA, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MISSISSIPPI, MISSOURI, NEVADA, NEW MEXICO, NORTH CAROLINA, NORTH DAKOTA, OHIO, OKLAHOMA, PENNSYLVANIA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, UTAH, VIRGINIA, WASHINGTON, AND THE DISTRICT OF COLUMBIA AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS

JOHN W. SUTHERS
Attorney General
of Colorado
DANIEL D. DOMENICO
Solicitor General
STATE OF COLORADO
1525 Sherman St.
7th Floor
Denver, CO 80203
(303) 866-3052

KATHLEEN M. SULLIVAN
*Counsel of Record*
DANIEL H. BROMBERG
QUINN EMANUEL
   URQUHART OLIVER &
   HEDGES, LLP
51 Madison Avenue
22d Floor
New York, NY 10010
(212) 849-7000

July 20, 2009

*Counsel for Amici Curiae*

[additional counsel listed on signature page]

Dockets.Justia.com

TABLE OF CONTENTS

Page

Interests of *Amici Curiae* ............................................. 1

Introduction and Summary ........................................ 2

Argument .................................................................... 5

Prosecutors Should Be Absolutely Immune
From Claims For Damages Caused By The
Testimony At Trial Of Witnesses Interviewed
During The Investigative Phase Of A Criminal
Proceeding ................................................................. 5

    A. Prosecutorial Participation In
       Investigative Interviews Improves
       Prosecutorial Functions, Protects
       Witnesses And Defendants, And
       Benefits Law Enforcement Officers ................... 5

       1. Improvement Of Prosecutorial
          Functions ...................................................... 8

       2. Protection Of Witnesses And
          Defendants ................................................. 11

       3. Benefits To Law Enforcement
          Officers ....................................................... 12

    B. Prosecutors Will Be Reluctant to
       Participate In Investigative Interviews
       If They May Be Sued For Damages
       Caused By The Testimony Of
       Individuals They Interviewed ....................... 13

(I)

TABLE OF CONTENTS – continued

Page

C. Respondents Cannot Avoid The Public
Policy Concerns Requiring Absolute
Prosecutorial Immunity By Pleading
Claims Based On Prosecutorial
Participation In Investigative
Interviews ............................................................ 15

Conclusion ................................................................23

# TABLE OF AUTHORITIES

Page

## CASES

*Brady v. Maryland*, 373 U.S. 83 (1963) ......................... 12

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003) ...... 18

*Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994) .................................................................... 11

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ................................................ 3, 6, 19, 21, 22

*Curry v. County of Los Angeles*, 2009 WL 1684578 (C.D. Cal. June 16, 2009) ..................... 18

*Davis v. United States*, 512 U.S. 452 (1994) ............ 11

*Doe v. Russotti*, 503 F. Supp. 942 (S.D.N.Y. 1980) .................................................................... 20

*Genzler v. Longanbach*, 410 F.3d 630 (9th Cir. 2005) .................................................................... 18

*Giglio v. United States*, 405 U.S. 150 (1972) ..... 11, 12

*Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949) ........ 3

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................ 3

*Imbler v. Pachtman*, 424 U.S. 409 (1976) .........*passim*

*Lee v. Willins*, 617 F.2d 320 (2d Cir. 1980) ............. 18

*Malinski v. New York*, 324 U.S. 401 (1945) ............. 19

*Milstein v. Cooley*, 257 F.3d 1004 (9th Cir. 2001) .................................................................... 18

*Moore v. Valder*, 65 F.3d 189 (D.C. Cir. 1995) ........ 18

*Moran v. Burbine*, 475 U.S. 412 (1986) ................... 18

(III)

TABLE OF AUTHORITIES – continued

*North Carolina v. Butler*, 441 U.S. 369 (1979)........ 11

*Tate v. Grose*, 412 F. Supp. 487 (E.D. Pa. 1976) ..... 18

*Taylor v. Poehling*, 438 F. Supp. 914 (E.D. Mo. 1977) .................................................................... 18

*United States v. Hasting*, 461 U.S. 499 (1983)........ 19

*United States v. Isgro*, 974 F.2d 1091 (9th Cir. 1992) .................................................................... 12

*United States v. Levenite*, 277 F.3d 454 (4th Cir. 2002)............................................................. 18

*United States v. Serrano*, 406 F.3d 1208 (10th Cir. 2005)............................................................. 11

*United States v. Starusko*, 729 F.2d 256 (3d Cir. 1984)............................................................. 12

*Van de Kamp v. Goldstein*, 129 S. Ct. 855 (2009)....................................................... 3, 14, 21

*Walker v. County of Santa Clara*, 2007 WL 831822 (N.D. Cal. Mar. 19, 2007)...................... 18

*Weinstein v. Mueller*, 563 F. Supp. 923 (N.D. Cal. 1982) ......................................................... 18

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000) ......... 18

## STATUTES

18 U.S.C. § 3500(b).................................................. 12

Ala. Code § 12-17-216 (2009) ..................................... 6

Cal. Gov't Code § 12550 (2005) ................................... 6

TABLE OF AUTHORITIES – continued

Page

Cal. Gov't Code § 12560 (2005) ................................... 6

Colo. Rev. Stat. § 20-1-209(1) (2005) ......................... 6

Ga. Code Ann. § 15-18-6(7) (2009) ............................. 7

Ind. Code § 33-39-4-1 (2004) ...................................... 6

La. Rev. Stat. Ann. § 16:13.1 (2001) .......................... 6

Me. Rev. Stat. Ann. 5 § 200-A (2002) ........................ 7

Me. Rev. Stat. Ann. 30-A § 289 (1996) ...................... 7

Me. Rev. Stat. Ann. 30-A § 290 (2001) ...................... 6

N.C. Gen. Stat. Ann. § 7A-61 (2009) .......................... 7

N.C. Gen. Stat. Ann. § 7A-69 (2009) .......................... 6

Nev. Rev. Stat. § 252.070 (2009) ................................ 6

Okla. Stat., tit. 19, § 215.35A(A) (2000) .................... 6

Or. Rev. Stat,. § 146.100(1) (2009) ............................. 7

## MISCELLANEOUS

ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993) .............................. 6, 8, 10

BETTY R. BROWN, THE WISCONSIN DISTRICT ATTORNEY AND THE CRIMINAL CASE (1977) ... 10, 11

ETHICS COMMITTEE OF THE CALIFORNIA DISTRICT ATTORNEYS ASS'N, PROFESSIONALISM: A SOURCEBOOK OF ETHICS AND CIVIL LIABILITY PRINCIPLES FOR PROSECUTORS (2001) ............................................ 6

TABLE OF AUTHORITIES – continued

NATIONAL DISTRICT ATTORNEYS ASSOCIATION, NATIONAL PROSECUTION STANDARDS (2d ed. 1991) .................................................................. 13

## INTERESTS OF *AMICI CURIAE*

The States have a paramount interest in the vigorous investigation and prosecution of criminal offenses. Absolute prosecutorial immunity furthers that interest by allowing prosecutors to perform their prosecutorial functions without fear that they will be held personally liable based upon the performance of their duties. The Eighth Circuit's decision in this case undercuts this immunity by allowing disgruntled criminal defendants to plead around it whenever a prosecutor allegedly has interviewed a witness during the investigatory phase of a criminal proceeding. If adopted, this decision will discourage prosecutors from participating in investigative interviews and from presenting testimony at trial from individuals that they have interviewed, thereby impairing the State's interest in both the investigation and prosecution of crime. Accordingly, the States filing this brief urge the Court to overturn the decision below.

*Amici* agree with petitioners that respondents cannot state a valid claim based upon the mere preparation of false testimony and that respondents' claim for the use of allegedly false testimony at trial is plainly barred by absolute prosecutorial immunity. *Amici* also maintain that, even if respondents could state a valid claim based upon the mere preparation of false testimony, absolute prosecutorial immunity would bar them from seeking damages resulting from the presentation of that testimony at trial. *Amici* submit this brief to inform the Court how permitting such claims would adversely affect prosecutorial functions and why therefore claims seeking damages for injuries caused by a prosecutor's

presentation of witnesses at trial are barred, whether or not prosecutors interviewed the witnesses before trial.

## INTRODUCTION AND SUMMARY

In *Imbler v. Pachtman*, 424 U.S. 409 (1976), this Court held that prosecutors should be afforded absolute immunity against claims for damages based upon the alleged presentation of false testimony at trial because such claims distort prosecutorial decision making and the administration of justice. In this case, respondents tried to plead around absolute prosecutorial immunity by alleging that prosecutors coerced a witness into giving false testimony in an interview during the investigative phase of a criminal proceeding and that this testimony was subsequently presented at trial. Respondents, however, are still seeking damages from the convictions that allegedly were caused by presentation of false testimony at trial, and therefore their claims have the same distorting impact on the prosecutorial function and the administration of justice as a direct challenge to the presentation of false testimony at trial. In addition, if permitted, claims such as respondents' would discourage prosecutors from participating in investigative interviews, which would distort prosecutorial decision making in other ways and deprive witnesses, defendants, and law enforcement officers of the benefits of prosecutorial participation in such interviews. As a consequence, absolute immunity should bar claims seeking damages caused by the presentation of testimony at trial, no matter what theory of liability has been pled.

As this Court has recognized, official immunity "reflects 'a balance' of 'evils.'" *Van de Kamp v. Goldstein*, 129 S. Ct. 855, 859 (2009) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand, J.)). On the one hand, immunizing government officials against claims for damages deprives criminal defendants who have been genuinely wronged by dishonest or malicious government officials of compensation for their injuries. On the other hand, permitting claims against government officials for damages caused by performance of their duties creates a threat of personal liability that chills officials in conducting their official duties, thereby depriving the public of the vigorous performance of government functions.

The balance between these two evils generally has been struck by affording government officials a "qualified" immunity that protects officials so long as they do not violate "clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("Qualified immunity represents the norm for executive officers."). However, where claims challenge conduct that is "'intimately associated with the judicial phase of the criminal process,'" *Van de Kamp*, 129 S. Ct. at 860-61 (quoting *Imbler*, 424 U.S. at 430), prosecutors are afforded greater protection—absolute immunity against suit—to ensure that fear of personal liability does not deter them from making the often difficult decisions demanded by their prosecutorial functions. *Van de Kamp*, 129 S. Ct. at 860-61; *Imbler*, 424 U.S. at 424-30.

Prosecutors should not be stripped of absolute immunity and subjected to claims for damages caused by the testimony of witnesses presented at trial simply because those witnesses were interviewed during the investigative phase of a criminal proceeding. Prosecutors frequently are involved in investigative activities such as witness interviews, and this involvement enhances the performance of their prosecutorial functions. When prosecutors interview witnesses, they are better able to perform two key prosecutorial functions: making charging decisions and presenting the Government's case at any eventual trial.

Witnesses and defendants also benefit when prosecutors participate in investigative interviews because the prosecutors' presence gives the rights of witnesses and defendants an extra layer of protection. Law enforcement officers also benefit because, among other things, the presence of prosecutors ensures that officers are advised on any unusual legal issues that may arise. If prosecutors could be sued for damages resulting from the presentation at trial of witnesses interviewed during the investigative phase, prosecutors understandably would be reluctant to participate in such interviews, and the many benefits of their participation would be lost in whole or in part.

By basing their claim upon the prosecutors' conduct in interviewing witnesses prior to trial rather than on presenting those witnesses, respondents have not altered the chilling effect that claims for damages caused by the presentation of evidence at trial have on the prosecutorial function. In *Imbler*, this Court held that prosecutors should

enjoy absolute immunity for conduct intimately associated with the judicial process because the threat that they will be held liable for one of the many difficult decisions that must be made in presenting evidence at trial would discourage prosecutors from vigorously performing their duties. This threat of personal liability, and its distorting impact on prosecutorial decision making, is not eliminated by simply modifying the pleadings to assert a constitutional violation that led to the presentation of false testimony at trial rather than a violation in the presentation of the testimony itself. Thus, whatever constitutional violation is pled, prosecutors should be afforded absolute immunity against claims seeking damages allegedly caused by the presentation of evidence at trial.

## ARGUMENT

**PROSECUTORS SHOULD BE ABSOLUTELY IMMUNE FROM CLAIMS FOR DAMAGES CAUSED BY THE TESTIMONY AT TRIAL OF WITNESSES INTERVIEWED DURING THE INVESTIGATIVE PHASE OF A CRIMINAL PROCEEDING.**

### A. Prosecutorial Participation In Investigative Interviews Improves Prosecutorial Functions, Protects Witnesses And Defendants, And Benefits Law Enforcement Officers.

Respondents seek to evade the absolute immunity that protects the prosecutorial function by alleging that the prosecutors in this case coerced a witness during an interview in the investigative phase of the proceedings. It is not, however, unusual for

prosecutors to participate in the "investigative" phase of criminal proceedings, which generally occurs before there is probable cause sufficient to initiate judicial proceedings against an individual. *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993). Sometimes prosecutors handle criminal investigations themselves, usually through criminal investigators assigned to their offices.[1] At other times, prosecutors' direct criminal investigations

---

[1] *See, e.g.,* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION § 3-3.1, at 48 (3d ed. 1993) (noting that prosecutors may be primarily responsible for investigating a crime "because the area of illegal activity is not one that attracts law enforcement interest, as in the case of certain commercial frauds, or where law enforcement officials are themselves involved"); *see also* ALA. CODE § 12-17-216 (2009) (authorizing district attorneys to "conduct investigations"); CAL. GOV'T CODE §§ 12550, 12560 (2005) (permitting Attorney General to take charge of investigations); COLO. REV. STAT. § 20-1-209(1) (2005) (authorizing district attorneys to appoint investigators); IND. CODE § 33-39-4-1 (2004) (authorizing prosecuting attorneys to employ special investigators); LA. REV. STAT. ANN. § 16:13.1 (2001) (authorizing district attorneys to employ special investigators); ME. REV. STAT. ANN. 30-A § 290 (2001) (authorizing district attorneys to appoint investigators); NEV. REV. STAT. § 252.070 (2009) (authorizing district attorneys to appoint "investigational" staff); N.C. GEN. STAT. ANN. § 7A-69 (2009) (providing for "investigatorial assistants"); OKLA. STAT., tit. 19, § 215.35A(A) (2000) (providing for "district attorney investigators . . . under the direction of the district attorney"); ETHICS COMMITTEE OF THE CALIFORNIA DISTRICT ATTORNEYS ASS'N, PROFESSIONALISM: A SOURCEBOOK OF ETHICS AND CIVIL LIABILITY PRINCIPLES FOR PROSECUTORS at III-8 (2001) (noting that "the investigation and gathering of evidence relating to criminal offenses is the prosecutor's responsibility") (quotation omitted).

conducted by law enforcement officers.[2] Most often, however, criminal matters are investigated by the police or other law enforcement personnel, and prosecutors assist such personnel in the investigation.[3] Moreover, the participation of prosecutors in investigative activities and in investigative interviews in particular has important benefits for prosecutors and others involved in criminal investigations.

Specifically, when prosecutors participate in investigative interviews, their ability to perform

---

[2] In some states, prosecutors are required to direct homicide investigations. *See, e.g.*, OR. REV. STAT.. § 146.100(1) (2009) ("Death investigations shall be under the direction of the district medical examiner and the district attorney for the county where the death occurs."); *see also* ME. REV. STAT. ANN. 5 § 200-A (2002) (conferring upon Attorney General authority to direct homicide investigations). In some states, prosecutors also are authorized to assume control of investigations into other offenses. *See, e.g.*, ME. REV. STAT. ANN. 30-A § 289 (1996) (authorizing district attorneys to direct investigations into child abuse). In addition, in states such as Pennsylvania, prosecutors are, in practice, solely responsible for managing investigations into economic crimes.

[3] Many States explicitly authorize or require prosecutors to assist law enforcement officers in the investigation of criminal offenses. *See* GA. CODE ANN. § 15-18-6(7) (2009) (imposing duty upon district attorneys "[t]o advise law enforcement officers concerning . . . matters relating to the investigation and prosecution of criminal offenses"); N.C. GEN. STAT. ANN. § 7A-61 (2009) (requiring a district attorney to "advise the officers of justice in his district"). In addition, in many states, prosecutors actively assist police in criminal investigations and even participate in reviewing crime scenes for offenses such as homicide. Prosecutors likewise often take an active role in investigating shootings by active duty officers and other special situations.

their prosecutorial functions is improved because they are able to make more efficient and informed charging decisions and to examine individuals that they have interviewed more effectively at trial. In addition, when prosecutors participate in interviews, their presence provides an extra layer of protection for the rights of both witnesses and defendants. Finally, law enforcement officers benefit from the involvement of prosecutors in investigative interviews because the presence of prosecutors protects officers from inadvertently violating the rights of witnesses and defendants and insulates the officers against unfounded claims of misconduct.

### 1. Improvement of Prosecutorial Functions

When prosecutors participate in investigative interviews, their ability to perform two key prosecutorial functions—charging criminal offenses and presenting the State's case at trial—is improved.

*First*, when prosecutors participate in investigative interviews, they are better able to perform a key prosecutorial function: determining whether to charge individuals suspected of criminal offenses and deciding what charges to bring against them. *See, e.g.*, ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION § 3-3.4(a), at 59 (3d ed. 1993) ("The decision to institute criminal proceedings should be initially and primarily the responsibility of the prosecutor."). Particularly where broad investigations are conducted or the potential offenses being investigated are complex, there may be an array of potential targets and charges. By participating in interviews early in an investigation,

prosecutors can ensure that the investigation is informed by consideration of the applicable law and focused upon producing evidence helpful to the charging and trial process. In addition, by participating in interviews of key subjects and witnesses, prosecutors are better able to determine the roles played by participants in a crime or criminal activity, which helps prosecutors to determine whether to bring charges against certain individuals and the most appropriate charges to bring.

Participation in investigative interviews also helps prosecutors to gauge the strength of the testimony of potential witnesses. When prosecutors are able to observe a potential witness's demeanor and probe his or her story, they are better able to judge how strong that witness's testimony at trial would be. Reading a witness statement or the summary of a witness interview is not the same as sitting face to face with a witness and assessing the witness's demeanor and credibility. This additional information improves a prosecutor's ability to determine whether to bring charges. By contrast, where a witness provides a suspect with an alibi or otherwise exculpates the suspect, a prosecutor that has interviewed the witness in person is better able to judge the strength of the witness's testimony and decide that charges should not be filed. Indeed, it is not unusual for a prosecutor that has filed charges against an individual to drop those charges after interviewing an alibi witness.

*Second*, prosecutors who participate in investigative interviews are better able to examine witnesses at trial. Just as depositions facilitate the

presentation of civil trials, interviews with potential witnesses facilitate the presentation of criminal cases because witness interviews allow prosecutors to "become familiar with the personality of the witness," which enables prosecutors to "anticipate how the witness will react on the stand" and thus makes prosecutors "better able to conduct cross-examination or to decide whether to cross-examine at all." ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION § 3-3.1, at 52.

Although prosecutors interview some witnesses after charges have been brought in preparation for trial, that is not always possible. Some witnesses who were willing to be interviewed during the investigative phase may balk at doing so after charges are brought, for example, because they learn who has been charged and become scared about cooperating. Or, the witness may be sympathetic to the defendant and willing to be interviewed before charges are brought in hopes of heading off such charges. Once, however, charges are brought, the witness may refuse to assist the prosecution by submitting to an interview. In addition, witnesses may not be available for later interviews because they are ill and may become unable to testify, because their memory may dim, or because their age or mental capacity makes them subject to undue influence of others. *See* BETTY R. BROWN, THE WISCONSIN DISTRICT ATTORNEY AND THE CRIMINAL CASE 28-29 (1977). In such cases, a prosecutor's only real opportunity to interview a witness may be in the investigative phase.

## 2. Protection Of Witnesses And Defendants

The participation of prosecutors in investigative interviews also provides an additional layer of protection for the rights of witnesses and defendants.

For example, although law enforcement officers presumably are aware of the requirements of *Miranda* and the prohibition against coercing testimony from witnesses, *see, e.g., United States v. Serrano*, 406 F.3d 1208, 1216 (10th Cir. 2005); *Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994), the presence of a prosecutor can help to ensure that those rights are respected. A prosecutor's participation may be even more beneficial—if not crucial—when more complex issues such as ambiguous waivers or invocations of the right to counsel, *see, e.g., Davis v. United States*, 512 U.S. 452, 458-462 (1994); *North Carolina v. Butler*, 441 U.S. 369, 373 (1979), or questions of confidentiality and privilege arise. *See also* BROWN, THE WISCONSIN DISTRICT ATTORNEY AND THE CRIMINAL CASE 34-35 (noting the importance of having prosecutors present at lineups and other identification procedures). In these situations, a prosecutor present at an investigative interview can advise law enforcement officers and thereby ensure that the officers do not inadvertently violate the rights of witnesses.

The rights of defendants also receive extra protection when prosecutors participate in investigative interviews. Criminal defendants have the right to disclosure of exculpatory evidence as well as evidence that impeaches the credibility of witnesses presented by the Government, *see Giglio v.*

*United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963), and they may request prior statements of any witness presented at trial, *see* 18 U.S.C. § 3500(b). Although law enforcement officers are aware of these obligations, prosecutors have a greater incentive to ensure that they are satisfied because prosecutors are responsible for making the required disclosures and, in fact, can be disciplined or sanctioned for failing to do so. *See, e.g., United States v. Isgro*, 974 F.2d 1091, 1099 (9th Cir. 1992); *United States v. Starusko*, 729 F.2d 256, 264-65 (3d Cir. 1984). Accordingly, when prosecutors are present during an investigative interview, they are more attentive to whether impeachment material has been created and more likely to ensure that such materials are properly memorialized and disclosed. Thus, prosecutorial participation in investigative interviews benefits defendants as well as witnesses.

### 3. Benefits To Law Enforcement Officers

Finally, law enforcement officers benefit from the involvement of prosecutors in investigative interviews. First, as discussed above, *see supra* pp. 8-9, when prosecutors participate in interviews of key witnesses early in the investigative process, they are better able to ensure that the investigation is focused, to determine whether the investigation should be continued and, if so, which avenues should be followed, what targets pursued, and what evidence collected. As a result, the work of the law enforcement officers involved in the investigation is more efficient and productive. Second, as also noted above, *see supra* p. 11, the presence of prosecutors in investigative interviews ensures that officers are

properly advised on the rights of witnesses and defendants, which protects officers against inadvertent violations of those rights and suits resulting from such violations. Third, the presence of prosecutors protects officers against unfounded claims of misconduct by providing credible, independent witnesses to the interviews.

**B. Prosecutors Will Be Reluctant To Participate In Investigative Interviews If They May Be Sued For Damages Caused By The Testimony Of Individuals They Interviewed.**

If prosecutors could be sued for damages caused by the testimony of witnesses that they interviewed, many of the benefits of prosecutors participating in investigative interviews would be lost because prosecutors would be reluctant to participate. Prosecutors normally are not required to participate in interviews in the investigative phase of a criminal proceeding, and they can perform their charging and trial functions (albeit not as effectively or efficiently) without doing so. As a consequence, if participating in such interviews created the risk of personal liability, rational prosecutors would not participate in many, if not all, investigative interviews,[4] and the

---

[4] *See, e.g.,* NATIONAL DISTRICT ATTORNEYS ASSOCIATION, NATIONAL PROSECUTION STANDARDS 82 (2d ed. 1991) ("The prosecuting attorney may be restricted from any active participation in the police function by the threatened loss of immunity to civil damages in instances where participation is beyond the scope of advisor and, therefore, not an integral part of the judicial process. The prosecutor must always be cognizant that his quasi-judicial immunity afforded by the courts in civil liability suits is limited to actions taken in advancement of the traditional prosecutorial function.").

public, suspects, witnesses, and defendants alike would be deprived of the benefits of such participation.

These adverse effects weigh against permitting claims against prosecutors for damages resulting from the testimony of witnesses that they have interviewed. In balancing the evils of immunizing prosecutors against damages claims against the evils of permitting such claims, this Court has focused primarily upon the impact that permitting such claims would have on "'the public trust of the prosecutor's office' . . . were the prosecutor to have in mind his 'own potential' damages 'liability' when making prosecutorial decisions." *Van de Kamp*, 129 S. Ct. at 860 (quoting *Imbler*, 424 U.S. at 424). This Court also has considered the impact that permitting claims against prosecutors would have on the administration of justice in general. Specifically, in recognizing absolute prosecutorial immunity, this Court observed that permitting damage claims against prosecutors "would prejudice defendants in criminal cases" by making courts reluctant to provide post-conviction relief where such relief might lead to liability for prosecutors. *Imbler*, 424 U.S. at 427-28.

Permitting claims for damages resulting from the presentation at trial of witnesses who were interviewed during the investigative phase of a criminal proceeding would interfere with both the prosecutorial function and the administration of justice. First, by discouraging prosecutors from participating in investigative interviews, such claims would impair the ability of prosecutors to perform their charging function and to present the Government's case at trial. *See supra* pp. 8-10.

Second, as shown above, if prosecutors were not present during investigative interviews, the administration of justice would suffer because innocent suspects would be subject to charges that would not otherwise have been brought, *see supra* p. 9; witnesses and defendants would be deprived of a layer of protection for their rights, *see supra* pp. 11-12; and law enforcement officers would lose the advice and other benefits of prosecutorial involvement, *see supra* pp. 12-13. Moreover, the impact may be especially great in rural areas where law enforcement agencies are small, and, as a practical matter, local prosecutors may be a law enforcement officer's only source of legal advice.

### C. Respondents Cannot Avoid The Public Policy Concerns Requiring Absolute Prosecutorial Immunity By Pleading Claims Based On Prosecutorial Participation In Investigative Interviews.

Even more important, respondents' pleading strategy—challenging the prosecutors' participation in an interview that allegedly led to the presentation of allegedly false testimony rather than directly challenging the presentation of such testimony—does not avoid the evils that led this Court to recognize absolute prosecutorial immunity in the first place. Whether or not a prosecutor's decision to present a witness is directly challenged, the threat that a prosecutor may be held personally liable for damages resulting from the witness's testimony has the same distorting impact on the prosecutorial function and the administration of justice. Because the purpose of absolute immunity is to protect the public interest by

avoiding such distortions, claims seeking damages caused by the presentation of a witness at trial should be barred, whatever theory of liability is pled.

As noted at the start, *see supra* p. 2, in *Imbler* this Court held that prosecutors are absolutely immune from claims for damages based upon their conduct in initiating criminal prosecution and in presenting the State's case because of the distorting impact such challenges would have on the decisions of prosecutors and the courts. *See Imbler*, 424 U.S. at 424-29. *Imbler* found that claims based upon the initiation of prosecution or the presentation of the State's case create a "substantial danger of liability" because disgruntled defendants could be expected to bring such claims against prosecutors "with some frequency," and even honest prosecutors would have difficulty in rebutting the claims. *Id.* at 425. This risk of personal liability, the Court concluded, would "prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.* at 427-28. In addition, because judges may be unconsciously concerned about making decisions that subject prosecutors to personal liability, the threat of personal liability for prosecutors may influence their willingness to grant criminal defendants post-conviction relief and thereby "skew[] post-conviction judicial decisions that should be made with the sole purpose of insuring justice." *Id.* at 427-28. Finally, this Court noted, absolute prosecutorial immunity against suits for damages does not give prosecutors free reign to engage in misconduct because prosecutors are subject to professional discipline and even criminal prosecution for presenting false testimony at trial. *Id.* at 429. Accordingly, the Court

held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id.* at 431.

Respondents have not eliminated any of these concerns by pleading a constitutional violation during the investigatory phase that led to the presentation of false testimony at trial rather than challenging the presentation of that testimony directly. *First*, like claims directly challenging the presentation of evidence at trial, claims such as respondents' are likely to be made with some frequency. Criminal defendants have as much incentive to sue prosecutors for improperly coercing witnesses into giving testimony as they do to sue prosecutors simply for presenting false testimony. The same damages are recoverable under either theory, and criminal defendants presumably are indifferent about which legal theory they plead. In addition, because prosecutors are required to disclose materials impeaching their witnesses as well as any prior witness statements, *see supra* pp. 11-12, defendants often know whether and when prosecutors interviewed witnesses presented at trial. In such circumstances, it is easy for criminal defendants to convert a claim that prosecutors presented false testimony at trial into a claim that misconduct in an investigative interview led to the presentation of false testimony at trial—which is no doubt why prosecutors are frequently sued for

allegedly coercing witnesses into giving false testimony at trial.[5]

*Second*, like claims that false testimony was presented at trial, claims that witnesses were coerced in investigative interviews to give false testimony that was later presented at trial are difficult for honest prosecutors to defend against. "Witnesses to criminal conduct are routinely either in conspiracy with the defendants or at risk of harm because they bore witness to criminal conduct." *United States v. Levenite*, 277 F.3d 454, 461 (4th Cir. 2002). As a consequence, prosecutors often are forced to use grants of immunity, plea agreements, promises of leniency in sentencing, and other inducements to obtain testimony from such witnesses. *Id.* at 461-62. The line between permissible inducements and impermissible coercion is, however, often a difficult one to draw. *Cf. Moran v. Burbine*, 475 U.S. 412, 426 (1986) (noting in the context of confessions the "fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion"). Consequently, even honest prosecutors may have

---

[5] *See, e.g., Genzler v. Longanbach*, 410 F.3d 630, 633-35 (9th Cir. 2005); *Broam v. Bogan*, 320 F.3d 1023, 1027-28 (9th Cir. 2003); *Milstein v. Cooley*, 257 F.3d 1004, 1006 (9th Cir. 2001); *Zahrey v. Coffey*, 221 F.3d 342, 345 (2d Cir. 2000); *Moore v. Valder*, 65 F.3d 189, 191 (D.C. Cir. 1995); *Lee v. Willins*, 617 F.2d 320, 321 (2d Cir. 1980); *Curry v. County of Los Angeles*, 2009 WL 1684578, at *1 (C.D. Cal. June 16, 2009); *Walker v. County of Santa Clara*, 2007 WL 831822, at *1-*2 (N.D. Cal. Mar. 19, 2007); *Weinstein v. Mueller*, 563 F. Supp. 923, 926-27 (N.D. Cal. 1982); *Taylor v. Poehling*, 438 F. Supp. 914, 914-15 (E.D. Mo. 1977); *Tate v. Grose*, 412 F. Supp. 487, 487 (E.D. Pa. 1976).

difficulty defending against charges that they coerced a recalcitrant witness into giving false testimony.

Thus, by pleading that the prosecutors engaged in misconduct during an investigatve interview that led to the presentation of false testimony at trial rather than challenging the alleged presentation of such evidence directly, respondents have not eliminated either the threat that such claims will be brought or the difficulty that prosecutors will have in defending against them. As a consequence, claims such as respondents' pose a danger of personal liability even to honest prosecutors. Permitting them may "hamper a prosecutor's exercise of his judgment as to whether a certain witness should be used" and thus interfere with the prosecutorial function (*Buckley*, 509 U.S. at 284-85 (Kennedy, J., concurring in part and dissenting in part))—the primary evil that *Imbler* sought to avoid.

*Third*, as the National Association of District Attorneys and the National Association of Assistant United States Attorneys have pointed out, there are alternative means for deterring prosecutors from coercing witnesses into giving false testimony and then presenting it at trial. Courts provide an important check upon such misconduct because they can deprive prosecutors of any benefit from coercing witnesses by excluding testimony that is coerced, *see, e.g., Malinski v. New* York, 324 U.S. 401, 430-31 (1945) (Rutledge, J., dissenting in part), or sanction the prosecutor directly, *see United States v. Hasting*, 461 U.S. 499, 506 n.5 (1983). In addition, like prosecutors who present false testimony at trial, prosecutors who coerce witnesses into giving false

testimony are subject to grievance procedures and professional discipline that can deprive them of their license to practice as well as criminal prosecution. *See Imbler*, 424 U.S. at 429. In fact, with investigative interviews, there is an additional alternative means for deterring misconduct because a witness that is coerced by a prosecutor during an interview can sue the prosecutor for damages. *See, e.g., Doe v. Russotti*, 503 F. Supp. 942, 945 (S.D.N.Y. 1980).

In sum, there is no reason to permit criminal defendants who seek damages for the alleged presentation of false testimony at trial to evade the bar of absolute prosecutorial immunity simply by pleading that the false testimony was created in an investigative interview. The threat of damages resulting from the presentation of a witness at trial has the same distorting impact upon prosecutorial decision making (and the willingness of courts to grant post-conviction relief) when the damages are sought based upon claims of misconduct in investigative interviews with a witness as when a claim directly challenges the presentation of the witness's testimony at trial. In addition, claims based upon investigative interviews will discourage prosecutors from participating in such interviews, which interferes with prosecutorial functions and the administration of justice in other ways. The alternative means of deterring prosecutorial misconduct in this context are even greater because of the possibility of suits by coerced witnesses. Thus, absolute immunity should bar claims that seek damages resulting from the presentation of the witnesses interviewed.

It is true that absolute immunity protects only conduct that is "intimately associated with the judicial phase of the criminal process." *Van de Kamp*, 129 S. Ct. at 861 (quoting *Imbler*, 424 U.S. at 430). However, as this Court recognized in *Van de Kamp*, conduct outside of trial may be intimately connected with the judicial phase if it is "directly connected with the conduct of a trial" and requires "legal knowledge and the exercise of related discretion." *Id.* at 862. To the extent that respondents are seeking damages resulting from testimony of a witness at trial, they are challenging conduct directly connected to the conduct of a trial. The interview of the witness at issue in this case is directly connected to trial because the witness examined in that interview testified at trial, and an essential element of plaintiff's claim is that the witness gave false testimony at trial. In addition, when a prosecutor interviews a witness who is likely to testify at trial, the prosecutor uses his or her legal knowledge and discretion in determining whether that witness is being truthful and whether to present that witness at trial. Thus, under this Court's decision in *Van de Kamp*, respondents' claim involves conduct intimately associated with the judicial process to the extent that respondents are seeking damages resulting from the presentation of a witness at trial, and therefore their claim for damages is barred by absolute immunity.

This conclusion is consistent with this Court's decision in *Buckley v. Fitzsimmons*. In that case, this Court held that a prosecutor was not absolutely immune against allegations that he fabricated false evidence (there, expert testimony concerning a bootprint) during the investigative phase of a

criminal proceeding even though that evidence was eventually presented at trial. *See* 509 U.S. at 271-76; *see also id.* at 276 ("A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial . . . ."). *Buckley*, however, did not consider whether the plaintiff in that case had stated a valid claim, much less whether the plaintiff could recover damages for injuries resulting from the presentation of testimony at trial. *See id.* at 281-82 (Scalia, J., concurring) (noting that the plaintiff was unlikely to be able to state a cognizable claim based upon "the mere preparation of false evidence as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him"). As a consequence, *Buckley* did not endorse the tactics employed by respondents in this case.

Prosecutorial immunity is a practical doctrine, which affords prosecutors absolute immunity based upon the impact of claims on the prosecutorial function and the criminal justice system. Respondents should not be permitted to evade such immunity by artful pleading when the practical impact of their claim is exactly the same as a claim that this Court has found barred by absolute immunity. Instead, this Court should hold that claims that seek damages caused by presentation of evidence at trial are barred by prosecutorial immunity whatever theory of liability is pled, because such damage claims cause the same evils that led this Court to recognize absolute immunity in *Imbler*.

## CONCLUSION

The judgment of the court of appeals should be reversed.

Respectfully submitted,

JOHN W. SUTHERS
  Attorney General
  of Colorado
DANIEL D. DOMENICO
  Solicitor General
1525 Sherman St.
7th Floor
Denver, CO 80203
(303) 866-3052

KATHLEEN M. SULLIVAN
  *Counsel of Record*
DANIEL H. BROMBERG
51 Madison Avenue
22d Floor
New York, NY 10010
(212) 849-7000

July 20, 2009

DUSTIN MCDANIEL
    Attorney General of
    Arkansas
323 Center Street
Little Rock, AR 72201

JOSEPH R. BIDEN, III
    Attorney General of
    Delaware
Carvel State Office Bldg.
820 N. French Street
Wilmington, DE 19801

PETER J. NICKLES
    Attorney General of
    the District of
    Columbia
One Judiciary Square
441 4th Street, N.W.
Suite 1180 North
Washington, D.C. 20001

GREGORY S. ZOELLER
    Attorney General of
    Indiana
302 W. Washington St.
5th Floor
Indianapolis, IN 46204

LAWRENCE G. WASDEN
    Attorney General of
    Idaho
Idaho Attorney General
P.O. Box 83720
Boise, ID 83720

THOMAS J. MILLER
    Attorney General of
    Iowa
Second Floor
1305 East Walnut Street
Des Moines, IA 50319

JACK CONWAY
    Attorney General of
    Kentucky
700 Capitol Avenue
Suite 118
Frankfort, KY 40601

JAMES D. "BUDDY"
    CALDWELL
    Attorney General of
    Louisiana
P.O. Box 94005
Baton Rouge, LA 70804

JANET T. MILLS
    Attorney General of
    Maine
6 State House Station
Augusta, ME 04333

DOUGLAS F. GANSLER
    Attorney General of
    Maryland
200 Saint Paul Place
Baltimore, MD 21202

MARTHA COAKLEY
    Attorney General of
    Massachusetts
One Ashburton Place
Boston, MA 02108

MICHAEL A. COX
    Attorney General of
    Michigan
P.O. Box 30212
Lansing, MI 48909

JIM HOOD
Attorney General of
Mississippi
Department of Justice
P.O. Box 220
Jackson, MS 39205

CHRIS KOSTER
Attorney General of
Missouri
Supreme Court Building
207 West High Street
Jefferson City, MO 65101

CATHERINE CORTEZ
MASTO
Attorney General of
Nevada
100 North Carson Street
Carson City, NV 89701

GARY K. KING
Attorney General of
New Mexico
P.O. Drawer 1508
Santa Fe, NM 87504

ROY COOPER
Attorney General of
North Carolina
114 W. Edenton Street
PO. Box 629
Raleigh, NC 27602

WAYNE STENEHJEM
Attorney General of
North Dakota
600 E. Boulevard Avenue
Department 125
Bismark, ND 58505

RICHARD CORDRAY
Attorney General of
Ohio
30 East Broad Street
17th Floor
Columbus, OH 43215

W.A. DREW EDMONDSON
Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma      City,      OK
73105

THOMAS J. CORBETT, JR.
Attorney General of
Pennsylvania
Strawberry Square
16th Floor
Harrisburg, PA 17120

HENRY D. MCMASTER
Attorney General of
South Carolina
P.O. Box 11549
Columbia, SC 29211

LAWRENCE E. LONG
  Attorney General of
  South Dakota
1302 E. Highway 14
Suite 1
Pierre, SD 57501

ROBERT E. COOPER, JR.
  Attorney General and
  Reporter of
  Tennessee
P.O. Box. 20207
Nashville, TN 37202

MARK L. SHURTLEFF
  Attorney General of
  Utah
Utah State Capitol
Suite 230
P.O. Box 142320
Salt Lake City, UT 84114

WILLIAM C. MIMS
  Attorney General of
  Virginia
900 East Main Street
Richmond, VA 23219

ROBERT M. MCKENNA
  Attorney General
  of Washington
1125 Washington Street
P.O. Box 40100
Olympia, WA 98504