IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID F. EVANS, et al.,                )
                                       )
                    Plaintiffs,        )
                                       )
          v.                           )          1:07CV739
                                       )
THE CITY OF DURHAM,                    )
NORTH CAROLINA, et al.,                )
                                       )
                    Defendants.        )

MEMORANDUM OPINION

This matter is before the Court on multiple Motions to Dismiss filed by the various

Defendants in this matter. This case involves 23 claims set out in a 153-page Second Amended

Complaint [Doc. #116] by Plaintiffs David F. Evans ("Evans"), Collin Finnerty ("Finnerty"),

and Reade Seligmann ("Seligmann"), all of whom are former undergraduate students at Duke

University and former members of the 2006 Duke men's lacrosse team, against Defendants The

City of Durham ("the City"), District Attorney Michael B. Nifong ("Nifong"), Durham Police

Detective Mark Gottlieb ("Gottlieb"), Durham Police Department Investigator Benjamin

Himan ("Himan"), Durham Police Department Spokesperson David Addison ("Addison"),

District Attorney's Office Investigator Linwood Wilson ("Wilson"), Durham City Manager

Patrick Baker ("Baker"), Durham Chief of Police Steven W. Chalmers ("Chalmers"), Durham

Police Uniform Patrol Bureau Commander Beverly Council ("Council"), Deputy Chief of

Police Ronald Hodge ("Hodge"), Durham Police District Two Uniform Patrol Commander

Jeff Lamb ("Lamb"), Durham Police Department Lieutenant Michael Ripberger ("Ripberger"),

Executive Officer to the Chief of Police Lee Russ ("Russ"), DNA Security, Inc. ("DSI"), DSI

President Richard Clark ("Clark"), and DSI Lab Director Brian Meehan ("Meehan").

Defendants have collectively filed multiple Motions to Dismiss, specifically, a Motion to Dismiss by Defendant Wilson [Doc. #119], a Motion to Dismiss by Defendant Meehan [Doc. #126], a Motion to Dismiss by Defendants DSI and Clark [Doc. #123], a Motion to Dismiss by Defendants Chalmers, Council, Hodge, Baker, Lamb, Ripberger, and Russ [Doc. #124], a Motion to Dismiss by Defendant Himan [Doc. #125], a Motion to Dismiss by Defendant Gottlieb [Doc. #120], a Motion to Dismiss by Defendant Addison [Doc. #121], and a Motion to Dismiss by the City [Doc. #127]. In addition, although the claims against Defendant Michael Nifong were initially stayed when he filed for bankruptcy protection, Defendant Nifong has been added back to this case and has filed his own Motion to Dismiss [Doc. #117]. Defendants previously filed various Motions to Dismiss with respect to Plaintiffs' prior Amended Complaint, but those Motions to Dismiss were rendered moot by the filing of Plaintiffs' Second Amended Complaint on February 18, 2010. In their present Motions to Dismiss the parties have incorporated the prior briefing filed in connection with the original Motions to Dismiss and, as appropriate, have added additional briefing with respect to new matters raised in the Second Amended Complaint. The new Motions to Dismiss with respect to the Second Amended Complaint were referred to the Court for determination on May 4, 2010, and are addressed in this Memorandum Opinion.[1]

_____

[1] The Court notes that some of the issues raised in the Motions to Dismiss in the present case are similar to certain of the issues raised in two other cases in this District that have been identified by the parties and the Clerk's Office as "related" to the present case: McFadyen, et al. v. Duke University, et al. (1:07CV953) and Carrington, et al. v. Duke University, et al. (1:08CV119). Those cases also involve multiple Motions to Dismiss for which briefing has now been completed and which have been referred to the Court for consideration. Orders and

2

## I.    FACTUAL BACKGROUND

This case arises out of the investigation and ultimate indictment, arrest, and prosecution of Plaintiffs Evans, Finnerty, and Seligmann on charges of rape, sexual assault, and kidnapping. The prosecution of Plaintiffs was ultimately turned over to the North Carolina State Attorney General, who dismissed the charges and announced that Plaintiffs were in fact innocent of the charges. Plaintiffs subsequently filed the present suit. Because this matter is before the Court on Motions to Dismiss prior to any discovery, the Court must take as true all of the facts as set out in Plaintiffs' Second Amended Complaint.

Based on the facts set out in the Second Amended Complaint, the underlying events in this matter began on March 13, 2006. At that time, Plaintiffs Evans, Finnerty, and Seligmann were undergraduate students at Duke University and were members of the men's lacrosse team. On the evening of March 13, 2006, some members of the lacrosse team attended a party at the off-campus home of Plaintiff Evans at 610 N. Buchanan Avenue, where exotic dancers Crystal Mangum and Kim Pittman attempted a short performance. Plaintiffs allege that Mangum was under the influence of drugs or alcohol before, during, and after the performance. Mangum and Pittman subsequently left the party in Pittman's car. Plaintiffs allege that Mangum became belligerent and accused Pittman of stealing her purse and money. Pittman drove to a Kroger grocery store parking lot and tried to remove Mangum from her car.

---

Opinions are being entered in those cases contemporaneously with the present Order and Opinion in this case. These cases have not been formally consolidated, and are still proceeding as separate cases, although some consolidation of discovery may be appropriate in light of the overlapping issues raised. In addition, given the overlapping legal issues, much of the analysis presented in the three Opinions in these cases is the same. The Court restates the analysis in each case, however, so that each Opinion can stand alone.

3

Pittman asked for help from a security guard, who concluded that Mangum was intoxicated and called 911. Durham Police Department Sergeant John Shelton responded to the scene. Pittman told Sergeant Shelton that Mangum was intoxicated. Sergeant Shelton attempted to rouse Mangum and determined that Mangum was pretending to be unconscious. Sergeant Shelton removed Mangum from Pittman's car and directed officers to take Mangum to a local mental health clinic, Durham ACCESS, for observation. At the intake interview at Durham ACCESS, Mangum alleged that she had been raped at the party at 610 North Buchanan Avenue. Officers then transported her to Duke Medical Center for a rape exam. (Second Am. Compl. ¶ 37-48).

Sergeant Shelton came to Duke Medical Center to interview Mangum. Plaintiffs allege that during the interview, Mangum told Shelton she was a professional stripper, that she had been hired to perform with Pittman at 610 N. Buchanan, that an altercation broke out between Pittman and some of the audience, and that she and Pittman had then left the party. Plaintiffs allege that during this interview, Mangum denied that she had been forced to engage in sexual activity and instead claimed only that someone had taken her money. Plaintiffs allege that Shelton reported Mangum's recantation of her rape allegation to the Durham Police Watch Commander.

Plaintiffs allege that Mangum subsequently gave "wildly conflicting and patently implausible statements" to personnel at Duke Medical Center and to other Durham Police Officers regarding whether she had been raped at the party, and denied that she had engaged

4

in sexual intercourse prior to the alleged rape.[2] (Second Am. Comp ¶ 57-59). These conflicting statements included "separately and alternatively claim[ing] that she had been raped by three, four, five, and twenty different men," "that she had been performing at a bachelor's party, and that one of the alleged rapists was the groom," and "that her (now three) assailants were named Adam, Brett, and Matt." (Second Am. Compl. ¶ 58, 60, 61). Mangum also claimed that Pittman had assisted the rapists, that Pittman had threatened Mangum and pushed her out of the car onto glass, and that Pittman had stolen her money and possessions, which Plaintiffs allege officers knew was false given Sgt. Shelton's involvement in removing Mangum from the car. (Second Am. Compl. ¶ 62). Plaintiffs further allege additional conflicting statements by Mangum regarding whether she was drunk, whether she was in pain, and whether she had otherwise been physically assaulted. Plaintiffs allege that "Durham Police officers at Duke Medical Center were so convinced that Mangum's rape claim was a hoax that they were overheard stating that if any charges were brought relating to the party, they would not exceed misdemeanor assault." (Second Am. Compl. ¶ 66). Plaintiffs allege that Nifong, Addison, Gottlieb, Himan, Wilson, and the "Supervisory Defendants" (Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger) were aware of all of these facts, including the inconsistencies and contradictions in Mangum's account and the conclusions of Durham Police officers on the

---

[2] Plaintiffs allege that "[t]his statement was utterly disproved by subsequent DNA testing, which established, among other things, that the various rape kit items collected from Mangum contained DNA from at least four unidentified males—none of whom was a Duke lacrosse player—and that corroborated the witness statement provided by Mangum's driver, Jarriel Johnson. Johnson had told Durham Police that he had driven Mangum to various locations in the Durham area so that Mangum could have sexual intercourse with other men in the hours and days before the party, and that Johnson himself had had sexual intercourse with Mangum in the days before the party." (Second Am. Compl. ¶ 59).

scene. (Second Am. Compl. ¶ 67-68).

Personnel at Duke Medical Center performed a rape examination that "produced no physical or medical evidence consistent with either rape or the traumatic assault Mangum had claimed." (Second Am. Compl. ¶ 70). Plaintiffs allege that at the end of the examination, officers from the Durham Police Department took custody of the rape kit items for submission to the State Bureau of Investigation. (Second Am. Compl. ¶ 75).

Plaintiffs allege that on March 14, 2006, the responsibility for investigating Mangum's rape claim was assigned to Investigator B. Jones. Investigator Jones concluded that there was "no evidence to proceed with a criminal investigation and that the file would be closed." (Second Am. Compl. ¶ 80). However, rather than closing the investigation, Durham Police reassigned the investigation to Defendant Gottlieb, who, according to the Second Amended Complaint, was "known to supervisory officials in the City of Durham and the Durham Police Department as having a history of selective and malicious prosecution, false arrest, excessive use of force, manufacturing of evidence, and filing of false police reports against students at Duke University." (Second Am. Compl. ¶ 82). Plaintiffs contend that "Gottlieb was so notorious in his dislike of Duke students that he had even been reassigned from covering the Trinity Park neighborhood around Duke University because of his prior misconduct and abhorrent record with respect to Duke students." (Second Am. Compl. ¶ 82). Plaintiffs contend that Gottlieb was nevertheless put in charge of the investigation, which Durham Police knew was related to a party attended by Duke students. Gottlieb assigned Defendant Himan, an investigator who had started only two months earlier, to assist him with the investigation.

6

Plaintiffs allege that on March 16, 2006, Defendants Gottlieb and Himan interviewed Mangum. Plaintiffs allege that Mangum gave contradictory accounts of what had occurred and gave physical descriptions of her alleged attackers but could not identify them in photo arrays shown to her by Durham Police Investigator R.D. Clayton. Plaintiffs allege that Mangum was shown photo arrays again on March 21, but Mangum failed to identify anyone in the array as her attacker. Plaintiffs contend that Mangum did identify one individual that she was "100% confident that she had seen" at the party, but Durham Police confirmed that that individual was not at the party. (Second Am. Compl. ¶ 98). Plaintiffs contend that Mangum gave a subsequent written statement to Gottlieb and Himan on April 6, 2006, and that she "continued to contradict her various, already-inconsistent accounts." (Second Am. Compl. ¶ 101). Plaintiffs allege that Durham Police subsequently learned that several years earlier, Mangum had claimed that she had been the victim of a purported gang rape by three men, which police had declined to pursue at the time. (Second Am. Compl. ¶ 105).

Plaintiffs allege that on March 20, 2006, Himan spoke with Kim Pittman, the exotic dancer who had performed with Mangum. During the interview, Pittman stated that the assault allegations were a "crock" and that "there was no opportunity for the alleged assault to have occurred." (Second Am. Compl. ¶ 87). Plaintiffs allege that Gottlieb, acting with "the intent to obstruct justice and to tamper with a witness," instructed Himan to "summon Pittman to their Durham Police station and to arrest her on an outstanding warrant if she did not recant her prior statement that Mangum was lying." (Second Am. Compl. ¶ 87, 88).

Plaintiffs allege that Gottlieb and Himan obtained and executed a search warrant for

Plaintiff Evans' home at 610 N. Buchanan where the alleged assault had occurred, and that the residents, including Plaintiff Evans, cooperated with police. (Sec Am. Compl. ¶ 110). Plaintiffs allege that Evans and the other residents of the house voluntarily submitted to "hours of isolated interviews" at the police station, and voluntarily provided DNA and hair samples. (Second Am. Compl. ¶ 112-115). Plaintiffs allege that on March 22 and 23, 2006, Gottlieb and Himan obtained a Non-Testimonial Order requiring white members of the lacrosse team to provide DNA samples, submit to physical examinations, and allow themselves to be photographed.[3] The members of the lacrosse team, including Plaintiffs, fully cooperated with the Non-Testimonial Order. (Second Am. Compl. ¶ 120-122).

Plaintiffs allege that on March 24, 2006, Defendant Nifong, the Interim District Attorney for the Fourteenth Prosecutorial District of North Carolina, learned of the investigation. At the time, according to the Second Amended Complaint, Nifong "was engaged in a hotly-contested political campaign" to be elected as District Attorney. (Second Am. Compl. ¶ 128). Plaintiffs allege that Nifong recognized that "he was in a position to exploit Mangum's high-profile, racially-charged rape allegation for his personal political gain." (Second Am. Compl. ¶ 130). Plaintiffs allege that Nifong contacted Durham Police officials, who agreed that Nifong would direct the police investigation. (Second Am. Compl. ¶ 131). Plaintiffs allege that Defendant Lamb instructed Gottlieb and Himan to take direction from Nifong regarding the investigation, and were further instructed to report the investigation's progress to Durham Police senior command staff. (Second Am. Compl. ¶ 133). Nifong assigned Defendant

---

[3] Only the white members of the team were subject to the Non-Testimonial Order because Mangum claimed that her alleged attackers were white.

Wilson, an investigator with the District Attorney's Office, to coordinate with Gottlieb and Himan with respect to the police investigation. (Second Am. Compl. ¶ 135).

Plaintiffs allege that Nifong met with Gottlieb and Himan on March 27, 2006 for a briefing regarding the investigation. According to the Second Amended Complaint, based on the information presented at that meeting, Nifong recognized "that there was no basis to charge the three innocent Duke lacrosse players." (Second Am. Compl. ¶ 138). Nifong nevertheless proceeded to provide extensive interviews with news media in which he stated that "he had 'no doubt' that three members of the Duke lacrosse team had engaged in a vicious and racially-motivated gang rape" and made multiple other statements as set out in the Second Amended Complaint. (Second Am. Compl. ¶ 146-147).

Plaintiffs allege that on or about March 30, 2006, the SBI crime lab finished its analysis of the rape kit, which revealed "no fibers, foreign hairs, blood, semen, sperm, or other forensic evidence supporting Mangum's allegations." (Second Am. Compl. ¶ 149). Plaintiffs contend that Nifong nevertheless continued to make public statements in support of Mangum's claims. (Second Am. Compl. ¶ 150). Plaintiffs allege that members of the Durham Police Department, specifically Spokesperson Addison and Defendant Hodge, also made statements falsely indicating that Mangum had been brutally assaulted by members of the Duke lacrosse team and that members of the lacrosse team were obstructing justice. (Second Am. Compl. ¶ 156-160). This included a "Wanted" poster for members of the lacrosse team that Addison disseminated in and around the Duke campus.

Plaintiffs allege that on March 28 and 29, 2006, the SBI crime lab personnel notified

9

Nifong that "they had examined the items from the rape kit and were unable to find any semen, blood, or saliva on any of the rape kit items." (Second Am. Compl. ¶ 170). Plaintiffs allege that Nifong was subsequently provided with a report from the SBI concluding "that no DNA from any of the players was found on the accuser's rape kit items or clothing; that DNA from one of the residents of 610 N. Buchanan was found on a towel in the house; and that DNA from another resident of 610 N. Buchanan was found on the floor in one of the bathrooms in the

house." (Second Am. Compl. ¶ 172). However, Plaintiffs allege that Nifong continued to make public statements and began to "tailor his comments" to match these results. (Second Am. Compl. ¶ 173).

Plaintiffs allege that despite knowing that there was "no evidence to corroborate Mangums's various inconsistent and contradictory accounts," Nifong then began a conspiracy with Durham Police, including Gottlieb, Himan, and the Supervisory Defendants, to manufacture false identifications and falsify DNA testing results in order to support charges against Plaintiffs. (Second Am. Compl. ¶ 175-176). On March 29, 2006, the Supervisory Defendants, including Defendants Baker, Chalmers, and Hodge, met with Himan and Gottlieb and ordered them to "expedite the identifications and arrests of Duke lacrosse players, notwithstanding the evidence demonstrating Plaintiffs' innocence, in order to satisfy a Durham community that had been misled by the false and inflammatory Nifong Statements and Durham Police Statements into believing that three white Duke lacrosse players had committed a violent and racially-motivated gang rape." (Second Am. Compl. ¶ 179). Plaintiffs allege that

on March 31, 2006, Himan and Gottlieb met with Nifong to develop a new identification procedure in which Mangum would be shown an array consisting solely of photographs of Duke lacrosse players. Nifong, Gottlieb and Himan "designed and conducted this suggestive procedure with the intention that the identifications it produced would be used to obtain indictments and convictions of three Duke lacrosse players." (Second Am. Compl. ¶ 181). Plaintiffs allege that Defendants Lamb and Ripberger and the other Supervisory Defendants approved and later ratified this procedure, even though it was contrary to official policy. (Second Am. Compl. ¶ 182-183). On April 4, 2006, the photo array was shown to Mangum, and she was instructed that "every photograph she would be shown was an individual who attended the party." (Second Am. Compl. ¶ 188). Mangum then picked Plaintiffs from the photo array, although in doing so she contradicted previous descriptions and statements she had given. (Second Am. Compl. ¶ 191-194).

Also on April 4, 2006, Nifong began searching for another laboratory to conduct DNA testing. Durham Police investigators located DSI, a laboratory in Burlington, North Carolina, that could perform more sensitive DNA testing. Plaintiffs allege that DSI's Lab Director, Defendant Meehan, was willing to "cut its standard prices" in order to be involved in the investigation. (Second Am. Compl. ¶ 200). Plaintiffs allege that Nifong obtained an Order to allow for the transfer of the rape kit and reference DNA samples to DSI for additional testing. DSI's subsequent analysis revealed DNA from other unidentified males, none of whom was a Duke lacrosse player. The analysis "resulted in the exclusion with 100% certainty of all members of the lacrosse team, including the three innocent Plaintiffs, as possible donors of

DNA found on the rape kit items." (Second Am. Compl. ¶ 206). Plaintiffs allege that on April 10, 2006, Nifong, Himan, and Gottlieb met with Meehan and DSI President Clark, and Meehan orally reported the results of the analysis. However, Plaintiffs allege that Nifong, Himan, Gottlieb, Clark, and Meehan "conspired to conceal and obfuscate these exculpatory results" in order to "manufacture probable cause, obtain indictments, and subsequently prosecute three Duke lacrosse players on rape charges." (Second Am. Comp. ¶ 208-209). The intended effect of this conspiracy was to "facilitate an indictment and prosecution of the three innocent Duke lacrosse players, while concealing the true results of DNA testing, which established Plaintiffs' actual innocence." (Second Am. Compl. ¶ 210). The Second Amended Complaint further alleges that the Supervisory Defendants were aware of the DNA testing and this illicit agreement but continued to allow Nifong to have responsibility for the investigation and continued to allow Gottlieb and Himan participate in this investigation.

On April 17, 2006, Nifong obtained grand jury indictments against Plaintiffs Finnerty and Seligmann for first-degree rage, first-degree sex offense, and kidnapping "in order to deprive the two innocent Duke lacrosse players of their civil rights and to assure his own election to the position of District Attorney." (Second Am. Compl. ¶ 214). Plaintiffs allege that Gottlieb and Himan provided inculpatory testimony before the grand jury, "despite actual knowledge of Finnerty's and Seligmann's innocence." (Second Am. Compl. ¶ 215). Plaintiffs allege that Nifong, Gottlieb, Himan, and the Supervisory Defendants agreed not to provide information to the grand jury regarding Mangum's varying and inconsistent accounts of events. Instead, Nifong, Gottlieb, and Himan "agreed in advance of the April 17 Indictments that they

12

would mislead the grand jury as to the nature of the evidence concerning Finnerty and Seligmann." (Second Am. Compl. ¶ 219).

On April 21, 2006, Nifong, Gottlieb, and Himan met again with Meehan and Clark at DSI's offices. Plaintiffs allege that at the meeting, Meehan reported that DNA from at least four different men was found on the items in the rape kit, and none of the DNA matched any of the Duke lacrosse players. Plaintiffs allege that Defendants Nifong, Gottlieb, Himan, Meehan, and Clark nevertheless agreed to "conceal and obfuscate this exculpatory evidence," and "conspired and acted to fabricate [a] false and misleading report." (Second Am. Compl. ¶ 225-226). The "intended and actual effect of this illicit agreement was to fabricate a false and misleading 'final' report of DNA testing" while concealing "the true results of DNA testing" in order to "sustain the prosecutions of Finnerty and Seligmann, and support and sustain the indictment and prosecution of Evans." (Second Am. Compl. ¶ 226). Plaintiffs allege that as part of the conspiracy, "these Defendants agreed that there would be no report or notes memorializing the substance of their discussions" during the meeting. (Second Am. Compl. ¶ 225). Plaintiffs allege that the Supervisory Defendants were aware of this conspiracy but continued to allow Nifong to direct the investigation and Gottlieb and Himan to participate in it. Plaintiffs allege that Meehan subsequently prepared a report, and Nifong, Himan, Meehan and Clark agreed that the report would be provided to Plaintiffs "under the knowingly false pretense that it represented the final report of DSI's work and contained all of DSI's findings with respect to DNA testing." (Second Am. Compl. ¶ 231).

Plaintiffs allege that on May 15, 2006, Nifong used the report, "which Nifong knew to

13

be misleading," to cause a grand jury indictment to be returned against Plaintiff Evans for first-degree rape, first-degree sexual offense, and kidnapping. (Second Am. Compl. ¶ 238). Plaintiffs allege that Gottlieb, Himan, and Nifong agreed in advance of the Indictment "that they would mislead the grand jury as to the evidence concerning Evans." (Second Am. Compl. ¶ 241).

Plaintiffs allege that after the indictments were obtained, Defendants engaged in further misconduct to conceal their earlier actions and to continue to restrain Plaintiffs and deny them due process. For example, Plaintiffs allege that when taxicab driver Moezeldin Ahmad Elmostafa provided a statement confirming that he had picked Plaintiff Seligmann up prior to the time of the purported attack, Nifong, Wilson, and Himan investigated and then arrested Elmostafa in an effort to force him to recant Seligmann's alibi. (Second Am. Compl. ¶ 245-253). In addition, Plaintiffs allege that Himan and Gottlieb, acting at the direction or approval of the Supervisory Defendants, arrested Pittman after she stated that Mangum's rape allegations were a "crock," and offered her "a deal on her parole violation" if she changed her categorical denial and her timeline of events. (Second Am. Compl. ¶ 256-260). Plaintiffs also allege that Defendants Nifong, Wilson, Lamb, Gottlieb, and Himan, at the direction of the Supervisory Defendants, attempted to intimidate and discredit Durham Police Officer Shelton for reporting Mangum's recanting of her rape claim on March 13. (Second Am. Compl. ¶ 264). Plaintiffs further allege that in July 2006, Defendant Gottlieb created an after-the-fact "report" of the investigation, which was "an intentional fabrication in an attempt to cover up inconsistencies and contradictions in Mangum's actual statements regarding the incident." (Second Am.

Compl. ¶ 266-267). Plaintiffs allege that as part of this fabricated account, "in order to conceal the disparities between Mangum's actual description of her alleged attackers during the March 16 interview and the Plaintiffs, Gottlieb simply invented a new account that Mangum had purportedly given during the March 16 interview." (Second Am. Compl. ¶ 269).

As the prosecution proceeded, Plaintiffs allege that "Defendants continued to make false public statements in an attempt to continue their conspiracy, to cover up their own wrongdoing, and to maintain the inflammatory atmosphere." (Second Am. Compl. ¶ 272). Plaintiffs allege that Nifong affirmatively and intentionally misrepresented to the state court on multiple occasions that he was aware of no other exculpatory evidence or DNA testing, and that he had provided Plaintiffs with all discovery materials, which were false statements of material fact. (Second Am. Compl. ¶ 275-308). At Nifong's direction, Defendant Wilson subsequently met with Mangum "the sole purpose of which was to revive the prosecution by persuading Mangum to alter her statements to conform to the revelations regarding the lack of Plaintiffs' DNA on the rape kit items." (Second Am. Compl. ¶ 310). Plaintiffs allege that during the interview, Mangum provided another contradictory account of events and recanted her rape allegations. However, Nifong did not dismiss the prosecution and continued with the sexual assault and kidnapping charges.

In December 2006, ethics complaints against Nifong were filed with the North Carolina State Bar based on his conduct in the investigation and prosecution of Plaintiffs. On January 12, 2007, Nifong recused himself from the prosecution and referred the cases to the North Carolina Attorney General. The Attorney General "conducted an intensive, independent

15

investigation" and ultimately "dismissed all of the remaining charges" against Plaintiffs, concluding that Plaintiffs were innocent of all charges against them. (Second Am. Compl. ¶ 318-319). The Attorney General concluded that "'these cases were the result of a tragic rush to accuse and a failure to verify serious allegations.'" (Second Am. Compl. ¶ 320). Nifong was subsequently disbarred by the North Carolina State Bar and was found guilty of criminal contempt in state court for his conduct during the prosecution of the charges against Plaintiffs. (Second Am. Compl. ¶ 326-328).

Plaintiffs subsequently filed the present suit alleging, *inter alia*, that Defendants maliciously conspired to bring the charges against them, that Defendants knew that the charges against Plaintiffs were unsupported by probable cause, that Defendants concealed evidence and fabricated false evidence to support the charges, that Defendants made false public statements about the investigation, and that Defendants conspired to charge Plaintiffs on facts they knew to be untrue. Based on these allegations, Plaintiffs contend that Defendants violated their rights under the Federal Constitution and Federal Statutes, and under North Carolina state law. Specifically, Plaintiffs assert the following claims: (1) 42 U.S.C. § 1983 claim for Malicious Prosecution and Seizure; (2) 42 U.S.C. § 1983 claim for Concealment of Evidence; (3) 42 U.S.C. § 1983 claim for Fabrication of False Evidence; (4) 42 U.S.C. § 1983 claim for False Public Statements; (5) 42 U.S.C. § 1983 claim against the City pursuant to <u>Monell</u>; (6) 42 U.S.C. § 1983 claim for "Supervisory Violations"; (7) 42 U.S.C. § 1983 claim for Conspiracy; (8) 42 U.S.C. § 1985(2) claim for Obstruction of Justice; (9) 42 U.S.C. § 1985(2) claim for Witness Tampering; (10) 42 U.S.C. § 1985(3) claim for Conspiracy; (11) 42 U.S.C. § 1986 claim for

Conspiracy (Durham Police); (12) 42 U.S.C. § 1986 claim for Conspiracy (DSI); (13) Malicious

Prosecution; (14) Obstruction of Justice; (15) Intentional Infliction of Emotional Distress; (16)

Negligence by Durham Police; (17) Negligent Supervision, Hiring, and Training by Durham

Police; (18) Negligent Infliction of Emotional Distress by Durham Police; (19) Negligent

Infliction of Emotional Distress by Durham Police; (20) Negligence by DSI; (21) Negligent

Supervision, Hiring and Training by DSI; (22) Negligent Infliction of Emotional Distress by

DSI; and (23) violation of the North Carolina Constitution.

Plaintiffs' claims and contentions in the Second Amended Complaint are directed

selectively against the various Defendants, and those Defendants can be divided into six groups

for purposes of analyzing the claims and the various Motions to Dismiss: (1) Defendant

Nifong, who was the District Attorney, and Defendant Wilson, who was the Investigator

employed by the District Attorney's Office ("Defendants Nifong and Wilson" or "the DA

Defendants"), (2) Defendant Gottlieb, who was the detective with the Durham Police

Department, and Defendant Himan, who was the investigator employed by the Durham Police

Department, both of whom were directly involved in the investigation ("Defendants Gottlieb

and Himan" or "the Police Officer Defendants"); (3) Defendant DSI, which was the DNA

testing lab retained to provide forensic analysis services relating to the investigation, as well as

DSI's President, Defendant Clark, and the lab director, Defendant Meehan ("the DSI

Defendants"), (4) Defendant Addison, the Durham Police Department spokesperson

("Addison"); (5) Defendant Baker, who was the Durham City Manager; Defendant Chalmers,

who was the Durham Chief of Police; Defendant Council, who was the Commander of the

Durham Police Uniform Patrol Bureau; Defendant Hodge, who was the Deputy Chief of Police; Defendant Lamb, who was the Commander of the Durham Police District Two Uniform Patrol; Defendant Ripberger, who was a Lieutenant with the Durham Police Department; and Defendant Russ, who the was Executive Officer to the Chief of Police (collectively, the "Supervisory Defendants,") and (6) the City of Durham, which operates the Durham Police Department ("the City"). In considering the various Motions to Dismiss, the Court will first outline the applicable legal standard for considering motions to dismiss, and will then apply that standard to analyze each of the 23 claims raised by Plaintiffs in this case.

## II.  STANDARD OF REVIEW ON MOTIONS TO DISMISS

In reviewing a Motion to Dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Fourth Circuit has directed that "we 'take the facts in the light most favorable to the plaintiff,' but 'we need not accept the legal conclusions drawn from the facts,' and 'we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" Giarratano v. Johnson, 521 F.3d 298, 302, 304 (4th Cir. 2008) (quoting Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000)).  In Ashcroft v. Iqbal, the Supreme Court addressed the appropriate standard for analyzing motions to dismiss pursuant to Rule 12(b)(6), noting that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)).  The Court in Iqbal laid out "two working principles" for considering Rule 12(b)(6) motions to dismiss.  First, the Court in Iqbal

18

noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" or "'naked assertions' devoid of 'further factual enhancement'" will not do. Id. In this regard, the Iqbal Court noted that Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief," but Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1949, 1950. Thus, in considering a Rule 12(b)(6) Motion to Dismiss, courts may begin by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950.

Second, the Iqbal Court noted that "only a complaint that states a plausible claim for relief survives a motion to dismiss," and therefore courts must determine whether the facts actually pled in the complaint show that the pleader is entitled to relief. Id. Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. at 1949 (internal citations omitted). Thus, dismissal of a complaint is proper where

plaintiffs' factual allegations fail to "produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" <u>Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 256 (4th Cir. 2009) (citing <u>Iqbal</u>, 129 S. Ct. at 1952 (internal quotation omitted)).

In considering claims that are asserted under state law, the Court "must rule as the North Carolina courts would, treating decisions of the Supreme Court of North Carolina as binding, and 'departing from an intermediate court's fully reasoned holding as to state law only if 'convinced' that the state's highest court would not follow that holding.'" <u>Iodice v. United States</u>, 289 F.3d 270, 275 (4th Cir. 2002). However, pleading standards are a matter of procedural law governed in this Court by federal, not state, law. <u>See</u> <u>Jackson v. Mecklenburg County, N.C.</u>, No. 3:07-cv-218, 2008 WL 2982468, at *2 (W.D.N.C. July 30, 2008) ("North Carolina substantive law applies to the elements of Plaintiffs' state law claims but the Federal Rules of Civil Procedure govern procedural law and North Carolina 'pleading requirements, so far as they are concerned with the degree of detail to be alleged, are irrelevant in federal court even as to claims arising under state law.'" (quoting <u>Andresen v. Diorio</u>, 349 F.3d 8, 17 (1st Cir. 2003) (citations omitted))). Therefore, the <u>Iqbal</u> procedural pleading standard applies to both federal and state law claims in this case.

## III.   ANALYSIS OF CLAIMS ASSERTED IN THIS CASE

The Court will consider each of Plaintiffs' alleged claims to determine whether Plaintiffs have stated a claim under these standards and the applicable state and federal law. The Court will consider each of the counts in the order in which they are asserted. Most of the counts will

20

be considered individually, although some of the overlapping claims in this case are considered together.  The Court acknowledges that there may still be some duplication of analysis between similar claims, except where it can be avoided, but the Court has organized the analysis in this way in order to ensure that each claim is separately addressed.

**Counts 1, 2, 3:**  **42 U.S.C. § 1983 claims for violations of the Fourth and Fourteenth Amendments, based on Malicious Prosecution and Seizure, Concealment of Evidence, and Fabrication of False Evidence, asserted against Defendant Nifong, Gottlieb, Himan, Wilson, Clark, Meehan, and DSI, in their individual capacities**

Counts 1 through 3 are claims for malicious prosecution, concealment of evidence, and fabrication of false evidence asserted against Defendants Nifong and Wilson (the DA Defendants), DSI, Clark, and Meehan (the DSI Defendants), and Gottlieb and Himan (the Investigators), individually, and are all related to Plaintiffs' contention that they were arrested and prosecuted without probable cause.  These claims are brought pursuant to 42 U.S.C. § 1983, which prohibits any person, acting under color of state law, from depriving an individual of their rights secured under the Constitution and laws of the United States.

Count 1 alleges a claim for "Malicious Prosecution and Seizure" for initiating and continuing criminal prosecutions against Plaintiffs without probable cause.  Count 2 alleges a claim for "Concealment of Evidence" for "concealing and obfuscating" evidence in order to manufacture probable cause to obtain indictments.  Count 3 alleges a claim for "Fabrication of False Evidence" for conspiring to produce a false and misleading DNA report, intimidating witnesses to obtain false statements to manufacture probable cause, and  manipulating photo arrays to secure false witness identifications, all in order to manufacture probable cause and

secure indictments against Plaintiffs, resulting in the unconstitutional seizure of Plaintiffs in violation of the Fourth and Fourteenth Amendments. In Plaintiffs' Consolidated Response, Plaintiffs note that Counts 1, 2, and 3 are all based on claims for unlawful seizure pursuant to a legal process that was not supported by probable cause, in violation of the Fourth Amendment made applicable to the States through the Fourteenth Amendment. Plaintiffs further note that Counts 2 and 3 are also based on violation of the Fourteenth Amendment Due Process Clause for bad faith concealment of evidence and fabrication of evidence to mislead the grand juries about probable cause and thus effect the unlawful seizure of Plaintiffs.

The constitutional rights at issue with respect to these claims are (1) the right under the Fourth Amendment not to be seized without probable cause and (2) the right under the Fourteenth Amendment not to be deprived of liberty without due process of law. Defendants contend that Plaintiffs have not alleged a violation of the Fourth or Fourteenth Amendment, and that they are entitled to "qualified immunity" because "[g]overnment officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Washington v. Wilmore, 407 F.3d 274, 281 (4th Cir. 2005) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). Therefore, if the Court determines that Plaintiffs' constitutional rights would have been violated on the facts alleged, the Court must then "consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir.

22

2002).[4] If it would have been clear to an objectively reasonable officer that his conduct violated that right, qualified immunity would not apply. The Court will therefore consider these claims, and the "qualified immunity" defense, first with respect to the Fourth Amendment, and then with respect to the Fourteenth Amendment Due Process Clause.

A.     Fourth Amendment Violations

As the basis for Counts 1, 2, and 3, Plaintiffs first contend that their Fourth Amendment rights were violated based on their "seizure," that is, their arrest, without probable cause. "'The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable.'" Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007) (quoting Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996)).  The Fourth Circuit has held that claims for arrest and prosecution without probable cause are cognizable under the Fourth Amendment, which "define[s] the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial."  Taylor v. Waters, 81 F.3d 429, 436 (4th Cir. 1996) (applying Albright v. Oliver, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994)); see also Lambert v. Williams, 223 F.3d 257, 261 (4th Cir. 2000) (noting that under Albright, the "right

_____

[4] In determining whether a governmental official is entitled to qualified immunity, the Court must first decide "'whether a constitutional right would have been violated on the facts alleged.'" Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002) (quoting Saucier v. Katz, 533 U.S. 194, 200, 121 S. Ct. 2151, 2155, 150 L. Ed. 2d 272 (2001)).  If the violation of the right is established, "courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right."  Id. However, pursuant to Pearson v. Callahan, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009).

23

to be free from prosecution without probable cause was not a substantive due process right, but rather was . . . a right to be free from unreasonable seizures"). In considering the scope of such a claim based on the Fourth Amendment, the Fourth Circuit has held that a plaintiff's allegations that he was seized "pursuant to legal process that was not supported by probable cause and that the criminal proceedings terminated in his favor are sufficient to state a § 1983 malicious prosecution claim alleging a seizure that was violative of the Fourth Amendment." Brooks, 85 F. 3d at 183-84. In Albright v. Oliver, 510 U.S. 266, 276-81, 114 S. Ct. 807, 814-17, 127 L. Ed. 2d 114 (1994) (Ginsburg, J., concurring), Justice Ginsburg noted that submission to arrest is unquestionably a "seizure" and further noted that subsequent misconduct, prior to dismissal of the charges, can perpetuate the Fourth Amendment violation. Therefore, § 1983 claims for "malicious prosecution" based on arrest pursuant to legal process not supported by probable cause are potentially cognizable under the Fourth Amendment.

Defendants nevertheless contend that with respect to this Fourth Amendment claim in the present case, the determination by the grand jury to indict Plaintiffs conclusively establishes the existence of probable cause and effectively bars any potential § 1983 claim based on an alleged Fourth Amendment violation. Defendants further note that there is no duty to present exculpatory evidence to the grand jury, and failure to present exculpatory evidence to the grand jury cannot establish a constitutional violation.

However, in considering similar contentions in the context of a Bivens claim, the D.C. Circuit recently concluded that in a civil case for malicious or retaliatory prosecution, a grand jury indictment is only prima facie evidence of probable cause that may be rebutted by evidence

24

that the indictment was "produced by fraud, corruption, perjury, fabricated evidence, or other

wrongful conduct undertaken in bad faith." Moore v. Hartman, 571 F.3d 62, 69 (D.C. Cir.

2009). The D.C. Circuit pointed to the weight of authority on this issue among the circuits,

noting that

> several of our sister circuits have held that a grand jury indictment is prima facie
> evidence of probable cause which may be rebutted. See, e.g., White v. Frank, 855 F.2d
> 956, 961-62 (2d Cir. 1988) ("[T]hough an indictment by a grand jury is generally
> considered prima facie evidence of probable cause in a subsequent civil action for
> malicious prosecution, this presumption may be rebutted by proof that the defendant
> misrepresented, withheld, or falsified evidence."); see also Gonzalez Rucci v. INS, 405
> F.3d 45, 49 (1st Cir. 2005) (generally an indictment establishes probable cause, but there
> is an exception if law enforcement officers knowingly presented false testimony to the
> grand jury); Rothstein v. Carriere, 373 F.3d 275, 282-83 (2d Cir.2004) (grand jury
> indictment creates presumption of probable cause; may be rebutted if plaintiff
> "establish[es] that the indictment was produced by fraud, perjury, the suppression of
> evidence or other police conduct undertaken in bad faith"); Riley v. City of
> Montgomery, Alabama, 104 F.3d 1247, 1254 (11th Cir. 1997) ("[A]n indictment is prima
> facie evidence of probable cause which can be overcome by showing that it was induced
> by misconduct."); Rose v. Bartle, 871 F.2d 331, 353 (3d Cir. 1989) (grand jury
> indictment "constitutes prima facie evidence of probable cause to prosecute,
> but . . . may be rebutted by evidence that the presentment was procured by fraud,
> perjury or other corrupt means"); Hand v. Gary, 838 F.2d 1420, 1426 (5th Cir. 1988)
> ("obtaining an indictment is not enough to insulate state actors from an action for
> malicious prosecution under § 1983" when "finding of probable cause remained tainted
> by the malicious actions of the government officials"); Harris v. Roderick, 126 F.3d
> 1189, 1198 (9th Cir. 1997) (same; explicitly adopts reasoning of Hand). Cf. Awabdy v.
> City of Adelanto, 368 F.3d 1062, 1067 (9th Cir. 2004) (in a later civil action for malicious
> prosecution, a judicial finding of probable cause in a criminal proceeding is prima facie
> evidence of probable cause which may be rebutted by a "showing that the criminal
> prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other
> wrongful conduct undertaken in bad faith"); Hinchman v. Moore, 312 F.3d 198 (6th Cir.
> 2002) (a judicial finding of probable cause in a criminal proceeding does not bar a future
> malicious prosecution claim where plaintiff alleges the police officer supplied false
> information to establish probable cause); DeLoach v. Bevers, 922 F.2d 618, 620-21
> (10th Cir. 1990) (despite judicial determination of probable cause, police officer "cannot
> hide behind the decisions of others involved in [plaintiff's] arrest and prosecution if she
> deliberately conceals and mischaracterizes exculpatory evidence").

25

Moore, 571 F.3d at 67. The D.C. Circuit acknowledged that in the criminal context, "the return of an indictment conclusively establishes probable cause" but nevertheless concluded that "[n]othing in these cases requires that their holdings control in a civil action such as this in which an essential element of the cause of action is a lack of probable cause." Id. at 68.

The Fourth Circuit has likewise recognized that when police officers effect a "seizure" by arresting an individual pursuant to an arrest warrant, the officers are liable under the Fourth Amendment if the officers "intentionally lie in warrant affidavits, or recklessly include or exclude material information known to them." Miller, 475 F.3d at 630. Thus, "[a]n investigation need not be perfect, but an officer who intentionally or recklessly puts lies before a magistrate, or hides facts from him, violates the Constitution unless the untainted facts themselves provide probable cause." Id. at 630-31; Brooks v. City of Winston-Salem, 85 F.3d 178, 183-84 (4th Cir. 1996); see also Washington, 407 F.3d at 283 ("[A] grand jury's decision to indict" will not "shield a police officer who deliberately supplied misleading information that influenced the decision." (quoting Jones v. Chicago, 856 F.2d 985, 994 (7th Cir. 1988))); White v. Wright, 150 Fed. Appx. 193, 196-98 (4th Cir. 2005) (applying this rule where allegedly false evidence was used by prosecutors before a grand jury to obtain an indictment that resulted in the plaintiff's seizure, but finding that plaintiff had failed to present evidence of non-testimonial acts by the officers); Hand v. Gary, 838 F.2d 1420, 1427-28 (5th Cir. 1988) (concluding that an official is not liable for a Fourth Amendment violation for an arrest based on a warrant or an indictment "if the facts supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury," but further finding that "[a]ny misdirection

26

of the magistrate or the grand jury by omission or commission perpetuates the taint of the original official behavior").

With regard to omissions, the Fourth Circuit has noted that "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," but a facially sufficient affidavit is still subject to challenge if it includes "omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate." United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990) (emphasis in original). In this context, "'[r]eckless disregard' can be established by evidence that an officer acted 'with a high degree of awareness of [a statement's] probable falsity,' that is, 'when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" Miller, 475 F.3d at 627 (quoting Wilson v. Russo, 212 F.3d 781, 788 (3d Cir. 2000)). Likewise, as to omissions, "'reckless disregard' can be established by evidence that a police officer 'failed to inform the judicial officer of facts [he] knew would negate probable cause.'" Id. (quoting Beauchamp v. City of Noblesville, Inc., 320 F.3d 733, 743 (7th Cir. 2003)). However, "[a] plaintiff's 'allegations of negligence or innocent mistake' by a police officer will not provide a basis for a constitutional violation." Id. at 627-28 (quoting Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684, 57 L. Ed. 2d 667 (1978)). Thus, where officials deliberately or recklessly supply false or misleading information that is used to obtain an indictment, or deliberately or recklessly omit material information that the officials know would negate probable cause, the officials may be liable if their actions result in the seizure of an individual

27

without probable cause.

Based on these cases, this Court concludes that the Fourth Circuit would recognize a potential § 1983 claim for violation of the Fourth Amendment when an individual is arrested pursuant to legal process that was not supported by probable cause, if the criminal proceedings terminated in the individual's favor. See Brooks, 85 F. 3d at 183-84. In addition, the Fourth Circuit has also recognized that even when a probable cause determination has been made by a neutral third party, "an officer who intentionally or recklessly puts lies before a magistrate, or hides facts from him, violates the Constitution unless the untainted facts themselves provide probable cause." Miller, 475 F.3d at 630-31. Therefore, this Court concludes that a potential § 1983 claim for violation of an individual's Fourth Amendment rights could be stated based on an official's intentional or reckless creation of false or misleading evidence that is necessary to a finding of probable cause and that is used before a magistrate judge or grand jury to ultimately effect the individual's arrest, or the deliberate or reckless omission of material information that the officials know would negate probable cause, if the criminal proceedings ultimately terminated in the individual's favor.[5]

---

[5] The Court acknowledges that these doctrines are ordinarily applied where the probable cause determination has been made by a magistrate judge issuing an arrest warrant, rather than by a grand jury. Therefore, with respect to claims that government officials prepared false and misleading evidence for presentation in grand jury proceedings in order to deprive citizens of their liberty rights, the constitutional violation might be more appropriately viewed as a due process violation rather than a Fourth Amendment violation, and that possibility is also discussed *infra*. However, the Supreme Court's decision in Albright v. Oliver, 510 U.S. 266, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994), although not addressing the context of grand jury proceedings, could be read to require that any claims for pre-trial deprivations of liberty be analyzed under the Fourth Amendment. The Court has therefore considered the claims as Fourth Amendment claims.

To the extent that Defendants have raised a "qualified immunity" defense, the Court concludes that there is no question that these rights were clearly established, and no reasonable official could have believed that it was permissible to deliberately or recklessly create false or misleading evidence to present to a grand jury to effect a citizen's indictment and arrest. <u>See</u> <u>Miller</u>, 475 F.3d at 631-32 ("[T]he Supreme Court has long held that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or 'with reckless disregard for the truth' makes material false statements or omits material facts. . . . No reasonable police officer . . . could believe that the Fourth Amendment permitted such conduct." (internal citations omitted)); <u>Brooks</u>, 85 F.3d at 183-84.[6] At the time of the acts alleged in the Second Amended Complaint, the Fourth Amendment rights outlined above were clearly established, and no reasonable official could have believed that it was permissible to deliberately or recklessly create false or misleading evidence to obtain an indictment in the absence of probable cause. <u>See</u> <u>Miller</u>, 475 F.3d at 632; <u>Brooks</u>, 85 F.3d at 183.

Therefore, having considered these contentions, the Court concludes that Plaintiffs can state a claim under § 1983 for violation of the Fourth Amendment in Counts 1, 2, and 3, but only to the extent that Plaintiffs can meet the standards set out above, specifically by alleging that Plaintiffs were arrested pursuant to an indictment that was obtained by the intentional or reckless creation of false or misleading evidence used before the grand jury that was necessary

_____

[6] The Court notes that in the context of a search or seizure conducted pursuant to a warrant, qualified immunity is analogous to the "good faith" exception to the exclusionary rule applied in criminal cases under <u>United States v. Leon</u>, 468 U.S. 897, 922-23, 104 S. Ct. 3405, 3420-21, 82 L. Ed. 2d 677(1984). <u>See</u> <u>Malley v. Briggs</u>, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1098, 89 L. Ed. 2d 271 (1986).

29

to a finding of probable cause, or the deliberate or reckless omission of material information that officials knew would negate probable cause. Plaintiffs have alleged such claims here, and it will be Plaintiffs' burden to present factual support for there claims after an opportunity for discovery. The Court notes that Defendants raise extensive factual contentions to dispute these allegations and to demonstrate that probable cause existed even if the allegedly false statements are removed and the material omissions are included. This analysis includes extensive parsing of pieces of the Second Amended Complaint, as well as contentions by the Defendants blaming one another for any alleged violation here. However, the analysis suggested by Defendants requires factual analysis beyond the allegations in the Second Amended Complaint, and the cases cited by the Defendants in support of this analysis involve summary judgment determinations, not determinations on a motion to dismiss. Therefore, having considered the parties' contentions in this regard, the Court finds that this parsing of the facts, and certainly any consideration of Defendants' factual contentions in response, is more appropriate at summary judgment after an opportunity for discovery, when the factual record is before the Court for consideration. At this stage in the case, the Court simply concludes that where officers deliberately or recklessly supply false or misleading evidence to support a grand jury indictment as alleged in the present case, or deliberately omit material information knowing that it would negate probable cause, the officers may be liable under § 1983 for violation of an individual's Fourth Amendment rights, if their actions result in the seizure of an individual without probable cause.

Therefore, the Court concludes that Plaintiffs have stated a plausible claim for violation

of the Fourth Amendment rights in this case. However, before considering whether Plaintiffs have stated a claim as to each Defendant against whom this claim is asserted, the Court will consider Plaintiffs' alternative contention that their rights under the Fourteenth Amendment were also violated.

B.    Fourteenth Amendment Violations

In addition to the Fourth Amendment claims, Plaintiffs also contend that their Fourteenth Amendment Due Process rights were violated by the bad faith concealment of evidence and the fabrication of inculpatory evidence. The Fourteenth Amendment protects citizens against deprivations of liberty or property without due process of law. U.S. Const. amend. XIV. "[T]he Due Process Clause of the Fourteenth Amendment 'guarantees more than fair process' and 'includes a substantive component that provides heightened protection against government interference with certain fundamental rights.' . . . The core of the concept of substantive due process is the 'protection of the individual against arbitrary action of government.'" Martin v. Saint Mary's Dep't of Soc. Servs., 346 F.3d 502, 511 (4th Cir. 2003) (citations omitted). The Fourth Circuit has generally held that a claim related to the initiation or continuation of a prosecution on less than probable cause, including failure to disclose exculpatory information during the investigation phase, "does not allege a deprivation of any right guaranteed under the Due Process Clause of the Fourteenth Amendment," and is instead cognizable only pursuant to the Fourth Amendment. See Taylor v. Waters, 81 F.3d 429, 436 (citing Albright v. Oliver, 510 U.S. 266, 268-76, 114 S. Ct. 807, 810-14, 127 L. Ed. 2d 114 (1994) and Baker v. McCollan, 443 U.S. 137, 142-46, 99 S. Ct. 2689, 2693-96, 61 L. Ed. 2d 433 (1979));

31

see also United States v. Ruiz, 536 U.S. 622, 628, 122 S. Ct. 2450, 2454 153 L. Ed. 2d 586 (2002) (noting that a defendant's right to receive exculpatory material from prosecutors is "a right that the Constitution provides as part of its basic 'fair trial' guarantee" under the Fifth and Sixth Amendments (citing Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963))); see generally Jean v. Collins, 221 F.3d 656 (4th Cir. 2000) (en banc, with multiple opinions by an evenly divided court).

However, the Fourth Circuit has also held that individuals possess a Fourteenth Amendment Due Process right not to be deprived of liberty as a result of the deliberate fabrication of evidence by a government officer acting in an investigating capacity. See Washington v. Wilmore, 407 F.3d 274, 282 (4th Cir. 2005) (citing Zahrey v. Coffey, 221 F.3d 342, 349 (2d Cir. 2000)); White v. Wright, 150 Fed. Appx. 193, 198-99 (4th Cir. 2005). Indeed, "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction)." Washington, 407 F.3d at 285 (Shedd, J., concurring) (quoting Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004)). This right "not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer . . . was clearly established in 1983" long before the events alleged in the Second Amended Complaint. See Washington, 407 F.3d at 283-84.

Although this Fourteenth Amendment right clearly applies to the use of false evidence

32

at trial, Defendants nevertheless contend that this Fourteenth Amendment right cannot apply to the pre-trial fabrication of evidence, even if the fabricated evidence results in a citizen's seizure, because pre-trial seizures are considered only under the Fourth Amendment. However, in articulating the right not to be deprived of liberty as a result of fabricated evidence in Washington, the Fourth Circuit has favorably cited the Second Circuit's decision in Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000), which specifically recognized a Fourteenth Amendment right in the context of pre-trial proceedings, where the fabricated evidence resulted in the citizen's arrest after his indictment. See Washington, 407 F.3d at 282 (citing Zahrey, 221 F.3d at 349-50); see also Robertson v. Elliott, 315 Fed. Appx. 473, 476-77 (2009) (unpublished) (identifying the Fourteenth Amendment as the applicable constitutional right where the plaintiff alleged that fabricated evidence resulted in the plaintiff's indictment and arrest before the charges were ultimately dismissed).

In considering these issues, the Court acknowledges the various overlapping constitutional doctrines at issue here, and the lack of clear guidance on the structure of such claims. See Lambert v. Williams, 223 F.3d 257, 260 (4th Cir. 2000) (noting that there continues to be an "'embarrassing diversity of judicial opinion' over the composition or even existence, of a claim for 'malicious prosecution' founded in § 1983" (citation omitted)). However, the Court has already determined that the claims asserted by Plaintiffs in Counts 1, 2, and 3 are going forward at this time based on alleged violations of their Fourth Amendment rights, as discussed above. The Court further concludes that under current precedent, Plaintiffs' claims should be analyzed pursuant to the Fourth Amendment, rather than the Fourteenth

33

Amendment.  See Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 813, 127 L. Ed. 2d 114 (1994) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" (citation omitted)).   However, in light of the unsettled legal doctrines, and in light of the deprivation of liberty alleged here based on Plaintiffs' indictments and arrests, this Court will not dismiss Plaintiffs' alternative Fourteenth Amendment claims at this time, and these Fourteenth Amendment claims will go forward as alternatives to the Fourth Amendment claims, all as part of Counts 1, 2, and 3.[7]

C.      Absolute Immunity Defenses

Several of the Defendants nevertheless contend that Plaintiffs cannot establish a § 1983 claim, under either the Fourth or Fourteenth Amendment, because any testimony that may have been given before the grand jury is entitled to "absolute immunity."  In this regard, the Court notes that the Supreme Court has held that in litigation brought pursuant to § 1983, witnesses, including both police officer witnesses and expert witnesses, are entitled to absolute immunity for testimony they may have given at trial, even if the testimony was perjured.  See Briscoe v. LaHue, 460 U.S. 325, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983).  Based on Briscoe, the Fourth Circuit has likewise found that this absolute witness applies to grand jury testimony. See Lyles v. Sparks, 79 F.3d 372, 378 (4th Cir. 1996).  However, Plaintiffs in the present suit

_____

[7] The Court notes however, that the claims will only be analyzed under the Fourth Amendment standards set out above, unless subsequent Fourth Circuit or Supreme Court cases provide for a different analysis.

acknowledge this immunity and do not attempt to assert claims based on any of the Defendants' actual grand jury testimony. Instead, Plaintiffs contend that the Defendants engaged in investigatory, non-testimonial acts to create false and misleading evidence inculpating Plaintiffs. In this regard, the Fourth Circuit has held that even though an officer cannot be held liable for his testimony in a legal proceeding, this immunity does not extend to the "initial act of fabrication," and would not protect an officer who allegedly fabricated a police report where the report was later used at trial. Washington v. Wilmore, 407 F.3d 274, 283 (4th Cir. 2005); see also Brown v. Daniel, 230 F.3d 1351, 2000 WL 1455443, at *2 (4th Cir. Sept. 29, 2000) (table opinion). Similarly, an expert witness can be liable not for his testimony, but for non-testimonial, deliberate creation of misleading evidence. See Gregory v. City of Louisville, 444 F.3d 725, 738-41 (6th Cir. 2006); Spurlock v. Satterfield, 167 F.3d 995, 1003-04 (6th Cir. 1999). Therefore, in the present case, under current Fourth Circuit law, Plaintiffs may not base their claim on any of the Defendants' grand jury testimony, which is protected by absolute witness immunity, but this immunity does not extend to alleged non-testimonial acts by the Defendants to create false and misleading evidence to inculpate Plaintiffs.[8]

Defendants Nifong and Wilson also contend that they are protected by absolute

---

[8] In addition, the Court notes that the Supreme Court has granted certiorari in the case of Rehberg v. Paulk, raising the issue of whether a government official who acts as a "complaining witness" by presenting perjured testimony against an innocent citizen is entitled to absolute witness immunity in a § 1983 suit. See Rehberg v. Paulk, 611 F.3d 828, 839-40 (11th Cir. 2010) (finding that investigator had absolute immunity for testimony before grand jury), cert. granted, 79 U.S.L.W. 3377, 2011 WL 940891 (U.S. Mar. 21, 2011) (No. 10-788). Therefore, the Court will consider any subsequent determinations by the Supreme Court in addressing the scope of any absolute witness immunity raised by Defendants in this case, but Plaintiffs' claims will go forward at this time under current Fourth Circuit law based on Plaintiffs' allegations of non-testimonial fabrications, as discussed above.

35

prosecutorial immunity. Under the doctrine of Prosecutorial Immunity, prosecutors are absolutely immune from liability for "prosecutorial actions that are 'intimately associated with the judicial phase of the criminal process.'" Van de Kamp v. Goldstein, 129 S. Ct. 855, 860, 172 L. Ed. 2d 706 (2009) (quoting Imbler v. Pachtman, 424 U.S. 409, 430, 96 S. Ct. 984, 995, 47 L. Ed. 2d 128 (1976)). This immunity includes actions such as the "decision to initiate a prosecution," preparation for trial, and the presentation of evidence in court. See id. However, "absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." Id. at 861. Thus, the Supreme Court has held that "absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation [or] when the prosecutor makes statements to the press." Id. (internal citations omitted). In Buckley v. Fitzsimmons, the Supreme Court specifically considered the application of absolute immunity to § 1983 claims asserted against a prosecutor for "allegedly fabricating evidence during the preliminary investigation of a crime." 509 U.S. 259, 261, 113 S. Ct. 2606, 2609, 125 L. Ed. 2d 209 (1993). As in the present case, the plaintiff in Buckley alleged that "in order to obtain an indictment in a case that had engendered 'extensive publicity' and 'intense emotions in the community,' the prosecutors fabricated false evidence" and that prosecutors made "false statements about petitioner in a press conference" in order "to gain votes." Id. at 262, 113 S. Ct. at 2610. The Supreme Court ultimately concluded that the prosecutor was not entitled to absolute immunity for his investigative work, including his alleged efforts to fabricate evidence prior to initiation of judicial proceedings. Id. at 275-78, 113 S. Ct. at 2616-18.

In the present case, Defendant Wilson contends that he was an investigator acting at the direction of and under the supervision of Nifong, and that all of his alleged actions were prosecutorial in nature, entitling both Wilson and Nifong to absolute prosecutorial immunity. Nifong has joined in this contention. In response, Plaintiffs acknowledge that absolute immunity would bar claims for "trial advocacy duties" such as presenting charges and evidence to the grand jury. See Buckley, 509 U.S. at 267 n.3, 273, 274 n.5, 113 S. Ct. at 2612 n.3, 2615, 2616 n.5 ("[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity," including "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made."). However, Plaintiffs contend that they have alleged acts by Defendants Nifong and Wilson beyond just evaluation and presentation of evidence as advocates. Specifically, Plaintiffs have alleged that Nifong took over the investigation in this matter before any suspects had been identified, and then proceeded, with his investigator, Wilson, and with the assistance of the Gottlieb and Himan and the DSI Defendants, to create false and misleading evidence inculpating Plaintiffs. Based on the allegations in the Second Amended Complaint, Nifong was acting far outside his prosecutorial role and was instead assuming an investigatory role in this matter, going so far as to assume supervision of an investigation that had just begun. Cf. id. at 273, 113 S. Ct. 2616 (noting that absolute immunity does not apply "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer," including "searching for the

37

clues and corroboration that might give him probable cause").  Therefore, the Court concludes that the claims against Nifong and Wilson for their investigatory acts, including the alleged preparation of false and misleading evidence during the course of the investigation, would not be barred by Prosecutorial Immunity.  Thus, Nifong and Wilson are liable for their investigatory acts to the same extent as other investigating officials.  See Zahrey v. Coffey, 221 F.3d 342, 353-54 (2d Cir. 2000) (noting that prosecutor could be held liable for fabrication of evidence in his investigatory role, because "it was at least reasonably foreseeable that in his advocacy role he would later use that evidence before the grand jury, with the likely result that [the plaintiff] would be indicted and arrested" and "[i]t would be a perverse doctrine of tort and constitutional law that would hold liable the fabricator of evidence who hands it to an unsuspecting prosecutor but exonerate the wrongdoer who enlists himself in a scheme to deprive a person of liberty").

D.     Sufficiency of Allegations as to Individual Defendants

However, the Court must still consider whether Plaintiffs have sufficiently stated a claim as to each of the particular Defendants against whom these Counts are asserted.  In considering this issue, the Court notes that these claims are first asserted against Defendants Nifong and Wilson. Nifong is alleged to have been directly responsible for the creation of false and misleading evidence that led to Plaintiffs' indictments and arrests, and therefore Plaintiffs have alleged sufficient involvement by Nifong in the constitutional violations.  The allegations are less clear with respect to Nifong's investigator, Wilson, however.  Wilson contends that Plaintiffs may not rely on alleged actions by Wilson that occurred after Plaintiffs' indictments

38

and arrests to establish any violation of Plaintiffs' constitutional rights. However, in Counts 1 through 3, Plaintiffs allege that Wilson conspired with others to conceal and obfuscate evidence and produce false and misleading evidence to secure Plaintiffs' indictments and arrests. In reciting their factual contentions, Plaintiffs also allege involvement by Wilson prior to Plaintiffs' indictments and arrests, specifically that Nifong assigned Wilson to coordinate with Gottlieb and Himan with respect to the police investigation after Nifong took over supervision of the investigation, and that Wilson was part of the conspiracy to seize Plaintiffs without probable cause using false and misleading evidence. It will be Plaintiffs' burden to present sufficient, specific evidence of actual participation by Wilson in the constitutional violation in order to support the § 1983 claims against him, but the Court finds that Plaintiffs have pled enough facts to state a claim that is "plausible on its face" as to Wilson based on his alleged involvement in investigatory acts that are not protected by absolute prosecutorial immunity, and that are alleged to have caused Plaintiffs' seizure in violation of the Fourth Amendment.

As to Defendants Gottlieb and Himan, these Defendants are the police officers who are alleged to have directly participated in the creation of false and misleading evidence. Gottlieb and Himan contend that they cannot be liable for these claims because they turned over all of the relevant evidence and information to Nifong. However, Plaintiffs' contention in the Second Amended Complaint is that Gottlieb and Himan did not just turn over the evidence to Nifong, but actually acted with Nifong to deliberately create the false and misleading evidence. Although it will be Plaintiffs' burden to prove this contention, at this stage Plaintiffs have

alleged direct involvement by Gottlieb and Himan in the constitutional violations that are at issue here.

Finally, with respect to the DSI Defendants, Plaintiffs allege that Defendants Meehan and Clark of DSI, acting under color of state law, were both directly involved in the deliberate creation of false and misleading evidence before the indictments and arrests, in order to manufacture probable cause so that Plaintiffs could be indicted and arrested. A private party may be held liable under § 1983 in certain circumstances if they are acting "under color of state law." "[T]he party charged with the deprivation must be a person who may fairly be said to be a state actor. . . . because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S. Ct. 2744, 2754, 73 L. Ed. 2d 482 (1982). To the extent that a § 1983 claim is based on an alleged "joint participation" or "conspiracy" between private actors and public actors, a bare assertion of a "conspiracy" is insufficient, and a plaintiff must plead enough factual matter to plausibly suggest that an agreement was made to deprive them of their constitutional rights. See Howard v. Food Lion, Inc., 232 F. Supp. 2d 585, 597 (M.D.N.C. 2002); see also Franklin v. Fox, 312 F.3d 423, 445 (9th Cir. 2002) ("To be liable as a co-conspirator, a private defendant must share with the public entity the goal of violating a plaintiff's constitutional rights."). Thus, to be acting "under color of state law" based on joint participation, the "private action must have a 'sufficiently close nexus' with the state [so] that the private action 'may be fairly treated as that of the State itself.'" DeBauche v. Trani, 191 F.3d 499, 507 (4th Cir. 1999) (citation omitted).

40

Plaintiffs in the present case allege that Meehan and Clark joined with Gottlieb, Nifong, and Himan to create false and misleading evidence, and reached an agreement to violate Plaintiffs' constitutional rights. Having considered these contentions, the Court concludes that Plaintiffs have alleged sufficient facts to state a claim against Clark and Meehan for their alleged role in the claimed constitutional violations. The allegations are sufficient to give notice as to how they are alleged to have participated in the violation of Plaintiffs' rights, and are sufficient to allege action "under color of state law" at this stage in the case. Cf. Brown v. Miller, 519 F.3d 231, 237 (5th Cir. 2008) ("[T]he deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights, and . . . a reasonable laboratory technician in 1984 would have understood that those actions violated those rights."). That issue will, however, be subject to further review on a motion for summary judgment to determine whether sufficient evidence exists to support this claim as to Clark and Meehan. With respect to Defendant DSI, a corporation may be held liable under § 1983 for constitutional violations based on acts of those with "final policymaking authority" for the corporation, in this case, Defendant Clark as President of DSI. See Rodriguez v. Smithfield Packing Co., 338 F.3d 348, 355 (4th Cir. 2003) (noting that § 1983 liability may be imposed on a corporation acting under color of state law "for a single decision by [corporate] policymakers under appropriate circumstances" (internal quotations omitted)). Therefore, Plaintiffs have alleged potential § 1983 claims against all of the DSI Defendants.[9]

_____

[9] In addition, as previously discussed, although the Defendants may be entitled to "witness immunity" for their actual testimony, that immunity does not extend to non-testimonial creation of false and misleading evidence.

As a result of these determinations, Counts 1, 2, and 3, collectively, will go forward to the extent recognized and discussed above, as to Defendants Nifong, Wilson, Gottlieb, Himan, Clark, Meehan, and DSI.

**Count 4:      42 U.S.C. § 1983 Claim for Making False Public Statements, asserted against Defendants Nifong, Hodge, and Addison, in their individual capacities**

Count 4 is asserted against Defendants Nifong, Deputy Chief Hodge, and Spokesperson Addison, individually, for Making False Public Statements regarding the investigation which injured Plaintiffs and which were "intended to inflame the Durham community and grand jury pool against the Plaintiffs an other Duke lacrosse players, and to compromise the fairness of subsequent judicial proceedings."  (Second Am. Compl. ¶ 366).

As discussed above, the Fourteenth Amendment protects against deprivations of liberty or property rights without due process of law.  In this regard, the Supreme Court has recognized the right to due process "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S. Ct. 507, 510, 27 L. Ed. 2d 515 (1971).  However, the Supreme Court has also held that an injury to reputation alone does not deprive a plaintiff of "liberty" or "property" interests so as to state a Fourteenth Amendment violation.  See Paul v. Davis, 424 U.S. 693, 711-12, 96 S. Ct. 1155, 1165-66, 47 L. Ed. 2d 405 (1976).  In Paul, the Supreme Court held that where defamatory flyers were distributed by police officers and caused the plaintiff reputational harm, the plaintiff could not state a Fourteenth Amendment violation unless the plaintiff alleged, in addition to the defamatory statement, that some other right or

42

status was altered or extinguished. See id. Under Paul, a Fourteenth Amendment claim based on defamatory statements by government actors requires a plaintiff to allege "(1) the utterance of a statement about her that is injurious to her reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in addition to the stigmatizing statement.'" Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005). Such a claim is referred to as a "stigma-plus" claim. Id.; Cooper v. Dupnik, 924 F.2d 1520, 1532 n.22 (9th Cir. 1991) ("The 'plus' part of this test can be met by either the denial of a right specifically secured by the Bill of Rights (such as the right to free speech or counsel), or the denial of a state-created property or liberty interest such that the Fourteenth Amendment's Due Process Clause is violated.").

In the present case, in their Consolidated Response, Plaintiffs note that their claim is not based solely on reputational injury to the Plaintiffs. Instead, Plaintiffs contend that they have stated a claim because the false public statements made by governmental officials in this case were intended to inflame the grand jury pool and result in indictments against Plaintiffs, and also because the false statements were made in connection with Plaintiffs' seizure pursuant to legal process not supported by probable cause in violation of the Fourth and Fourteenth Amendments. Other courts have recognized a "stigma-plus" claim where officers are alleged to have made defamatory statements in connection with unlawful arrests or seizures in violation of the Fourth Amendment. See, e.g., Cooper, 924 F.2d at 1534-36; Marrero v. Hialeah, 625 F.2d 499, 517-19 (5th Cir. 1980); see also Albright v. Oliver, 510 U.S. 266, 294-96, 114 S. Ct. 807, 823-26 127 L. Ed. 2d 114 (1994) (Stevens, J., dissenting) (noting that injury to reputation

43

plus unconstitutional prosecution is sufficient to establish "stigma plus"). In addition, the court

in <u>Cooper</u> noted that "the law on this point - that defamation in connection with the violation

of a constitutional right states a claim under section 1983 - was clear" and "it should have been

clear to a reasonable public official" that such claims were actionable. <u>Cooper</u>, 924 F.2d at

1535-36.

In light of these cases and in light of the circumstances alleged in the Second Amended

Complaint, the Court concludes that Plaintiffs have alleged a § 1983 claim for violation of their

constitutional rights based on the government officials' false public statements. Specifically,

the Court finds that Plaintiffs have alleged a "stigma-plus" claim with a "tangible state-imposed

burden . . . in addition to the stigmatizing statement," because the false public statements were

made in connection with the alleged Fourth and Fourteenth Amendment violations discussed

above with respect to Counts 1, 2, and 3. Because this right was clearly established, qualified

immunity would not apply with respect to these claims. With respect to Defendant Nifong,

Plaintiffs have alleged that Nifong created false and misleading evidence that resulted in their

unlawful seizure as discussed above, and made ongoing false public statements in connection

with that seizure and based on that evidence. With respect to Defendants Addison and Hodge,

Plaintiffs contend that Addison and Hodge made false public statements in connection with

the grand jury proceedings and the deprivations of their Fourth and Fourteenth Amendment

rights. <u>See also</u> <u>Velez</u>, 401 F.3d at 88-89 (noting that "[w]hen government actors defame a

person and - either previously or subsequently - deprive them of some tangible legal right or

status . . . a liberty interest may be implicated, even though the 'stigma' and 'plus' were not

44

imposed at precisely the same time" or by "the same actor," as long as they are "connected");

Marrero, 625 F.2d at 519 (noting that it is sufficient "that the defamation occur in connection

with, and be reasonably related to, the alteration of the right or interest"). To the extent that

these Defendants contest the particular nature or timing or effect of what was allegedly said,

the Court concludes that such a factual inquiry is more appropriate on a motion for summary

judgment, and Plaintiffs have alleged that each of the named Defendants made deliberately false

public statements in connection with the alleged falsification of evidence that was used to

subject them to indictment and arrest. In addition, this right was clearly established well before

the conduct alleged in the present case, and a reasonable official would have known that it

violated clearly established constitutional rights to deliberately make false public statements

regarding a citizen in connection with an unlawful arrest of that citizen. To the extent that

Defendants raise factual contentions about what a reasonable official would have done based

on what they knew at the time, the Court concludes that this analysis would involve

consideration of factual contentions and would be more appropriate at summary judgment on

a factual record. At this point, Plaintiffs have sufficiently stated a plausible claim, although it

will of course be Plaintiffs' burden to present evidence in support of these claims going

forward. Therefore, Count 4 will go forward as to Defendants Nifong, Addison, and Hodge.

**Count 5:      42 U.S.C. § 1983 Claim, asserted against the City pursuant to <u>Monell</u>**

In Count 5, Plaintiffs assert § 1983 claims against the City under <u>Monell v. Department

of Social Services</u>, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Pursuant to <u>Monell</u>,

a municipality is not vicariously liable under § 1983 for actions of its employees; instead, a

45

municipality is only liable under § 1983 if the alleged constitutional violations were the result of a municipal policy or practice. A municipality may be liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694, 98 S. Ct. at 2037-38. A plaintiff can establish liability under Monell where the constitutional injury is proximately caused by a written policy or ordinance, or by a widespread practice that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915, 926, 99 L. Ed. 2d 107 (1988) (citation omitted). In addition, the Supreme Court has also recognized that liability may be imposed on a municipality where the constitutional injury is proximately caused by the decision of an official with final policymaking authority, that is, an official with authority to establish and implement municipal policy in that area. Id. at 127, 108 S. Ct. at 926. Finally, municipal liability has been recognized based on inadequate training or supervision of employees if the training or supervision was so inadequate as to establish "deliberate indifference" to the rights of citizens and if the deficiency caused the constitutional violation alleged. See City of Canton v. Harris, 489 U.S. 378, 390-92, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989). In sum, "[a] policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a

46

'custom or usage with the force of law.'" <u>Lytle v. Doyle</u>, 326 F.3d 463, 471 (4th Cir. 2003) (quoting <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999)). Such a claim only exists if, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." <u>Bd. of the County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997).

In the present case, Plaintiffs assert a claim against the City[10] alleging express policies or widespread customs that led to the constitutional violations alleged in Counts 1, 2, 3, and 4. Specifically, Plaintiffs allege that Durham police had an established policy or custom permitting officers to publish premature conclusions of criminality and guilt, and that Durham police had an established policy or custom targeting Duke University students for harassment through selective and improper enforcement of the criminal laws, including selective and malicious prosecution and manufacturing of false evidence by Defendant Gottlieb with the knowledge of the Supervisory Defendants.

In addition, Plaintiffs also assert the claim against the City based on allegations that officials with final policymaking authority for the Durham police caused or ratified the unconstitutional conduct of their subordinates as to Counts 1-4. Plaintiffs similarly allege that officials with final policymaking authority failed to exercise adequate supervisory responsibility

---

[10] Plaintiffs originally asserted this claim against the Supervisory Defendants in their "official capacities," but Plaintiffs agree that the "official capacity" claims are duplicative and may be dismissed. Therefore, this claim is being asserted only against the City.

over Gottlieb and assigned Gottlieb to lead the investigation, thus endorsing and ratifying Gottlieb's unconstitutional conduct. On this point, the Court notes that to impose municipal liability based on the decision of a final policymaking official, the final policymaking official must have been "aware of the constitutional violation and either participated in, or otherwise condoned, it." Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004). This includes situations where "the authorized policymakers approve a subordinate's decision and the basis for it," since "their ratification would be chargeable to the municipality because their decision is final." Praprotnik, 485 U.S. at 127. Thus, liability may be imposed where the final policymaking official intentionally participates in or ratifies the constitutional violation. In addition, where a final policymaking official makes a decision or acts in a manner that is not in itself unconstitutional, liability may still exist if the final policymaking official acts with "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Bd. of the County Comm'rs of Bryan County, 520 U.S. at 411, 117 S. Ct. at 1392; see also Carter v. Morris, 164 F.3d 215, 218-19 (4th Cir. 1999) (describing the required connection between the official's deliberate indifference and the ultimate constitutional violation).

Finally, Plaintiffs allege that the City is liable for the unconstitutional conduct of Defendant Nifong. On this point, Plaintiffs allege that officials with final policymaking authority failed to exercise adequate supervisory responsibility over Nifong and conferred authority on Nifong to direct the investigation knowing that Nifong's "political ambition was driving his personal engagement with the investigation." (Second Am. Compl. ¶ 388).

48

Plaintiffs also contend that Nifong himself was given "final policymaking authority" for the Durham Police Department and as a final policymaking official, Nifong instructed Durham Police officers to engage in constitutional violations.

In considering these contentions, the Court notes that although "[t]he substantive requirements for proof of municipal liability are stringent," § 1983 claims are not subject to any heightened pleading standard, and "primary reliance must be placed on discovery controls and summary judgment to ferret out before trial unmeritorious suits against municipalities." Jordan v. Jackson, 15 F.3d 333, 338-40 (4th Cir. 1994). Thus, where a complaint alleges the existence of municipal policies, alleges that officials with final policymaking authority condoned and ratified unconstitutional conduct of subordinates, and alleges that the policies proximately caused the alleged constitutional violation, the allegations are sufficient at the motion to dismiss stage, although the "required showings are appreciably more demanding" at summary judgment. Jordan, 15 F.3d at 340.

Having considered Plaintiffs' contentions in the present case with respect to the City, the Court concludes that Plaintiffs have sufficiently stated a claim for Monell liability against the City at this stage in the case. Specifically, the Court concludes that Plaintiffs have alleged that the City had a policy of targeting Duke students that led to multiple constitutional violations against Duke students, particularly by Gottlieb, and that the City through its final policymaking officials nevertheless continued the policy and ratified and condoned those violations. Plaintiffs have stated a plausible claim that this condoning of constitutional violations in the enforcement of the policy led to the constitutional violations and injuries

49

alleged by Plaintiffs in the present case.[11]  Whether evidence exists to support this contention

is not a question before the Court on the present motions. Of course, at later stages in the case,

Plaintiffs will be required to present evidence to support these contentions, including evidence

to establish the existence of an official policy or custom, and proof that the policy was the cause

of the constitutional violation and injuries alleged here.  See Jordan, 15 F.3d at 339-40.

However, given the preliminary stage of this case, the Court concludes that those issues are

more appropriately resolved at summary judgment, since resolution of this issue will require

consideration of facts and proof beyond the allegations in the Second Amended Complaint

However, with respect to Plaintiffs' contention that Monell liability should attach to the

City based on "delegation" to Nifong, or based on Nifong's alleged status as a "final

policymaker" for the City, the Court notes that "[w]hether a particular official has 'final

policymaking authority' is a question of state law," and is "dependent on the definition of the

official's functions under relevant state law."  McMillian v. Monroe County, 520 U.S. 781, 786,

117 S. Ct. 1734, 1737, 138 L. Ed. 2d 1 (1997) (internal citation omitted).  "A municipal agency

or official may have final policymaking authority by direct delegation from the municipal

lawmaking body, or by conferral from higher authority" such as state law.  Spell v. McDaniel,

824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); see also Pembaur v. City of

---

[11] In addition to the policy of targeting Duke students and ratification of Gottlieb's constitutional violations and assignment of Gottlieb to the investigation, Plaintiffs allege that Durham had a policy of publishing premature official conclusions of guilt. However, the Court does not reach the issue of whether these allegations are sufficient to state a Monell claim based on this policy, since the Court has already determined that Plaintiffs have alleged a sufficient policy to support a Monell claim at this stage in the case, as discussed above.  Any further consideration of this issue is therefore reserved for summary judgment determination.

Cincinnati, 475 U.S. 469, 481-85, 106 S. Ct. 1292, 1299-1301, 89 L. Ed. 2d 452 (1986) (holding that a County Prosecutor may be a final policymaking official for the County where County officials delegated authority to the Prosecutor and state law authorized the County Prosecutor to establish county policy in appropriate circumstances). "Delegation may be express, as by a formal job-description, or implied from a continued course of knowing acquiescence by the governing body in the exercise of policymaking authority by an agency or official." Spell, 824 F.2d at 1387 (internal citations omitted); see also Praprotnik, 485 U.S. at 130, 108 S. Ct. at 927. ("[G]oing along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy.") In addition, in determining whether an official has final policymaking authority in an area, "[t]he most critical factor is not the practical finality of an official's 'acts and edicts,' but their 'policy' nature." Spell, 824 F.2d at 1386 (noting that policymaking authority is "authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government).

Under North Carolina law, the District Attorneys are state actors who act on behalf of the State of North Carolina and answer to the State Attorney General. N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. § 7A-61, 69; see also Nivens v. Gilchrist, 444 F.3d 237, 249 (4th Cir. 2006) (holding that a suit against a District Attorney in his "official capacity" in North Carolina is a suit against the State as is therefore subject to Eleventh Amendment immunity). Although the Second Amended Complaint alleges that the City delegated authority to Defendant Nifong to direct the investigation, the Court concludes that delegation of authority to supervise a

51

particular investigation is not equal to delegation of authority to set City law enforcement policy. Moreover, there is no state law that would allow a city to delegate its policymaking authority to a state prosecutor, and only the state legislature has authority to prescribe duties for District Attorneys or supervise the District Attorney's exercise of authority. See N.C. Const. art. IV, § 18(1) ("The District Attorney shall advise the officers of justice in his district, be responsible for the prosecution on behalf of the State of all criminal actions in the Superior Courts of his district, perform such duties related to appeals therefrom as the Attorney General may require, and perform such other duties as the General Assembly may prescribe."); State v. Smith, 359 N.C. 199, 225, 607 S.E.2d 607, 625 (2005) (Brady, J., concurring); Simeon v. Hardin, 339 N.C. 358, 373, 451 S.E.2d 858, 868 (1994) ("[T]he district attorney's duties, including the docketing of criminal cases, are derived from statutes promulgated by the General Assembly pursuant to authority granted in Article IV, Section 18 of the North Carolina Constitution."). Therefore, the Court concludes that the City could not have delegated its policymaking authority to Nifong, and the claims against Nifong in his "official capacity" are claims against the State, not the City.[12] In light of this conclusion, the City cannot be liable under § 1983 for "official capacity" claims against Defendant Nifong or for alleged conduct by Nifong as a "policymaker." However, the City is still responsible for its own policies that result in constitutional violations by City employees, even if the City employees were acting in

_____

[12] The Court notes that Plaintiffs have not attempted to name the State as a party in this case or otherwise bring this suit against the State, since under the Eleventh Amendment, the State is immune from suits brought in federal court, and the State would not be a "person" subject to suit under § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.").

52

coordination with or at the direction of Nifong. As noted above, Plaintiffs have alleged that the constitutional injuries alleged in Counts 1, 2, 3, and 4 were committed by City police officers, were approved or ratified by City officials with final policymaking authority for the City, and were the result of City policies adopted by those City officials. Therefore, although the Court rejects the legal contention that Nifong had final policymaking authority for the City or that the City delegated its policymaking authority to Nifong, the Court has nevertheless concluded that the Plaintiffs have stated a claim against the City pursuant to <u>Monell</u>, and any further consideration or determination of whether liability can be established will be before the Court at summary judgment.[13] The Court notes, however, that a "<u>Monell</u>" claim is not in and of itself a § 1983 claim, and is instead simply the basis for holding the City liable for the underlying constitutional violations. Therefore, the Court's conclusion as to this <u>Monell</u> claim against the City simply means that the City is properly included as a Defendant on Counts 1, 2, 3, and 4.

**Count 6:** **42 U.S.C. § 1983 Claims for Supervisory Violations, asserted against the Supervisory Defendants (Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger), in their individual capacities**

Count 6 is asserted against the Supervisory Defendants (Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger) in their individual capacities for (a) failure to supervise the investigation, (b) failure to control and supervise Gottlieb, and (c) failure to train, control and supervise Addison.

---

[13] The Court notes that Plaintiffs have not alleged that DSI or its employees had "final policymaking authority" for the City. As discussed above, the City can only be liable for its own policies, including decisions made by those with final policymaking authority for the City.

53

Supervisory officials may be liable under § 1983 if "(1) . . . the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) . . . the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices[]'; and (3) . . . there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). As discussed above, the Supreme Court in Ashcroft v. Iqbal reiterated that "[b]ecause vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S. Ct. 1937, 1948 (2009) (emphasis added). In Iqbal, the Supreme Court affirmed that under § 1983, supervisors "may not be held accountable for the misdeeds of their agents" and noted that as such, "the term 'supervisory liability' is a misnomer." Id. at 1949. Thus, each government actor "is only liable for his or her own misconduct" which requires the requisite intent for the type of constitutional violation pled. See id. (holding that where the underlying constitutional violation required a showing of "purpose" to discriminate, "a supervisor's mere knowledge of his subordinate's discriminatory purpose" is not sufficient to establish a constitutional violation by the supervisor). However, in applying this standard, circuit courts have concluded that supervisory liability may still be imposed based on "deliberate indifference" where the underlying constitutional violation itself may be established based on deliberate indifference. See Starr v. Baca, No. 09-55233, 2011 WL 477094, at *4 (9th Cir. 2011); see also, e.g., Smith v.

54

Ray, No. 09-1518, 2011 WL 317166, at *8 (4th Cir. Feb. 2, 2011) (continuing to apply the Shaw v. Stroud "deliberate indifference" standard).

In light of this evolving case law, and given the allegations presented by Plaintiffs, the Court concludes that Plaintiffs have sufficiently alleged conduct by the Supervisory Defendants to at least raise a plausible claim at this stage in the case.[14]  In the present case, Plaintiffs allege that these Supervisors knew of Gottlieb's previous constitutional violations against Duke students, including fabrication of warrants and searches and seizures without probable cause, and were deliberately indifferent to the rights of citizens by condoning and ratifying that behavior and then assigning him to an investigation involving Plaintiffs and other Duke students.  Plaintiffs also contend that the Supervisory Defendants knew of the unlawful actions by Nifong, Gottlieb, Wilson, and Himan to manufacture false and misleading evidence to effect Plaintiffs' seizure without probable cause, and that the Supervisory Defendants failed to act, demonstrating a deliberate indifference[15] or tacit authorization of the actions, ultimately allowing the actions to continue and leading to Plaintiffs' unlawful seizure.  In this regard, Plaintiffs allege that the Supervisory Defendants directly participated in meetings with Gottlieb

_____

[14] Moreover, it is apparent that these Supervisory Defendants will necessarily be involved in the discovery process in this case in any event, given their direct involvement in the alleged events and the ongoing claims against the City and other City employees.

[15] In this case, for the claims alleged in Counts 1-3, Plaintiffs must allege that false or misleading information was presented to the grand jury *knowingly and intentionally, or with reckless disregard for the truth*.  Thus, the requisite intent to establish a constitutional violation and defeat qualified immunity is actual intent or reckless disregard.  As discussed above, under Iqbal, each government actor "is only liable for his or her own misconduct" which requires the requisite intent for the type of constitutional violation pled.  Therefore, "deliberate indifference," which requires a showing of actual intent or reckless disregard, would be sufficient to establish the requisite intent.  See Starr v. Baca, No. 09-55233, 2011 WL 477094, at *2-4 (9th Cir. 2011).

55

and Himan regarding the investigation and prosecution, and authorized the constitutional violations. Plaintiffs similarly allege that the Supervisory Defendants knew that Addison was making false public statements in connection with the unlawful seizure, and that the Supervisory Defendants failed to act, evidencing deliberate indifference to Plaintiffs' constitutional rights. Although the Supervisory Defendants contend that they could not control Nifong and Wilson, the Court notes that the claims alleged in Count 6 against the Supervisory Defendants are not based on their failure to control Nifong or Wilson, and are instead based on their failure to train, supervise, control or intervene with respect to Defendants Gottlieb and Himan. Based on these allegations, the Court concludes that Plaintiffs have stated potential § 1983 claims against the Supervisory Defendants. These Defendants raise the defense of qualified immunity, but as discussed above with respect to Count 1-3, a reasonable police officer would have known that it would violate clearly established constitutional law to deliberately or recklessly present false or misleading evidence to obtain an indictment and effect a seizure without probable cause. In addition, under the Fourth Circuit's decision in Shaw, it was clearly established that an official violated the Constitution if, in deliberate indifference to the constitutional rights of citizens, the official knew of his subordinate's constitutional violations and failed to act. Here, Plaintiffs allege that the Supervisory Defendants knew of Gottlieb's previous constitutional violations and were deliberately indifferent to the rights of citizens by condoning and ratifying that behavior and then assigning him to an investigation involving Plaintiffs and other Duke students. In addition, Plaintiffs allege that the Supervisory Defendants knew of the alleged constitutional violations and ratified and approved that

56

conduct. Therefore, the Court will allow the claims against the Supervisory Defendants Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger to go forward at this time, but at summary judgment, it will be Plaintiffs' burden to "pinpoint[] the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked," and the Court will scrutinize evidence regarding each Defendant's direct, individual involvement, and evidence regarding their individual intent, in order to determine whether any of them is potentially liable under § 1983 for their own conduct with respect to the alleged constitutional violations that are proceeding in this case. See Shaw, 13 F.3d at 798. Therefore, the Motion to Dismiss will be denied as to Count 6, and the claims asserted in Count 6 against Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger will go forward at this time.

**Count 7:**    **42 U.S.C. § 1983 Claim for "Conspiracy," asserted against the City and against Nifong, Gottlieb, Himan, Addison, Wilson, Clark, Meehan, DSI, and the Supervisory Defendants (Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger), in their individual capacities**

Count 7 is a claim of a general "conspiracy" against the City and against all of the Defendants in their individual capacities, for conspiring to charge and prosecute Plaintiffs, knowing the charges were not supported by probable cause. This claim alleges a conspiracy that included manufacturing a "phony identification," fabricating and concealing DNA test results, and "agreeing to make false and materially incomplete statements to the grand juries." (Second Am. Compl. ¶ 440).

"To establish a civil conspiracy under § 1983," Plaintiffs must allege that the Defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy

57

which resulted in [Plaintiffs] deprivation of a constitutional right." <u>Hinkle v. City of Clarksburg</u>, 81 F.3d 416, 421 (4th Cir. 1996). To establish such a claim, Plaintiffs must ultimately prove that "each member of the alleged conspiracy shared the same conspiratorial objective," that is, that Defendants "positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." <u>Id.</u> In this case, based on the potential constitutional violations actually stated here, the allegation of an unlawful plan must have related to the unlawful seizure of Plaintiffs without probable cause using false and misleading evidence, and the release of false, defamatory statements in connection with that unlawful seizure.

However, with respect to Defendants Nifong, Wilson, Gottlieb, Himan, Clark, Meehan, DSI, Addison, and Hodge the Court has already discussed the substance of the alleged violations by those Defendants as set out in Counts 1 through 4, including allegations of conspiracy, as well as claims against the City in Count 5, and against the Supervisory Defendants in Count 6. Count 7 alleges conspiracy charges against those same Defendants based on those same alleged violations, and the standards applicable to those Counts, as discussed above, will be the applicable standards in this case. Any general allegations of "conspiracy" will be considered with respect to the specific alleged constitutional violations raised in those counts. Therefore, the Court concludes that there is no need for a separate "conspiracy" claim, and the general "conspiracy" claim asserted in Count 7 will be dismissed.

**Counts 8, 9, 10:       42 U.S.C. § 1985 Claims**

Counts 8, 9, and 10 of the Second Amended Complaint are brought pursuant to 42 U.S.C. § 1985. Specifically, Count 8 is brought against all of the Defendants in their individual

capacities, as well as against the City, for Conspiracy in violation of 42 U.S.C. § 1985(2) for Obstruction of Justice with the intent to deny Plaintiffs the equal protection of the laws. Count 9 is brought against Defendants Nifong, Wilson, Gottlieb, Himan, and the Supervisory Defendants (Baker, Chalmers, Hodge, Russ, Council, Lamb, Ripberger) in their individual capacities, as well as against the City, for Conspiracy in violation of 42 U.S.C. § 1985(2) for Witness Tampering. Count 10 is brought against all Defendants in their individual capacities, as well as against the City, for Conspiracy in violation of 42 U.S.C. § 1985(3) to deprive Plaintiffs of equal protection of the laws.

With respect to the § 1985 claims in Counts 8, 9, and 10, Plaintiffs bring Counts 8 and 9 pursuant to the second clause of 42 U.S.C. § 1985(2), which prohibits obstruction of justice in state court proceedings "with intent to deny any citizen the equal protection of the laws." See 42 U.S.C. § 1985(2); Kush v. Rutledge, 460 U.S. 719, 724-27, 103 S. Ct. 1483, 1486-88, 75 L. Ed. 2d 413 (1983).[16] Plaintiffs bring Count 10 pursuant to 42 U.S.C. § 1985(3) for conspiracy to deprive Plaintiffs the equal protection of the laws. With respect to all of these claims, the

---

[16] The Court notes that Count 9 could be read as attempting to assert a claim pursuant to the first clause of 42 U.S.C. § 1985(2), which prohibits two of more persons from conspiring to deter a witness from testifying truthfully in federal court, and which does not require that the conspirators act with the "intent to deprive their victims of the equal protection of the laws." Kush v. Rutledge, 460 U.S. 719, 724-25, 103 S. Ct. 1483, 1487, 75 L. Ed. 2d 413 (1983). However, in their various Motions to Dismiss, Defendants have noted that none of the allegations in the Second Amended Complaint involve any proceedings in federal court, and Plaintiffs in the Consolidated Response concede that they have not asserted a claim pursuant to this provision. Instead, Plaintiffs contend that Count 9, like Count 8, is intended to assert a claim pursuant to the second clause of § 1985(2), which prohibits conspiracy to obstruct justice in state court proceedings with "the intent to deprive their victims of the equal protection of the laws." Id. Therefore, the Court will treat Counts 8 and 9 as having both been asserted pursuant to the second clause of § 1985(2).

"'language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" Kush, 460 U.S. at 726, 103 S. Ct. at 1487 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798, 29 L. Ed. 2d 338 (1971)).

The Supreme Court has interpreted these provisions of § 1985 narrowly, and has held that plaintiffs must establish as an element of the cause of action that the conspirators were motivated by a purpose to discriminate against a recognized class of persons. Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268-72, 113 S. Ct. 753, 758-60, 122 L. Ed. 2d 34 (1993).[17] This "discriminatory purpose" for purposes of § 1985, "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id. at 271-72, 113 S. Ct. at 760 (citation omitted). This discriminatory intent must be shared by all of the conspirators, and "willful blindness" to the discriminatory intent of others is insufficient to establish a claim under § 1985. See Simmons v. Poe, 47 F.3d 1370, 1378 (4th Cir. 1995). Thus, to allege a claim under the provisions of § 1985 at issue in the present case, Plaintiffs must allege that all of the conspirators were motivated by a purpose to discriminate against a recognized class of persons of which Plaintiffs were members.

---

[17] This discussion relates only to the requirements for claims brought pursuant to the second clause of § 1985(2) and the first clause of § 1985(3), which are the provisions at issue in this case.

Further, with respect to the "recognized classes of persons" protected by § 1985, the Supreme Court has noted that § 1985(3) was adopted in 1871 as part of the Ku Klux Klan Act in order to "combat the prevalent animus" against blacks and their supporters. <u>United Bhd. of Carpenters & Joiners of America v. Scott</u>, 463 U.S. 825, 836, 103 S Ct. 3352, 3360, 77 L. Ed. 2d 1049 (1983). Given this statutory purpose, the Supreme Court has further noted that "it is a close question whether § 1985(3) was intended to reach any class-based animus" other than animus against blacks and "those who championed their cause." <u>Id.</u>; <u>see also</u> <u>Harrison v. Kvat Food Mgmt., Inc.</u>, 766 F.2d 155, 157-61 (4th Cir. 1985) (noting that § 1985(3) was "enacted to fulfill a particular purpose and designed to meet particular conditions," in 1871 to afford "a remedy for the vindication of the civil rights of those being threatened and injured, notably blacks and advocates for their cause" and that "the original objective of the 1871 Civil Rights Act and § 1985(3) was the protection of blacks and their supporters in the South"). Although the Supreme Court has not definitively identified all of the "recognized classes of persons" for purposes of § 1985(3), the Court of Appeals for the Fourth Circuit has noted that "the class protected can extend no further than to those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence.'" <u>Buschi v. Kirven</u>, 775 F.2d 1240, 1258 (4th Cir. 1985) (quoting <u>United Bhd. of Carpenters</u>, 463 U.S. at 851, 103 S. Ct. at 3368); <u>see also</u> <u>Harrison</u>, 766 F.2d at 161 (noting the Supreme Court's "lack of enthusiasm for expanding the coverage of § 1985(3) to any classes other than those expressly provided by the Court"); <u>Phillips v. Mabe</u>, 367 F. Supp. 2d 861, 873 (M.D.N.C. 2005) (noting that "[p]laintiffs have standing under § 1985 only

61

if they can show they are members of a class that the government has determined 'requires and warrants special federal assistance in protecting their civil rights'" (citations omitted)).  Thus, the Supreme Court and the Court of Appeals for the Fourth Circuit have narrowly interpreted the "recognized classes of persons" who may bring § 1985 claims, and this Court is bound to follow that interpretation in the present suit.

Applying these standards in the present case, the Court finds that Plaintiffs have not alleged that they were in a classification entitled to protection under § 1985(2) or § 1985(3).  In the Second Amended Complaint, Plaintiffs allege that they were "undergraduate student[s] enrolled at Duke University" and that they were members of the Duke men's lacrosse team. However, based on the case law set out above, it is clear that "Duke students" or "Duke Lacrosse team members" are not classes entitled to protection under § 1985.  Cf. McGee v. Schoolcraft Cmty. Coll., 167 Fed. Appx. 429, 435-36 (6th Cir. 2006) (finding that a group of individuals seeking an advanced degree is not a class entitled to special protection under § 1985(3)); Lewin v. Cooke, 95 F. Supp. 2d 513, 525-26 (E.D. Va. 2000) (holding that a class of students does not qualify as a class entitled to § 1985(3) protection); Murphy v. Villanova Univ., 520 F. Supp. 560, 561-62 (E.D. Pa. 1981) (same); Crain v. Martinez, No. 93-942-CIV-ORL-22, 1994 WL 391672, at *1 (M.D. Fla. July 12, 1994) ) (same); Naglak v. Berlin, No. 87-3427, 1988 WL 30920, at *4 (E.D. Pa. March 30, 1988) (same); see also Upah v. Thornton Dev. Auth., 632 F. Supp. 1279, 1281 (D. Colo. 1986) (holding that a class composed of out-of-state residents is not a class within the protection of § 1985(3)); Korotki v. Goughan, 597 F. Supp. 1365, 1374 (D. Md. 1984) (same); Ford v. Green Giant Co., 560 F. Supp. 275, 277-78 (W.D.

Wash. 1983) (same).

Moreover, the Court notes that Plaintiffs do not allege in the Second Amended Complaint that they are members of any racial class, but in the Consolidated Response, Plaintiffs contend that they have alleged race discrimination as "white plaintiffs." However, the § 1985 claims based on this contention fails for two reasons. First, the Supreme Court and Fourth Circuit have indicated an intent to limit the protections of § 1985 to discrimination against "those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence.'" Buschi, 775 F.2d at 1258 (quoting United Bhd. of Carpenters, 463 U.S. at 851, 103 S. Ct. at 3368); see also Cloaninger v. McDevitt, No. 106cv135, 2006 WL 2570586 (W.D.N.C. Sept. 3, 2006) ("As recognized by the controlling law in the Fourth Circuit, the only class of persons protected by Section 1985(3) are African Americans." (citing Harrison, 766 F.2d at 161-62)); Stock v. Universal Foods Corp., 817 F. Supp. 1300, 1310 (D. Md. 1993) (dismissing § 1985(3) claim because plaintiff, as a white male, was not a member of a class that has suffered historically pervasive discrimination); Blackmon v. Perez, 791 F. Supp. 1086, 1093 (E.D. Va. 1992) (dismissing § 1985(3) claims by white plaintiffs because "plaintiffs do not represent a class of persons who [do] not enjoy the possibility of [ ]effective state enforcement of their rights" (internal quotations omitted)).[18]

_____

[18] The Court notes that the decision in Waller v. Butkovich, 605 F. Supp. 1137 (M.D.N.C. 1985) cited by Plaintiffs, did not directly address this question, and in any event was based on reasoning that was subsequently repudiated by the Fourth Circuit in Buschi, 775 F.2d 1240, and Harrison, 766 F.2d 155. In addition, the Court further notes that this Court's previous decision in Phillips v. Mabe did not address the question of whether a § 1985 claim could be based on alleged discrimination against whites as a class; instead, Phillips involved § 1985 claims brought

63

Second, even if the Fourth Circuit decided to extend § 1985 to additional classes of persons, including 'white plaintiffs' as a class, Plaintiffs here have not sufficiently alleged facts in support of such a claim. When a plaintiff attempts to assert a conspiracy claim pursuant to § 1985(2) and § 1985(3), the Fourth Circuit has made clear that the purported conspiracy must be alleged in more than just a "conclusory manner," and must include allegations of "concrete supporting facts." Simmons, 47 F.3d at 1377. "[C]ourts have thus required that plaintiffs alleging unlawful intent in conspiracy claims under § 1985(3) or § 1983 plead specific facts in a nonconclusory fashion to survive a motion to dismiss." Gooden v. Howard County, 954 F.2d 960, 969-70 (4th Cir. 1992); see also Jenkins v. Trs. of Sandhills Cmty. Coll., 259 F. Supp. 2d 432, 445 (M.D.N.C. 2003). In this case, the Court finds that the facts alleged in Plaintiffs' Second Amended Complaint would state a claim only for discrimination against them as "Duke Students" by Defendant Gottlieb or for personal political gain by Defendant Nifong. Thus, Plaintiffs do not allege any facts that would establish intent by the Defendants to discriminate against whites as a class, or intent to injure Plaintiffs or deprive them of their rights because they were white. See Bray, 506 U.S. at 267-72, 113 S. Ct. at 758-60 (holding that plaintiffs must establish as an element of the cause of action that the conspirators were motivated by a purpose to discriminate against a recognized class of persons). The Second Amended Complaint does include a conclusory allegation that "one or more Defendants" engaged in acts that were "motived by invidious racial animus, intended to foment invidious racial animus against

_____

by a white plaintiff who alleged discrimination based on his efforts to protect the interests of black students, and the Court concluded that the plaintiff was not a member of a protected class and did not have standing to assert § 1985 claims there. See Phillips, 367 F. Supp. 2d at 873-74.

Plaintiffs in the Durham community and/or intended to take advantage of the invidious racial animus that they had fomented in the Durham community against Plaintiffs." (Second Am. Compl. ¶ 448, 463). However, this allegation includes several conclusory alternatives without any definite or specific allegations, and in any event this contention is simply not supported by any factual allegations to support a claim that Defendants were motivated by a purpose to discriminate against whites. Cf. Jordan v. Alt. Res. Corp., 458 F.3d 332, 345-46 (4th Cir. 2006) (dismissing allegations as "conclusory" in a claim of racial discrimination under 42 U.S.C. § 1981 where the plaintiff alleged simply that race was a 'motivating factor' in the action taken against him "without explaining how that conclusion is consistent with the allegations," since "it is the alleged facts supporting those words, construed liberally, which are the proper focus at the motion to dismiss stage"). In addition, an allegation that "one Defendant" acted with racial animus is insufficient to allege a conspiracy in which all of the conspirators were motivated by a shared intent to discriminate on the basis of race. Cf. Simmons, 47 F.3d at 1378; Martin v. Boyce, No. 1:99CV01072, 2000 WL 1264148, at *7 (M.D.N.C. July 20, 2000) (noting that for claims under § 1985(3), "all of the conspirators must share the same forbidden animus" and "when only one conspirator is motivated by a forbidden purpose, there can be no meeting of the minds, no agreement, to deprive another of the equal protection of the laws based on his race").

Therefore, the Court concludes that Plaintiffs have failed to state a claim under § 1985(2) or § 1985(3) because Plaintiffs are not members of a "recognized class of persons" entitled to protection under § 1985 and because even if they were members of a recognized

65

class of persons, they have failed to sufficiently allege racial or other class-based invidiously discriminatory animus as the purpose of the alleged conspirators' action. Counts 8, 9, and 10 will therefore be dismissed as to all Defendants.[19]

**Counts 11 & 12:       42 U.S.C. § 1986 Claims**

Counts 11 and 12 are based on alleged violations of 42 U.S.C. § 1986 for failing to prevent the violations of § 1985 that were alleged in Counts 8, 9, and 10. Count 11 is asserted against the Supervisory Defendants (Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger) in their individual capacities, as well as against the City, for Conspiracy in violation of 42 U.S.C. § 1986 for failing to prevent the violations of § 1985. Similarly, Count 12 is asserted against the DSI Defendants (Clark, Meehan, and DSI), in their individual and official capacities, for Conspiracy in violation of 42 U.S.C. § 1986 for failing to prevent the violations of § 1985. In their Consolidated Response, Plaintiffs note that Counts 11 and 12 are derivative claims based on the existence of the § 1985 conspiracy.

However, "[a] cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." Trerice v. Summons, 755 F.2d 1081, 1085 (4th Cir. 1985). Therefore, when the underlying § 1985 claims are dismissed, the § 1986 claims should also be dismissed. See id. In the present case, because all of the § 1985 claims are being dismissed, the Court

_____

[19] The Court notes that to the extent Plaintiffs contend that Defendants violated their constitutional rights, the Court has already recognized the ability of Plaintiffs to pursue those claims pursuant to 42 U.S.C. § 1983, without having to establish membership in a protected class or class-based discrimination by Defendants. However, the sections of § 1985 at issue here are very limited in scope. As such, the claims alleged in this case are simply not within the limited scope of those particular provisions of § 1985, at least as those sections been interpreted by the Supreme Court and the Fourth Circuit.

concludes that the § 1986 claims asserted in Counts 11 and 12 should also be dismissed as to all of the Defendants.

As a result of these determinations, Counts 11 and 12 will be dismissed as to all of the Defendants.

**Count 13:** **Malicious Prosecution and Conspiracy, asserted against the City and against Nifong, Wilson, Gottlieb, Himan, Addison, Clark, Meehan, DSI, in their individual capacities**

In Count 13, Plaintiffs assert a claim against the City and against Defendants Nifong, Wilson, DSI, Clark, Meehan, Gottlieb, Himan, Addison, in their individual capcities for Malicious Prosecution and Conspiracy, including conspiring to manufacture false and misleading expert reports, intimidating witnesses, and manipulating witness identification procedures in order to advance the criminal process against Plaintiffs.

Under North Carolina law, a plaintiff asserting a claim of malicious prosecution must show that the defendant "(1) instituted, procured, or participated in the criminal proceeding against [the] plaintiff; (2) without probable cause; (3) with malice; and (4) the prior proceeding terminated in favor of [the] plaintiff." Moore v. Evans, 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996) (quoted in Hill v. Hill, 142 N.C. App. 524, 537, 545 S.E.2d 442, 451 (2001) (Tyson, J., dissenting) (adopted as the decision of the Supreme Court of North Carolina in Hill v. Hill, 354 N.C. 348, 553 S.E.2d 679 (2001))).  With respect to the first prong of this test, the North Carolina Court of Appeals has repeatedly recognized that an action for malicious prosecution can lie against anyone who "instituted, procured or participated in the criminal proceeding against [the] plaintiff." See, e.g., Thomas v. Sellers, 142 N.C. App. 310, 314, 542 S.E.2d 283,

67

287 (2001). In <u>Moore v. City of Creedmoor</u>, the North Carolina Supreme Court was equally divided on the question of whether a Chief of Police "initiated" a suit when he provided information to the district attorney and the district attorney filed a <u>civil</u> nuisance suit. <u>See</u> 345 N.C. 356, 371, 481 S.E.2d 14, 24 (1997) (noting that the court was equally divided on this question). However, North Carolina courts have continued to recognize malicious prosecution claims against individuals who provide evidence and information used in a criminal prosecution. <u>See, e.g.</u>, <u>Nguyen v. Burgerbusters, Inc.</u>, 182 N.C. App. 447, 450-54, 642 S.E.2d 502, 505-07 (2007); <u>Becker v. Pierce</u>, 168 N.C. App. 671, 675-78, 608 S.E.2d 825, 828-30 (2005). In this regard, "[i]t is well established that the act of giving honest assistance and information to prosecuting authorities does not render one liable for malicious prosecution." <u>Nguyen</u>, 182 N.C. App. at 450, 642 S.E.2d at 506 (internal quotation omitted). "However, where 'it is unlikely there would have been a criminal prosecution of [a] plaintiff except for the efforts of a defendant, [the North Carolina Court of Appeals] has held a genuine issue of fact existed and the jury should consider the facts comprising the first element of malicious prosecution." <u>Id.</u> (internal quotation omitted). Where the claim of malicious prosecution is made against a police officer or investigator, North Carolina courts have recognized potential malicious prosecution claims where an officer arrested an individual and brought them before a magistrate without probable cause and then allowed the prosecution to continue even after another person was arrested. <u>See</u> <u>Moore</u>, 124 N.C. App. at 42-46, 476 S.E.2d at 421-24; <u>see also</u> <u>Hedgepeth v. Swanson</u>, 223 N.C. 442, 444-45, 27 S.E.2d 122, 123-24 (1943) (holding that a sheriff may be liable for malicious prosecution for submitting a false affidavit to obtain a search warrant,

68

criminal warrant, and arrest of a citizen without probable cause out of hate and revenge, and with malice).

In the present case, Plaintiffs have alleged that Defendants Nifong, Addison, Gottlieb, Himan, Wilson, Clark, and Meehan all procured or participated in the proceedings against them by manufacturing and manipulating evidence on which the prosecution was based. Defendants Gottlieb, Himan, Wilson, Clark, and Meehan nevertheless contend that they cannot be liable for malicious prosecution for providing information to the prosecutor. However, Plaintiffs have alleged that Defendants Gottlieb, Himan, Wilson, Clark, and Meehan did not just give honest information and assistance to Defendant Nifong. Instead, Plaintiffs allege that these Defendants created false and misleading evidence, conspired with Nifong to initiate the prosecution, and affirmatively participated in efforts to initiate and maintain that prosecution, such that the criminal prosecution would not have existed except for the efforts of these Defendants. Similarly with respect to Defendant Addison, Plaintiffs allege that Addison made false and inflammatory public statements in his role as official Durham Police spokesperson, acting in concert with the other Durham Police Defendants, intending to inflame the jury pool, compromise the fairness of the criminal proceedings, and otherwise procure the prosecution of Plaintiffs. Therefore, the Court finds that the allegations are sufficient to satisfy the first prong of the claim for malicious prosecution as to Addison. As a result, the Court concludes that the allegations are sufficient to satisfy the first prong as to Defendants Nifong, Wilson, Gottlieb, Himan, Meehan, Clark, and Addison.

Defendants Gottlieb, Himan, Meehan, and Clark also contend that they cannot be liable

69

for malicious prosecution because they acted in good faith to assist in the investigation and perform their assignments. These Defendants are correct that as to any Defendant who was acting in good faith, or even who may have been simply negligent, Plaintiffs cannot state a claim for malicious prosecution. To state a claim for malicious prosecution under state law, a plaintiff must establish that the defendant acted with malice, that is, that the defendant was "motivated by personal spite and a desire for revenge" or that the defendant acted with "reckless and wanton disregard" for the plaintiffs' rights. Hill v. Hill, 142 N.C. App 524, 537, 545 S.E.2d 442, 451 (2001) (Tyson, J., dissenting) (adopted as the decision of the Supreme Court in Hill v. Hill, 354 N.C. 348, 553 S.E.2d 679 (2001)); Moore, 345 N.C. at 371, 481 S.E.2d at 24. However, in the present case, Plaintiffs allege that these Defendants were all acting with "malice, spite, ill-will, and wanton disregard for Plaintiffs' rights" by intentionally creating false and misleading evidence to support the prosecution. (Second Am. Compl. ¶ 489-494). Ultimately, it will be Plaintiffs' burden to prove this allegation, and summary judgment will be appropriate on this claim as to any Defendant who was acting in good faith or was simply negligent. Nevertheless, at this stage, Plaintiffs have alleged that the Defendants acted with the requisite malice.

Finally, as noted above, Defendant Nifong enjoys absolute prosecutorial immunity for the decision to prosecute, but that immunity does not extend to investigatory acts by Defendants Nifong and Wilson, particularly the creation of false and misleading evidence during the investigation. North Carolina courts have not specifically considered the reach of absolute prosecutorial immunity with respect to acts of investigators hired by District Attorneys, such as Defendant Wilson, or to investigatory acts of District Attorneys themselves.

70

However, in their Motions to Dismiss, Defendants Nifong and Wilson assume that the federal rule set out in Buckley applies to state law claims as well.  See Buckley v. Fitzsimmons, 509 U.S. 259, 273-76, 113 S. Ct. 2606, 2615-17, 125 L. Ed. 2d 209 (1993) (concluding that absolute prosecutorial immunity does not extend to investigatory or administrative acts).  Therefore, at least for purposes of the present Motions, this Court will assume that North Carolina courts would apply a rule similar to the federal rule for determining the scope of prosecutorial immunity for state law claims brought against prosecutors or their investigators in their individual capacities for non-judicial, investigatory activities like those ordinarily performed by police officers, and would conclude that Defendants Wilson and Nifong do not have absolute prosecutorial immunity for their non-judicial investigatory activities.  See Strong's North Carolina Index 4th, District Attorneys § 9 (noting that "[a]bsolute immunity does not extend to conduct taken by a prosecutor in an investigatory capacity"); Buckley, 509 U.S. at 273-76, 113 S. Ct. at 2615-17.  Therefore, the Court concludes that Defendants Nifong and Wilson are not immune from a claim of malicious prosecution for their investigatory actions to the extent they are alleged to have acted with the requisite malice.

Similarly, with respect to the state law claims against Clark and Meehan, the Court notes that under state law, reports and testimony made by a witness or in preparation for being called as a witness in a judicial proceeding are subject to absolute privilege under state law.  See Sharp v. Miller, 121 N.C. App. 616, 617, 468 S.E.2d 799, 801 (1996); Williams v. Congdon, 43 N.C. App. 53, 55, 257 S.E.2d 677, 678 (1979).  However, as discussed previously, Plaintiffs contend that their claims here are based on non-testimonial investigative work by Meehan and Clark that

included participation in a conspiracy to create false and misleading evidence. Therefore, the Court concludes that while Meehan and Clark are entitled to absolute immunity for their testimony, Plaintiffs may state potential claims to the extent they were functioning in an investigatory capacity to the same extent as the other investigators.

Therefore, having considered the issues that have been raised, the Court concludes that the claim for malicious prosecution will go forward as to Defendants Nifong, Wilson, Himan, Gottlieb, Clark, Meehan, and Addison in their individual capacities. In addition, to the extent that the individual Defendants are alleged to have been acting in the course and scope of their employment, the principle of *respondeat superior* would apply to this state tort claim. In this regard, with respect to state torts, "liability of a principal for the torts of his agent may arise in three situations: (1) when the agent's act is expressly authorized by the principal; (2) when the agent's act is committed within the scope of his employment and in furtherance of the principal's business; or (3) when the agent's act is ratified by the principal." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 491, 340 S.E.2d 116, 121 (1986). Plaintiffs have alleged *respondeat superior* liability for the employers of the individuals named in this Count, and therefore this claim will go forward against the City based on the allegations against Defendants Himan and Gottlieb, and against DSI based on the allegations against Defendants Clark and Meehan.[20]

_____

[20] The Court notes that *respondeat superior* liability would not extend liability to the City for the alleged torts of Meehan and Clark, who were employees of DSI. In addition, the claims against Nifong and Wilson would not impose *respondeat superior* liability on the City since they are not City employees. As discussed in Count 5, Defendant Nifong does not have an official capacity with respect to the City, and any official capacity claim against Nifong would be a claim against the State, which Plaintiffs have not asserted here. Therefore, the claims against the City

72

Based on the foregoing, the Motions to Dismiss Count 13 will be denied, and the claims asserted in Count 13 for malicious prosecution will go forward as to Defendants Nifong, Wilson, Himan, Gottlieb, Clark, Meehan, Addison, DSI and the City.

**Count 14:**   **Obstruction of Justice and Conspiracy, asserted against the City and against Nifong, Wilson, Gottlieb, Himan, Clark, Meehan, DSI, in their individual capacities**

Count 14 is a claim for Obstruction of Justice asserted against Defendants Nifong, Wilson, DSI, Clark, Meehan, Gottlieb, Himan, and the City based on alleged Obstruction of Justice and Conspiracy, including conspiring to manufacture false and misleading reports, intimidating witnesses, and manipulating witness identification procedures in order to advance the criminal process against Plaintiffs.

"Obstruction of justice is a common law offense in North Carolina. . . . It is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice." Jones v. City of Durham, 183 N.C. App. 57, 59, 643 S.E.2d 631, 633 (2007) (internal quotations omitted) (citing In re Kivett, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983) and Broughton v. McClatchy Newspapers, Inc., 161 N.C. App. 20, 33, 588 S.E.2d 20, 30 (2003)).  This tort would include, for example, claims that "Defendants attempted to impede the legal justice system through [a] false affidavit," Jackson v. Blue Dolphin Commc'ns of N.C., L.L.C., 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002), and claims that Defendants "conspired to impede [the] investigation of this case by destroying . . . records and by falsifying and fabricating records." Henry v. Deen, 310 N.C. 75, 86, 310 S.E.2d 326, 333 (1984); see also Reed v. Buckeye Fire Equip., 241 Fed. Appx.

---

are based on the alleged conduct of Gottlieb and Himan, and the claims against DSI are based on the alleged torts of Clark and Meehan.

73

917, 928 (4th Cir. 2007) (collecting cases).

In the present case, Plaintiffs contend that Defendants Nifong, Wilson, Gottlieb, Himan, Clark, Meehan, and DSI obstructed justice by manufacturing false and misleading evidence and intimidating witnesses in a manner that impaired the judicial process. Although not separately repeated in Count 14, Plaintiffs have also alleged throughout the Second Amended Complaint that these Defendants were motivated by malice, spite, ill-will and wanton disregard for Plaintiffs' rights in order to overcome any public official immunity that might otherwise apply. In addition, Plaintiffs have sufficiently alleged that these actions were taken by Defendants Nifong and Wilson in an investigatory capacity, such that absolute prosecutorial immunity would not apply, at least as to those investigatory activities. Therefore, the Court concludes that Plaintiffs have stated a claim for obstruction of justice against Defendants Nifong, Wilson, Gottlieb, Himan, Clark, and Meehan, although the Court notes again that it will be Plaintiffs' burden to present evidence in support of this claim as to each individual Defendants.

In addition, Plaintiffs have also asserted this claim against the City based on the principle of *respondeat superior*, pursuant to which the City is held liable for the acts of its employees. Therefore, the claim for Obstruction of Justice will go forward against the City based on the claim asserted against Defendants Gottlieb and Himan in their official capacities. This claim will also go forward against DSI on the basis of potential *respondeat superior* liability for the alleged torts of Clark and Meehan.[21] Therefore, the Motions to Dismiss will be denied, and

---

[21] As noted above, *respondeat superior* liability would not extend liability to the City for the alleged torts of Meehan and Clark, who were employees of DSI. In addition, the claims against

74

Count 14 will go forward against DSI and the City, and against Nifong, Wilson, Gottlieb, Himan, Clark, and Meehan in their individual capacities.

**Count 15:      Intentional Infliction of Emotional Distress and Conspiracy, asserted against the City and against Nifong, Wilson, Gottlieb, Himan, Addison, Hodge, Clark, Meehan, DSI, in their individual capacities**

Count 15 is asserted against the City and against Defendants Nifong, Wilson, DSI, Clark, Meehan, Gottlieb, Himan, Hodge, Addison, in their individual capacities for Intentional Infliction of Emotional Distress and Conspiracy for manufacturing inculpatory evidence, making false and inflammatory statements, and intimidating witnesses, all with the intent to cause Plaintiffs to suffer severe emotional distress.

Under North Carolina law, "liability arises under the tort of intentional infliction of emotional distress when a defendant's conduct exceeds all bounds of decency tolerated by society and the conduct causes mental distress of a very serious kind." West v. King's Dep't Store, Inc., 321 N.C. 698, 704, 365 S.E.2d 621, 625 (1988). "The essential elements of an action for intentional infliction of emotional distress are '1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress.'" Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (quoting Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981)). With respect to the first element, conduct is "extreme and outrageous" when it is "so outrageous in character, and so extreme in degree, as to go beyond

_____

Nifong and Wilson would not impose *respondeat superior* liability on the City since they are not City employees. As discussed in Count 5, Defendant Nifong does not have an official capacity with respect to the City, and any official capacity claim against Nifong would be a claim against the State, which Plaintiffs have not asserted here. Therefore, the claims against the City are based on the alleged conduct of Gottlieb and Himan, and the claims against DSI are based on the alleged torts of Clark and Meehan.

75

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986). With respect to the second element, "[a] defendant is liable for this tort when he 'desires to inflict severe emotional distress . . . [or] knows that such distress is certain, or substantially certain, to result from his conduct . . . [or] where he acts recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow' and the mental distress does in fact result." Dickens v. Puryear, 302 N.C. 437, 449, 276 S.E.2d 325, 333 (1981) (quoting Restatement (Second) of Torts § 46 cmt. i (1965)). With respect to the third element, "the term 'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Waddle, 331 N.C. at 83, 414 S.E.2d at 27 (quoting Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97, reh'g denied, 327 N.C. 644, 399 S.E.2d 133 (1990)). "Humiliation and worry are not enough." Jolly v. Acad. Collection Serv., 400 F. Supp. 2d 851, 866 (M.D.N.C. 2005). The North Carolina Supreme Court has noted that "[e]motional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea," but "*[i]t is only where it is extreme that the liability arises.*" Waddle, 331 N.C. 73, 84, 414 S.E.2d 22, 27 (1992) (emphasis in original); see also Pacheco v. Rogers & Breece, Inc., 157 N.C. App. 445, 451, 579 S.E.2d 505, 509 (2003)

76

(applying this standard and noting that "[e]ven assuming, *arguendo*, that some issues are 'too obvious to dispute,' the legal presence of severe emotional distress is not among these,'" and rejecting the contention that outrageous conduct can substitute for severe emotional distress).

In the present case, with respect to the requirement that Plaintiffs have suffered "severe emotional distress," the Court notes that in the Second Amended Complaint, Plaintiffs do not include any specific allegations of emotional or mental disorders or severe and disabling emotional or mental conditions suffered by any of the Plaintiffs individually. Indeed, the Second Amended Complaint does not include any specific identification of any particular Plaintiff's mental or emotional condition or the nature of his emotional distress. With respect to this issue, this Court has previously dismissed claims for intentional infliction of emotional distress ("IIED") where the complaint included only a conclusory statement of damages, without any "factual allegations regarding the type, manner, or degree of severe emotional distress [the plaintiff] experienced." Swaim v. Westchester Acad., Inc., 170 F. Supp. 2d 580, 585 (M.D.N.C. 2001); see also Vogler v. Countrywide Home Loans, Inc., No. 1:10CV370, 2010 WL 3394034, at *9 (M.D.N.C. Aug. 26, 2010) (dismissing claim as insufficient where "[p]laintiffs assert that they suffered severe emotional distress, but do not allege any facts in support of this assertion"); Baucom v. Cabarrus Eye Ctr., P.A., No. 1:06CV209, 2007 WL 1074663, at *5 (M.D.N.C. Apr. 4, 2007) (noting that "[a]lthough the amended complaint makes the conclusory statement that Defendant's actions caused 'great emotional distress,' Plaintiff does not allege any facts or conditions from which she suffered to support this motion"); cf. Holleman v. Aiken, 193 N.C. App. 484, 501, 668 S.E.2d 579, 590 (2008) (concluding that the

plaintiff had failed to allege a claim for IIED where the "plaintiff has failed to make any specific allegations as [to] the nature of her severe emotional distress"); Soderlund v. Kuch, 143 N.C. App. 361, 371, 546 S.E.2d 632, 639 (2001) ("The crux of establishing 'severe emotional distress' is that the emotional or mental disorder may generally be diagnosed by professionals trained to do so," even if an actual diagnosis has not been made); Fox-Kirk v. Hannon, 142 N.C. App. 267, 281, 542 S.E.2d 346, 356 (2001) (holding that a claim for infliction of emotional distress was "not justiciable" where, at the time of the filing of the complaint, the plaintiff "had not sought any medical treatment or received any diagnosis for any condition that could support a claim for severe emotional distress").

In the present case, Plaintiffs contend that they "have suffered and continue to suffer from emotional and mental conditions generally recognized and diagnosed by trained professionals." However, a "label and conclusion" or "naked assertion" will not suffice under the pleading standards set out in Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Plaintiffs have failed to include any factual allegations as to each Plaintiff's emotional or mental disorders, condition, or diagnosis, in order to support the contention that each of them suffered from severe emotional distress. Plaintiffs also failed to sufficiently allege a link between any emotional or mental disorder or condition and the specific misconduct alleged in this claim.[22] Therefore, Defendants' Motions to Dismiss as to Count 15 will be granted, and Plaintiffs' claims for intentional infliction of emotional distress will be dismissed on this basis.

---

[22] The Court notes, however, that emotional distress damages are nevertheless recoverable under Counts 1-6 and 13 and 14, which are going forward, without any additional factual allegations regarding the nature, diagnosis, or severity of Plaintiffs' emotional distress.

**Count 16:** **Negligence, asserted against the City**

Count 16 is a claim against the City for Negligence, alleging failure by Defendants Hodge and Addison to use due care in making public statements regarding the investigation, and failure of Defendants Gottlieb and Himan to use due care in conducting the investigation. "Actionable negligence is the failure to exercise that degree of care which a reasonable and prudent person would exercise under similar conditions." Hart v. Ivey, 332 N.C. 299, 305, 420 S.E.2d 174, 177-78 (1992). Liability is established "if the negligence is the proximate cause of injury to a person to whom the defendant is under a duty to use reasonable care." Id. at 305, 420 S.E.2d at 178.

This claim was originally asserted against Defendants Gottlieb, Himan, Hodge, and Addison in their individual and official capacities, as well as the City. However, Plaintiffs agree that any negligence claims asserted against the individual Defendants in their individual capacities would be barred by public official immunity. "The public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003); see also Thomas v. Sellers, 142 N.C. App. 310, 313, 542 S.E.2d 283, 286 (2001) (noting that under state law, a public officer is not liable in his individual capacity unless his conduct is "malicious, corrupt, or outside the scope of his official authority"); Moore v. Evans, 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996). Plaintiffs also agree that the "official capacity" claims are actually claims against the City. Therefore, this negligence claim is now being asserted only against the City.

79

However, the City has not addressed this claim in its briefing to the extent that Plaintiffs assert this claim against the City based on alleged negligence by City employees Gottlieb, Himan, and Addison.[23]  Therefore, this claim for negligence against the City will not be dismissed at this time.  To the extent that the City asks for the opportunity to raise additional argument on these claims, the City may raise those arguments after discovery in summary judgment motions.[24]  Therefore, this claim will go forward at this time.

**Count 17:    Negligent Supervision, Hiring, Training, Discipline, and Retention, asserted against the City**

Count 17 is a claim for Negligent Supervision, Hiring, Training, Discipline, and Retention for negligent supervision of Defendants Addison, Gottlieb, and Himan in the course of the investigation.  "North Carolina recognizes the existence of a claim against an employer for negligence in employing or retaining an employee whose wrongful conduct injures another."  Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 494, 340 S.E.2d 116, 123 (1986).  This type of claim "becomes important in cases where the act of the employee either was not, or may not have been, within the scope of his employment."   Id. at 495, 340 S.E.2d at 124.

---

[23] In its renewed Motion to Dismiss, the City attempts to incorporate the briefing of Defendants Himan and Addison with respect to these claims.  However, because this claim was not raised in the City's briefing, Plaintiffs have not had the opportunity to respond to this contention as it relates to the City.  The Court will therefore consider this issue further at summary judgment to the extent that Plaintiffs' claims against the City are based in negligence.

[24] The City has filed a separate, pre-discovery Motion for Summary Judgment as to this claim raising the defense of governmental immunity, and that Motion is addressed below in relation to Count 23.  The Court also notes that other claims are going forward against the City under 42 U.S.C. § 1983 and state law, and therefore it is more appropriate to allow further briefing on the negligence claims at summary judgment with the other claims, rather than undertaking additional briefing on Motions to Dismiss.

"However, before the employer can be held liable, plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." Id.

This claim was originally asserted against the individual Supervisory Defendants in both their official and individual capacities, but Plaintiffs concede that the "official capacity" claims are duplicative of the claim against the City and may be dismissed. With respect to the "individual capacity" claims, Plaintiffs concede that these claims would be barred by public official immunity. As noted above, "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003); see also Thomas v. Sellers, 142 N.C. App. 310, 313, 542 S.E.2d 283, 286 (2001); Moore v. Evans, 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996). Therefore, this claim is now being asserted only against the City.

To the extent that this claim is asserted against the City, the Court concludes that this claim should go forward at the time. In this regard, the Court notes that just as in Count 16, the City has not addressed this claim in its briefing. To the extent that the City asks for the opportunity to raise additional argument on these claims, the City may raise those arguments after discovery in summary judgment motions.[25] Therefore, the claims against the City in

---

[25] The City has filed a separate, pre-discovery Motion for Summary Judgment as to this claim raising the defense of governmental immunity, and that Motion is addressed below in relation to Count 23. The Court also notes that other claims are going forward against the City under 42 U.S.C. § 1983 and state law, and therefore it is more appropriate to allow further briefing on the negligence claims at summary judgment with the other claims, rather than undertaking additional briefing on Motions to Dismiss.

Count 17 will go forward at this time.

**Count 18 & 19:    Negligent Infliction of Emotional Distress, asserted against the City**

Count 18 is a claim for Negligent Infliction of Emotional Distress for actions by Defendants Gottlieb and Himan and the Supervisory Defendants (Baker, Chalmers, Hodge, Russ, Council, Lamb, and Ripberger) for manufacturing false evidence, concealing evidence, and violating Durham Police Department procedures. Count 19 is also a claim for Negligent Infliction of Emotional Distress, this claim based on actions by Addison and the Supervisory Defendants involving the publication of false and inflammatory statements.[26]

In order to state a claim for Negligent Infliction of Emotional Distress ("NIED") under North Carolina law, "a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . . , and (3) the conduct did in fact cause the plaintiff severe emotional distress." McAllister v. Khie Sem Ha, 347 N.C. 638, 645, 496 S.E.2d 577, 582-83 (1998) (quoting Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990), reh'g denied, 327 N.C. 644, 399 S.E.2d 133 (1990)). Thus, to state a claim

---

[26] These claims were originally asserted against the individual Defendants in both their official and individual capacities, but Plaintiffs concede that the "official capacity" claims are duplicative of the claim against the City and may be dismissed. With respect to the "individual capacity" claims, Plaintiffs concede that these claims would be barred by public official immunity. As noted above, "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003); see also Thomas v. Sellers, 142 N.C. App. 310, 313, 542 S.E.2d 283, 286 (2001); Moore v. Evans, 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996). Therefore, these claims are now being asserted only against the City.

for NIED, Plaintiffs must allege a sufficient basis to support the contention that that they each suffered "severe emotional distress" under North Carolina law, and that the "severe emotional distress was the foreseeable and proximate result" of the defendant's alleged negligence. Id. at 645, 496 S.E.2d at 583. "[M]ere temporary fright, disappointment or regret will not suffice." Id. As with a claim for intentional infliction of emotional distress, "severe emotional distress" requires an "emotional or mental disorder . . . which may be generally recognized and diagnosed by professionals trained to do so." Id.

As noted above, in the Second Amended Complaint, Plaintiffs do not include any specific allegations of emotional or mental disorders or severe and disabling emotional or mental conditions suffered by any of the Plaintiffs, and the Second Amended Complaint does not include any specific identification of any particular Plaintiff's mental or emotional condition or the nature of their emotional distress. It is not sufficient to state summarily that all Plaintiffs suffered "severe emotional distress." As noted above, Plaintiffs have failed to detail the specifics of each Plaintiff's emotional or mental disorders, condition, or diagnosis. Cf. Holleman v. Aiken, 193 N.C. App. 484, 502, 668 S.E.2d 579, 590 (2008) (dismissing NIED claim because "plaintiff does not make any specific factual allegation as [to] her 'severe emotional distress'); Swaim v. Westchester Acad., Inc., 170 F. Supp. 2d 580, 585 (M.D.N.C. 2001). Therefore, the Motion to Dismiss as to Count 18 and 19 will be granted, and Plaintiffs' claims for negligent infliction of emotional distress against the City will be dismissed.[27]

_____

[27] The Court notes that the City moved to dismiss these claims in its Renewed Motion to Dismiss, but the City did not address these claims in its original briefing. However, other Defendants addressed these and other claims for Intentional and Negligent Infliction of Emotional Distress, and as in those other claims, the Court concludes that Plaintiffs have failed

**Count 20:      Negligence, asserted against Clark, Meehan, and DSI**

Count 20 is a negligence claim asserted against DSI and Defendants Clark and Meehan in their individual and official capacities.[28]  Count 20 alleges a claim for Negligence in preparing the expert report and disclosing the results of the analysis.

As noted above, under North Carolina law, a plaintiff states a claim for negligence if he alleges sufficient facts to establish "(1) that there has been a failure to exercise proper care in the performance of some legal duty which defendant owed to plaintiff under the circumstances in which they were placed; and (2) that such negligent breach of duty was a proximate cause of the injury."  Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 232, 311 S.E.2d 559, 564 (1984); see also Estate of Mullis by Dixon v. Monroe Oil Co., 349 N.C. 196, 201, 505 S.E.2d 131, 135 (1998) (noting that a common law negligence claim has four essential elements: "duty, breach of duty, proximate cause, and damages").

However, in the present case, Plaintiffs have not identified any legally cognizable duty of care that Clark, Meehan, and DSI would owe to the Plaintiffs.  According to the allegations in the Second Amended Complaint, Clark, Meehan, and DSI were operating pursuant to a request from Nifong or Durham Officials.  Therefore, while Clark, Meehan, and DSI may have had an obligation to the City, that did not create a duty to others who were not parties to the agreement.  North Carolina has adopted the rule from the Restatement (First) of Contracts

to sufficiently allege "severe emotional distress."

[28] To the extent claims are asserted against Clark and Meehan in their "official capacities," the Court notes that Clark and Meehan were employees and agents of DSI, and the "official capacity" claims must be construed as claims against DSI, not against the City.

§ 145, that "'A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless, (a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences, or (b) the promisor's contract is with a municipality to render services the nonperformance of which would subject the municipality to a duty to pay damages to those injured thereby.'" <u>Matternes v. City of Winston-Salem</u>, 286 N.C. 1, 14-15, 209 S.E.2d 481, 488-89 (1974) (adopting the rule from the Restatement (First) of Contracts § 145 (1932)).  There is no allegation here to support the conclusion that the agreement by Nifong or the City with DSI manifested an intent to compensate members of the public or that nonperformance of the contract would subject the City to damages.  <u>Cf.</u> <u>Walker v. City of Durham</u>, 158 N.C. App. 747, 582 S.E.2d 80, 2003 WL 21499222, at *2 (2003) (table opinion) (finding no liability for City for negligent handling or destruction of evidence or for failing to conduct DNA tests).  Therefore, the Court concludes that Clark, Meehan, and DSI did not owe a duty of care to Plaintiffs, and Plaintiffs cannot recover from Clark, Meehan, or DSI for simple negligence.[29]  Therefore, the Motions to Dismiss will be granted as to Count 20, and this claim will be dismissed.

**Count 21:** **Negligent Supervision, Hiring, Training, Discipline, and Retention, asserted against Clark, Meehan, and DSI**

---

[29] To the extent that Plaintiffs base their claim on intentional misconduct involving falsification or fabrication of evidence, those claims are considered as part of Plaintiffs' claim for malicious prosecution and obstruction of justice in Counts 13 and 14.

85

Count 21 alleges a claim for Negligent Supervision, Hiring, Training, Discipline, and Retention against Clark and DSI for negligently hiring, supervising, training, and retaining Meehan, and against Clark, Meehan, and DSI for negligently hiring, supervising, training, and retaining the lab personnel assisting Meehan with respect to the preparation of reports of scientific testing.

"North Carolina recognizes the existence of a claim against an employer for negligence in employing or retaining an employee whose wrongful conduct injures another." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 494, 340 S.E.2d 116, 123 (1986). This type of claim "becomes important in cases where the act of the employee either was not, or may not have been, within the scope of his employment." Id. at 495, 340 S.E.2d at 124. "However, before the employer can be held liable, plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." Id.

Thus, under North Carolina law, an employer may be held liable for the tortious acts of its employees, based on either a theory of (1) *respondeat superior* if the employee was acting in the scope of his or her employment, or (2) negligent supervision if, "prior to the [tortious] act, the employer knew or had reason to know of the employee's incompetency" even if "the act of the employee either was not, or may not have been, within the scope of his employment" Id. at 495, 340 S.E.2d at 124. Therefore, the negligent supervision claim may be asserted as an alternative to *respondeat superior* liability under state law.

In the present case, the Court has concluded that the negligence claim in Count 20

86

against Clark and Meehan should be dismissed, and therefore no negligent supervision claim can be raised as to that dismissed claim. However, the Court has also concluded that the claims for malicious prosecution and obstruction of justice are going forward as to Defendants Clark and Meehan. The claims for malicious prosecution and obstruction of justice are also going forward against DSI on the basis of *respondeat superior* liability. As discussed above, a negligent supervision claim may be asserted as an alternative to *respondeat superior* liability under state law, and applies even if the employee was not acting within the scope of his employment, if the employer knew or had reason to know of the employee's incompetency. Id. Therefore, the Court will not dismiss the claim asserted in Count 21 for negligent supervision to the extent that it is asserted against DSI for negligent supervision of Clark and Meehan.

However, a claim for negligent hiring, retention, and supervision would be actionable only against the employer, not the individual supervisors. Cf. Foster v. Crandell, 181 N.C. App. 152, 170-71, 638 S.E.2d 526, 538-39 (2007) (noting that liability for negligent hiring or retention would extend only to an employer who employed an incompetent employee either as an employee or independent contractor, not to co-employees); Ostwalt v. Charlotte-Mecklenburg Bd. of Educ., 614 F. Supp. 2d 603, 609 (W.D.N.C. 2008) ("North Carolina courts have determined that no claim for negligent supervision lies when the Defendant is not the employer of the individual who commits the tortious act."). Therefore, this claim is properly dismissed as to Clark and Meehan individually. Therefore, the Motions to Dismiss Count 21 will be granted as to Defendants Clark and Meehan individually, and those claims will be dismissed. However, the Motions to Dismiss Count 21 will be denied as to DSI, their employer, and that

87

claim will go forward at this time.

**Count 22:    Negligent Inflection of Emotional Distress, asserted against Clark, Meehan, and DSI**

Count 22 alleges a claim for Negligent Inflection of Emotional Distress against Defendants Clark, Meehan, and DSI and for manufacturing false evidence and failing to follow proper standards, resulting in severe emotional distress to Plaintiffs.

As discussed above, in order to state a claim for Negligent Inflection of Emotional Distress ("NIED") under North Carolina law, Plaintiffs must allege a sufficient basis to support the contention that they each suffered "severe emotional distress" under North Carolina law, and that the "severe emotional distress was the foreseeable and proximate result" of Defendants' alleged negligence. McAllister v. Khie Sem Ha, 347 N.C. 638, 645, 496 S.E.2d 577, 583 (1998). As with a claim for intentional infliction of emotional distress, "severe emotional distress" requires an "emotional or mental disorder . . . which may be generally recognized and diagnosed by professionals trained to do so." Id. However, Plaintiffs have failed to include any specific allegations of emotional or mental disorders or severe and disabling emotional or mental conditions suffered by any of the Plaintiffs, and the Second Amended Complaint does not include any specific identification of any particular Plaintiff's mental or emotional condition or the nature of their emotional distress. Cf. Holleman v. Aiken, 193 N.C. App. 484, 502, 668 S.E.2d 579, 591 (2008); Swaim v. Westchester Acad., Inc., 170 F. Supp. 2d 580, 585 (M.D.N.C. 2001). Therefore, Plaintiffs' claims for negligent infliction of emotional distress in Count 22

will be dismissed.[30]

**Count 23:  Violation of the North Carolina Constitution, asserted against the City**

Finally, Plaintiffs in the Second Amended Complaint have added Count 23, which is a claim against the City for violation of the North Carolina Constitution.  As the basis for this claim, Plaintiffs contend that they have been deprived of their rights under Article I, Section 19 of the North Carolina Constitution.  As part of the claim, Plaintiffs note that this cause of action is pled "as an alternative remedy, should the City prevail in its contention that the other state-law causes of action pleaded herein are barred in whole or part by principles of governmental immunity."  (Second Am. Compl. ¶ 571).

With respect to these contentions, the Court notes that, as discussed above, Plaintiffs have asserted state law claims against the City for malicious prosecution, obstruction of justice and negligence with respect to Counts 13, 14, 16, and 17 that will not be dismissed on a Motion to Dismiss.  However, the City has filed a separate Motion for Summary Judgment [Doc. #78], contending that the state law claims are barred by the doctrine of governmental immunity.  In this regard, the City enjoys governmental immunity on these state law claims except to the extent that its immunity has been waived by the purchase of insurance.  See Mullins v. Friend, 116 N.C. App. 676, 680, 449 S.E.2d 227, 229 (1994); N.C. Gen. Stat. § 160A-485(a).  Plaintiffs have alleged in the Second Amended Complaint that the doctrine of governmental immunity does not apply to bar the state law claims because "the City of Durham has purchased liability insurance and/or participates in a municipal risk-pooling scheme sufficient under N.C. Gen.

---

[30] Moreover, the Court notes that, as discussed in Count 20, Plaintiffs cannot state a negligence claim against Clark, Meehan, or DSI in any event.

89

Stat. § 160A-485 to waive its immunity against civil liability." (Second Am. Compl. ¶ 17). However, in the Motion for Summary Judgment, the City contends that it has not purchased insurance that would waive its immunity for the state law claims asserted by Plaintiffs. Specifically, the City contends that while it has purchased insurance coverage, those policies do not extend coverage to claims against the City for which a defense of governmental immunity would otherwise be available.

After the Motion for Summary Judgment was filed, the North Carolina Supreme Court issued a decision in Craig v. New Hanover County Bd. of Educ., 363 N.C. 334, 340, 678 S.E.2d 351, 355 (2009), concluding that a claim may potentially be asserted under the state constitution if other state law claims would be barred by governmental immunity. Therefore, in response to that decision, Plaintiffs subsequently added the claim in Count 23 as an alternative claim, should it ultimately be determined that the state law claims would otherwise be barred by governmental immunity.

In their renewed Motions to Dismiss, Defendants contend that Count 23 should be dismissed because Plaintiffs cannot state a claim under the North Carolina Constitution. Defendants contend that Plaintiffs have not alleged any constitutional violation and that Plaintiffs have other "adequate remedies" at state law. Under North Carolina law, a claim under the state constitution may only be asserted when there is no other adequate remedy under state law. See id.; see also Corum v. Univ. of N.C., 330 N.C. 761, 782-86 413 S.E.2d 276, 289-92 (1992). Thus, to assert a direct constitutional claim, "a plaintiff must allege that no adequate state remedy exists to provide relief for the injury." Copper v. Denlinger, 363 N.C.

90

784, 788, 688 S.E.2d 426, 428 (2010). "An adequate state remedy exists if, assuming the plaintiff's claim is successful, the remedy would compensate the plaintiff for the same injury alleged in the direct constitutional claim." Estate of Fennell v. Stephenson, 137 N.C. App. 430, 437, 528 S.E.2d 911, 915-16 (2000), rev'd in part on other grounds, 354 N.C. 327, 554 S.E.2d 629 (2001). Moreover, an adequate remedy is one that "provide[s] the possibility of relief under the circumstances." Craig, 363 N.C. at 340, 678 S.E.2d at 355. Thus, "to be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." Id. at 339-40, 678 S.E.2d at 355.

In Craig, the Supreme Court held that where governmental immunity bars a common law negligence claim, that negligence claim does not provide an adequate remedy at state law. Id. The court further held that when a tort remedy is barred by governmental immunity, a "plaintiff may move forward in the alternative, bringing his colorable claims directly under [the] State Constitution based on the same facts that formed the basis for his common law negligence claim." Id. at 340, 678 S.E.2d at 355. The court noted that the "holding does not predetermine the likelihood that plaintiff will win other pretrial motions, defeat affirmative defenses, or ultimately succeed on the merits of his case. Rather, it simply ensures that an adequate remedy must provide the possibility of relief under the circumstances." Id. Thus, the state supreme court has concluded that where a negligence claim is asserted against the municipality but no recovery is available due to the doctrine of governmental immunity, then no adequate state remedy exists.

In the present case, unresolved questions remain with respect to whether there are other

adequate remedies under state law, particularly in light of the City's assertion of governmental immunity. Therefore, to the extent that Defendants contend that Count 23 should be dismissed because there are alternative remedies, the Court will deny the Motion to Dismiss as to Count 23, and allow it to go forward as a potential alternative claim should the City ultimately prevail on its governmental immunity defense.

Moreover, since these claims are going forward on an alternative basis, the Court concludes that there is no need to resolve the City's governmental immunity defense on a preliminary summary judgment determination, and that determination is better made after an opportunity for discovery and consideration with all of the remaining claims and defenses together. This approach is particularly appropriate here given that claims are proceeding against the City in any event under 42 U.S.C. § 1983. Therefore, the Motion to Dismiss as to Count 23 will be denied, and the City's Motion for Summary Judgment [Doc. #78] raising the governmental immunity defense will be denied at this time without prejudice to the City raising the defense as part of a comprehensive Motion for Summary Judgment at the close of discovery.

## IV.     CONCLUSION

Having undertaken this comprehensive review of the 23 claims asserted in this case, the Court concludes that the Motions to Dismiss will be granted in part and denied in part as set out herein. In summary, Counts 1, 2, and 3 will go forward under 42 U.S.C. § 1983 for alleged violations of the Fourth and Fourteenth Amendment for unlawful seizures without probable cause based on Plaintiffs' contentions that they were arrested pursuant to indictments that were

obtained by the intentional or reckless creation of false or misleading evidence used before the grand jury that was necessary to a finding of probable cause, or the deliberate or reckless omission of material information that officials knew would negate probable cause. These counts are proceeding against Defendants Nifong, Wilson, Gottlieb, Himan, Meehan, Clark, and DSI. Count 4 will go forward under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment based on alleged false and stigmatizing statements made in connection with the alleged constitutional violations in Counts 1, 2, and 3. Count 4 is proceeding as to Defendants Nifong, Addison, and Hodge. The claims asserted in Counts 1, 2, 3, and 4 are also going forward against the City based on the additional allegations contained in Count 5 setting out claims for municipal liability. However, to the extent that there are claims proceeding against the City, Plaintiffs may not recover punitive damages from the City. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S. Ct. 2748, 2762, 69 L. Ed. 2d 616 (1981).[31] Therefore, the claim for punitive damages against the City will be dismissed. Finally, the Court will allow the § 1983 claims in Counts 1, 2, 3, and 4 to go forward against the Durham Police "Supervisory Defendants," specifically, Baker, Chalmers, Hodge, Russ, Council, Lamb, and

---

[31] To the extent that Defendants also challenge Plaintiffs' request for injunctive relief, the Court notes that to have standing to assert a claim for injunctive relief, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct *and* the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" See City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S. Ct. 1660, 1665, 75 L. Ed. 2d 675 (1981) (emphasis added) (citations omitted). Plaintiffs must allege a "real and immediate threat of repeated injury" beyond just "speculation." Id. at 102-05, 103 S. Ct. at 1665-66. Given the claims that are proceeding against the City in this case, the Court concludes that there is no basis to further address the scope of remedies available at this time, and the Court will resolve the availability of injunctive relief at summary judgment after an opportunity for discovery.

93

Ripberger, based on Plaintiffs' allegations as discussed with respect to Count 6. However, at summary judgment, it will be Plaintiffs' burden to "pinpoint the persons in the decision-making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked," and the Court will scrutinize evidence regarding each Defendant's direct, individual involvement, and evidence regarding their individual intent, in order to determine whether any of them is potentially liable under § 1983 for their own conduct with respect to the alleged constitutional violations that are proceeding in this case.[32] With respect to the last § 1983 claim, set out in Count 7 as a claim for "Conspiracy," the Court concludes that this claim does not set out any separate constitutional violation, and all of the underlying claims are already addressed with respect to Counts 1-4. Therefore, the separate general "conspiracy" claim in Count 7 will be dismissed. In addition, Plaintiffs' claims in Counts 8, 9, 10, 11 and 12 asserted pursuant to 42 U.S.C. § 1985 and § 1986 fail to state a plausible, legally-viable claim and will be dismissed.

With respect to the state law claims, the Court concludes that Plaintiffs have stated a claim in Count 13 for malicious prosecution as to Defendants Nifong, Wilson, Himan, Gottlieb, Clark, Meehan, and Addison. The Court similarly concludes that Plaintiffs have stated a claim in Count 14 for Obstruction of Justice as to Defendants Nifong, Wilson, Gottlieb, Himan, Clark, and Meehan. Counts 13 and 14 will also go forward against the City and DSI on the basis of *respondeat superior* liability. In addition, as an alternative to *respondeat superior*

---

[32] In addition, special attention should be given during the discovery process to ensure that these Supervisors are not unduly burdened, in light of the potential qualified immunity defense and the protections it affords.

94

liability under state law, Plaintiffs have also stated a claim for negligent supervision as to the City in Count 17 and DSI in Count 21.

Finally, the state law claim for negligence against the City asserted in Count 16 is also going forward at this time, as are the alternative claims asserted against the City in Count 23 under the state constitution. With respect to the state law claims against the City in Counts 13, 14, 16, and 17, and the state constitutional claim asserted in Count 23, the Court concludes that these claims, and the governmental immunity defense raised in the City's Motion for Summary Judgment [Doc. #78], are intertwined claims, some of which are pled in the alternative, that must be resolved at summary judgment after an opportunity for discovery, given the factual issues raised.[33]

However, the Court concludes that Plaintiffs have failed to state a claim for Intentional Infliction of Emotional Distress in Count 15 or for Negligent Infliction of Emotional Distress in Counts 18, 19, and 22, and those claims will be dismissed. The Court also concludes that Plaintiffs have failed to state a claim for negligence against Defendants Clark, Meehan, and DSI as asserted in Count 20, and therefore the state law negligence claim in Count 20 will be dismissed.

Based on this determination, the Court notes that claims are going forward as to Defendant Nifong in Counts 1, 2, 3, 4, 13, and 14; against Defendants Gottlieb, Himan, Wilson, Clark, Meehan, and DSI in Counts 1, 2, 3, 13, and 14, plus Count 21 as to Defendant DSI;

---

[33] As with the § 1983 claims, Plaintiffs may not recover punitive damages against the City on the state claims. See Efird v. Riley, 342 F. Supp. 2d 413, 430 (M.D.N.C. 2004) (citing Long v. City of Charlotte, 306 N.C. 187, 208, 293 S.E.2d 101, 115 (1982)).

95

against Defendant Addison in Counts 4 and 13; against the City in Counts 1, 2, 3, and 4 (based on the allegations in Count 5), as well as in Counts 13, 14, 16, 17, and 23; and against Defendants Hodge, Baker, Chalmers, Russ, Council, Lamb, and Ripberger in Counts 1, 2, 3, 4, and 6. All of the remaining claims are dismissed, including all of the claims asserted in Counts 7, 8, 9, 10, 11, 12, 15, 18, 19, 20, and 22.

Having undertaken this comprehensive review of the claims asserted in this case, the Court notes that this case, like many § 1983 cases, is complex and involves multiple Defendants, requiring significant analysis, resulting in this rather extensive Memorandum Opinion. The Court notes that of the three "related cases," see *supra* note 1, this case involves the most significant alleged constitutional deprivations, but was commendably more concise. However, a complaint of over 150 pages, with over 570 numbered paragraphs, as in this case, is still beyond what is necessary or appropriate under Rule 8. Review of this case, and particularly of the related cases involving complaints that are 2 and 3 times as long, required the Court to undertake the time-consuming process of wading through a mass of legally unsupportable claims and extraneous factual allegations in an attempt to "ferret out the relevant material from a mass of verbiage." 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1281 (3d ed. 2004). The Court has nevertheless undertaken this process and has considered each of the claims in all three cases. Going forward, the parties are encouraged to make every effort to reduce the volume of filings and to avoid unnecessary rhetoric, and to proceed on the remaining claims in a direct, professional manner, without requiring unnecessary involvement from the Court.

The Court is also compelled to note that the allegations in the Second Amended Complaint that are going forward, particularly as to Counts 1-3, set out allegations of significant abuses of government power. Indeed, the intentional use of false or misleading evidence before a grand jury to obtain an indictment and arrest without probable cause is exactly the type of "unreasonable" search and seizure that the Fourth Amendment was designed to protect against, and would violate the most fundamental concepts of due process. In this regard, it has been noted that "'if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction)."' Washington v. Wilmore, 407 F.3d 274, 285 (Shedd, J., concurring) (quoting Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004)). In addition, "the Supreme Court has long held that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or 'with reckless disregard for the truth' makes material false statements or omits material facts. . . . No reasonable police officer . . . could believe that the Fourth Amendment permitted such conduct." Miller v. Prince George's County, 475 F.3d 621, 631-32 (4th Cir. 2007) (internal citations omitted). Thus, there can be no question that the Constitution is violated when government officials deliberately fabricate evidence and use that evidence against a citizen, in this case by allegedly presenting the false evidence to a grand jury in order to obtain an indictment of individuals that the officials know are innocent. The Court acknowledges the "'embarrassing diversity of judicial opinion' over the composition or even existence, of a claim

97

for 'malicious prosecution' founded in § 1983." <u>Lambert v. Williams</u>, 223 F.3d 257, 260 (4th Cir. 2000). However, Defendants in this case essentially contend that this Court should take the most restrictive view of the applicable doctrines and should conclude that no provision of the Constitution has been violated, and that no redressable claim can be stated, when government officials intentionally fabricate evidence to frame innocent citizens, even if the evidence is used to indict and arrest those citizens without probable cause. This Court cannot take such a restrictive view of the protections afforded by the Constitution. Therefore, the Court concludes that Plaintiffs have stated a potential violation of their constitutional rights in this case. This case will therefore proceed to discovery on the claims as set out above, and it will ultimately be Plaintiffs' burden to present proof in support of these claims.

IT IS THEREFORE ORDERED that the Motions to Dismiss [Doc. #117, 119, 120, 121, 123, 124, 125, 126, 127 are GRANTED IN PART and DENIED IN PART as set out herein. IT IS FURTHER ORDERED that the City of Durham's Motion for Summary Judgment [Doc. #78] is DENIED at this time, without prejudice to the City raising the issues asserted therein as part of a comprehensive Motion for Summary Judgment at the close of discovery.

A separate Order will be entered contemporaneously herewith.

This, the 31st day of March, 2011.

United States District Judge

98