**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DAVID F. EVANS; COLLIN FINNERTY;
READE SELIGMANN,

             *Plaintiffs-Appellees,*

        v.

STEVEN W. CHALMERS; BEVERLY
COUNCIL; RONALD HODGE; JEFF
LAMB; MICHAEL RIPBERGER; LEE
RUSS; PATRICK BAKER,

            *Defendants-Appellants,*

        and

CITY OF DURHAM, NORTH CAROLINA;
MARK GOTTLIEB; BENJAMIN HIMAN;
DAVID ADDISON; MICHAEL NIFONG;
LINWOOD WILSON; STEPHEN
MIHAICH; DNA SECURITY,
INCORPORATED; RICHARD CLARK;
BRIAN MEEHAN,

            *Defendants.*

No. 11-1436

DAVID F. EVANS; COLLIN FINNERTY;
READE SELIGMANN,

        *Plaintiffs-Appellees,*

       v.

CITY OF DURHAM, NORTH CAROLINA;
MARK GOTTLIEB; BENJAMIN HIMAN;
DAVID ADDISON,

        *Defendants-Appellants,*

       and

MICHAEL NIFONG; LINWOOD
WILSON; STEVEN W. CHALMERS;
BEVERLY COUNCIL; RONALD HODGE;
JEFF LAMB; STEPHEN MIHAICH;
MICHAEL RIPBERGER; LEE RUSS;
DNA SECURITY, INCORPORATED;
RICHARD CLARK; BRIAN MEEHAN;
PATRICK BAKER,

        *Defendants.*

No. 11-1438

EDWARD CARRINGTON; CASEY J.
CARROLL; MICHAEL P. CATALINO;
GALE CATALINO; THOMAS V. CLUTE;
KEVIN COLEMAN; JOSHUA R.
COVELESKI; EDWARD J. CROTTY;
EDWARD S. DOUGLAS; KYLE DOWD;
PATRICIA DOWD; DANIEL FLANNERY;
RICHARD GIBBS FOGARTY; ZACHARY
GREER; IRENE GREER; ERIK S.
HENKELMAN; STEVEN W.
HENKELMAN; JOHN E. JENNISON;
BEN KOESTERER; MARK KOESTERER;
JOYCE KOESTERER; FRED KROM;
PETER J. LAMADE; ADAM LANGLEY;
CHRISTOPHER LOFTUS; DANIEL
LOFTUS; BARBARA LOFTUS;                                    No. 11-1453
ANTHONY MCDEVITT; GLENN NICK;
NICHOLAS O'HARA; LYNNDA
O'HARA; DANIEL OPPEDISANO; SAM
PAYTON; JOHN BRADLEY ROSS;
KENNETH SAUER, III; STEVE
SCHOEFFEL; ROBERT SCHROEDER;
DEVON SHERWOOD; DANIEL
THEODORIDIS; BRET THOMPSON;
CHRISTOPHER TKAC; TRACY TKAC;
JOHN WALSH, JR.; MICHAEL WARD;
ROBERT WELLINGTON, IV; WILLIAM
WOLCOTT; MICHAEL YOUNG,

*Plaintiffs-Appellees,*

4                          EVANS V. CHALMERS

v.

PATRICK BAKER; STEVEN CHALMERS;
RONALD HODGE; LEE RUSS;
BEVERLY COUNCIL; JEFF LAMB;
MICHAEL RIPBERGER,

                    *Defendants-Appellants,*

                    and

DUKE UNIVERSITY; DUKE
UNIVERSITY HEALTH SYSTEMS,
INCORPORATED; RICHARD BRODHEAD;
PETER LANGE; LARRY MONETA;
JOHN BURNESS; TALLMAN TRASK;
SUZANNE WASIOLEK; MATTHEW
DRUMMOND; AARON GRAVES;
ROBERT DEAN; TARA LEVICY;
THERESA ARICO; J. WESLEY
COVINGTON; KATE HENDRICKS;
VICTOR DZAU; CITY OF DURHAM;
LINWOOD WILSON; MARK GOTTLIEB;
BENJAMIN HIMAN; STEPHEN
MIHAICH; DAVID ADDISON; MARSHA
COVINGTON, Executrix of the Estate
of John Wesley Covington,

                    *Defendants.*

RYAN MCFADYEN; MATTHEW
WILSON; BRECK ARCHER,

   *Plaintiffs-Appellees,*

v.

PATRICK BAKER; STEVEN CHALMERS;
RONALD HODGE; LEE RUSS;
BEVERLY COUNCIL; JEFF LAMB;
MICHAEL RIPBERGER,

   *Defendants-Appellants,*

and

DUKE UNIVERSITY; DUKE
UNIVERSITY POLICE DEPARTMENT;
AARON GRAVES; ROBERT DEAN;
LEILA HUMPHRIES; PHYLLIS COOPER;
WILLIAM F. GARBER, III; JAMES
SCHWAB; JOSEPH FLEMING; JEFFREY
O. BEST; GARY N. SMITH; GREG
STOTSENBERG; ROBERT K. STEEL;
RICHARD H. BRODHEAD, PH. D.;
PETER LANGE, PH. D.; TALLMAN
TRASK, III, PH. D.; JOHN BURNESS;
LARRY MONETA, ED. D.; DUKE
UNIVERSITY HEALTH SYSTEMS,
INCORPORATED; PRIVATE DIAGNOSTIC
CLINIC, PLLC; JULIE MANLY, MD;
THERESA ARICO, R. N.; TARA
LEVICY, R. N.; THE CITY OF
DURHAM, NORTH CAROLINA;
MICHAEL NIFONG; STEPHEN
MIHAICH; EDWARD SARVIS;

No. 11-1458

6                        EVANS V. CHALMERS

LAIRD EVANS; JAMES T. SOUKUP;
KAMMIE MICHAEL; DAVID ADDISON;
MARK D. GOTTLIEB; BENJAMIN W.
HIMAN; LINWOOD WILSON; RICHARD
D. CLAYTON; DNA SECURITY,
INCORPORATED; RICHARD CLARK;
BRIAN MEEHAN, Ph. D.; VICTOR J.
DZAU, MD; ALLISON HALTON;
KEMEL DAWKINS; SUZANNE
WASIOLEK; STEPHEN BRYAN;
MATTHEW DRUMMOND; DUKE
POLICE DEFENDANTS,

                        *Defendants.*

RYAN MCFADYEN; MATTHEW
WILSON; BRECK ARCHER,

              *Plaintiffs-Appellees,*

                    v.                        No. 11-1460

THE CITY OF DURHAM, NORTH
CAROLINA; DAVID ADDISON; MARK
GOTTLIEB; BEJAMIN HIMAN,

          *Defendants-Appellants,*

                    and

DUKE UNIVERSITY; DUKE
UNIVERSITY POLICE DEPARTMENT;
AARON GRAVES; ROBERT DEAN;
LEILA HUMPHRIES; PHYLLIS COOPER;
WILLIAM F. GARBER, II; JAMES
SCHWAB; JOSEPH FLEMING; JEFFREY
O. BEST; GARY N. SMITH; GREG
STOTSENBERG; ROBERT K. STEEL;
RICHARD H. BRODHEAD, Ph. D.;
PETER LANGE, Ph. D.; TALLMAN
TRASK, III, Ph. D.; JOHN BURNESS;
LARRY MONETA, Ed. D.; DUKE
UNIVERSITY HEALTH SYSTEMS,
INCORPORATED; PRIVATE DIAGNOSTIC
CLINIC, PLLC; JULIE MANLY, MD;
THERESA ARICO, R. N.; TARA
LEVICY, R. N.; MICHAEL NIFONG;
STEPHEN MIHAICH; EDWARD SARVIS;
LAIRD EVANS; JAMES T. SOUKUP;
KAMMIE MICHAEL; LINWOOD
WILSON; RICHARD D. CLAYTON;
DNA SECURITY, INCORPORATED;
RICHARD CLARK; BRIAN MEEHAN,
Ph. D.; VICTOR J. DZAU, MD;
ALLISON HALTON; KEMEL DAWKINS;
SUZANNE WASIOLEK; STEPHEN
BRYAN; MATTHEW DRUMMOND;
DUKE POLICE DEFENDANTS; PATRICK
BAKER; STEVEN W. CHALMERS;
RONALD HODGE; LEE RUSS;
BEVERLY COUNCIL; JEFF LAMB;
MICHAEL RIPBERGER,

*Defendants.*

EDWARD CARRINGTON; CASEY J.
CARROLL; MICHAEL P. CATALINO;
GALE CATALINO; THOMAS V. CLUTE;
KEVIN COLEMAN; JOSHUA R.
COVELESKI; EDWARD J. CROTTY;
EDWARD S. DOUGLAS; KYLE DOWD;
PATRICIA DOWD; DANIEL FLANNERY;
RICHARD GIBBS FOGARTY; ZACHARY
GREER; IRENE GREER; ERIK S.
HENKELMAN; STEVEN W.
HENKELMAN; JOHN E. JENNISON;
BEN KOESTERER; MARK KOESTERER;
JOYCE KOESTERER; FRED KROM;
PETER J. LAMADE; ADAM LANGLEY;
CHRISTOPHER LOFTUS; DANIEL                    No. 11-1465
LOFTUS; BARBARA LOFTUS;
ANTHONY MCDEVITT; GLENN NICK;
NICHOLAS O'HARA; LYNNDA
O'HARA; DANIEL OPPEDISANO; SAM
PAYTON; JOHN BRADLEY ROSS;
KENNETH SAUER, III; STEVE
SCHOEFFEL; ROBERT SCHROEDER;
DEVON SHERWOOD; DANIEL
THEODORIDIS; BRET THOMPSON;
CHRISTOPHER TKAC; TRACY TKAC;
JOHN WALSH, JR.; MICHAEL WARD;
ROBERT WELLINGTON, IV; WILLIAM
WOLCOTT; MICHAEL YOUNG,

                            *Plaintiffs-Appellees,*

v.

CITY OF DURHAM; MARK GOTTLIEB;
BENJAMIN HIMAN; DAVID ADDISON,

*Defendants-Appellants,*

and

PATRICK BAKER; STEVEN CHALMERS;
RONALD HODGE; LEE RUSS;
BEVERLY COUNCIL; JEFF LAMB;
MICHAEL RIPBERGER; DUKE
UNIVERSITY; DUKE UNIVERSITY
HEALTH SYSTEMS, INCORPORATED;
RICHARD BRODHEAD; PETER LANGE;
LARRY MONETA; JOHN BURNESS;
TALLMAN TRASK; SUZANNE
WASIOLEK; MATTHEW DRUMMOND;
AARON GRAVES; ROBERT DEAN;
TARA LEVICY; THERESA ARICO; J.
WESLEY COVINGTON; KATE
HENDRICKS; VICTOR J. DZAU;
LINWOOD WILSON; STEPHEN
MIHAICH; MARSHA COVINGTON,
Executrix of the Estate of John
Wesley Covington,

*Defendants.*

Appeals from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., Chief District Judge.
(1:07-cv-00739-JAB-WWD; l:08-cv-00119-JAB-WWD;
1:07-cv-00953-JAB-WWD)

Argued: September 18, 2012

Decided: December 17, 2012

Before WILKINSON, MOTZ, and GREGORY,
Circuit Judges.

---

Affirmed in part, dismissed in part, reversed in part, and
remanded by published opinion. Judge Motz wrote the opin-
ion, in which Judge Wilkinson concurred and Judge Gregory
concurred except as to Parts III-B and III-B.1. Judge Wilkin-
son wrote a concurring opinion. Judge Gregory wrote an opin-
ion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Michael A. Vatis, STEPTOE & JOHNSON, LLP,
New York, New York, for Appellants. Christopher Nicholas
Manning, WILLIAMS & CONNOLLY, LLP, Washington,
D.C.; Robert Christopher Ekstrand, EKSTRAND & EKST-
RAND, LLP, Durham, North Carolina; Peter A. Patterson,
COOPER & KIRK, PLLC, Washington, D.C., for Appellees.
**ON BRIEF:** Patricia P. Shields, D. Martin Warf, TROUT-
MAN SANDERS, LLP, Raleigh, North Carolina, for Appel-
lants Steven W. Chalmers, Beverly Council, Ronald Hodge,
Jeff Lamb, Michael Ripberger, Lee Russ, and Patrick Baker;
Roger E. Warin, Matthew J. Herrington, Leah M. Quadrino,
John P. Nolan, STEPTOE & JOHNSON, LLP, Washington,
D.C., Reginald B. Gillespie, Jr., FAISON & GILLESPIE,
Durham, North Carolina, for the City of Durham; Edwin M.
Speas, Jr., Eric P. Stevens, POYNER & SPRUILL LLP,
Raleigh, North Carolina, for Appellant Mark Gottlieb; Joel M.
Craig, Henry W. Sappenfield, KENNON, CRAVER, PLLC,
Durham, North Carolina, for Appellant Benjamin Himan;

James B. Maxwell, MAXWELL, FREEMAN & BOWMAN, PA, Durham, North Carolina, for David Addison. David S. Rudolf, RUDOLF WIDENHOUSE & FIALKO, Charlotte, North Carolina, Richard D. Emery, Ilann M. Maazel, EMERY CELLI BRINCKERHOFF & ABADY LLP, New York, New York, for Appellee Reade Seligmann; Robert M. Cary, Charles Davant IV, Ashley W. Hardin, WILLIAMS & CON-NOLLY, LLP, Washington, D.C., for Appellees David F. Evans, and Collin Finnerty. William J. Thomas II, THOMAS, FERGUSON & MULLINS, LLP, Durham, North Carolina; Brian S. Koukoutchos, Mandeville, Louisiana; Charles J. Cooper, David H. Thompson, COOPER & KIRK, PLLC, Washington, D.C., for Appellees Carrington. Stefanie A. Sparks, EKSTRAND & EKSTRAND, LLP, Durham, North Carolina, for Appellees McFadyen.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

These appeals arise from allegations that the City of Durham and its officials mishandled false rape charges made against members of the 2005-2006 Duke University lacrosse team. The City and its officials asserted various immunities from suit and on that basis moved to dismiss, or for summary judgment, as to all claims alleged against them. The district court granted those motions in part and denied them in part. The City and its officials appeal. There is no cross-appeal. For the reasons that follow, we affirm in part, dismiss in part, reverse in part, and remand for further proceedings.

I.

Three groups of plaintiffs brought these cases. We set forth the relevant facts as alleged in their amended complaints. Although the complaints are not identical, they differ only minimally. We note all relevant differences.

### A.

According to the amended complaints, on the evening of
March 13-14, 2006, many members of the Duke lacrosse team
attended a party at the Durham, North Carolina home of team
co-captains David Evans, Daniel Flannery, and Matthew
Zash. One of the hosts had hired two exotic dancers, Crystal
Mangum and Kim Pittman, to perform at the party. Mangum
(who appeared to be intoxicated) and Pittman performed only
briefly from midnight to 12:04. Approximately forty minutes
later, the two women left the party together in Pittman's car.

After leaving the party, Mangum became belligerent and
accused Pittman of stealing her money. Pittman pulled into a
grocery store parking lot and asked a nearby security guard
for assistance in removing Mangum from her car. After the
guard determined that Mangum in fact was intoxicated, he
called Durham police. When Sergeant John Shelton arrived at
the scene, Mangum feigned unconsciousness. Sergeant Shel-
ton instructed another officer to take Mangum to the Durham
Access Center, an outpatient mental health clinic with a man-
datory twenty-four hour observation period for involuntarily
admitted patients. During her intake interview, Mangum
asserted that she had been raped by nodding "yes" to the ques-
tion "Were you raped?" Because of her allegation, Mangum
was transported to the Duke Medical Center for a sexual
assault examination.

At the Duke Medical Center, Sergeant Shelton questioned
Mangum regarding her rape allegations. Mangum then denied
being raped, but contended that someone had stolen her
money. Soon after this recantation, Mangum told another offi-
cer she had been raped by as many as five men after perform-
ing at a bachelor party. Over the course of that night and the
next few days, Mangum provided multiple, vastly inconsistent
versions of her rape to medical personnel and police officers.
Her accounts differed not only as to how many men had raped

her (ranging from three to twenty), but also as to how they raped her (orally, vaginally, or anally).

Nurses at the Duke Medical Center performed a rape kit examination to document physical evidence of sexual assault. Some plaintiffs allege that Nurse Tara Levicy interviewed Mangum, who told the nurse that three white men—named Adam, Brett, and Matt—had raped her orally, vaginally, and anally, had not worn condoms, and had ejaculated in her mouth, vagina, and anus. A doctor performed a pelvic examination on Mangum and noted only one abnormality—diffuse edema of the vaginal walls—which Nurse Levicy then recorded on a sexual assault examination report.

Officer B.S. Jones, who was initially assigned to investigate Mangum's allegations, believed that no evidence supported proceeding with a criminal investigation. Nonetheless, during the next two days (March 15-16), the case was reassigned to Officers Mark Gottlieb and Benjamin Himan. When Officers Gottlieb and Himan interviewed Mangum for the first time on March 16, Mangum told them that she was raped by three white men –- Adam, Brett, and Matt -– and provided physical descriptions of the attackers. Later that day, based on her descriptions, Durham Police administered a photo array to Mangum limited to pictures of twenty-four white members of the Duke lacrosse team. Mangum did not identify any of the men in the photographs as her attackers, though she did identify men who she believed had attended the party.

On the same day, March 16, Officers Gottlieb and Himan executed a search warrant for the site of the March 13-14 party. The three residents—Evans, Flannery, and Zash—complied with the execution of the search warrant, consented to lengthy police interviews, submitted to physical inspections for signs of rape, and provided DNA and hair samples.

Four days later, on Monday, March 20, Officer Himan interviewed Mangum's fellow dancer, Pittman, who asserted

that Mangum's rape allegations were a "crock" and that there had been no opportunity for an assault to have occurred out of Pittman's presence at the party. On March 22, Officers Gottlieb and Himan used an outstanding arrest warrant and the threat of revocation of probation to induce Pittman to recant her initial statement calling the rape allegations a "crock," and to create a fictional window of opportunity in her story when the rape could have been committed. In the meantime, Durham Police arranged a second photo array of members of the Duke lacrosse team. Once again, Mangum could not identify any attacker.

During this same time period, Officer Gottlieb served a subpoena on Nurse Levicy to obtain the Medical Center's sexual assault examination report. Some plaintiffs allege that Nurse Levicy previously had indicated to Officer Gottlieb that the examination of Mangum had revealed "signs consistent with sexual assault," but had refused to turn over the report without a subpoena. Once Officer Gottlieb returned with the subpoena, Nurse Levicy misled Gottlieb about the extent of the evidence of sexual assault, claiming that the examination had also revealed physical evidence of "blunt force trauma" and other symptoms "consistent with the victim's statement."

Two days later, on Thursday, March 23, Officers Gottlieb and Himan, using Nurse Levicy's corroborating statements, obtained court approval for a non-testimonial order ("NTO"). The NTO required the forty-six white lacrosse team members to provide DNA samples, sit for photographs, and submit to examination for injuries consistent with struggle during a sexual assault. The police offered two affidavits in support of the NTO—one to establish probable cause that a crime had been committed, the other to establish reasonable grounds that the subjects might have committed the crime. The NTO affidavits explained that "[t]he DNA evidence requested will immediately rule out any innocent persons, and show conclusive evidence as to who the suspect(s) are in the alleged violent attack

upon this victim." The team members fully complied with the NTO.

### B.

The next day, Friday, March 24 (ten days after the alleged rape), District Attorney Michael Nifong took over the investigation. Durham Police Commander Jeff Lamb instructed Officers Gottlieb and Himan to take direction in the rape investigation from Nifong.

On Monday morning, March 27, Officers Gottlieb and Himan briefed Nifong on the case. At this briefing, the officers detailed the exculpatory evidence, including contradictions in Mangum's allegations and the negative results of the photo arrays. Recognizing the weakness of the case, Nifong responded, "You know, we're f*cked."

Nonetheless, the investigation continued. Later that morning, Officer Gottlieb obtained from a confidential source an email that a lacrosse team member, Ryan McFadyen, had sent to his teammates only hours after the party at which the rape assertedly occurred. The email stated:

> tomorrow night . . . ive decided to have some strippers over to edens 2c. all are welcome.. however there will be no nudity. i plan on killing the bitches as soon as they walk in and proceeding to cut their skin off while cumming in my duke issue spandex. . . . 41

McFadyen's dormitory address was Edens 2C, and his lacrosse jersey number was 41. Officers Gottlieb and Himan added the text of the email to the information from the NTO affidavits and applied for and executed a search warrant on McFadyen's dorm room, adding to the list of suspected crimes "conspiracy to commit murder."

Meanwhile, on March 24 and 25, Durham police spokesperson Corporal David Addison made a series of public statements regarding the case. On March 24, Corporal Addison told local and national reporters that the investigation had produced "really, really strong physical evidence" of rape. In explaining the scope of the NTO, Corporal Addison told one reporter: "You are looking at one victim brutally raped. If that was someone else's daughter, child, I don't think 46 [suspects] would be a large enough number to figure out exactly who did it." The next day, Corporal Addison stated: "We're asking someone from the lacrosse team to step forward. We will be relentless in finding out who committed this crime."

By March 28, the State Bureau of Investigation had concluded its examination of evidence from Mangum's rape kit and the DNA collected from the plaintiffs under the NTO. By March 29, the State Bureau of Investigation had notified Nifong of the results: the state examination revealed *no* DNA from anyone in Mangum's rape kit or her clothing. Nevertheless, Nifong sought a second, more sensitive DNA analysis at a private laboratory, DNA Security, Inc. On April 5, Nifong obtained a judicial order to transfer the rape kit and NTO evidence to the private laboratory.

Meanwhile, the day before, on April 4, Officer Gottlieb administered a third photo array to Mangum. This photo array contained pictures of all forty-six white members of the Duke lacrosse team; the police officers informed Mangum that they had reason to believe everyone pictured had been at the party. During this photo array, Mangum identified three team members as her attackers—David Evans with 90% certainty, Collin Finnerty with 100% certainty, and Reade Seligmann with 100% certainty.

From April 7 through April 10, the private laboratory analyzed the rape kit and NTO evidence. On April 10, employees from the private laboratory met with Nifong and Officers Gottlieb and Himan to report the results of the analyses. Although

the private laboratory found that several men contributed DNA to the items in Mangum's rape kit, the analyses excluded with 100% certainty every member of the Duke lacrosse team as a potential contributor of that DNA. Knowing that the private laboratory's results would prevent an indictment, neither Nifong nor the officers disclosed the results to the players or their attorneys. However, the state laboratory's initial report—finding no DNA from anyone in Mangum's rape kit—was released to the public later that day.

Notwithstanding two negative DNA analyses, Mangum's inconsistent testimony, and Pittman's initial repudiation of Mangum's allegations, Nifong continued pursuing the case. On April 17, Nifong sought and successfully obtained indictments against Collin Finnerty and Reade Seligmann for first-degree rape, first-degree sex offense, and kidnapping. On May 12, Nifong provided a report detailing the private laboratory's DNA results to counsel for Finnerty and Seligmann. However, the report excluded the fact that the private laboratory had conclusively eliminated every member of the Duke lacrosse team as a potential contributor of the DNA found in the rape kit. Nifong, along with Officers Gottlieb and Himan, had worked with the private laboratory to ensure that the report remained ambiguous and misleading on this point. On May 15, based partly on the private laboratory's misleading report, Nifong sought and obtained an indictment against David Evans for first-degree rape, first-degree sexual offense, and kidnapping.

Over the next few months, Nifong intentionally misrepresented and misstated material facts to opposing counsel and the state trial judge regarding the private laboratory's DNA report. On September 22, the state judge issued an order requiring Nifong to provide the indicted lacrosse players with the complete files and underlying data from both the State and private laboratory analyses. After complying with the order, Nifong denied prior knowledge that the private laboratory test had ruled out all lacrosse team members as contributors of

DNA in Mangum's rape kit. However, on December 15, employees from the private laboratory admitted to conspiring with Nifong to obfuscate the results of its DNA analyses.

On December 21, in an interview with a Durham police officer, Mangum recanted her rape allegation for the first time since the night of the alleged rape. Mangum, however, still maintained that she had been assaulted. Nifong dismissed the charges of first degree rape, but continued the prosecutions of the sexual assault and kidnapping charges.

The North Carolina State Bar subsequently filed an ethics complaint against Nifong based on his conduct in the Mangum rape investigation. On January 12, 2007, Nifong recused himself from the criminal cases arising from Mangum's allegations. On April 11, after a thorough, independent review, the Attorney General of North Carolina, noting the inconsistency in Mangum's statements, Mangum's suspect credibility, and the DNA reports demonstrating no rape by the indicted men, dismissed the remaining charges against Evans, Finnerty, and Seligmann. On June 16, Nifong was disbarred for his conduct during the Mangum investigation and prosecution.

## C.

Based on the above facts, Evans, Seligmann, and Finnerty (collectively the "Evans plaintiffs"), Ryan McFadyen, Matthew Wilson, and Breck Archer (collectively the "McFadyen plaintiffs"), and thirty-eight other members of the 2005-2006 Duke University lacrosse team (collectively the "Carrington plaintiffs") filed three separate complaints in the Middle District of North Carolina alleging a myriad of claims against many defendants, including the City of Durham and city officials, particularly certain police officers.[1]

---

[1]We note that one or more of the three complaints also allege claims against the private laboratory, Duke University, and Duke employees,

The individual police officers moved to dismiss all claims against them. They asserted qualified immunity from the federal claims and official immunity from the state claims. The City and its supervisory officials moved to dismiss the federal claims pled against them, arguing that those claims failed because the allegations against the officers failed. The City moved for summary judgment on the state common-law claims, asserting governmental immunity, and moved to dismiss the state constitutional claims. The district court granted these motions in part and denied them in part.

The police officers, supervisory officials, and City appeal; no plaintiff cross-appeals. We have consolidated the three cases on appeal. We address first the federal and then the state claims asserted in the three amended complaints.

## II.

We have jurisdiction over the officers' interlocutory appeals from the district court's judgment denying their motions to dismiss the federal claims against them because the officers assert qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "We review de novo the denial of a motion to dismiss based on qualified immunity, accepting as true the facts alleged in the complaint and viewing them in the light most favorable to the plaintiff." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006).

Qualified immunity protects government officials from suit for damages when their conduct does not violate a "clearly

---

among others. None of these defendants asserted any immunity from suit, and thus none could file appeals from the district court's interlocutory rulings. All three complaints additionally allege numerous claims against the prosecutor, Michael Nifong. The district court held that Nifong did not enjoy qualified immunity from the claims alleged against him for his investigatory actions. Because Nifong did not note an appeal of that ruling, it is not before us.

established" constitutional right. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To escape dismissal of a complaint on qualified immunity grounds, a plaintiff must (1) allege a violation of a right (2) that is clearly established at the time of the violation. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Although we may address immunity without ruling on the existence of a right, *see id.* at 236, if a plaintiff fails to allege that an official has violated any right, the official "is hardly in need of any immunity and the analysis ends right then and there," *Abney v. Coe*, 493 F.3d 412, 415 (4th Cir. 2007).

With these principles in mind, we turn to the federal claims at issue here.

### A.

The Evans plaintiffs allege a § 1983 malicious prosecution claim against Officers Gottlieb and Himan.[2] The district court denied the officers' motions to dismiss this claim, reasoning that the plaintiffs stated such a claim by alleging they "were arrested pursuant to an indictment that was obtained by the

---

[2]Based on the same facts, the Evans plaintiffs also allege a Fourteenth Amendment substantive due process claim against Officers Gottlieb and Himan. The district court, noting the "unsettled legal doctrines" surrounding due process claims based on asserted pre-trial fabrication of evidence, nonetheless denied the officers' motions to dismiss this claim. In doing so, the court erred. The Due Process Clause does not constitute a catch-all provision that provides a remedy whenever a state actor causes harm. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Rather, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (internal quotation marks omitted); *see also id.* at 286-91 (Souter, J., concurring). Because the Fourth Amendment provides "an explicit textual source" for § 1983 malicious prosecution claims, the Fourteenth Amendment provides no alternative basis for those claims.

intentional or reckless creation of false or misleading evidence used before the grand jury that was necessary to a finding of probable cause, or the deliberate or reckless omission of material information that officials knew would negate probable cause." *Evans v. City of Durham*, No. 1:07CV739, slip op. at 29-30 (M.D.N.C. Mar. 31, 2011).

A "malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000). To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor. *See Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

For purposes of this appeal, the officers do not contend that the Evans plaintiffs have failed to allege illegal seizures (*i.e.*, the indictments) or that criminal proceedings failed to terminate in the plaintiffs' favor (*i.e.*, the dismissal of the indictments). The officers do maintain, however, that they escape liability for the assertedly illegal seizures because they did not *cause* them. Rather, they contend, an independent intervening act of another—*i.e.*, Prosecutor Nifong's decisions to seek the indictments—caused the seizures.[3]

Of course, constitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation. *See Murray v. Earle*, 405 F.3d 278, 289-90 (5th Cir. 2005); *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999). Accordingly, subsequent acts of indepen-

---

[3]In addition to contending that Nifong's decisions to seek the indictments constitute intervening acts shielding them from liability, Officers Gottlieb and Himan contend that the grand jury's decisions to indict constitute similar intervening acts. Given our holding as to Nifong, we need not and do not reach this contention.

dent decision-makers (*e.g.*, prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure. *See Zahrey v. Coffey*, 221 F.3d 342, 351 (2d Cir. 2000). Such "intervening acts of other participants in the criminal justice system" insulate a police officer from liability. *Id.*; *see also Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2972 (2011); *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); *Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir. 1989); *Smiddy v. Varney*, 665 F.2d 261, 266-68 (9th Cir. 1981), *overruled on other grounds by Beck v. City of Upland*, 527 F.3d 853, 865 (9th Cir. 2008); *Rhodes v. Smithers*, 939 F. Supp. 1256, 1274 (S.D. W. Va. 1995), *aff'd*, No. 95-2837, 1996 WL 420471 (4th Cir. July 29, 1996) (unpublished).

However, even when, as here, a prosecutor retains all discretion to seek an indictment,[4] police officers may be held to have caused the seizure and remain liable to a wrongfully indicted defendant under certain circumstances. In particular, officers may be liable when they have lied to or misled the prosecutor, *see, e.g.*, *Sykes v. Anderson*, 625 F.3d 294, 317 (6th Cir. 2010); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988); *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988); failed to disclose exculpatory evidence to the prosecutor, *see, e.g.*, *Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008); *Sanders v. English*, 950 F.2d 1152, 1159-60 (5th Cir. 1992); or unduly pressured the prosecutor to seek the indictment, *cf. Beck*, 527 F.3d at 870.

Stated differently, a police officer is not liable for a plaintiff's unlawful seizure following indictment "in the absence of evidence that [the officer] misled or pressured the prosecu-

---

[4]In North Carolina, state district attorneys, like Nifong, have the sole discretion to decide whether to prosecute. *See State v. Ward*, 555 S.E.2d 251, 260 (N.C. 2001) (citing N.C. Const. Art. IV § 18(1)).

tion." *Wray*, 490 F.3d at 195; *see also Snider v. Lee*, 584 F.3d 193, 206 (4th Cir. 2009) (Stamp, J., concurring) ("A law enforcement officer who presents all relevant probable cause evidence to a prosecutor . . . is insulated from a malicious prosecution claim where such intermediary makes an independent decision . . . unless the officer [1] concealed or misrepresented facts or [2] brought such undue pressure to bear on the intermediary that the intermediary's independent judgment was overborne."); *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988) ("An independent intermediary breaks the chain of causation unless it can be shown that the deliberations of that intermediary were in some way tainted by the actions of the defendant.").

    The Evans plaintiffs do not allege that Officers Gottlieb and Himan misled or misinformed Nifong. Indeed, the Evans plaintiffs expressly allege that, from the outset, the officers candidly briefed Nifong as to the startling weaknesses in the case by "detail[ing] the extraordinary evidence of innocence and the fatal defects in Mangum's claims" and "convey[ing] to Nifong that Mangum was not credible." The Evans plaintiffs nonetheless insist that the officers remain liable because they "misrepresented, withheld, or falsified evidence" that ultimately *influenced the grand jury*. This argument fails because acts of *either* the prosecutor *or* the grand jury may break the causal chain. *Cf. Cuadra*, 626 F.3d at 813; *Barts*, 865 F.2d at 1195. In other words, if the independent act of a prosecutor breaks the causal chain, the fact that the prosecutor misled the grand jury does not render police officers liable.

    Alternatively, the Evans plaintiffs maintain that Officers Gottlieb and Himan conspired with Nifong to fabricate and conceal evidence from the grand jury and thus somehow unduly pressured Nifong to seek the indictment. The allegations in their complaint significantly undercut this argument. For the Evans plaintiffs ground their entire case on allegations that Nifong desired to exploit the "high-profile, racially-charged rape allegation for *his personal* political gain." They

further allege that from his very first meeting with the offi-
cers, Nifong noted the lack of exculpatory evidence: "we're
f*cked." Tellingly, the Evans plaintiffs do not assert that Offi-
cers Gottlieb and Himan responded by pressuring Nifong to
pursue the case. Rather, they allege that the officers continued
the investigation at Nifong's instruction, and that, when
Nifong sought to indict the Evans plaintiffs, Officer Himan
frankly responded, "With what?" No matter how generously
read, these allegations do not allege that Officers Gottlieb and
Himan pressured Nifong to seek an indictment.

Moreover, it seems contrary to the very purpose of quali-
fied immunity to extend personal liability to police officers
who have assertedly conspired with, but neither misled nor
unduly pressured, an independent prosecutor. Police officers
and prosecutors often work together to establish probable
cause and seek indictments; such collaboration could always
be characterized as a "conspiracy." Allowing § 1983 claims
against police officers to proceed on allegations of such a
"conspiracy" would in virtually every case render the officers'
qualified immunity from suit "effectively lost," *Mitchell*, 472
U.S. at 526, and make discovery the rule, rather than the
exception, *see Anderson v. Creighton*, 483 U.S. 635, 639-40
& n.2 (1987).

Thus, we hold today that an alleged officer-prosecutor con-
spiracy does not alter the rule that a prosecutor's independent
decision to seek an indictment breaks the causal chain unless
the officer has misled or unduly pressured the prosecutor.[5]
Because the Evans plaintiffs do not allege that Officers Got-

---

[5]Twelve years ago, the Second Circuit questioned in dicta why "reason-
able foreseeability" would not suffice to preserve the causal chain between
a police officer's actions and an unlawful seizure by way of indictment.
*See Zahrey*, 221 F.3d at 351-52. However, no other court has pursued this
suggestion and more recently the Second Circuit itself has stepped back
from that broad dicta. *See Wray*, 490 F.3d at 195. As explained in text
above, we believe good reasons counsel against following the approach
suggested in the *Zahrey* dicta.

tlieb and Himan either misled or pressured Nifong to seek their indictments, we reverse the district court's denial of the officers' motions to dismiss the Evans plaintiffs' § 1983 malicious prosecution claims against them.

### B.

Both the McFadyen and Carrington plaintiffs allege § 1983 claims against Officers Gottlieb and Himan based on the officers' asserted unlawful seizures of evidence pursuant to a state non-testimonial order ("NTO"). Plaintiffs acknowledge that in seizing physical evidence from them, the officers acted pursuant to a state NTO, but claim that those seizures nonetheless violate the Fourth Amendment because the NTO flowed from the officers' assertedly dishonest supporting affidavits. The district court agreed and so denied the officers' motions to dismiss these claims.

The North Carolina NTO statute requires "probable cause to believe that a felony offense . . . has been committed;" "reasonable grounds to suspect that the person named or described in the affidavit committed the offense;" and "[t]hat the results of specific nontestimonial identification procedures will be of material aid in determining whether the person named in the affidavit committed the offense." N.C. Gen. Stat. § 15A-273(1)-(3).[6]

---

[6]Plaintiffs also challenge the constitutionality of the North Carolina NTO statute, contending that it authorizes searches and seizures of blood and DNA without probable cause. The district court correctly noted the uncertainty as to whether North Carolina courts would interpret the state NTO statute "as authorizing a search and seizure . . . on less than a full showing of probable cause" and whether "such an interpretation would render the state NTO statutes unconstitutional." *McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 925 (M.D.N.C. 2011); *see also State v. Grooms*, 540 S.E.2d 713, 728 (N.C. 2000). Nonetheless, the district court refused to hold that the officers' qualified immunity barred this claim. Given this uncertainty, we cannot conclude that clearly established law mandated "a full showing of probable cause" or that the state NTO statute would be

*Franks v. Delaware*, 438 U.S. 154 (1978), guides our analysis as to whether asserted material false statements and omissions in the NTO supporting affidavits offered by Officers Gottlieb and Himan state a constitutional claim. *See also Miller v. Prince George's Cnty.*, 475 F.3d 621, 627 (4th Cir. 2007) (extending *Franks* to § 1983 claims). *Franks* provides a two-prong test. First, plaintiffs must allege that defendants "knowingly and intentionally or with a reckless disregard for the truth" either made false statements in their affidavits or omitted facts from those affidavits, thus rendering the affidavits misleading. *See Franks*, 438 U.S. at 155-56; *Miller*, 475 F.3d at 627. Second, plaintiffs must demonstrate that those "false statements or omissions [are] 'material,' that is, 'necessary to'" a neutral and disinterested magistrate's authorization of the search. *Miller*, 475 F.3d at 628 (quoting *Franks*, 438 U.S. at 155-56). We take up each prong in turn.

1.

a.

In their complaints, both the McFadyen and Carrington plaintiffs allege that Officers Gottlieb and Himan deliberately falsified their NTO affidavits by wrongly declaring that: (1) Mangum had claimed she lost painted fingernails in a struggle with her attackers, and police recovered fingernails during

---

held unconstitutional without such a showing. Accordingly, we must reverse the district court's refusal to dismiss this constitutional challenge to the state NTO statute on qualified immunity grounds. However, it is clear that seizures pursuant to the NTO statute are "no less subject to the constraints of the Fourth Amendment," and that the Constitution requires some evidentiary showing, even if not "probable cause in the traditional sense," for the collection of DNA evidence pursuant to an NTO. *See Davis v. Mississippi*, 394 U.S. 721, 727 (1969); *see also Hayes v. Florida*, 470 U.S. 811, 816-17 (1985). On its face, the state NTO statute requires such an evidentiary showing. *See* N.C. Gen. Stat. § 15A-273(1)-(3). We address in text plaintiffs' arguments that NTO affidavits failed to provide the evidentiary showing required in the NTO statute.

their search of the house where the party (and alleged rape) occurred; (2) the lacrosse team members used aliases before and during the party to conceal their identities from Mangum and Pittman; and (3) the team members attempted to conceal their university and team affiliations from Mangum and Pittman during the party. In addition, the McFadyen plaintiffs maintain that the officers deliberately falsified the affidavits by declaring that at one point during the party a male attendee, holding a broomstick in the air, told Mangum and Pittman "I'm going to shove this up you." No record evidence lends any support for these four statements; accordingly, they clearly satisfy the first *Franks* prong as deliberate falsehoods.

We note that on appeal, plaintiffs vigorously contend that the officers' reliance in the NTO affidavits on Nurse Levicy's corroborating statements constitutes another deliberately false statement under *Franks*. But the plaintiffs' amended complaints belie this contention.

The McFadyen complaint does not even mention the nurse's statements when detailing the false statements in the NTO affidavits. While the Carrington complaint does allege that the portions of the affidavits based on the nurse's statements were false, it does not allege that the officers knew of the falsity when applying for the NTO, or acted with reckless disregard for the truth in relying on the nurse's statements. Of course, the truthfulness of a *witness* statement is irrelevant as to whether *affiants'* statements were truthful. *See Franks*, 438 U.S. at 171. And that the officers may have learned of the falsehood of the nurse's statements after the NTO issued does not defeat their reliance on the information when applying for the NTO. *See Unus v. Kane*, 565 F.3d 103, 125 (4th Cir. 2009). Moreover, although the Carrington plaintiffs allege that at some point Nurse Levicy and Officers Gottlieb and Himan conspired to prolong the investigation, they do not allege when that conspiracy began. Indeed their complaint suggests that the officers initially believed Nurse Levicy's statements.

For these reasons, we cannot agree that the officers' reliance on the nurse's corroborating statements constituted a deliberate falsehood under *Franks*. Rather, only the four misstatements actually pled in the McFadyen plaintiffs' complaint (three of which are also pled in the Carrington plaintiffs' complaint) satisfy the first *Franks* prong.[7]

b.

In addition, the McFadyen plaintiffs allege that Officers Gottlieb and Himan's *omission* from the NTO affidavits of the fact that in the first photo array Mangum "ruled out as plausible suspects" several team members also satisfies the first *Franks* prong. We disagree. Affiants are not required to include every piece of exculpatory information in affidavits. *See, e.g.*, *Simmons v. Poe*, 47 F.3d 1370, 1384 (4th Cir. 1995) (finding affiant's omission of facts inconsistent with a suspect's guilt from an affidavit "was not an attempt to mislead the magistrate" under *Franks*); *United States v. Colkley*, 899 F.2d 297, 299-301 (4th Cir. 1990) (holding affiant's omission of the fact that six eyewitnesses failed to identify a criminal suspect in a photo array did not satisfy the first *Franks* prong absent evidence that the affiant possessed "the requisite intent to mislead"). As in *Simmons* and *Colkley*, nothing in the omission alleged by the McFadyen plaintiffs plausibly suggests an intent to deceive or recklessness, and thus the asserted omission does not satisfy the first *Franks* prong.

---

[7]On appeal, plaintiffs insist that we look to their complaints as a whole to determine whether Officers Gottlieb and Himan alleged numerous other assertedly false statements in the NTO affidavits. We reject plaintiffs' suggestion that defendants—and courts—should scour several-hundred page complaints to discover which affidavit statements plaintiffs allege are fabricated or misleading. A complaint must specify the facts plaintiffs allege defendants falsified or omitted. Contrary to plaintiffs' arguments, general allegations that "every material fact" in the affidavits was fabricated do not suffice. *See Franks*, 438 U.S. at 171 ("[Plaintiffs] should point out specifically the portion of the warrant affidavit that is claimed to be false.").

2.

Because the plaintiffs have sufficiently pled that Officers Gottlieb and Himan deliberately made four false statements in the NTO supporting affidavits, we proceed to *Franks*' materiality prong. To state a *Franks* claim, false statements must be "material, that is, necessary to the neutral and disinterested magistrate's" authorization of the search. *Miller*, 475 F.3d at 628 (internal quotation marks omitted); *see also Franks*, 438 U.S. at 171; *Colkley*, 899 F.2d at 301. To determine materiality, we "excise the offending inaccuracies . . . and then determine whether or not the corrected warrant affidavit would" provide adequate grounds for the search. *Miller*, 475 F.3d at 628 (internal quotation marks omitted).

In correcting the supporting affidavits, we remove the false statements regarding the broomstick, Mangum's fingernails, and the suggestions that team members attempted to hide their identities, school, and team affiliations. Even so, the corrected affidavits clearly contain sufficient factual bases to establish both probable cause that a rape was committed and "reasonable grounds" that the named persons committed the rape, as required under the NTO statute.

As corrected, the affidavits: (1) describe Mangum's allegation that, after dancing at the party, three white males "forcefully held her legs and arms and raped and sexually assaulted her anally, vaginally, and orally;" (2) include the fact that police found some of Mangum's belongings during their search of the house where the alleged rape was committed; and (3) contain Nurse Levicy's corroborating statement that "the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally." A rape allegation, paired with corroborating medical evidence, undoubtedly establishes probable cause that a rape was committed. *Cf. Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991).

The corrected affidavits also state "reasonable grounds" for belief that the named persons committed the rape. The corrected affidavits state Mangum's allegations of gang-rape by three white men at the party; that the team captains had identified all but five of the white team members named in the NTO as being present at the party; that "no strangers . . . showed up to the event"; and that—because there were so many attendees—all white members of the lacrosse team were listed under the NTO because "they were all aware of the party and could have been present." These facts might not demonstrate probable cause, but certainly meet the NTO "reasonable grounds" standard. For these facts state more than an "unparticularized suspicion" that the parties named in the NTO may have raped Mangum. *See State v. Pearson*, 566 S.E.2d 50, 54 (N.C. 2002) (stating that "reasonable grounds" requires only "a minimal amount of objective justification, something more than an 'unparticularized suspicion or hunch,'" and is a "significantly lower" standard than probable cause).

Because the corrected NTO affidavits would provide adequate support for a magistrate's authorization of the NTO, we cannot say that the false statements identified above were "material." Therefore, we reverse the district court's denial of defendants' motions to dismiss these § 1983 unlawful seizure claims.

## C.

Plaintiff Ryan McFadyen individually alleges a § 1983 claim against Officers Gottlieb and Himan for the assertedly unlawful search and seizure of his apartment and car pursuant to a search warrant.[8] McFadyen alleges that the officers made material false statements and omissions in the search warrant

---

[8]To the extent that McFadyen's co-plaintiffs, Matthew Wilson and Breck Archer, also attempt to bring this claim, we hold that they lack standing to do so. *See United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007).

application. The district court denied the officers' motions to dismiss this claim, relying on its reasoning with respect to the NTO claims. Because McFadyen alleges that Officers Gottlieb and Himan made false statements or omissions material to the issuance of the search warrant, we again analyze the claim under *Franks*.

1.

The affidavit supporting the search warrant mirrors those supporting the NTO with the following two additions. First, the officers added that during the party "[t]he players . . . used numbers when calling for one and another across the room[,] again to hide their identities." Second, the officers added the contents of the email McFadyen sent to his teammates and the assertion by Officer Gottlieb that he received the email from a confidential source. McFadyen contends that both of these statements, like the four statements discussed above in the NTO affidavits, constitute knowing false statements under the first *Franks* prong. We agree with respect to the first statement, as the record lends it no support.

But we disagree as to the second statement, which contains the email. McFadyen argues that, because the affidavit indicates that the email was provided by a "confidential source," but does not articulate any facts relating to the reliability of the source, we must strike the email from the affidavit before addressing *Franks*' materiality prong. Assuming, without deciding, that this would be the appropriate manner to handle such admittedly truthful, yet perhaps inadequately verified, information under *Franks*, we nonetheless find McFadyen's argument meritless.

*Florida v. J.L.*, 529 U.S. 266 (2000), on which McFadyen heavily relies, in fact provides him little support. *J.L.* holds that police officers must offer evidence other than an anonymous tip to support a *Terry* stop-and-frisk. *Id.* at 268. In this case, the email itself supplies evidence in addition to the

anonymous tip. For the email sent from McFadyen's Duke email account and signed with his jersey number contains sufficient indicia of reliability to support its inclusion in the search warrant application. *See United States v. Perkins*, 363 F.3d 317, 325 (4th Cir. 2004) ("The central point in those [anonymous tip] cases is that courts must ensure, one way or the other, that an anonymous informant's tip was sufficiently reliable."). Accordingly, we do not strike McFadyen's email from the warrant affidavit.

## 2.

Because McFadyen sufficiently pled that Officers Gottlieb and Himan made five false statements in the search warrant affidavit (four from the NTO affidavits and the additional statement as to the players' use of jersey numbers to hide their identities), we proceed to *Franks*' materiality prong to "determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Miller*, 475 F.3d at 628 (internal quotation marks omitted).

"Probable cause exists when there is a fair probability that . . . evidence of a crime will be found in a particular place." *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (internal quotation marks omitted). We conclude that the corrected affidavit establishes probable cause to search McFadyen's dorm room.[9]

As corrected, the affidavit still contains significant evidence that a rape was committed, most notably Mangum's allegations and Nurse Levicy's corroborating statement that "the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally." Fur-

---

[9]The search warrant also authorized the search of McFadyen's car. On appeal, McFadyen maintains that a search of his car violated the Constitution. This argument fails because in his complaint McFadyen never alleges that police actually searched his car.

ther, the affidavit contains McFadyen's email, which specifi-
cally identified his apartment as the location of a planned
murder of exotic dancers.

Even crediting McFadyen's allegation that his email
spoofed the novel and film, *American Psycho*, a reasonable
officer could have—and given the circumstances here, should
have—taken seriously the email's disturbing contents. McFa-
dyen's email, sent only hours after the alleged rape of an
exotic dancer, specifically contemplated other brutally violent
behavior toward exotic dancers. The email's temporal prox-
imity and substantive similarity to the rape allegations provide
more than a fair probability that evidence relating to the rape
would be found in McFadyen's apartment.[10]

McFadyen's argument that the affidavit fails to establish a
nexus between his apartment and the asserted crimes also
fails. That none of the crimes stemming from Mangum's alle-
gations were alleged to have occurred in McFadyen's apart-
ment is irrelevant. Instead, the probable cause inquiry focuses
on whether the affidavit demonstrates a "fair probability" that
evidence *relating to* the crimes alleged would be found in
McFadyen's apartment. *See Unus*, 565 F.3d at 125 n.25; *see
also Grubbs*, 547 U.S. at 95. Based on the content of McFa-
dyen's email, there is no question that the corrected affidavit
meets this standard.

Because the corrected affidavit would provide adequate
support for a magistrate's finding of probable cause, we can-
not say that the false statements in the affidavit were "mate-
rial" under the second *Franks* prong. Therefore, we reverse
the district court's denial of defendants' motions to dismiss

---

[10]McFadyen contends that the fact that the search warrant was executed
nearly two weeks after he sent the email renders its information stale.
While this may be true for the "conspiracy to commit murder" crime, the
email certainly provided non-stale probable cause for the other crimes
listed in the warrant application—sexual assault and kidnapping.

McFadyen's individual § 1983 unlawful search and seizure claim.

### D.

Based on the above § 1983 claims, all three sets of plaintiffs allege derivative claims of supervisory liability against City supervisory officials and of liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against the City itself.[11] Further, plaintiffs allege "stigma-plus" due process claims under *Paul v. Davis*, 424 U.S. 693 (1976), against various officials who had made public statements about the investigation. The district court denied the City and its officials' motions to dismiss these claims.

All of these claims require a predicate constitutional violation to proceed. For "supervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages." *Waybright v. Frederick Cnty.*, 528 F.3d 199, 203 (4th Cir. 2008) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Similarly, a plaintiff bringing a "stigma-plus" claim under *Paul* must allege both a stigmatic statement and a "state action that 'distinctly altered or extinguished'" his legal status. *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) (quoting *Paul*, 424 U.S. at 711). Because we hold that all plaintiffs failed to state predicate § 1983 claims against the individual officers, we must also hold that all plaintiffs have failed to state supervi-

---

[11]We recognize that because cities do not possess qualified immunity from § 1983 claims, *Owen v. City of Independence*, 445 U.S. 622, 638 (1980), we do not have appellate jurisdiction under the collateral order doctrine to hear the City's appeal of the *Monell* claims. However, because our determinations of the individual officers' qualified immunities fully resolve the issue of the City's *Monell* liability, we exercise pendent appellate jurisdiction over these claims. *See Altman v. City of High Point*, 330 F.3d 194, 207 n.10 (4th Cir. 2003).

sory liability, *Monell* liability, and "stigma-plus" claims.[12]
Thus, we reverse the district court's denial of the defendants'
motions to dismiss these derivative claims.

### III.

Having resolved the City and officials' appeals of the dis-
trict court's denial of their motions to dismiss the federal
claims asserted against them, we turn to their appeals of the
district court's denial of their motions for summary judgment
or to dismiss the state law claims. Federal jurisdiction over
the Evans and Carrington state law claims rests on diversity
of citizenship. Although the McFadyen plaintiffs only pled
federal question jurisdiction, a federal court has pendent juris-
diction over their state law claims. 28 U.S.C. § 1367. Simi-
larly, we have appellate jurisdiction under the collateral order
doctrine to review a district court's denial of those claims to
which the defendants assert immunities "from suit." *Gray-
Hopkins v. Prince George's Cnty.*, 309 F.3d 224, 231 (4th Cir.
2002); *see also Moore v. Evans*, 476 S.E.2d 415, 420 (N.C.
Ct. App. 1996).

### A.

All three sets of plaintiffs allege state common-law tort
claims against the City. The City moved for summary judg-
ment as to these claims on the ground of governmental immu-
nity from suit. The district court denied the motion.

Clearly, North Carolina municipalities enjoy governmental
immunity from state common-law tort claims arising out of
their performance of governmental, as opposed to proprietary,
functions. *Patrick v. Wake Cnty. Dep't of Human Servs.*, 655

---

[12]The parties dispute whether a Fourth Amendment violation constitutes
a cognizable "plus" under *Paul*. Given that we hold that plaintiffs failed
to state Fourth Amendment claims, we need not and do not reach this
question.

S.E.2d 920, 923 (N.C. Ct. App. 2008). Just as clearly, the pro-
vision of police services constitutes a governmental function
protected by governmental immunity. *Arrington v. Martinez*,
716 S.E.2d 410, 414 (N.C. Ct. App. 2011).

All plaintiffs maintain, however, that the City has waived
its governmental immunity by purchasing liability insurance
pursuant to N.C. Gen. Stat. § 160A-485(a). Well-established
North Carolina law holds that courts may not lightly infer a
waiver of immunity. *Guthrie v. N.C. State Ports Auth.*, 299
S.E.2d 618, 627 (N.C. 1983). Indeed, "[i]mmunity is waived
only to the extent that the city or town is indemnified by the
insurance contract from liability for the acts alleged." *Combs
v. Town of Belhaven*, 415 S.E.2d 91, 92 (N.C. Ct. App. 1992).
All plaintiffs argue that a genuine dispute of material fact
exists as to whether the City waived its governmental immu-
nity by purchasing liability insurance.[13]

Plaintiffs first contend that the City's purchase of two lia-
bility insurance policies from the Insurance Company of the
State of Pennsylvania ("ICOP") waived its governmental
immunity. But a "governmental immunity endorsement" pres-
ent in both ICOP policies establishes that the City did not
waive its governmental immunity. The endorsement states:

> [T]his policy provides coverage only for occurrences
> or wrongful acts for which the defense of govern-
> mental immunity is clearly not applicable or for
> which, after the defenses is [sic] asserted, a court of

---

[13]Plaintiffs briefly argue the City's conflicting statements regarding its
insurance coverage, along with its arbitration with one of its insurers over
the policy coverage, bars the grant of summary judgment. However,
because "[t]he meaning of language used in an insurance contract is a
question of law for the Court," *Daniel v. City of Morganton*, 479 S.E.2d
263, 267 (N.C. Ct. App. 1997), the City's opinions and the existence and
outcome of the arbitration proceedings are irrelevant to the purely legal
question of whether the City waived its governmental immunity by pur-
chasing liability insurance.

competent jurisdiction determines the defense of governmental immunity not to be applicable.

The endorsement is clear and none of the plaintiffs' arguments undermine its clarity. Indeed, the endorsement is materially indistinguishable from similar provisions that North Carolina courts have held do preserve governmental immunity. *See Owen v. Haywood Cnty.*, 697 S.E.2d 357, 359-60 (N.C. Ct. App.), *review denied*, 705 S.E.2d 361 (N.C. 2010); *Estate of Earley ex rel. Earley v. Haywood Cnty. Dep't of Soc. Servs.*, 694 S.E.2d 405, 409 (N.C. Ct. App. 2010); *Patrick*, 655 S.E.2d at 923-24. Thus, we must hold that the City did not waive its governmental immunity through the ICOP policies.

Nor do the plaintiffs' contentions that the City waived its governmental immunity by purchasing an insurance policy from Everest Insurance Company fare any better. For none of the plaintiffs' claims implicate the policy period covered by the Everest policy. That policy explicitly provides coverage for "occurrences" or "wrongful acts" for the policy period of April 1, 2007 to April 1, 2008. Plaintiffs do not allege any "occurrences" or "wrongful acts" during the Everest policy's temporal scope.[14] Accordingly, the Everest policy does not apply to their claims and cannot function as a waiver of governmental immunity. *See Patrick*, 665 S.E.2d at 923.

Finally, the McFadyen plaintiffs argue that the City waived its governmental immunity by participating in a local government risk pool or creating a funded reserve under N.C. Gen. Stat. § 160A-485(a). Neither argument is persuasive. The

---

[14]Although the Evans and McFadyen plaintiffs allege an ongoing conspiracy among several defendants until April 11, 2007, the last specific "occurrence" or "wrongful act" they allege occurred in December 2006. A plaintiff cannot defeat governmental immunity by alleging an ongoing conspiracy without any specific factual pleadings of a covered action during the policy period.

asserted local government risk pool that the McFadyen plaintiffs identify is actually a contract for the provision of liability claims adjusting services, not a contract for the provision of liability coverage itself. Further, because the City repealed its funded reserve on June 18, 2007, the funded reserve does not waive the City's governmental immunity in these cases.[15]

In short, no genuine dispute as to any material fact exists as to whether the City waived its governmental immunity from state common-law tort claims; it clearly did not. Accordingly, we reverse the district court's denial of the City's motion for summary judgment as to these claims.

### B.

The plaintiffs also allege state common-law tort claims against various Durham police officers, to which the officers asserted official immunity. In North Carolina, official immunity protects public officials performing discretionary acts under color of authority from suit in their individual capacity. *See Moore*, 476 S.E.2d at 421. Plaintiffs may avoid dismissal of such claims on official immunity grounds simply by pleading that an official's tortious actions were "malicious, corrupt or outside the scope of [his] official duties." *Id.* Notwithstanding the officers' vigorous appellate arguments to the contrary, as the district court explained, the plaintiffs sufficiently *pled*

---

[15]Of course, all plaintiffs' tort claims against the City rest on conduct that occurred before the City repealed its funded reserve. However, when creating the funded reserve in 2004, "[t]he City reserve[d] the right to modify or terminate th[e] policy at any time, and to have any such modification or termination apply to any claim not paid or for which there has not yet been a final decision of a court of competent jurisdiction." Because the City repealed its funded reserve policy before a final decision in any of these cases—indeed, before plaintiffs even filed their original complaints—the City has not waived its governmental immunity as to these claims through its prior funded reserve. Moreover, because the City has not waived its governmental immunity, we need not reach the issue of whether the public duty doctrine immunizes the City from plaintiffs' negligence-based tort claims.

malicious conduct by the officers.[16] Thus, we need only con-
sider whether the alleged conduct fails as a matter of law to
constitute a tortious act under North Carolina law.

1.

The Evans plaintiffs allege that Officers Addison, Gottlieb,
and Himan engaged in the tort of malicious prosecution by
concealing material evidence, manufacturing false evidence,
and intimidating witnesses. The district court denied the offi-
cers' motion to dismiss this claim on official immunity
grounds, finding the plaintiffs properly pled the elements of
a state malicious prosecution claim—causation of a criminal
proceeding, without probable cause and with malice, which
terminates in the plaintiff's favor. *See Williams v. Kuppen-
heimer Mfg. Co.*, 412 S.E.2d 897, 899 (N.C. Ct. App. 1992).
On appeal, the officers urge us to hold—as we do in the
§ 1983 context—that Prosecutor Nifong's decision to seek
indictments against the Evans plaintiffs broke the causal chain
between their acts and the indictments.

Certainly, no North Carolina court has adopted the attenu-
ated view of causation espoused by the plaintiffs; but North
Carolina courts have generally held causation can be estab-
lished by allegations that the defendant "instituted, procured,

---

[16]The partial dissent contends that there is an "obvious alternative
explanation" for the officers' allegedly malicious acts. *See Ashcroft v.
Iqbal*, 556 U.S. 662, 682 (2009) (internal quotation marks omitted).
Maybe so if each act were viewed in isolation. But, in applying *Iqbal*, we
are to "draw on [our] judicial experience and common sense" to determine
whether plaintiffs' well-pleaded, non-conclusory allegations *collectively*
nudge the issue of malice "across the line from conceivable to plausible."
*Id.* at 679-80. As outlined in the dissent itself, plaintiffs allege many
wrongful acts by the officers. Taken together, the officers' multiple
alleged acts certainly present plausible claims of malice. Of course, plain-
tiffs ultimately bear the burden of proving these allegations, and the dis-
trict court may determine prior to trial that they have failed to offer
evidence of a triable issue of fact as to the officers' allegedly malicious
conduct.

or participated in" a criminal proceeding. *See Moore v. City of Creedmoor*, 460 S.E.2d 899, 906 (N.C. Ct. App. 1995), *aff'd in part*, *rev'd in part on other grounds*, 481 S.E.2d 14 (N.C. 1997); *see also Becker v. Pierce*, 608 S.E.2d 825, 829 (N.C. Ct. App. 2005). Given this language, we cannot hold that the district court erred in finding that the Evans plaintiffs pled a state-law malicious prosecution claim as to Officers Gottlieb and Himan. However, plaintiffs fail to allege any conduct by Officer Addison that plausibly could be construed as "institut[ing], procur[ing], or participat[ing]" in a criminal proceeding. Accordingly, we must affirm the court's denial of Officers Gottlieb and Himan's motions to dismiss this claim, and reverse the court's denial of Officer Addison's motion to dismiss this claim.

2.

All three sets of plaintiffs allege state common-law obstruction of justice claims against Officers Gottlieb and Himan, based on the officers' asserted fabrication and concealment of evidence and witness tampering. The McFadyen plaintiffs also allege a state common-law obstruction of justice claim against the officers' supervisor, Commander Jeff Lamb, based on his asserted concealment of evidence and witness tampering.

All three officers argue that, in North Carolina, criminal suspects (like the plaintiffs) cannot allege a common-law obstruction of justice claim against police officers based on how the officers conducted a criminal investigation. Although logic would seem to compel this conclusion, the district court denied the defendants' motions to dismiss, explaining it could not "rule out the possibility that a claim could exist for common law obstruction of justice for creation of false evidence or destruction of evidence for the purpose of impeding the justice system, even if the conduct occurred as part of a criminal investigation." *McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 975 (M.D.N.C. 2011). We cannot affirm. Even though

North Carolina courts have interpreted common-law obstruc-
tion of justice to include fabrication of evidence, *Henry v.
Deen*, 310 S.E.2d 326, 334 (N.C. 1984), and destruction of
evidence, *Grant v. High Point Reg'l Health Sys.,* 645 S.E.2d
851, 855 (N.C. Ct. App. 2007), we have not found—and
plaintiffs have not offered—any case from any jurisdiction
recognizing a common-law obstruction of justice claim
against a police officer for his actions relating to a criminal
proceeding.

Thus, in forecasting whether North Carolina would recog-
nize such an action, *see Wilson v. Ford Motor Co.*, 656 F.2d
960, 960 (4th Cir. 1981), we must conclude that although
such a holding may be a remote "possibility," it is not a real-
ity. Accordingly, we reverse the district court's denial of the
officers' motions to dismiss this claim.

## C.

Finally, the City asks us to exercise pendent appellate juris-
diction over the district court's denial of the City's motions to
dismiss all three sets of plaintiffs' state constitutional claims.

Because governmental immunity does not shield North
Carolina municipalities from claims alleged under the state
constitution, *Craig ex rel. Craig v. New Hanover Cnty. Bd. of
Educ.*, 678 S.E.2d 351, 354 (N.C. 2009), the district court's
denial of the City's motion to dismiss is a non-final order, not
appealable under the collateral order doctrine. Nonetheless,
the City urges us to exercise pendent appellate jurisdiction
over these claims because, it argues, the issue of governmen-
tal immunity is relevant to the existence of a state constitu-
tional claim, and because the state constitutional standards are
the same as those applicable to plaintiffs' § 1983 claims.

As we have previously noted, "[p]endent appellate jurisdic-
tion is an exception of limited and narrow application driven
by considerations of need, rather than of efficiency." *Rux v.*

*Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006). Our exercise of pendent appellate jurisdiction "is proper only when an issue is (1) inextricably intertwined with the decision of the lower court to deny qualified immunity or (2) consideration of the additional issue is necessary to ensure meaningful review of the qualified immunity question." *Bellotte v. Edwards*, 629 F.3d 415, 427 (4th Cir. 2011) (internal quotation marks omitted). In this case, neither rationale is present. Our review of the issues of qualified, official, and governmental immunity in these appeals did not require any evaluation of the state constitutional claims. Indeed, the state constitutional claims, although "sharing certain wholesale commonalities" with the immunity issues, "nevertheless present quite distinct factual and legal issues at the retail level"—in particular, what constitutes an "adequate remedy at state law" under *Craig. Id.*

We therefore decline to exercise pendent appellate jurisdiction over the state constitutional claims. Instead, we dismiss for lack of jurisdiction the City's appeal of the district court's denial of the City's motions to dismiss these claims.

                                    IV.

To recapitulate, we hold as follows. We reverse the district court's denial of all defendants' motions to dismiss the federal claims alleged against them. We reverse the court's denial of the City's motion for summary judgment as to the state common-law claims alleged against it. We affirm the court's denial of Officers Gottlieb and Himan's motions to dismiss the state common-law malicious prosecution claims alleged against them. We reverse the court's denial of the officers' motions to dismiss all other state common-law claims. We dismiss for lack of appellate jurisdiction the City's appeal of the state constitutional claims alleged against it. Finally, we remand the cases for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*DISMISSED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

WILKINSON, Circuit Judge, concurring:

I concur fully in Judge Motz's fine opinion. It demonstrates well the central flaws in the plaintiffs' contentions.

A few additional observations may underscore the over-blown nature of this case. Plaintiffs have sought to raise every experimental claim and to corral every conceivable defendant. The result is a case on the far limbs of law and one destined, were it to succeed in whole, to spread damage in all directions.

I.

Although I appreciate the able and well-intentioned efforts of the attorneys in this matter, there is something disquieting about the sweeping scope and number of claims brought by the various plaintiff groups (twenty-three counts in the *Evans* complaint, thirty-two in *Carrington*, and forty in *McFadyen*), as well as the glacial pace at which this litigation has proceeded (we are now nearly six years removed from the dismissal of the last charges against the three Duke lacrosse players). With all of these overwrought claims disputed over years of complex litigation, this matter has taken on an unfortunate life of its own. A few examples of the pitfalls in plaintiffs' most inventive claims illustrate my concerns with allowing them to proceed.

A.

To take one example, the complaints lodge a Fourteenth Amendment "due process stigma-plus" claim against Corporal David Addison, the Durham Police spokesman. In seeking to

hold Addison liable for allegedly defamatory statements, the complaints fly in the face of the Supreme Court's admonition that the Due Process Clause is not to be converted into "a font of tort law to be superimposed upon whatever systems may already be administered by the states." *Paul v. Davis*, 424 U.S. 693, 701 (1976). Yet plaintiffs seek that result and then some, attempting to hold a police spokesman liable for general statements that reference no individual and are therefore not even actionable under traditional defamation law. *See* Restatement (Second) of Torts § 564A (1977) ("One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if, (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.").

Moreover, the plaintiffs' position would expose spokespersons (who are often given limited information by their superiors on a need-to-know basis) to the threat of monetary damages for expressing a departmental position in the most general of terms. Think of the implications of such a rule for public spokespersons of all sorts, from the press secretary for the Department of State to the spokesperson for a local school board. The threat posed by litigation of this kind would cause such officials to clam up, and the criminal justice system—not to mention government generally—would become less transparent than it already is.

The plaintiffs' "stigma-plus" claim against Addison suffers from another shortcoming. Even if Addison's general statements could somehow be considered defamatory with respect to the various individual plaintiffs, the complaints fail to plausibly allege that any of his statements *caused* the indictments of Evans, Finnerty, and Seligmann, much less the issuance of the NTO or McFadyen search warrant. *See Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) ("[F]or a liberty interest to have been implicated, some damage to [plaintiff's] employ-

ment status must have *resulted from* publication of the reasons for his demotion." (emphasis added)); *see also Rehberg v. Paulk*, 611 F.3d 828, 853 (11th Cir. 2010) (dismissing a stigma-plus claim where the complaint did not allege that the defendant's media statements "caused" the plaintiff's indictments and arrest), *aff'd on other grounds*, 132 S. Ct. 1497 (2012).

Indeed, it is difficult to imagine how the public statements of a spokesperson about the status of a rape investigation could be causally related to a police investigator's decision to seek evidence or a prosecutor's decision to pursue an indictment. The *Evans* plaintiffs argue that a causal connection may be inferred from their allegation that Addison's statements were "intended to inflame the Durham community and grand jury pool against the plaintiffs." But such an intent, even if taken as true, is far too removed from the prosecutor's decision to indict and the investigators' decision to seek the NTO to justify imposition of monetary liability on the basis of a defamation claim that is dubious enough under common law and that the Supreme Court was deeply reluctant to constitutionalize in the first place.

### B.

A second example of the complaints' overreach lies not so much in the nature of the claims as in the identity of the defendants. The plaintiffs have sued not just the police investigators, but also a number of Durham city officials such as the City Manager, Chief of Police, and various members of the police chain of command. Plaintiffs seek monetary damages from these so-called "supervisory defendants" under a theory of supervisory liability. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), however, the Supreme Court issued several cautionary holdings with respect to such liability—lessons that plaintiffs have utterly failed to heed.

To begin with, the Supreme Court explained in *Iqbal* that "a supervisor's mere knowledge" that his subordinates are

engaged in unconstitutional conduct is insufficient to give rise to liability; instead, a supervisor can be held liable only for "his or her own misconduct." *Id.* at 677. Yet the complaints in this case repeatedly allege that the so-called supervisory defendants violated plaintiffs' constitutional rights on the theory that they "knew or should have known" about their subordinates' conduct. This directly contradicts *Iqbal*'s holding that such allegations, standing alone, cannot give rise to supervisory liability.

Moreover, the *Iqbal* Court explained that in order to state a claim for supervisory liability, "a plaintiff must plead that *each* [supervisory] defendant, through the official's *own individual actions*, has violated the Constitution." *Id.* at 676 (emphases added); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1250, 1252-53 (10th Cir. 2008) (dismissing supervisory liability claim where complaint failed to "isolate the allegedly unconstitutional acts of each defendant"). The plaintiffs here, however, have roped in a number of Durham city officials without pleading any allegedly improper *individual* actions. For example, apart from general references to name, rank, and place in the chain of command, the *Evans* complaint does not contain so much as a single individualized allegation against named defendants Beverly Council and Lee Russ. The *Carrington* complaint likewise fails to make particularized allegations against Council, Russ, and Michael Ripberger. The absence of individualized allegations is all the more remarkable in light of the otherwise exhaustive nature of the complaints: combined, the three complaints weigh in at a staggering eight hundred-plus pages.

The plaintiffs argue that the absence of specific allegations with respect to each individual supervisor is of no consequence given that they have used the term "supervisory defendants" as shorthand to allege the collective actions and state of mind for all of the named supervisors. Requiring repetition of the names of specific defendants within the context of each factual allegation, we are told, would be "pointless and ineffi-

cient." This contention sorely misses the mark. The purpose of requiring a plaintiff to identify how "*each* [supervisory] defendant, through the official's *own individual actions*, has violated the Constitution," *Iqbal*, 556 U.S. at 676 (emphases added), is not to erect some formalistic rule that a complaint must mention each defendant by name some particular number of times. The requirement is instead designed to ensure that the serious burdens of defending against this sort of lawsuit are visited upon a departmental supervisor only when the complaint "plausibly suggest[s]" that the supervisor engaged in "his or her *own* misconduct." *Id.* at 681, 677 (emphasis added).

That showing is demonstrably absent here. In addition to the complaints' failure to identify specific misconduct on the part of certain individual defendants, there are numerous problems with the individualized allegations that are actually made. For instance, both the *Carrington* and *McFadyen* complaints discuss at length a meeting occurring on or around March 29, 2006, allegedly attended by specific supervisory defendants (Patrick Baker and Steven Chalmers in the *Carrington* complaint; Baker, Russ, and Ronald Hodge in the *McFadyen* complaint) where the prosecutor and investigators allegedly agreed or were instructed to expedite the case against the Duke players despite mounting evidence of their innocence. But that meeting has no logical relevance to the supposed Fourth Amendment violations of which these plaintiffs complain because it occurred days *after* the preparation of the allegedly false NTO and McFadyen search warrant applications. In other words, to use the language of *Iqbal*, the plaintiffs' allegations regarding this meeting do not "plausibly give rise to an entitlement to relief." *Id.* at 679.

At bottom, then, the problem with the supervisory liability claims here is that, like those at issue in *Iqbal*, they fail to cross "the line from conceivable to plausible." *Id.* at 680. As in *Iqbal*, the plaintiffs' allegations here *could* be "consistent with" a scenario in which the supervisory officials somehow

participated in their subordinates' allegedly unconstitutional conduct. *Id.* at 678. But the "obvious alternative explanation," *id.* at 682, for the supervisors' conduct in assigning the case to certain investigators and attending meetings where the case was discussed is that they wanted to facilitate the investigation, stay abreast of recent developments, and bring the case to closure on a reasonable timeline. That, after all, is their job.

In short, the complaints here are wholly indiscriminate. They seek to sweep in everyone and everything, heedless of any actual indications of individual malfeasance that would justify the personal burdens that litigation can impose. What *Iqbal* condemned, the complaints assay. What is more, the complaints' sweeping allegations mirror the sweeping nature of the wrongs of which plaintiffs complain. It is, of course, the purpose of civil litigation to rectify, but not in a manner that duplicates the very evils that prompted plaintiffs to file suit.

## C.

The damage that the plaintiffs' theory of the case would inflict upon the criminal justice system is evident in a related sense as well. The plaintiffs seek to hold the investigating officers and their supervisors liable by repeatedly asserting notions of conspiracy, suggesting that the defendants colluded to investigate and prosecute the Duke players despite the evidence of their innocence. The upshot of such a theory, however, would be that whenever police officers, their superiors, and prosecutors communicate regarding an investigation into certain suspects, that very act of communication would expose them to a risk of monetary liability should the suspects ultimately be exonerated. The plaintiffs' theory of conspiracy, in other words, would inhibit the exchange of information among police and prosecutors that takes place every day. Thus, I could not agree more with Judge Motz's statement that to allow § 1983 claims "to proceed on allegations of such a 'conspiracy' would in virtually every case render the offi-

cers' qualified immunity from suit 'effectively lost' and make discovery the rule, rather than the exception." *Ante* at 24.

The improvidence of subjecting law enforcement officers to such wide-ranging liability is supported by Supreme Court precedent in the analogous context of intra-enterprise antitrust conspiracy doctrine. As with the present case, that doctrine involves civil damages actions against related parties (for instance, a parent corporation and its wholly owned subsidiary) on the theory that wrongful conduct may be inferred from their intra-organizational communications. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984), however, the Court held that such parties cannot be held liable for "conspiring with each other" under Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court recognized that coordination among various actors within a company is often "necessary if a business enterprise is to [operate] effectively," but that such coordination might be discouraged if intra-enterprise conspiracy liability were permitted. *Id.* at 769-71. That same concern animates our decision here. Moreover, *Copperweld* noted that "[c]oordination within a firm" is frequently the hallmark of a business's commonplace desire to increase its effectiveness, and not necessarily a sign of some "effort to stifle competition." *Id.* at 769. That caution rings true here as well, where the mere fact that public officials meet to discuss a high-profile criminal case is far more often indicative of a desire to foster communication and cooperation than an insidious conspiracy to violate the Constitution.

D.

A final example of the overreach infecting this case lies in the *Carrington* and *McFadyen* plaintiffs' attempts under *Franks v. Delaware*, 438 U.S. 154 (1978), to hold officers monetarily liable for seeking from the state courts a non-testimonial order and a search warrant for standard investigatory purposes.

Although *Franks* held that a warrant so grounded in false-hoods as to effectively eliminate its "support[ ] by Oath or affirmation" could give rise to a Fourth Amendment violation, *id.* at 164-65, the Supreme Court stressed the importance of applying this rule so as not to vitiate the warrant process so instrumental to the personal privacy protected by our Bill of Rights. Indeed, in part because of concerns with the holding's potential effects on the incentives of police, the Court empha-sized that "the rule announced today has a limited scope." *Id.* at 165-67. And since *Franks*, the Court itself has never eluci-dated the standards for evaluating the veracity of affidavits supporting warrants. *See* Stephen W. Gard, *Bearing False Witness: Perjured Affidavits and the Fourth Amendment*, 41 Suffolk U. L. Rev. 445, 446 (2008).

In this area, therefore, we must heed the Supreme Court's often communicated goal of preserving the warrant require-ment. As one treatise explains:

> The Supreme Court has long expressed a strong pref-erence for the use of arrest warrants and search war-rants. Resort to the warrant process, the Court has declared, is to be preferred because it "interposes an orderly procedure" involving "judicial impartiality," *United States v. Jeffers*, 342 U.S. 48, 51 (1951), whereby "a neutral and detached magistrate," *John-son v. United States*, 333 U.S. 10, 14 (1948), can make "informed and deliberate determinations," *Aguilar v. Texas*, 378 U.S. 108, 110 (1964), on the issue of probable cause. To leave such decisions to the police is to allow "hurried actions," *id.* at 110-11, by those "engaged in the often competitive enterprise of ferreting out crime," *Johnson*, 333 U.S. at 14.

Wayne R. LaFave, 2 *Search and Seizure* § 3.1(c) (4th ed. 2004). Because of this overarching concern, the Supreme Court has instructed lower courts to eschew rulings that would discourage resort to judicial process and instead incen-

tivize the invocation of exceptions to the warrant requirement. As the Court declared in determining whether a warrant was supported by probable cause:

> If the affidavits submitted by police officers are sub-jected to the type of scrutiny some courts have deemed appropriate, police might well resort to war-rantless searches, with the hope of relying on con-sent or some other exception to the warrant clause that might develop at the time of the search. In addi-tion, the possession of a warrant by officers conduct-ing an arrest or search greatly reduces the perception of unlawful or intrusive police conduct, by assuring the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.

*Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks omitted). This court has specifically acknowledged this admonition in declining to interpret the *Franks* rule in an overbroad manner. *See United States v. Colkley*, 899 F.2d 297, 303 (4th Cir. 1990).

Moreover, the concern with establishing perverse incen-tives to circumvent the warrant process is all the more critical where an officer faces, as here, personal pecuniary loss in a civil claim for damages—as opposed to the exclusion of evi-dence in a criminal matter. In this regard, it bears note that *Franks* itself was an exclusionary rule case, and the Supreme Court has never provided guidance on whether and how the *Franks* rule should be implemented in the context of § 1983 claims. *See* Gard, *supra*, at 446 ("Th[e] absence of guidance [from the Supreme Court] for lower courts [with respect to the *Franks* rule generally] is especially acute because *Franks* pre-dates both the Supreme Court's revolutionary reinterpretation of the Fourth Amendment and the development of most mod-ern civil rights law."). Though this court has previously allowed such claims to proceed, *see Miller v. Prince George's*

*Cnty.*, 475 F.3d 621, 627 (4th Cir. 2007), we must step cautiously in light of the Supreme Court's lack of direction in this area and its steadfast commitment to preserving the warrant requirement generally.

Plaintiff McFadyen's *Franks* challenge to the search warrant for his room and car in connection with his utterly tasteless—indeed, ominous—e-mail stands on the shakiest of grounds. The potential for inflicting tremendous damage to the criminal justice system by punishing officers for pursuing a court-ordered NTO would be compounded by penalizing them for attempting to investigate what initially (and understandably) appeared to be an entirely credible threat to perpetrate a gruesome murder. To hold policemen liable for damages for a search even when they request and possess a warrant, even when they have uncovered an e-mail explicitly vowing to kill certain people out of apparent contempt for their class, and even where that e-mail identifies the exact location of the slaying would be outrageous.

The argument offered in the *McFadyen* complaint—that the investigators should have somehow realized that the e-mail was meant to be a joke or parody—is a theory that could succeed only in Never Never Land, a theory that takes no account of the real and brutal rampages by disturbed individuals on college campuses and elsewhere in recent years. As it turned out, the e-mail was a highly vulgarized expression of fancy. But we cannot ascribe instant clairvoyance to those charged with protecting the community—and who must be simultaneously encouraged to seek judicial sanction in doing so.

## II.

It cannot be emphasized too often that the plaintiffs in this case were innocent of any criminal wrongdoing. Their behavior in many instances was boorish, but it was in no way illegal based on any evidence before us. The problem is that the immunities and rules of pleading at issue here exist to protect

the larger good of discretionary judgment in the service of public purposes—and to prevent defendant officials who are innocent of any wrongdoing from being swept up by baseless accusations in unrestrained complaints. The infirmities of the pleadings portended what was sure to become an extended fishing expedition, the broader implications of which could hardly be confined to these particular actions.

Hard cases can and do make bad law, and the costs of these ones—outside of the limited claim we have allowed to proceed—are much too steep. The plaintiffs seek to thrust the prospect of monetary liability and burdensome discovery into every meeting between supervisor and subordinate within a police department, every internal communication between police officer and prosecutor, every statement by a police spokesperson, and every effort to invoke judicial process in furtherance of a police investigation. Allowing these claims to proceed would let litigation loose in such a fashion as to impair the ability of the criminal justice system to do its job.

In sum, we run the risk here of replicating in civil litigation the very maladies that plaintiffs complain infected the criminal process to which they were subjected. That is to say, individuals would be pulled into the coercive proceedings of courts when they have no business being there. To prolong the overextension of legal process that has been attempted here would portend a sorry end to a sorry saga.

It is for this reason that I join the majority opinion in dismissing the complaints in large part, but preserving the state malicious prosecution claim against Gottlieb and Himan asserted by the *Evans* plaintiffs. The *Evans* plaintiffs were the only ones to raise a malicious prosecution claim under North Carolina law, and they were the only ones indicted. Given that the elements of the federal and North Carolina claims appear to differ, I agree with the court that the *Evans* plaintiffs have pled the state malicious prosecution claim with sufficient specificity to survive a motion to dismiss under the *Iqbal* stan-

dards governing even state claims brought in federal court. The *Evans* plaintiffs are the ones who have suffered the most harm, and their claim is the one most plausibly grounded in North Carolina law. That single claim with its two discrete defendants is where the case before us essentially stands now, and where it should have focused long, long ago.

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I concur in part in Judge Motz's opinion, which I believe does a very fine job disposing of most of the issues in these cases. However, I dissent from Parts III-B and III-B.1. Unlike the majority, I would dismiss all state common law claims against all individual defendants based on the North Carolina doctrine of official immunity. I cannot agree that the complaints sufficiently allege malicious conduct such that the claims are not barred. Because the majority disposes of the bulk of state common law claims on other grounds, allowing only the Evans plaintiffs' malicious prosecution claims against Gottlieb and Himan to proceed, I focus my partial dissent on the inadequacies of those claims.

The North Carolina doctrine of official immunity protects public officials from personal liability for discretionary acts performed in the course of their official duties, so long as the officers acted without malice or corruption. *Collins v. N. Carolina Parole Comm'n*, 473 S.E.2d 1, 3 (N.C. 1996). Thus, a police officer is protected from personal liability for investigative conduct unless the plaintiffs "allege and prove that the defendant's acts were malicious or corrupt." *Schlossberg v. Goins*, 540 S.E.2d 49, 56 (N.C. Ct. App. 2000) (citing *Jones v. Kearns*, 462 S.E.2d 245, 248 (N.C. Ct. App. 1995). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *In re Grad v. Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984) (citing *Givens v. Sellars*, 159 S.E.2d 530 (N.C. 1968)).

"An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Id.* at 890–91 (citing *Givens*, 273 N.C. at 535).

Because the plaintiffs chose to bring suit in federal court, the sufficiency of their allegations must be judged against the pleading standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Under that standard, a complaint's "bare assertions" of malicious conduct are not entitled to the assumption of truth. *See Iqbal*, 556 U.S. at 680-81. Rather, the complaint must plausibly suggest malicious conduct by alleging "sufficient factual matter" to draw a "reasonable inference" of malice. *Id.* at 678. Although the plausibility requirement is not a probability requirement, *id.*, where there is an "obvious alternative explanation" for the conduct alleged, malice may not plausibly be inferred, *id.* at 682 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)).

The majority does not explain why the complaint plausibly alleges Gottlieb and Himan acted maliciously, but instead merely says it is so. I cannot agree. Stripping the complaint of its conclusory allegations, it does not plausibly suggest the officers acted "wantonly," in a way that reasonable officers "would know to be contrary to [their] duty," for the purpose of framing the plaintiffs. *In re Grad*, 321 S.E.2d at 890. On the contrary, the "obvious alternative explanation" for the officers' conduct is that they were acting as reasonable, though not perfect, police officers would to investigate Mangum's rape allegations, which they did not know to be false.

To begin, the complaint alleges that Gottlieb and Himan diligently investigated a case assigned to them by their supervisors, not that they sought to frame the plaintiffs. Consistent with their official duties, the officers interviewed Mangum, interviewed Pittman, interviewed Duke lacrosse players,

obtained a search warrant and an NTO, collected DNA evidence, and turned over the full results of their investigation to prosecutor Nifong, candidly briefing him on the case. The complaints also allege that the officers continued the investigation under the direction of Nifong and their police department supervisors. Far from plausibly suggesting the officers acted maliciously to frame the plaintiffs, the "obvious alternative explanation" for their conduct is that they were doing their job and investigating a case assigned to them, in collaboration with the prosecutor.

The plaintiffs make much of Mangum's inconsistent accounts of the alleged attack and Pittman's initial denial, alleging on this basis that the detectives knew Mangum was lying and proceeded with the investigation with the intent of framing Duke lacrosse players. This is simply implausible. Mangum told numerous people, on numerous occasions, that she was raped. Although the details of her accusations shifted, she was known to have been intoxicated on the night of the alleged assault. Further, as the other two complaints make clear, a nurse at Duke Medical Center informed officer Gottlieb that Mangum's examination had revealed evidence "consistent with sexual assault." And an email sent by one of the lacrosse players just hours after the alleged attack stated that, "after tonight's show," the author planned to have strippers over again and to murder them. Given the facts alleged in the three consolidated cases, it is implausible to infer that Gottlieb and Himan knew Mangum was lying and therefore acted maliciously to frame the lacrosse players. The fact that an alleged rape victim changes the details of her story does not mean she is lying, nor does a witness's initial denial always correspond with the truth. Police officers owe a duty to the public to take seriously and investigate allegations of rape—a duty that cannot and should not be dismissed on such flimsy grounds.

Nor can the plaintiffs rest their allegations of malice on the officers' supposed witness tampering, use of suggestive photo

arrays, or fabrication of false DNA evidence. As for the allegations of witness tampering, the complaint alleges that the officers threatened to enforce an outstanding warrant against Pittman if she did not recant her earlier statement that Mangum was lying. But leveraging an outstanding warrant against a recalcitrant witness is hardly beyond the pale of police investigative techniques. Given that this occurred *after* Mangum told police she had been raped and Gottlieb was informed that medical evidence corroborated her accusations, the obvious alternative explanation is that Gottlieb and Himan were trying to persuade Pittman to tell the truth, not to frame the plaintiffs.

As for the suggestive photo arrays, the complaint does allege that the procedures violated police department policy. However, the obvious explanation for the officers' conduct is that the police officers were attempting to identify a suspect to further investigate Mangum's claims, which they did not know were false. Although their photo array techniques were not perfect, a mere deviation from departmental policy, by itself, does not plausibly suggest they acted "wantonly" for the purpose of framing the plaintiffs.

Finally, although the complaint alleges that Gottlieb and Himan were present during the meetings in which Nifong and DNA laboratory personnel decided to withhold potentially exculpatory DNA information, these meetings took place hardly a month into the investigation, before indictments had even been secured. Neither the Constitution nor any law I am aware of requires police officers to disclose potentially exculpatory information at this early stage—either to the grand jury or to suspects—and I do not believe a reasonable police officer would believe such a duty exists. The officers' failure to do something they were under no obligation to do does not plausibly suggest malice.

Although in retrospect it may be clear to some that Mangum's accusations were baseless, the complaint does not

plausibly allege Gottlieb and Himan knew this to be the case, particularly in light of the corroborating medical information they possessed. Rather, their investigative conduct leading to the plaintiffs' indictments, though not perfect, is consistent with the conduct of reasonable police officers assigned a rape case. If a complaint of this kind can proceed, I fear that every rape case where a victim has given inconsistent accounts and a witness has changed her statement could subject investigating police officers to personal liability. I do not believe the North Carolina doctrine of official immunity or federal pleading standards can be circumvented so easily, and I fear this Court has done a disservice to both by denying Gottlieb and Himan official immunity.

For these reasons, I dissent from Parts III-B and III.B.1 of the majority opinion.