# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID F. EVANS, et al.,

    Plaintiffs,

        v.

CITY OF DURHAM, N.C., et al.,

    Defendants.

Case No. 1:07-CV-739

## PLAINTIFFS' OPPOSITION TO THE DSI DEFENDANTS' RENEWED MOTIONS TO DISMISS

Plaintiffs David F. Evans, Collin Finnerty, and Reade Seligmann, by undersigned counsel, hereby respond to the renewed motions to dismiss of Defendants DNA Security, Inc. ("DSI") and Richard Clark (Docs. 193 & 194), and of Defendant Brian Meehan, who joins the brief of DSI and Clark (Doc. 195). DSI, Clark, and Meehan are referred to collectively as the "DSI Defendants."

The DSI Defendants ask the Court to dismiss the remaining claims against them based upon the recent opinion of the U.S. Court of Appeals for the Fourth Circuit on the City Defendants' interlocutory appeal (Doc. 182). Plaintiffs intend to seek Supreme Court review of the Fourth Circuit's decision, and thus the DSI Defendants' motion should be held in abeyance pending the outcome of Plaintiffs' petition for writ of certiorari.

Regardless of the outcome of the Fourth Circuit's decision, however, the DSI Defendants' motion still should be denied as to Plaintiffs' malicious prosecution claim (Count 13). The Fourth Circuit opinion provides no basis for the dismissal of that claim,

which the Fourth Circuit allowed to proceed against the two City detectives, Defendants Gottlieb and Himan, who along with the DSI Defendants are alleged to have engaged in fabrication and concealment of evidence. Because the malicious prosecution claim should be allowed to proceed, so should Plaintiffs' negligent supervision claim (Count 21).

Perhaps recognizing the obstacles to dismissal of the malicious prosecution claim, the Motions go well beyond the Fourth Circuit's decision and assert a number of additional arguments. These arguments either were raised, or could have been raised, in connection with the DSI Defendants' previously decided motions to dismiss. They do not constitute a proper basis upon which to seek reconsideration of the Court's prior decision. They include, among other things, a North Carolina Court of Appeals decision that was decided *before* this Court's March 31, 2011 decision and addressed claims against *attorneys* who provide legal advice, not crime labs alleged to have fabricated and concealed evidence; the March 2006 Order authorizing DNA testing, which as DSI's own report demonstrates, did *not* limit the scope of DSI's reporting only to lacrosse players; and North Carolina's "rape shield" rule, which is a rule of *evidence*, not a rule permitting crime labs to tailor their DNA reports to selectively and deliberately conceal material evidence. The DSI Defendants also rely for the first time on hearsay press reports and statements, which in addition to being outside the complaint and thus improper on a motion to dismiss, also do not support dismissal.

## BACKGROUND

### A.    Summary of Plaintiffs' Allegations Regarding the DSI Defendants

The allegations regarding the DSI Defendants are described in Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss the First Amended Complaint

(Doc. 51 at 13-15), and were not modified in the Second Amended Complaint (hereinafter "Amended Complaint"). They can be summarized as follows:

The Amended Complaint alleges that, because the accuser Crystal Mangum had alleged that none of her attackers had used condoms and that all three had ejaculated inside of her, Defendants knew that DNA testing would be critically important to confirming or disproving her already inconsistent claims. Am. Compl., Doc. 116, at ¶ 164.

In April 2006, Durham Police personnel retained DSI, a private laboratory in Burlington, North Carolina, to conduct Y-chromosome, or Y-STR DNA testing, which is more sensitive than the autosomal DNA testing performed by the SBI crime lab. *Id.* ¶ 199. At the time, Meehan told Durham Police that DSI was so eager to be involved in the high-profile investigation of the Duke lacrosse team that DSI was willing to cut its standard prices for the testing. *Id.* ¶ 200.

Between April 8 and 10, 2006, DSI conducted testing of Mangum's rape kit items. But instead of identifying DNA from Plaintiffs or any other member of the Duke lacrosse team on Mangum's rape kit items, DSI instead identified DNA from several *other* men, none of whom was a lacrosse player. *Id.* ¶ 206. DSI excluded with 100% certainty every member of the lacrosse team, including Plaintiffs, as being the donors of this DNA. *Id.* Even if Mangum had been telling the truth when she claimed to be the victim of a rape committed by men who were not wearing condoms and had ejaculated inside her (she was not), these DNA findings conclusively established Plaintiffs' actual innocence—and that other men would have been responsible. *Id.*

3

The Amended Complaint alleges that Meehan and Clark informed Nifong, Gottlieb, and Himan of these exculpatory findings during a meeting on April 10, 2006 (the "April 10 Meeting"), but instead of concluding the investigation, these Defendants agreed that they would conceal these exculpatory findings so that they could claim to have probable cause to support arrests, indictments, and prosecutions of three Duke lacrosse players on rape charges. *Id.* ¶¶ 207-208. One week later, Seligmann and Finnerty were indicted. *Id.* ¶¶ 212-213.

During subsequent meetings on April 21, 2006 (the "April 21 Meeting") and May 12, 2006 (the "May 12 Meeting"), Nifong, Gottlieb, Himan, and the DSI Defendants agreed to fabricate a false "final report of the results of all DNA testing" that would omit the exculpatory findings regarding the rape kit items, in violation of DSI's internal protocols, FBI standards, and the regulations of DSI's accrediting organizations. *Id.* ¶¶ 225, 231. The resulting report (the "May 12 Report") intentionally omitted the fact that DNA from at least four other men was found on the rape kit items and, instead, deceptively reported that DNA consistent with Evans was found on one of Mangum's false fingernails. *Id.* ¶¶ 232-233, 236. As the Amended Complaint alleges, "the intended and actual effect of this illicit agreement was to fabricate a false and misleading 'final' report of DNA testing that would sustain the prosecutions of Finnerty and Seligmann, and support and sustain the indictment and prosecution of Evans, while concealing by omission the true results of DNA testing, which further established Plaintiffs' actual innocence." *Id.* ¶ 226. Three days after the May 12 Meeting and Report, Evans was indicted. *Id.* ¶ 238.

4

After Plaintiffs were provided the underlying documents and materials from DSI on October 27, 2006, it took approximately 100 hours of review and complex analysis of the underlying raw DNA data for defense counsel to determine that the May 12 Report did not include all of the results of DNA tests performed by DSI and that DSI had found DNA from multiple unidentified males on the rape kit items. *Id.* ¶ 303.

Meehan testified at a court hearing held on December 15, 2006 regarding defense counsel's discovery of the existence of DNA from multiple unidentified males on the rape kit items. *Id.* ¶ 307. At that hearing, Meehan admitted under oath to the underlying facts of the DNA conspiracy, including DSI's initial discovery of the DNA from at least four other men—none of whom was a lacrosse player—on Mangum's rape kit items; the concealment of this evidence, which Meehan admitted was the result of "an intentional limitation" agreed upon during the earlier meetings with Nifong "not to report all of the results of all examinations and tests" that DSI performed; and DSI's creation of an "inappropriate" report that did not convey all of DSI's findings, in violation of FBI standards, DSI protocols, and industry custom and practice. *Id.*

## B. Procedural History

The DSI Defendants moved to dismiss the complaint in January 2008. *See* Docs. 30 & 32. At the time, they raised many arguments similar to those presented in their instant renewed motions to dismiss. The DSI Defendants argued that Plaintiffs could not state an actionable claim because the DSI Defendants were not alleged to have fabricated or destroyed evidence, or to have made false statements to Plaintiffs or the court. Doc. 33 at 2-3. The DSI Defendants also argued that the DNA testing confirmed that "no DNA

5

evidence existed to support" Mangum's claims, and that it "contradicted Mangum's claim that she had not had sexual intercourse with anyone other than Plaintiffs in the days leading up to the alleged rape." *Id.* at 3. The DSI Defendants further argued that they had reported the complete results of the DNA testing to Nifong, and that the May 12 Report's omission of the DNA findings from the "non-reference" samples was at Nifong's direction. *Id.* at 5-6.

With respect to Plaintiffs' common law malicious prosecution claim, the DSI Defendants argued in their prior motions to dismiss that the claim failed because they did not initiate the underlying criminal action. Doc. 33 at 42. They further contended that even if providing false information to law enforcement were sufficient to establish malicious prosecution, Plaintiffs' claim would still fail because they provided accurate and complete and information to law enforcement. *Id.* at 43-44. In their reply brief, the DSI Defendants argued that withholding exculpatory evidence—*i.e.*, the DNA evidence of unidentified men on the rape kit items—from the grand juries could not form the basis of a claim against them. Doc. 63 at 3.

The DSI Defendants' motions were thoroughly briefed, and the DSI Defendants later offered supplemental briefing and renewed their motion after the filing of the Second Amended Complaint. *See* Docs. 30-33, 63, 64, 98, 102, 123, 126. On March 31, 2011, the Court denied the DSI Defendants' motions to dismiss as to Counts 1, 2, 3, 13, 14 and 21 as part of its omnibus ruling on the defendants' motions to dismiss. *See* Doc. 133 at 95. Regarding Count 13 for malicious prosecution, the Court rejected the argument that the DSI Defendants merely provided information to a prosecutor, noting that "Plaintiffs alleged that [Defendants Gottlieb, Himan, Wilson, Clark, and Meehan] created false and misleading

6

evidence, conspired with Nifong to initiate the prosecution, and affirmatively participated in efforts to initiate and maintain that prosecution, such that the criminal prosecution would have not existed except for the efforts of these Defendants." Doc. 133 at 69.[1] Accordingly, the Court held that Plaintiffs had stated a claim for malicious prosecution. The Court also rejected Defendants Meehan's and Clark's argument that the malicious prosecution claim should be dismissed because they acted in good faith, holding that "Plaintiffs have alleged that the Defendants acted with the requisite malice." *Id.* at 70. Finally, the Court held that the claim against DSI may proceed under the doctrine of *respondeat superior*, based on the acts of Defendants Clark and Meehan. *Id.* at 72.

The DSI Defendants did not appeal the Court's ruling. However, the City Defendants took an interlocutory appeal of the Court's denial of their immunity claims. In relevant part, the Fourth Circuit affirmed the Court's denials of the two City detectives' (Gottlieb's and Himan's) motions to dismiss Plaintiffs' common law malicious prosecution claim (Count 13), and permitted that claim to proceed against the two detectives. *Id.* at 39-40. The Fourth Circuit, however, reversed the denial of the motions to dismiss Plaintiffs' § 1983 claims (Counts 1, 2, and 3) against Gottlieb and Himan, holding that for purposes of § 1983 liability, Defendant Nifong's decision to seek indictments of Plaintiffs constituted an intervening cause that broke the causal chain between the detectives' improper conduct and the unlawful seizures of Plaintiffs. *Id.* at 22, 24-25. (The court held that the same

---

[1] The Court addressed separately the allegations against the City police spokesman, Defendant Addison, *see id.*, reflecting that those allegations were of a different nature than those regarding the conduct of the detectives and the DSI Defendants.

intervening cause standard did not apply to Plaintiffs' malicious prosecution claim. *Id.* at 39-40.) The court also reversed the denial of Himan's and Gottlieb's motions to dismiss Plaintiffs' obstruction of justice claim (Count 14), holding that the claim was not cognizable "against a police officer for his actions relating to a criminal proceeding." *Id.* at 41. The Fourth Circuit did not address Count 21, for negligent supervision, as it was not on appeal.

Plaintiffs intend to seek Supreme Court review of the Fourth Circuit's decision; the petition for certiorari is currently due in April 2013.

## ARGUMENT

## I.    Legal Standard

Although not styled as such, the DSI Defendants' motions are properly treated as a motion for reconsideration of the Court's March 31, 2011 Order. Reconsideration of interlocutory orders is limited to a "fairly narrow set of grounds." *Akeva, L.L.C. v. Adidas Am., Inc.*, 385 F. Supp. 2d 559, 565 (M.D.N.C. 2005). "Courts will reconsider an interlocutory order in the following situations: (1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work manifest injustice." *Id.* at 566; *see also Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003). As discussed below, other than the Fourth Circuit's decision, the DSI Defendants identify no appropriate basis for reconsideration of the Court's prior ruling.

8

## II. The DSI Defendants' Motion Should Be Held In Abeyance Pending Resolution of Plaintiffs' Petition for Certiorari.

The stated basis for the DSI Defendants' renewed motion to dismiss is the Fourth Circuit's opinion in the City Defendants' interlocutory appeal. Doc. 194 at 2, 6. Because Plaintiffs intend to seek Supreme Court review, Plaintiffs request that the Court hold the DSI Defendants' motions in abeyance pending resolution of Plaintiffs' petition for certiorari. The district courts "possess[] the authority to hold a motion in abeyance if resolution of a pending matter will help clarify the current issues or make currently disputed issues moot." *Rice v. Astrue,* 4:06-CV-02770-GRA, 2010 WL 3607474, at *2 (D.S.C. Sept. 9, 2010) (citing *Rhines v. Weber,* 544 U.S. 269 (2005) and *United States v. Franczak,* 8 F. App'x 246 (4th Cir. 2001)). If the Supreme Court reverses the Fourth Circuit's decision, it would render the DSI Defendants' motions moot. Thus, the Motions should be held in abeyance pending resolution of Plaintiffs' petition for writ of certiorari.

## III. Regardless of the Fourth Circuit's Decision, Plaintiffs' Common Law Malicious Prosecution Claim Should Proceed Against the DSI Defendants.[2]

### A. The Fourth Circuit's Decision Provides No Basis To Dismiss the Malicious Prosecution Claim.

The Court denied the DSI Defendants' prior motions to dismiss Plaintiffs' common law malicious prosecution claim (Count 13) in its March 31, 2011 opinion. Doc. 133 at 95. The Fourth Circuit affirmed that ruling as to two similarly situated defendants, City detectives Gottlieb and Himan. Specifically, the Fourth Circuit held that Plaintiffs'

---

[2] Plaintiffs concede that if the Fourth Circuit's decision were to stand as to Counts 1, 2, 3, and 14, then those claims should be dismissed against the DSI Defendants as well.

9

allegations that Gottlieb and Himan had, *inter alia*, concealed material evidence and manufactured false evidence were sufficient to meet the standard for malicious prosecution under North Carolina law. Doc. 182 at 39-40. The Fourth Circuit also rejected the detectives' argument that Nifong's decision to seek indictments broke the causal chain between their actions and the indictments, holding that a different causation analysis applied to the state law malicious prosecution claim, and that Plaintiffs satisfied the requirement that the defendants be alleged to have "instituted, procured, or participated in a criminal proceeding." *Id.* For the same reasons, Plaintiffs' malicious prosecution claim also should proceed against the DSI Defendants, who like Gottlieb and Himan are alleged to have deliberately fabricated and concealed material evidence to initiate and maintain the wrongful prosecutions of Plaintiffs.

Seeking to draw a different comparison, the DSI Defendants note that the Fourth Circuit ordered the dismissal of Plaintiffs' malicious prosecution claim as to the City police spokesman, Addison. *Id.* at 40. However, the allegations against the DSI Defendants are akin to those leveled against the City detectives, Gottlieb and Himan—as the Court appears to have recognized when it analyzed the allegations against those five Defendants together (separately from the police spokesman) in its prior ruling on the motions to dismiss. Doc. 133 at 69. The Amended Complaint alleges that the DSI Defendants, like Gottlieb and Himan, affirmatively participated in the efforts to initiate and maintain the prosecution of Plaintiffs without probable cause, and like Gottlieb and Himan deliberately participated in the falsification of evidence and concealment of material evidence. *See* Am. Compl., Doc. 116, at ¶¶ 207-210, 225-227, 229-236. The Amended Complaint does not allege that the DSI

10

Defendants performed a public relations role. Thus, the Fourth Circuit's decision to allow Plaintiffs' malicious prosecution claim to proceed against Gottlieb and Himan, but not the police spokesperson, provides no basis for the Court to reconsider its prior denial of the DSI Defendants' motion to dismiss this claim. To the contrary, it supports the Court's prior decision to permit this claim to proceed.

C. **The DSI Defendants' Remaining Arguments Improperly Re-Litigate Their Prior Motions To Dismiss and Are Without Merit.**

The DSI Defendants ostensibly base their motion to dismiss Count 13 on the Fourth Circuit's decision. *See* Doc. 194 at 6 (questions presented: "2. Does the Fourth Circuit's opinion require dismissal of the state law malicious prosecution claim against the DSI Defendants?"). Because the Fourth Circuit's decision provides no basis to dismiss this claim, the Court could end its analysis here. Perhaps recognizing this, the DSI Defendants make a number of additional arguments that go beyond the Fourth Circuit's decision and either were already made, or could have been made, in their previously decided motions to dismiss. This effort is both procedurally improper and flawed on the merits.

As previously noted in Section I, *supra*, reconsideration of interlocutory orders is limited to a "fairly narrow set of grounds." *Akeva, L.L.C. v. Adidas Am., Inc.*, 385 F. Supp. 2d 559, 565 (M.D.N.C. 2005). None of the DSI Defendants' other arguments meet this standard: they do not constitute (1) "an intervening change in controlling law," (2) "additional evidence that was not previously available," or (3) a basis to conclude that "the prior decision was based on clear error or would work manifest injustice." *Id.* at 566; *see*

11

*also Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003).[3]  Therefore, these arguments should be denied on this basis.  They also fail on the merits.

### 1.   *Chidnese v. Chidnese*

For example, the DSI Defendants invoke a North Carolina Court of Appeals decision that they cryptically assert was decided "[a]round the time that this Court issued its March 31, 2011 Opinion resolving the various motions to dismiss" and that ostensibly "clarifi[ed]" the law on the causation requirement.  Doc. 194 at 15.  But that decision, *Chidnese v. Chidenese*, 708 S.E.2d 725 (N.C. Ct. App. March 15, 2011), is hardly new.  It is two years old.  It was decided over two weeks *before* the Court's ruling on the DSI Defendants' prior motions to dismiss.  Had the DSI Defendants, or others, wished to bring it to the Court's attention, whether at the time or even promptly thereafter, they could have done so.  It is telling that no Defendant ever did.

This is because *Chidnese* does *not* call the Court's prior decision into question.  Rather, it applies the *same* rule followed by this Court, and by the Fourth Circuit—*i.e.*, that a defendant may be liable for malicious prosecution for its role in "institut[ing], procur[ing], or participat[ing] in a criminal proceeding."  708 S.E.2d at 305.  Nor did *Chidnese* "clarify" the law outside of the unusual attorney-client context that the case addressed.  In *Chidnese*, the

---

[3] The authorities that the DSI Defendants cite for the mandate rule and the law of the case doctrine (Doc. 194 at 6-7) stand only for the proposition that lower courts must follow the decisions of the appellate court.  In *Stott v. Martin*, 783 F. Supp. 970, 976 (E.D.N.C. 1992), the case on which the DSI Defendants rely (Doc. 194 at 7), the court reviewed its prior decision where the Fourth Circuit had "implicitly rejected the legal test, the factual standard, and the burden of proof" applied by the lower court.  That is not the situation with respect to Count 13, for the reasons stated in Section II, *supra*.

court *permitted* an estranged wife's malicious prosecution claim to go forward against the estranged husband's attorney, even though it was the client, not the attorney, who initiated the criminal proceeding against the wife. *Id.* at 305. The court's analysis was specific to the attorney-client context in which the case arose. Relying on *Jackson v. Jackson*, 201 S.E.2d 722 (N.C. Ct. App. 1974), the court held that an "attorney who maliciously and unlawfully advised a client to initiate a malicious prosecution would meet all elements of the tort of malicious prosecution, including procurement, and would be directly liable for that tort." *Id.* at 306. The Court went on to hold that in the context of a claim against an attorney for malicious prosecution, it would follow the rule from the Restatement (Second) of Torts (§653, cmt. h, which addresses "Procurement by Attorneys") and the Restatement (Third) of the Law Governing Lawyers (§ 57, cmt. e) and require that "an attorney should be considered to have procured a malicious criminal prosecution initiated by a client only when the attorney advises the client, without any instigation from the client regarding a criminal prosecution, to initiate criminal proceedings." *Id.* at 308. While the DSI Defendants seek to expand *Chidnese* well beyond its moorings in the unique attorney-client context that the case addressed, nothing in the decision suggests that the court intended to announce a broader standard, or to create an "intervening cause" standard applicable in the law enforcement context. To the contrary, the court made clear that its holding was intended to ensure "that an *attorney* is not punished for zealously and lawfully advocating for a *client*." *Id.* (emphasis added). At bottom, *Chidnese* is a case about attorneys who provide legal advice, not crime labs alleged to have fabricated and concealed evidence.

13

## 2.    The DSI Defendants' Purportedly "Limited" Role

The DSI Defendants also argue that the malicious prosecution claim should be dismissed because their role in the prosecution of Plaintiffs was more limited than that of certain other Defendants.  They note, for example, that they did not appear before the grand jury, did not misrepresent evidence to the prosecution team and truthfully reported that none of the lacrosse players could be linked to the rape kit samples, and had no contact with witnesses or members of the lacrosse team.  Doc. 194 at 13.   They also note that Finnerty and Seligmann were indicted after DSI provided its oral report to Nifong, and before the May 12 Report.  *Id.* at 17.  The DSI Defendants made these same arguments in their original motions to dismiss, *see* Doc. 33 at 43-44, which the Court denied with respect to Plaintiffs' malicious prosecution claim.   The Amended Complaint alleges that the DSI Defendants actively participated in the conspiracy to charge Plaintiffs by concealing the exculpatory DNA evidence and fabricating the false report of "all DNA findings," and that they acted in furtherance of this conspiracy before the indictments were returned—wrongdoing that made it possible to initiate and maintain the false charges against the three Plaintiffs.  *See, e.g.*, Am. Compl., Doc. 116 at ¶¶ 206-210.

## 3.    The DNA Order and "Rape Shield" Rule

The DSI Defendants also renew their argument that they were not obliged to include in the May 12 Report their finding of DNA from other, unidentified men in the rape kit. This argument was previously made in the DSI Defendants' initial motions to dismiss.  *See, e.g.*, Doc. 33 at 4, 6, 21-22, 44-45.  This time, however, the DSI Defendants suggest that they were *compelled* to conceal their DNA findings based on (1) the Order directing that further

14

DNA testing be completed; and (2) North Carolina's "rape shield" rule (N. C. R. Evid. 412). Doc. 194 at 14-15 & n.12. Neither point constitutes "additional evidence that was not previously available," or otherwise supports their argument for reconsideration.

The DNA Order did *not* authorize DSI to limit its DNA analysis or its reporting. To the contrary, the Order made clear that the aim of the testing was to identify *any* potential perpetrator. The Order found that "*any* male cells found among the victim's swabs from the rape kit can be evidence of an assault and *may lead to identification of the perpetrator*" and ordered that "*any male positive results*" be compared to "the 46 cheek swabbings" from the Duke lacrosse players. Doc. 193-1 at 2-3 (emphasis added). This language cannot credibly be read to *limit* DSI's reporting only to Duke lacrosse players.

Nor did DSI understand the DNA Order as such. To the contrary, the DNA report states that DSI analyzed DNA from *three other men*. Doc. 193-2, at 5 (Johnson, Taylor, Murchison). The report also *includes* DSI's findings as to Mangum's boyfriend, Matthew Murchison, *who was not a member of the Duke lacrosse team. Id.* at 11; *see also* Am. Compl., Doc. 116, at ¶¶ 224(b), 232. The fact that DSI selectively included the Murchison finding, while agreeing to omit its DNA findings of the four other men who were not lacrosse players, belies the DSI Defendants' current suggestion that they understood the Order to limit their reporting only to the 46 lacrosse players. Doc. 194 at 14. It also reinforces the calculated nature of DSI's misconduct. DSI's finding of DNA from at least four other men on the rape kit items directly contradicted Mangum's statement that she had not engaged in sexual intercourse immediately prior to the alleged rape and, unlike the Murchison finding, could not be explained away. Am. Compl., Doc. 116, at ¶ 59. Even if one had credited Mangum's

15

allegation that she had been raped by multiple men, the concealed findings implicated individuals other than the Plaintiffs. Yet, the DSI Defendants agreed to deliberately conceal and omit these findings from their DNA report—in furtherance of the conspiracy to conceal and obfuscate the exculpatory evidence, and in direct violation of DSI's own protocols and FBI and accreditation body standards—so that the wrongful prosecutions could be initiated and maintained against the Plaintiffs. *See id.* at ¶¶ 232, 235.

The DSI Defendants' invocation of North Carolina's "rape shield" rule is even further afield. The rape shield rule is a rule of *evidence*—it permits a *judge* to exclude certain types of evidence at trial *after that evidence has been disclosed to the defense.* N.C. R. Evid. 412. It has nothing to do with the information that should be included in a crime lab report. Moreover, the rule makes clear that the findings that DSI omitted from its May 12 Report are precisely the type of evidence that is expressly *permitted* in rape cases, under the express exception for "evidence of specific instances of sexual behavior offered for the purposes of showing that the act or acts charged were not committed by the defendant." N.C. R. Evid. 412(b)(2). In a case in which the alleged victim claims to have been raped by multiple men, none of whom was wearing a condom, the fact that DSI identified DNA of four men— none of whom was a lacrosse player—in the rape kit items certainly would be relevant to "showing that the act or acts charged were not committed by [Plaintiffs]." *Id.* Under the DSI Defendants' proffered reading, however, crime labs would be the gatekeepers of Rule 412, not judges, and crime labs would be free to selectively report their findings. Such an interpretation is chilling.

### 4. "The Absence of Any DNA Linking the Lacrosse Players to the Evidence in the Rape Kit"

The DSI Defendants again argue that the malicious prosecution claim should be dismissed because the May 12 Report "confirmed the absence of any DNA linking the lacrosse players to the evidence in the rape kit." Doc. 193 at 2. The DSI Defendants also assert that "[t]here is no factual dispute that the DSI Report cleared the lacrosse players from any DNA connection with the rape kit evidence, and that everyone, including the Plaintiffs, understood that fact immediately upon release of the Report." Doc. 193 at 2. This argument was previously made in their initial motions to dismiss, Doc. 33 at 3, 4, and again, it suffers from faulty logic.

To say that the DNA Report did not report a link between the players' DNA and the rape kit items is literally true, but grossly misleading. As the Amended Complaint explains, the DSI Defendants selectively reported that DNA consistent with Plaintiff Evans was found on Mangum's fingernail, and they selectively and deliberately excluded the findings of non-player DNA on the rape kit items, precisely in order to *maintain* the pretense that Mangum had been raped by lacrosse players. Am. Compl., Doc. 116, at ¶¶ 208-210, 225, 226, 232-36. Indeed, even if one had credited Mangum's rape allegation, the concealed evidence of non-player DNA would have implicated persons other than the Plaintiffs. It is no defense to say that a crime lab is permitted to deliberately conceal material DNA findings simply because other aspects of its report are not completely inaccurate. For good reason, that is not the law: as the Fourth Circuit decision recognizes, the concealment of material evidence supports a claim for malicious prosecution. Doc. 182 at 39-40.

### 5. The Hearsay Press Reports and Statements

The DSI Defendants also invoke, for the first time, press reports from the May 2006 time period to argue that they cannot be liable because attorneys for Plaintiff Evans and other lacrosse players took the position that the May 12 Report was exculpatory. Doc. 194 at 13-14. Such press reports, and the statements attributed therein, constitute hearsay outside the complaint that is not properly considered on a motion to dismiss. *See In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 469 (M.D.N.C. 2004) (holding defendants' citation to newspaper articles improper on a motion to dismiss where complaint did not rely on the articles cited). Moreover, the press reports certainly did not take the position that the players were cleared.

As discussed above, the May 12 Report did not clear the players of wrongdoing; rather, it was intentionally crafted to permit the contrary conclusion. And the article cited in footnote 5 of DSI's Brief does not portray the May 12 Report as exonerating the players. To the contrary, the article recites Nifong's statement that in many sexual assault cases no DNA exists and notes that DNA taken from one of the accuser's false fingernails was a partial match with Evans' DNA. *See* www.wral.com/news/local/story/1091695/. (Doc. 194 at 5 n.5). Again, the deliberately crafted DNA report permitted the Defendants to initiate and maintain prosecutions on the theory that there was a rape, but that no DNA had been recovered, except on a fingernail. As discussed above, had the DNA report disclosed instead that the DSI Defendants had positively matched the DNA of four other men to the rape kit items, a far different inference would have been drawn. But, the DSI Defendants

18

deliberately and maliciously agreed to conceal those findings. The lives of three innocent young men were forever changed as a result.

## IV. Because Plaintiffs Have Properly Alleged a Malicious Prosecution Claim, There is No Basis for Dismissal of Their Negligent Supervision Claim.

The DSI Defendants' only argument for dismissal of Plaintiffs' negligent supervision claim (Count 21) is that it fails for lack of an underlying tort claim. *See* Doc. 194 at 19-20. Since Plaintiffs' malicious prosecution claim should proceed for the reasons stated in Section III, *supra*, this argument should be denied. Alternatively, this argument may be held in abeyance pending the outcome of Plaintiff's petition for certiorari.

## CONCLUSION

For the foregoing reasons, the DSI Defendants' renewed motions to dismiss should be held in abeyance pending resolution of Plaintiffs' petition for certiorari. If the Fourth Circuit's decision were to stand, then the Court should deny the motions as to Count 13, alleging malicious prosecution under North Carolina law, and Count 21, alleging negligent supervision under North Carolina law.

19

Dated: March 25, 2013                    Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

By:      /s/ Christopher N. Manning
By:      /s/ Charles Davant IV
         Brendan V. Sullivan, Jr. (*pro hac vice*)
         Robert M. Cary (*pro hac vice*)
         Christopher N. Manning (*pro hac vice*)
         Charles Davant IV (N.C. Bar #28489)
         725 Twelfth Street, NW
         Washington, DC  20005
         Tel.:      (202) 434-5000
         E-mail:      cdavant@wc.com

*Attorneys for Plaintiffs David F. Evans and*
  *Collin Finnerty*

                        -and-

**RUDOLF WIDENHOUSE & FIALKO**

By:      /s/ David S. Rudolf
         David S. Rudolf (N.C. Bar #8587)
         225 East Worthington Avenue
         Suite 200
         Charlotte, NC  28203
         Tel.:      (704) 333-9945
         E-mail:      dsrudolf@rwf-law.com

**BARRY C. SCHECK, ESQ.**

         Barry C. Scheck*
         Attn: Elizabeth Vaca
         100 Fifth Avenue
         New York, NY  10011
         Tel.:      (212) 364-5390
         E-mail:      bcsinnocence@aol.com

         (* motion for special appearance
            to be filed)

20

**EMERY CELLI BRINCKERHOFF & ABADY LLP**

Richard D. Emery (*pro hac vice*)
Ilann M. Maazel (*pro hac vice*)
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Tel.:          (212) 763-5000
Fax.:          (212) 763-5001
E-mail:        remery@ecbalaw.com

*Attorneys for Plaintiff Reade Seligmann*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID F. EVANS, et al.,

      Plaintiffs,

      v.

CITY OF DURHAM, N.C., et al.,

      Defendants.

Case No. 1:07CV739

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2013, the foregoing Opposition to Defendant Linwood Wilson's Renewed Motion to Dismiss was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Reginald B. Gillespie, Jr.
*Counsel for Defendant City of Durham*

Joel M. Craig
Henry W. Sappenfield
*Counsel for Defendant Benjamin Himan*

James B. Maxwell,
*Counsel for Defendant David Addison*

Edwin M. Speas
Eric P. Stevens
*Counsel for Defendant Mark Gottlieb*

Patricia P. Kerner
D. Martin Warf
Hannah G. Styron
*Counsel for Defendants Steven Chalmers, Beverly Council, Ronald Hodge, Jeff Lamb, Patrick Baker, Michael Ripberger, and Lee Russ*

Robert A. Sar
Nicholas J. Sanservino, Jr.
*Counsel for Defendant DSI Security*

Robert J. King III
Kearns Davis
Clinton R. Pinyan
*Counsel for Defendant DSI Security, Inc. & Richard Clark*

Paul R. Dickinson, Jr.
James A. Roberts, III
*Counsel for Defendant Brian Meehan*

Linwood Wilson
*Pro se*

James B. Craven III
*Counsel for Michael B. Nifong*


Respectfully submitted,

/s/ Charles Davant IV
Charles Davant IV (N.C. Bar No. 28489)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
Tel.:            (202) 434-5000
E-mail:        cdavant@wc.com

*Attorney for Plaintiffs David F. Evans and*
  *Collin Finnerty*