# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### 1:07cv739

| | |
|---|---|
| **DAVID F. EVANS, *et al.*,**<br>                                        **Plaintiffs,**<br><br>v.<br><br>**THE CITY OF DURHAM, NORTH CAROLINA**<br>***et al.*,**<br>                                        **Defendants.** | **MOTION FOR RULE 11;**<br>**SANCTIONS BY THE COURT ON**<br>**IT'S OWN INITIATIVE AND ISSUE**<br>**A SHOW CAUSE ORDER TO**<br>**PLAINTIFF'S** |

**NOW COMES** Defendant Linwood Wilson in a Motion for the Court, on it's own initiative as described in Rule 11, (c)(1)(B)(2)(A)(3) bring Motion To Show Cause why Rule 11; Sanctions against all the plaintiffs and their attorneys of record, for filing frivolous, unreasonable, without foundation, vexatious and groundless Complaint 1:07cv739 should not be granted .

## FACTS

1.  On October 5, 2007, the Plaintiffs by and through their counsel, WILLIAMS & CONNOLLY LLP Law Firm and Attorneys Charles Davant IV, Brendon V. Sullivan, Jr., Robert M. Cary, Christopher N. Manning; RUDOLF WIDENHOUSE & FIALKO and Attorney David S. Rudolf; BARRY C. SCHECK, ESQ. Attorney Barry C. Scheck; EMERY CELLI BRINCKERHOFF & ABADY LLP and Attorney Richard D. Emery, filed the original complaint in this action.

2.  On December 11, 2007 the Plaintiffs by and through their counsel, WILLIAMS & CONNOLLY LLP Law Firm and Attorneys Charles Davant IV, Brendon V. Sullivan, Jr., Robert M. Cary, Christopher N. Manning; RUDOLF WIDENHOUSE & FIALKO and

Attorney David S. Rudolf; BARRY C. SCHECK, ESQ. Attorney Barry C. Scheck; EMERY CELLI BRINCKERHOFF & ABADY LLP and Attorney Richard D. Emery, filed the first amended complaint in this action.

3.  On February 18, 2010, the Plaintiffs by and through their counsel, WILLIAMS & CONNOLLY LLP Law Firm and Attorneys Charles Davant IV, Brendon V. Sullivan, Jr., Robert M. Cary, Christopher N. Manning; RUDOLF WIDENHOUSE & FIALKO and Attorney David S. Rudolf; BARRY C. SCHECK, ESQ. Attorney Barry C. Scheck; EMERY CELLI BRINCKERHOFF & ABADY LLP and Attorney Richard D. Emery, filed the second amended complaint in this action.

4.  On March 31, 2011, the Court entered a Memorandum Opinion [Doc. #133] and Order [Doc. #134] granting in part and denying in part the Defendants' various Motions to Dismiss. Specifically, IT IS ORDERED that Plaintiffs' claims will go forward against Defendant Nifong in Counts 1, 2, 3, 4, 13, and 14; against Defendants Gottlieb, Himan, Wilson, Clark, Meehan, and DSI in Counts 1, 2, 3, 13, and 14, plus Count 21 as to Defendant DSI; against Defendant Addison in Counts 4 and 13; against the City in Counts 1, 2, 3, and 4 (based on the allegations in Count 5), as well as in Counts 13, 14, 16, 17, and 23; and against Defendants Hodge, Baker, Chalmers, Russ, Council, Lamb, and Ripberger in Counts 1, 2, 3, 4, and 6.

IT IS THEREFORE ORDERED that all remaining claims are DISMISSED, including all of the claims asserted in Counts 7, 8, 9, 10, 11, 12, 15, 18, 19, 20, and 22.

FINALLY, IT IS ORDERED that the City of Durham's Motion for Summary Judgment [Doc. #78] is DENIED at this time, without prejudice to the City raising the

Issues asserted therein as part of a comprehensive Motion for Summary Judgment at the close of discovery.

IT IS FURTHER ORDERED that the claim for punitive damages against the City is dismissed. Thereafter, Defendants Addison, Gottlieb, Himan, Hodge, Baker, Chalmers, Russ, Council, Lamb, Ripberger, and the City filed interlocutory appeals before the United States Court of Appeals for the Fourth Circuit. The Fourth Circuit consolidated the appeals filed in this case with the appeals filed by the same Defendants in the related cases McFadyen et al. v Duke University et al., 1:07-CV-953 (M.D.N.C.), and Evans et al. v. City of Durham, North Carolina, et al., 1:07-CV-739 (M.D.N.C.), Carrington, et al, 1:08 CV-119 (NCMD).

In an Opinion and Judgment entered on December 17, 2012 Appeal: 11-1436 Doc: 91, the Fourth Circuit reversed in part the decisions of this Court in the three related cases.

A. (From USCA Doc. 91)

The Evans plaintiffs allege a § 1983 malicious prosecution claim against Officers Gottlieb and Himan.[2] The district court denied the officers' motions to dismiss this claim, reasoning that the plaintiffs stated such a claim by alleging they "were arrested pursuant to an indictment that was obtained by the

_____

[2]Based on the same facts, the Evans plaintiffs also allege a Fourteenth Amendment substantive due process claim against Officers Gottlieb and Himan. The district court, noting the "unsettled legal doctrines" surrounding due process claims based on asserted pre-trial fabrication of evidence, nonetheless denied the officers' motions to dismiss this claim. In doing so, the court erred. The Due Process Clause does not constitute a catch-all provision that provides a remedy whenever a state actor causes harm. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Rather, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (internal quotation marks omitted);

*see also id.* at 286-91 (Souter, J., concurring). Because the Fourth Amendment provides "an explicit textual source" for § 1983 malicious prosecution claims, the Fourteenth Amendment provides no alternative basis for those claims.

intentional or reckless creation of false or misleading evidence used before the grand jury that was necessary to a finding of probable cause, or the deliberate or reckless omission of material information that officials knew would negate probable cause." *Evans v. City of Durham*, No. 1:07CV739, slip op. at 29-30 (M.D.N.C. Mar. 31, 2011). A "malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000). To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor. *See Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

For purposes of this appeal, the officers do not contend that the Evans plaintiffs have failed to allege illegal seizures (*i.e.*, the indictments) or that criminal proceedings failed to terminate in the plaintiffs' favor (*i.e.*, the dismissal of the indictments). The officers do maintain, however, that they escape liability for the assertedly illegal seizures because they did not *cause* them. Rather, they contend, an independent intervening act of another—*i.e.*, Prosecutor Nifong's decisions to seek the indictments—caused the seizures.[3]

---

[3]In addition to contending that Nifong's decisions to seek the indictments constitute intervening acts shielding them from liability, Officers Gottlieb and Himan contend that the grand jury's decisions to indict constitute similar intervening acts. Given our holding as to Nifong, we need not and do not reach this contention.

4

Of course, constitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation. *See Murray v. Earle*, 405 F.3d 278, 289-90 (5th Cir. 2005); *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999). Accordingly, subsequent acts of independent decision-makers (*e.g.*, prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal

chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure. *See Zahrey v. Coffey*, 221 F.3d 342, 351 (2d Cir. 2000). Such "intervening acts of other participants in the criminal justice system" insulate a police officer from liability. *Id.*; *see also Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2972 (2011); *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); *Barts v. Joyner*, 865 F.2d 1187, 1195 (11th Cir. 1989); *Smiddy v. Varney*, 665 F.2d 261, 266-68 (9th Cir. 1981), *overruled on other grounds by Beck v. City of Upland*, 527 F.3d 853, 865 (9th Cir. 2008); *Rhodes v. Smithers*, 939 F. Supp. 1256, 1274 (S.D. W. Va. 1995), *aff'd*, No. 95-2837, 1996 WL 420471 (4th Cir. July 29, 1996) (unpublished). However, even when, as here, a prosecutor retains all discretion to seek an indictment,[4] police officers may be held to have caused the seizure and remain liable to a wrongfully indicted defendant under certain circumstances. In particular, officers may be liable when they have lied to or misled the prosecutor, *see, e.g.*, *Sykes v. Anderson*, 625 F.3d 294, 317 (6th Cir. 2010); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988); *Borunda v.*

---

[4]In North Carolina, state district attorneys, like Nifong, have the sole discretion to decide whether to prosecute. *See State v. Ward*, 555 S.E.2d 251, 260 (N.C. 2001) (citing N.C. Const. Art. IV § 18(1)).

*Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988); failed to disclose exculpatory evidence

to the prosecutor, *see, e.g.*, *Dominguez v. Hendley*, 545 F.3d 585, 590 (7th Cir. 2008);

*Sanders v. English*, 950 F.2d 1152, 1159-60 (5th Cir. 1992); or unduly pressured the

prosecutor to seek the indictment, *cf. Beck*, 527 F.3d at 870.

Stated differently, a police officer is not liable for a plaintiff's unlawful seizure following

indictment "in the absence of evidence that [the officer] misled or pressured the prosecu-

tion." *Wray*, 490 F.3d at 195; *see also Snider v. Lee*, 584 F.3d 193, 206 (4th Cir. 2009)

(Stamp, J., concurring) ("A law enforcement officer who presents all relevant probable

cause evidence to a prosecutor . . . is insulated from a malicious prosecution claim where

such intermediary makes an independent decision . . . unless the officer [1] concealed or

misrepresented facts or [2] brought such undue pressure to bear on the intermediary that

the intermediary's independent judgment was overborne."); *Hand v. Gary*, 838 F.2d

1420, 1428 (5th Cir. 1988) ("An independent intermediary breaks the chain of causation

unless it can be shown that the deliberations of that intermediary were in some way

tainted by the actions of the defendant.").

The Evans plaintiffs do not allege that Officers Gottlieb and Himan misled or

misinformed Nifong. Indeed, the Evans plaintiffs expressly allege that, from the outset,

the officers candidly briefed Nifong as to the startling weaknesses in the case by

"detail[ing] the extraordinary evidence of innocence and the fatal defects in Mangum's

claims" and "convey[ing] to Nifong that Mangum was not credible." The Evans plaintiffs

nonetheless insist that the officers remain liable because they "misrepresented, withheld, or falsified evidence" that ultimately *influenced the grand jury*. This argument fails because acts of *either* the prosecutor *or* the grand jury may break the causal chain. *Cf. Cuadra*, 626 F.3d at 813; *Barts*, 865 F.2d at 1195. In other words, if the independent act of a prosecutor breaks the causal chain, the fact that the prosecutor misled the grand jury does not render police officers liable.

Alternatively, the Evans plaintiffs maintain that Officers Gottlieb and Himan conspired with Nifong to fabricate and conceal evidence from the grand jury and thus somehow unduly pressured Nifong to seek the indictment. The allegations in their complaint significantly undercut this argument. For the Evans plaintiffs ground their entire case on allegations that Nifong desired to exploit the "high-profile, racially charged rape allegation for *his personal* political gain." They

further allege that from his very first meeting with the officers, Nifong noted the lack of exculpatory evidence: "we're f*cked." Tellingly, the Evans plaintiffs do not assert that Officers Gottlieb and Himan responded by pressuring Nifong to pursue the case. Rather, they allege that the officers continued the investigation at Nifong's instruction, and that, when Nifong sought to indict the Evans plaintiffs, Officer Himan frankly responded, "With what?" No matter how generously read, these allegations do not allege that Officers Gottlieb and Himan pressured Nifong to seek an indictment.

Moreover, it seems contrary to the very purpose of qualified immunity to extend personal liability to police officers who have assertedly conspired with, but neither misled nor

unduly pressured, an independent prosecutor. Police officers and prosecutors often work together to establish probable cause and seek indictments; such collaboration could always be characterized as a "conspiracy." Allowing § 1983 claims against police officers to proceed on allegations of such a "conspiracy" would in virtually every case render the officers' qualified immunity from suit "effectively lost," *Mitchell*, 472 U.S. at 526, and make discovery the rule, rather than the exception, *see Anderson v. Creighton*, 483 U.S. 635, 639-40 & n.2 (1987).

Thus, we hold today that an alleged officer-prosecutor conspiracy does not alter the rule that a prosecutor's independent decision to seek an indictment breaks the causal chain unless the officer has misled or unduly pressured the prosecutor.[5] Because the Evans plaintiffs do not allege that Officers Got-

---

[5] Twelve years ago, the Second Circuit questioned in dicta why "reasonable foreseeability" would not suffice to preserve the causal chain between a police officer's actions and an unlawful seizure by way of indictment. *See Zahrey*, 221 F.3d at 351-52. However, no other court has pursued this suggestion and more recently the Second Circuit itself has stepped back from that broad dicta. *See Wray*, 490 F.3d at 195. As explained in text above, we believe good reasons counsel against following the approach suggested in the *Zahrey* dicta.

tlieb and Himan either misled or pressured Nifong to seek their indictments, we reverse the district court's denial of the officers' motions to dismiss the Evans plaintiffs' § 1983 malicious prosecution claims against them.

With regard to case 1:07cv953 specifically, the Fourth Circuit reversed the judgment of this Court as to Counts 21, 25, and 27 against Defendants Hodge, Baker, Chalmers, Russ, Council, Lamb, and Ripberger. In addition, the Fourth Circuit reversed the judgment of

this Court as to Counts 21, 23, and 25 against Defendants Gottlieb, Himan, and the City, and as to Count 25 against Defendant Addison. Furthermore, the Fourth Circuit reversed the judgment of this Court as to Counts 26, 30, and 31 against the City. Finally, the Fourth Circuit dismissed the City's appeal as to Count 32. Although Defendant Wilson was not a party to the interlocutory appeal, he filed the present Motions seeking to dismiss the remaining Counts against him, that is, Counts 23 and 25, in light of the Fourth Circuit's Opinion resulting from that appeal. As noted above, the Fourth Circuit reversed this Court's judgment as to Count 23, which alleges common law obstruction of justice, and Count 25, which alleges a due process "stigma-plus" claim, against the Defendants who were parties to the interlocutory appeal. With regard to Count 23, the Fourth Circuit held that the obstruction of justice claim alleged cannot lie "against a police officer for his actions relating to a criminal proceeding." Evans v. Chalmers, 703 F.3d 636, 658 (4th Cir. 2012). Although Defendant Wilson was acting as an investigator employed by the district attorney's office, and not as a police officer, during the investigation of the criminal case, Plaintiffs concede that "nothing in the Fourth Circuit's opinion suggests that this distinction is a material one, particularly when [Defendant Wilson] was acting in an 'investigatory capacity in the same criminal investigation." (Pls.' Resp. [Doc. #296, at 1-2.) Furthermore, with regard to Count 25, the Fourth Circuit held that "plaintiffs failed to state [the] predicate § 1983 claim" necessary to sustain the "stigma-plus" claim. Evans, 703 F.3d at 654. Based on the Fourth Circuit's Opinion, Plaintiffs concede that they cannot succeed on either Count 23 or Count 25 against Defendant Wilson.

9

5.  Plaintiff's and their counsel should have known by recent rulings, as well as the past rulings by the Supreme Court and lower courts "doctrines of immunity", that they were in fact filing frivolous, groundless, or vexatious complaints. Thereby injuring Defendant Wilson's reputation, causing extreme emotional distress, loss of income and retirement, as well as having to defend himself, *pro se,* for over 7 years in a frivolous, unreasonable, without foundation, vexatious and groundless lawsuit. These actions brought on by the Plaintiff's have damaged Defendant Wilson by being a contributing factor in Defendant Wilson's divorce and the loss of relationship with his son. One might argue that Defendant Wilson should file a lawsuit for these damages. However, Defendant Wilson argues that Rule 11 specifically accomplishes that when it states:

### Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions

Federal Rule of Civil Procedure Rule 11provides that a district court may sanction attorneys or parties who submit pleadings for an improper purpose or that contain frivolous arguments or arguments that have no evidentiary support.

Rule 11. Signing of Pleadings, Motions, and Other Papers; Representations to Court; Sanctions

(a) Signature.
Every pleading, written motion, and other paper shall be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, shall be signed by the party. Each paper shall state the signer's address and telephone number, if any. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

(b) Representations to the Court.
By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge,

information, and belief, formed after an inquiry reasonable under the circumstances,-

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(c) Sanctions.
If, after notice and a reasonable opportunity to respond,
the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) How Initiated.
(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

(B) On Court's Initiative.
On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

(2) Nature of Sanction; Limitations.

A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a non-monetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

(A) Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2). (B) Monetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.

(3) Order.
When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this rule and explain the basis for the sanction imposed.

(d) Inapplicability to Discovery.
Subdivisions (a) through (c) of this rule do not apply to disclosures and discovery requests, responses, objections, and motions that are subject to the provisions of Rules 26 through 37.

Rule 11 was amended effective December 31, 1993. The prior version provides in pertinent part: Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record and in the attorney's individual name[.] . . . . [T]he signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion or other paper; that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party or both, an appropriate sanction, which may include an order to pay the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's

12

fee. Even if the district court finds evidence to be insufficient for purposes of summary judgment, that "does not mean that appellants' claims were factually unfounded for purposes of Rule 11." Stitt v.Williams, 919 F.2d 516, 527 (9th Cir. 1990). A district court may impose monetary sanctions, in the form of attorneys' fees, upon plaintiffs who file Title VII claims that are "frivolous, unreasonable, or without foundation." See EEOC v. Bruno's Restaurant, 13 F.3d 285, 287 (9th Cir. 1993) (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22 (1978)). However, "[b]ecause Congress intended to `promote the vigorous enforcement of the provisions of Title VII,' a district court must exercise caution in awarding fees to a prevailing defendant in order to avoid discouraging legitimate suits that may not be `airtight.' " Id. (quoting Christiansburg, 434 U.S. at 422); see also EEOC v. Consolidated Serv. Sys., 30 F.3d 58, 59 (7th Cir. 1994) (suggesting that the "frivolous" standard is much more stringent than merely "not substantially justified"). Courts must heed "the Supreme Court's warning in Christiansburg against the `temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.' " Bruno's Restaurant, 13 F.3d at 290 (quoting Christiansburg, 434 U.S. at 421-22); see also Forsberg v. Pacific Northwest Bell Tel. Co., 840 F.2d 1409, 1422 (9th Cir. 1988) (applying the same "frivolous, unreasonable, or without foundation" standard to request for sanctions under Rule 11 and 42 U.S.C. S 2000e-5(k)). Kizer v. Children's Learning Ctr., 962 F.2d 608, 613 (7th Cir. 1992) affirms a district court's decision not to impose Rule 11 sanctions on a plaintiff who had failed to make out a prima facie case under Title VII because the claim was not filed with improper motives or inadequate investigation. Rule 11 sanctions are only available with regard to papers filed with the court, not attorney misconduct. Fed. R. Civ. P. 11; see also United Energy Owners Comm., Inc. v. United States Energy Management Systems, Inc., 837 F.2d 356, 364-65 (9th Cir. 1988). (Under pre-'93 rule)

6.  Based on the Rule 11 Sanctions, as stated herein above, Defendant Wilson states the specific reasons for this Motion is clearly the numerous Causes of Actions filed, twenty-three in this lawsuit. The fact that all of these Causes of Actions were dismissed by either this court or the Fourth Circuit Court of Appeals is not justification for a Rule 11 Sanction alone. Defendant Wilson's Motion for Rule 11 Sanctions is based

13

on the fact that Plaintiffs by and through their attorneys filed frivolous, unsubstantiated, groundless, or vexatious claims that would award any other defendant attorney fees.

This Note argues that courts should grant a pro se litigant reasonable attorney's fees when the opposing party has violated Rule 11. Part I examines the goals of Rule 11 and concludes that Congress intended deterrence of abusive practices to drive the Rule 11 inquiry. Other, less important goals that inform the analysis include compensation of the offended party and punishment of the offending party. Part II discusses the factors that influence a judge in choosing a particular sanction and demonstrates that both practical and policy-oriented criteria support an award of attorney's fees even when the movant acts pro se. Part III contrasts the policy of Rule 11 with the goals of the fee-shifting provisions in three federal statutes. Part III concludes that, although courts almost uniformly deny pro se litigants fees under those statutes, the policies behind the fee-shifting provisions do not implicate the concerns addressed by Rule 11; therefore, courts are not bound by the cases denying fees under those statutes. Finally, Part IV suggests a means of calculating the ultimate award to the pro se litigant.

I. THE GOAL(S) OF RULE 11

Deterrence must underlie any Rule 11 decision because "the purpose of Rule 11 sanctions is to deter" abusive practices and frivolous arguments. The 1983 amendments to the rule reinforced this notion by adding the word "sanctions" to the rule's title. In making this change, the committee intended to "stress[ ] a deterrent orientation" for courts addressing violations of Rule 11. Finally, the Supreme Court has recently declared that "the central purpose of Rule 11 is to deter baseless filings."

The Supreme Court may recognize punishment as an additional rationale for imposing a Rule 11 sanction, even though its recent cases have emphasized deterrence. Moreover, the advisory committee has previously noted that "punishment of a violation . . . is part of the court's responsibility for securing the system's effective operation." Though several lower courts and commentators have echoed this position, they have not always seen punishment as a goal in and of itself as much as a means of achieving the deterrence objective. Given that view, and considering the Court's and advisory committee's hesitancy to rely solely on a punishment-based theory, courts should consider punishment only as a secondary factor in the Rule 11 sanction analysis.

Though also subordinate to the deterrence goal, a third, compensatory objective inheres in the rule as well. Providing for a sanction such as attorney's fees -- whose amount correlates to the expenses incurred by the offended party -- appears to suggest a policy more akin to compensation than deterrence. The committee note makes clear, however, that a Rule 11 sanction, though potentially calculated on the basis of the movant's monetary expenditures, still has deterrence as its primary objective. Thus "a district court may take into account compensation of other parties and punishment of the offender, but deterrence remains the touchstone of the Rule 11 inquiry."

When the movant acts pro se, emphasizing deterrence over compensation makes all the difference: because an unrepresented party's expenses will be relatively low, little if any deterrent effect would accrue from forcing the non-movant to reimburse only those expenses. Were a court to focus on compensation, it would transform Rule 11 into a fee-shifting statute, thereby undermining the Supreme Court's insistence that the rule remain

15

a mechanism for preventing litigation abuse. With deterrence as the overriding theme, the actual amount of fees incurred becomes less important than the size of sanction required to send an effective message both to the offender and to the bar in general.

## II. DETERMINING THE APPROPRIATE SANCTION

A grant of attorney's fees to a pro se litigant follows directly from the legislative objective of deterrence. This Part illustrates the reasons for, and addresses the potential objections to, making an attorney's fees award to an unrepresented party. Section II.A explains that while trial judges have significant discretion in determining the type and severity of sanctions that they can impose under Rule 11, attorney's fees are by far the most frequent and most logical choice. Section II.A concludes that courts should make that same choice when the movant acts pro se. Section II.B refutes arguments against making the award -- including those based on statutory language and on fears of granting movants potential windfalls -- in favor of honoring the deterrence rationale that controls Rule 11.

### A. Why Choose Attorney's Fees?

Among all the sanctions a trial judge could choose, only attorney's fees will fulfill the goals of Rule 11. Only if a court imposes a substantial monetary sanction -- only if it "hits them where it hurts" -- will parties be dissuaded from violating the rule's prescriptions. A sanction imposing the mere costs incurred by a pro se litigant -- for example, filing and copying costs -- would be insignificant and thus would not deter

future abusive conduct. A fees award, on the other hand, carries a large enough price tag that it will serve the appropriate deterrent effect.

As an alternative, one might suggest assessing a fine payable directly to the court. This approach would provide the same deterrent effect as a fees award and simultaneously would avoid awarding fees when none were incurred. Such a route, however, would be unfavorable for several reasons. First, judges should strive to treat represented and unrepresented parties consistently -- that is, they should impose similar sanctions for similarly offensive conduct, regardless of who the offended party might be. Because represented parties whose opponents violate Rule 11 are almost always granted attorney's fees, pro se litigants should receive that same award. Second, requiring the non-movant to pay the fine into court would deprive the pro se litigant of any compensation, which is a lesser yet significant goal of the rule. This litigant, after all, did experience some compensable harm -- whether in terms of opportunity costs or in terms of the administrative costs of responding to the offensive paper. Third, the advisory committee itself suggests that there exist some circumstances in which the objectives of Rule 11 can be achieved only if the sanction is paid directly to the other party and not into court. Fourth, and perhaps most important, denying the unrepresented litigant any award, or compensating him solely for his costs, would reduce the incentive pro se parties have to bring Rule 11 actions -- and thus would reduce enforcement of the rule itself. Once a litigant is aware that her pro se adversary is unlikely to institute a Rule 11 proceeding, that litigant may become more lax in monitoring and curbing her own potentially violative behavior.

17

When a party does violate Rule 11, the sanction should be only as severe as necessary to deter the offending party and the bar. A fees award therefore might not be necessary if a court could meet the deterrence goal through other, nonmonetary sanctions. The reverse, however, is also true. A court may impose a sanction in excess of the movant's attorney's fees if the court believes that such a sanction is necessary to deter further violative conduct.

Consider the Case of Rynkiewicz v. Jeanes Hospital. There the defendants moved to dismiss the pro se plaintiff's ADEA claim even though there was no legal basis for that motion. In denying the motion and imposing sanctions, the trial judge wrote, "I see no reason why the fact that plaintiff is proceeding pro se should redound to the benefit of defendants' attorney insofar as Rule 11 sanctions are concerned." That no fees were incurred was immaterial. The Court therefore awarded the pro se litigant the amount of a reasonable attorney's fee.

Because trial judges are entrusted with much discretion in effectuating the underlying policy of the FRCP, "the Civil Rules place virtually no limits on judicial Creativity." Thus the advisory committee encourages district courts engaging in the sanctioning calculus to consider many different factors relating to the offending paper. Specifically, the court may weigh certain equitable factors that do not necessarily reflect the expenses or fees incurred. Interpreting Rule 11 to include these considerations allows judges to assess an award substantial enough to force the offending party "to answer for [her] act." At bottom, the express grant of judicial latitude, coupled with the requirement that judges match sanctions to the requisite degree of deterrence, ensures that courts will impose

sanctions, including attorney's fees, that reflect the offensiveness of the violation and not the representation vel non of the movant.

There is a final important reason to choose attorney's fees as the proper sanction. The use of sanctions other than attorney's fees is rare under Rule 11. Presumably judges would not consistently award these fees if the sanction did not serve the goals of the rule. To continue achieving those goals, judges should punish similar violations with similar sanctions, regardless of the movant's status. Thus, when a movant is unrepresented, the judge should choose the same effective sanction that he would apply if the movant were not proceeding pro se -- that is, a fees award.

When the violation is wilful, judges are similarly more likely to impose a fees award than any other sanction. Therefore, when a party has taken advantage of a pro se litigant's status, for example, by inundating him with excessive motions or stimulating significant filing costs -- significant in terms of the pro se party's financial resources -- assessing an attorney's fee against the offending party has even more appeal. *(Taken in part From Michigan Law Review, Jeremy D. Spector, author.)*

**Pro Se litigants entitled to Fees:**

Pro se litigants may be entitled to Attorney fees and costs under the Civil Rights Attorney's Fee Award Act of 1976, 90 Stat. 2641, as amended 42 USC 1988 doubt that the addition of this attorney's fee provision fueled the growth in the number of section 1983 cases that have been filed because it has been held that prevailing plaintiffs

**IV.      ATTORNEY'S FEES**
The Civil Rights Attorney's Fees Awards Act of 1976[91] provides that one who

19

prevails[92] in a section 1983 action is entitled to recover attorneys' fees. There is little

---

[91] 42 U.S.C. § 1988.

[92] One who recovers nominal damages is not a prevailing party. <u>Farrar v. Hobby</u>, 506 U.S. 103, 114 (1992). The Court reasoned that the most critical factor in determining the reasonableness of a fee award is the degree of success obtained. <u>Id.</u> at 114 (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 436 (1983)). Also, see <u>Marek v. Chesny</u>, 473 U.S. 1 (1985), for a discussion of the interplay between 42 U.S.C. § 1988 and the offer of judgment provision contained in Fed.R.Civ.P 68.

are entitled to recover attorneys' fees unless special circumstances would render such an award unjust, while a prevailing defendant may be awarded attorneys' fees only "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." <u>The different standards derive from 42 U.S.C. § 1988's generally pro-plaintiff and pro-civil rights orientation and protects the defendant only from groundless litigation.</u>

7.   Federal Rule of Civil Procedure 11provides that a district court may sanction attorneys or parties who submit pleadings for an improper purpose or that contain frivolous arguments or arguments that have no evidentiary support. Defendant Wilson knows the following are such pleadings by Plaintiffs and their respective Attorneys of Record.

 (a) FIRST CAUSE OF ACTION:
MALICIOUS PROSECUTION AND SEIZURE IN VIOLATION OF 42 U.S.C. § 1983
(Against Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI in their individual capacities)

¶ 330 – 337 are frivolous, have no evidentiary support, and are intended to harass, intimidate, and harm the character and reputation of Defendant Wilson bringing emotional distress, loss of employment, income, retirement, family and future

20

employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was at no time involved in any meetings, conversations, or any interaction between Nifong, Gottlieb, Hinman, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that Defendant Wilson did not become involved in this case until after the indictments and arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant Wilson was a civilian investigator as provided in the NC Statues and had no power of arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and prosecution of the Plaintiffs. Plaintiffs and their Attorneys were just unfounded and they were just throwing them up to see how many would stick. That is a clear violation of Rule 11. Defendant Wilson argues to the court that the purpose of bringing these frivolous actions were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove allegations that they knew they could not prove. Defendant Wilson was forced to represent himself *pro se* to defend these frivolous accusations.

(b) SECOND CAUSE OF ACTION:
CONCEALMENT OF EVIDENCE IN VIOLATION OF 42 U.S.C. § 1983
(Against Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI
in their individual capacities)

¶ 338-349 are frivolous, have no evidentiary support, and are intended to harass, intimidate, and harm the character and reputation of Defendant Wilson bringing emotional distress, loss of employment, income, retirement, family and future employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was at no time involved in any meetings, conversations, or any interaction between Nifong, Gottlieb, Hinman, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that

Defendant Wilson did not become involved in this case until after the indictments and arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant Wilson was a civilian investigator as provided in the NC Statues and had no power of arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and prosecution of the Plaintiffs. Plaintiffs and their Attorneys were just unfounded and they were just throwing them up to see how many would stick. That is a clear violation of Rule 11. Defendant Wilson argues to the court that the purpose of bringing these frivolous actions were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove allegations that they knew they could not prove. Defendant Wilson was forced to represent himself *pro se* to defend these frivolous accusations.

(c) THIRD CAUSE OF ACTION:
FABRICATION OF FALSE EVIDENCE IN VIOLATION OF 42 U.S.C. § 1983
(Against Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI in their individual capacities)

¶ 350-353, 355-358 are frivolous, have no evidentiary support, and are intended to harass, intimidate, and harm the character and reputation of Defendant Wilson bringing emotional distress, loss of employment, income, retirement, family and future employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was at no time involved in any meetings, conversations, or any interaction between Nifong, Gottlieb, Himan, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that Defendant Wilson did not become involved in this case until after the indictments and arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant Wilson was a civilian investigator as provided in the NC Statues and had no power of

arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or

prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and

prosecution of the Plaintiffs. Plaintiffs and their Attorneys were unfounded and they were

just throwing them up to see how many would stick. That is a clear violation of Rule 11.

Defendant Wilson argues to the court that the purpose of bringing these frivolous actions

were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove

allegations that they knew they could not prove. Defendant Wilson was forced to

represent himself *pro se* to defend these frivolous accusations.

(d) SEVENTH CAUSE OF ACTION:
CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983

(Against Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, the Supervisory
Defendants, and DSI in their individual capacities; and the City of Durham based on the
actions of City employees and agents in their official capacities)

¶ 437-444 are frivolous, have no evidentiary support, and are intended to harass,

intimidate, and harm the character and reputation of Defendant Wilson bringing

emotional distress, loss of employment, income, retirement, family and future

employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was

at no time involved in any meetings, conversations, or any interaction between Nifong,

Gottlieb, Himan, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that

Defendant Wilson did not become involved in this case until after the indictments and

arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant

Wilson was a civilian investigator as provided in the NC Statues and had no power of

arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or

prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and

prosecution of the Plaintiffs. Plaintiffs and their Attorneys were unfounded and they were just throwing them up to see how many would stick. That is a clear violation of Rule 11. Defendant Wilson argues to the court that the purpose of bringing these frivolous actions were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove allegations that they knew they could not prove. Defendant Wilson was forced to represent himself *pro se* to defend these frivolous accusations.

¶ 440 (f)(g) talks about Defendant Wilson's infamous interview of Crystal Mangum on December 21, 2006. The Plaintiffs and their Attorneys just plain didn't want to believe the truth. They assumed Defendant Wilson went there with the intentions of getting Ms. Mangum to change her story so it would fit the timeline better and somehow help with the upcoming photo lineup hearing coming up sometime in the future, which Defendant Wilson knew nothing about. Defendant Wilson wrote a report of what took place on December 21, 2006, yet the Plaintiffs and their brilliant attorneys wanted to make it fit their version of why Defendant Wilson went. Everyone knew that Defendant Wilson went there to tell Crystal Mangum that Mike Nifong was turning the case over to the Attorney General's office and that she needed to make sure that she wanted to proceed with the prosecutions. It was this interview, by Defendant Wilson, that got the rape charges dropped. What, no credit for getting to the truth? "We all know when you assume, you are making an ass out of you, not me." So where is the conspiracy here other than frivolous accusations by the Plaintiffs and their Attorneys with the main intent to defame Defendant Wilson's character and reputation, to harass him, intimidate him and do anything they could to damage his credibility should he ever have to testify in this case. The Plaintiffs in this case were simply trying to do to the defendants what Plaintiffs

were claiming the Defendants had done to them. **Oh let's throw it up on the ceiling and see if it sticks!** Well it didn't stick, it never made it to the ceiling.

(e) EIGHTH CAUSE OF ACTION:
CONSPIRACY IN VIOLATIONOF 42 U.S.C. § 1985(2) (OBSTRUCTION OF JUSTICE)
(Against Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, the Supervisory Defendants, and DSI in their individual capacities; and the City of Durham based on the actions of City employees and agents in their official capacities)

¶ 445-452 are frivolous, have no evidentiary support, and are intended to harass, intimidate, and harm the character and reputation of Defendant Wilson bringing emotional distress, loss of employment, income, retirement, family and future employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was at no time involved in any meetings, conversations, or any interaction between Nifong, Gottlieb, Himan, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that Defendant Wilson did not become involved in this case until after the indictments and arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant Wilson was a civilian investigator as provided in the NC Statues and had no power of arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and prosecution of the Plaintiffs. Plaintiffs and their Attorneys were unfounded and they were just throwing them up to see how many would stick. That is a clear violation of Rule 11. Defendant Wilson argues to the court that the purpose of bringing these frivolous actions were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove allegations that they knew they could not prove. A fishing expedition! Defendant Wilson was forced to represent himself *pro se* to defend these frivolous accusations.

(f) NINTH CAUSE OF ACTION:
CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(2)
(WITNESS TAMPERING)
(Against Nifong, Gottlieb, Himan, Wilson, and the Supervisory Defendants in their
individual capacities; and the City of Durham based on the actions of City employees and
agents in their official capacities)

¶ 453-459 are frivolous, have no evidentiary support, and are intended to harass,

intimidate, and harm the character and reputation of Defendant Wilson bringing

emotional distress, loss of employment, income, retirement, family and future

employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was

at no time involved in any meetings, conversations, or any interaction between Nifong,

Gottlieb, Himan, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that

Defendant Wilson did not become involved in this case until after the indictments and

arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant

Wilson was a civilian investigator as provided in the NC Statues and had no power of

arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or

prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and

prosecution of the Plaintiffs. Plaintiffs and their Attorneys were unfounded and they were

just throwing them up to see how many would stick. That is a clear violation of Rule 11.

Defendant Wilson argues to the court that the purpose of bringing these frivolous actions

were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove

allegations that they knew they could not prove. Defendant Wilson was forced to

represent himself *pro se* to defend these frivolous accusations. These Plaintiffs and

Attorneys have not alleged any specific action, that Defendant Wilson, did that was in

anyway a conspiracy. All they have done is lump everyone, with the exception of then

26

President Bush, together and called it a conspiracy. When the Attorneys on behalf of the

Plaintiffs investigated the claims brought in the causes of actions, where are the specifics

or proof of their sincere investigation to verify, as they are required to do, all these

allegations in all these Causes of Actions? There is a lot of speculation and "I sure hope

this is true" in the lawsuit, but not one shred of evidence. They brought these charges for

the notoriety and have drawn them out for eight years now. I hope they got paid well.

(g) TENTH CAUSE OF ACTION:
CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985(3)
(Against Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, the Supervisory
Defendants, and DSI in their individual capacities; and the City of Durham based on the
actions of City employees and agents in their official capacities)

¶ 460-467 are frivolous, have no evidentiary support, and are intended to harass,

intimidate, and harm the character and reputation of Defendant Wilson bringing

emotional distress, loss of employment, income, retirement, family and future

employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was

at no time involved in any meetings, conversations, or any interaction between Nifong,

Gottlieb, Himan, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that

Defendant Wilson did not become involved in this case until after the indictments and

arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant

Wilson was a civilian investigator as provided in the NC Statues and had no power of

arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or

prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and

prosecution of the Plaintiffs. Plaintiffs and their Attorneys were unfounded and they were

just throwing them up to see how many would stick. That is a clear violation of Rule 11.

Defendant Wilson argues to the court that the purpose of bringing these frivolous actions

were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove allegations that they knew they could not prove. Defendant Wilson was forced to represent himself *pro se* to defend these frivolous accusations. These Plaintiffs and Attorneys have not alleged any specific action that Defendant Wilson did that was in anyway a conspiracy. All they have done is lump everyone, with the exception of then President Bush, together and called it a conspiracy. When the Attorneys on behalf of the Plaintiffs investigated the claims brought in the causes of actions, where are the specifics or proof of their sincere investigation to verify, as they are required to do, all these allegations in all these Causes of Actions? There is a lot of speculation and "I sure hope this is true" in the lawsuit, but not one shred of evidence.

(h) THIRTEENTH CAUSE OF ACTION:
MALICIOUS PROSECUTION AND CONSPIRACY
(Against Nifong, Addison, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI in their individual capacities; and the City of Durham based on the actions of City employees and agents in their official capacities)

¶486-497 It is all the same over and over without any specific allegations of proof. Defendant Wilson argues these are frivolous, have no evidentiary support, and are intended to harass, intimidate, and harm the character and reputation of Defendant Wilson bringing emotional distress, loss of employment, income, retirement, family and future employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was at no time involved in any meetings, conversations, or any interaction between Nifong, Gottlieb, Himan, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that Defendant Wilson did not become involved in this case until after the indictments and arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant Wilson was a civilian investigator as provided in the NC Statues and had

no power of arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and prosecution of the Plaintiffs. Plaintiffs and their Attorneys were unfounded and they were just throwing them up to see how many would stick. That is a clear violation of Rule 11. Defendant Wilson argues to the court that the purpose of bringing these frivolous actions were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove allegations that they knew they could not prove. Defendant Wilson was forced to represent himself *pro se* to defend these frivolous accusations. These Plaintiffs and Attorneys have not alleged any specific action that Defendant Wilson did that was in anyway a conspiracy. All they have done is lump everyone, with the exception of then President Bush, together and called it a conspiracy. When the Attorneys on behalf of the Plaintiffs investigated the claims brought in the causes of actions, where are the specifics or proof of their "sincere investigation" to verify, as they are required to do, in all these allegations in all these Causes of Actions? There is a lot of speculation and "I sure hope this is true" in the lawsuit, but not one shred of evidence.

(i)     FOURTEENTH CAUSE OF ACTION:
OBSTRUCTION OF JUSTICE AND CONSPIRACY
(Against Nifong, Clark, Gottlieb, Himan, Meehan, Wilson, and DSI in their individual capacities; and the City of Durham based on the actions of City employees and agents in their official capacities)

¶ 498-507 Another "I sure hope this sticks cause we ain't got no evidence to support it" These paragraphs, just like all the rest of them, say the same thing except the changing of a word. Still frivolous, have no evidentiary support, and are intended to harass, intimidate, and harm the character and reputation of Defendant Wilson bringing emotional distress, loss of employment, income, retirement, family and future

29

employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was at no time involved in any meetings, conversations, or any interaction between Nifong, Gottlieb, Himan, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that Defendant Wilson did not become involved in this case until after the indictments and arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant Wilson was a civilian investigator as provided in the NC Statues and had no power of arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and prosecution of the Plaintiffs. Plaintiffs and their Attorneys were unfounded and they were just throwing them up to see how many would stick. That is a clear violation of Rule 11. Defendant Wilson argues to the court that the purpose of bringing these frivolous actions were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove allegations that they knew they could not prove. Defendant Wilson was forced to represent himself *pro se* to defend these frivolous accusations. These Plaintiffs and Attorneys have not alleged any specific action that Defendant Wilson did that was in anyway a conspiracy. All they have done is lump everyone, with the exception of then President Bush, together and called it a conspiracy. When the Attorneys on behalf of the Plaintiffs investigated the claims brought in the causes of actions, where are the specifics or proof of their "sincere investigation" to verify, as they are required to do, in all these allegations in all these Causes of Actions? There is a lot of speculation and "I sure hope this is true" in the lawsuit, but not one shred of evidence.

(j) FIFTEENTH CAUSE OF ACTION:
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND CONSPIRACY
(Against Nifong, Addison, Clark, Gottlieb, Himan, Hodge, Meehan, Wilson, and DSI in

their individual capacities; and the City of Durham based on the actions of City employees and agents in their official capacities)

¶508-517 Plaintiffs just changed the words to Intentional Infliction of emotion distress and conspiracy. These paragraphs, just like all the rest of them, say the same thing except the changing of a word. Still frivolous, have no evidentiary support, and are intended to harass, intimidate, and harm the character and reputation of Defendant Wilson bringing emotional distress, loss of employment, income, retirement, family and future employment possibilities. Plaintiffs and their Attorneys knew that Defendant Wilson was at no time involved in any meetings, conversations, or any interaction between Nifong, Gottlieb, Himan, Meehan, and DSI. Plaintiffs and their Attorneys are fully aware that Defendant Wilson did not become involved in this case until after the indictments and arrests of the Plaintiffs. . Plaintiffs and their Attorneys are fully aware that Defendant Wilson was a civilian investigator as provided in the NC Statues and had no power of arrest, no prosecutorial authority and in no way could Defendant Wilson have arrested or prosecuted Plaintiffs, nor could he have prevented the indictments, arrests, and prosecution of the Plaintiffs. Plaintiffs and their Attorneys were unfounded and they were just throwing them up to see how many would stick. That is a clear violation of Rule 11. Defendant Wilson argues to the court that the purpose of bringing these frivolous actions were in hopes, since Wilson was *pro se,* he would roll over and help Plaintiffs prove allegations that they knew they could not prove. Defendant Wilson was forced to represent himself *pro se* to defend these frivolous accusations. These Plaintiffs and Attorneys have not alleged any specific action that Defendant Wilson did that was in anyway a conspiracy. All they have done is lump everyone, with the exception of then

31

President Bush, together and called it a conspiracy. When the Attorneys on behalf of the Plaintiffs investigated the claims brought in the causes of actions, where are the specifics or proof of their "sincere investigation" to verify, as they are required to do, in all these allegations in all these Causes of Actions? There is a lot of speculation and "I sure hope this is true" in the lawsuit, but not one shred of evidence.

On page 28 of the USCA Opinion the court states:

For these reasons, we cannot agree that the officers' reliance on the nurse's corroborating statements constituted a deliberate falsehood under *Franks*. Rather, only the four misstatements actually pled in the McFadyen plaintiffs' complaint (three of which are also pled in the Carrington plaintiffs' complaint) satisfy the first *Franks* prong.[7]

b.

In addition, the McFadyen plaintiffs allege that Officers Gottlieb and Himan's *omission* from the NTO affidavits of the fact that in the first photo array Mangum "ruled out as plausible suspects" several team members also satisfies the first *Franks* prong. We disagree. Affiants are not required to include every piece of exculpatory information in affidavits. *See, e.g.*, *Simmons v. Poe*, 47 F.3d 1370, 1384 (4th Cir. 1995) (finding affiant's omission of facts inconsistent with a suspect's guilt from an affidavit "was not an attempt to mislead the magistrate" under *Franks*); *United States v. Colkley*, 899 F.2d 297, 299-301 (4th Cir. 1990) (holding affiant's omission of the fact that six eyewitnesses failed to identify a criminal suspect in a photo array did not satisfy the first *Franks* prong absent evidence that the affiant possessed "the requisite intent to mislead").

---

[7]On appeal, plaintiffs insist that we look to their complaints as a whole to determine whether Officers Gottlieb and Himan alleged numerous other assertedly false statements in the NTO

As in *Simmons* and *Colkley*, nothing in the omission alleged by the McFadyen plaintiffs plausibly suggests an intent to deceive or recklessness, and thus the asserted omission does not satisfy the first *Franks* prong.

## C.

Plaintiff Ryan McFadyen individually alleges a § 1983 claim against Officers Gottlieb and Himan for the assertedly unlawful search and seizure of his apartment and car pursuant to a search warrant.[8] McFadyen alleges that the officers made material false statements and omissions in the search warrant application. The district court denied the officers' motions to dismiss this claim, relying on its reasoning with respect to the NTO claims. Because McFadyen alleges that Officers Gottlieb and Himan made false statements or omissions material to the issuance of the search warrant, we again analyze the claim under *Franks*.

### 1.

The affidavit supporting the search warrant mirrors those supporting the NTO with the following two additions. First, the officers added that during the party "[t]he players . . . used numbers when calling for one and another across the room[,] again to hide their identities." Second, the officers added the contents of the email McFadyen sent to his teammates and the assertion by Officer Gottlieb that he received the email from a confidential source. McFadyen contends that both of these statements, like the four statements discussed above in the NTO affidavits, constitute knowing false statements under the first *Franks* prong. We agree with respect to the

---

affidavits. We reject plaintiffs' suggestion that defendants—and courts—should scour several-hundred page complaints to discover which affidavit statements plaintiffs allege are fabricated or misleading. A complaint must specify the facts plaintiffs allege defendants falsified or omitted. Contrary to plaintiffs' arguments, general allegations that "every material fact" in the affidavits was fabricated do not suffice. *See Franks*, 438 U.S. at 171 ("[Plaintiffs] should point out specifically the portion of the warrant affidavit that is claimed to be false.").

[8]To the extent that McFadyen's co-plaintiffs, Matthew Wilson and Breck Archer, also attempt to bring this claim, we hold that they lack standing to do so. *See United States v. Gray*, 491 F.3d 138, 144 (4th Cir.2007)

33

first statement, as the record lends it no support. But we disagree as to the second statement, which contains the email. McFadyen argues that, because the affidavit indicates that the email was provided by a "confidential source," but does not articulate any facts relating to the reliability of the source, we must strike the email from the affidavit before addressing *Franks*' materiality prong. Assuming, without deciding, that this would be the appropriate manner to handle such admittedly truthful, yet perhaps inadequately verified, information under *Franks*, we nonetheless find McFadyen's argument meritless. *Florida v. J.L.*, 529 U.S. 266 (2000), on which McFadyen heavily relies, in fact provides him little support. *J.L.* holds that police officers must offer evidence other than an anonymous tip to support a *Terry* stop-and-frisk. *Id.* at 268. In this case, the the email itself supplies evidence in addition to the anonymous tip. For the email sent from McFadyen's Duke email account and signed with his jersey number contains sufficient indicia of reliability to support its inclusion in the search warrant application. *See United States v. Perkins*, 363 F.3d 317, 325 (4th Cir. 2004) ("The central point in those [anonymous tip] cases is that courts must ensure, one way or the other, that an anonymous informant's tip was sufficiently reliable."). Accordingly, we do not strike McFadyen's email from the warrant affidavit.

One could go on forever about the frivolous, unreasonable, without foundation, vexatious and groundless lawsuits brought by the Plaintiffs and quote all the findings by Fourth Circuit Court of Appeals, however I would ask the court to view those. Especially the opinion of Circuit Judge Wilkinson.

WILKINSON, Circuit Judge, concurring:

I concur fully in Judge Motz's fine opinion. It demonstrates well the **central flaws** in the plaintiffs' contentions. A few additional observations may underscore the **overblown**

**nature** of this case. **Plaintiffs have sought to raise every experimental claim and to corral every conceivable defendant**. The result is **a case on the far limbs of law** and one destined, **were it to succeed in whole, to spread damage in all directions**.

I.

Although I appreciate the able and well-intentioned efforts of the attorneys in this matter, there is something **disquieting** about the **sweeping scope and number of claims brought by the various plaintiff groups (twenty-three counts in the *Evans* complaint, thirty-two in *Carrington*, and forty in *McFadyen*)**, as well as the glacial pace at which this litigation has proceeded (we are now nearly six years removed from the dismissal of the last charges against the three Duke lacrosse players). With all of these **overwrought claims** disputed over years of complex litigation, **this matter has taken on an unfortunate life of its own**. A few examples of the pitfalls in plaintiffs' most **inventive** claims illustrate my concerns with allowing them to proceed.

A.

To take one example, the complaints lodge a Fourteenth Amendment "due process stigma-plus" claim against Corporal David Addison, the Durham Police spokesman. In seeking to hold Addison liable for allegedly defamatory statements, the complaints fly in the face of the Supreme Court's admonition that the Due Process Clause is not to be converted into "a font of tort law to be superimposed upon whatever systems may already be administered by the states." *Paul v. Davis*, 424 U.S. 693, 701 (1976). Yet plaintiffs seek that result and then some, attempting to hold a police spokesman liable for general statements that reference no individual and are therefore not even actionable under traditional defamation law. *See* Restatement (Second) of Torts § 564A (1977) ("One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if, (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or (b) the circumstances of

publication reasonably give rise to the conclusion that there is particular reference to the member.").

Moreover, the plaintiffs' position would expose spokespersons (who are often given limited information by their superiors on a need-to-know basis) to the threat of monetary damages for expressing a departmental position in the most general of terms. Think of the implications of such a rule for public spokespersons of all sorts, from the press secretary for the Department of State to the spokesperson for a local school board. The threat posed by litigation of this kind would cause such officials to clam up, and the criminal justice system—not to mention government generally—would become less transparent than it already is. The plaintiffs' "stigma-plus" claim against Addison suffers from another shortcoming. Even if Addison's general statements could somehow be considered defamatory with respect to the various individual plaintiffs, the complaints fail to plausibly allege that any of his statements *caused* the indictments of Evans, Finnerty, and Seligmann, much less the issuance of the NTO or McFadyen search warrant. *See Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) ("[F]or a liberty interest to have been implicated, some damage to [plaintiff's] employment status must have *resulted from* publication of the reasons for his demotion." (emphasis added)); *see also Rehberg v. Paulk*, 611 F.3d 828, 853 (11th Cir. 2010) (dismissing a stigma-plus claim where the complaint did not allege that the defendant's media statements "caused" the plaintiff's indictments and arrest), *aff'd on other grounds*, 132 S. Ct. 1497 (2012).

Indeed, it is difficult to imagine how the public statements of a spokesperson about the status of a rape investigation could be causally related to a police investigator's decision to seek evidence or a prosecutor's decision to pursue an indictment. The *Evans* plaintiffs argue that a causal connection may be inferred from their allegation that Addison's statements were "intended to inflame the Durham community and grand jury pool against the plaintiffs." But such an intent, even if taken as true, is far too removed from the prosecutor's decision to indict and the

investigators' decision to seek the NTO to justify imposition of monetary liability on the basis of a defamation claim that is dubious enough under common law and that the Supreme Court was deeply reluctant to constitutionalize in the first place.

B.

A second example of the complaints' overreach lies not so much in the nature of the claims as in the identity of the defendants. The plaintiffs have sued not just the police investigators, but also a number of Durham city officials such as the City Manager, Chief of Police, and various members of the police chain of command. Plaintiffs seek monetary damages from these so-called "supervisory defendants" under a theory of supervisory liability. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), however, the Supreme Court issued several cautionary holdings with respect to such liability—lessons that plaintiffs have utterly failed to heed. To begin with, the Supreme Court explained in *Iqbal* that "a supervisor's mere knowledge" that his subordinates are engaged in unconstitutional conduct is insufficient to give rise to liability; instead, a supervisor can be held liable only for "his or her own misconduct." *Id.* at 677. Yet the complaints in this case repeatedly allege that the so-called supervisory defendants violated plaintiffs' constitutional rights on the theory that they "knew or should have known" about their subordinates' conduct. This directly contradicts *Iqbal*'s holding that such allegations, standing alone, cannot give rise to supervisory liability.

Moreover, the *Iqbal* Court explained that in order to state a claim for supervisory liability, "a plaintiff must plead that *each* [supervisory] defendant, through the official's *own individual actions*, has violated the Constitution." *Id.* at 676 (emphases added); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1250, 1252-53 (10th Cir. 2008) (dismissing supervisory liability claim where complaint failed to "isolate the allegedly unconstitutional acts of each defendant"). **<u>The plaintiffs here, however, have roped in a number of Durham city officials without pleading any allegedly improper *individual* actions.</u>**

37

For example, apart from general references to name, rank, and place in the chain of command, the *Evans* complaint does not contain so much as a single individualized allegation against named defendants Beverly Council and Lee Russ. The *Carrington* complaint likewise fails to make particularized allegations against Council, Russ, and Michael Ripberger. The absence of individualized allegations is all the more remarkable in light of the otherwise exhaustive nature of the complaints: combined, the three complaints weigh in at a staggering eight hundred-plus pages.

The plaintiffs argue that the absence of specific allegations with respect to each individual supervisor is of no consequence given that they have used the term "supervisory defendants" as shorthand to allege the collective actions and state of mind for all of the named supervisors. Requiring repetition of the names of specific defendants within the context of each factual allegation, we are told, would be "pointless and inefficient." This contention sorely misses the mark. The purpose of requiring a plaintiff to identify how "*each* [supervisory] defendant, through the official's *own individual actions*, has violated the Constitution," *Iqbal*, 556 U.S. at 676 (emphases added), is not to erect some formalistic rule that a complaint must mention each defendant by name some particular number of times. The requirement is instead designed to ensure that the serious burdens of defending against this sort of lawsuit are visited upon a departmental supervisor only when the complaint "plausibly suggest[s]" that the supervisor engaged in "his or her *own* misconduct." *Id.* at 681, 677 (emphasis added).

**That showing is demonstrably absent here**. In addition to **the complaints' failure to identify specific misconduct on the part of certain individual defendants, there are numerous problems with the individualized allegations that are actually made**. For instance, both the *Carrington* and *McFadyen* complaints discuss at length a meeting occurring on or around March 29, 2006, allegedly attended by specific supervisory defendants (Patrick Baker and Steven Chalmers in the *Carrington* complaint; Baker, Russ, and Ronald Hodge in the *McFadyen*

38

complaint) where the prosecutor and investigators allegedly agreed or were instructed to expedite the case against the Duke players despite mounting evidence of their innocence. But that meeting has no logical relevance to the supposed Fourth Amendment violations of which these plaintiffs complain because it occurred days *after* the preparation of the allegedly false NTO and McFadyen search warrant applications. In other words, to use the language of *Iqbal*, the plaintiffs' allegations regarding this meeting do not "plausibly give rise to an entitlement to relief." *Id.* at 679.

At bottom, then, the problem with the supervisory liability claims here is that, like those at issue in *Iqbal*, **they fail to cross "the line from conceivable to plausible**." *Id.* at 680. As in *Iqbal*, the plaintiffs' allegations here *could* be "consistent with" a scenario in which the supervisory officials somehow participated in their subordinates' allegedly unconstitutional conduct. *Id.* at 678. But the "obvious alternative explanation," *id.* at 682, for the supervisors' conduct in assigning the case to certain investigators and attending meetings where the case was discussed is that they wanted to facilitate the investigation, stay abreast of recent developments, and bring the case to closure on a reasonable timeline. That, after all, is their job.

In short, **the complaints here are wholly indiscriminate**. **They seek to sweep in everyone and everything, heedless of any actual indications of individual malfeasance that would justify the personal burdens that litigation can impose.** What *Iqbal* condemned, the complaints assay. **What is more, the complaints' sweeping allegations mirror the sweeping nature of the wrongs of which plaintiffs complain. It is, of course, the purpose of civil litigation to rectify, but not in a manner that duplicates the very evils that prompted plaintiffs to file suit.**

C.

**The damage that the plaintiffs' theory of the case would inflict upon the criminal justice system is evident in a related sense as well**. The plaintiffs seek to hold the investigating officers and their supervisors liable by repeatedly asserting notions of conspiracy, suggesting that

39

the defendants colluded to investigate and prosecute the Duke players despite the evidence of their innocence. The upshot of such a theory, however, would be that whenever police officers, their superiors, and prosecutors communicate regarding an investigation into certain suspects, that very act of communication would expose them to a risk of monetary liability should the suspects ultimately be exonerated. The plaintiffs' theory of conspiracy, in other words, would inhibit the exchange of information among police and prosecutors that takes place every day. Thus, I could not agree more with Judge Motz's statement that to allow § 1983 claims "to proceed on allegations of such a 'conspiracy' would in virtually every case render the officers' qualified immunity from suit 'effectively lost' and make discovery the rule, rather than the exception." *Ante* at 24. The improvidence of subjecting law enforcement officers to such wide-ranging liability is supported by Supreme Court precedent in the analogous context of intra-enterprise antitrust conspiracy doctrine. As with the present case, that doctrine involves civil damages actions against related parties (for instance, a parent corporation and its wholly owned subsidiary) on the theory that wrongful conduct may be inferred from their intra-organizational communications. In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984), however, the Court held that such parties cannot be held liable for "conspiring with each other" under Section 1of the Sherman Act, 15 U.S.C. § 1. The Court recognized that coordination among various actors within a company is often "necessary if a business enterprise is to [operate] effectively," but that such coordination might be discouraged if intraenterprise conspiracy liability were permitted. *Id.* at 769-71.

That same concern animates our decision here. Moreover, *Copperweld* noted that "[c]oordination within a firm" is frequently the hallmark of a business's commonplace desire to increase its effectiveness, and not necessarily a sign of some "effort to stifle competition." *Id.* at 769. That caution rings true here as well, where the mere fact that public officials meet to discuss a high-

profile criminal case is far more often indicative of a desire to foster communication and cooperation **than an insidious conspiracy to violate the Constitution**.

### D.

**A final example of the overreach infecting this case** lies in the *Carrington* and *McFadyen* plaintiffs' attempts under *Franks v. Delaware*, 438 U.S. 154 (1978), to hold officers monetarily liable for seeking from the state courts a nontestimonial order and a search warrant for standard investigatory purposes.

Plaintiff McFadyen's *Franks* challenge to the search warrant for his room and car in connection **with his utterly tasteless—indeed, ominous—e-mail stands on the shakiest of grounds.** The potential for inflicting tremendous damage to the criminal justice system by punishing officers for pursuing a court-ordered NTO would be compounded by penalizing them for attempting to investigate what initially (and understandably) appeared to be an entirely credible threat to perpetrate a gruesome murder. To hold policemen liable for damages for a search even when they request and possess a warrant, even when they have uncovered an e-mail explicitly vowing to kill certain people out of apparent contempt for their class, and even where that e-mail identifies the exact location of the slaying would be outrageous.

**The argument offered in the *McFadyen* complaint—that the investigators should have somehow realized that the e-mail was meant to be a joke or parody—is a theory that could succeed only in Never Never Land, a theory that takes no account of the real and brutal rampages by disturbed individuals on college campuses and elsewhere in recent years.** As it turned out, the e-mail was a highly vulgarized expression of fancy. But we cannot ascribe instant clairvoyance to those charged with protecting the community—and who must be simultaneously encouraged to seek judicial sanction in doing so.

It cannot be emphasized too often that the plaintiffs in this case were innocent of any criminal wrongdoing. Their behavior in many instances was boorish, but it was in no way illegal

41

based on any evidence before us. **The problem is that the immunities and rules of pleading at issue here exist to protect the larger good of discretionary judgment in the service of public purposes—and to prevent defendant officials who are innocent of any wrongdoing from being swept up by baseless accusations in unrestrained complaints. The infirmities of the pleadings portended what was sure to become an extended fishing expedition, the broader implications of which could hardly be confined to these particular actions.**

**Hard cases can and do make bad law, and the costs of these ones—outside of the limited claim we have allowed to proceed—are much too steep**. The plaintiffs seek to thrust the prospect of monetary liability and burdensome discovery into every meeting between supervisor and subordinate within a police department, every internal communication between police officer and prosecutor, every statement by a police spokesperson, and every effort to invoke judicial process in furtherance of a police investigation**. Allowing these claims to proceed would let litigation loose in such a fashion as to impair the ability of the criminal justice system to do its job.**

**In sum, we run the risk here of replicating in civil litigation the very maladies that plaintiffs complain infected the criminal process to which they were subjected. That is to say, individuals would be pulled into the coercive proceedings of courts when they have no business being there. To prolong the overextension of legal process that has been attempted here would portend a sorry end to a sorry saga.**

Defendant Wilson believes Judge Wilkinson just plain told it like it was. It is clear from his opinion that these are baseless claims against all defendants. Judge Gregory's opinion states the Plaintiffs were wrong on all issues including the state common law claims. Rule 11; Sanctions is the only way to stop this kind of frivolous, unreasonable, without foundation, vexatious and groundless complaints.

## CONCLUSION

For all the foregoing reasons this case needs to be stopped right now, in it's tracks. It is going nowhere despite the March 14, 2014 Status Conference held by your Honor. I don't need to go into those minutes as your Honor is familiar with his own order. I cannot speak for the other defendants in this case, however it appears to me that instead of moving ahead in a manner to settle this case, we are moving backwards. I don't know about the other defendants nor do I insinuate that I am speaking for anyone other than myself. There has been absolutely no real movement towards settling this action. Instead it seems that in the Macfayden, et al case 1:07cv953 the Plaintiffs' Attorney was filing motions before I even got back to Durham. Red lining, what's with that? Nothing has changed. It would seem that Plaintiffs' Attorney in Macfayden, is prolonging this case so he can retire off it. In all due respect, I'm sure he can find other Duke Students to represent.

**In ALL due respect to the Court, the Law, and your Honor,** if the court cannot see what's going on in this case then it's blind. Judge Beaty I truly believe it is time for you to put a stop to this kind of actions by attorney's who know better. What better way to sanction them than hit their pocketbooks. To allow this to continue is a Malfeasance of justice.

## PRAYER FOR RELIEF

**NOW COMES** Defendant Linwood Wilson, pursuant to Rule 11 of the FRCP, to ask your Honor, on his own initiative as provided by law, to issue an order for Show Cause as why sanctions against Plaintiffs and Plaintiffs' Attorneys and law firms for violation of Rule 11 as stated in this Motion for Rule 11; Sanctions should not be granted. Defendant Wilson believes the appropriate relief for him in order to stop this kind of action in future filings be as follows:

1. Find that the Plaintiffs, by and through their Attorneys, violated FRCP Rule 11 by filing frivolous, unreasonable, without foundation, vexatious and groundless complaints against Defendant Wilson; and

2. Find that the Attorneys of Record, and their law Firms, for the Plaintiffs violated FRCP Rule 11 by filing frivolous, unreasonable, without foundation, vexatious and groundless complaints against Defendant Wilson; and

3. Award Attorney Fees for Pro Se Defendant Wilson pursuant to Rule 11; Sanctions, as stated herein above, in the reasonable amount of Three Million Dollars ($3,000,000.00); and

4. Any other relief the court deems fit.

Respectfully Submitted this the 27th day of March, 2014.


By:/s/Linwood E. Wilson
Linwood E. Wilson, *Pro Se*
6910 Innesbrook Way
Bahama, NC 27503

<u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>

The undersigned hereby certifies that, pursuant to Rule 5 of the Federal Rules of Civil Procedure and LR5.3 and LR5.4, MDNC, the foregoing pleading, motion, affidavit, notice, or other document/paper has been electronically filed with the Clerk of Court using the CM/ECF system, which system will automatically generate and send a Notice of Electronic Filing (NEF) to the undersigned filing user and registered users of record, and that the Court's electronic records show that each party to this action is represented by at least one registered user of record (or that the party is a registered user of record), to each of whom the NEF will be transmitted.

This the 27th day of March, 2014.

By: <u>/s/ Linwood E. Wilson</u>
Linwood E. Wilson, *Pro Se*
6910 Innesbrook Way
Bahama, NC 27503